ECF

ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
NOV - 6 2003
U.S. COURT OF
FEDERAL CLAIMS

| | |
|---|---|
| AXION CORPORATION, | ) |
| Plaintiff, | ) |
| v. | ) |
| THE UNITED STATES, | ) |
| Defendant. | ) |

No. 03-2644C

## COMPLAINT

Plaintiff Axion Corporation ("Axion") brings this civil action for relief from a final decision of a Navy Contract Officer terminating contract N00106-96-C-KA09 ("Navy Contract")(Exhibit 1) for default.

## JURISDICTION

1. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1491(a). Plaintiff brings this action pursuant to the Contract Disputes Act of 1978, 41 U.S.C. § 601, et seq.

## THE PARTIES

2. Plaintiff Axion is a small business incorporated under the laws of the State of Alabama. For nineteen years, Axion has been in the business of manufacturing component parts for the United States Government based on

competitively awarded fixed-price contracts. Axion's principal office and principal place of business is in Huntsville, Alabama.

3. Defendant is the United States of America ("United States" or "Government"), acting by and through the Department of the Navy ("Navy"), and its officers, employees, and agents.

## PROCEDURAL HISTORY

4. On or about November 12, 2002, a Navy Contracting Officer issued Modification No. P00021 terminating the Navy Contract for default. (Exhibit 2).

5. Axion initially appealed to the Armed Services Board of Contract Appeals (ASBCA No. 54125). The Government moved to dismiss for lack of jurisdiction for failure to appeal within 90 days of receipt of contracting officer's final decision. Axion joined the Government's motion, and on June 17, 2003, the ASBCA dismissed Axion's ASBCA appeal "without prejudice to the contractor's right to bring an action directly in the United States Court of Federal Claims." (Order of Dismissal, ASBCA No. 54125, dated June 17, 2003, Exhibit 3).

## BACKGROUND

6. The PS-115 power supply is a dormant battery located in a munition that is fired from a large bore weapon such as an artillery piece

7. A PS-115 power supply becomes active when a projectile containing a PS-115 is fired from an artillery piece or a mortar. The acceleration produces as much as 25,000 Gs of force. This force causes cutters within the PS-115 to penetrate and cut a diaphragm. Electrolyte (acid) passes through the penetrated

diaphragm and permeates the cells. The resulting chemical reaction must generate 23.0 volts of electrical power for 150 seconds. The resulting electrical charge causes the fuse to detonate the explosive.

8. Because the Navy discovered that several thousand PS-115s in the Navy's inventory were leaking electrolyte, the Navy had a requirement to procure PS-115s for replacements.

9. In 1995, the Navy issued a solicitation for a fixed-price production contract to acquire 55,209 PS-115 power supplies. The solicitation also contained an option quantity for an additional 55,209 units.

10. The United States had been acquiring PS-115 power supplies for over two decades. However, prior to 1995, the Navy relied on the Army to acquire PS-115s.

11. The solicitation issued in 1995 contained specifications that were primarily "level-III," "build-to-print" drawings.

12. Axion submitted the lowest price proposal. After a pre-award survey, Axion was awarded the Navy Contract (Exhibit 1) on or about December 14, 1995.

13. The PS-115 power supplies were made of parts that are mentioned and described in the Automated Data List ("ADL"), which was incorporated into the Navy Contract. (See Navy Contract, Exhibit 1).

14. Because munitions are stored for many years, a twenty-year shelf life is required for the PS-115.

15. The Navy Contract required a First Article Test ("FAT"). The Navy Contract also required Axion to provide all acceptance inspection equipment "necessary to assure conformance of components and end items to contract requirements." (Exhibit 1 at p. 97).

16. Although the Navy Contract does not specifically mention an "air gun," previous contracts for PS-115s used an air gun as the acceptance inspection equipment "necessary to assure conformance of components and end items to contract requirements." *Id.*

17. An air gun essentially uses a partial vacuum to accelerate a PS-115 in a manner that supposedly replicates the 25,000 G force of a projectile being fired from an artillery piece or a mortar.

