analysis that is relevant to the performance requirements. Furthermore, a total of 25 of the 66 First Article Power Supplies failed to meet the performance requirements of 11744726. The Navy's letter of October 01, 2002 advised Axion of its First Article disapproval.

117. As stated in P00021, the Navy's first basis for the termination for default was "[t]he Navy examined Axion's FATR and disapproved the First Article for failure to meet the requirements of Contract Data Requirements List A004 and the lack of information that would pertain to test procedures test equipment, or data analysis that is relevant to the performance requirements."

118. The alleged failures that form the first basis for the termination for default are "information defects."

119. An information defect does not arise to the level of a deficiency that is not correctable in production. Hence, the first basis for the termination for default was not a valid basis to reject the FAT.

120. According to P00021, the Navy's second basis for the termination for default was "a total of 25 of the 66 First Article Power Supplies failed to meet the performance requirements of 11744726."

121. At the beginning of the second FAT testing in early September 2002, several of the tests involving the air gun failed to produce data because of a broken connector in the air gun's projectile.

123. Once the problem with the broken connector was corrected, 31 PS-115s were consecutively tested as successful.

124. Axion had previously passed the FAT.

125. A Navy memorandum to Axion, dated September 28, 2001 states:

> The First Article Test (FAT) samples were produced with plate stock provided by an outside vendor. The FAT is meant to verify the manufacturing process and material. The contractor changed the material thereby invalidating the First Articles. The Government requires another FAT of a reduced quantity of batteries be done to validate the manufacturing process currently being utilized to produce the energizers.

126. The 25 failures that the Navy relied upon for the termination for default were attributable to a systemic failure in the air gun.

127. Because these 25 failures were attributable to the air gun, the 25 failures provided no basis to reach a conclusion regarding the purpose of the second FAT—"to verify the manufacturing process and material" for the plate stock meet the Navy Contract's specifications.

128. The 31 consecutive successful shots are cogent proof that the plates manufactured by Axion met the specifications.

129. The 25 failures provided the Government no basis to draw a conclusion regarding the plates. And the next 31 successes provided cogent proof that the plates met the specifications. Therefore, the 25 failures do not provide a valid basis for the termination for default.

130. Because the reasons articulated by the Navy in P00021 did not provide a valid basis to termination for default, the TERMINATION FOR DEFAULT must be converted to a TERMINATION FOR CONVENIENCE.

**COUNT XI**

**(CONTRARY TO P0021, NAVY APPROVED THE SECOND FAT)**

131. All other allegations of the Complaint are incorporated herein by reference.

132. P00021 states "The Navy … disapproved the First Article…."

133. Page 31 of the Navy Contract states: "Acceptance or rejection shall be accomplished by the cognizant GQAR based upon his own inspection(s) and the results of the First Articles . . . ."

134. The Government's Quality Assurance Representative (GQAR) was Mr. Fortan.

135. As the GQAR, Mr. Fortan had authority to approve the second FAT.

136. Mr. Fortan was present at Axion on Friday, September 6, 2002 as Axion was conducting the second FAT.

137. The GQAR was able to ascertain whether the test was successful shortly after the firing of the air gun by examining a chart that plots the voltage over time.

138. Mr. Fortan observed Mr. Alex Latifi, owner, President and CEO of Axion, successfully complete 31 consecutive tests using Axion's air gun.

139. After observing the 31 consecutive successful tests, Mr. Fortan directed Axion to stop the testing.

140. After observing the 31 consecutive successful tests, Mr. Fortan related to Mr. Latifi that as far as he [Mr. Fortan] was concerned, Axion had passed (meaning the second FAT) and it was wasteful to further destroy good units. (When a PS-115 power supply is tested, it is necessarily destroyed in the process of testing.).

141. Mr. Fortan's statement to Mr. Latifi constituted approval of the second FAT.

142. Because Mr. Fortan approved the second FAT, P00021 was not correct in its statement that the Navy disapproved the first article. The Navy's mistake about the second FAT being approved requires the termination for default to be converted to a termination for convenience pursuant to FAR § 52.249-8(g), "the rights and obligations of the parties shall the same as if the termination had been issued for the convenience of the Government."

