Nos. 03-2644C & 04-297C
(Judge Firestone)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AXION CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S PARTIAL MOTION TO DISMISS FOR LACK OF JURISDICTION, OR IN THE ALTERNATIVE, PARTIAL MOTION FOR SUMMARY JUDGMENT

PETER D. KIESLER
Assistant Attorney General

DAVID M. COHEN
Director

KATHRYN A. BLEECKER
Assistant Director

DOUGLAS K. MICKLE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 353-7961
Fax: (202) 353-7988
Attorneys For Defendant

OF COUNSEL:

RICHARD MARTINELLI
Office of Counsel
Naval Inventory Control Point
Mechanicsburg, PA 17055-0788

April 11, 2005

# TABLE OF CONTENTS

PAGE(S)

DEFENDANTS PARTIAL MOTION TO DISMISS FOR LACK OF JURISDICTION, OR IN THE ALTERNATIVE, PARTIAL MOTION FOR SUMMARY JUDGMENT ..... 1

STATEMENT OF THE ISSUES ..... 2

STATEMENT OF THE CASE ..... 2

I. Nature of the Case ..... 2

II. Statement of Facts ..... 3

ARGUMENT ..... 7

I. Standard of Review: Motion To Dismiss For Lack of Jurisdiction ..... 7

II. Axion's Claims Concerning The Air Gun Accrued In 1996, And Because Axion Failed To Raise Them With The Contracting Officer Until 2003, Axion's Claims Are Barred Because They Were Raised After The Six-Year Statute Of Limitation Period Expired ..... 7

III. Laches Also Bars Axion's Claims Concerning The Air-Gun ..... 9

IV. Standard of Review: Motion For Summary Judgment ..... 11

V. The United States Is Entitled To Summary Judgment Because Axion's Claims Are Barred By The Doctrine Of Accord And Satisfaction ..... 12

A. Modifications P00017, P00019, And P00020 Each Contain The Requisite Four Elements Of A Valid Accord And Satisfaction ..... 12

B. Modifications P00017, P00019, And P00020 Were Bilateral Agreements Concerning Proper Subject Matter, That Were Negotiated And Consented To By Competent Parties, Axion And The United States ..... 13

C. There Was A Meeting Of The Minds ..... 15

1. The Modification Language Is Clear And Not Ambiguous ..... 15

2. Each Of The Three Times Axion And The Government Bilaterally Agreed To An Accord And Satisfaction Provision, There Existed Bona Fide Disputes Concerning The Contract That The Parties Waived ........ 16

D. Both Parties Bargained For, And Obtained, Consideration With Respect To Bilateral Modifications P00017, P00019 and P00020 .................................. 17

1. The Government Provided Consideration For Modification P00017 ............. 17

2. The Government Provided Consideration For Modification P00019 ............. 18

3. The Government Provided Consideration For Modification P00020 ............. 18

VI. The United States Is Also Entitled To Summary Judgment Because Axion Is Asserting Claims That It Has Already Agreed To Release ..................................... 19

A. The Doctrine Of Release Bars Axion's Claims ................................................. 19

B. Just As The Language Of The Accord And Satisfaction Portion Of The Modification Is Unambiguous, So Is The Release Language ............................ 20

CONCLUSION ............................................................................................................. 20

## TABLE OF AUTHORITIES

**FEDERAL CASES** **PAGE(S)**

A.C. Aukerman Co. v. R. L. Chaides Construction Co.,
960 F.2d 1020 (Fed. Cir. 1992) .......... 10

Abatement Contracting Corporation v. United States,
58 Fed. Cl. 594 (2003) .......... 20

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) .......... 11

Ahrens v. United States,
62 Fed. Cl. 664 (2004) .......... 15

Bath Iron Works Corp. v. United States,
20 F.3d 1567 (Fed. Cir. 1994) .......... 7, 8

Brighton Village Associates v. United States,
52 F.3d 1056 (Fed. Cir.1995) .......... 8

C&H Commercial Contractors, Inc. v. United States,
35 Fed. Cl. 246 (1996) .......... 12

Case, Inc. v. United States,
88 F.3d 1004 (Fed. Cir. 1996) .......... 12

Celotex Corp. v. Catrett,
477 U.S. at 325 .......... 11

Chesapeake & Potomac Telegraph Co. of Va. v. United States,
654 F.2d 711 (Ct. Cl. 1981) .......... 12

Foley Co. v. United States,
11 F.3d 1032 (Fed. Cir. 1993) .......... 15

Greco v. Department of the Army,
852 F.2d 558 (Fed. Cir. 1988) .......... 15

Henry v. United States,
870 F.2d 634 (Fed. Cir. 1989) .......... 7

Hermes Consolidated, Inc. v. United States,
58 Fed. Cl. 3 (2003) .......... 9

Hopland Band of Pomo Indians v. United States,
855 F.2d 1573 (Fed. Cir. 1988) .......... 7, 8

JANA, Inc. v. United States,
936 F.2d 1265 (Fed. Cir. 1991) ... 9

J.G. Watts Constr. Co. v. United States,
161 Ct. Cl. 801 (1963) ... 20

Kinsey v. United States,
13 Cl. Ct. 585 (1987) ... 8

Kinsey v. United States,
852 F.2d 556 (Fed. Cir. 1988) ... 8

Kirby v. United States,
201 Ct. 527 (1973) ... 8

Mingus Constructors, Inc. v. United States,
812 F.2d 1387 (Fed. Cir. 1987) ... 11, 19

