Nos. 03-2644C & 04-297C
(Judge Firestone)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

AXION CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S APPENDIX
VOLUME VII, PAGES 178 - 210

---

PETER D. KIESLER
Assistant Attorney General

DAVID M. COHEN
Director

KATHRYN A. BLEECKER
Assistant Director

DOUGLAS K. MICKLE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 353-7961
Fax: (202) 353-7988
Attorneys For Defendant

OF COUNSEL:

RICHARD MARTINELLI
Office of Counsel
Naval Inventory Control Point
Mechanicsburg, PA 17055-0788

April 11, 2005

# INDEX TO APPENDIX

Document

Contract Number N00104-96-C-KA091 . . . . . . . . . . . 1

Contract Modification P00001- P00021 . . . . . . . . . . . 143

Letter from Axion to Department of the Navy (Dated August 4, 1994) . . . . . . . . . . . 166

Letter from Axion to Department of the Navy (Dated August 11, 1995) . . . . . . . . . . . 167

Letter from Axion to Department of the Army (Dated September 26, 1995) . . . . . . . . . . . 168

Letter from Department of the Navy to Axion (Dated September 27, 1995) . . . . . . . . . . . 169

Letter from Axion to Department of the Navy (Dated October 2, 1995) . . . . . . . . . . . 170

Letter from Small Business Administration to Department of the Navy Regarding
Certificate of Competency ("COC") (Dated October 11, 1995) . . . . . . . . . . . 171

Letter from U.S. Small Business Administration to Mr. Artz: Regarding
COC (Dated November 9, 1995) . . . . . . . . . . . 172

Letter from Dep't of the Navy to Department of Labor: Requesting
Clearance (Dated November 22, 1995) . . . . . . . . . . . 174

Letter from U.S. Small Business Administration to Department of Navy: Regarding Solicitation
of Axion: Regarding Solicitation (Dated December, 4, 1995) . . . . . . . . . . . 175

Letter from Department of Navy to Axion (Dated December 7, 1995) . . . . . . . . . . . 176

Letter from Axion to Department of Navy: Regarding ECP on Axion Contract (Dated January
17, 1996) . . . . . . . . . . . 178

Letter from Department of Navy to Alex Latifi, President of Axion: Regarding Dies (Dated
January 26, 1996) . . . . . . . . . . . 179

Letter from Axion to Department of the Navy: Regarding Post Award (Dated March 18, 1996)180

Letter from Axion to U.S. Army Research Laboratory: Regarding Cooperative Resolution and
Development Agreement (Dated June 27, 1996)....................182

Letter from Axion to Mr. John Korab, Naval Inventory Control Point : Regarding N00104-96
CKA09 (Dated April 15, 1997) . . . . . . . . . . . 184

Letter from Axion Mr. Weir to Mr. Alen Artz (Weir Memo) (Dated May 30, 1997) . . . . . . . . 185

Letter from Axion to Mr. John Korab, Naval Inventory Control Point: Regarding Data of First Article in Reference to Axion Contract N00104-96 CKA09 (Dated April 12, 1999) . . . . . . . . 187

Letter from Commanding Officer, Naval Inventory Control Point to Axion : Regarding First Article Approval for Contract (Dated May 17, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .189

Letter from Axion to Naval Inventory Control Point: Regarding Plating Guidelines (Dated November 13, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

Letter from Department of the Navy to Axion (Dated November 22, 2000) . . . . . . . . . . . . . . . 192

Letter from Axion to Naval Inventory Control Point (Dated August 27, 2001) . . . . . . . . . . . . 194

Transmittal Letter from Department of the Navy to Axion (Dated September 18, 2001) Transmitting September 6, 2001 Letter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196

Letter from Axion to Mr. John Korab (Date September 18, 2001) . . . . . . . . . . . . . . . . . . . . . . 198

Letter from Department of the Navy to Axion (Dated November 1, 2001) . . . . . . . . . . . . . . . . 199

Letter from Department of the Navy to Axion (Dated December 13, 2001) . . . . . . . . . . . . . . . 200

Letter from Department of the Navy to Axion (Dated April 30, 2002) . . . . . . . . . . . . . . . . . . . 201

Letter from Axion to Mr. John Korab, Naval Inventory Control Point (Dated September 9, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202

Letter from Department of the Navy to Axion (Dated October 1, 2002) . . . . . . . . . . . . . . . . . . 203

Letter from Department of the Navy to Axion (Dated October 1, 2002) . . . . . . . . . . . . . . . . . . 204

Letter from Axion to Mr. Korab (Dated October 11, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 205

Memorandum from John Korab Regarding Proposed Termination for Default (Dated October 17, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208(a)

Letter from Department of the Navy to Axion (Dated June 30, 2003) . . . . . . . . . . . . . . . . . . . 209

Deposition of Mr. Jerry Hahin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 211

Deposition of Mr. John Korab . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

Deposition of Mr. Alex Latifi . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 243

Declaration of Mr. Jerry Hahin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 348

Declaration of Mr. John J. Korab . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 354

Declaration of Mr. Henry Stickrod . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 359

AXION

AXION CORPORATION
P. O. BOX 5366
317 NICK FITCHEARD ROAD
HUNTSVILLE, ALABAMA 35806
TELEPHONE: (205) 851-9770
FAX: (205) 851-9771

January 17, 1996

Department of the Navy
Navy Ships Parts Control Center
5450 Carlisle Pike
P.O. Box 2020
Mechanicsburg, PA 17055-0788

ATTN: John Korab

Reference: *Contract No: N00104-96-C-KA09*
Noun: *Power Supply*
Part No: *PS-115*

Dear John,

In reference to our telephone conversation, Axion Corp. hereby requests any ECP available on the above referenced part. We understand that the government has supplied two airguns as government furnished material to previous contractor, Accudyne, to perform the final testing. We hereby request one unit supplied to Axion Corp. for performance of final testing.

We appreciate your help and cooperation in this matter. Should you have any questions, please contact the undersigned.

Sincerely,

AXION CORPORATION

Alex Latifi
President

8

**DEPARTMENT OF THE NAVY**
NAVAL INVENTORY CONTROL POINT
700 ROBBINS AVENUE 5450 CARLISLE PIKE - PO BOX 2020
PHILADELPHIA PA 19111-5098 MECHANICSBURG PA 17055-0788
COM & FTS (717)790-
DSN & EXT
FAX #

IN REPLY REFER TO:

Ser 0242.6/JK
N00104-96-C-KA09
26 January 1996

Alex Latifi, President
Axion Corporation
P. O. Box 5366
317 Nick Fitcheard Road
Huntsville, AL 35806

Dear Mr. Latifi:

The following information is provided in response to your letters dated January 11th and 17th, 1996.

In the January 11, 1996 letter, you addressed government owned stamping dies. The Navy does not own any stamping dies which can be used in the PS115 Power Supply.

The January 17, 1996 letter requested any available ECP's which would apply to the PS115 Power Supply, and also requested an air gun to perform final testing. All ECP's have been incorporated into the PS115 Automated Data List 53711-5355797. The Navy did not supply any air guns to the previous contractor, Accudyne Corporation, for test purposes.

If I can be of further assistance, contact me at (717) 790-2027.

