Nos. 03-2644C & 04-297C
(Judge Firestone)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

AXION CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S APPENDIX
# VOLUME VIII, PAGES 211 - 242

---

PETER D. KIESLER
Assistant Attorney General

DAVID M. COHEN
Director

KATHRYN A. BLEECKER
Assistant Director

DOUGLAS K. MICKLE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 353-7961
Fax: (202) 353-7988
Attorneys For Defendant

OF COUNSEL:

RICHARD MARTINELLI
Office of Counsel
Naval Inventory Control Point
Mechanicsburg, PA 17055-0788

April 11, 2005

# INDEX TO APPENDIX

Document

Contract Number N00104-96-C-KA091 . . . . . . . . . . 1

Contract Modification P00001- P00021 . . . . . . . . . . 143

Letter from Axion to Department of the Navy (Dated August 4, 1994) . . . . . . . . . . 166

Letter from Axion to Department of the Navy (Dated August 11, 1995) . . . . . . . . . . 167

Letter from Axion to Department of the Army (Dated September 26, 1995) . . . . . . . . . . 168

Letter from Department of the Navy to Axion (Dated September 27, 1995) . . . . . . . . . . 169

Letter from Axion to Department of the Navy (Dated October 2, 1995) . . . . . . . . . . 170

Letter from Small Business Administration to Department of the Navy Regarding Certificate of Competency ("COC") (Dated October 11, 1995) . . . . . . . . . . 171

Letter from U.S. Small Business Administration to Mr. Artz: Regarding COC (Dated November 9, 1995) . . . . . . . . . . 172

Letter from Dep't of the Navy to Department of Labor: Requesting Clearance (Dated November 22, 1995) . . . . . . . . . . 174

Letter from U.S. Small Business Administration to Department of Navy: Regarding Solicitation of Axion: Regarding Solicitation (Dated December, 4, 1995) . . . . . . . . . . 175

Letter from Department of Navy to Axion (Dated December 7, 1995) . . . . . . . . . . 176

Letter from Axion to Department of Navy: Regarding ECP on Axion Contract (Dated January 17, 1996) . . . . . . . . . . 178

Letter from Department of Navy to Alex Latifi, President of Axion: Regarding Dies (Dated January 26, 1996) . . . . . . . . . . 179

Letter from Axion to Department of the Navy: Regarding Post Award (Dated March 18, 1996)180

Letter from Axion to U.S. Army Research Laboratory: Regarding Cooperative Resolution and Development Agreement (Dated June 27, 1996)....................182

Letter from Axion to Mr. John Korab, Naval Inventory Control Point : Regarding N00104-96 CKA09 (Dated April 15, 1997) . . . . . . . . . . 184

Letter from Axion Mr. Weir to Mr. Alen Artz (Weir Memo) (Dated May 30, 1997) . . . . . . . . 185

Letter from Axion to Mr. John Korab, Naval Inventory Control Point: Regarding Data of First Article in Reference to Axion Contract N00104-96 CKA09 (Dated April 12, 1999) . . . . . . . . 187

Letter from Commanding Officer, Naval Inventory Control Point to Axion : Regarding First Article Approval for Contract (Dated May 17, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .189

Letter from Axion to Naval Inventory Control Point: Regarding Plating Guidelines (Dated November 13, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

Letter from Department of the Navy to Axion (Dated November 22, 2000) . . . . . . . . . . . . . . . 192

Letter from Axion to Naval Inventory Control Point (Dated August 27, 2001) . . . . . . . . . . . . 194

Transmittal Letter from Department of the Navy to Axion (Dated September 18, 2001) Transmitting September 6, 2001 Letter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196

Letter from Axion to Mr. John Korab (Date September 18, 2001) . . . . . . . . . . . . . . . . . . . . . . 198

Letter from Department of the Navy to Axion (Dated November 1, 2001) . . . . . . . . . . . . . . . . 199

Letter from Department of the Navy to Axion (Dated December 13, 2001) . . . . . . . . . . . . . . . 200

Letter from Department of the Navy to Axion (Dated April 30, 2002) . . . . . . . . . . . . . . . . . . . 201

