Nos. 03-2644C & 04-297C
(Judge Firestone)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

AXION CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

DEFENDANT'S APPENDIX
VOLUME IX, PAGES 243 - 299

---

PETER D. KIESLER
Assistant Attorney General

DAVID M. COHEN
Director

KATHRYN A. BLEECKER
Assistant Director

DOUGLAS K. MICKLE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 353-7961
Fax: (202) 353-7988
Attorneys For Defendant

OF COUNSEL:

RICHARD MARTINELLI
Office of Counsel
Naval Inventory Control Point
Mechanicsburg, PA 17055-0788

April 11, 2005

## INDEX TO APPENDIX

Document

Contract Number N00104-96-C-KA091 . . . . . . . . . . 1

Contract Modification P00001- P00021 . . . . . . . . . . 143

Letter from Axion to Department of the Navy (Dated August 4, 1994) . . . . . . . . . . 166

Letter from Axion to Department of the Navy (Dated August 11, 1995) . . . . . . . . . . 167

Letter from Axion to Department of the Army (Dated September 26, 1995) . . . . . . . . . . 168

Letter from Department of the Navy to Axion (Dated September 27, 1995) . . . . . . . . . . 169

Letter from Axion to Department of the Navy (Dated October 2, 1995) . . . . . . . . . . 170

Letter from Small Business Administration to Department of the Navy Regarding Certificate of Competency ("COC") (Dated October 11, 1995) . . . . . . . . . . 171

Letter from U.S. Small Business Administration to Mr. Artz: Regarding COC (Dated November 9, 1995) . . . . . . . . . . 172

Letter from Dep't of the Navy to Department of Labor: Requesting Clearance (Dated November 22, 1995) . . . . . . . . . . 174

Letter from U.S. Small Business Administration to Department of Navy: Regarding Solicitation of Axion: Regarding Solicitation (Dated December, 4, 1995) . . . . . . . . . . 175

Letter from Department of Navy to Axion (Dated December 7, 1995) . . . . . . . . . . 176

Letter from Axion to Department of Navy: Regarding ECP on Axion Contract (Dated January 17, 1996) . . . . . . . . . . 178

Letter from Department of Navy to Alex Latifi, President of Axion: Regarding Dies (Dated January 26, 1996) . . . . . . . . . . 179

Letter from Axion to Department of the Navy: Regarding Post Award (Dated March 18, 1996)180

Letter from Axion to U.S. Army Research Laboratory: Regarding Cooperative Resolution and Development Agreement (Dated June 27, 1996)..........182

Letter from Axion to Mr. John Korab, Naval Inventory Control Point : Regarding N00104-96 CKA09 (Dated April 15, 1997) . . . . . . . . . . 184

Letter from Axion Mr. Weir to Mr. Alen Artz (Weir Memo) (Dated May 30, 1997) . . . . . . . . 185

Letter from Axion to Mr. John Korab, Naval Inventory Control Point: Regarding Data of First Article in Reference to Axion Contract N00104-96 CKA09 (Dated April 12, 1999) . . . . . . . . 187

Letter from Commanding Officer, Naval Inventory Control Point to Axion : Regarding First Article Approval for Contract (Dated May 17, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .189

Letter from Axion to Naval Inventory Control Point: Regarding Plating Guidelines (Dated November 13, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

Letter from Department of the Navy to Axion (Dated November 22, 2000) . . . . . . . . . . . . . . . 192

Letter from Axion to Naval Inventory Control Point (Dated August 27, 2001) . . . . . . . . . . . . 194

Transmittal Letter from Department of the Navy to Axion (Dated September 18, 2001) Transmitting September 6, 2001 Letter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196

Letter from Axion to Mr. John Korab (Date September 18, 2001) . . . . . . . . . . . . . . . . . . . . . . 198

Letter from Department of the Navy to Axion (Dated November 1, 2001) . . . . . . . . . . . . . . . . 199

Letter from Department of the Navy to Axion (Dated December 13, 2001) . . . . . . . . . . . . . . . 200

Letter from Department of the Navy to Axion (Dated April 30, 2002) . . . . . . . . . . . . . . . . . . . 201

Letter from Axion to Mr. John Korab, Naval Inventory Control Point (Dated September 9, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202

Letter from Department of the Navy to Axion (Dated October 1, 2002) . . . . . . . . . . . . . . . . . . 203

Letter from Department of the Navy to Axion (Dated October 1, 2002) . . . . . . . . . . . . . . . . . . 204

Letter from Axion to Mr. Korab (Dated October 11, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 205

Memorandum from John Korab Regarding Proposed Termination for Default (Dated October 17, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208

Letter from Department of the Navy to Axion (Dated June 30, 2003) . . . . . . . . . . . . . . . . . . . 209

Deposition of Mr. Jerry Hahin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 211

Deposition of Mr. John Korab . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

Deposition of Mr. Alex Latifi . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 243

Declaration of Mr. Jerry Hahin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 348

Declaration of Mr. John J. Korab . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 354

Declaration of Mr. Henry Stickrod . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 359

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AXION CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. 63-2644C |
| | ) | |
| THE UNITED STATES, | ) | Judge Firestone |
| | ) | |
| Defendant. | ) | |

* * * * * * * * * *

DEPOSITION OF ALEX LATIFI

January 28, 2005
Huntsville, Alabama
9:15 a.m.

