Nos. 03-2644C & 04-297C
(Judge Firestone)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AXION CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S APPENDIX
# VOLUME X, PAGES 300 - 347

PETER D. KIESLER
Assistant Attorney General

DAVID M. COHEN
Director

KATHRYN A. BLEECKER
Assistant Director

DOUGLAS K. MICKLE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 353-7961
Fax: (202) 353-7988
Attorneys For Defendant

OF COUNSEL:

RICHARD MARTINELLI
Office of Counsel
Naval Inventory Control Point
Mechanicsburg, PA 17055-0788

April 11, 2005

# INDEX TO APPENDIX

Document

Contract Number N00104-96-C-KA091 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Contract Modification P00001- P00021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

Letter from Axion to Department of the Navy (Dated August 4, 1994) . . . . . . . . . . . . . . . . . . 166

Letter from Axion to Department of the Navy (Dated August 11, 1995) . . . . . . . . . . . . . . . . . 167

Letter from Axion to Department of the Army (Dated September 26, 1995) . . . . . . . . . . . . . . 168

Letter from Department of the Navy to Axion (Dated September 27, 1995) . . . . . . . . . . . . . . 169

Letter from Axion to Department of the Navy (Dated October 2, 1995) . . . . . . . . . . . . . . . . . . 170

Letter from Small Business Administration to Department of the Navy Regarding Certificate of Competency ("COC") (Dated October 11, 1995) . . . . . . . . . . . . . . . . . . . . . . . . 171

Letter from U.S. Small Business Administration to Mr. Artz: Regarding COC (Dated November 9, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

Letter from Dep't of the Navy to Department of Labor: Requesting Clearance (Dated November 22, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

Letter from U.S. Small Business Administration to Department of Navy: Regarding Solicitation of Axion: Regarding Solicitation (Dated December, 4, 1995) . . . . . . . . . . . . . . . . . . . . . . . . 175

Letter from Department of Navy to Axion (Dated December 7, 1995) . . . . . . . . . . . . . . . . . . . 176

Letter from Axion to Department of Navy: Regarding ECP on Axion Contract (Dated January 17, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

Letter from Department of Navy to Alex Latifi, President of Axion: Regarding Dies (Dated January 26, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

Letter from Axion to Department of the Navy: Regarding Post Award (Dated March 18, 1996)180

Letter from Axion to U.S. Army Research Laboratory: Regarding Cooperative Resolution and Development Agreement (Dated June 27, 1996)..............................................................182

Letter from Axion to Mr. John Korab, Naval Inventory Control Point : Regarding N00104-96 CKA09 (Dated April 15, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

Letter from Axion Mr. Weir to Mr. Alen Artz (Weir Memo) (Dated May 30, 1997) . . . . . . . . 185

Letter from Axion to Mr. John Korab, Naval Inventory Control Point: Regarding Data of First Article in Reference to Axion Contract N00104-96 CKA09 (Dated April 12, 1999) . . . . . . . . 187

Letter from Commanding Officer, Naval Inventory Control Point to Axion : Regarding First Article Approval for Contract (Dated May 17, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .189

Letter from Axion to Naval Inventory Control Point: Regarding Plating Guidelines (Dated November 13, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

Letter from Department of the Navy to Axion (Dated November 22, 2000) . . . . . . . . . . . . . . . 192

Letter from Axion to Naval Inventory Control Point (Dated August 27, 2001) . . . . . . . . . . . . 194

Transmittal Letter from Department of the Navy to Axion (Dated September 18, 2001) Transmitting September 6, 2001 Letter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196

Letter from Axion to Mr. John Korab (Date September 18, 2001) . . . . . . . . . . . . . . . . . . . . . . 198

Letter from Department of the Navy to Axion (Dated November 1, 2001) . . . . . . . . . . . . . . . . 199

Letter from Department of the Navy to Axion (Dated December 13, 2001) . . . . . . . . . . . . . . . 200

Letter from Department of the Navy to Axion (Dated April 30, 2002) . . . . . . . . . . . . . . . . . . . 201

Letter from Axion to Mr. John Korab, Naval Inventory Control Point (Dated September 9, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202

Letter from Department of the Navy to Axion (Dated October 1, 2002) . . . . . . . . . . . . . . . . . . 203

Letter from Department of the Navy to Axion (Dated October 1, 2002) . . . . . . . . . . . . . . . . . . 204

Letter from Axion to Mr. Korab (Dated October 11, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

Memorandum from John Korab Regarding Proposed Termination for Default (Dated October 17, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208(a)

Letter from Department of the Navy to Axion (Dated June 30, 2003) . . . . . . . . . . . . . . . . . . . 209

Deposition of Mr. Jerry Hahin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 211

Deposition of Mr. John Korab . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

Deposition of Mr. Alex Latifi . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 243

Declaration of Mr. Jerry Hahin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 348

Declaration of Mr. John J. Korab . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 354

Declaration of Mr. Henry Stickrod . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 359

why the leakage is.

Q And what did they tell you?

A They say they had no data that shows there has been any leakage ever.

Q All right.

A And they sent Mr. Hahin to our facility.

