Nos. 03-2644C & 04-297C
(Judge Firestone)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

AXION CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

DEFENDANT'S APPENDIX
VOLUME XI, PAGES 348 - 362

---

PETER D. KIESLER
Assistant Attorney General

DAVID M. COHEN
Director

KATHRYN A. BLEECKER
Assistant Director

DOUGLAS K. MICKLE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 353-7961
Fax: (202) 353-7988
Attorneys For Defendant

OF COUNSEL:

RICHARD MARTINELLI
Office of Counsel
Naval Inventory Control Point
Mechanicsburg, PA 17055-0788

April 11, 2005

# INDEX TO APPENDIX

Document

Contract Number N00104-96-C-KA091 . . . . . . . . . . 1

Contract Modification P00001- P00021 . . . . . . . . . . 143

Letter from Axion to Department of the Navy (Dated August 4, 1994) . . . . . . . . . . 166

Letter from Axion to Department of the Navy (Dated August 11, 1995) . . . . . . . . . . 167

Letter from Axion to Department of the Army (Dated September 26, 1995) . . . . . . . . . . 168

Letter from Department of the Navy to Axion (Dated September 27, 1995) . . . . . . . . . . 169

Letter from Axion to Department of the Navy (Dated October 2, 1995) . . . . . . . . . . 170

Letter from Small Business Administration to Department of the Navy Regarding Certificate of Competency ("COC") (Dated October 11, 1995) . . . . . . . . . . 171

Letter from U.S. Small Business Administration to Mr. Artz: Regarding COC (Dated November 9, 1995) . . . . . . . . . . 172

Letter from Dep't of the Navy to Department of Labor: Requesting Clearance (Dated November 22, 1995) . . . . . . . . . . 174

Letter from U.S. Small Business Administration to Department of Navy: Regarding Solicitation of Axion: Regarding Solicitation (Dated December, 4, 1995) . . . . . . . . . . 175

Letter from Department of Navy to Axion (Dated December 7, 1995) . . . . . . . . . . 176

Letter from Axion to Department of Navy: Regarding ECP on Axion Contract (Dated January 17, 1996) . . . . . . . . . . 178

Letter from Department of Navy to Alex Latifi, President of Axion: Regarding Dies (Dated January 26, 1996) . . . . . . . . . . 179

Letter from Axion to Department of the Navy: Regarding Post Award (Dated March 18, 1996)180

Letter from Axion to U.S. Army Research Laboratory: Regarding Cooperative Resolution and Development Agreement (Dated June 27, 1996)..........182

Letter from Axion to Mr. John Korab, Naval Inventory Control Point : Regarding N00104-96 CKA09 (Dated April 15, 1997) . . . . . . . . . . 184

Letter from Axion Mr. Weir to Mr. Alen Artz (Weir Memo) (Dated May 30, 1997) . . . . . . . . 185

Letter from Axion to Mr. John Korab, Naval Inventory Control Point: Regarding Data of First Article in Reference to Axion Contract N00104-96 CKA09 (Dated April 12, 1999) . . . . . . . . 187

Letter from Commanding Officer, Naval Inventory Control Point to Axion : Regarding First Article Approval for Contract (Dated May 17, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .189

Letter from Axion to Naval Inventory Control Point: Regarding Plating Guidelines (Dated November 13, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

Letter from Department of the Navy to Axion (Dated November 22, 2000) . . . . . . . . . . . . . . . 192

Letter from Axion to Naval Inventory Control Point (Dated August 27, 2001) . . . . . . . . . . . . 194

Transmittal Letter from Department of the Navy to Axion (Dated September 18, 2001) Transmitting September 6, 2001 Letter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196

Letter from Axion to Mr. John Korab (Date September 18, 2001) . . . . . . . . . . . . . . . . . . . . . . 198

Letter from Department of the Navy to Axion (Dated November 1, 2001) . . . . . . . . . . . . . . . . 199

Letter from Department of the Navy to Axion (Dated December 13, 2001) . . . . . . . . . . . . . . . 200

Letter from Department of the Navy to Axion (Dated April 30, 2002) . . . . . . . . . . . . . . . . . . . 201

Letter from Axion to Mr. John Korab, Naval Inventory Control Point (Dated September 9, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202

