**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **AXION CORPORATION,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 03-2644C & 04–297C** **(Judge Firestone)** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**DEFENDANTS' PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

Pursuant to Rule 56(h) of the Rules of the United States Court of Federal Claims, the United States respectfully submits the following proposed findings of uncontroverted fact.

1. On December 14, 1995, the Naval Inventory Control Point ("NAVICP") confirmed its award of contract N00104-96-C-KA09 ("contract") to Axion. Defendant's Appendix ("DA") 1, and Deposition of Mr. Alex Latifi ("Latifi Depo.") p. 51 at DA 266.

2. The contract required delivery of 55,209 PS-115s exclusive of first article samples, production lot samples, and option quantities. DA 2.

3. The PS-115 is a battery used in Navy munitions. Declaration of Mr. John Korab ("Korab Decl.") ¶ 3 at DA 354-355.

4. The contract was a firm-fixed price contract. DA 1; Latifi Depo. p. 29 at DA 251.

5. The contract's unit price was $23.80, and the total price, exclusive of option quantities, was $1,313,974.20. DA 1, 2, 176.

6. The contract included a First Article Test ("FAT") requirement. DA 62; Latifi Depo. p. 36 at DA 255.

7. The purpose of FAT is to ensure that the contractor can furnish a product that conforms to all contract requirements for acceptance. Federal Acquisition Regulation ("FAR") 9.302; Korab Decl. ¶ 3 at DA 354.

8. The contract's FAT requirement stated:

> FAR 52.209-3: FIRST ARTICLE APPROVAL-CONTRACTOR TESTING (SEP 1989)

(a) The Contractor shall test 540 unit(s) of Lot/Item 0001AB as specified in this contract. At least 45 calendar days before the beginning of first article tests, the Contractor shall notify the Contracting Officer, in writing, of the time and location of the testing so that the Government may witness the tests.

(b) The Contractor shall submit the first article test report within 120 DACA calendar days from the date of this contract to SPCC Code 0282 marked "First Article Test Report: Contract No. _______, Lot/Item No. _______" Within 30 calendar days after the Government receives the test report, the Contracting Officer shall notify the Contractor, in writing, of the conditional approval, approval, or disapproval of the first article. The notice of conditional approval or approval shall not relieve the Contractor from complying with all requirements of the specifications and all other terms and conditions of this contract. A notice of conditional approval shall state any further action required of the Contractor. A notice of disapproval shall cite reasons for the disapproval.

(c) If the first article is disapproved, the Contractor, upon Government request, shall repeat any or all first article tests. After each request for additional tests, the Contractor shall make any necessary changes, modifications, or repairs to the first article or select another first article for testing. All costs related to these tests are to be borne by the Contractor, including any and all costs for additional tests following a disapproval. The Contractor shall then conduct the tests and deliver another report to the Government under the terms and conditions and within the time specified by the Government. The Government shall take action on this report within the time specified in paragraph (b) above. The Government reserves the right to require an equitable adjustment of the contract price for any extension of the delivery schedule, or for any additional costs to the Government related to these tests.

(d) If the Contractor fails to deliver any first article report on time, or the Contracting Officer disapproves any first article, the Contractor shall be deemed to have failed to make delivery within the meaning of the Default clause of this contract.

(e) Unless otherwise provided in the contract, and if the approved first article is not consumed or destroyed in testing, the Contractor may deliver the approved first article as part of the contract quantity if it meets all contract requirements for acceptance.

(f) If the Government does not act within the time specified in paragraph (b) or (c) above, the Contracting Officer shall, upon timely written request from the Contractor, equitably adjust under the changes clause of this contract the delivery or performance dates and/or the contract price, and any other contractual term affected by the delay.