18. Counts I through VI are grounds to convert the termination for default of the Navy Contract to termination for convenience for reasons pertaining to the air gun.

19. The Navy Contract specification required the electrolyte (acid) to be stored in a copper reservoir. Axion complied with the specification. However, when Axion followed the Navy Contract specification, after the electrolyte had been stored in the copper reservoir for several months, the electrolyte would corrode the copper reservoir. The corrosion resulted in the electrolyte leaking out of the copper reservoirs. This leakage prevented the PS-115 from having a twenty-year shelf life.

20. Counts VII through IX are grounds to convert the termination for default of the Navy contract to a termination for convenience for reasons pertaining to the electrolyte corroding the copper reservoirs.

21. The remaining Counts, X to XVI, are seven distinct reasons why the termination for default cannot withstand legal scrutiny.

## COUNT I

## (IMPOSSIBILITY/IMPRACTICABILITY - AIRGUN TEST EQUIPMENT)

22. All other allegations of the Complaint are incorporated herein by reference.

23. The solicitation issued by the Navy contained the following background information on previous acquisitions of PS-115s by the United States:

| CONTRACTOR | AWARD DATE | QUANTITY | UNIT PRICE |
|---|---|---|---|
| Accudyne Corp | 8/93 | 45,736 EA | $16.90 |
| Accudyne Corp | 6/92 | 30,000 EA | $13.54 |

(See Exhibit 1).

24. Prior to the award of the Navy Contract, the Army Research Laboratory ("ARL") had developed an air gun that the ARL used for testing PS-115s.

25. For one or more of the contracts awarded to Accudyne Corporation, the United States provided an air gun to Accudyne Corporation to test the PS-115s.

26. In a letter dated, January 17, 1996, Axion requested the Navy to provide Axion with an air gun.

27. The Navy declined to provide Axion with an air gun.

28. Axion was told by an official at ARL that ARL would provide drawings of ARL's air gun to Axion.

29. Axion mailed a check to ARL to pay the expense of copying the drawings of the air gun.

30. ARL refused to provide the drawings of the air gun to Axion.

31. The Navy Contracting Officer was told, in a letter by Axion dated April 15, 1997:

> Axion was then informed that they [ARL] would furnish us a set of drawings of the spin gun, and Axion sent a check to cover copy costs per the requested amount for copies but then after several inquiries, we were informed that they could not furnish the drawings.

32. The Navy Contracting Officer did not assist Axion by obtaining the drawings of the air gun from ARL to provide to Axion.

33. On average, the ARL air gun could only successfully test no more than five PS-115s during an eight-hour period.

34. Because of the limited number of PS-115s that the ARL air gun could test in an eight-hour period, the ARL air gun was inadequate for the special test equipment requirements of contract N00104-96-C-DA09.

35. On average, the ARL air gun was only able to collect sufficient data to ascertain if a PS-115 met the specifications for less than fifty percent of the times the air gun was fired.

36. In a letter dated April 30, 1996, Axion informed the Navy Contracting Officer that Axion and the ARL were completing negotiations on a Cooperative Research and Development Agreement ("CRDA") to develop an air gun. Axion provided the Navy Contacting Officer with a draft of the CDRA signed by Axion.

37. ARL subsequently declined to sign the CDRA.

38. Without the CRDA, ARL declined to inform Axion of its lessons-learned in fabricating an air gun.

39. Without the CRDA, ARL declined to make its expertise on the air gun available to Axion.

40. The Navy Contracting Officer did not contact ARL to request that ARL enter into the CRDA with Axion.

41. The Navy had very little experience in the design or fabrication of an air gun to test the PS115s.

42. Axion's memorandum to the Navy dated May 30, 1997 stated: "Since Harry Diamond Labs will not perform to our previous agreement and will not furnish drawing of their Spin Gun, Axion had no other choice than to design and build our own spin gun for testing."