## COUNT XII

## (BREACH OF DUTY TO COOPERATE—SECOND FAT)

143. All other allegations of the Complaint are incorporated herein by reference.

144. Concerning the FAT, the Navy Contract specification provides that "the tests shall be performed by the contractor under then observation of the

government QA representative and a representative of the cognizant technical agency." *Id.* at §4.3.

145. On Friday afternoon, September 6, 2002, Mr. Fortan expressly directed Axion to stop the testing after Mr. Fortan had observed Axion successfully tested 31 consecutive units using the air gun.

146. Mr. Fortan departed on Friday afternoon, September 6, 2002 and did not return the following Monday.

147. Axion was not authorized to continue the tests without a Government inspector present.

148. Axion was ready, willing, and able to continue testing at the time of Mr. Fortan's departure and after Mr. Fortan departed.

149. By not having an inspector available, the Navy has breached its implied duty to cooperate.

150. If the Government had complied with its duty to cooperate, Axion would have fired an ample number of units to satisfy the Navy that the plates manufactured by Axion met the specifications.

151. In light of the Government's violation of its duty to cooperate, Axion was excused from further testing. Since Axion was excused from further testing regarding the second FAT, the alleged default was "excusable" under paragraph (g) of FAR 52.249-8 Default (Fixed-Price Supply). Pursuant to paragraph (g), the termination for default should be converted to a termination for convenience.

## COUNT XIII

## (AIRGUN NOT AN ACCURATE TEST OF PLATING)

152. All other allegations of the Complaint are incorporated herein by reference.

153. The Government has the ultimate burden of proving that a termination for default was proper. This includes providing that the tests the Government relied upon were accurate and reasonably calculated to determine compliance with the Navy Contract specification.

154. According to correspondence sent to Axion by the Navy, dated September 28, 2001, the primary purpose for the second FAT was to "validate the manufacturing process" involving the plate stock produced by Axion.

155. Air guns used to test PS-115s often suffered from systemic failures.

156. The most frequent cause of air gun systemic failures is the breaking of components within the projectile caused by the thousands of G-force applied to the components during testing.

157. On average, the ARL air gun was only able to collect sufficient data to ascertain if a PS-115 met the specifications for less than fifty percent of the times the air gun was fired.

158. On average, Axion's air gun was only able to collect sufficient data to ascertain if a PS-115 met the specifications for 75% to 80% of the times the air gun was fired.

159. Because of the lack of reliability of air guns, air gun testing of plates manufactured by Axion could not accurately determine compliance with the Navy Contract specifications.

160. The Navy Contract, at page 7, incorporated by reference technical data package ("TDP") 19202-11744726. The TDP states at paragraph 4.4.6.2.2:

> Field Tests. The Government may at its discretion perform the following field tests. One hundred and eighty power supplies may be fired from the designated artillery pieces as specified below.

161. The Government did not perform the field tests authorized in the TDP.

162. Because of its failure to exercise its discretion to perform field testing, the Government, rather than Axion, is responsible for any lack of an accurate test and any alleged insufficiency in testing data with regard to the second FAT.

163. Because the air gun tests the Government relied upon were not accurate and reasonably calculated to determine compliance with the Navy Contract specification for the plates, the Navy lacked a reliable basis to disapprove the second FAT. Since the termination for default lacked a reliable basis to disapprove the second FAT, the termination for default should be converted to a termination for convenience.

## COUNT XIV

## (WHAT THE NAVY ASSERTS IS A "SECOND FAT" WAS, IN FACT, NOT A FAT)

164. All other allegations of the Complaint are incorporated herein by reference.

165. When contract N00104-96-C-KA09 was awarded in 1995, FAR § 9.301 included the following definition of first article test: "means testing and evaluating the first article for conformance with specified contract requirements before or in the initial stages of production." FAR § 9.302 further explained that first article testing "ensures that the contractor can furnish a product that conforms to **all** contract requirements for acceptance." (Emphasis added.)

166. The firing of the PS-115s in the air gun in early September 2002 (called by the Navy the "second FAT") was not a FAT because the test did not ensure that the PS-115s conformed to "**all** contract requirements for acceptance."