Motorola, Inc. v. West,
125 F.3d 1470 (Fed. Cir. 1997) ... 8

National Steel and Shipbuilding v. United States,
49 Fed. Cl. 579 (2001) ... 15

Neptune v. United States,
38 Fed. Cl. 510 (1997) ... 11

O'Connor v. United States,
308 F.3d 1233 (Fed. Cir. 2002) ... 12

ResAnchorCornetta v. United States,
851 F.2d 1372 (Fed. Cir.1988) ... 10

Reynolds v. Army & Air Force Exch. Service,
846 F.2d 746 (Fed. Cir.1988) ... 7

Rocovich v. United States,
933 F.2d 991 (Fed. Cir.1991) ... 7

Scheuer v. Rhodes,
416 U.S. 232 (1974) ... 7

Sweats Fashions, Inc. v. Pannill Knitting Company, Inc.,
833 F.2d 1560 (Fed. Cir. 1987) ... 11

Thomas Creek Lumber & Log Co. v. United States,
36 Fed. Cl. 220 (1996) ... 12

United States v. Johnson Controls, Inc.,
713 F.2d 1541 (Fed. Cir. 1983) ... 8

United States v. King,
395 U.S. 1 (1969) .................... 8

United States v. Mitchell,
445 U.S. 535 (1980) .................... 8

Valcon II, Inc. v. United States,
26 Cl. Ct. 393 (1992) .................... 12

Wanlass v. General Electric Co.,
148 F.3d 1334 (Fed. Cir. 1998) .................... 9

Weckler v. United States,
752 F.2d 1577 (Fed. Cir.) .................... 8

**FEDERAL STATUTES AND REGULATIONS**

28 U.S.C. § 2501 .................... 8

48 C.F.R. 33.201 .................... 9

48 C.F.R. 33.206 .................... 8

48 C.F.R. 52.209 .................... 6

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **AXION CORPORATION,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 03-2644C & 04-297C** **(Judge Firestone)** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S PARTIAL MOTION TO DISMISS FOR LACK OF JURISDICTION, OR IN THE ALTERNATIVE, PARTIAL MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), the United States respectfully requests the Court dismiss part of Axion Corporation's ("Axion") complaint for lack of jurisdiction. Counts XVII, XVIII, XXI, XXII, XXIII, XXIV, and XXV of Axion's complaint concern problems Axion experienced with producing an air gun to test the PS-115 batteries that Axion was required to produce pursuant to the contract. Axion's claims regarding the costs associated with producing the airgun accrued in 1996, and certainly no later than May of 1997, when Axion informed the Government that it was producing its own air gun. However, Axion never made claims for having to produce the air gun until 2003. Accordingly, all claims regarding Axion and its air gun should be dismissed because it is outside the statute of limitations. Additionally, Axion's claims concerning its development of the air gun should also be barred by the doctrine of laches.[1]

Additionally, the United States respectfully requests that the Court enter summary judgment against Axion pursuant to RCFC 56 upon the claims set forth in Counts I through IX, and XIII through XXIX, because these claims arose before October 2, 2001. On that date, the parties jointly agreed to Modification P000017, which contains accord and satisfaction and release language that bar Axion's claims pursuant to these counts. Additionally, Axion and the

[1] Although the Court's orders setting forth a briefing schedule in this matter only mentioned the Government filing a dispositive motion addressing the issues of accord and satisfaction and release, while researching that motion, Government counsel contemporaneously considered and identified the statute of limitations and laches issues, and for judicial economy, addresses these issues in this motion as well, to avoid piecemeal litigation.

United States entered into subsequent bilateral modifications that also contains this accord and satisfaction and release language that bars Axion's claims. In support of these motions, the United States relies upon the Complaint ("Compl."),[2] defendant's proposed findings of uncontroverted fact ("DPFUF") accompanying this motion, the accompanying appendix, and the following brief.

## STATEMENT OF THE ISSUES

1. Whether claims that accrued no lather than March 1997, should be dismissed for lack of jurisdiction when Axion failed to raise them with the contracting officer within the six-year statute of limitation period.

2. Whether bilateral modifications P00017, P00019 and P00020, which contain mutually agreed upon accord and satisfaction language, bar Axion's claims set forth in Counts I through IX and XIII through XXIX.

3. Whether bilateral modifications P00017, P00019 and P00020, which contain mutually agreed upon release language, bar Axion's claims set forth in Counts I through IX and XIII through XXIX.

## STATEMENT OF THE CASE

### I. Nature of the Case

Axion brings this action challenging the Navy's termination for default of contract N00104-96-C-KA09. Axion claims the Navy was not justified in terminating the contract for default, and that it should be converted to a termination for convenience. In addition, Axion claims entitlement to equitable adjustments under the contract regardless of whether the termination for default was valid.

---

[2] Axion filed two complaints with Court. These complaints were consolidated pursuant to this Court's Order of April 22, 2004. Accordingly, because Axion's second complaint (i.e. 04-297C) includes new claims, as well as all the allegations it raised in its initial complaint, the United States will direct its response to the latter complaint.

## II. Statement of Facts

The United States respectfully refers the Court to our proposed findings of uncontroverted fact, which are filed with this motion pursuant to RCFC 56(h). In addition to our Rule 56(h) submission, a short summary of salient facts follows.

Mr. Alex Latiffi has been President and owner of Axion Corporation since 1984. Deposition of Mr. Alex Latiffi ("Latifi Depo.") p. 13 at Defendant's Appendix ("DA") 244. Mr. Latiffi has been involved in Government contracting since 1977. Latifi Depo. p. 19 at DA 246. Axion's primary customer since its inception has been the United States Government. Axion has been involved in 100 to 200 contracts during this time frame, which range in size from $10,000 to approximately $2 million. Latifi Depo. p. 15 at DA 245. Axion currently holds the contracts for 16 United States Government projects, at an estimated value of five to ten million dollars. Latifi Depo. pp. 23, 24 at DA 247, 248.