Sincerely,

John Korab

JOHN KORAB
Contracting Officer

cc: DCMAO Birmingham

AXION

AXION CORPORATION
P. O. BOX 5366
317 NICK FITCHEARD ROAD
HUNTSVILLE, ALABAMA 35806
TELEPHONE: (205) 851-9770
FAX: (205) 851-9771

March 18, 1996

Department of the Navy
Navy Ships Parts Control Center
5450 Carlisle Pike
P.O. Box 2020
Mechanicsburg, PA 17055-0788

**ATTN: John Korab**

**Reference:** *Contract No: N00104-96-C-KA09*
**Noun:** *Power Supply*
**Subject Part No:** *PS-115*

Dear John,

We enjoyed your visit it has been very informative. We appreciate the professional manner that the post-award was handled. In reference to the post-award, please enclose find the deviation form for the 187 copper as agreed on. I would like to take this opportunity to inform you of our agreement with Harry Diamond Laboratory.

In principle, Axion Corporation and ARL have reached an agreement to join their effort to produce a new generation of airgun. Highlights of agreement points are listed below. Furthermore, Harry Diamond Laboratory agreed to perform first article test for Axion; in case by that time gun was not completed.

ARL will:

| | | |
|---|---|---|
| 1. | Provide drawings and/or phone technical support for an air gun design for equipment to be built by and for Axion. | 1 week after agreement |
| 2. | Provide a spin-airgun for development work. | 2 weeks after agreement |
| 3. | Provide guidance regarding bird size and weight, MEM weight, spinner dimensions, etc. | 2 weeks after agreement |
| 4. | Provide an adequate number of batteries from characterized lots for confirmation of their system (Would require our doing testing at ARL). | On request with 2 weeks notice |

Axion will:

1. Develop a compatible on-board data logging device (including both hardware and software) capable of capturing and saving voltage, time, acceleration, etc. (As relevant) at specifications to be determined.

2. Develop a compatible system for real-time monitoring of battery performance in a "gross mode" (might be IR transmission)

3. Modify air gun (provided by ARL) to accommodate data logging devise(s) and return to Adelphi

4. Improvements of air gun design would be available to ARL (designs, drawings, parts sources, etc.).

90 days after agreement

Please be advised that this is the highlight of the agreement in principle. The final agreement has not been signed at this time.

We appreciate your help and cooperation in this matter. Should you have any questions, please contact the undersigned.

Sincerely,

AXION CORPORATION

Alex Latifi
President

Encl.

AL/djm

AXION

AXION CORPORATION
P. O. BOX 5366
317 NICK FITCHEARD ROAD
HUNTSVILLE, ALABAMA 35806
TELEPHONE: (205) 851-9770
FAX: (205) 851-9771

U.S. Army Research Laboratory (ARL)
2800 Powder Mill Road
Adelphi, Maryland 20783-1145

June 27, 1996

**ATTN:** Mel Morganstein

**Reference:** **Cooperative Research and Development Agreement**

Dear Mel,

In reference to your letter we received on June 3, 1996, and our meeting with your organization in Cherry Hill, N.J. regarding the Cooperative Research and Development Agreement (CRADA), please be advised Axion Corp. has reviewed your letter and made a feasibility study on the concept of collecting data through LED at 12 Khz sample rate.

Axion agrees to design and build a remote IR Data Collection System and adapt it to the Airgun used by the Government. This IRDC System would be produced in lieu of the data logging system previously proposed by Axion. All other specifics already agreed upon will remain in effect.

Axion's IRDC System would allow the collection of battery voltage data at the 12 Khz sample rate. The system will also allow the computer to remotely control the battery loads. The data would be captured using a desktop computer system such as a PC or Mac. The data collected could then be analyzed using LabView or a similar program. A preliminary drawing (342122) is enclosed for your attention.

We would further like to advise you that Axion Corporations contract with the Navy is not in any form or shape a part of this agreement, nor does your organization hold any responsibility towards Axion and the contract for the battery with the Navy.

If Axion requires your help in testing the batteries it will be under a different agreement and of course Axion will absorb any incurred costs.

| Post-it® Fax Note 7671 | Date 28-6-96 # of pages ▸ 3 |
|---|---|
| To Mel Morganstein | From Alex Latifi |
| Co./Dept. U.S. Army Research Lab | Co. Axion Corp. |
| Phone # (301) 394-3114 | Phone # (205) 851-9770 |
| Fax # (301) 394-4860 | Fax # (205) 851-9771 |

We have discussed the matter with the Navy and a copy of the CRADA has been supplied to our contracting officer and he does not see any problems whatsoever with our agreement, on the contrary, he's glad that such an agreement has been reached. We would like to inform you that in our discussion with the Navy concerning any questions that we might have that the Navy must come to you for the answer, you will be compensated for such work by the Navy through a fund already available for this purpose. I hope this will clear any reservations which you had.

We hereby request to proceed with the CRADA as already signed.

We appreciate your help and cooperation in the above matters. Should you have any questions, please contact the undersigned.

Sincerely,

**AXION CORPORATION**

Alex Latifi
President

AL/mkb MM960627.wps

AXION CORPORATION

P. O. BOX 5366
317 NICK FITCHEARD ROAD
HUNTSVILLE, ALABAMA 35806

TELEPHONE: (205) 851-9770
FAX: (205) 851-9771

FAXED

Commanding Officer
Naval Inventory Control Point
540 Carlisle Pike
PO Box 2020
Mechanicsburg, PA 17055-0788

April 15, 1997

Attn: John Korab, Code 0242.6/JK

Reference Contract # N00104-95-KA09

Dear Mr. Korab;

On 10 April, 1997, I talked to Brian Gage (he called me) about the RFW's and letters that we have submitted, and as of yet have not been answered. Brian indicated that Craig and he have some concern with the RFW # W-KA09-02, solder ring dimension change. I told him that we have run tests on the melted solder, and Axion believes that the change is an improvement.

Yesterday, Alex talked to Craig Herndon about trying to expedite answers to our RFW's and outstanding letters. Axion produced most of the special gages that were requested in the last meeting by the visiting team, even though the CDRL A0003 was previously approved and it was unnecessary. As a courtesy, we shipped Fed-Ex over night to Craig copies of the gage drawings, one sequencer and one solder ring in order to help expedite the unanswered RFW's and letters.

As was submitted and approved in CDRL A003, Axion had a previously agreement with Harry Diamond Laboratory to perform Spin Testing of our units to the drawing requirements. However, now they say they can only test 4 units a day, which will require 90 Work days (120 calendar days) in order to perform the Spin Testing. Alex talked with Craig and he (Craig) confirmed our findings that only 4 units a day was indeed all they say they can test. Axion was then informed that they would furnish us a set of drawings of the spin gun, and Axion sent a check to cover copy costs per the requested amount for copies, but then after several inquiries, we were informed that they could not furnish the drawings

The First Articles are approximately 80 - 85% completely assembled, but we cannot proceed any further with assembly until we receive answers to our submitted letters and RFW's. The letter asking for clarification about solder or weld (Per Dwg # 11744726) vs weld (Per Dwg # 11716473) on the Stack and Ampule Assembly is a major hold up for Axion, as we cannot complete the assembly until we receive answers to our letter. (Axion wishes to solder the wires Per Dwg # 11744726.) This places Axion in a *hold status*, as far as assembly is concerned.

Craig says that the prior supplier welded the wires, and that perhaps Axion should do so also (even though drawing # 11744726 permits us to solder the wires). He was to get with Brian Gage and discuss it, and advise us of their decision. No answer as of today. Axion is certified to solder to several Military Solder Specifications, and it could be that the prior supplier was not certified to solder, and for that reason and chose to weld the wires in lieu of solder.