Letter from Axion to Mr. John Korab, Naval Inventory Control Point (Dated September 9, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202

Letter from Department of the Navy to Axion (Dated October 1, 2002) . . . . . . . . . . . . . . . . . . 203

Letter from Department of the Navy to Axion (Dated October 1, 2002) . . . . . . . . . . . . . . . . . . 204

Letter from Axion to Mr. Korab (Dated October 11, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

Memorandum from John Korab Regarding Proposed Termination for Default (Dated October 17, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208(a)

Letter from Department of the Navy to Axion (Dated June 30, 2003) . . . . . . . . . . . . . . . . . . . 209

Deposition of Mr. Jerry Hahin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 211

Deposition of Mr. John Korab . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

Deposition of Mr. Alex Latifi . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 243

Declaration of Mr. Jerry Hahin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 348

Declaration of Mr. John J. Korab . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 354

Declaration of Mr. Henry Stickrod . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 359

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
NO. 03-2644C

AXION CORPORATION PLAINTIFF

VS.

THE UNITED STATES DEFENDANT

**********

DEPOSITION OF JERRY HAHIN

FEBRUARY 10, 2005

**********

TAKEN BY PLAINTIFF

AT

510 WEST BROADWAY

LOUISVILLE, KENTUCKY

**********

KATHY NOLD
ACCURATE COURT REPORTING, LLC
SUITE 419
730 WEST MAIN STREET
LOUISVILLE, KENTUCKY 40202
(502) 589-1413 - FAX: (502) 568-3788

211

took your sample out of your plate whether or not you passed the cell test.

Q. Well, in the plating, weren't you periodically required to test the plating as it was coming off the machine, wasn't that a requirement?

A. I believe that is a requirement.

Q. So that would have satisfied that need, wouldn't it?

A. If it was done, it would ensure that more than likely the plating was good.

Q. Well, isn't it true that Axion was doing that and they had records showing they were doing it?

A. I never saw any records that they did that test.

Q. Did you ask for the records?

A. No, I did not.

Q. Let's look at the memo again. About the fourth line down there it says the government requires another FAT of reduced quantity of batteries be done to validate the manufacturing process currently being utilized for the production of energizers. So that was the purpose of this, was to validate the manufacturing process currently to produce the energizers. Now, the reason for the



ACCUR
730 WEST MAIN STREET, SUITE 419
LOUISVILLE, KENTUCKY 40202
(502) 589-1413

11:38:33 second FAT is exclusively the plating stock, is that
37 it?
11:38:38 A. It's the plating process.
11:38:39 Q. The plating process. But normally the
11:38:42 process makes the plates and the plates go into the
11:38:46 battery, right? So you want to test the plate
11:38:48 because you want to have confidence that these
11:38:50 plates can hold the charge or produce the charge,
11:38:52 isn't that what this is all about here?
11:38:53 A. Yes.
11:38:53 Q. And your testimony previously was, and you
11:38:55 previously said, that this could be done with a cell
11:38:57 test, correct?
1...:00 A. Yeah. And again, the cell test does
11:39:03 provide some indication that the plating is good,
11:39:08 but I'm not convinced that it provides complete data
11:39:14 to prove that it would work in a battery. It's a
11:39:17 much more process-oriented test versus performance
11:39:25 for the final product.
11:39:27 Q. Let's go back to Exhibit 19 again. It's
11:39:31 right over here. Didn't you testify then that at
11:39:37 that particular time you believed the cell test was
11:39:39 sufficient to satisfy you that the plating was
11:39:42 acceptable?
43 A. Yes.

11:39:45 Q. Did the physics change somehow on cell tests?

1 47

11:39:48 A. No, I think that I just learned a little

11:39:50 bit more about cell tests versus battery tests.

11:39:53 Q. What more did you learn? Did you study a

11:39:55 book or some sort of a paper out there that

11:39:58 persuaded you that your first impression of cell

11:40:00 testing was incorrect?

11:40:02 A. No, I just looked more closely at the cell

11:40:05 test itself. And it's just an engineering decision,

11:40:08 I mean it's not necessarily true or false, it's just

11:40:12 my opinion.