ORIGINAL

* * * * * * * * * *

APPEARANCES

For the Plaintiff: Mr. Richard Raleigh
Wilmer Lee
100 Washington Street
Huntsville, Alabama 35801
and
Mr. Jerome S. Gabig
Attorney at Law
515 Sparkman Drive
Huntsville, Alabama 35816

For the Defendant: Mr. Douglas K. Mickle
United States Department of Justice
1100 L Street N.W.
Room 4062
Washington, D.C. 20005
and
Mr. Rick Martinelli
Assistant Counsel for Naval Inventory Control Point
5450 Carlisle Pike, Bldg. 410
Mechanicsburg, PA 17055



SHOEMAKER & ASSOCIATES
*The Court Reporters*
3077 Leeman Ferry Road, SW
Huntsville, Alabama 35801
(256) 881-8900
1-800-232-6077 Fax: (256) 882-2692

A No problem.
Q -- because I would really like to get a good history of the contract.
A I will be glad to be of any help I can.
Q Well, I appreciate that. Thank you very much.
How long have you served as President of Axion Corporation?
A Since 1984.
Q And what are your duties as the President of Axion Corporation?
A Since the company is small, I do a lot of stuff.
Q What would be some of that stuff?
A I am involved in bidding, production, quality. I oversee most everything.
Q So you are a hands-on manager?
A Yes.
Q And is your primary customer the U.S. Government?
A Yes.
Q And during this time as President of Axion Corporation, has your company grown in size or has it

A Yes, sir.
Q So that's 20 years, and about 10 -- you are involved in 10 Government contracts a year?
A Yes. A very small amount.
Q And what is the dollar value of those contracts, usually?
A From 10,000 to two million.
Q Two million?
A Yes.
Q So this contract that is in dispute right now that was for 1.3 million and change --
A Yes.
Q -- that is an average size contract that you were usually involved with?
A That's the high end.
Q That's the high end?
A Yes.
Q Since this is the first time you have testified in a deposition, am I correct to assume, then, that you are not involved in any other litigation? Or have you ever been involved in any other litigation involving contract disputes?
A No, sir.

Q Was Axion your first job after graduation? It seems like there was a lag --

A No, I worked for another company, Acudata Systems.

Q And what did you do there? I know it says in your resume that you were in charge of the production and the administration of the entire plant.

A Yes.

Q What did that entail?

A That is the same facility. They had a facility in California, and they had a facility in Huntsville. And I started with them as a purchasing agent and later on became chief engineer, and then I became plant manager, and then after three years, I bought the company.

Q And then Acudata became Axion?

A Yes, sir.

Q And from '77 to '84 when you were working with Acudata, were you also involved in Government contracting at that time?

A Yes.

Q So you have basically been involved in Government contracting since 1977?

A Call them again, until they might tell us, "Okay, make a request, written request." And we make a written request. First we try to solve it as fast as possible so we don't get delayed.

Q Why would you make a written request?

A If they ask us to make a written request, then we make a written request.

Q Why would they ask you to make a written request?

A Sometimes they want to take the question to engineers to get the -- the contracting officer doesn't know; he wants to take it to engineers himself, so he says, "Okay, make a written request so I can send it to engineers." So it won't be just words; it will be, like, "Okay, the problem is here; the drawing is --" so and so and so and so -- so he can take it and give it to them.

Q All right. How many contracts are you working on right now, Government contracts?

A I believe 16.

Q You have 16 Government contracts currently active that you are managing?

A Yes.

Q And what is the dollar value of those contracts?

A I'm not exactly sure, but between five to ten million, probably.

Q Between five to ten million dollars on the 16 contracts you are currently managing?

A Yes.

Q And that doesn't include, obviously, this one, because it was terminated?

A Yes.

Q During your almost 30 years in Government contracting, have you ever had a contract terminated for default before?

A Before this?

Q Yes.

A No, sir.

Q Since Axion has been terminated -- since you were terminated in the Axion case, have you had contracts terminated for default?

A There is a contract right now we are discussing with the Government that changed from Termination for Default to "for Convenience," because the vendor we had, he has some problem -- he never

Q No, the Axion contract.

MR. RALEIGH: You are calling it the "Axion contract," but he is Axion. Do you mean this Navy contract --

MR. MICKLE: The Navy contract. I apologize. Thank you. I'm sorry.

A Okay, question, please.

Q The Navy contract, that was terminated in 2003; right?

A Yes.

Q And since 2003, how many contracts have you been awarded?

A I really don't know.

Q More than 10?

A Yes, sir.

Q But less than 20? It could be -- do you get about 16 contracts a year, or 10 to 15 contracts a year, awarded to you?

A If you average it that way, yes, but it doesn't average that way. Sometimes more one year, less another year. So you really can't --

Q But you have received Government work since your termination?

A Yes.

Q Let's talk about the Navy contract, and throughout this deposition if I say "Axion contract," I am misspeaking, and I am talking about the Navy contract, the one in dispute.

A Yes.

Q And, again, if you have any questions or I am confusing you, just let me know.

A All right.

Q What was your involvement in preparing the proposal?

A I made all the research on the proposal, and pricing, and quoting from vendors, and dies, and everything that was required to make the battery.

Q And when you say "the battery," we are talking about the PS-115?

A Yes, sir.

Q But how long a process was this?

A I think we went through 30 days.

Q 30 days from the time the RFP hit the street?

A Until we provided the bid, yes, sir.

Q So was there anyone else helping you in preparing the bid or did you do all the research and

all the review of the proposal and --

A I think I had secretaries and people helping me, but I don't remember who, to be honest with you.

Q But they did more ministerial work --

A Yes.

Q -- and you did all the thinking, the number crunching --

A That is correct.

Q -- formulating the plan on how you were going to manufacture this thing?

A Yes, sir, that is correct.

MR. RALEIGH: Try to wait until he finishes his question.

THE WITNESS: Okay.

Q When you were reviewing the RFP, did you notice anything that you really thought was going to require extra work on your part?

A No. Just preparing all the bidding process and calculating all the material and labor required, the dies and everything needed to produce the PS-115.

Q But you understood it was a firm-fixed-price contract?

A Yes, sir.

Q And in my understanding, it was a firm fixed price. What did that fact -- what effect did that fact have when you were making your management decisions throughout the process?

A Which fact?

Q The fact that it was a firm-fixed-price contract.

A How did it affect what?

Q How did it affect the way you managed -- with a firm-fixed-price contract -- would you agree with me that usually on a firm-fixed-price contract you have to deliver the goods for the price you bid?