Q When was this?

A I can't recall, to be honest with you, but I am sure there is some paper that shows that.

Q All right. I am trying to figure out -- because on August 29th --

(Discussion off the record.)

MR. MICKLE: Mark this, please.

(Marked Defendant's Exhibit No. 29.)

Q On August 29th, P00015 -- it appears to be agreed upon by the parties. Is that your signature?

A Yes, sir.

Q And why was the contract price reduced by ten -- why did you agree to a reduction in the contract price of $10,000?

A Mr. Korab said the cost -- it cost that much to produce a Mod.

Q $10,000? And you agreed to that?

A Yes, sir.

Q And pursuant to this modification, what was the final price of the contract to be?

A $10,000 less than it was before.

Q Did you agree, then -- I guess -- what it says is in August of 2000 -- the end result was that the contract you were going to be paid at the end was $1,295,974.20?

A Or he was going to cancel it.

Q Cancel it?

A I mean, that's --

Q Or terminate it?

A Terminate.

Q All right. And it appears that we also established -- we, the Government and the Navy and --

A -- Mr. Korab.

Q -- Mr. Korab and you, Mr. Latifi. Did you also agree upon a new delivery schedule?

A Yes, sir.

Q And am I reading it correctly by saying "28 November 2000, you agreed to 5,209 batteries"?

A That is correct.

Q And 28 December 2000, 8,000?

A Yes, sir.
Q And 28 January 2001?
A Yes, sir.
Q So despite some problems that are ongoing in Axion at that time and getting the batteries built -- for leakage or for whatever reason --
A At that time -- when we do this here (indicating), we are making them, and we haven't seen leakage yet.
Q You had not seen leakage yet?
A No.
Q But for whatever reason -- you were telling me earlier, though, that was one of the reasons why there was some --
A I don't know the reason. We found out about the leakage sometime during this time period. I don't know if it was before this or after this. But it could be -- I am going to say -- at that time, possibly. I can't recall the exact date, but possibly we were still trying to find out if there was anything we had done wrong. Did we buy bad material? Did somebody give us something wrong? Or the process is wrong.

So we give some period of time to verify that it is not our fault before we call the Government and say, "Listen. We believe that something is wrong here." And after we exhausted all possibility that the process and the product is not our fault, then we tell the Government, "Listen. We have a leakage problem. Please advise us if that has happened before and what can we do about it."

Q But at this time the Government and you were still working together and just keeping -- and working on modifications to establish new delivery dates?

A We always worked for the Government; we never did have any not working conditions, except they wouldn't pay us for the air gun.

MR. MICKLE: Mark this, please.

(Marked Defendant's Exhibit 30.)

Q The reporter just gave you Exhibit 30, which is a letter dated November 13, 2000, which it appears you sent to the Government. And your memory is pretty good, Mr. Latifi, because this is the letter -- I guess it was about that time when you were telling the Government you believed that the

PS-115 spec was bad -- for plating?

A Do you mind if I read it? I don't remember.

Q All right.

A (Witness reviews document.)

MR. MICKLE: Mark this, please.

(Marked Defendant's Exhibit No. 31.)

(Discussion off the record.)

MR. RALEIGH: Is there a question pending?

MR. MICKLE: Yes. I asked him --

Q This is the letter where you are basically informing the Government that you believe that there were bad specs, that the contract contained bad specs regarding plating?

A Yes, sir.

Q You have a lot of information in paragraph 1 of this letter --

A Yes.

Q -- that, obviously, you have to have an engineering or science background -- but I just called this the "bad spec plating letter."

A Yes, sir.

Q And you told Mr. Korab, "It is leaking, and it is your specs that are causing the leakage"?

A There is no leakage.

Q Oh, this is the bad spec for plating?

A Yes, sir.

Q The plating was bad?

A Yes, sir.

Q All right. And then you told me awhile ago that the Government got back to you and said, "No, that's not true." And I think you were referring to this letter -- and let me show you. And this is marked as Exhibit 31. And on November 22nd, in a letter that you have as Exhibit 31, it looked like you received a letter from Mr. Korab, and at that time it appears that he disagreed with your assertions in that letter?

A He is -- if you don't mind, I will read the letter for you -- both of them.

Q I can read the letter. Just -- you know --

A Okay. Well, in this letter, we are saying that -- this document is around 200 pages -- that they give to us --

Q What document?

A This document that -- the plating document.

Q All right. The plating specifications?

A Yes, sir.

Q All right.

A As you stated, plating specification. That means I am bound to proceed with that specification. I could not assume anything. I have to provide exactly what the specification said.

Q Right.

A When I did that, the results of the specification did not produce any usable plate for the battery.

Q All right. And you told Mr. Korab that, basically, "These specifications are bad"?

A That the specification did not produce the results that are required by the contract.

Q And he came back to you and said, basically -- and I am summarizing. Tell me if you agree or disagree.

A Okay. Go ahead, please.

Q "We disagree"?

A But Mr. Korab did not say disagree on what basis.

Q Okay.