Letter from Department of the Navy to Axion (Dated October 1, 2002) . . . . . . . . . . . . . . . . . . 203

Letter from Department of the Navy to Axion (Dated October 1, 2002) . . . . . . . . . . . . . . . . . . 204

Letter from Axion to Mr. Korab (Dated October 11, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

Memorandum from John Korab Regarding Proposed Termination for Default (Dated October 17, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208(a)

Letter from Department of the Navy to Axion (Dated June 30, 2003) . . . . . . . . . . . . . . . . . . . 209

Deposition of Mr. Jerry Hahin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 211

Deposition of Mr. John Korab . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

Deposition of Mr. Alex Latifi . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 243

Declaration of Mr. Jerry Hahin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 348

Declaration of Mr. John J. Korab . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 354

Declaration of Mr. Henry Stickrod . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 359

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AXION CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 03-2644C |
| v. | ) | (Judge Firestone) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DECLARATION OF JERRY HAHIN

1. I, Jerry Hahin, make the following declaration in accordance with 10 U.S.C. 1746. I am aware that this declaration will be used in the United States Court of Federal Claims, and that this declaration is the legal equivalent to a statement under oath.

2. I work for the Naval Surface Warfare Center (NSWC), Crane, located in Crane, Indiana as an Electronics Engineer. I have held this position since December 1985. My duties include technical oversight of production contracts for Naval products. Specifically, my group is assigned as the Acquisition Engineering Agent (AEA) for Naval Gun Ammunition. A few of my duties include preparation of technical documentation packages for Naval production buys, reviewing contractor submitted technical data required by the contract, forwarding quality requirements to be put into solicitations and providing technical oversight once the contract is awarded. For contract N00104-96-C-KA09, I was the AEA for the PS-115 power supply at the time Axion was terminated for default. I began working on this contract on approximately May 5, 1998.

3. Contract N00104-96-C-KA09 contained a First Article Test (FAT) requirement. The purpose of a FAT is to verify the manufacturer's production process and materials for use in full-rate production. FAT is a means of verifying that both the materials and the production process to be used will result in a product that conforms to all the technical requirements required by the Navy.

4. Axion experienced many problems in attempting to perform contract N00104-96-C-KA09. When I first became involved with the contract, I visited Axion to observe First Article tests. This first visit ended up consisting of tests conducted by Axion to validate their test equipment for use in FAT and Lot Acceptance Test (LAT). During this initial visit, Axion had trouble with battery wires breaking inside the package utilized to hold the PS-115 and associated electronics. The electronics were necessary to measure the rise time, voltage under load conditions and life of the power supply. Axion also had problems with components within the package being damaged due to the high acceleration forces experienced during the test. The equipment is meant to simulate a Naval gun-firing environment, which is experienced by the power supply in actual Naval use. Axion built equipment to simulate this environment utilizing a tube in which a vacuum was drawn and then released accelerating the power supply and then suddenly stopping and spinning the power supply similar to set-back force and spin seen in the gun launch environment. Along with this long plastic tube was a motor at the end of the tube connected via pulley to a smaller metal cylinder at the end of the tube. This motor is used to spin the cylinder at up to 300 revolutions per second. Axion experienced difficulties reaching this maximum speed and sustaining it for the required time. This was due to the extreme stress being exerted on the motor to produce the torque necessary to create this spin. Axion experienced problems with the design of the piece containing the power supply and electronics due to the fact that the power supplies needed to be tested within a certain time after temperature conditioning. The power supplies could not be installed in this piece and the piece closed up and fired in the required time. However, despite all these obstacles, Axion was able to conduct FAT and submit an acceptable FAT report in April 1999.

5. Axion then experienced difficulties in producing the first production lot. The most prevalent problem that I was aware of was the difficulty Axion experienced in obtaining electronic components for their test equipment to support LAT. Also, Axion informed the Government that the main computing chip used in the testing equipment was no longer available and the equipment would have to be redesigned. It took quite a while to find a suitable replacement due to the storage capacity needed on-board the chip along with the size constraints inside the electronics

housing. These problems resulted in numerous extensions to the contract's delivery schedule for the production lots.