(g) Before first article approval, the acquisition of materials or

> components for, or the commencement of production of, the balance of the contract quantity is at the sole risk of the Contractor. Before first article approval, the costs thereof shall not be allocable to this contract for (1) progress payments, or (2) termination settlements if the contract is terminated for the convenience of the Government.
>
> (h) The Government may waive the requirement for first article approval test where supplies identical or similar to those called for in the schedule have been previously furnished by the offeror/contractor and have been accepted by the Government. The offeror/contractor may request a waiver.
>
> Alternate I - (SEP 1989)
>
> As prescribed in (a)(2) and (b)(2), add the following paragraph (i) to the basic clause: (i) The Contractor shall produce both the first article and the production quantity at the same facility and shall submit a certification to this effect on each first article.
>
> Alternate II (Sep 1989). As prescribed in (a)(3) and (b)(3), substitute the following paragraph (g) for paragraph (g) of the basic clause:
>
> (g) Before first article approval, the Contracting Officer may, by written authorization, authorize the Contractor to acquire specific materials or components or to commence production to the extent essential to meet the delivery schedules. Until first article approval is granted, only costs for the first article and costs incurred under this authorization are allocable to this contract for (1) progress payments, or (2) termination settlements if the contract is terminated for the convenience of the Government. If first article tests reveal deviations from contract requirements, the Contractor shall, at the location designated by the Government, make the required changes or replace all items produced under this contract at no change in the contract price.

DA 62.

9. The contract's FAT clause obligated Axion to conduct the FAT and submit a FAT report demonstrating compliance with specified testing requirements. Id., DA 140.

10. Pursuant to the contract, the purpose of FAT is to verify the adequacy of manufacturing processes and material. DA 140 (¶ (d) stating "[t]he approved first article will serve as the manufacturing standard.").

11. The contract required Axion to provide all acceptance-inspection equipment. Compl. ¶ 24; DA 109 ("(t)he contractor shall provide all AIE [except for any equipment listed as

available in Appendix VI] necessary to assure conformance of components and end items to contract requirements"); Latifi Depo., page 46 at DA 261.

12. It was Axion's intent to use an air gun to meet the contract's FAT requirements. Compl. ¶ 16; Latifi Depo., page 63 at 273.

13. Axion had difficulties associated with acquiring or producing an air gun for use during first article testing of the PS-115. DA 178-186; Latifi Depo. pp. 64, 66, 67, 103, 112, 123, 198 at DA 274, 276, 277, 278, 287, 294, 330.

14. On January 17, 1996, Axion requested that the Navy provide it with an air gun. DA 178; Latifi Depo. p. 63 at DA 273.

15. In 1996, Axion and the Army Research Laboratory ("ARL") discussed the possibility of Axion using an ARL air gun. DA 180-183; Latifi Depo. p. 67 at DA 277.

16. After several communications with Axion, the ARL decided not to enter into any agreement with Axion regarding an air gun. DA 186; Latifi Depo. pp. 105-109 at DA 280-284.

17. When Axion learned that assistance from the ARL was not forthcoming, the company notified the Navy in April and May of 1997 of its intent to produce its own air gun. DA 185-186; Latifi Depo. pp. 109-110 at DA 284-285.

18. Axion did develop an air gun and used its gun to conduct FAT and submit a FAT report on April 12, 1999. DA 187; Latifi Depo. p. 119 at DA 290.

19. After evaluating the FAT report, the Navy notified Axion in May 1999 that the FAT was approved. DA 189; Declaration of Mr. Jerry Hahin ("Hahin Decl.") ¶ 4 at DA 349; Latifi Depo. p. 119 at DA 290.

20. The contract provided for delivery of the first production quantities 90 days after FAT approval. DA 3, 177 (5,209 units to be delivered "90 DAAFA," or 90 days after approval of first article).

21. On June 2, 1999 the parties bilaterally agreed to modification P00011 which incorporated a revised delivery schedule into the contract requiring the first production lot

delivery by December 28, 1999. DA 153; Latifi Depo. p. 122 at DA 293.

22. Axion did not make delivery in accordance with modification P00011. Korab Decl. ¶ 4 at DA 354; Latifi Depo. p. 124 at DA 295.

23. On five occasions, Axion and the Navy entered bilateral modifications to extend the contract's delivery schedule. DA 153, 155, 156, 157, 158 (Modifications P00011, P00013, P00014, P00015, and P00016); Latifi Depo., pp. 122, 124, 125, 133, 146 at DA 293, 295, 296, 300, 313.

24. The PS-115 that passed first article testing included plate stock manufactured by an outside vendor. Hahin Decl. ¶ 6 at DA 350; Korab Decl. ¶ 5 at DA 354; Declaration of Mr. Henry Stickrod ("Stickrod Decl.") ¶ 5 at DA 360; Latifi Depo. p. 174 at DA 328.

25. After passing the FAT, Axion decided to produce plate stock itself rather than acquire the item from the foreign vendor. Hahin Decl. ¶ 6 at DA 350; Latifi Depo. p. 174 at DA 328.