43. In attempting to develop the air gun without the assistance of the Government, Axion experienced extreme and unreasonable difficulty.

44. In attempting to develop the air gun without the assistance of ARL, Axion experienced extreme and unreasonable expense.

45. The allocation of risk under the Navy Contract did not place the risk on Axion that the air gun would be commercially impractical.

46. The termination for default of the Navy Contract should be converted to a termination for convenience because the development of the air gun involved extreme and unreasonable difficulty and expense, thus rendering the air gun commercially impracticable. The commercial impracticability excused the default under paragraph (g) of FAR 52.249-8.

## COUNT II

## (FAILURE TO DISCLOSE SUPERIOR KNOWLEDGE – AIRGUN)

47. All other allegations of the Complaint are incorporated herein by reference.

48. Prior to the award of the Navy Contract, the ARL had failed to fabricate an air gun that could reliably record data from the "firing" of PS-115s for more than 50% of the firings.

49. At the time of the Navy Contract award, the air gun fabricated by ARL could not, on average, successfully "fire" more than five PS-115s during an eight-hour period.

50. At the time of the Navy Contract award, Axion did not have any knowledge of the difficulties that the United States (as well as previous vendors) had experienced with air gun testing of PS-115s.

51. At the time of the Navy Contract award, the United States had not informed Axion of the difficulties that ARL (and previous vendors) had experienced with air gun testing of PS-115s.

52. The solicitation issued by the Navy makes no requirement for an air gun.

53. The specifications in the solicitation issued by the Navy for the PS-115s involved level III, build-to-print drawings.

54. There was nothing in the solicitation putting Axion on notice that it should inquire about difficulties with an air gun.

55. The solicitation's specifications misled Axion to believe that there would be no development work required to perform the Navy Contract.

56. The termination for default should be converted to a termination for convenience because the Government had superior knowledge of the difficulties in producing the air gun but failed to disclose its superior knowledge to Axion, thereby excusing the default under paragraph (g) of FAR 52.249-8.

## COUNT III

## (MISREPRESENTATION CONCERNING THE AIRGUN)

57. All other allegations of the Complaint are incorporated herein by reference.

58. The Navy's solicitation was seeking a previously manufactured, build-to-print deliverable.

59. The Navy never put Axion (or others) on notice that to perform the Navy Contract, the contractor who was awarded the Navy Contract would have to design and develop an air gun.

60. The Navy misled Axion that either an air gun would be made available which Axion could use to test the PS-115 or level three, build-to-print drawings existed that would have enabled Axion to fabricate the air gun without any developmental work.

61. The misrepresentation was material. The effort by Axion to design and develop an air gun represented more than 20% of the total base contract price of $1,313,974.20.

62. The material misrepresentation is a basis to convert the termination for default into a termination for convenience because the material misrepresentation excused the default under paragraph (g) of FAR 52.249-8.

**COUNT IV**

**(IMPLIED WARRANTY AIRGUN WAS NONDEVELOPMENTAL ITEM)**

63. All other allegations of the Complaint are incorporated herein by reference.

64. The general rule is that there is ordinarily no implied warranty that materials specified in the Navy Contract specifications will be commercially available. However, an implied warranty exists where the Government has a prior

relationship with the supplier of the unavailable material and there are no specifications for that material which the contractor can use to either make it itself or have it made.

65. ARL is an entity of the United States. The Government had prior relationship with the potential supplier of the unavailable air gun - ARL.

66. There were no specifications for the air gun that Axion could either use to either make the air gun or have the air gun made.

67. The Navy Contract contained an implied warranty that the air gun was a non-developmental item.

68. The Navy breached the implied warranty that the air gun was a non-developmental item.

69. The breach of the implied warrant is a basis to convert the termination for default into a termination for convenience because the breach of the implied warranty excused the default under paragraph (g) of FAR 52.249-8.