167. Prior to September 2002, Axion had put the Navy on notice that the PS-115s manufactured by Axion could not meet all the Navy Contract requirements because the electrolyte, after corroding the copper reservoir, would leak.

168. Because the test dubbed by the Navy as the "second FAT" did not ensure the PS-115 conformed to all Navy Contract requirements, the test was not, in fact, a FAT.

169. Because the testing in September 2002 was not a FAT, FAR § 52.209-3 did not apply.

170. Since FAR § 52.209-3 did not apply, the Navy could not terminate the Navy Contract for default without first issuing a cure notice to Axion.

171. The Navy did not issue a cure notice for the termination for default set forth in P00021.

172. The Navy's failure to issue a cure notice renders the termination for default defective. The defective termination for default mandates that the termination for default be converted to a termination for convenience.

## COUNT XV

## (APPLICATION OF *SPEARIN* DOCTRINE TO AXION'S PLATES)

173. All other allegations of the Complaint are incorporated herein by reference.

174. A Navy memorandum to Axion, dated September 28, 2001, stated:

> The First Article Test (FAT) samples were produced with plate stock provided by an outside vendor. The FAT is meant to verify the manufacturing process and material. The contractor changed the material thereby invalidating the First Articles. The Government requires another FAT of a reduced quantity of batteries be done to validate the manufacturing process currently being utilized to produce the energizers.

175. The manufacturing process to be validated by the second FAT was set forth in the Navy Contract as NAVORD OD 18332.

176. For over a year, Axion gave its best efforts to produce the plates consistent with the design specification in NAVORD OD 18322. However, Axion could not produce the plates consistent with NAVORD OD 18322 because of deficiencies in the Navy's specification. Among the major deficiencies in NAVORD OD 18332 were the timing, amperage, and chemical composition.

177. In a letter to the Navy dated November 13, 2000, Axion stated, in part:

- "We have spent 1 week on lead plating solution and one week on lead dioxide plating solution and 1 week on acetate lead dioxide plating trying to make a solution to Government specifications and be able to pass the required sell test. We were unable to do so."
- "Our chemist and factory chemical representative came to the conclusion that the amount per ounce or gram given by the Government document for each element solution was not correct and completely off. Therefore we have spent the past 2 weeks and have mixed the 3 solutions with help from the chemical representative and our chemist to find the correct amount of mixture for each solution."

- "The documents provide us current density and plating time, based on <foot per minute travel time and 109 ASF for lead dioxide plating and 13.2 ASF for lead acetate plating. Our plating line has been designed based on above current density and was designed to run 4 foot per minute and we have purchased rectifiers to provide the required ASF for each solution. This past Thursday and Friday that we ran the machine we find out the ASF called out by the Government was not adequate."

178. Under the *Spearin* Doctrine, if the Government provides a design specification to a contractor, the Government warrants that if the deliverable is produced according to the design specification, the consequences shall not be responsible for the consequences of defects in the specifications.

179. The specification provided by the Government to Axion, NAVORD OD 18332, was a design specification.

180. If Axion built the plate stock with the design specification, the plate stock would have been defective.

181. Axion was not aware that NAVORD OD 18332 was defective at the time of contract award.

182. Upon learning of the defective specification, Axion gave the Navy notice of the defective specification.

183. Axion incurred unanticipated costs in trying to meet the defective specification, NAVORD OD 18332.

184. Inasmuch as NAVORD OD 18322 was defective, pursuant to the *Spearin* Doctrine, Axion cannot be held responsible if the test on which the Navy terminated the contract revealed the plate stock was defective. Therefore, the termination for default must be converted to a termination for convenience.

**COUNT XVI**

**(TERMINATION FOR DEFAULT WAS AN ABUSE OF DISCRETION)**

185. All other allegations of the Complaint are incorporated herein by reference.

186. Axion sent a letter to the Navy, dated August 27, 2001, stating:

> The design requires Axion to put Acid in copper cans, which is a chemical fact, the acid will eventually dislove (sic) the copper. We are experiencing this phenomenon at this time. We have over thousands of copper cans that have been filled with acid and welded and started leaking on the surface of the diaphragms. We had discussion with Mr. Carey Jackson Quality Assurance Manager, of CP/PHIBROCHEM, the approved source of supply of the acid (34-A, Electrolyte). He states that it is a fact that this acid will eventually penetrate the copper. CP/Phibrochem ships the acid in polyethene containers, which can survive indefinitely without any

leakage. Axion has produced polyethylene cans and filled with acid and sealed and clearly there has been no leakage. We wish to submit a VCP or ECP to the government, and suggest that changing from copper cans to polyethylene cans, this will solve the leakage problem, that the government may have experienced infield and will stop any future occurrence.