On December 14, 1995, the Navy Inventory Control Point ("NAVICP") awarded Axion a fixed-price contract which required it to produce 55,209 PS-115 batteries for a total cost of $1,313,974.20. DA 1-2; Compl. ¶ 18, 21; Latiffi Depo. p. 28-29 at DA 250-51. Mr. Latiffi, as President of Axion, solely developed and submitted the proposal for the above contract. Latiffi Depo. p. 28-30 at DA 250-52. The contract required that Axion conduct a first article test ("FAT") at its facilities and report results to the Government within 120 days of the contract award. DA 62. Due to various technical issues, both sides agreed to re-establish the delivery date on several occasions. DA 144, 146, 147; Declaration of Mr. Jerry Hahin ("Hahin Decl.") ¶ 4, 5 at DA 349-350.

From the onset of the contract, Axion experienced difficulties. The three areas Axion experienced problems relevant to this motion include: (1) Axion had difficulties associated with producing an air gun for use during first article testing of the PS-115; (2) Axion experienced leaking of electrolyte from the PS-115 and believed the leaking was due to defective specifications; and (3) Axion had difficulties producing the PS-115 plate stocking and alleged

this was attributable to defective specifications. DA 178 (1/17/96 letter from Axion to the Navy requesting an air gun); DA 180 (3/18/96 letter from Axion to the Navy noting that Harry Diamond Labs would perform testing if air gun was not ready in time); DA 194 (8/27/01 letter from Axion to the Navy); Latifi Depo. pp. 64, 66-67, 103, 112, 123, 136-144, 150-157, 198 at DA 274, 276-78, 287, 294, 287, 294, 303-11, 316-323, 330.

With respect to the air gun, it was Axion's intent to use an air gun to meet the contract's FAT requirements. Compl. ¶ 35; Latifi Depo. pp. 64-67 at DA 274-277. Under the terms of the contract, Axion, rather than the Navy, was responsible for acceptance-inspection equipment, such as the air gun. Compl. ¶ 24; DA 109; Latifi Depo. p. 46 at DA 253. It is apparent from the record that Axion entered the firm fixed price contract without knowing how it would acquire an air gun. On January 17, 1996, Axion requested that the Navy provide it with an air gun. DA 178; Latifi Depo., p. 63 at DA 273. In 1996, Axion and the Army Research Laboratory ("ARL") discussed the possibility of Axion using an ARL air gun. DA 180; Latifi Depo. p. 67 at DA 277. After several communications with Axion, ARL decided not to enter any agreement with ARL regarding an air gun. DA 185, 186; Latifi Depo. pp. 105-109 at DA 280-284. When Axion learned that assistance from ARL was not forthcoming, the company notified the Navy on May 30, 1997 of its intent to produce its own air gun. DA 186; Latifi Depo., pp. 109-110 at DA 284-285.

Axion did develop an air gun and used its gun to conduct FAT and submit a FAT report on April 12, 1999. After evaluating the FAT report, the Navy notified Axion in May 1999 that FAT was approved. DA 189. Hahin Decl. ¶ 4 at DA 349; Declaration of Mr. John Korab ("Korab Decl.") ¶ 4 at DA 355; Latifi Depo. p. 119 at DA 290.

The contract provided for delivery of the first production quantities 90 days after FAT approval. Axion did not make delivery in accordance with this schedule, and on five occasions, Axion and the Navy entered bilateral modifications to extend the contract's delivery schedule. DA 153, 155, 156, 157, 158; Latifi Depo. pp. 122, 124, 125, 133, 146 at DA 293, 295, 296, 300

& 313.

During this time, an issue arose concerning the PS-115 plate stock. The plate stock includes an electro deposition of lead and lead dioxide that is critical to acceptable performance of the PS-115. Declaration of Mr. Jerry Hahin ("Hahin Decl.") ¶ 6 at DA 350. The PS-115 that passed first article testing included plate stock manufactured by a foreign vendor. Latif Depo. p. 174 at DA 328. After passing the FAT, Axion decided to produce plate stock itself rather than acquire the item from the foreign vendor. Latifi Depo. pp. 174-175 at DA 328-329. Axion's decision invalidated the approved FAT as the purpose of FAT is to verify the adequacy of manufacturing processes and material. Hahin Depo. pp. 98-110 at DA 212-224; Hahin Decl. ¶ 6 at DA 350. In addition, the results of Axion's 1999 first article testing were placed in further doubt due to fact Axion's PS-115 were leaking electrolyte. Hahin Depo. p. 110 at DA 224; Hahin Decl ¶ 7 at DA 350. On October 2, 2001, Axion and NAVICP agreed to a bilateral modification P00017, establishing a requirement for resubmission of FAT samples by October 3, 2001. DA 159. Modification P00017 also included the following statement:

> This modification constitutes a full and final disposition of all matters relating to this contract and is a full release and accord and satisfaction of any and all claims, demands, or causes of action that either the contractor or the government may have against the other arising out of or related to the contract to date.

DA 159.

Axion did not satisfy the FAT requirements of modification P00017. On April 4, 2002, Axion and NAVICP agreed to a bilateral modification P00019, reestablishing a date of April 23, 2002 for FAT. DA 162. The modification included release, and accord and satisfaction language identical to that of bilateral modification P00017. Axion did not satisfy the FAT requirements of modification P00019.

On July 11, 2002, Axion and NAVICP agreed to bilateral modification P00020, again reestablishing the requirement for FAT. This modification included a delivery date for submission of a FAT report by September 9, 2002. DA 163. Modification P00020 also

included release, and accord and satisfaction language identical to that of bilateral modifications P00017 and P00019.

On September 9, 2002, Axion finally resubmitted a FAT report. Axion submitted this report in an attempt to comply with the requirements of P00020. DA 202; Latifi Depo. p. 213 at DA 342. The report did not demonstrate compliance with contract requirements, and the contracting officer terminated Axion for default for failing to meet the contract's delivery schedule.[3] The test was rejected for a number of reasons: 1) an insufficient number of units were tested; the contract called for 80 tests and the data Axion provided to the Government shows only 66 tests were accomplished, 2) an unacceptable number of units failed, and 3) the report lacked certain information called for in the contract's data requirement list. DA 203 (Memorandum from John Korab to Alex Latiffi on 10/1/2002). Korab Decl. ¶ 10 at DA 357; Hahin Decl. ¶ 11 at DA 351.