Based upon Harry Diamond Laboratories revised excessively projected test time required, and the fact that we are still waiting for answers to our RFW's and letters, Axion decided to proceed and design our own Spin Gun, of which the design is complete and is currently in the process of being manufactured, and should be complete within approximately 2 weeks. This will permit Axion to test from 50 to 60 units each day, for a total test time of 7 to 8 days *maximum* in lieu of the 4 units a day by Harry Diamond Lab. This will enable Axion to produce the required units *at least* 100 days *faster and far more accurately* than Harry Diamond Labs. By Axion performing the tests, the data will be clean and accurate. Craig is aware of how our method of data collection will be computerized and much more reliable and accurate, in lieu of the method Harry Diamond Lab uses.

Therefore, due to circumstances *beyond our control*, Axion must ask for a contract extension of an additional approximately 75 days to allow time for the First Article submission, placing it at approximately 31 August, 1997, provided our letters, RFW's are answered in a timely manner. Axion will do everything in our power to make an earlier shipment of the First Articles, if at all possible.

Thank you for your assistance in this matter. Please advise, as we await your rapid response.

Sincerely,

Levi Weir

Levi Weir, QA Manager

cc: Brenda Middleton, GLNA/QAR, Huntsville

903slrwl

AXION CORPORATION
P. O. BOX 5366
317 NICK FITCHEARD ROAD
HUNTSVILLE, ALABAMA 35806

TELEPHONE: (205) 851-9770
FAX: (205) 851-9771

**Memo: To Alen Artz** **5/30/97**

**Contract N00104-95-KA09 Power Supply, PS 115**

Today, Axion received a call from Mr. Alen Artz, about how much time extension we need for the First Articles. I told him we would need ***90 days after*** we receive approval of the CDRL A003, Inspection/Test Plan, that will have to be resubmitted. By changing the place of Spin Testing, we must, by contract, resubmit the Test Plan. The reason for resubmittal is due to Harry Diamond Labs not holding up their agreement to perform the Spin Testing as was agreed upon and approved in our precious submission of CDRL A003.

Since Harry Diamond Labs will not perform to our previous agreement and will not furnish drawings of their Spin Gun, Axion had no other choice than to design and build our own spin gun for testing. We expect to have the manufacturing of the spin gun completed in a few days, then will have to make "dry runs" in order to check it's operation and "fine tune" our test procedures before final submission of CDRL.

Axion expects to resubmit the CDRL in apx 30 days. The Government has 30 days to approve of reject the CDRL, but on the other submission took apx 4 1/2 months. This is the reason we cannot give a definite date due to we have no way of knowing how long it may take for approval.

Levi Weir

Levi Weir, QA Manager

Δ π EXHIBIT 20
Deponent________
Date______ Rptr.______
DEPOBOOK

NAVY01806



MAY. 30. 1997 9:07AM AXION CORP. (205) 851-9771 NO. 0712 P. 2/2

Copy

AXION CORPORATION

TELEPHONE: (256) 851-9770
FAX: (256) 851-9771

April 12, 1999

Naval Inventory Control Point
P.O. Box 2020
Mechanicsburg, PA 17055-0788

Attn: Mr. John Korab

RE: N00104-96-C-KA09

Dear Mr. Korab:

Axion Corporation hereby submits valid collected data of First Article testing required on Contract N00104-96-C-KA09, per conversations with Mr. Jerry Hahin of Crane Naval Warfare Center, a reduction from 360 to 240 First Article Data is requested.

1) A brief synopsis of pertinent development is provided below.

2) Quantity manufactured for first article: 609 each.

3) All 609 units were subjected to the environmental requirement of the Technical Data Package.

4) A table of 581 Units were destructively tested.
   a. 360 Units were consumed to:
      1. Develop the Spin Vacuum Gun.
      2. Establish the Acceleration Criteria.
      3. Verify the Inboard Computer.
      4. Verify data collection.
      5. Final verification of the Gun and System accuracy.

5) Enclosed are computer floppy disks, which contain valid verified successful data for (221) units. Hard copy printouts of additional (22) Units are in the possession of Crane NWP Engineer, Mr. Jerry Hahin. None of the (22) is duplicated on these disks.



317 Nick Fitcheard Road ▪ Huntsville, Alabama 35806

6) Mr. Jerry Hahin, Naval Warfare Center, Crane, Indiana, has made four trips to Axion facility: May 1989, August 1989, September 1989, and March 1999; to observe, witness and verify the unique Spin Vacuum Gun System, processes and procedures that we have developed to meet the requirements of the contract. On his last visit March 2,3,4, 1999, he witnessed the Final First Article Testing and Data Collection. Mr. Henry Stickrod, our DCMC representative has been witnessing the operation and collection of test data for the past four months. Mr. Stickrod and Mr. Hahin were satisfied with the results of the test data.

We hereby request the First Article be approved, so Axion can proceed to produce the contract quantity of 53,000 production units.

Sincerely,

Alex Latifi
President
Axion Corporation

INFORMATION AND/OR ACTION
(REV 1/84) (LOCAL)

CODE 0212.6

DATE 17 MAY 99

FROM: Commanding Officer, Naval Inventory Control Point-Mechanicsburg
5450 Carlisle Pike, PO Box 2020, Mechanicsburg, PA 17055-0788

TO: AXION CORP
P O BOX 5366
317 NICK FITCHEARD RD
HUNTSVILLE AL 35806

CONTRACT/ORDER NO.
N00104-96-C-KA09

SUBJECT
FIRST ARTICLE APPROVAL

Ref: (a)
(b)

Encl: (1)
(2)

First Article submitted under the subject order is approved and production authorized.

A revised delivery schedule of is acceptable. NAVICP-M records have been updated. Modification will will not be issued by PCO/ACO.

The waiver/deviation/substitution requested by Ref is denied. (See below)

Deletion of cannot be granted.

Drawings (Preliminary/Final), Manuals (Preliminary/Final), Provisioning Documentation submitted under subject document

Advise if subject order can be cancelled without cost or liability to either party. If not, advise cost to cancel.

Funds in the amount of $ are authorized for finalization of modification.

Use ACRN:

Reference was answered by enclosure

The drawings listed below are attached.

Material has been / will be shipped on

The proposed / negotiated delivery schedule is acceptable. Issue modification.

Verification of the price increase requested in Ref is necessary prior to acceptance.

NAVICP-M records indicate material was previously supplied as follows:

| Contract / Order | Date | Quantity | Unit Price |
|---|---|---|---|

Ref is under review and reply is expected on or about

OTHER:

FIRST ARTICLE IS APPROVED. AS STATED IN SECTION F-DELIVERIES, THE FIRST LOT DELIVERY OF PRODUCTION UNITS IS DUE 90 DAYS FROM THIS DATE WITH SUBSEQUENT LOTS DUE IN 30 DAY INCREMENTS.

COPY TO:
32J

John Korab

JOHN KORAB
CONTRACTING OFFICER

AXION CORPORATION

TELEPHONE: (256) 851-9770
FAX: (256) 851-9771

November 13, 2000

Naval Inventory Control Point-Mechanicsburg
5450 Carlisle Pike
Mechanicsburg, PA 17055-0788
Attn: John Korab

**RE: N00104-96-C-KA09**

Dear Mr. Korab

In reference to the above contract, please be advised that we have produced approximately 6800 ampule assemblies. And we have over 10,000 bromide cans assembled and other sub-assemblies complete for over 50,00 units. Per our contract we have received OD1832 plating guideline. The scope of this guideline is to provide preparation, manufacturing and quality control of preserved energizer lead dioxide electrode stock in a continuous strip and batch stock plating operation. The guideline is providing Axion with current density, plating time, solution mix and flow rate and temperature. We have spent 1 week on lead plating solution and one 1 week on lead dioxide plating solution and 1 week on acetate lead dioxide plating trying to make a solution to Government specifications and be able to pass the required sell test. We were unable to do so. Our chemist and a factory chemical representative came to the conclusion that the amount per ounce or gram given by the Government document for each element solution was not correct and completely off. Therefore we have spent the past 2 weeks and have mixed the 3 solutions with help from the chemical representative and our chemist to find the correct amount of mixture for each solution. We have plated and ran sample sell test, 5 sets of tests were preformed for verification and clearly show that we exceed the sell test requirement and matched sell sample test that we had in stock.