11:40:26 Q. Well, apparently previously you were

1. .29 satisfied with one single cell test. How many

11:40:32 destructive tests do you think was necessary now to

11:40:35 satisfy you that this new plating was going to work?

11:40:38 A. Again, it's a production process. So my

11:40:43 particular -- I guess what I wanted out of the test

11:40:52 was to verify that his process worked. So I felt if

11:40:55 he could pass a test similar to an LAT, that that

11:40:59 would prove that his process was okay and then we

11:41:02 could go ahead and test a full lot.

11:41:04 Q. What is an LAT?

11:41:06 A. A Lot Acceptance Test.

1 08 Q. Okay.

A. So a hundred twenty batteries is pretty close to an LAT. I don't have that -- it's in that drawing, if you could look to see if that's the actual number. But I know it's close. It might be slightly less than that for LAT.

Q. Why didn't you just have done some cell testing and then maybe just sought five with the air gun, would that have been satisfactory?

A. Again, he was required to test 120 anyway with the first lot. It was just a simpler solution, in my opinion, to do another functional test.

Q. So essentially, this is the same test whether it's a first lot test or, you call it, a second FAT, is that pretty much the situation? You're still testing them and the bottom line is the government is not going to accept production units until you get through this, is that right?

A. Right.

Q. So you were essentially blurring, if you will, a second FAT slash first lot test, is that an accurate statement?

A. No.

Q. No?

A. I was trying to get him to produce batteries in a small quantity to test, to verify his

process, before we went on with the first lot test.

Q. Well, in this particular time, he had already produced thousands of batteries because he had been told to go to production, isn't that correct? And he was waiting to essentially make delivery of those batteries. So he actually had thousands of them already produced, isn't that correct?

A. I didn't know he had thousands produced.

Q. You made a lot of trips to his shop and you didn't see --

A. I never saw any batteries. All I saw was ampules. I never saw any full batteries in his facility when I went there, other than the ones he was testing.

Q. Did you ever talk to Stickrod about it?

A. I probably talked to Henry a few times and he said he had some batteries there, but I don't recall him saying he had thousands.

Q. Now, if Mister Latifi were to tell you that at the time of the second FAT he already produced ten thousand units and was ready to ship them, would you think he would not be telling you the truth?

A. No.

11:43:13 Q. Okay. So from his -- that would probably be a truthful statement that Axion had already manufactured ten thousand batteries because they thought they were in production, is that -- you don't dispute that -- you have no basis to believe that's not correct?

A. Yes.

Q. Okay. And from Mister Latifi's perception, when you say you have to shoot some more, whether you call it a First Article Test or a lot test, it's the same thing, before he can deliver those ten thousand units, he's got to fire about 120-four more units, is that correct?

A. Yes.

Q. Okay.

(PLAINTIFF'S EXHIBIT 21 WAS MARKED FOR IDENTIFICATION.)

BY MR. GABIG:

Q. I've now handed you Exhibit 21. Is it correct to state this is an E-mail from you to Mister Latifi?

A. Yes. It's got both an E-mail from Alex to me and an E-mail back from me to Alex.

Q. Okay. Could you please read to us what you've told Mister Latifi in this E-mail?



ACCURATE
730 WEST MAIN STREET, SUITE 419
LOUISVILLE, KENTUCKY 40202
(502) 589-1413

11:45:12 A. This says Alex, I appreciate the update, however I would like you to begin actual lot acceptance testing as soon as possible. I suggest that if you can get three or four successful shots this week, you proceed into the acceptance testing next week. If you notify me Thursday or before noon on Friday I can arrange to be there Monday afternoon the 28th. Hopefully Henry will be able to witness some of your tests this week. Please inform him when you are ready to run these tests. Thanks again for the information and pease keep me posted on your progress. Respectfully, myself.

11:45:47 Q. Let's take a look here. This is January 22nd, is that correct?

11:45:50 A. Yes.

11:45:54 Q. So we're well into P00017 requiring a second FAT, is that correct?

11:46:01 A. Yes.

11:46:02 Q. But now you're telling me you actually wanted to get actual lot acceptance tests, is that correct?