A That is correct.

Q And would you agree that the profit you make is the difference, the delta, between the firm fixed price in your proposal and the cost that you incurred in manufacturing -- in this case PS-115s?

A Yes, that is correct.

Q And if for some reason during the manufacturing process you believe that either -- you know, what usually happens in a firm-fixed-price contract that you have been involved with where costs start to be greater than you initially believed that

they were going to be? You start performing on a loss contract.

A That is correct.

Q That is correct, but, I mean, what usually happens in your case?

A I have no case before except this one.

Q This is the first time you have ever had a loss contract?

A Yes, sir.

Q So you have never ever requested an equitable adjustment before?

A No, sir.

Q But you have worked on firm-fixed-price contracts?

A Always.

Q You always work on firm-fixed-price contracts?

A Yes.

Q So, then, you are very familiar with the administration of firm-fixed-price contracts?

A Yes, sir.

Q When you were developing your manufacturing plan for the PS-115s, how long did you think it would

252A

take you from the time the contract was awarded until the time that you were going to be able to produce your first battery?

A I thought it would take the same time the contract requests delivery -- what I have to deliver by contract -- what the delivery time was in the contract. I thought I could meet that.

Q And I think the initial contract called for 90 days for the First Article Tests from the time of award?

A That is correct.

Q And, obviously, that didn't occur in this case or we wouldn't be here. What were some of the immediate problems that you started to encounter in developing the battery?

A Problems started before we developed the battery. The Government took a year and a half to just approve the process how we can measure the can -- the can that was stamped -- and every one was the same thing.

Q I guess I don't understand. What do you mean by "can"?

A The battery goes in a copper can, and they

line. So me and the Quality manager spent all the time trying to get this process -- procedure -- they wanted to do it, making the gauges and everything else that they requested --

Q I'm sorry, I guess I was confused, because you previously testified -- and maybe I misunderstood you -- and that is probably what I did do -- you said that you incurred additional costs because you had to keep workers on.

A Yes, me and the Quality --

Q I guess this is as good a time as any to start getting these documents -- this case has more documents than I think any other case I have encountered, so I hope -- and some of these copies aren't the best, because those are copies we gave you, and then you gave us, and then we gave back to you, that you gave to us. And several I think are from the complaint. I can see some of those -- like "page 50," or something, on the top right-hand corner. There will be a page number, and those are usually from the contract that was in the complaint. But if there is any document that you don't recognize, just let me know.

There are also some Bates stamps on the bottom of every document, starting with "NAVY --" and then a number. And I think in discussing with your counsel, Mr. Raleigh, that those are documents that we gave you, that you had in your files, and you gave back to us?

A Yes, sir.

Q That is the source of these documents. You gave them to us, and we gave them back to you.

MR. MICKLE: Would you mark this, please.

(Marked Defendant's Exhibit No. 2.)

Q Mr. Latifi, this exhibit is the standard FAR clause for First Article approval. Do you recognize this?

A Yes.

Q And this was the FAR clause that pertained to this contract?

A I don't know the FAR clause; I just know the page.

Q But this was part of your contract?

A Yes, it was.

Q What is a "First Article Test"?

A When you get the first samples and you test

them -- or you submit them to the Government for testing.

Q And why does the Government require that, if you know? Or what do you believe they do that for?

A The First Article Test in any contract, it represents -- it allows you to learn how to produce it. First Article quantities normally represent what you go through to learn how to produce production quantities.

Q So is it verifying your manufacturing process?

A It verifies the part can be produced properly, per drawing the Government submitted to you.

Q Was this the first time you had ever submitted a First Article?

A No, sir.

Q Is that the standard course in Government contracts that you are involved with?

A The Government contracts -- the First Article represents the work that comes before -- that you produce per drawing, per specification, given to you by the Government for the Government to make sure you

can produce the item and for you to make sure that the drawing as submitted to you can produce a good unit.

Q But in the -- I think we said between 100 and 200 contracts --

A Yes, sir.

Q -- that you have been involved with, are you usually required to produce a First Article?

A Not all the time.

Q Not all the time, but you are aware of the First Article --

A -- in this case.

Q -- in this case. And you were also aware that if you failed to deliver the First Article, that you could be terminated immediately?

A If it was my fault.

Q If it was your fault?

A Yes.

Q Well, what do you mean by that?

A Sometimes the first -- the drawing they give to you -- or the way they thought the part had to be produced -- which was produced by a prime contractor before -- most of the time the prime does not provide

all the documents to the Government, so secondary people like me don't get the total package correctly to produce the part. You would have some problems to produce the first item, so you would request the Government to seek the information that is not there to get to you so you would be able to produce it. The first --

Q And --

A Go ahead.

Q I'm sorry. Were you finished?

A Yes.

Q And maybe I'm misunderstanding you, but what I think you were saying is that if you fail to deliver the First Article on time, you can be defaulted unless there is some intervening circumstance, and in this case what you were alluding to, the Government owed you some documents, or something like that, and in those cases, even though you could be defaulted, that is when you would request the Government for more time or not to be defaulted, or what?

MR. RALEIGH: I object to the form.

I just objected to the form of the question.

A Yes, sir.

Q And how did you interpret that clause when you read that?

A That I was supposed to do the First Article Testing.

Q That you were responsible?

A That Axion was responsible to do the First Article Testing.

Q And what did that entail?

A It entailed to test the product.

Q So you were --

A The component --

Q -- for testing --

A -- gauges and calibers and -- all pieces required to check all the parts -- to manufacture the parts.

Q All right. And that is not only the process but the parts that make up that process?

A Yes, sir.

Q And you were responsible for conducting that testing?

A Test every item and put it together properly.

Q All right. Let's go to the next one, please.

MR. MICKLE: Mark this, please. I believe this will be Exhibit No. 4.

(Marked Defendant's Exhibit No. 4.)