A Was it this is wrong -- but he say he

disagreed because that was given out for some other reason -- Mr. Korab did not disagree because he said the document was correct. If you read his answer --

Q Okay.

A He didn't say the document was correct -- he said that this was a guideline. Okay? When we produce something as a specification -- as you said, "specification --" and a contractor can't tell -- leave one and take the other. If that be the case, then I not be responsible for any specification.

Q Well, why didn't you just build it to the specification as asked, even if it didn't work?

A I did. I did make it to specification. It didn't work. And I told them, "It won't work."

Q All right. And he came back and told you what?

A His letter says that the specification provided to you is for a guideline and does not preclude the contractor from altering the process set in the contract -- which really doesn't say much. All he says is this specification I give you is not a guideline but it is just a specification -- you can't say, "I give you a specification but it is not a

guideline --" not a specification. You have got to make up your mind. If you take the specification as a contract in one way, that allowed me, as a contractor, to take another specification out.

(Discussion off the record.)

A If the Government has the right to say, "The specification I give you, don't worry about it," then, that gives the contractor the right to say the same thing, which is -- we are never going to produce a good item if we just keep on saying, "This specification is okay; that specification is okay. Use this one -- use that one --" I am bound to all these specifications in the contract, and the Government is bound to all the specifications in the contract. This specification that the Government give me did not produce the battery.

Q What did Mr. Korab mean in his letter when he said, "Axion planned to use a commercial plater at the beginning of the contract? It's not the Government's fault that Axion decided to undertake the plating process"?

A It really make no sense. I have the right to choose the plating process -- me or outside or

anywhere. But no matter who I use or who does it, it has to perform to specification. It doesn't make any difference if I use outside house, inside house.

Q So after you received this letter on November 22nd, or on or about -- after you received the November 22nd letter --

A Yes.

Q -- what was your impression regarding where you stood with this specification? What did you decide to do?

A As usual, I was out -- like the air gun -- by myself -- and "Do what you can," or "We can't help you." I mean, that was the whole -- the whole time of this contract, it was always that way. There was no answer. Nobody could help me. I was out. I was just sitting over there.

Q Well, which specification did you end up using?

A We used the -- we went to -- to develop the specification. We developed the formula to be able to provide the charge. And, actually, after testing, we found out -- and the Government found out -- that we developed much better charge -- which documents

from the Government show that -- and this e-mail that is asking us what did we do. There is an e-mail from the Government engineer that says, "What did Axion do to be able to --" would hold charge of 35 minutes. We submitted the samples -- we played it to the Government in all different forms -- long form, short form, cut sizes, cells -- everything for the Government to do tests. And they performed the tests, and they found that our product, the cell that we plated, held the charge much, much longer.

Q All right.

A And that this documented --

Q And this plating process that you developed --

A Yes.

Q When did you finally develop this plating so it was -- when did you perfect the plating?

A After this letter.

Q About when was that?

A That was around 2000.

Q Around 2000 -- so it was between November 22, 2000, and December 31, 2000?

A I really can't tell you the exact date,

but -- by this time, we have the development; we are just trying to run the machine, and we find out this -- we find out the Government spec doesn't work, so we have to figure out what to do.

Q So the bottom line is in November of 2000 you had a disagreement regarding the specification with the Government -- regarding the plating?

A Yes. Regarding the plating, we said their -- it doesn't work -- and the Government says, "Well, we have got you what we have, and we can't help you no way."

Q Well, I think we have beat that horse to death. Let me see if I can find another one in the corral.

MR. MICKLE: Mark this, please.

(Marked Defendant's Exhibit No. 32.)

Q Toward the end of May, you wrote Mr. Korab and told him you were going to start delivering 8,000 units within 10 weeks?

A Yes, sir.

Q So at this time, on May 30th, you had not distributed or given them any units; is that correct?

A No, we had not.

Q So you really haven't -- you have begun production, but you haven't been able to give the Government any units at this time?

A It could be we are still going to find out what the leak is about. It's possible that -- that leakage thing was a long period of time. We kept trying to figure out what to do. And if you look at the e-mail, maybe you will find out what period of time this leakage we discussed with them, and when they said -- the engineers -- I can't recall. But somewhere in this new ball game.

Q But it appears that this time, too, you think you are close to solving the problem, because you did tell the Government that "Within 10 weeks from today --" you know, "10 weeks from May 30th, we are going to be able to give you 8,000"?

A No, it doesn't mean -- we are producing the quantity of 8,000, and we are hoping that a leakage does not show up.

Q But, I mean --

A Possibly we don't know about leakage at this time.

Q I guess this is -- you are proposing a

delivery schedule in this May 30th letter?

A Yes, sir.

MR. MICKLE: Mark this, please.

(Marked Defendant's Exhibit No. 33.)

A Production quantity.

Q And then -- it appears to me -- and maybe I am wrong -- that you wrote this letter on May 30th, and then a few days later, on June 4th, you and Mr. Korab agreed to Modification 16. Is that correct?

A Yes.

Q And pursuant to Modification 16, you established a new delivery schedule?

A Yes, sir.

Q And tell me if I am reading this wrong. Is this thing on August 8, 2001, you will deliver 8,000 units?