6. Two events occurred between 2000 and 2001 that invalidated the results of Axion's successful 1999 First Article Testing. The first involved the PS-115 plate stock. Axion passed FAT in 1999 with PS-115 Power Supplies made with plate stock manufactured by another vendor. In 2000, while experiencing other difficulties with contract performance, Axion decided to attempt to produce its own plate stock. The electro deposition of the lead and lead dioxide in the plate stock are critical to acceptable performance of the power supply. The change in production process, therefore, created doubt as to whether the PS-115 used for the 1999 First Article Testing would be comparable to PS-115 using Axion produced plate stock; and a First Article function test, rather than a cell test, was the only way to remove this doubt. A cell test is performed during plate stock manufacturing to provide assurance that the plating process is producing adequate material deposition to produce the required amount of voltage for each cell. However, a cell test does not provide any indication relative to the cell's ability to withstand gun launch or its ability to produce the required voltage under load for the required life of the power supply. A First Article function test is necessary to provide these assurances to both the government and the manufacturer.

7. The second event that invalidated the results of the 1999 First Article Testing is that in 2001 Axion's PS-115 began to leak electrolyte. This raised additional doubt with respect to whether the processes and materials Axion was using in 2001 could yield conforming production deliveries. Both Axion and the Navy agreed additional First Article Testing was appropriate, and on October 2, 2001 the parties executed bilateral modification P00017 establishing a requirement for additional First Article Testing.

8. Modification P00017 required First Article Testing of 120 PS-115, with three types of tests each to be performed on 40 units. The contract specifications allow a maximum of 3 rejects per test group and a maximum number of 7 total rejects as specified on sheet 15 of drawing 11744726 and paragraph 4.4.6.1.2 of the drawing. Two groups of 40 units each were to flow down through the first and last columns

as shown on sheet 15 of drawing 11744726 from the left of the page. As shown on sheet 15, the units are broken down into two groups of 60 and then a group of 40 is taken from each group of 60. The Axion First Article sample required by modification P00017 was to be the 40 units flowing down through the environmental tests specified in each column and then the functional tests. The drawing also shows the accept/reject criteria of accept on three failures but reject on four failures for each environmental group of 20 power supplies. The required parameters for each PS-115 during a First Article test are set forth at paragraphs 3.3.1.1 through 3.3.1.7 of drawing 11744726.

9. From October 2001 Axion experienced further difficulties that prevented the company from successfully completing FAT. Axion discovered that producing plate stock was not a simple task and encountered delays due to process modifications necessary to produce the plate stock. This resulted in two additional bilateral modifications, P00019 and P00020, both extending the date for completion of First Article Testing. Modification P00019 also reduced the First Article quantity from 120 to 80. Modification P00020, which was signed on July 11, 2002, required submission of First Article Test report by September 9, 2002.

10. According to discussions I had with the Quality Assurance Representative, I understood that testing in 2002 was progressing, albeit slowly. I was unable to visit the contractor's facility during this time frame due to other assigned duties. Again, my understanding of the problems encountered during this time period were similar to those experienced in the past due to test equipment failures. Axion continued testing throughout July and August, and into early September 2002.

11. On September 9, 2002, Axion submitted a FAT report. I reviewed this report and determined the report should be rejected for failure to meet the technical data requirements. The primary basis for rejecting the FAT report was due to the fact that twenty-five of the samples failed to meet the requirements of drawing 11744726. The two major requirements the power supplies failed to meet were activation time and discharge life. A few batteries also failed peak voltage requirements. In addition to the fact Axion's FAT report indicated 25 of the tested PS-115 failed, Axion's test equipment did not collect data on two

of the tested PS-115. Also, two units were not counted in my analysis and were considered to be "no tests" because no electrical load was applied during the test as required by the technical data package. This failure rate falls below the standards set forth in the contract's specification that I have explained above in paragraph 8. I, therefore, drafted NSWC's letter of September 26, 2002 concluding that Axion's FAT report should be rejected. The contracting officer adopted my recommendation and disapproved Axion's FAT report on October 1, 2002.