26. Axion's decision to change the approved manufacturing process invalidated the previously approved FAT. Hahin Decl. ¶ 6 at DA 350.

27. The validity of the approved FAT was placed in further doubt by the leaking electrolyte. Hahin Decl. ¶ 7 at DA 350; Deposition of Mr. Jerry Hahin ("Hahin Depo."), p. 110 at DA 224.

28. Axion experienced leaking of electrolyte from the PS-115 and believed the leaking was due to defective specifications. DA 194; Latifi Depo. pp. 150-157 at DA 316-323.

29. Axion had difficulties producing the PS-115 plate stocking and alleged in 2000 that this was attributable to defective specifications. DA 190; Latifi Depo. pp. 136-144 at DA 303-311.

30. On October 2, 2001, Axion and NAVICP agreed to bilateral modification P00017 establishing a requirement for resubmission of FAT samples by October 3, 2001. DA159; Deposition of Mr. John Korab ("Korab Depo.") p. 51 at DA 233.

31. Modification P00017 also included the following statement:

> This modification constitutes a full and final disposition of all matters relating to this contract and is a full release and accord and satisfaction of any and all claims, demands, or causes of action that either the contractor or the government may have against the other arising out of or related to the contract to date.

DA 159; Korab Depo. p. 26 at DA 231.

32. At the time Axion and the United States agreed to modification P00017, Axion was at risk for termination for default pursuant to the contract's termination clause because it failed to make delivery in accordance with the requirements of P00016. DA 158; Korab Decl. ¶ 4 at DA 355; Latifi Depo. p. 158 at DA 324.

33. Axion did not satisfy the FAT requirements of modification P00017. Korab Decl. ¶ 6 at DA 355.

34. On April 4, 2002, Axion and NAVICP agreed to a bilateral modification P00019 reestablishing a date of April 23, 2002 for FAT. DA 162; Latif Depo. p. 200 at DA 332.

35. The modification included the following language:

> This modification constitutes a full and final disposition of all matters relating to this contract and is a full release and accord and satisfaction of any and all claims, demands, or causes of action that either the contractor or the government may have against the other arising out of or related to the contract to date.

DA 162.

36. At the time Axion and the United States agreed to modification P00019, Axion was at risk for termination for default because Axion failed to make delivery of the FAT pursuant to modification P00017. Korab Decl. ¶¶ 8 & 9 at DA 356-57.

37. Axion did not satisfy the FAT requirements of modification P00019. Korab Decl. ¶ 6 at DA 355-356; Latifi Depo. p. 206 at DA 335.

38. On July 11, 2002, Axion and NAVICP agreed to a bilateral modification P00020, again reestablishing the requirement for FAT. DA 163; Korab Decl. ¶ 6 at DA 355; Latif Depo. p. 209 at DA 338.

39. This modification included a delivery date for submission of a FAT report by September 9, 2002. DA 163; Korab Decl. ¶ 6 at DA 355; Latifi Depo. p. 209 at DA 238.

40. Modification P00020 included the following language relating to release and accord and satisfaction:

> This modification constitutes a full and final disposition of all matters relating to this contract and is a full release and accord and satisfaction of any and all claims, demands, or causes of action that either the contractor or Government may have against the other arising out of or related to the contract to date.

DA 163 (Modification P00020).

41. At the time Axion and the United States agreed to bilateral modification P00020, Axion was at risk for termination for default because Axion had failed to meet the delivery requirements of P00019. Korab Decl. ¶¶ 8 and 9 at DA 356-57; Latifi Depo. p. 206 at DA 235.

42. On September 9, 2002, Axion resubmitted a FAT report. Latifi Depo. pp. 210-211 at DA 339-340; Hahin Decl. ¶ 11 at DA 351; Korab Decl. ¶ 10 at DA 357.

43. This FAT report concerned testing Axion conducted in attempting to comply with the requirements of P00020. Latif Depo. p 213 at DA 342; Hahin Decl. ¶¶ 9-11 at DA 351; Korab Decl. ¶¶ 6 & 10 at DA 355 & 357.

44. The report did not demonstrate compliance with contract requirements. Hahin Decl. ¶ 11 at DA 351; Korab Decl. ¶ 10 at DA 357.

45. The contracting officer terminated Axion for default for failing to meet the contract's first article testing requirements. Korab Decl. ¶ 11 at DA 358.