**COUNT V**

**(DUTY TO COOPERATE – AIRGUN)**

70. All other allegations of the Complaint are incorporated herein by reference.

71. In a letter dated January 17, 1996, Axion requested the Navy supply an air gun to perform testing on the PS-115s:

> We understand that the government has supplied two air guns as government furnished material to a previous contractor, Accudyne,

> to perform the final tests. We hereby request one unit supplied to Axion Corp for performance of final testing.

72. The United States did not provide an air gun to Axion to perform the testing.

73. In a letter dated April 15, 1997, Axion informed the Navy Contracting Officer as follows:

> Axion was then informed that they [ARL] would furnish us a set of drawings of the spin gun, and Axion sent a check to cover copy costs per the requested amount for copies but then after several inquiries, we were informed that they could not furnish the drawings.

74. The Navy Contracting Officer did not contact ARL to obtain the drawings for Axion.

75. In a letter dated April 30, 1996, Axion informed the Navy Contracting Officer that Axion and the ARL were completing negotiations on a Cooperative Research and Development Agreement ("CRDA") to develop an air gun. Axion provided the Navy Contacting Officer with a draft of the CDRA signed by Axion.

76. ARL subsequently declined to sign the CDRA.

77. Without the CRDA, the ARL would not inform Axion of its lessons-learned in fabricating an air gun.

78. Without the CRDA, the ARL would not make its expertise on the air gun available to Axion.

79. The Navy Contracting Officer did not contact ARL to request ARL enter into the CRDA with Axion.

80. The United States did not to do what was reasonably necessary to enable Axion to perform. The United States did not make an air gun available to Axion; it did not make the drawings for the air gun available to Axion; and it did not cooperate with Axion to allow Axion to learn from the mistakes of the Government in attempting to develop an air gun for testing of the PS-115s.

81. By failing to do what was reasonably necessary to enable Axion to perform, the United States violated its duty to cooperate.

82. The violation of the duty to cooperate is a basis to render the alleged default "excusable" under paragraph (g) of FAR 52.249-8 Default (Fixed-Price Supply). Pursuant to paragraph (g), the termination for default should be converted to a termination for convenience.

## COUNT VI

## (MUTUAL MISTAKE – AIRGUN)

83. Count VI is being pled in the alternative to Count V.

84. Prior to the award of contract N00104-96-C-KA09, the Navy had relied upon the Army to acquire PS-115s.

85. At the time of the Navy Contract award, the Navy was unaware that the air gun would require a significant developmental effort.

86. Axion was unaware at the time of the Navy Contract award that the air gun would require a significant developmental effort.

87. The fact that the air gun required a significant developmental effort had a material effect on the agreed exchange of performances.

88. It was a basic assumption of Contract N00104-96-C-KA09 that this fixed-price production contract would not require a significant development effort.

89. The mutual mistake of fact as to a basic assumption is a basis to render the alleged default "excusable" under paragraph (g) of FAR 52.249-8 Default (Fixed-Price Supply). Pursuant to paragraph (g), the termination for default should be converted to a termination for convenience.

## COUNT VII

## (SUPERIOR KNOWLEDGE—ELECTROLYTE CORRODING COPPER)

90. All other allegations of the Complaint are incorporated herein by reference.

91. Axion's letter to the Contracting Officer, dated August 27, 2001 stated:

> The design requires Axion to put Acid in copper cans, which is a chemical fact, the acid will eventually dislove (sic) the copper. We are experiencing this phenomenon at this time. We have over thousands of copper cans that have been filled with acid and welded and started leaking on the surface of the diaphragms. We had discussion with Mr. Carey Jackson

Quality Assurance Manager, of CP/PHIBROCHEM, the approved source of supply of the acid (34-A, Electrolyte). He states that it is a fact that this acid will eventually penetrate the copper.