187. In response to this letter, the Contracting Officer proceeded to investigate. He sent Mr. Hahin to Axion to inspect the copper for compliance with the specifications.

188. After Mr. Hahin's visit, Axion also provided Mr. Hahin with samples of the electrolyte and the copper reservoirs.

189. Axion was asked by the Navy to substantiate that the electrolyte was procured from a qualified source. Axion did so.

190. As a result of his investigation, the Contracting Officer concluded that the Navy had provided Axion with a defective design.

191. Following his investigation, the Contracting Officer called Mr. Latifi, the President of Axion. Also present on during the telephone conversation was a Navy attorney.

192. During the telephone conversation, the Contracting Officer offered Axion a no-cost termination for convenience.

193. Mr. Latifi explained that Axion could not accept a no-cost termination for convenience because Axion has spent in excess of three million

dollars trying to perform the Navy Contract. A no-cost termination for convenience would be ruinous for Axion.

194. Unable to effect a no-cost termination for convenience, the Navy "trumped-up" a termination for default centered upon a second FAT.

195. A Navy memorandum dated 9/28/01 identified the purpose of the second FAT as follows:

> The First Article Test (FAT) samples were produced with plate stock provided by an outside vendor. The FAT is meant to verify the manufacturing process and material. The contractor changed the material thereby invalidating the First Articles. The Government requires another FAT of a reduced quantity of batteries be done to validate the manufacturing process currently being utilized to produce the energizers.

196. The "manufacturing process" for the plate stock designated in the contract was NAVORD OD 18332.

197. NAVORD OD 18332, paragraph 6.2 is entitled "Discharge Cell Test."

198. In the presence of representatives of the Navy, Axion successfully performed the Discharge Cell Test for plates manufactured by Axion.

199. The test results provided to the Navy showed that Axion's plates held a load of 105 ohms for approximately 15 minutes whereas previous samples

manufactured by other vendors but tested by the Navy only held a load of 105 ohms for a maximum of 9 minutes.

200. After receiving the results of Axion's cell tests, the Navy requested sample plates to test independently.

201. The discharge cell tests conducted by the Navy on cells manufactured by the Axion confirmed Axion's tests.

202. The Navy inquired into why Axion's sample could hold the charge for approximately 40% longer than previous samples. Axion explained that Axion used pure nickel instead of nickel-plated steel. The difference in price, however, was $1.83 for the nickel plated steel versus $26.00 per pound for the pure nickel.

203. Mr. Korab, the Navy Contracting Officer, gave Axion permission to proceed using the pure nickel plates but emphasized that the pure nickel plates were to be used at no additional cost to the Government.

204. The Default clause does not mandate a termination for default; it merely gives the contracting officer discretion to terminate for default.

205. In determining whether to terminate a contract for default, the exercise of discretion by the Contracting Officer must be fair and reasonable. It cannot be arbitrary or capricious.

206. The discretion of the Contracting Officer is limited by his obligation under FAR § 1.102(b)(3) to "conduct business with integrity, fairness, and openness."

207. Integrity and fairness cannot condone "trumping-up" a termination for default that results in a small businessman losing his retirement savings after the Government has misled the small business with impossible specifications.

208. Because the Contracting Officer's use of a termination for default in this case is contrary to conducting business with integrity and fairness, the Contracting Officer's decision to terminate for default was an abuse of discretion.

209. The abuse of discretion by the Contracting Officer is a basis to convert the termination for default to a termination for convenience.