The default termination was memorialized on November 12, 2002, when NAVICP issued contract modification P00021. DA 164. This modification provided the following:

> Contract N00104-96-C-KA09 was awarded to Axion Corporation (Axion) on December 7, 1995 for the production of 55,209 Power Supplies at a unit price of $23.80 for a total contract price in the amount of $1,313,974.20. The delivery date for Axion's First Article Test Report (FATR) was 06 April 1996. That April delivery date had been extended on numerous occasions per Axion's request. Contract modification P00002 extended the delivery date of FATR to October 29, 1996. Contract modification P00004 extended the delivery date of FATR to December 29, 1996. Modification P00005 extended the delivery of FATR to May 15, 1997. Subsequently, Axion's FATR was approved on 17 May 1999. Furthermore, from the time Axion successfully passed the FATR, the delivery schedule for the production lot was modified on 5 separate occasions since Axion failed to meet its required delivery dates. In the interim, based on Axion's unilateral decision to change its manufacturing process by plating at Axion's plant in lieu of using an outside vendor as originally conducted, Axion was required to submit a second FATR. This decision was made because the results of the initial FATR were no longer

[3] Federal Acquisition Regulation ("FAR") 52.209-3(d), incorporated into the contract, provides that the contractor shall be deemed to have failed to make delivery for failing to deliver a FAT report on time or when the contracting officer disapproves any first article.

> reliable. Resubmission of the FATR was due on October 3, 2001. This date was changed per modification P000019 to April 23, 2002. Modification P00020 further extended delivery of the FATR to September 9, 2002. Axion submitted its second FATR by letter and five floppy disks on September 09, 2002. The Navy examined Axion's FATR and disapproved the First Article for failure to meet the requirements of Contract Data Requirements list A004 and the lack of information that would pertain to test procedures, test equipment, or data analysis that is relevant to the performance requirements. Furthermore, a total of 25 out of the 66 First Article Power Supplies failed to meet the performance requirements of drawing 11744726. The Navy's letter of October 01, 2002 advised Axion of its First Article disapproval. A Show Cause letter of October 01, 2002 was also sent to inform Axion that the Navy was considering terminating the contract for default for failure to make delivery unless facts were presented in writing, indicating that failure to perform was due to causes beyond Axion's control and without fault or negligence on Axion's part. Axion's letter of October 11, 2002 does not provide an adequate excuse for Axion's failure of the First Article thereby failing to meet the September 09, 2002 delivery schedule.

DA 164.

Axion filed its first complaint (03-2644C) on November 6, 2003, and filed its second complaint (04-297) on March 5, 2004.

## ARGUMENT

### I. Standard of Review: Motion To Dismiss For Lack Of Jurisdiction

In considering a motion to dismiss for lack of jurisdiction the court construes the allegations of the complaint favorably to the pleader. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). However, if the motion to dismiss challenges the truth of those jurisdictional facts, then the court may look beyond the pleadings to consider all available evidence to determine jurisdiction. Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir.1991). Ultimately, the burden is on the plaintiff to establish that the court has subject matter jurisdiction to hear the case. Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir.1988).

### II. Axion's Claims Concerning The Air Gun Accrued In 1996, And Because Axion Failed To Raise Them With The Contracting Officer Until 2003, Axion's Claims Are Barred Because They Were Raised After The Six-Year Statute Of Limitation Period Expired

The "[s]tatutes of limitations in 28 U.S.C. § 2501 and 41 U.S.C. § 609(a) are

jurisdictional." Bath Iron Works Corp. v. United States, 20 F.3d 1567, 1572 n. 2 (Fed. Cir. 1994). Accord Henry v. United States, 870 F.2d 634 (Fed. Cir. 1989); Hopland Band of Pomo Indians v. United States, 855 F.2d 1573 (Fed. Cir. 1988). Statutes of limitations are "a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity and, as such, must be strictly construed." Id. at 1576-77. See generally United States v. Mitchell, 445 U.S. 535 (1980)(waivers of sovereign immunity are strictly construed). Accord United States v. King, 395 U.S. 1 (1969); United States v. Johnson Controls, Inc., 713 F.2d 1541 (Fed. Cir. 1983). Thus, they are "jurisdictional prerequisites to the exercise of power by the CFC [Court of Federal Claims]." Bath Iron Works, 20 F.3d at 1572.

The rationale underlying statutes of limitations is that they are "necessary . . . to insure prompt handling of claims and to prevent actions from being withheld until such time that memories of witnesses and other types of evidence have become obscured or unavailable by the passage of time . . . ." Kinsey v. United States, 13 Cl. Ct. 585, 586 (1987), aff'd 852 F.2d 556 (Fed. Cir.1988)(quoting Braude v. United States, 218 Ct. Cl. 270 (1978)). Accord Kirby v. United States, 201 Ct. Cl. 527 (1973), cert. denied, 417 U.S. 919 (1974).

Generally, "[a] claim accrues 'when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action.'" Brighton Village Assocs. v. United States, 52 F.3d 1056, 1060 (Fed. Cir.1995) (quoting Kinsey v. United States, 852 F.2d 556, 557 (Fed. Cir.1988)). The Court's general jurisdictional grant is limited by the statute providing "[e]very claim of which the United States [Court of Federal Claims] has jurisdiction shall be time barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. Similarly, contract disputes must be submitted to the contracting officer within six years after accrual of the claim pursuant to the Federal Acquisition Streamlining Act of 1994 ("FASA"). Motorola, Inc. v. West, 125 F.3d 1470, 1472-73 (Fed. Cir. 1997); Pub. L. No. 103-355, § 2351, 108 Stat. 3243, 3322. The limitations period codified in the FASA has been set forth in the FAR at FAR 33.206(a). 48 C.F.R. § 33.206(a). The "accrual

date" means "the date when all events, which fix the alleged liability of either the Government or the contractor and permit assertion of the claim, were known or should have been known." 48 C.F.R. § 33.201; FAR 33.201.