The documents provide us current density and plating time, based on 4 foot per minute travel time and 109 ASF for lead plating and 69 ASF for lead dioxide plating and 13.2 ASF for lead acetate plating. Our plating line has been designed base on above current density and was designed to run 4 foot per minute and we have purchased rectifiers to provide the required ASF for each solution. This past Thursday and Friday that we ran the machine we find out the ASF called out by the Government was not adequate. Therefore we have no choice but to purchase a larger rectifier. We intend to move down our rectifiers by using 109 ASF on 69 ASF call out and 69 ASF call out in place of 13.2 ASF call out and purchase 1 larger rectifier for the lead plate

317 Nick Fitcheard Road • Huntsville, Alabama 35630
www.axioncorporation.com • axion@sprintmail.com

solution. We intend to find a rectifier as soon as possible and have it shipped to our site the fastest possible way. We have already lost 5 weeks of our time trying to correct the Government document. We are not asking for the costs incurred to Axion, nor are we asking for the cost of a rectifier. It will take time to purchase chemicals again and a rectifier, and after that we need plating time. We request that Axion be compensated for the lost time of the 5 weeks, 1 week for mixing the chemicals and running the test, and 2 weeks for finding a rectifier, receiving and installing it, for a total of 8 weeks. And this estimate is cutting it really close. We have shown the problem to the Government inspector, Mr. Henry Stickrod. I apologize for not getting back to you earlier, but it was necessary to ensure we had properly prepared and tested each solution and received the correct result, so our position could be clear before reporting to you.

We appreciate your help and cooperation in this matter. Should you have any questions, kindly contact the undersigned.

Sincerely,

Alex Latifi
President,
Axion Corporation

317 Nick Fitcheard Road • Huntsville, Alabama 35630
www.axioncorporation.com • axion@sprintmail.com

**DEPARTMENT OF THE NAVY**
NAVAL INVENTORY CONTROL POINT
700 ROBBINS AVENUE
PHILADELPHIA PA 19111-5098
5450 CARLISLE PIKE - PO BOX 2020
MECHANICSBURG PA 17055-0788

IN REPLY REFER TO.

Ser 0242.6
N00104-96-C-KA09
November 22, 2000

Axion Corporation
317 Nick Fitcheard Road
Huntsville, AL 35630

Dear Mr. Latifi:

The following is in response to Axion's letter of November 13,2000 that asserted Axion lost five weeks time trying to correct the Government's document OD 18332. The Government takes strong exception to Axion's position especially since the document has been in circulation since 1967.

The OD 18332 is provided as a guideline and does not preclude the contractor from altering the process to suit the contractor's particular manufacturing process.

It is recommended that Axion proceed with production utilizing the available equipment on-hand at one foot per minute line speed until the rectifier needed to run at the higher rate of four feet per minute is received from the supplier. Axion has stated that the material can be produced by using the slower line speed. Axion planned to use a commercial plater at the beginning of the contract. It is not the Government's fault that Axion decided to undertake the plating process.

The Government is looking forward to Axion producing the Power Supply PS-115.

Sincerely,

John Korab

John Korab
Contracting Officer

Cc: J.Hahin
J.Ellis

solution. We intend to find a rectifier as soon as possible and have it shipped to our site the fastest possible way. We have already lost 5 weeks of our time trying to correct the Government document. We are not asking for the costs incurred to Axion, nor are we asking for the cost of a rectifier. It will take time to purchase chemicals again and a rectifier, and after that we need plating time. We request that Axion be compensated for the lost time of the 5 weeks, 1 week for mixing the chemicals and running the test, and 2 weeks for finding a rectifier, receiving and installing it, for a total of 8 weeks. And this estimate is cutting it really close. We have shown the problem to the Government inspector, Mr. Henry Stickrod. I apologize for not getting back to you earlier, but it was necessary to ensure we had properly prepared and tested each solution and received the correct result, so our position could be clear before reporting to you.

We appreciate your help and cooperation in this matter. Should you have any questions, kindly contact the undersigned.

Sincerely,

Alex Latifi
President,
Axion Corporation



317 Nick Fitcheard Road • Huntsville, Alabama 35630
www.axioncorporation.com • axion@sprintmail.com

AXION CORPORATION

Innovation is our business.

8/27/01

Naval Inventory Control Point – Mechanicsburg
5450 Carlisle Pike
Mechanicsburg, PA 17055-0788
Attn: John Korab

**RE: N00104-96-C-KA09**

Dear Mr. Korab:

In reference to the above contract, as you know:

1. Axion has improved the product, by developing the complete Air Gun and complete automated wireless data collection by developing a 1- inch by 2 –inch computer placed on board of "flying Bird" to collect the data.

2. Axion has improved the basic plating process by using pure nickel instead of steel plated nickel by doing this and developing a new automated plating line Axion has been able to improve the charge from 9 min. to 18 min., which will provide the Government with a long range operating capability.

The design requires Axion to put Acid in copper cans, which is a chemical fact, the acid will eventually dislove the copper. We are experiencing this phenomenon at this time. We have over thousands of copper cans that have been filled with acid and welded and started leaking on the surface of the diaphragms. We had discussion with Mr. Carey Jackson Quality Assurance Manager, of CP/PHIBROCHEM, the approved source of supply of the acid (34-A, Electrolyte). He states that it is a fact that this acid will eventually penetrate the copper. CP/Phibrochem ships the acid in polyethylene containers, which can survive indefinitely without any leakage. Axion has produced polyethylene cans and filled with acid and sealed and clearly there has been no leakage. We wish to submit a VCP or ECP to the government, and suggest that changing from copper cans to polyethylene cans, this will solve any leakage problem, that the government may have experienced infield and will stop any future occurrence.

Were producing 400 units per day, but within a short period of time our production can go up to 1,000 units per day. The time that is required for change over is very nominal and the cost is fractional with compared to the losses of product. Allowing the government ability to store the finished product for long period of time without experiencing any leakage. This change would complete this product and bring it to near perfection. Axion has done some study on making the polyethylene can, with small modification to the equipment Axion can put the polyethylene can on

10



317 Nick Fitcheard Road • Huntsville, Alabama 35806 • Tel: 256.851.9770 • Fax: 256.851.9771 • e-mail: axion@pgtv.net

production line within a short period of time. Were are manufacturing with the cooper can, please advise us if we should continue. We are open for any meeting and discussion at your convince.

We appreciate your help and cooperation in this matter. Should you have any questions, please kindly contact the undersigned.

Sincerely,

Alex Latifi
President
Axion Corporation

lsr

| INFORMATION AND/OR ACTION (A ERNATE) (REV 1/84) (LOCAL) | CODE: 0242.6/JK | DATE: September 18, 2001 |
|---|---|---|

FROM: NAVICP-M

| TO: AXION CORPORATION 317 FITCHEARD ROAD HUNTSVILLE AL 35806 | CONTRACT/ORDER NO. N00104-96-C-KA09 SUBJECT: Power Supply, PS115 |
|---|---|

Ref: (a) Axion letter of August 22,2001

(b)
(c)

Encl: (1) Memo of September 6, 2001, NSWC, Crane Div..
(2)

Attachment (1) is being forwarded as a response to reference(a)

COPY TO:
J. Ellis, NALC
J. Hahin, NSWC. Crane Div.