11:46:08 A. That's what the E-mail says.

11:46:10 Q. But we haven't completed the second FATs, is that correct?

A. That's correct.

11:46:14 Q. So you're willing to just do away with the second FAT and go right into lot production?

18 A. No, that was just a typo on my part.

11:46:21

11:46:23 Q. It is?

11:46:24 A. Yes.

11:46:24 Q. But it does suggest that the word lot acceptance and FATs, the concept, was sort of interchanged at this particular time because they are the identical shots?

11:46:27

11:46:30

11:46:33

11:46:35 A. No.

11:46:35 Q. No?

11:46:37 A. No. Again, the First Article Test is meant to verify the production process and those units go through a slightly different environmental -- more stringent environmental test than the LAT units do.

11:46:39

1. .42

11:46:45

11:46:48

11:46:51 Q. Let's assume hypothetically that Latifi passed -- or Axion passed the second FATs. Now he's got ten thousand units he wants to ship. The next step would have been lot testing, is that correct?

11:46:54

11:46:59

11:47:02

11:47:04 A. Yes.

11:47:04 Q. And that would have been to shoot another hundred twenty units, is that correct?

11:47:07

11:47:09 A. I'm not sure of the quantity. It's eighty or a hundred twenty.

12



ACCURATE (
730 WEST MAIN STREET, SUITE 419
LOUISVILLE, KENTUCKY 40202
(502) 589-1413

11:47:14 Q. Okay.

1 15 A. I can't recall which one. That's in that document there, the actual number.

11:48:24 (PLAINTIFF'S EXHIBIT 22 WAS MARKED FOR IDENTIFICATION.)

11:48:24 BY MR. GABIG:

11:48:44 Q. All right, let's take a look at Exhibit 22 here, another E-mail from you to Mister Latifi?

11:48:49 A. Yes.

11:48:51 Q. Would you read this one to us?

11:48:54 A. Alex, after further thought and discussion with my program sponsor, request you only test three or four batteries successfully before proceeding with lot acceptance, slash, First Article Test. We cannot afford a delay of three weeks until we begin acceptance tests and depleting your assets defeats the purpose of timely delivery of battery lots. Please contact me and let me know how your testing goes today.

11:49:18 Q. So do you see where you have lot acceptance, slash, First Article Test?

11:49:22 A. Yes.

11:49:23 Q. Is that sort of a blurring of the two?

11:49:27 A. I wouldn't call it a blurring, I would call it a combination.

11:49:31 Q. But if Mister Latifi was to use the word interchangeably like you've sort of been doing, or the mistake you had, you wouldn't say he doesn't understand what he's doing, is that correct?
11:49:41 A. That's correct.
11:49:41 Q. Okay. When did Mister Latifi first put you on notice that the batteries appeared to be leaking?
11:50:32 A. I don't recall. There's probably an E-mail somewhere.
11:50:37 Q. 2000, about that time frame?
11:50:43 A. It could have been 2000 or 2001.
11:50:46 Q. Okay. Is it safe to say that you were aware of the leakage problem before P00017 -- let's put that in our time line -- September, 2001?
11:52:06 A. I can't say for sure.
11:54:04 Q. Can we take a look at number eighteen again? Here it is.
11:54:12 (WITNESS COMPLIES WITH REQUEST OF COUNSEL.)
11:54:15 Q. This is August, 2001. We previously went through the one and two above. The next paragraph begins, "The design requires Axion to put acid into copper cans, which is a chemical fact the acid will eventually dissolve" -- or dislove -- "the copper. We are experiencing this phenomenon at this time.



ACCURATE CC
730 WEST MAIN STREET, SUITE 419
LOUISVILLE, KENTUCKY 40202
(502) 589-1413

11:54:27 We have over a thousand of copper cans that have been filled with acid and welded and started leaking on the surface of the diaphragms." So you previously said you had seen this letter before, is that correct?

A. Yes.

Q. So it shows that in August of 2001 you were aware of the fact that they had thousands of units, at least, already welded and closed, is that correct?