Q Mr. Latifi, you now have Exhibit 4, which is entitled "Acceptance Inspection Equipment Requirements for Power Supply, PS-115"?

A Yes, sir.

Q Also, it is "NAVY 01713." Do you recognize this?

A Yes, sir.

Q Was this also included in your contract?

A I believe so.

Q There is an "X" next to 1.b, and that "X" in 1.b states "The contractor shall provide all AIE --" and "AIE" stands for "Acceptance Inspection Equipment --"

A "... except for any equipment listed as available in Appendix V."

Q "VI."

A VI.

Q All right. But if it wasn't listed in Appendix VI -- and you will agree that pursuant to this solicitation that you made a proposal for

that -- "The contractor shall provide all AIE --" Acceptance Inspection Equipment?

A Yes, Inspection -- yes, sir.

Q And that was your responsibility?

A Yes.

Q In this case what did you believe was "Acceptance Inspection Equipment" for verifying the PS-115s in this case?

A We had to provide the Government with procedure for inspection -- procedure -- that took them a year and a half to approve. In that procedure we submitted all the gauges and the stuff that we saw necessary to check every component. That was one of the requirements.

Q Well, what type of equipment did you think you needed to conduct the --

A We provided gauges, calibers, and other small hand tools to measure all the parts, and the cans and everything to put them together -- and that process. And then we provided the Government a data collection process -- system -- that would collect the data.

Q And what was that data collection system?

A We came up with a computer, a small, two-inch

computer that could collect the data.
Q And that was your design?
A Yes, sir.
Q And why did you come up with this computer?
A To collect the data.
Q And the reason you needed to collect the data was because -- you said pursuant to the -- and you did that pursuant to the Acceptance Inspection Equipment clause in here?
A Yes. We have to be able to collect the data.
Q And your ability to collect the data was required by the contract -- you were required by the contract to collect the data and submit it to the Government for approval?
A We are supposed to be able to provide a way to collect the data, yes, sir.
Q So I guess -- do you believe that the contract required you to collect that data?
A The contract required to collect the data.
Q And what were you supposed to do, according to the contract, with that data?
A We were supposed to provide a bird and a battery and a computer to collect the data.

Q You were required to provide that pursuant to the contract?

A No -- nowhere in the contract says that, but in general terms, of saying that the first contract -- the First Article -- that is what we came up with to do. But nowhere in the contract specifies how to do it.

Q It was up to you to provide the means, and you could do it any way that was approved by the Government?

A Accepted by the Government.

Q But it was still your responsibility?

A To provide the way to collect the data.

Q The way to collect the data. And what was the way to collect the data that you ended up providing to the Government?

A We provided the Government with the bird and a data collection inside the bird, that the Government could put the battery in it and shoot it and collect the data.

Q And how was the Government -- why was the Government required to shoot it?

A The Government had the gun.

Q The Government had the gun?

A Yes, sir.

Q Well, where did it say in the contract that the Government was going to shoot the bird?

A It says in the contract.

Q Where is that?

A Somewhere in the contract it says the Government has the right to use Mouser, gun, or something to shoot the parts.

(Discussion off the record.)

Q The bottom lime is that when you submitted your proposal, you believed that your requirements for First Article Testing were --

A -- to provide a collection -- a data collection form so the Government could collect data when they were shooting it.

Q And who would put that information on the form?

A The information is collected by the computer. We made the form exactly the way the Government wanted it.

Q And who was responsible for developing the computer?

A We developed the computer.
Q And where did the computer get its information from?
A From the battery.
Q From the battery?
A Yes, sir.
Q And how did the battery transmit its information to the computer?
A The battery had -- we give those to the Government, and the battery had to be shot in the Howitzer.
Q In the Howitzer?
A Yes, sir.
Q All right. What Howitzer did you use?
A I didn't have a Howitzer.
Q Why didn't you have a Howitzer?
A Sir?
Q Why didn't you have a Howitzer?
A The Government was supposed to give us one. We never got one.
Q You never got one?
A No, sir.
Q Did you ever ask the Government for a

Howitzer?

A Yes, sir -- I asked for the gun.

Q You asked for the gun?

A Yes.

Q And when was that?

A Three days after I got the contract.

Q So you knew back in -- when did you get the contract?

A '65, '66 --

Q '95?

A '95, yes.

MR. RALEIGH: You can't look to me for answers. But most of this didn't happen during the '60s.

(Discussion off the record.)

Q All right. So in '95 you got the award?

A Yes.

Q And within three days or four days of getting the award, you asked the Government to provide you with an air gun?

A Yes.

Q Or a Howitzer?

A Just for the gun.

Q A gun?

A Yes. I didn't know what it was. I just said "a gun."

Q And what did the Government tell you?

A They said, "The Navy doesn't have a gun."

Q And when did you learn this information?

A A couple of days after.

Q A couple of days after that?

A Yes.

Q And then at that point did you believe the Government was not living up to its end of the bargain, so to speak?

A Yes.

Q And did you write anybody?

A No, I just asked them for the gun, and I called them, and so and so -- and I talked to them several times after that, and I told them that they should give me the gun, just like they give the previous producer, that I should be equal -- I should have equal rights, like other contractors, that they provided other contractors with a gun and they should provide a gun, that I bid on this one on the basis they were going to give me a gun, and why they not

give me a gun.

Q Are you saying that you had a mistake in your bid?

A No.

Q But you made a bid believing that -- you thought the Government was going to provide you with an air gun?

A Yes.

Q And three days after you were notified of award, you were told that you weren't going to get that air gun?

A Yes, sir.

Q And at that point you realized that you had to develop the air gun?

A I didn't know air gun or anything -- I had to develop a way -- by that time I realized the Government is -- well, by that time I understood the Government was not going to give me a gun, like they should.

Q And that was when in 1996? Or was that in 1995?

A It was 1996, January of 1996.

Q January of 1996?