A Yes, sir.

Q And then on 10 September, 2001, you said you would give them 8,000 -- another 8,000?

A Yes.

Q And so on and so forth?

A Yes, sir.

Q 10 October -- all right.

A Yes.

Q And at this time, though, there have not been any deliveries -- you were still trying to work out some problems -- but you thought that you were going to be close?

A Yes.

Q Now, back to P00016, 8 August 2001 is the new delivery date, when you have to deliver the PS-115s?

A Yes.

(Marked Defendant's Exhibit No. 34)

Q I have a question on Exhibit 34, which is a letter dated August 6, 2001 -- and it appears to be signed by you. I am just confused because the letter is dated August 6, 2001, but it says "In reference to your letter received September 18, 2001...." And I just didn't quite understand -- what is the right date? Is August 6 correct and September 18th should be -- or should it be November -- October 6 -- I guess I -- I don't understand -- what is the correct date in this letter, if you can remember?

A I wouldn't remember, sir. I guess the date is what is -- I guess the date of the letter -- oh,

office -- came to my office and picked up the cans and certifications -- so and so -- reviewed them. And I believe prior to this letter the Government called me with their lawyer -- Mr. Korab called me with their lawyer and asked me -- that they wanted to cancel the contract for convenience. And I thought, They are going to cancel it because we told them they are leaking. So I believe I sent the letter to kind of tell them that we can control it, and we try to figure out what is going on with it.

Q Well, you thought everything was under control and that you would be able to solve the problem?

A Well, we did -- the ones that leaked, we took out and tried to find out what was the leakage about and see if we can solve the problem.

Q All right.

A And that's what we say -- it's possible that we can solve the problem with leakage.

Okay. (To Mr. Raleigh:) Should I proceed with the letter?

MR. RALEIGH: You have to wait for his question -- if you are asking what I think.

MR. MICKLE: Mark this, please.

(Marked Defendant's Exhibit No. 35.)

Q Exhibit 35 is a letter that you sent to Mr. Korab, it appears on August 27, 2001. Is this the first -- I guess this is the second time you mentioned leakage, but in this case you go into great detail about what you believe the cause of the leakage is. Is that a correct characterization of this letter?

A Yes. I would like to read it, sir.

Q Yes, please.

A (Witness reviews document.) This letter is in the form of two or three things that we have done for them. One is that we have developed an air gun now, and the bird, and the computer to collect the data. And, secondly, we tell them about the improvement that they agreed on, on the -- by using nickel has improved the charge from 9 minutes to 18 minutes, which is -- which they previously examined and agreed on.

And now we talk about the design of the battery. And we say, "The design requires Axion to put acid in copper cans, which is a chemical fact the

acid will eventually dissolve the copper. We are experiencing this phenomenon at this time. We have over thousands of copper cans that have been filled with acid and welded and started leaking on the surface of the diaphragms."

Q All right. And I guess the question is: At that time you were experiencing leakage?

A Yes, sir.

Q And, again, you thought this was caused by the specification that they provided?

A We thought that that was caused by putting acid inside the copper can, which is -- when you put acid in copper -- I'm not a chemist, but I took some chemistry in high school and college. But the acid will eat the copper.

(Discussion off the record.)

Q And in this letter you talk about the suggested changing from copper cans to polyethylene cans?

A Yes. We went to the -- we bought the acid from the source defined by the drawing and the Government, and we talked to Mr. Carey Jackson, the quality assurance manager of the chemical

manufacturer. We asked him -- we said, "The Government is telling us to put this acid in the copper --" what his opinion is about this? He said, "That acid will eventually eat it."

Q What do you mean the Government is telling you to put acid into copper? Where were they telling you to do that?

A In the drawings.

Q That was in the contract?

A Yes, sir.

Q So the contract required that you put acid in copper?

A Yes, sir.

Q And this letter is telling the Government that requirement or that specification, whatever, in the contract --

A -- will result in leakage. It is going to leak.

Q And after you told the Government this, what did they tell you?

A Well, we had to develop a can -- made out of the same material -- these chemical people sent the product to us -- that has been proved for many years

that they sent acid in this product -- that when they ship the product -- the acid -- they put it in this kind of can -- Teflon. So we asked them to allow us to use the same product -- make the can out of the same product -- and solve the problem from now on -- for the rest of their life.

Q And what did the Government tell you?

A We never got a clear response what they want us to do. They weren't for it -- even though we make some units and we give them to Mr. Hahin to look at them.

Q Well, what did they say about your assertion that acid in copper caused the leaks?

A No response -- well, yeah, they made one response.

Q What did they say?

A Mr. Korab and his lawyer called me, and they offered me cancellation for no cause.

Q And who was their lawyer?

A Their in-house lawyer.

Q But you don't know what his or her name was?

A It was a man. Seemed like a young fellow -- sounded young.

MR. MICKLE: I only have one copy of this, unfortunately. Can I get this marked, and I will --

MR. RALEIGH: Do you want me to run off two?

MR. MICKLE: Yes. Thank you.

(Discussion off the record.)

(Marked Defendant's Exhibit No. 36.)