12. On October 1, 2002, the contracting officer also informed Axion that the Government was considering a termination for default due to Axion's disapproved FAT report and afforded Axion the opportunity to show why the contract should not be terminated for default. In response to this "show cause" notice, Axion submitted an October 11, 2002 letter summarizing the testing data. This letter provided no information explaining the test failures noted by the government in their analysis. All that was provided was a description of the data files on the disc and whether the power supply was conditioned to hot, cold or ambient temperature. Axion's October 1, 2002 letter also states that 74 units produced good data. The government does not consider data not meeting the requirements of the technical data package to be good data. The government also did not find 74 files with data, only 68. Axion's October 11, 2002 letter provided no assurances that Axion could produce power supplies that would meet the specified performance requirements of the technical data package.

13. Although Axion experienced difficulties with its testing equipment, the information submitted in Axion's September 9, 2002 FAT report indicate that on 25 occasions a PS-115 was properly tested but failed to achieve the contract requirements for a successful test. The test data indicates a number of probable reasons for these failures. In some cases, the power supplies appeared to lose voltage rapidly, indicating leakage of the electrolyte due to poorly produced housing or damage from improper test procedures. Two units exceed the maximum allowable voltage output, indicating too many cells. Finally, a few indicated inadequate activation time due to either leaking electrolyte before the test was performed or during the test due to improper test procedures. I also note that despite Axion's air gun difficulties, the Navy had previously acquired approximately 135,000 PS-115 in

seventeen lots from another manufacturer, and in all instances, an air gun was successfully used to perform acceptance testing.

14. In 2000, the NSWC test group obtained a spin tester and in late 2001 the spin tester became available for possible use under Axion's contract. In December 2001, the Navy offered to perform functional testing for Axion using the government spin tester and this offer was repeated in April or May of 2002. The offers included both cost and time to complete estimates. Axion declined to accept these offers both times.

15. I have read the foregoing 6-page declaration and I certify under penalty of perjury that the foregoing is true and correct.

Jerry Hahin

Jerry Hahin

3/28/05

Date

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AXION CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 03-2644C |
| v. | ) | (Judge Firestone) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF JOHN J. KORAB**

1. I, John J. Korab, make the following declaration in accordance with 10 U.S.C. 1746. I am aware that this declaration will be used in the United States Court of Federal Claims, and that this declaration is the legal equivalent to a statement under oath.

2. I am employed as a Contract Specialist at the Naval Inventory Control Point- Mechanicsburg, and have been so employed for approximately 21 years. I was the Contract Specialist responsible for administering contact N00104-96-C-KA09 (the "Contract"), and I was responsible for recommending that the contract be terminated for default.

3. The contract, which was awarded to Axion on December 7, 1995, required Axion to deliver a production lot of 55,209 PS-115. The PS-115 is a battery used in Navy munitions. The unit price for each PS-115 was $23.80. The contract also required that prior to delivering the production lot, Axion was required to perform First Article (FA) testing and submit a FA test report within 120 days of contract award (see Contract, page 50). Pursuant to Federal Acquisition Regulation (FAR) 9.302, the purpose of FA testing is to ensure the contractor can produce an item that conforms to all contract requirements. The Navy required FA testing in this instance because Axion had not produced PS-115 previously. Due to Axion and the Navy trying to solve technical issues, Axion did not deliver the FA test report within the stated time. Subsequently, the FA delivery date was re-established three times via modifications P00002, P00004, and P00005.

4. On May 17, 1999, Axion's FA test report was approved and Axion was released to production. Modification P00011 established delivery dates for the production units. Axion failed to deliver any production units, and modifications P00013, P00014, P00015, and P00016 again set new delivery schedules, none of which Axion met. The clause at FAR 52.249-8, Default (Fixed Price Supply and Service), which was incorporated by reference on page 46 of the Contract, authorizes the Government to terminate a contract for default if the contractor fails to deliver the supplies within the time specified. The Navy, however, continued to work with Axion in the hope the company would be able to successfully produce and deliver acceptable PS-115.

5. In 2000, Axion made a decision to produce its own plate stock. Plate stock is a component within the PS-115. Axion's decision to produce its own plate stock was a change in plans as the PS-115 that had passed FA testing in 1999 were produced with plate stock manufactured by an outside vendor. The Navy Engineering Agent for the PS-115, Naval Surface Warfare Center (NSWC), Crane (located in Crane, Indiana) determined that this change invalidated the approved FA testing since there was no way of knowing whether Axion would be successful in producing its own plate stock and incorporating that plate stock into the PS-115. The ability of Axion to successfully produce production lots was placed in further doubt during this timeframe as some of Axion's PS-115s began to leak electrolyte. On September 28, 2001, NSWC recommended that Axion be subject to additional FA testing (see September 28, 2001 NSWC letter). Axion did not disagree that there should be further FA testing, and on October 2, 2001, the Navy and Axion entered a bilateral modification (P00017) establishing a requirement for additional FA testing on 120 PS-115.