46. Axion's contract with the Navy contained a clause that established that a contractor shall be deemed to have failed to make delivery within the meaning of the Default clause if FAT testing is disapproved. DA 62; FAR 52.509-3(d); Latifi Depo. p. 38 at DA 2657

47. The default termination was memorialized on November 12, 2002, when NAVICP issued contract modification P00021. DA 164.

48. This modification provided the following:

> Contract N00104-96-C-KA09 was awarded to Axion Corporation (Axion) on December 7, 1995 for the production of 55,209 Power Supplies at a unit price of $23.80 for a total contract price in the amount of $1,313,974.20. The delivery date for Axion's First Article Test Report (FATR) was 06 April 1996. That April delivery date had been extended on numerous occasions per Axion's request. Contract modification P00002 extended the delivery date of FATR to October 29, 1996. Contract modification P00004 extended the delivery date of FATR to December 29, 1996. Modification P00005 extended the delivery of FATR to May 15, 1997. Subsequently, Axion's FATR was approved on 17 May 1999. Furthermore, from the time Axion successfully passed the FATR, the delivery schedule for the production lot was modified on 5 separate occasions since Axion failed to meet its required delivery dates. In the interim, based on Axion's unilateral decision to change its manufacturing process by plating at Axion's plant in lieu of using an outside vendor as originally conducted, Axion was required to submit a second FATR. This decision was made because the results of the initial FATR were no longer reliable. Resubmission of the FATR was due on October 3, 2001. This date was changed per modification P000019 to April 23, 2002. Modification P00020 further extended delivery of the FATR to September 9, 2002. Axion submitted its second FATR by letter and five floppy disks on September 09, 2002. The Navy examined Axion's FATR and disapproved the First Article for failure to meet the requirements of Contract Data Requirements list A004 and the lack of information that would pertain to test procedures, test equipment, or data analysis that is relevant to the performance requirements. Furthermore, a total of 25 out of the 66 First Article Power Supplies failed to meet the performance requirements of drawing 11744726. The Navy's letter of October 01, 2002 advised Axion of its First Article disapproval. A Show Cause letter of October 01, 2002 was also sent to inform Axion that the Navy was considering terminating the contract for default for failure to make delivery unless facts were presented in writing, indicating that failure to perform was due to causes beyond Axion's control and without fault or negligence on Axion' s part. Axion's letter of October 11, 2002 does not provide an adequate excuse for Axion's failure of the First Article thereby failing to meet the September 09, 2002 delivery schedule.

DA 164.

49. Although Axion never made a single production lot delivery, the Government nonetheless provided it with progress payments in the amount of $512,365.00. DA 209; Korab Decl. ¶ 12 at DA 358; Latifi Depo. p. 237 at DA 345.

50. Axion signed an agreement with the Government prior to filing this lawsuit that

acknowledges this debt. DA 209.

51. Contract issues related to the air gun first arose in 1996, long before modifications P00017, P00019, and P00020. DA 178-186; DA 159, 161 & 163; Korab Decl. ¶ 7 at DA 356; Latifi Depo. pp. 52, 64 –67; 110-112, 119, 130-131 at DA 267, 274, 275, 276, 277, 285, 286, 290, 297, 298.

52. Contract issues related to the leaking electrolyte first arose in 2001, long before modifications P00017, P00019, and P00020. DA 194; DA 159, 161, 163; Korab Decl. ¶ 7 at DA 356; Latifi Depo. p. 150-157 at DA 316-323.

53. Contract issues related to the plating specifications first arose in 2000, long before modifications P00017, P00019, and P00020. DA 190; DA 159, 162, 163; Korab Decl. ¶ 7 at DA 356; Latifi Depo. p. 136-144 at DA 303-311.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Kathryn A. Bleecker
KATHRYN A. BLEECKER
Assistant Director

s/Douglas K. Mickle
DOUGLAS K. MICKLE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530
Tele: (202) 307-0383

OF COUNSEL:

Richard Martinelli
Office of Counsel
Naval Inventory Control Point
Mechanicsburg, PA 17055-0788

April 11, 2005

Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on April 11, 2005, a copy of the foregoing **"DEFENDANTS' PROPOSED FINDINGS OF UNCONTROVERTED FACTS"** was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Douglas K. Mickle
Douglas K. Mickle