92. Exhibit 4 contains a briefing given by ARL at the Proceedings from the 45th Annual Fuze Conference, 16-18 April 2001. The briefing was entitled Storage Reliability of Reserve Batteries. Slide # 7 is entitled "PS115: A Case Study." Slide # 9 of the briefing is entitled "PS115: Problems Detected." Slide #9 contains the following bullets:

- Production began in 1978
- Five years later, leakage was noted in engineering samples at HDL.
- Further investigation revealed that virtually every lot produced prior to November 1980 contained leaking batteries

93. Axion bid on the Navy Contract without any knowledge that PS-115s manufactured pursuant to the level three drawings would result in the electrolyte corroding the copper reservoir.

94. The United States was aware that Axion had no knowledge of, or reason to know of, that the electrolyte would corrode the copper reservoirs.

95. The Navy Contract specification mislead Axion to believe that if Axion followed the level III, build-to-print drawings, there would be no problem with the electrolyte leaking through the corroded copper.

96. Nothing in the specification put Axion on notice to inquire as to whether the electrolyte would corrode the copper reservoir.

97. As shown in Exhibit 4, the United States knew that the PS-115s would leak electrolyte after several months because the electrolyte would corrode the copper reservoirs.

98. At no time did the Government reveal its superior knowledge of the PS115 leaking electrolyte to Axion.

99. The termination for default should be converted to a termination for convenience, because the Government had superior knowledge of the electrolyte corroding the copper reservoirs, but failed to disclose its superior knowledge to Axion, thereby excusing the default under paragraph (g) of FAR 52.249-8.

## COUNT VIII

## (LEAKING ELECTROLYTE - *SPEARIN* DOCTRINE)

100. All other allegations of the Complaint are incorporated herein by reference.

101. Under the *Spearin* Doctrine, if the Government provides a design specification to a contractor, the Government warrants that if the deliverable is produced according to the design specification, the contractor shall not be responsible for the consequences of defects in the specifications.

102. The specification in contract N00104-96-C-KA09 for the PS-115 was predominantly a design specification.

103. The specification in contract N00104-96-C-KA09 required the electrolyte to be stored in a copper reservoir.

104. After a year, electrolyte stored in a copper reservoir will corrode the copper reservoir.

105. Axion was not aware, at the time of contract award, that, after a year, electrolyte stored in a copper reservoir will corrode the copper reservoir.

106. Upon learning of the electrolyte would leak, after corroding the copper reservoir, Axion gave the United States notice of the defective specification in a letter dated August 27, 2001.

107. Axion incurred unanticipated costs in trying to meet the defective specification.

108. Under the *Spearin* Doctrine, the Government made an implied warranty that the electrolyte would not corrode the copper reservoirs. The termination for default should be converted to a termination for convenience because the Government's breach of the implied warranty excused the default under paragraph (g) of FAR 52.249-8.

**<u>COUNT IX</u>**

**(IMPOSSIBILITY – ELECTROLYTE CORRODING COPPER)**

109. All other allegations of the Complaint are incorporated herein by reference.

110. It is an inviolable law of chemistry that, after an exposure of several months, electrolyte will corrode a copper reservoir.

111. The corroding of the copper reservoir by the electrolyte, after several months, causes the electrolyte to leak.

112. A PS-115 will not meet the requirements of the Government if the PS-115 leaks electrolyte within a year of the PS-115 being accepted by the Government.

113. The termination for default should be converted to a termination for convenience because it is impossible for a copper reservoir to store electrolyte for several months without leaking. This impossibility excused the default under paragraph (g) of FAR 52.249-8.

## COUNT X

## (NAVY'S REASONS FOR TERMINATION FOR DEFAULT NOT A VALID BASIS TO REJECT FAT)

114. All other allegations of the Complaint are incorporated herein by reference.

115. Deficiencies in a first article that are correctable in production are not a valid basis for an outright disapproval of a first article.

116. P00021, dated November 12, 2003, sets forth the Navy's two reasons for terminating the contact for default:

> The Navy examined Axion's FATR and disapproved the First Article for failure to meet the requirements of Contract Data Requirements list A004 and the lack of information that would pertain to test procedures test equipment, or data