**WHEREFORE**, Plaintiff, Axion Corporation requests this Honorable Court:

a. Declare and adjudge that the TERMINATION FOR DEFAULT must be converted to a TERMINATION FOR CONVENIENCE because the air gun was commercially impractical for Axion to fabricate.

b. Declare and adjudge that the TERMINATION FOR DEFAULT must be converted to a TERMINATION FOR CONVENIENCE because the Government had superior knowledge of the difficulties in fabricating the air gun but failed to disclose its superior knowledge to Axion.

c. Declare and adjudge that the TERMINATION FOR DEFAULT must be converted to a TERMINATION FOR CONVENIENCE because the Navy misled Axion that the Navy Contract would not require a significant amount of research and development for special test equipment.

d. Declare and adjudge that the TERMINATION FOR DEFAULT must be converted to a TERMINATION FOR CONVENIENCE because the Navy breached an implied warranty that the air gun would either be commercially available or a non-developmental item.

e. Declare and adjudge that the TERMINATION FOR DEFAULT must be converted to a TERMINATION FOR CONVENIENCE because the Government breached its duty to cooperate regarding the air gun.

f. Declare and adjudge that the TERMINATION FOR DEFAULT must be converted to a TERMINATION FOR CONVENIENCE because there was a mutual mistake of a basic assumption that the special test equipment would not require a significant amount of development.

g. Declare and adjudge that the TERMINATION FOR DEFAULT must be converted to a TERMINATION FOR CONVENIENCE because the Government had superior knowledge of the electrolyte corroding the copper reservoir but failed to disclose the superior knowledge to Axion.

h. Declare and adjudge that the TERMINATION FOR DEFAULT must be converted to a TERMINATION FOR CONVENIENCE because, under the *Spearin* Doctrine, the Government warranted that if Axion complied with the level three drawings, the electrolyte would not leak.

i. Declare and adjudge that the TERMINATION FOR DEFAULT must be converted to a TERMINATION FOR CONVENIENCE because it was impossible to manufacture the PS-115 using copper to store the electrolyte.

j. Declare and adjudge that the TERMINATION FOR DEFAULT must be converted to a TERMINATION FOR CONVENIENCE because the two reasons asserted by the Navy in P00021 for the TERMINATION FOR DEFAULT do not establish a valid basis for disapproving the second FAT.

k. Declare and adjudge that the TERMINATION FOR DEFAULT must be converted to a TERMINATION FOR CONVENIENCE because, contrary to the Navy's assertion, the Government approved the second FAT.

l. Declare and adjudge that the TERMINATION FOR DEFAULT must be converted to a TERMINATION FOR CONVENIENCE because the Government breached its duty to cooperate by not having an inspector available to continue the testing.

m. Declare and adjudge that the TERMINATION FOR DEFAULT must be converted to a TERMINATION FOR CONVENIENCE because the air gun was not an accurate test for ascertaining whether the plate stock produced by Axion complied with the specification.

n. Declare and adjudge that the TERMINATION FOR DEFAULT must be converted to a TERMINATION FOR CONVENIENCE because what the Navy dubbed a second FAT was not a FAT which thereby resulted in an improper TERMINATION FOR DEFAULT because the Navy never issued a cure notice.

o. Declare and adjudge that the TERMINATION FOR DEFAULT must be converted to a TERMINATION FOR CONVENIENCE because, even if the tests on which the Navy justified the TERMINATION FOR DEFAULT

established that the plates manufactured by Axion were defective, under the *Spearin* Doctrine, Axion cannot be held responsible for the defective plates.

p. Declare and adjudge that the TERMINATION FOR DEFAULT must be converted to a TERMINATION FOR CONVENIENCE because the Contracting Officer abused his discretion by terminating the contract for default.

q. Grant such other declaratory, equitable, and other relief as this Honorable Court deems just and appropriate.

Dated this the 4th day of November, 2003.

Respectfully submitted,

**ATTORNEY OF RECORD:**

**RICHARD J.R. RALEIGH JR.**
**WILMER & LEE, P.A.**
100 Washington Street, Suite 200
Huntsville, Alabama 35801
(256) 533-0202 Telephone
(256) 533-0302 Facsimile
rraleigh@wilmerlee.com

**OF COUNSEL:**

**JEROME S. GABIG, JR.**
4811 Cove Creek Drive
Brownsboro, AL 35741
(256) 509-0279 Telephone
(256) 512-0020 Facsimile
gabig3@comcast.net