Axion has made several claims regarding its decision to build an air gun to test the PS-115 batteries. Compl. Counts XVII, XVIII, XXI, XXII, XXIII, XXIV, and XXV. Axion did not dispute the air-gun requirement, and the plain language of the contract required Axion to "provide all [Acceptance Inspection Equipment] (except for equipment listed as available in Appendix VI) necessary to assure conformance." DA 109. Mr. Latifi was specifically notified on January 26, 1996 that the Navy would not be providing any "air gun" for testing and that it had not provided any for any other contractors. DA 179. Accordingly, Axion determined that it would develop its own testing equipment. DA 186; Latifi Depo. pp. 109-110 at DA 284-285. It is clear that Axion's potential claims upon this issue were known to it by 1996, and it was then that any liability was fixed. At that time Axion knew that the Government was not going to produce an air gun for Axion to use to test the PS-115s. Axion also knew at that time that the Government believed Axion was responsible for producing the air gun and that the Government would not be underwriting Axion's costs. Axion was in possession of all the information and facts it needed in 1996 to make its claims for costs incurred for developing and producing an air gun. However, despite the underpinnings of its air gun claims being set in 1996, Axion did not file a claim with the contracting officer until October 31, 2003. Compl. ¶ 6. Accordingly, Axion's claim to the contracting officer over seven years after the fact are barred by the statute of limitations requirement in the FASA.

## III. Laches Also Bars Axion's Claims Concerning The Air-Gun

In addition to being barred by the FASA's six-year statute of limitations, Axion's claims surrounding its building of an air gun to test the PS-115s are barred by laches. It is well-established that the defense of laches requires a showing of: "(1) unreasonable and unexcused delay in bringing a claim, and (2) prejudice to the defendant as a result of the delay." Hermes

Consol., Inc. v. United States, 58 Fed. Cl. 3, 20 (2003); JANA, Inc. v. United States, 936 F.2d 1265, 1269 (Fed. Cir. 1991). In order to satisfy "the latter prong, a defendant may establish either evidentiary or economic prejudice." Wanlass v. General Elec. Co., 148 F.3d 1334 (Fed. Cir. 1998). Accord A.C. Aukerman Co. v. R. L. Chaides Construction Co., 960 F.2d 1020, 1033 (Fed. Cir. 1992); ResAnchorCornetta v. United States, 851 F.2d 1372, 1378 (Fed. Cir.1988) (en banc).

That there has been unreasonable and unexcused delay on Axion's part is beyond question. Although Axion seeks $1,534,934 for building an air gun, it delayed filing its claim for these costs for seven years. The dilatory manner in which Axion has proceeded, now deciding that the contract's terms made the Navy responsible for the cost of test equipment seven years after the fact, should be sufficient to demonstrate the material unfairness in Axion's claims. Furthermore, prejudice to the Government is equally apparent. Because of the delay in bringing this protest, the Navy might be saddled with $1,534,934 bill, if Axion's substantially belated assertion is upheld. A bill the Government possibly would have avoided if Axion's interpretation of the contract was made known to the Navy in a timely fashion. In addition, seven years after the contract was negotiated, the significant evidentiary burden upon the part of the Government to attempt to collect evidence about the state of mind of parties seven years ago is substantially prejudicial. Axion was fully aware in 1996 that the Government believed Axion was responsible for all test equipment. Latifi Depo. p. 46 at DA 261. Indeed, Axion built the now disputed test equipment after it was told the Government would not provide the test equipment. DA 179. Furthermore, it was Axion's choice in 1996 not to dispute this issue with the Government, and for at least seven years, at no time did it formally complain of these costs. It is clearly materially prejudicial to the Navy to require it to pay for this equipment seven years after it believed this matter was concluded.

Accordingly, because Axion's delay in bringing a claim regarding its air gun was unreasonable and unexcused, and this has materially prejudiced the Government, this Court should dismiss its complaint pursuant to the defense of laches.

**IV. Standard of Review: Motion For Summary Judgment**

Summary disposition is appropriate where there are no genuine disputes as to any material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-52 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987); RCFC 56(c). Summary judgment is "a salutary method of disposition 'designed to secure the just, speedy and inexpensive determination of every action.'" Sweats Fashions, Inc. v. Pannill Knitting Company, Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (quoting Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). As the court of appeals emphasized in Sweats Fashions: "the burden is not on the movant to produce evidence showing the absence of a genuine issue of material fact." 833 F.2d at 1563 (emphasis in original). Rather, "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the [Court of Federal Claims] – that there is an absence of evidence to support the non-moving party's case." Id. (emphasis in original)(quoting Celotex Corp. v. Catrett, 477 U.S. at 325).

A "material fact" is one "that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, 477 U.S. at 248. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. As discussed below, there is no dispute over any fact that could affect the outcome of this case. Thus, it is a legal issue, not a factual issue, left for this Court to resolve, and legal issues are particularly well-suited for resolution by summary judgment. Neptune v. United States, 38 Fed. Cl. 510, 513 (1997), aff'd 178 F.3d. 1306 (Fed. Cir. 1997).