John Korab
John Korab
CONTRACTING OFFICER

**DEPARTMENT OF THE NAVY**
CRANE DIVISION
NAVAL SURFACE WARFARE CENTER
300 HIGHWAY 361
CRANE INDIANA 47522-5000

8000 IN REPLY REFER TO:
Ser 402/1148

6 SEP 2001

From: Commander, Crane Division, Naval Surface Warfare Center
To: Commanding Officer, Naval Ammunition Logistics Center (Code 32J)

Subj: RESPONSE TO AXION CORPORATION LETTER REGARDING PRODUCTION OF PS115 RESERVE ENRGIZERS ON CONTRACT N00104-96-C-KA09

Ref: (a) Axion Corporation ltr of 27 Aug 01

1. In response to reference (a), the Government does not agree with the allegations set forth by the contractor regarding reaction of fluoboric acid with copper. The United States Army has produced thousands of energizers utilizing this technology. Storage/shelf life tests have been performed on these energizers with no noticeable signs of copper degradation or energizer performance.

2. However, fluoboric acid when combined with methylene bromide has proved to have a corrosive effect on copper. A previous version of the PS115 Reserve Energizer did not isolate the methylene bromide from the fluoboric acid and during quality evaluation tests a significant number of reserve energizers experienced leakage. Corrective action was taken to isolate the methylene bromide from the fluoboric acid by encapsulating the methylene bromide in an ampule surrounded in a larger ampule with the fluoboric acid. This design has been utilized successfully on previous contracts and there remain a significant number of PS115 Reserve Energizers in inventory.

3. This was the design provided to Axion Corporation to build the energizers as set forth in Contract N00104-96-C-KA09. While a change in material from copper to polyethylene may eliminate the contractor leakage problem, this is a significant change to the design of the energizer and would require re-submission of First Article Test samples. The Government is willing to meet with the contractor to inspect and discuss the leakage problem and will entertain potential solutions.

4. NAVSURFWARCENDIV Crane point of contact is Mr. J.R. Hahin. Code 4025, telephone DSN 482-5652 or 812-854-5652.

Karen Whorrall
KAREN WHORRALL
By direction

Copy to: NALC Mechanicsburg (Code 0242.6)



Enclosure (1)

DEPARTMENT OF THE NAV
CRANE DIVISION
NAVAL SURFACE WARFARE CENTER
300 HIGHWAY 361
CRANE INDIANA 47522-5000

IN REPLY REFER TO:
8000
Ser 402/1149

18 SEP 2001

From: Commander, Crane Division, Naval Surface Warfare Center
To: Commanding Officer, Naval Ammunition Logistics Center (Code 32J)

Subj: RESPONSE TO AXION CORPORATION LETTER REGARDING PRODUCTION OF PS115 RESERVE ENRGIZERS ON CONTRACT N00104-96-C-KA09

Ref: (a) Axion Corporation ltr of 22 Aug 01

1. This letter is sent in response to reference (a). The tools outlined in reference (a) item number one are necessary and have been verified to be present at the contractor's facility.

2. The automated equipment and chemical dispensing automation identified in item numbers two and three of reference (a) are useful for large-scale production, but were not required by this contract to produce these reserve energizers.

3. The air gun test fixture and automated data collection system identified in item number four of reference (a) were developed at the discretion of the contractor. The technical data provided an air gun test fixture and data collection system design that was utilized on all previous contracts.

4. The last item, number five, of reference (a) is a plating factory/facility. The contractor did not have to build a new plating facility since plate stock was available from other sources. The contractor procured plated material from a vendor that was used to build the First Article Test (FAT) samples. This plate stock provided excellent results during FAT. The decision by the contractor to develop a plating facility has caused significant delay in production of the energizers. No reserve energizers have been produced since the FAT samples.

5. This contract was awarded in 1995. Authorization to proceed into production was granted in May 1999. Numerous delays were experienced due to the fact the contractor elected to design and build a new air gun test fixture and data collection system. More delays were encountered as the contractor went through the pains of developing a new plating facility.

6. The contractor made two changes without properly notifying the Government. First, the contractor utilized pure nickel in lieu of nickel plated onto steel as called for in the technical data package. Secondly, the contractor decided to

Subj: RESPONSE TO AXION CORPORATION LETTER REGARDING PRODUCTION OF PS115 RESERVE ENRGIZERS ON CONTRACT N00104-96-C-KA09

set-up a plating line to plate material for production after approval was given by the Government to proceed into production. The FA energizers utilized plate stock provided by a vendor. Under normal circumstances, any manufacturing change made after FAT invalidates the results and requires new FA samples to be produced and tested in order to provide assurance that the manufacturing change did not compromise the quality of the product. However, due to the significant delays in production on this contract, the Government decided to allow the contractor to proceed into production without requiring another FA. This decision was based on the fact the plate stock is tested for electrical storage potential in a cell test before it is utilized in the energizer.

7. This contract was awarded in December 1995 and as of this date no production deliveries have been received from the contractor. This is nearly six years after the contract was awarded to Axion Corporation. The funding utilized for this contract expires at the end of this fiscal year and the Government is concerned whether any deliverables will be received before this time. The contractor has not shown significant progress since authorization to proceed into production was provided in May 1999.

8. A recommendation is hereby provided to pursue one of the two proposals set forth below. The first proposal is to terminate the contract for default. The second is to terminate the contract for the convenience of both parties along with requiring the contractor to produce the first lot energizers and perform Lot Acceptance Testing (LAT) of this lot before the end of the Fiscal Year. This lot will be accepted contingent upon the energizers passing LAT. The contractor will also be required to provide level two drawings of the air gun fixture and associated test hardware along with level two drawings of the proposed polyethylene ampule design.

9. NAVSURFWARCENDIV Crane point of contact is Mr. J. R. Hahin, Code 4025, telephone DSN 482-5652 or 812-854-5652.

Karen Whorrall

KAREN WHORRALL
By direction

Copy to:
NALC Mechanicsburg (Code 0242.6)

198(a)

**DEPARTMENT OF THE NAVY**
NAVAL INVENTORY CONTROL POINT
700 ROBBINS AVENUE
PHILADELPHIA PA 19111-5098
5450 CARLISLE PIKE - PO BOX 2020
MECHANICSBURG PA 17055-0788

IN REPLY REFER TO:

Ser: 0242.6/JK
N00104-96-C-K09
November 01, 2001

BY FACSIMILE

Axion Corporation
P O Box 5366
317 Nick Fitcheard Road
Huntsville, Al 35806

Gentlemen:

Reference is made to contract N00104-96-C-K09. Item 0001AB, 120 each, (First Article ) was due for delivery on October 03, 2001. Our records indicate that delivery has not been made to date.