A. Yes.

Q. So at least as of August, 2001 you were on notice of the leakage problem, is that correct?

A. Yes.

Q. Okay. So is it a fair statement that you were aware of the leakage problem before the decision was made to have a second FAT, is that correct?

A. Yes, that's correct.

Q. And you looked into the leakage problem that was being alleged, is that right?

A. I had some discussions with some folks about it.

Q. You did. Did you do any investigative steps?

11:56:06 A. I didn't do any testing or anything like that if you're referring.

11:56:10 Q. Did you request any materials from Axion?

11:56:13 A. Yes.

11:56:14 Q. What did you request?

11:56:16 A. I think I requested copper and some of the ampules.

11:56:21 Q. What did you do with it after you got it?

11:56:24 A. My plan was to take it to the chemical lab, but I never got that done.

11:56:29 Q. Okay. Did you do any investigative steps to try and find out what their problem was?

11:56:34 A. No, other than discussions with other personnel.

11:56:37 Q. Did you ever fly out to Axion to take a look at these and see if you could see what the problem was by looking at them?

11:56:44 A. I don't think I ever flew out there. I think I went there once and saw some of the leaking ampules.

11:56:51 Q. So in some time frame you recognized this was a serious problem because there was a serious leakage on these things, is that correct?

11:57:01 A. I recognized there was a problem that needed to be resolved.

Q. Is there any connection whatsoever, cause and effect, from the leaking of those -- of the acid that was reported to you by Axion in the decision to hold a second FAT?

A. Yes, that played in my decision to require another second First Article.

Q. And how did it play into your decision?

A. Again, the First Article is required to verify their production process. And so since they were having this manufacturing problem, it was another method to verify that that process was indeed working okay.

Q. Okay. Let's go back to the slides again. Do you have the copy there? What exhibit number is that?

A. Seventeen.

Q. Okay. Let's spend a little time with this. You said you had a discussion with Mister Swank on this, and this briefing was about 1990, is that correct?

A. No, the briefing that I saw was done in 2000.

Q. 2000, okay. Let's just walk our way through this. Could you turn to the first page where it says "At issue". The first fold in

12:00:19 there -- excuse me -- first bullet talks about a
22 twenty-year shelf life requirement. Is that --
12:00:26 that's an Army requirement though, isn't it?
12:00:29 A. Yes.
12:00:30 Q. Is that comparable for the Navy?
12:00:32 A. There's no specific requirement, it has to
12:00:35 be close to that.
12:00:36 Q. It's really not a requirement, but it's an
12:00:39 expectation?
12:00:40 A. Expectation would be a better word, yes.
12:00:47 Q. Can you turn -- it says a common approach.
12:00:56 See the last bullet down there? When he gave this
12:00:59 presentation and the last bullet addresses
1. ..00 analytical work kept to a minimum, is that correct?
12:01:05 A. Yes.
12:01:05 Q. Do you recall what his comment was on that
12:01:07 and what point he was making there?
12:01:21 A. No, I don't recall ever talking to him
12:01:23 about this.
12:01:24 Q. But you had attended the briefing, is that
12:01:26 correct?
12:01:27 A. Yes.
12:01:27 Q. You heard the briefing?
12:01:28 A. Yes.
1' 29 Q. You just don't recall what he said on

that?

A. No.

Q. Would it be reasonable to assume that the suggestion is that the Army could have been more analytical in trying to figure out the possible corrosion within power supplies before they went into production contracts? Where it says that analytical work kept to a minimum, that perhaps that means should have been more involved in looking at these matters?

A. (WITNESS MOVES HEAD UP AND DOWN.)

Q. You're nodding your head, is that correct?

A. Yes, that could have been his meaning there.

Q. Let's go to the next line. It says potential drawbacks. So it's correct that they're talking about the fact that they're identifying a corrosion problem in the PS-115s. And in the 2000 time frame, apparently they thought they had it fixed, but isn't it true it says there it might mask the problem all together? Do you see where it says might mask problem all together? Is that on the chart?

A. Yes.

Q. Could that be an acknowledgment that the

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

. . . . . . . . . . . . . .

AXION CORPORATION, Plaintiff . NO. 03-2644C

vs. .