Navy, and -- "Dear Allen." Who is Allen?

A "A.L. Artz."

Q Is that Mr. Artz?

A I guess so.

Q And was he the contracting officer before Mr. Korab?

A Or somebody working with him.

Q But he was the representative for the Government you were dealing with in that time --

A Yes.

Q And on December 15th, you were asking for use of tools and things like that?

A Yes, sir.

Q But in this letter you never mentioned the air gun. Why not?

A Because I thought they -- they already give me -- at this point, we need it because we are at the beginning of the product -- we need the air gun now -- we are just trying to get the cans.

Q All right. But you were telling me earlier that within three days of getting the award, you were contacting the Government about the air gun.

A In January somewhere.

Q But at that time -- so in January, then --
A Would you like for me to explain this for you?
Q Yes, please.
A We understood that the Government owned a lot of dies -- that they paid for it and they were owned by the Government. We wanted to use the dies to produce the cans. It is a legal right of the Government when they pay for it that they could use it. We called these people to get the can from them. Accudyne called and said the cans belonged to them and not the Government, they cannot use them. But legally they belonged to the Government.
Q So when you made your proposal on this contract you also expected the Government to provide you with the tooling?
A No, just the gun.
Q But you were asking the Government for tooling here?
A If they had it, it would expedite the delivery.
Q All right. This is a January 17th letter. This must be the letter you were talking about, Alex.

A Yes, sir.

Q I will show it to you in a second.

MR. MICKLE: Would you mark that, please, and hand it to the witness.

(Marked Defendant's Exhibit No. 6.)

Q This is a letter dated January 17, 1996?

A Yes, sir.

Q And I believe this is the letter you were referring to earlier, regarding when you asked the Government for the air gun?

A Yes. I mean, in this letter we asked them for any ECPs. We were trying to make sure that any changes the Government made previously we could have a copy of it.

Q What is an "ECP"?

A "Engineering Change Procedure." We thought there were some changes made by Accudyne that maybe on paper, or contract -- or drawing does not have it. And we requested to give us any changes they may have.

Q And I see from the letter it says, "We understand that the Government has supplied two air guns --"

A Yes.

Q And "We hereby request one unit supplied to Axion Corp. for performance of final testing"?

A Yes, sir.

Q Why did you request it?

A Because Accudyne got one.

Q Why didn't you just say, "Pursuant to the contract, you are supposed to provide it"?

A The contract says there, too. We asked for that.

Q But in your letter you requested it.

A What else could I do besides request it?

Q But if it was contained in the contract -- if the Government owes you something, wouldn't you usually demand it from the Government?

A Usually we just send letter just like -- that is a demand in itself. I mean, you don't say, "I am demanding right now." I mean, you just make a letter -- as nice as it can be -- you know, try to get the parts. If you demand it, they cancel the contract --

Q Sugar always works better than lemon, I believe. You're right.

At any time did you go from being a nice request to a demand and cite a specific contract provision for this air gun?

A No. We tried to stay in a proper, professional way and try to do the best we can. I have a small company. You really don't have that -- we are not Boeing; we are just a little contractor. We live by the Government crumbs. We don't really take positions that are harmful to our company, so we -- even if it is our right, we try to say it as nice as possible, not demand it.

Q Right. But soon thereafter this January 17th, you were told that the Government wasn't going to provide an air gun?

A We -- yes. We kind of got a feeling that -- "Jesus, the Government is not going to do this. We had better figure it out."

Q Well, how did you kind of get that feeling?

A Because -- after this letter, I talked to Mr. Korab several times. I said, "Mr. Korab, look, Accudyne has gotten guns given to them. I should be equal contractor -- and so on -- this and that -- and he answered, "Alex, we didn't do that; the Army did

that. And your contract is with the Navy, not the Army."

Q So pursuant to this Navy contract, you knew back in January of 1996 that you weren't going to be provided an air gun to do the testing, that you were responsible for testing?

A I didn't know anything about an air gun at the time. I didn't know an air gun was involved in it. I just had to find a way to activate the battery.

Q But on January 17th, you asked if the Government would supply an air gun; right?

A Yes.

Q So you did know about an air gun back in January of 1996?

A They told me after there was a gun -- I find out from the Accudyne people.

Q Right. But in 1996, you knew that there was an air gun that could help in the testing of this PS-115?

A That is correct, sir. Yes, sir.

Q And soon after January, you were told you weren't getting this air gun?

A Yes, but I still didn't believe it.

Q You didn't believe it, but on March 18, you wrote Mr. Korab and started telling him that you had reached an agreement with Army Research Lab?

A Yes.

Q Tell me about your dealings with Army Research Lab and if -- why you went to ARL.

A Well, I understood that Mr. Korab or Mr. Hahin -- they told me that the gun is in Baltimore, Harry Diamond Laboratories.

MR. MICKLE: Would you mark this, please.

(Marked Defendant's Exhibit No. 7.)

Q This is the letter -- it is Exhibit 7, Mr. Latifi, that was referred to, March 18, 1996.

And it starts out very cordial --

A Yes.

Q It assumes that -- that Mr. Korab came down to see you and look at your facility?

A Yes, sir.

Q It looks like you were getting along and he had answered all your questions or you had resolved all your problems?

A They just told us they can't give us the gun.

Q It was around this time when they told you you weren't getting the air gun?

A Yes. And now I am going, "Jesus, this guy is not really giving me a gun, so I've got to do something."

Q So when they told you no the first time, you thought you still might have an outside chance? Back on March 18, 1996, you know that --

A I thought it was no longer --

Q You agreed there was no chance after March 18th?

A Yes.

Q All right. And thus you started trying to have a side agreement with the Army Research Lab?

A I think at that meeting Mr. Korab told me that the gun is at Army Research Lab -- or something -- or I found out before that -- so I started working with them.

Q All right. And this is the letter that you sent to Mr. Korab to explain the agreement that you are trying to enter into with the Army Research Lab?