Q Now, you said you got a phone call from Mr. Korab talking about a Termination for Convenience or --

A And there was the lawyer on the phone, too.

Q Do you remember receiving this memo with attachment from Mr. Korab where it says the memo being responded to is the 22 August and also refers to your letter of 27 August regarding the specifications and the leakage?

A Yes, and so -- such a wrong position for Mr. Korab to take.

Q Why is that?

A He says the Army has never had leakage, that the Army has produced thousands of those batteries and did not experience leakage --

Q And did you disagree with Mr. Korab when you saw this letter --

A Because the Army has experienced leakage -- I know now -- I didn't know then --

Q You were experiencing leakage --

A The Navy come back in this memo and says no one experienced leakage -- I am thinking maybe I did something wrong --

Q Or did you think you did something right and the Navy was wrong?

A I went through all the -- I want to find out -- and later on I find out -- and the Army had problems for a long time and had a seminar and talked about what is supposed to fix it, and I -- I didn't know nothing about it then.

Q Going back -- even though you didn't know anything about it back in September of 2001 and August of 2001, you were talking to the Navy about this leakage problem -- and they are telling you it is not a problem -- and that is affecting your ability to deliver the PS-115s; right?

A Yes, but the Navy -- the Navy representative and DCAS representative were already aware of the problem. We showed it to them in our product. I said, "Look, this is leakage." They know the

problem, and they went through our process to see if anything wrong, and they didn't find anything wrong. But they couldn't answer why it was doing it.

Q But they just told you that it's not copper in the -- or it is not acid in the copper?

A They never said that. You see what it says in the second paragraph -- it says, "However, fluoboric acid when combined with methylene bromide has proved to have a corrosive effect on copper."

Q Right, but then doesn't the letter also go on to state that corrective action was taken?

A This is what they think was corrective, but nobody has made them at this moment the way we are talking about.

Q But when you received this letter and they were telling you that corrective action was taken to isolate the methylene bromide from the fluoboric acid by encapsulating the -- blah, blah, blah --

A Yes. Do I believe them? Is that what you are asking, do I believe them? Do I believe them at that moment?

Q Yes.

A They put doubt in my mind, but after going

through all the research that we did, we didn't find any reason that would cause that problem. And later on my lawyers hired --

MR. RALEIGH: Let's not talk about discussions that we had. It's just cleaner that way.

THE WITNESS: Okay.

A We later on found out it is a fact that acid eats the copper.

Q Eats the copper?

A Yes.

Q So back then, though --

A I didn't know. I had no idea --

Q But you thought acid ate copper, and you thought that your vendor -- your vendor thought acid ate copper?

A Yes.

Q And you knew that the Navy thought that, as corrected, acid didn't eat copper?

A Yes.

Q And still at this time -- we are in September of 2001 as we are moving along the timeline of this Navy contract.

A Yes.

Q And at this point, for whatever reason, you still have not delivered any batteries to the Government?

A Yes.

Q And we come along, and then it is October, and we come to the first -- P00017.

MR. MICKLE: Please mark this.

(Marked Defendant's Exhibit No. 37.)

(Discussion off the record.)

Q Now, P00017 --

MR. MICKLE: What exhibit is this, again?

MR. RALEIGH: It's 37, but we have got a sticker over it probably -- well, over some language --

(Discussion off the record.)

Q When did P00017 become effective? Is that October 2, 2001?

A 10/2/01.

Q Is that October 2, 2001?

I think it is.

A October -- it says "2" on top.

Q All right. October 2, 2001?

A Yes, sir.

Q All right. And part of P00017 I see re-establishes the new First Article sample as --
A -- 2003.
Q 2003?
A Yes.
Q 1 October 2003?
A That is correct.
Q And that is your interpretation?
A That is what it says.
Q Why do you think it says "1 October 2003"?
A Because that is what it says.
Q But why -- when I showed you the previous P000s, you said that the year would go second -- or first -- and the date last.
A Where?
Q In the previous modifications.
A I didn't say about the date.
(Mr. Mickle hands document to the witness.)
A Where?
Q In referring to Exhibit 33 -- remember when we were talking about when you established delivery schedules?
A Yes, sir.

Q And you told me that you were going to deliver 8,000 on August 8, 2001?

A Yes, 2001.

Q August 8; right?

A Yes.

Q So why -- and in the previous other P000s we discussed when you were re-establishing delivery dates it was always year, month, date. Why do you think on P00017 all of a sudden that it is month, year, date -- month --

A I always put a date at end --

Q No, I'm talking about this date right here (indicating).

MR. MICKLE: Could I please have 17.

Q This date right here (indicating).

A It is the same as the date on top. It's year end.

Q Right here (indicating).

A Yes, I know, but this date is same as here (indicating). The year is at the end. And the same as here (indicating), and the same as others.

Q Well, why isn't it the same there?

A I don't know why it is not there, but

A They were in Germany.

Q And that was the nickel to steel plating?

A Yes -- no, they doing nickel and -- nickel and lead.

Q Nickel and lead?

A When I went to them and talked to them -- when I went back, I found out they using pure nickel.