6. Axion failed to accomplish FA testing as required by modification P00017 and was experiencing testing delays due to malfunctioning test equipment. On December 13, 2001, I sent a letter to Axion requesting an assurance that Axion had the expertise to continue FA testing (see December 13, 2001 NAVICP letter). Axion responded by setting forth a plan to produce new testing equipment (see December 27, 2001 Axion letter). After reviewing this letter, I decided to continue working with Axion in the hope they would be able to satisfy the FA test requirement. However, Axion's

difficulties continued, and it was not until April 4, 2002 that a new date for completion of FA testing was established. On April 4, 2002, the Navy and Axion bilaterally modified the contract (P00019) to require completion of FA testing by April 23, 2002. Modification P00019 also changed the number of units for FA testing from 120 to 80. After Axion failed to meet the requirements of modification P00019, the Navy and Axion bilaterally modified the contract (P00020) to require completion of FA testing and submission of the FA test report by September 9, 2002. Mr. Latifi, President of Axion, and myself signed P00020 on July 11, 2002.

7. Modifications P00017, P00019, and P00020 all contained accord and satisfaction, and release language in which Axion relinquished the right to raise claims, demands and causes of action arising out of or related to the contract prior to the date of the modifications. During my deposition on July 27, 2004, Axion's attorney asked me numerous questions related to the parties' intent when executing these three bilateral modifications. As I stated during the deposition, Mr. Latifi and I did not discuss specific claims that would be barred by the accord and satisfaction, and release language. However, I consider the language contained in the three modifications to be unambiguous, and I have no reason to suspect Mr. Latifi made a mistake when signing the modifications. Contract issues related to the air gun, leaking electrolyte and plating specification had arisen long before the date of these modifications, and I believe Mr. Latifi should have understood the accord and satisfaction, and release language of the modifications might limit his future ability to raise claims related to these issues.

8. During my deposition, Axion's attorney also questioned me repeatedly on whether Axion received consideration for modifications P00017, P00019, and P00020. As I stated during the deposition, Axion received the consideration of a revised delivery schedule in each of the three modifications. In each of the three instances, Axion was in non-compliance with the contract's delivery schedule when the modifications were executed. Also, I did not mention during the deposition that for modification P00019, Axion also received the benefit of a reduction in the number of units required for FA testing. With respect to the first of the three modifications (P00017), the Government gave up the ability to terminate Axion for

default for failure to comply with the schedule set for in modification P00016 as P00016 required delivery of a production lot by August 8, 2001. With respect to P00019, Axion received the benefit of a reduction in the number of units required for FA testing and the Government gave up the ability to terminate Axion for default for failure to comply with the requirements of P00017. And with respect to P00020, the Government gave up the ability to terminate Axion for default for failure to comply with the requirements of P00019.

9. I note that during the deposition I mentioned that the "Government released nothing" when executing P00017. I made this statement with reference to the fact the accord and satisfaction, and release language also stated Axion was released from claims the Government had against Axion and at the time of the modifications the Government had no claims against Axion. My deposition statement regarding "[releasing] nothing" should not be interpreted to mean that I think the modifications did not contain consideration for Axion. As I stated repeatedly during the depositions, Axion obtained the benefit of a revised delivery schedule. My deposition statement regarding "[releasing] nothing should not be interpreted as meaning that I think the Government did not have the right to terminate for default when P00017, P00019 and P00020 were executed. If the right to terminate for default is legally a Government "claim," then the Navy was, in fact, releasing Axion from a claim when executing modifications P00017, P00019, and P00020.