## V. The United States Is Entitled To Summary Judgment Because Axion's Claims Are Barred By The Doctrine Of Accord And Satisfaction

The doctrine of accord and satisfaction "denotes 'one of the recognized methods of discharging and terminating an existing right' and constitutes 'a perfect defense in an action to enforce a previous claim, whether that claim was well-founded or not.'" Chesapeake & Potomac Tel. Co. of Va. v. United States, 654 F.2d 711, 716 (Ct. Cl. 1981) (quoting 6 Corbin on Contracts § 1276 (1962)); see also Thomas Creek Lumber & Log Co. v. United States, 36 Fed. Cl. 220, 237 (1996); Valcon II, Inc. v. United States, 26 Cl. Ct. 393, 396 (1992). "A claim is discharged by the doctrine of accord and satisfaction when 'some performance different from that which was claimed as due is rendered and such substituted performance is accepted by the claimant as full satisfaction of his claim.'" Case, Inc. v. United States, 88 F.3d 1004, 1011 n.7 (Fed. Cir. 1996) (quoting Cmty. Heating & Plumbing Co. v. Kelso, 987 F.2d 1575, 1581 (Fed. Cir. 1993)); accord Thomas Creek Lumber, 36 Fed. Cl. at 237-38. It is well-settled that "an executed bilateral contract modification that contains no reservation of rights constitutes an accord and satisfaction." Valcon II, 26 Cl. Ct. at 397; C&H Commercial Contractors, Inc. v. United States, 35 Fed. Cl. 246, 252 (1996). Moreover, "any reservation of a right or a claim for damages from a bilateral contract modification must ordinarily be manifestly and expressly set forth in the contract modification which incorporates the parties' settlement." C&H Commercial Contractors, 35 Fed. Cl. at 252. Also, "the execution by a contractor of a release which is complete on its face reflects the contractor's unqualified acceptance and agreement with its terms and is binding on both parties." Id.

### A. Modifications P00017, P00019, And P00020 Each Contain The Requisite Four Elements Of A Valid Accord And Satisfaction

There are four elements of a valid accord and satisfaction, all of which are present in each of the three modifications: 1) proper subject matter; 2) competent parties; 3) meeting of the minds of those parties; and 4) consideration. O'Connor v. United States, 308 F.3d 1233, 1239 (Fed. Cir. 2002). Each time the parties agreed to an accord and satisfaction, it involved the

extension of a contractual deadline. A Government contract can certainly be said to be proper subject matter for an accord and satisfaction. Also, it cannot be disputed that both Axion and the United States are competent parties, capable of negotiating and committing to contractual agreements. As we demonstrate below, the other two elements, meeting of the minds and consideration, were also present each time Axion and the United States bargained for and agreed to Contract Modifications P00017, P00019, and P00020.

### B. Modifications P00017, P00019, And P00020 Were Bilateral Agreements Concerning Proper Subject Matter, That Were Negotiated And Consented To By Competent Parties, Axion And The United States

There is no doubt that Modifications P00017, P00019, and P00020 were negotiated and agreed upon by competent parties. Mr. Latifi had over twenty years of experience working upon Government contracts, as did the contracting officer. Similarly, there is no doubt that the claims Axion brings to this Court arose during its performance upon its contract with the Navy. Accordingly, these claims are proper claims within the doctrine of accord and satisfaction.

Counts I through VI, XIII, XVII, XVIII, and XXI through XXV all concern the difficulties Axion experienced in attempting to obtain an air gun for testing. These difficulties commenced shortly after the contract was awarded on December 14, 1995.[4] On January 17, 1996, Axion requested that the Navy provide the firm with an air gun. DA 178. The Navy notified Axion shortly thereafter that it would not provide such equipment. DA 179. Searching for an alternative means of coming up with an airgun, Axion contacted the Army Research Labs ("ARL") and proposed a joint effort, one result of which would be that ARL would assist Axion in meeting the contract's first article requirement. DA 180. After ARL decided not to assist Axion, the company notified the Navy on May 30, 1997 of its intent to produce its own air gun. DA 186. Axion developed its own air gun and used the gun to successfully pass FAT in May 1999.

---

[4] The fact that the air gun claims accrued in 1996 (based upon the Navy's 1/26/96 response to Axion's 1/17/96 request for an air gun) and the legal consequences to Axion as a result of this accrual, were discussed above in sections II and III, at pages 7 and 9 of this motion.

Axion's agreement through bilateral modification P00017 on October 2, 2001; and subsequently through bilateral modifications P00019 and P00020, April 4, 2002 and July 11, 2002, respectively, to re-conduct FAT concerns the same subject matter as those counts involving the difficulties Axion experienced in developing an air gun. At the time these modifications were executed, Axion had already developed and used an air gun to pass FAT and Axion was aware that it would be necessary to use an air gun for further testing as the express purpose of these modifications was for Axion to resubmit to further first article testing.

Similarly, Axion's claims that the contract's specifications were defective were also known early in the performance period of this contract. With respect to those counts involving Axion's contention that the contract's specification for manufacturing the plates was defective (these counts include XV, XX, XXVIII, and XXIX), Axion made this allegation to the Navy in a November 13, 2000 letter, nearly a year before entering bilateral modification P00017, and more than a year before entering bilateral modifications P00019 and P00020. DA159 & DA 162, 163. As these three modifications were prompted, in large part, by the need for an additional FAT due to Axion's decision to produce plates in-house, it is clear that any and all challenges to the sufficiency of the plate requirements fall within the ambit of P00017, P00019, and P00020's accord and satisfaction provisions.

Axion also now claims that it experienced problems with leaking electrolyte. Compl. 28; DA 194. These counts include VII, VIII, IX, XIX, XXVI, and XXVII. Again, these issues known to Axion prior to modifications P00017, P00019, and P00020. On August 27, 2001, Axion forwarded a letter to the contracting officer alleging that these problems were attributable to the contract's specifications. DA 194. This letter also discussed the status of the air gun Axion was developing for use in FAT. Bilateral modifications P00017, P00019, and P00020 were all entered into after Axion's August 27, 2001 letter. In addition, the Navy's desire for the additional FAT testing required by modifications P00017, P00019, and P00020 was prompted in part by Axion's leaking problem. Hahin Decl. ¶ 7 at DA 350; Hahin Depo. p. 110 at DA 224.