Since you have failed to perform the subject contract within the time required by the terms thereof, the Government is considering terminating said contract pursuant to Federal Acquisition Regulation (FAR) 52.259-8 entitled "Default." Pending a final decision in this matter, it will be necessary to determine whether your failure to perform arose out of causes beyond your control and without fault or negligence on your part. Accordingly, you are hereby afforded the opportunity to present, in writing, any facts bearing on the question to Commanding Officer, Naval Inventory Control Point, Code 0242.6, 5450 Carlisle Pike, P.O. Box 2020, Mechanicsburg, PA 17055-0788, within ten (10) days after receipt of this notice. Your failure to present any excuses within this time may be considered as an admission that none exits, your attention is invited to the respective rights of the Contractor and the Government under FAR 52.249-8 "Default" and the liabilities that may be invoked in the event a decision is made to terminated for default of the Contractor.
Any assistance rendered to you on this contract or acceptance by the Government of delinquent goods or services hereunder, will be solely for the purpose of mitigating damages, and is not to be construed as any intention on the part of the Government to condone any delinquency, or as a waiver of any rights the Government may have under subject contract.

Sincerely,

John Korab
Contracting Officer

cc: DCMC Birmingham
SBA Atlanta
NSWC Crane Div
NALC 32J

**DEPARTMENT OF THE NAVY**
NAVAL INVENTORY CONTROL POINT
700 ROBBINS AVENUE
PHILADELPHIA PA 19111-5098
5450 CARLISLE PIKE - PO BOX 2020
MECHANICSBURG PA 17055-0788

IN REPLY REFER TO.

Ser 0242.6
N00104-96-C-KA09
December 13, 2001

Axion Corporation
Attn: Alex LaTifi
317 Fitcheard Road
Huntsvillle, AL 35806

Dear Mr. LaTifi:

The Contracting Officer has received information that First Article testing for the Power Supply has been delayed due to malfunctioning equipment.

If a contractor is responsible for the manufacturing and testing of material, the Navy expects that the contractor will meticulously undertake the responsibility in order to fulfill the contractor's obligation.

In view of the fact that Axion has received several hundred thousand dollars in progress payments, the Contacting Officer, Program Office, and all Government employees involved in Axion's contract are extremely disappointed and disillusioned with Axion's capability to execute contract N00104-96-C-KA09.

Axion's lack of progress, and apparent deficiency in being able to conduct the First Article test, leads the Contacting Officer to believe that Axion is incapable of producing and delivering the PS-115, Power Supply under the instant contract.

Therefore, this letter is a request for assurance that Axion has the expertise, resources, commitment, and ability to conduct the First Article testing in a professional manner to finally proceed toward the full execution of the contract. Axion shall respond within 10 days with its solution to rectify the current First Article setback.

Sincerely,

John Korab
Contracting Officer

Cc: NSWC, Crane
NALC, Mechanicsburg
DCM, Birmingham
SBA, Atlanta

DEPARTMENT OF THE NAVY
NAVAL INVENTORY CONTROL POINT
700 ROBBINS AVENUE
PHILADELPHIA PA 19111-5098
5450 CARLISLE PIKE - PO BOX 2020
MECHANICSBURG PA 17055-0788

IN REPLY REFER TO.

Ser 0242.6
N00104-96-C-KA09
April 30, 2002

Axion Corporation
Attn: Mr.Alex Latifi, President
371 Fitcheard Road
Huntsville, AL 35806

Dear Mr. Latifi:

It has come to the attention of the Contracting Officer that Axion Corporation (AXION) has not tested any First Articles due to repetitive test equipment failure(s). This situation is most serious in that Axion has not been able to test the PS-115 Power Supply successfully due to malfunctioning test equipment for the past 4 to 6 months. The Navy does not have confidence in Axion's capability to produce the PS-115 Power Supply without a successful First Article Test.

Axion shall respond in writing within five (5) days and provide a detailed description that describes the remedial action that Axion will undertake to rectify the inadequate First Article Test equipment.

If you have any questions, contact me at 717-605-2027.

Sincerely,

John Korab
John Korab
Contracting Officer

cc: Jerry Hahin, NSWC Crane
J. Ellis, NALC, Mechanicsburg
DCM, Birmingham

AXION CORPORATION

*Innovation is our business.*

September 9, 2002

Mr. John Korab
Naval Inventory Control Point – Mechanicsburg
5450 Carlisle Pike
P.O. Box 2020
Mechanicsburg, PA 17055-2020

RE: Contract N00104-96-C-KA09

Dear John:

In reference to the above contract regarding the first article test performance, please be advised that Axion Corporation has performed tests on 127 units that were submitted to the environmental testing requirements listed below.

1. 7' drop
2. Transportation vibration
3. Minus 40-degree temperature
4. Plus 140-degree temperature

Under the presence of DCMA quality assurance representatives, the units were tested at the above temperature and data collected from 74 units were activated and good data were collected. The copies of the collected data are on floppy disks, which, per your instructions, will be sent overnight to Jerry Hahin for his review.

Please advise.

Thank you for your help and cooperation with this matter. If you should have any questions, please contact the undersigned at 256-851-9770.

Sincerely,

Alex Latifi
President
Axion Corporation

317 Nick Fitcheard Road • Huntsville, Alabama 35806 • Tel: 256 851 9770 • Fax: 256 851 9771 • e-mail: axion@pgtv.net

DEPARTMENT OF THE NAVY
NAVAL INVENTORY CONTROL POINT
700 ROBBINS AVENUE
PHILADELPHIA PA 19111-5098
5450 CARLISLE PIKE - PO BOX 2020
MECHANICSBURG PA 17055-0788

IN REPLY REFER TO:

Ser 0242.6
N00104-96-C-KA09
October 1, 2002

Axion Corporation
Alex Latifi, President
317 Nick Fitcheard Road
Huntsville, AL 35806

Dear Mr. Latifi:

By letter of September 09, 2002, Axion forwarded a First Article Test (FAT) Data Table under contract N00104-96-C-KA09. The FAT consisted of five floppy discs that contained data files from reserve energizer function tests, along with a brief description of the number of reserve energizers tested, number of reserve energizers with good data collected, and a list of environmental tests that the reserve energizers underwent.

Contract modification P00017 required that 120 reserve energizers be function tested. The 120 reserve energizers were to be tested in accordance with Drawing 11744726 for the FAT. The floppy discs contain only 66 separate records, and the five floppy discs contain a total of 84 data files. However, there are 18 duplicitous records. Some of these files have the same name, but are on different discs, while others have different names, but the data in each file are identical. Each of the files with different names are linked to each other in the FAT Data Table.

The contract also required that the reserve energizers be subjected to certain environmental tests before function. Axion's September 09, 2002 letter and the floppy discs data files do not provide any information on which environmental tests each reserve energizer went through.

A FAT report is required by the contract. The format and information required in the FAT report are identified in the Contract Data Requirements List (CDRL) A004 and the Data Item Description (DID) Identification Number DI-NDTI-80809A. Axion's letter of September 09, 2002 does not meet the requirements of CDRL A004. Furthermore, Axion's letter does not contain any information relative to test procedure, test equipment, or data analysis that pertains to the performance requirements.

The FAT Data Table submitted by Axion is disapproved. A total of 25 out of 66 reserve energizers failed to meet the performance requirements per drawing 11744726. Axion failed to comply with contract modification P00017 that required 120 reserve energizers for FAT. Axion's FAT Data Table provides a tabular listing of all the data files that shows three of the four performance requirements for the reserve energizer and identifies the failed performance parameters for each of the 25 defective reserve energizers.

If I can be of further assistance, contact me at 717-605-2027.