. JUDGE FIRESTONE

THE UNITED STATES, Defendants .

. . . . . . . . . . . . . .

Deposition of: JOHN KORAB

Taken by: Plaintiff

Date: July 27, 2004, 10:00 a.m.

Before: Vicki L. Fox, RMR, Reporter-Notary

Place: Naval Inspection Depot
Mechanicsburg, Pennsylvania

APPEARANCES:

WILMER & LEE
BY: RICHARD J. R. RALEIGH, JR., ESQUIRE
JEROME S. GABIG, ESQUIRE

For - Plaintiff

UNITED STATES DEPARTMENT OF JUSTICE
BY: DOUGLAS K. MICKLE, ESQUIRE
RICHARD A. MARTINELLI, ESQUIRE

For - Defendant

Q. Do you know whether or not the airgun was itemized in the contract?
A. It was not itemized in the contract, not to my knowledge.
Q. Assuming hypothetically since it wasn't itemized in the contract, and if it had your approval, and if it was special test equipment, then the acquiring or the fabricating could have been done at government expense; is that correct?
A. You are speaking hypothetically?
Q. Yes.
A. Yes.
Q. Again since we caught you by surprise, is it fair to say this isn't anything you considered when you signed let's say P00017, this wasn't anything that was on your mind when you signed P00017, this particular matter?
A. That's correct.
Q. Or saw P00019?
A. That's correct.
Q. P00020?
A. That's correct.
Q. Could we look at language of P00017, can you pull it up?
A. (Witness complies.)
Q. You put the language in bold here on P00017?
A. That's correct.

Q. Could you read that for us?
A. This modification constitutes a full and final disposition of all matters relating to this contract and is a full release in accord and satisfaction of any and all claims, demands, or causes of action that either the contractor or the government may have against the other arising out of or related to the contract to date.
Q. It is like boilerplate. Do you use that quite frequently?
A. Yes.
Q. That is something you use from time to time when you write things; you have used it before?
A. I have used it before.
Q. In fact, it is pretty much the same thing we have seen in 19 and 20; is that correct?
A. That's correct.
Q. Let's work our way through it here. Again, I am looking at what was REA number two. Now hypothetically, Mr. Latifi was to send you a bill, an invoice and let's say without deciding whether the quantum was right, and he asked for payment.
Assuming that it was special test equipment and assuming there was contracting officer approval, would this invoice that comes to you, would that be considered a claim? It would just be a routine request for

payment; wouldn't it?
A. Yes.
Q. As a routine request for payment, it is not a claim; correct?
A. That's correct.
Q. At that particular time, it is not a demand, is it, and it is not a cause of action either; is that correct?
A. If he is asking for payment, that is a cause of action. It is requesting a cause of action.
Q. It is? Any time he sends an invoice to you, that is a cause of action?
A. I interpret it as -- hypothetically, if anyone sends a request in for payment or something, it is a cause of action. It is either affirming it or denying it.
Q. Would a routine request for a progress payment be considered a cause of action?
A. No. You didn't say it was a progress payment.
Q. Any request for -- a typical request for payment is considered a cause of action as you interpret this?
A. To finalize or execute, you have to have an action to do it.
Q. Again, you wrote the language. Can you tell me what you meant when you wrote this by the word cause of action?
A. It simply means to me that until this point in time when both parties sign this modification, there were no


FILIUS & McLUCAS REPORTING SERVICE, INC.
Harrisburg 717-236-0623 York 717-845-6418 PA 1-800-233-9327

Q. Was this a modification that required consideration?
A. Yes.
Q. Can you tell me what consideration the government gave to Axion?
A. A revised delivery schedule.
Q. What was it revised from and to?
A. According to 17, it was established as October 1st, 2003.
Q. What was it before?
A. The previous delivery schedule was incorporated in modification P00016.
Q. Can you show me that? I don't have that. Do you have P00016 there?
A. Yes, right here.
Q. Can you tell me what is being delivered here in P00016?
A. This would have been for the production unit.
Q. What is being delivered on P00017?
A. First article samples.
Q. Are they the same thing?
A. No.
Q. Is it correct to say that there was not a delivery schedule for first articles before P00017?
A. The initial first article, there was a schedule for the first article.
Q. They met that delivery schedule?