A Yes.

Q But you also told Mr. Korab at that time that

A Well, both will spin.

Q Well, I notice sometimes we call it a "spin gun" and sometimes we call it an "air gun."

A It is a matter of who uses the word -- how they try to define it. But the result is the -- you are spinning the battery.

MR. MICKLE: Would you mark this, please.

(Marked Defendant's Exhibit No. 20.)

Q And that seems consistent, because on May 30th of '97, Mr. Weir sent a memo to Alen Artz, who was I think a contracting officer with the Navy, where -- in this thing it looks like you have decided that you are going to design and build your own spin gun.

A I would like to read it.

Q Oh, yes. I'm sorry.

A (Witness reviews document.) Okay.

Q So would you agree back in May, that is when you decided you were going to develop the air gun?

A No, spin gun.

Q The spin gun. Okay. Did you ever develop an air gun?

A Yes.

Q When did your spin gun turn into an air gun?

A When we -- a spin gun is a very simple way to do it. We had a piece of equipment that could spin the battery at the speed that was required, and then you could hit it and collect the data. We discussed that -- I think with engineers and so on -- and they said no -- they want something that is shot and timing so and so -- so that took that one out of the game.

So we had to go after that and try -- we requested a drawing from Harry Diamond Laboratory, and we send money to them to buy drawing from them -- for $300 -- to do what they had -- so we can meet the -- what they had -- because the Government did not supply any specification, any drawing, for how to do it. So we thought we were going to buy the drawing from the Government -- even though when you tell somebody to do something, you should give them some way to do it -- tell them how you are going to do it -- or what is acceptable or not acceptable. There was nothing -- anything that shows what acceptable or not acceptable -- how you are supposed to do it. There was nothing in the contract that did

that.

So we always go back and ask them -- okay, "You call it "spin gun," "air gun" -- "How does it work? How we supposed to do this? Give us some hint." And we received no help. But then we talked to Harry Diamond Laboratory, and they said -- first they say they are going to test it -- and then they are going to help us to develop one, and then finally they say no, they can't do -- and then they say okay, they will send us the drawing. So we sent them a check for $300 for the drawings, and they took the check, and they never got us the drawings.

Q But -- I guess I am confused, because in your April 30, 1996, letter, which is Exhibit 8, when you were working -- you know, where you were talking about your agreement with the Harry Diamond Labs -- and they are not holding up their agreement --

A Yes.

Q But back in 1996, prior to Harry Diamond Labs -- not holding up their end of the agreement, we'll say -- you were writing the Government telling them that -- this second-generation spin air gun. So I guess I am not -- I am confused. The spin gun and

air gun -- is it the same thing or --

A Oh, no, there is no --

Q Are we arguing over semantics here? Well, I guess not arguing. Is it a semantics issue?

A No, no. We are really clear. We try to make it -- I am going to give more information, to just help both sides.

(Discussion off the record.)

A The air gun that Harry Diamond Laboratory uses has a lot of problems -- we found out when we met with them. They couldn't get the line -- this graph -- clear enough to verify the test. They had the problem for many years. They always try to find a way to fix it.

They use spin ring to collect the data, and to shoot the bird they use wood so they can hold it. It was very, very elementary and not -- successful less than 50 percent -- around 25 percent. When we came up -- when we thought at the beginning that we have to give the Government a bird with data collection included -- a computer inside of it to collect the data -- we thought we was supposed to give the computer to the Government and they would

shoot it.

When we submitted that to them, Harry Diamond Laboratory found out about it, and they thought that was the solution to their problem, and the discussion started, because now they could get their data very clean without going through the split ring.

So they got interested to the way we saw it to do it. So it looked like there was a match here. They had a problem collecting data; we had the -- we came up with a way to collect data clearly, but we had no gun, because we thought the Government was going to shoot it. So it was a good match for both ways. So they came together for us to go ahead and produce the data collection, give the drawing -- and in exchange, they would help us test it or help us produce a gun to shoot it with -- because we didn't know anything about the gun. That's how the agreement was written between us.

But somehow between this ball game that we try to do -- somehow between the Navy and the Army -- somehow they not function properly. They -- they didn't want to work a contractor that was a Navy contractor. We didn't know anything about it. And

historically, the Navy always bought this part from the Army.

Q Right.

A So now we are caught in between these two giants -- agree or disagree. The Army had all the information and didn't want to help the Navy contractor, and the Navy didn't know what the hell it was doing -- because that wasn't their damn contract; they never bought the part. They had no information; they had no data, or nothing.

We got caught in the middle. We got squashed. That's the true fact of what happened. Now, we can go to the paperwork and say who did this or who did that or -- and now, to come down to it, you cannot go to the Government and ask them -- "Okay, how do you do this"? And "Well, I don't know. Wait." And for months, you have got to ask, "How do you do that?"

And then go to the Army and find out -- the Army says this wasn't their contract. We are over there begging for help, and they said, "We can't help you. It is not our contract. You have got to go through Navy." And Navy says, "Well, listen, the

Army has a procedure -- new procedure you have to play -- and "Can we have that?" "Oh, we don't know what it is."

We are asking for the gun, and "We don't know anything about that." And the Navy wasn't lying; the Navy was telling the truth. They didn't know anything about it. But to cut -- to take apart -- from 1967 drawing and take it to 2000 and put it in the market, with not good documentation -- it puts a contractor in the position that I am.

And NASA, you see, took a year and a half for them to answer only a couple of questions.

Q So as a result, though --

A As a result --

Q -- in May 1997, you told the Army -- excuse me -- you told the Navy that you had no other choice but to design and build your own spin air gun?

A By this time, I am saying, "Okay, there is no other way, there is no other choice. There is nobody I can go to, so I am going to try to do it -- because now it has been -- by this time, I have spent the money on the material -- tools and dies -- I'm stuck. There is nothing I can do at this state.

Q And this is the only notice that you gave the Navy specifically that says, "I am doing the air gun"; is that true?