MR. RALEIGH: Do you want me to explain to you off the record?

MR. MICKLE: Yes.

THE WITNESS: I can do it off the record, too.

MR. RALEIGH: Well, I don't know that you can --

MR. MICKLE: Well, why don't we just do it on the record.

Q Could you explain that whole process, because I -- nickel -- I told you -- you know, with me and organic -- out. I need the simple --

A The way that this unit works -- the battery is based on lead oxide and lead. This is the differential charge between those two elements. You plate one side lead, one side lead dioxide. Lead and

lead dioxide only can be plated on nickel.

Q Then, what was the steel -- where did we get steel? Okay, I heard lead, I heard nickel. I am missing the element -- the steel.

A In 1967, the United States used steel and plated with nickel -- and they use it that way. It is best to use pure nickel.

Q And why was your German -- well, was it a German vendor you were using?

A Yes.

Q Where in Germany?

A In -- somewhere around Cologne.

Q And who was it?

A Fewer -- F-E-W-E-R or F-I-W-E-R -- something like that.

Q And when did you stop using them?

A We used them for the First Article.

Q And then you switched once you went into production? After the First Article Test was approved in May of -- whatever -- 1999, was it?

A Yes, sir.

Q -- you were using the German vendor to produce the nickel plating; is that correct?

A Yes, sir.
Q And then when did you start doing it in-house?
A Before I did the production quantity.
Q So the bottom line is that is why you were required to do a new First Article?
A It shouldn't be that way, sir.
Q It shouldn't be, but --
A It should not be that way.
Q Well, how should it be?
A The cell itself has a test --
Q Who has --
MR. RALEIGH: The cell.
A The cell. It is called out as a test in the contract. The contract requires for you to perform a test on product prior to using them on the battery. It don't matter where you get them from. It makes no difference. The end product has to produce so much charge. It doesn't matter where you get it from.
Q All right.
A And we performed a test to our product every half an hour. And the Government has witnessed the test all this time. For two years we were in

A Because we still had problems testing them.

Q And at this point you still believed that the -- you know, that the testing that you were submitting -- you had to submit some testing to the Government for -- that they needed 120 to verify?

A 80 to 120, whatever this -- just to ship the lots -- to ship the quantities that we already had -- already made.

(Discussion off the record.)

MR. MICKLE: I apologize. I didn't make a copy of this one P000. But I have got my notes on this one. Do you want to take -- I know we just took a break, but can we take five minutes?

MR. RALEIGH: Sure.

(Discussion off the record.)

(Reporter's Note: During the off-the-record discussion, it was agreed not to take a recess.)

MR. MICKLE: Would you please mark this.

(Marked Defendant's Exhibit No. 44.)

Q Exhibit 44, as you see, is Modification 19 to this contract, and it is dated April 4, 2002. Why did they reduce the contract -- why did you agree to a $1,000 reduction in the contract price for this

modification?

A You know, if you -- if the Government asks me for First Article Test, the Government is supposed to give me what contractually agreed for contract time -- which is almost one year to do it.

Q Well, in the original contract, didn't they say post award that you have 90 days to produce a First Article Test?

A No, First Article Test is much more than that -- almost a year.

Q So it is your testimony that the contract didn't require --

A Whatever the contract is requiring. I don't exactly remember how much it is, but it is a good amount of time.

Q But in this modification, you agree to a $1,000 reduction in the contract?

A Yes. It would be unfair for the Government to ask for First Article and give me only 10 days to do it.

Q But they gave you -- and this time you were going to produce 80 -- they are going to take 1,000 off the contract, and as part of that reduction, you

are going to deliver 80 batteries that they call First -- that are called "First Article Samples." Do you agree?

A Yes.

Q And you agreed that you would produce those 80 First Article samples by April 23, 2002?

A Yes.

Q All right. And at this point, when you signed this agreement --

A Notice the date is 2002, and the year is behind.

Q I know. Did you ask yourself then what happened to the 2003 First Article Test?

A On here? No, because 2003 is not -- this is 80 units. 80 units is a Lot Test.

Q It's a Lot Test?

A To ship the quantities.

Q All right. Well, then, what are you going to provide in 2003?

A The First Article that they want to see after three or four years.

Q Why would they need to see First Articles after three or four years when if you met the

delivery schedule, you would be done with the contract?

A No, if you -- if you want to stay producing -- continue producing -- every once in a while they have to ask you for First Article. That's what I understood -- maybe it's in the FAR; maybe it not in the FAR, but that is what I understood normally happens. You can look at the FAR and find out. I don't know, but -- but every 5 years I think the Government has the right to ask you for another First Article -- as a qualified producer. But see here, it asked for 80 units. The 80 units only came from the contract -- if you look at a clause in the contract -- I will be glad to show it to you. It says, "80 units should be tested for every lot prior to shipping." And this is the Lot Test.

Q Well, why didn't they call it "Lot Test"?

A I have no idea why they didn't call it "Lot Test."

Q Well, you signed off on this.

A I understand, but they use it back and forth -

Q Where did they call it "Lot Test" --

discussion was about when we were going to ship that first lot.