10. On September 09, 2002, Axion submitted the FA test report to the Navy for evaluation. While the contract establishes that the contracting officer approves or disapproves FA testing, it was the responsibility of the NSWC to evaluate the FA test report and provide a recommendation to the contracting officer. NSWC evaluated Axion's FA test report and concluded the test should be rejected (see September 26, 2002 NSWC letter). The deficiencies associated with Axion's report included, (1) the report indicated that only 66 units were tested when modification P00019 required the testing of 80 units; (2) the data indicated that 25 of 66 units failed; and (3) the report did not include other data required by the contract's data requirements list. Based on NSWC's letter, I sent a letter to Axion on October 1, 2002 stating that FA testing was disapproved. FAR 52.209-3(d), which is

included in the Contract on page 50, states that the contractor shall be deemed to have failed to make delivery within the meaning of the Default clause if FA testing is disapproved.

11. On October 01, 2002, I also forwarded a "show cause" notice to Axion providing the company the opportunity to show why the contract should not be terminated for default. Axion responded by letter of October 11, 2002 but this response did not provide an adequate excuse for Axion's failure to provide an acceptable FA test report by September 9, 2002. I then reviewed the situation in the context of FAR 49.402-3(f), which sets forth factors a contracting officer must consider when determining whether to terminate a contract for default. Based on this review, I determined the contract should be terminated for default and I prepared a memorandum discussing my decision. Naval Inventory Control Point management then reviewed the memorandum and determined that Axion should be terminated for default (see NAVICP termination memorandum). On November 12, 2002, the contract was terminated for default through issuance of contract modification P00021.

12. During the course of the contract, the Government provided Axion progress payments in the amount of $512,365, yet Axion was unable to make a single production lot delivery. The contract included the clause at Federal Acquisition Regulation 52.232-16, entitled Progress Payments. The clause provides that if the contract is terminated for default the contractor shall repay to the Government, on demand, the amount of unliquidated progress payments. On June 30, 2003, I entered an agreement with Axion that defers re-payment of the $512,365 until Axion's appeal of the termination for default is decided.

13. I have read the foregoing 5-page declaration and I certify under penalty of perjury that the foregoing is true and correct.

John Korab

John Korab

28 March 2005

Date

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AXION CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 03-2644C |
| v. | ) | (Judge Firestone) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF HENRY STICKROD

1. I, Henry Stickrod, make the following declaration in accordance with 10 U.S.C. 1746. I am aware that this declaration will be used in the United States Court of Federal Claims, and that this declaration is the legal equivalent to a statement under oath.

2. I work for the Defense Contact Management Agency (DCMA), Redstone Arsenal, Alabama as a Quality Assurance Specialist. I have held this position since January 5, 1998. My duties include the review of Government contracts awarded to contractors assigned to me for Quality Assurance oversight, observing manufacturing and testing processes, workmanship, submission of completed forms, investigation of Quality Deficiency Reports, and helping to assure the Government receives a quality product in accordance with the Technical Data Package for which it has contracted. I was the Quality Assurance Representative (QAR) for the contract N00104-96-C-KA09 at the time Axion was terminated for default.

3. My involvement with contract N00104-96-C-KA09 began in the middle of 1998 when I assumed the duty of contract QAR from Ms. Brenda Middleton. The contract required Axion to produce PS-115 batteries for use in Navy munitions. The contract included a First Article Test requirement during which Axion had to test PS-115 under various environmental conditions. As QAR, my role was to observe and verify the units were tested under the correct environmental conditions and that the test data was downloaded and recorded for submission for First Article determination. Axion created a First Article Test report by downloading test results from each item tested into a permanent data

file. It was then Axion's responsibility to submit a First Article Test report to the Government for evaluation (see Contract, page 50).

4. My role did not include approving or disapproving the First Article Tests, and it was not the responsibility of my activity, DCMA, to be involved in the decision to approve or disapprove First Article Testing. Under the terms of the contract, the Naval Inventory Control Point contracting officer was responsible for approving or disapproving the First Article testing (see Contract, page 50). In addition, the Naval Surface Warfare Center (NSWC), Crane (located in Crane, Indiana) provided technical expertise with regard to whether the First Article Testing should be approved. Also, the negotiation of contract modifications was not my responsibility nor did I have any involvement with the negotiation of any contract modifications. In many instances, I did not learn of a contract modification until some time after the modification was executed.