Accordingly, the bilateral modifications clearly involve the same subject matter as those counts alleging that Axion's leaking problems were attributable to the contract's specifications.

Two additional counts that should also be barred by the doctrine of accord and satisfaction are Counts XIV and XVI. Count XIV alleges the testing required by modifications P00017, P00019, and P00020 was not, in fact, first article testing. All three modifications, however, expressly referred to the testing of "first articles." Therefore, the subject matter of these modifications encompasses the type of testing (i.e., first article) required by the modifications.

Count XVI is premised on a combination of issues related to both the leaking electrolyte and Axion's decision to produce its own plate stock. Therefore, the subject matter of modifications P00017, P00019, and P00020 encompasses Count XVI for the same reasons as the leaking electrolyte and defective plating specification Counts addressed above.

### C. There Was A Meeting Of The Minds

#### 1. The Modification Language Is Clear And Not Ambiguous

"Contract interpretation begins with the plain language of the agreement." Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993). "The most important indicator of intent is, of course, the agreement itself." Ahrens v. United States, 62 Fed. Cl. 664, 671 (2004) (quoting Greco v. Dep't of the Army, 852 F.2d 558, 560 (Fed. Cir. 1988)). In the context of accord and satisfaction, a meeting of the minds occurs when there are expressions sufficient to make the parties understand, or where it would be unreasonable not to understand, that the accord encompasses the contested claim. National Steel and Shipbuilding v. United States, 49 Fed. Cl. 579 (2001). Here, contract modifications P00017, P00019, and P00020 each contain the following language:

> This modification constitutes a full and final disposition of all matters relating to this contract and is a full release and accord and satisfaction of any and all claims, demands, or causes of action that either the contractor or the government may have against the other arising out of or relating to the contract to date.

DA 159, 162, 163.

This language leaves little room for the imagination. In addition, Mr. Latifi, President and owner of Axion, stated in his deposition that Axion and specifically he had been contracting with the United States Government for 20 years. Latifi Depo. pp. 13, 19 at DA 244, 246. It beyond credulity that such clear and plain language would be difficult for an experienced government contractor to understand. While the language is so clear that it almost renders an evaluation of the context unnecessary, such an evaluation only lends support to the notion that, with each modification, Axion and the Government knowingly agreed to a valid accord and satisfaction, and bilaterally agreed to release all claims to the date of the most recent signing.

**2. Each Of The Three Times Axion And The Government Bilaterally Agreed To An Accord And Satisfaction Provision, There Existed Bona Fide Disputes Concerning The Contract That The Parties Waived**

On October 2, 2001, the date on which both parties agreed to modification P00017, a dispute existed between Axion and the Government concerning the air gun, plate stock specifications, and leaking electrolyte. In an August 27, 2001 letter to the Government, Axion alleged that defective specifications caused its power supplies to leak electrolyte. DA 194. The Government took exception to this allegation in a September 18, 2001 response. There is no doubt that, no later than September 18, 2001, a bona fide dispute concerning electrolyte leaks existed. See also Latifi Depo. p. 157 at DA 323. By agreeing to P00017, both the Government and Axion agreed to waive all claims related to the leaking electrolyte to that date.

With respect to the air gun, Axion asked the Navy to provide it with such a gun as early as January 17, 1996. DA 178; Latifi Depo. p. 63 at DA 273. The Navy denied that request on January 26, 1996. DA 179. Since this dispute concerning the air gun arose well before both parties agreed to P00017, Axion is also barred from bringing any claim related to the provision of the air gun.

Finally, turning to Axion's claims relating to the manufacturing plate stock, Axion made allegations of defective specifications in a November 13, 2000 letter to the contracting officer.

DA 190; Latifi Depo., pp. 136-144 at DA 303-311. Nine days later, on November 22, 2000, the Government wrote a letter back to Axion, in which it refuted that claim. DA 192. Therefore, a dispute concerning the contract's plate specifications existed at the time both parties agreed to P00017. DA 192; Latifi Depo. p. 144 at DA 311. Accordingly, Axion is further barred from bringing any claims related to this issue.

Even if Axion was not already in the process of formulating formal legal claims concerning these three issues at the time it agreed to modification P00017, the fact remains that the cause of the electrolyte leaks, responsibility for the provision of the air gun, and adequacy of the manufacturing plate stock specifications were all in dispute at the time Axion and the Government agreed to "a full release and accord and satisfaction of any and all claims, demands, or causes of action that either the Contractor or the Government may have against the other arising out of or related to the contract to date." Accordingly, these claims are barred by the doctrine of accord and satisfaction.

### D. Both Parties Bargained For, And Obtained, Consideration With Respect To Bilateral Modifications P00017, P00019, and P00020

#### 1. The Government Provided Consideration For Modification P00017

Pursuant to modification P00016, Axion was required to begin production lot deliveries on or before August 8, 2001. DA 158. Axion failed to meet this deadline. Upon missing this deadline, pursuant to the contract's termination clause, the Government gained the option of terminating the contract for default. Id. Accordingly, Axion and the Navy agreed to P00017 on October 2, 2001. The simple fact is that, on that date, Axion was not in compliance with the delivery requirements of P00016 and at risk of a termination for default. The consideration the Government provided, then, was significant. As part of a valid accord and satisfaction, the Government extended the delivery schedule to the following day, thereby relinquishing its ability to terminate Axion for default at that time. Moreover, it also waived any claims it might have had against Axion when agreeing to the modification.