Sincerely,
John Korab
John Korab
Contracting Officer

cc: NSWC, Crane Division

**DEPARTMENT OF THE NAVY**
NAVAL INVENTORY CONTROL POINT
700 ROBBINS AVENUE
PHILADELPHIA PA 19111-5098
5450 CARLISLE PIKE - PO BOX 2020
MECHANICSBURG PA 17055-0788

IN REPLY REFER TO:

Ser: 0242.6/JK
N00104-96-C-KA09
October 01,2002

BY FACSIMILE

Axion Corporation
P O Box 5366
317 Nick Fitcheard Road
Huntsville, Al 35806

Gentlemen:

Reference is made to contract N00104-96-C-KA09. Item 0001AB, First Article, is disapproved. Pursuant to the First Article Approval-Contractor Testing (SEP 1989) Clause, Para.(A)(d), Axion failed to make delivery.

Since you have failed to perform the subject contract within the time required by the terms thereof, the Government is considering terminating said contract pursuant to Federal Acquisition Regulation (FAR) 52.259-8 entitled "Default." Pending a final decision in this matter, it will be necessary to determine whether your failure to perform arose out of causes beyond your control and without fault or negligence on your part. Accordingly, you are hereby afforded the opportunity to present, in writing, any facts bearing on the question to Commanding Officer, Naval Inventory Control Point, Code 0242.6, 5450 Carlisle Pike, P.O. Box 2020, Mechanicsburg, PA 17055-0788, within ten (10) days after receipt of this notice. Your failure to present any excuses within this time may be considered as an admission that none exits, your attention is invited to the respective rights of the Contractor and the Government under FAR 52.249-8 "Default" and the liabilities that may be invoked in the event a decision is made to terminated for default of the Contractor.
Any assistance rendered to you on this contract or acceptance by the Government of delinquent goods or services hereunder, will be solely for the purpose of mitigating damages, and is not to be construed as any intention on the part of the Government to condone any delinquency, or as a waiver of any rights the Government may have under subject contract.

Sincerely,

John Korab
Contracting Officer

cc: DCMC Birmingham
SBA Atlanta
NSWC Crane Div
NALC 4314A

For Jerry Halvre

October 11, 2002

Commanding Officer
Naval Inventory Control Point
Code 0242.6
5450 Carlisle Pike
P.O. Box 2020
Mechanicsburg, PA 17055-0788

RE: Contract N00104-96-C-KA09

Dear Mr. Korab:

In reference to the above contract and your letter received October 1, 2002, Axion Corporation stated that 127 units were put through the required environmental testing and they were tested and witnessed by our local DCAS. From the 127 units tested, we collected 74 units with good data. We intended to send you copies of good data collected. While making copies of the disks, my assistant inadvertently put duplicate files on the disks. It remains the same that 74 good data were collected and submitted. Listed below are the data you have received test by test. In the test number, "r" stands for room temperature, "h" stands for plus140-degree temperature, and "c" stands for minus 40-degree temperature. The first column represents the file name, the second column represents the beginning datum, and the third represents the ending datum.

Disk 1

| | | |
|---|---|---|
| 1 | 13.91 | 21.06 |
| 21hg | 13.91 | 21.11 |
| 104 | .00 | 27.30 |
| 105 | 4.86 | 28.78 |
| 107c | .12 | 24.85 |
| 108r | .00 | 26.23 |
| 109r | 7.00 | 23.47 |
| 110r | 11.53 | 23.09 |
| 112r | 15.32 | 30.40 |
| 11hg | 16.83 | 24.41 |
| 15rg | 19.21 | 26.87 |

| | | |
|---|---|---|
| 45cg | 20.07 | 28.24 |
| 4hg | 7.21 | 23.14 |
| 52rg | 11.53 | 23.09 |
| 55cg | .44 | 30.72 |
| 5cg | 6.34 | 34.15 |
| 66 | 13.91 | 21.06 |
| 66rg | 30.17 | 26.15 |
| 6cg | 4.40 | 41.36 |
| 7cg | 10.01 | 30.61 |
| 89 | .81 | 30.49 |
| 8cg | 12.80 | 29.28 |
| 9cg | 8.83 | 19.53 |

Disk 5

| | | |
|---|---|---|
| 20h | 7.21 | 23.14 |
| 25rg | 26.94 | 26.93 |
| 30c | 5.00 | 26.02 |
| 32rg | 24.38 | 24.38 |
| 33rg | 2.21 | 14.38 |
| 38cg | 2.62 | 29.02 |
| 3cg | 8.01 | 27.94 |
| 41cg | 7.21 | 23.14 |
| 42cg | 8.01 | 27.94 |
| 44cg | 8.01 | 27.94 |
| 48cg | 0.00 | 20.25 |
| 51cg | 6.55 | .00 |
| 57rg | 8.10 | 28.23 |
| 59cg | 0.00 | 30.28 |
| 61 | 5.60 | 29.79 |
| 61h | 21.27 | 31.21 |
| 62rg | 7.92 | 27.85 |
| 72 | 6.96 | 29.66 |
| 82hg | 19.44 | 22.34 |
| 85c | 12.08 | 17.42 |
| 95 | 6.32 | 26.98 |
| 99 | .51 | 34.10 |
| 9c | .00 | 23.43 |

On Friday, September 6, 2002, while we were performing the testing, DCAS had a question that should we test beyond the 120 units that were previously selected by DCAS. We tried to contact you at that time and the chief of our local DCAS was trying to do the same. Axion could have performed the tests very easily since we are now capable of testing four (4) units per hour, when previously the

| | | |
|---|---|---|
| 16cg | 1.38 | 22.25 |
| 17cg | 2.53 | 30.25 |
| 19cg | 5.87 | 28.61 |

Disk 2

| | | |
|---|---|---|
| 113 | 12.29 | 30.72 |
| 114r | .44 | 30.72 |
| 117h | 15.88 | 29.79 |
| 122c | .95 | 30.12 |
| 123h | 21.68 | 29.89 |
| 125r | 12.80 | 21.22 |
| 126r | 20.37 | 27.26 |
| 15rg | 19.21 | 26.87 |
| 16cg | 1.38 | 22.25 |
| 17cg | 2.53 | 30.25 |
| 19cg | 5.87 | 28.61 |
| 20cg | 10.49 | 29.57 |
| 20h | 7.21 | 23.14 |

Disk 3

| | | |
|---|---|---|
| 129r | 11.41 | 29.87 |
| 137 | 6.65 | 29.70 |
| 139 | 13.31 | 25.80 |
| 13rg | 1.82 | 27.19 |
| 140 | 2.00 | 22.67 |
| 14rg | 32.43 | 31.51 |
| 15rg | 19.21 | 26.87 |
| 16cg | 1.38 | 22.25 |
| 17cg | 2.53 | 30.25 |
| 19cg | 5.87 | 28.61 |
| 20cg | 10.49 | 29.57 |
| 22cg | 2.00 | 22.67 |
| 23cg | 13.31 | 25.80 |
| 24 | .37 | 31.20 |

Disk 4

| | | |
|---|---|---|
| 27rg | 6.65 | 29.70 |
| 28rg | 13.57 | 28.41 |
| 29 | 19.93 | 29.51 |
| 32c | 8.83 | 21.07 |
| 35rg | 29.45 | 24.37 |
| 36rg | 11.41 | 29.89 |
| 37rg | 9.33 | 31.41 |

By signing this agreement, Axion snall be bound to comply with all of the above terms and conditions of this authorization for a deferral of re-payment.

John Korab, Contracting Officer

Signature: John Korab Date: August 5, 2003

Alex Latifi, President, Axion Corp.

Signature: ____________ Date: 8-05-2003

207(a)

Memorandum

Date: October 17, 2002

From: 0242.6

To: CRB
Via: 0242
024
008

Subject: Proposed Termination for Default (CONTGINST 43308.3B)

This memorandum has been prepared to explain the rationale for proposing termination of this contract for default.