A. I am not sure if we met the delivery schedule.
Q. There was acceptance?
A. It was approved.
Q. That is water under the bridge; right?
A. Yes.
Q. Now we have a second FAT; is that correct?
A. That's correct.
Q. And in P00017, we are setting a delivery schedule for that?
A. For the second FATs, yes.
Q. Prior to P00017, there was another delivery schedule for the second FATs?
A. That's correct.
Q. When you said earlier that P00017 changed the delivery schedule, it didn't change it, it established a first delivery schedule; is that correct?
A. That's right.
Q. You would agree that the contracting officer, yourself, had the authority to unilaterally set a delivery schedule, is that correct, for the first article test as long as it is reasonable?
A. I would disagree with that because reasonableness is hard to judge for me to unilaterally establish a delivery schedule.
Q. Did you have the authority to unilaterally establish a

delivery schedule?
A. It is possible to unilaterally establish a delivery schedule. It is not my general --
Q. But you had the authority; is that correct?
A. I would say yes.
Q. Okay. But instead, you chose to do it bilaterally; is that correct?
A. That's correct.
Q. When you do it bilaterally, you need consideration in an instance like this; is that correct?
A. That's correct.
Q. Can you show me what consideration you gave the government for this bilateral modification?
A. Yes.
Q. What was that?
A. It was the accord and satisfaction release of any seeking of -- I will use the term -- redress up to that point in time.
Q. Can you tell me what redress the government was giving up?
A. Yes.
Q. What were they giving up?
A. We were giving up a new delivery schedule. We allowed the contractor to tell us.
Q. You just told me there wasn't a delivery schedule for

Q. If you are wrong hypothetically and it wasn't required, but it was discretionary, would you agree then that there wasn't any consideration for P00017?
A. I still say the consideration was the release in the accord and satisfaction.
Q. Could you tell me what the government released?
A. The government released nothing.
Q. All right. So if the government released nothing, where is the consideration?
A. The contractor relinquished his right to submit any -- well, for example, requests for equitable adjustment or claim.
Q. What did the government give up? Didn't you just say nothing?
A. The government kept the contract going by giving a delivery schedule.
Q. Can you show me some sort of documentation where previously you were not going to keep the contract going?
A. No. Because both parties were working to try and get this material shipped.
Q. If you were going to end the contract, would that have been done with a termination for convenience?
A. Repeat that.
Q. You told me the consideration the government gave was to

keep the contract going; is that correct?
A. Both parties wanted to keep the contract progressing.
Q. The contract still could have progressed if you didn't require a second first article test?
A. No, you are wrong because he changed the process. We needed a second first article to ensure that he --
Q. Let's move on. Just to back up for a second on 17 here. Other than what you just told me here, was there any other consideration that the government gave to Axion for P00017?
A. Was there any --
Q. Other consideration.
A. That the government gave?
Q. Gave to Axion.
A. No, just the delivery schedule.
Q. Just the delivery schedule, all right. Let's take a look at P00019 then.
A. (Witness complies.)
Q. Is this the modification that required -- let me ask you is this a bilateral modification?
A. Yes.
Q. Is this a bilateral modification that required consideration?
A. Yes.
Q. Could you tell me what consideration was given to Axion?



FILIUS & McLUCAS REPORTING SERVICE, INC.
Harrisburg 717-236-0623 York 717-845-6418 PA 1-800-233-9327

A. Yes.
Q. What was that?
A. There was a decrease in the contract price, and Axion agreed to the accord and satisfaction language.
Q. So there was a decrease in the contract price; is that correct?
A. Yes.
Q. That was a thousand dollars?
A. That's correct.
Q. That means Axion got paid a thousand dollars less for the contract; right?
A. A thousand dollars was reduced from the contract price.
Q. Axion gave up a thousand dollars; right?
A. Yes.
Q. Can you explain to me how that is consideration to Axion?
A. Axion agreed to that price to reestablish the first article.
Q. Axion is giving the government a thousand dollars; correct?
A. That's correct.
Q. What is the government giving Axion?
A. A revised delivery schedule.
Q. Can you tell me what that revised schedule is? What is the new date on the schedule?