A Yes.

Q Is there any other documentation regarding the air gun that you know of where the Navy sent something back to you and said, "Build an air gun, submit us the paperwork, the cost --

MR. RALEIGH: Objection to the form of the question.

Q Did the Navy ever come back and say, "We know you are building the air gun now"? Did they ever -- how did the Navy respond to this memo?

A I don't remember, to be honest with you.

Q Did they respond?

A I don't know, sir. You have to look at documents to see. I don't remember.

Q All right. After you told the Navy that you were going to design and build your own spin gun, at any time did you tell the Navy how much it would cost?

A No, because at that time we didn't think it was going to cost that much money. At this time we

are going to make a spin gun and go ahead with the hammer -- with thing -- and activate it and use it. That's what we thought we were going to do. And they didn't accept it, so we have to go for the whole thing.

Q And that's why -- the follow-on in the memo -- there is a sentence that says, "We expect to have the manufacturing of the spin gun completed in a few days"?

A Yes, because we thought we are going to get the spin -- the spin machine that we have, put the parts in it and hit it and collect the data.

Q So you couldn't provide an estimate of the cost of the air gun to the Navy?

A It was not -- this way it was not much for us to really -- it was just a simple process. And it would work, too.

Q But at bottom, you never provided an estimate of the cost to the Navy -- how much you thought the air gun would cost to develop?

A No.

Q You just developed it?

A Because we didn't know how much it was going

to cost. So there was no way -- it was something we had never done before, so we have no idea what it cost to do -- plus there was no -- Mr. Mickle, there were no drawings, there were no specifications, so you couldn't really tell what it was going to cost. So you really -- you just went --

Q You couldn't even estimate it?

A There is no way. There is no estimation until you start the -- the only way you could make estimation, if you have a drawing, specification, and you say, "Okay, that is how I am going to do it." But the Army never give us that, nor the Navy give us that. So we didn't know what we were against. We just try to -- well, okay, how are we supposed to do this -- now that we are stuck in this middle? If we had a drawing -- some kind of hint of how to do it -- it would have saved us time and money -- a lot.

Q Did you ever talk to the Navy about the cost of the air gun?

A No.

Q You never did?

A I don't believe so. I don't know if I talked on the phone and tell them that this was really too

A We submit the data to -- but when they accepted them, and they said, "Okay, that's acceptable. It's okay," then we submit the data.

Q Then, why did you submit the data to the Navy Inventory Control Point?

A I think the contract required to send the data. I think there is a place in the contract that tell you, or -- and the DDP sends you -- to send the data.

Q And who did you send the data to?

A To whatever address the contract told us to send it to -- or directed us to send it to.

Q Jerry Hahin; right, at Crane?

A I believe so. I'm not sure. But whatever they told to send it to, we send it to.

Q Well, I was just assuming from Paragraph 5 of the letter -- it says that hard copy printout of additional units are in the possession of Crane Labs. And I thought if they had those units --

A Yes. I guess at that time Mr. Hahin was involved in testing -- accepted them. He might have took some of them with him right then.

Q Subsequent to this letter, on May 17th, your

First Article was approved. Do you agree with that statement?

A The First Article was approved?

Yes, they approved the First Article.

Q And do you agree that it was 17 May 1999?

A I don't remember -- the date I don't remember, to be honest with you.

Q Well, if I show you this, maybe this will refresh your recollection.

MR. MICKLE: Please mark this.

(Marked Defendant's Exhibit No. 22.)

Q You have just been handed Exhibit 22.

A Yes.

Q And that is a memo from John Korab, dated 17 May, 1999, I believe. Do you agree? And is that the memo you received that demonstrates that your First Article Test was approved?

A Yes, and he is -- he has approved the First Article, and he is asking to proceed to production and to submit the first lot for testing.

Q All right. May I have that back, please.

So on May 17th, you had passed First Article Testing -- in 1999?

A Yes.
Q And what was the testing process, again? Describe that for me from start to finish.
A They came to my facility, and they picked up the units, and we shot them for them, and they look at the printout in their computer, and they verified the unit passed or not.
Q And this is the hot test/cold test?
A Hot test/cold test, yes. We had a refrigerator chamber for cold, and a chamber for hot, and room temperature, and they selected any one they want for us to shoot.
Q So this First Article Testing that you passed on -- that was approved on 17 May -- this was all with that air gun that you developed, as well?
A Yes.
Q All right. And how many hot tests, do you remember, did you submit -- did you shoot with the air gun that time?
A I don't remember, but they collect all the data. We just did what they told us -- "Take one of these, take one of that, take one of that --"
Q The computer collected the data, and you took

that data and forwarded it to Crane Lab?
A Some data they took with them.
Q Who is "they"?
A Mr. Hahin.
Q Mr. Hahin, who is with Crane Lab?
A Yes, sir. He took some with him, and some -- but right then -- right at this moment, they said, "Okay, this is good and is acceptable, and they -- and we knew when they left that the First Article had passed.
Q And subsequent to that First Article being approved in May, you submitted a document to the Navy asking to establish a new delivery schedule. Do you remember that document?
A No, sir.
MR. MICKLE: Mark this, please.
(Marked Defendant's Exhibit No. 23.)
Q And pursuant to this letter, you requested that on December 28, 1999 -- am I reading this correctly? -- 5,209 batteries would be delivered?
A I am going to read it for a second.
Q Yes, please.
A (Witness reviews document.)

This in here, we tell them that -- about the test -- expense that we are going through -- in this letter to Mr. Korab. And we are saying "During this time, Axion has facilitated visits from the Navy Crane Division and has not requested any reimbursement for those expenses." Because at that time we discussed with Mr. Korab about the cost incurred to us to develop the gun -- to make the air gun. And he was saying to us -- he said that even though we spend a lot of time, he -- we developed all the stuff, and they -- we never were reimbursed for any of the expenses that we incurred from the top of the contract.