"What's wrong with you? Why can't you ship and get through with it?"

Q But you knew that you still had to get a First Article approval as of April 23, 2002? You called it "Lot"; the Government called it "First Article"?

A You see -- see, you call it "First Article," but when you had a document in your hand that says "First Article has been approved" -- so which way would you like to go?

Q Well, if it has been approved, why did you agree to call it "First Article" here?

A Because as far as I am concerned and they concerned, it was a Lot Test. They always call it a Lot Test.

(Discussion off the record.)

Q All right, we can move on.

A I would like to ask question.

MR. RALEIGH: Then, you ask it to me.

THE WITNESS: Okay.

MR. RALEIGH: If you need to ask any

question -- there is no question pending. Ask me the question.

(Discussion off the record.)

Q Regardless if it was a First Article Test or a Lot Test --

A Yes.

Q -- on April 23, 2002, 80 units weren't successfully tested, were they?

A No, sir.

Q And as a result of that, on May 10, 2002 --

MR. MICKLE: Let's go off the record for a second.

(Recess.)

(Marked Defendant's Exhibit Nos. 45 through 52, inclusive.)

(Examination Resumed by Mr. Mickle:)

Q I guess we are done with Exhibit 44, which is P00019. Let's go to the next document. And I just need some explanation. And that's Exhibit 45. That is a May 10, 2002, letter you sent. And it looks like up until this point you are still having difficulty with your measuring apparatus -- with the air gun and the computer on board?

A Yes.

Q And am I correct in saying that as of May 10th you thought you would be ready to do testing once again on May 13, 2002?

A Yes.

Q And then, once again, you followed up with that and made good on your word with Exhibit -- 46, is it? Is that what that is, Exhibit 46?

A Yes.

Q Where you sent an e-mail to Mr. Korab -- I think it was May 14th -- that you performed the tests and the rings held and now you are -- it looks like you are ready to start testing again.

A Yes.

Q And every time that you shot -- or performed a test -- somebody from DCMA was there?

A Always.

Q Always. And was that usually Mr. Stickrod?

A Yes.

Q And Mr. Stickrod, how many times was he in your building?

A Numerous times.

Q Numerous times. In fact, my impression was

even though you had a professional relationship, you respected each other and got along fairly well?

A Yes.

Q Has that been your relationship with DCMA throughout?

A Always, always.

Q So they were very cooperative?

A I was very cooperative.

Q You were very cooperative? Were they cooperative?

A I was very cooperative, so I didn't give them any reason not to be cooperative.

Q But I mean, I gather when -- if you needed them, you could call them up, and they would respond?

A If they were available, yes.

Q If they were available. Did they ever say they weren't available?

A There is a limit when you call DCAS. They have a limit time to do it. I think three or four days they have to get back to you. But we always had a good relationship with them.

Q All right. So any of the problems that you had in doing your testing, was DCMA at fault at all?

A No.

Q Now, let me show you Exhibit 47. And this is Modification 20. And the way I read this modification -- and tell me if you disagree -- but first, is that your signature down there? I see it is a printed name of "Alex Latifi."

A Yes, sir.

Q And, Mr. Latifi, through P00020, on July 11, 2002, a new delivery date, once again for First Article Tests, was established -- and this time as of September 9, 2002?

A Yes.

Q All right. And what did you have to do on September 9, 2002, pursuant to this modification?

A Nothing. Just delivery time went to September 9, 2002.

Q And what were you delivering?

A The test -- the results -- so I could ship the stuff.

Q All right. And, of course -- is this again -- even though it says "First Article Test," you always thought this meant Lot Test?

A Well, the Mod before, that was 80 pieces, so

I assumed the 80 pieces.

Q But now you are sure that -- now, after you have read this modification, I am assuming that you now agree that this was First Article Test?

A They meshed them together. I didn't -- it really didn't make any difference which one they wanted me to do. I just wanted to test so I can ship. It didn't make any difference which one it is -- or what they call it. Sometimes they call "Lot Test"; sometimes they call "80 pieces"; sometimes they call "120 pieces." It really wasn't clear -- but what it was, I have to test quantities, 80 to 120 -- somewhere -- to ship my product --

Q All right.

A -- because they change it -- 80 -- 120 -- you couldn't tell exactly what.

Q You couldn't tell --

A No. But I agree to test the quantity to satisfy so I could ship.

Q But I note that on September 9th, on that delivery date -- and this is Exhibit 48 -- in your note that forwarded the test results, you also referred to the testing as "First Article Testing"?

A Yes. But that time, they said "First Article," so we are taking the same --

Q So at least on September 9, 2002, you and the Government were in agreement that this was a First Article Test you were submitting on September 9th?

A We used the same word they used.

Q So did you agree on September 9th that you were submitting First Article Test Performance Results?

A We have shot --

Q Would you answer that question for us, please, sir.

A At this time?

Q Yes.

A We used the same word they use.

Q And by using the same verbiage, did that mean that you agreed, then, that you were submitting First Article Test Results on September 9th?