5. In May 1999, the contracting officer notified Axion that First Article Testing was approved, although I did not become aware of this until some time later. Axion was then required to conduct production lot testing and deliver the contract's production quantities. Between May 1999 and October 2001, I spent approximately 92 hours at Axion. During this time, Axion experienced problems associated with both the testing equipment and PS-115 production. A significant issue during this time was Axion's decision to produce its own plating for the PS-115 rather than acquire plating from an outside vendor as was accomplished when Axion's First Article Testing was approved in May 1999. The problems Axion encountered with testing equipment and PS-115 production resulted in numerous contract modifications extending the contract's delivery schedule for production quantities. The last of these modifications was P00016, which was signed by both Axion and the Navy on June 4, 2001. Modification P00016 required Axion to make the first production delivery by August 8, 2001.

6. After Axion failed to comply with the delivery schedule of modification P00016, Axion and the Navy agreed that Axion's change in production process to produce its own plate stock was such that the prior First Article Test results were invalidated and that additional First Article Testing was necessary. On October 1, 2001, Axion and the

Navy signed modification P00017. This modification established a requirement for additional First Article Testing. After Axion failed to accomplish First Article Testing by the date required in modification P00017, the Navy and Axion bilaterally extended the date for completion of First Article Testing through modification P00019. And Axion again failed to complete First Article Testing by the date set forth in P00019. The reasons for Axion's failure to satisfy the requirements of P00017 and P00019 included difficulties with Axion's testing equipment providing verifiable test data, Axion's attempt to develop a plating line, Axion's interest in changing material to provide a superior product to that required by the contract, and that some of the PS-115 Axion had produced were leaking electrolyte.

7. In July 2002, the Navy and Axion agreed to their final modification setting forth a new date for completion of First Article Testing. This modification (P00020) required Axion to deliver a First Article Test report by September 9, 2002.

8. I visited Axion on 8/1/02, 8/2/02, 8/7/02, 8/12/02, 8/13/02, 8/19/02, 8/21/02, 8/27/02, 8/28/02, 8/29/02, 9/3/02 and 9/4/02, for a total of approximately 39 hours, to observe First Article Testing. While it appeared that many of the problems encountered during the testing had been eliminated by Axion, there were some remaining difficulties in downloading data from the modules to the permanent data file on an ancillary computer.

9. My visits to Axion to observe testing were prompted when Axion notified me that the company was prepared to perform testing. In those situations when a QAR assigned to a contract is not able to satisfy a contractor's request for a visit within a 7-day timeframe, DCMA will send another employee to the contractor. Under the Axion contract, there were no instances that DCMA was unable to immediately send a representative to Axion upon a request from the company for a site visit.

10. Mr. Charles Vartan was assigned by my supervision to observe the testing and downloading of data in my absence after September 4, 2002 since I was required to attend training at a distant location. I informed both Mr. Latifi of Axion and Mr. Vartan that Mr. Vartan would be present at Axion for the sole purpose of observing Axion's testing.

In addition, I told Mr. Latifi and Mr. Vartan that, like myself, Mr. Vartan would not have authority to change the contract or to make any determinations with respect to First Article approval or disapproval. Mr. Latifi and Mr. Vartan acknowledged that they understood that the role of Mr. Vartan and myself was solely to observe testing.

11. Axion completed testing in September 2002 and submitted a First Article Test Report. I later learned that upon the recommendation of NSWC, the contracting officer disapproved the report, and the contracting officer then terminated the contract for default. It was not my responsibility to determine or to know whether the problems evidenced in Axion's report were due to defective PS-115 or problems with the testing equipment, or a combination of the two.

12. Axion has alleged in Count XII of their complaint that the company was ready, willing, and able to continue testing beyond the afternoon of Friday, September 6, 2002, which was the last workday before the First Article Test report was due on Monday, September 9, 2002. Additional testing would have been contingent upon having sufficient PS-115s that had been prepared for First Article Testing. A DCMA QAR would then have been required to select additional First Article samples from that batch. Since I was in training at an out-of-state facility until September 20, 2002, I have no first hand knowledge of what transpired after Mr. Vartan began observing the testing. However, in so far as I know, Axion did not request DCMA provide overtime coverage during the weekend between September 6, 2002 and September 9, 2002 to observe First Article Testing.

13. I have read the foregoing 4-page declaration and I certify under penalty of perjury that the foregoing is true and correct.

Henry K Stickrod

Henry Stickrod

28 March 2005

Date