2. **<u>The Government Provided Consideration For Modification P00019</u>**

In agreeing to modification P00019, the Government provided two forms of consideration. First, it granted Axion another extension of the delivery date. Second, the Government reduced the number of required first article test samples from 120 to 80. Bilateral Modification P00017 reestablished the first article requirement for October 3, 2001. DA 159. When Axion failed to satisfy the requirements of P00017, the Government again had the right to terminate for default. The Government gave up this right by agreeing to P00019, which reestablished the date for first article by April 23, 2002. By agreeing to give Axion more time, P00019 includes consideration flowing to Axion. Furthermore, P00019 includes a second form of consideration flowing to Axion irrespective of the above. P00019 reduced the quantity of first article samples from 120 to 80. Axion, therefore, gained the benefit of having to expend only 80, rather than 120, units on destructive testing and the decrease lowered the threshold for passing first article testing.

Also, in agreeing to the accord and satisfaction and release of P00019, the Government waived its right to bring any outstanding claims it may have possessed up to that time against Axion. This, too, was consideration for the agreement. Accordingly, the Navy provided consideration when it agreed with Axion to bi-lateral modification P00019.

3. **<u>The Government Provided Consideration For Modification P00020</u>**

Modification P00019 established April 23, 2002 as the new deadline for the first article test requirement. DA 162. After Axion failed to meet the requirements of P00019, the parties bilaterally agreed to modification P00020. DA 163. Modification P00020 set September 9, 2002 as the new first article deadline, which, by agreeing to yet another extension, constituted consideration on the part of the Government. <u>Id.</u> Again the Government would no longer be able to terminate for default when Axion missed yet another deadline set forth in the agreement. It is quite clear that, just as with bilateral modifications P00017 and P00019, Axion received the benefit of additional time to perform, and an alleviation of the risk of termination for default,

when it agreed to modification P00020. Accordingly, this modification also was supported by consideration.

The record in this case is clear. The elements of accord and satisfaction were met on three occasions. Accordingly, Axion's claims here must be dismissed because they are barred by the doctrine of accord and satisfaction.

## VI. The United States Is Also Entitled To Summary Judgment Because Axion Is Asserting Claims That It Has Already Agreed To Release

### A. The Doctrine Of Release Bars Axion's Claims

"A release is a writing providing that a duty owed to the maker of the release is discharged immediately or on the occurrence of a condition." Restat. 2d of Contracts § 284. A contractor that executes an unconditional general release without exercising the right to reserve claims is barred from maintaining a suit under the contract based on events that occurred prior to the execution of the release. Mingus Constructors, Inc., 812 F.2d at 1391; Abatement Contracting Corporation v. United States, 58 Fed.Cl. 594, 607 (2003). Once again, modifications P00017, P00019, and P00020 each include the following language:

> This modification constitutes a full and final disposition of all matters relating to this contract and is a **full release** and accord and satisfaction of any and all claims, demands, or causes of action that either the contractor or the government may have against the other arising out of or relating to the contract to date.

DA 159, 162, 163 (emphasis added).

As this was a bilateral agreement, both Axion and the United States are the "maker" of the release, and as there are no conditions precedent set forth in the modifications, it is clear that agreement to P00017, P00019, and P00020 had the effect of an immediate release of all potential and actual claims that could be brought by either of the two parties. For a release to be valid, all that is required by a contractor is that he "execute[] an unconditional release and fail[] to exercise his right to reserve claims" or the contractor "is barred from maintaining a suit for damages or additional compensation under the contract based on events that occurred prior to execution of

the release." Abatement Contracting v. U.S., 58 Fed. Cl. 594, 611 (2003). Accordingly, the doctrine of release bars claims "based on [prior] events" rather than only those that were in dispute.

As with any contract, a release may be invalidated if fraud, duress, or mutual mistake is involved; however, none of those elements are present in this case. Moreover, Axion has never raised these issues. Accordingly, the release is valid, and those counts barred by accord and satisfaction are also barred by release. J.G. Watts Constr. Co. v. United States, 161 Ct. Cl. 801, 807 (1963).

### B. Just As The Language Of The Accord And Satisfaction Portion Of The Modification Is Unambiguous, So Is The Release Language

It is undisputed that the release language was displayed prominently in each of the three modifications to which Axion and the United States voluntarily agreed. DA 159, 162, 163. The provision is clear, concise, and easily understandable. A party should not be able to simply ignore a straightforward agreement, choosing instead to bring claims it has already released. Accordingly, the plain language of the release agreements demonstrate that counts I through IX, and XIII through XXIX of Axion's complaint should be dismissed pursuant to the doctrine of release.

## CONCLUSION

Axion's claims regarding the building of an air gun to test the PS-115s first accrued in 1996, and thus they are barred by the six-year statute of limitations set forth in the FAR. These claims are also barred by the doctrine of laches as they were brought after an unreasonable seven year delay and are materially prejudicial to the Government. Additionally, Axion is barred by the doctrines of accord and satisfaction and release from seeking or obtaining any relief for counts I through IX and XIII through XXIX. Accordingly, the United States respectfully requests that the Court dismiss all Counts asserted by Axion regarding its development of the air gun because they barred by the statute of limitations and laches. In the alternative, the Government respectfully requests that the Court enter summary judgment in its favor and dismiss Counts I through IX and

counts XIII through XXIX because they are barred by the doctrines of accord and satisfaction and release.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Kathryn A. Bleecker
KATHRYN A. BLEECKER
Assistant Director

s/Douglas K. Mickle
DOUGLAS K. MICKLE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530
Tele: (202) 307-0383
Fax: (202) 353-7988

OF COUNSEL:
Richard Martinelli
Office of Counsel
Naval Inventory Control Point
Mechanicsburg, PA 17055-0788

April 11, 2004

Attorneys for Defendant

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on April 11, 2005, a copy of the foregoing "DEFENDANT'S PARTIAL MOTION TO DISMISS FOR LACK OF JURISDICTION, AND IN THE ALTERNATIVE, PARTIAL MOTION FOR SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Douglas K. Mickle
Douglas K. Mickle