1. Background Information

(a) Contractor: Axion Corporation

(b) Contract: N00104-96-C-K09

(c) Supplies: Item 0001, NSN 1390-01-200-8338, Power Supply, PS-115
Quantity: 55,209 each, U/P: $23.80, Total Contract value: $1,313,974.20

(d) Award Date: December 7, 1995

(e) Initial Delivery: First Article, Item 0001AB, 540 each, later changed to 360 each, due 120 days after the contract date (April 6, 1996)

(f) Delivery Extensions:
First Article due: 29 October 1996, Modification P00002
First Article due: 29 December 1996, Modification P00004
First Article due: 15 May 1997, Modification P00005
Production Lot 1 due: 28 December 99, Modification P00011
Production Lot 1 due: 31 March 00, Modification P00013, Consideration: $3,000.00
Production Lot 1 due: 10 August 00, Modification P00014, Consideration: $5,000.00
Production Lot 1 due: 28 November 00, Modification P00015, Consideration: $10,000.00
Production Lot 1 due: 08 August 01, Modification P00016
A change in the contractor's manufacturing process required that another First Article Test, 120 each, had to be processed. First Article due: 03 October 01, Modification P00017
First Article, 80 each, due: 23 April 02, Modification P00019, Consideration: $1,000.00

First Article due: 09 September 02, Modification P00020

(g) Quantity Shipped: None

(h) Proper justification is in the file

2. This proposed action is taken pursuant to the default clause, FAR 52.249-8, of the contract, and is based on the contractor's failure to deliver an approved First Article. The contract includes FAR 52.209-3, First Article approval-Contractor Testing (Sep 1989), paragraph (d), which states: if the contractor fails to deliver any first article report on time, or the Contracting Officer disapproves any first article, the contractor shall be deemed to have failed to make delivery within the meaning of the default clause of this contract. By letter of October 01, 2002, the contractor was told that the First Article was disapproved.

3. A Show Cause letter, dated October 01, 2002, was also sent to the contractor via facsimile and it was verified by the contractor's secretary that the contractor received the letter. The contractor responded by letter of October 11, 2002, and the contractor failed to take any exceptions to the failures, which totaled 25 out of 66 Power Supplies that failed to meet the performance requirements of drawing 11744726.

4. The Power Supplies are no longer required by the Government and this precludes the availability issue from other sources.

5. The contractor will not be responsible for re-procurement costs because the Government will not re-procure the Power Supplies.

6. I have considered the essentiality of the contractor in the Government acquisition program and the effect of a termination for default upon the contractor's capability as a supplier under other contracts. Presently, the contractor has 10 active contracts worth in excess of $7,000,000.00. A termination for default will not cause a significant impact on the contractor's operations.

7. The contractor received $512,365.00 in progress payments that remain un-liquidated. The Contracting Officer will pursue an action to re-coup the un-liquidated progress payments after the termination for default.

8. The contract has been ongoing due to the need for the Power Supply, however, after several years of helping the contractor, extending the delivery schedule numerous times, and the failure of the First Article, the requirement for the Power Supply is no longer required. During this overly long term of the contract, funding expired and new fiscal year money had to be obligated. Based on the contractor's First Article failure, the contractor's credibility and competency as a viable manufacturer of the Power Supply is sorely lacking.

The contract, applicable laws, and regulations have been reviewed, and the specific

failure of the contractor and excuse for the failure have been considered. I recommend that, with the concurrence of counsel, this contract be terminated for default.

Prepared: John Kord / Contract Specialist 0242-6/2027 10/17/02
Name/Title Code/Ext Date

Reviewed: McNeil, Supv 0242 10/18/02
Name/Title Code Date

208B

208(b)

**DEPARTMENT OF THE NAVY**
NAVAL INVENTORY CONTROL POINT
700 ROBBINS AVENUE
PHILADELPHIA PA 19111-5098
5450 CARLISLE PIKE • PO BOX 2020
MECHANICSBURG PA 17055-0788

IN REPLY REFER TO:

Ser 0242.6
N00104-96-C-KA09
June 30, 2003

Axion Corporation
Attn: Alex Latifi, President
317 Litchfield Road
Huntsville, AL 35806

Dear Mr. Latifi:

By letter of June 17, 2003, Axion requested that the Navy consider a deferral of re-payment of $512,365.00 in un-liquidated progress payments due to the termination for default of contract N00104-96-C-KA09 on November 12, 2002.

Subsequently, a letter of March 04, 2003 was sent to Axion and demanded that Axion re-pay the un-liquidated progress payments in the amount of $512,365.00. Axion responded by letter of March 04, 2003 and took exception to the demand letter. The contracting officer sent a second demand letter for re-payment of $512,365.00 in un-liquidated progress payments on March 13, 2003 that included a final decision.

Upon agreement by Axion and the Government, the contracting officer will grant the requested deferral of payment under the following terms and conditions as stated in FAR 32.613(h)(1 through 7, and (i)(1) and (2):

The contract incorporated FAR Clause 52.232-17, Interest, (1991). Axion will be assessed the interest accrued from the date of the March 04, 2003 demand letter.

The re-payment of $512,365.00 shall be sent to: Naval Inventory Control Point-Mechanicsburg, Attn: Code 0242.6 John Korab, 5450 Carlisle Pike P.O. Box 2020, Mechanicsburg, PA 17055-0788. Make the check payable to: DFAS Columbus Center, South Entitlement Operation.

Upon request, Axion shall submit financial information, and give reasonable access to Axion's records and property by Government representatives.

The Government shall have the right to terminate the deferment agreement and accelerate the maturity of the debt if Axion enters into bankruptcy or insolvency proceedings instituted by or against Axion.

The Government shall initiate any protective requirements that are considered prudent and feasible in the specific circumstances.

Axion shall diligently prosecute its appeal to the United States Court of Federal Claims.

Axion shall pay the debt in full when the appeal is decided, or when the Government and Axion reach agreement on the debt amount.



RECEIVED TIME AUG. 5. 11:23AM PRINT TIME AUG. 5. 11:24AM

best we could do was five (5) units per day. The question was not if Axion Corporation was capable of performing the test, but if the government would accept a quantity over 120 units. The local DCAS felt it was not necessary to proceed shooting good units and wasting them when 127 units had been shot and approximately 80 good data were collected. Originally, Jerry Hahin stated that a quantity around 80 units would be sufficient. In my conversation with you on Monday, September 9, 2002, you stated you felt that that quantity was adequate. We should not have had to proceed wasting more units.

We believe we performed as required. Should you want us to shoot more units, we would be glad to shoot with one day's notice.

Mr. Korab, in a telephone conversation almost a year ago between you, a governmental lawyer, and me, the government made an offer to Axion Corporation that it would cancel this contract for convenience with no cost to both parties. Axion Corporation could not accept that offer due to the tremendous amount of money invested in this project. Since then, we have invested more money and time in this project without asking for any progress payments. I am not embarrassed to say I have invested all my retirement funds in this project, plus six years of my life. I really don't know what to do any longer. If the government no longer requires these items, I am willing to sit with you and find a resolution by possibly accepting the cancellation of this contract with Axion Corporation receiving a small amount of funds to compensate for all the investments we have made or the government helping us to proceed and finish the project.

I appreciate your help and cooperation in this matter. I would be glad to go to your office to discuss this matter with you further and achieve a mutually amicable resolution. I can be in your office with one day's notice.

Please contact the undersigned at 256-851-9770 should you have any questions or need further information.

Sincerely,

Alex Latifi
President
Axion Corporation