FILIUS & McLUCAS REPORTING SERVICE, INC.
Harrisburg 717-236-0623 York 717-845-6418 PA 1-800-233-9327

A. In modification P 19?
Q. Yes, for 19.
A. April 23, 2002.
Q. Can you go back and look at P00017 again and tell me what delivery date was established there?
A. October 1st, '03.
Q. Am I correct then on P00019, Axion gave up several months of time on the delivery order on the delivery schedule?
A. That had to be a typo on the 03.
Q. You are saying that is a typo, is that what you are saying?
A. The 03 on P 17 has to be.
Q. You are saying the new delivery date was April, 2003?
A. No. Which modification are you speaking of?
Q. Let's go back. You are saying that on P00017?
A. Right.
Q. October --
A. I am sorry. I am sorry. I am sorry. I am getting my dates mixed up here. Okay.
Q. Okay?
A. The delivery -- because we write our dates using maybe the last two digits, it was October 3rd of 2001 on P 17.
Q. So you are saying that the date was intended to be October 1 of 2000 --


FILIUS & McLUCAS R... SERVICE, INC.
Harrisburg 717-236-0623 York 717-845-6418 PA 1-800-233-9327

A. No, October 3rd of 2001.
Q. Let's go up and look at the date when this thing was signed. When was it effective?
A. October 2nd.
Q. You are saying that the very next day after this thing was signed, it was the intent of the parties that they were going to deliver the samples?
A. That's correct.
Q. That was your intent at the time?
A. Both of our intent, exactly.
Q. Was this ever changed in any way, this P00017 to reflect what your intent was?
A. No. No. I would have conversed with Axion, and we both agreed to this date.
Q. Do you have any records that show that was the date you had in your negotiations?
A. It could have been a phone conversation. I would have to search the entire file to see if we had anything -- a letter.
Q. But to the best of your knowledge, there is no documentation; is that correct?
A. I can't say that. I would have to look really.
Q. Does it seem reasonable that he delivered the very next day? Doesn't transition time take time?
A. Not necessarily. We could have been testing. I can't

remember the particulars. As I said, you know, when is the mutual date? We both agreed the next day.
Q. Go back to P00019 again. Let's just start with a thousand dollars. You would agree that giving up a thousand dollars in itself is not consideration to Axion; is that correct?
When Axion has to give up a thousand dollars, that is not them receiving consideration from the government; correct?
A. They are not receiving the thousand dollars.
Q. Would you agree with me that if that is the correct date that Axion intended, one, October, rather than 03, rather that be 01, if that was the intent of Axion, so it was a unilateral mistake?
A. It was not a unilateral mistake.
Q. Let's just say if that is the date, then in this instance, Axion is giving up time rather than getting time; is that correct?
A. You are referring to MOD 17?
Q. Yes. We went from 17 to 19. Axion was actually giving up several months if that is the correct date; is that right?
A. No.
Q. Hypothetically, if that is the right date --
A. The right date, first of all, is October 3rd of 2001.

COMMONWEALTH OF PENNSYLVANIA :
:
COUNTY OF CUMBERLAND :

I, Vicki L. Fox, Reporter and Notary Public in and for the Commonwealth of Pennsylvania and County of Cumberland, do hereby certify that the foregoing testimony was taken before me at the time and place hereinbefore set forth, and that it is the testimony of:

JOHN KORAB

I further certify that said witness was by me duly sworn to testify the whole and complete truth in said cause; that the testimony then given was reported by me stenographically, and subsequently transcribed under my direction and supervision; and that the foregoing is a full, true and correct transcript of my original shorthand notes.

I further certify that I am not counsel for nor related to any of the parties to the foregoing cause, nor employed by them or their attorneys, and am not interested in the subject matter or outcome thereof.

Dated at Camp Hill, Pennsylvania, this 6th day of August, 2004.

Vicki L. Fox
Reporter - Notary Public

(The foregoing certification does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)