Q Right, but also with this letter -- getting back to my question -- you did ask at that time that you would be able to deliver 5,209 PS-115s by December 28th, 1999?

A Let me read it, please.

(Witness reviews document.)

All right, in this letter, they already have agreed to the December 28th delivery, because we mutually agreed in telephone call.

Q And by mutually agreeing to that -- that's

why you entered into --

A And the --

MR. RALEIGH: Listen to his question.

THE WITNESS: Okay.

MR. MICKLE: Please mark this.

(Marked Defendant's Exhibit No. 24.)

Q Pursuant to Exhibit 24 -- what you were saying, Mr. Latifi, is that this was a delivery schedule that the parties had agreed upon, and it was memorialized in P00011, dated June 2, 1999?

MR. RALEIGH: It's the next exhibit.

Q Which is Exhibit 23 -- well, pardon me. Exhibit 24.

A Yes, sir, they are asking us to go ahead and go in production and produce this quantity.

Q All right.

A At this date.

Q And what were those dates, then? Are those the same dates of 5,209 on December 28, 1999?

A Yes, I believe they reflect what we agreed on.

Q And then 10,000 the following month -- and it looks like you will be doing 10,000 for the next

30 days -- 10,000 on January 28th, 2000?

A Yes.

MR. MICKLE: Would you mark this, please.

(Marked Defendant's Exhibit No. 25.)

Q You have just been handed Exhibit 25, which is a letter that you wrote on December 7th -- or purports to be. Is that your signature on that letter?

A Yes, sir.

Q And that letter -- and let me know if you disagree with how I characterize it -- it appears that -- it doesn't look like you will make the December 28, 1999, delivery date, and you are asking to be able to deliver the 5,280 units now on March 20, 2000.

A No, we discussed that -- since the test takes so much time to perform -- it's five units per day -- it is going to take a long time to perform the test -- on a Lot Test -- before we ship them, because we are required to -- the first lot -- every lot we are supposed to test 80 units before we ship them.

Q Right, but at that time, what you are asking for in this letter is to --

A -- extension.

Q -- an extension --

A Yes.

Q -- to provide that first -- initial delivery?

A Yes.

MR. MICKLE: Mark this, please.

(Marked Defendant's Exhibit No. 26.)

Q And pursuant to Exhibit No. 26, which is P00013, it looks like the Government agreed to that extension and established a new delivery date. I read Block 14 -- and tell me if you disagree -- that pursuant to your request of December 7th, 5,209 batteries were going to be delivered now on -- well, you can't read it, but I am assuming that is 20 March -- 31 March 2000. Do you agree?

A I would like -- I am trying to see the date.

Q All right.

A Where is the date? March -- yes -- it says, "each to March 31 --" well, "Each 00," and -- okay, March -- I guess it is the year 2000.

Q 2000. And then it would be 10,000 on 30 April 2000?

A Yes, sir.

MR. MICKLE: Mark this, please.
(Marked Defendant's Exhibit No. 27.)
Q And then for some reason, you weren't able to deliver the 5,000 batteries in March, because -- it appears you agreed to another modification establishing a new delivery date. Am I wrong in my characterization of P00014?
A For some reason. I don't know what the reason was.
Q But you agree that it was a bilateral modification between you and the Government on April 10, 2000?
MR. RALEIGH: I object to the form, to the extent that it calls for a legal conclusion by this witness.
Q Did you sign this document?
A Yes, sir.
Q And what did you agree to when you signed this document?
A I agreed to the delivery.
Q And what is the delivery?
A I agree to production deliver 8,000 units.
Q When did you agree to deliver 8,000 units?

had you received that said that the contract was going to change?

A The conversation with Mr. Korab -- previous to that conversation -- we had some discussion about the cost of the air gun that incurred to Axion and were they going to give us any money for it or not.

Q And when did you have those conversations with Mr. Korab?

A Prior to the letter that we said we not ask for reimbursement -- because that was -- we always brought that up. I think Exhibit 25 -- no, I don't -- one exhibit here we said that -- no, Exhibit 23. We said that the Government has not reimbursed for any testing. Prior to that time, we were talking about how much it was going to cost us and I wished there was a way they could help us, with the amount of money we spent on it. And somehow -- somewhere -- I don't know if there is an e-mail somewhere that has come to your attention -- they asked us to submit all the drawings and all the development material that we had to the Government. And we discussed with them that they have to pay for this, but Mr. Korab said, "The contract says that you have to supply it no

matter we pay for it or not."

Q And when was this? Was this back in --

A At the same time we were going through the -- I can't recall the time. But there are e-mails and stuff that show that they directed us to -- even though we didn't want to do this, they directed us to submit all data to the Government.

Q You sent e-mails to Mr. Korab telling him what the cost of the air gun was?

A Not a total amount, but we said -- we tried to get to some agreement to say they were going to pay something for the cost.

Q All right.

A But it never --

Q But you were still experiencing difficulty producing the PS-115 back in 2000; right?

A We saw some leakage at that time. We tried to figure out where the leakage was.

Q Leakage --

A Acid leakage.

Q Where?

A When we do production -- when we went to production quantities, we experienced some leakage.

Q What was the cause of the leakage?

A At that time we tried to figure out what the cause of the leakage. So we went through looking at all our vendors to verify the product that we were using was what exactly the contract stated. And we went through all our invoices and all our COCs to verify the vendors provide us what we were supposed to receive.

Q All right. And what did you determine?

A We determined that the vendors give us the right product -- and right COCs --

Q And what does "COC" mean?

A "Certificate of Compliance." And all the vendors that we bought the product from was the ones that the Government qualify them to purchase from -- every one of them. So we eliminated that possibility that we have a bad component -- maybe bad acid or bad copper, because of the leakage. But after we determined that wasn't the case, we informed the Government.

Q And what did you tell the Government?

A We told them that we were experiencing a leakage on those units and do they have any ideas of