A The last time it was 80, and then they said 120, and now 127 pieces. So we -- we do what they tell us. It seem like the Government has pushed the Lot Test and First Article together as a -- one case. So we are proceeding with it as they want us to.

Q Well, that goes to the numbers, but consistent with the modification -- well, P00020, which was Exhibit 47, and Exhibit 48, in your September 9, 2002 -- when you submitted that data as required by Mod 20, you called that submission "First Article Test Performance"; right?

A Yes.

Q Is that correct?

A Yes, sir.

Q And when you submitted the First Article Test Performance, you submitted the 74 units?

A We tested over 90 units.

Q But how many did you submit?

A In that paper, we -- I think we submitted 74 units.

Q Did you submit other First Articles on September the 9th, on different paper?

A Mr. Hahin took some stuff with him.

Q Mr. Hahin was there on September 9, 2002?

A During the whole test -- the second test we did -- three or four times.

Q Three or four times he was there?

A Yes, sir.

Q But on September the 9th --

A These tests --

Q Let me go back.

A Yes, sir.

Q On Modification 20, the delivery date for First Article Test Report is established as September 9, 2002. Do you agree with that statement?

A Yes.

Q On September 9, 2002, you submitted First Article Test Performance Data Report. Is that true?

A Yes, but it took us a long time to bring the data.

Q I understand, but you only submitted one report; right?

A In this instance, we tested over a hundred and some units.

Q Okay.

A Mr. Hahin was there. He collected some data and took with him. Mr. Henry Stickrod was there, and he counted 90 units he took with him -- he counted 90 good units that we tested. Mr. -- the last gentleman --

Q Vartan?

they just stopped it.

Q They just stopped it?

A Yes.

Q How long was -- the test period between P00020 and P00021 was about three months -- if I remember correctly.

MR. RALEIGH: Look at the documents.

THE WITNESS: Sir? What did you say?

MR. RALEIGH: 20 and 21.

MR. GABIG: I think it's 47.

Q Exhibit 47?

A Yes, sir.

Q So between July 11, 2002 -- and at that time, where you agreed that you would submit your First Article Test Report on September 9, 2002 -- that's approximately -- it's a little bit less than three months. Do you agree?

A Yes.

Q And during that three months, you are required to test -- 80 or 120 good units; is that correct?

A Somewhere between 80 and 120 units, yes.

Q All right. And you stated that you tested

127 units and collected good data on 74?

A I said that it looked to DCAS that it was not necessary to proceed shooting good units and wasting them when 127 units had been shot and approximately 80 good data were collected.

Q Are there any other reasons why you believe you complied with the FAT or is that -- are all your reasons incorporated in this letter?

A Well, most of the reasons that I think are factual -- is that Henry Stickrod collected 90 data.

Q So, going back to my question, is there anything else besides what is mentioned in this letter why you believe back in October of 2002 you had complied with submitting your First Article Test Report?

A Yes. All the people that were involved in test, they agreed that we were doing pretty good -- passed the test -- and the representatives of the Government tell us don't proceed in test any more.

Q The Government stopped you from testing?

A Any more, yes, sir.

Q And when did they stop you from testing? On September 9th?

A The Friday -- that Friday.
Q That Friday?
A Yes, sir.
Q And then to close out the story, the saga, this contract -- well, a good portion of your life -- I don't mean to minimize it. And that's P00021 -- which on November 12, 2002, the contract was terminated for default?
A Yes. Seven years.
Q And at the time the contract was terminated, how many batteries did you deliver to the Government?
A They didn't -- I had them all packed up to ship them, and I couldn't ship them.
Q So you delivered no batteries --
A They didn't allow me to ship them.
Q So I guess the question is: What number of batteries did you submit to the Government?
A I submit --
MR. RALEIGH: I object to the form.
Q How many batteries did you deliver to the Government for their use?
A I had them all packed up. I couldn't ship them because they canceled the contract.

Q What books do you have on your desk, Alex? Do you have a desk at work?

A Yes.

Q Do you have a dictionary?

A No.

Q You don't have a dictionary. Do you ever use a dictionary?

A Yes.

Q What dictionary do you use? Do you know?

A I don't use often dictionary, but --

Q Well, when you have a need to look up a word, you use it?

A I assume Webster's or something like that. I don't remember. Maybe Webster or --

Q Webster?

A Yes.

Q Well, I have got, like, two or three, and whatever is closest I use.

MR. MICKLE: Can we go off the record for a minute?

(Discussion off the record.)

(Recess.)

STATE OF ALABAMA )
)
COUNTY OF MADISON )

I, the undersigned, hereby certify that the foregoing pages, numbered 1 through 239, inclusive, contain a full, true, and correct transcript of the oral deposition of ALEX LATIFI, as the same was by me taken down in shorthand on the date and at the place heretofore set out and thereafter, under my supervision, reduced to writing.

I further certify that immediately prior to testifying ALEX LATIFI was by me duly sworn as set out above.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney employed by the parties hereto, or financially interested in the action.

This the 7th day of March, 2005.

Ileen S. Shoemaker

Ileen S. Shoemaker, Registered Professional Reporter and Notary Public, State of Alabama at large.