Nos. 03-2644C & 04-297C
(Judge Firestone)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AXION CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# AXION'S RESPONSE TO THE UNITED STATES' PARTIAL MOTION TO DISMISS AND AXION'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Richard J.R. Raleigh, Jr.
Wilmer & Lee, P.A.
100 Washington Street, Suite 200
Post Office Box 2168
Huntsville, Alabama 35804-2168
256-533-0202 Telephone
256-533-0302 Facsimile

Jerome S. Gabig
4811 Cove Creek Road
Brownsboro, Alabama 35741
256-489-0075 Telephone

Attorneys for Plaintiff

May 12, 2005

TABLE OF CONTENTS

Page(s)

AXION'S RESPONSE TO THE UNITED STATES' PARTIAL MOTION TO DISMISS AND AXION'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT .......... 1

Defendant's Motion to Dismiss for Lack of Jurisdiction .......... 1

Defendant's Motions Asserting Laches .......... 2

Axion's Cross-Motion for Partial Summary Judgment – Accord and Satisfaction .......... 2

STATEMENT OF THE FACTS .......... 2

ARGUMENT .......... 9

I. Standards of Review .......... 9

A. Motion to Dismiss .......... 9

B. Motions for Summary Judgment .......... 10

C. Terminations for Default .......... 10

II. Defendant's Motion to Dismiss for Lack of Jurisdiction .......... 11

A. Count XVII: Equitable Adjustment Claims Related to Axion's Attempts to Fabricate a Commercially Impractical Airgun for Navy .......... 11

B. Count XVIII: Equitable Adjustment Claims Related to Compensation for Axion's Work in Fabricating the Navy's Air Gun .......... 13

C. Count XXI: Equitable Adjustment Claims Related to Government's Superior Knowledge of Air Gun .......... 17

D. Count XXII: Equitable Adjustment Claims Regarding Axion Being Misled by Navy that the Air Gun Would Not Require a Significant Amount of Development Work .......... 18

E. Count XXIII: Equitable Adjustment Claims Related to the Government's Breach of Implied Warranty that the Air Gun Would Either Be Commercially Available or a Non-Developmental Item .......... 20

F. Count XXIV: Claims For Equitable Adjustment with Regard to the Government's Breach of Duty to Cooperate Concerning the Air Gun .......... 21

G. Count XXV: Equitable Adjustment Claims Regarding the Mutual Mistakes Concerning the Air Gun ....................23

III. Laches Does Not Bar Axion's Claims Concerning The Air Gun Because There Has Been No Prejudice to the Government and Because the Government Engaged in Inequitable Conduct ....................23

IV. Axion Is Entitled to Summary Judgment That P00017, P00019, P00020 Are Unenforceable For Lack Of Consideration ....................25

A. The Lack of Consideration for Modification P00017 ....................25

1. "Pursuant to modification P00016, Axion was required to begin production lot deliveries on or before August 8, 2001." ....................26

2. "Axion failed to meet this deadline." ....................26

3. "Upon missing the deadline, pursuant to the termination clause, the Government gained the option of terminating the contract for default." ...28

B. The Lack of Consideration for Modification P00019 ....................29

1. "In agreeing to modification P00019, the Government provided two forms of consideration. First it granted Axion another extension of the very date." ....................30

2. "Second, the Government reduced the number of required first article test samples from 120 to 80." ....................32

3. "Bilateral Modification P00017 Re-established the First Article Requirement for October 3, 2001. DA 159." ....................33

C. The Lack of Consideration for Modification P00020 ....................34

1. "Modification P00019 established April 23, 2002 as the new deadline for the first article test requirement. DA 162." ....................35

2. "After Axion failed to meet the requirements of P00019, the parties bilaterally agreed to modification P00020. DA 163. Modification P00020. "Modification P00020 set forth September 9, 2002 as the new first article line, which, by agreeing to yet another extension, constituted consideration on the part of the Government." ....................35

3. "Again, the Government would no longer be able to terminate for default when Axion missed yet another deadline set forth in the

agreement." ........................................................................................ 36

4. "It is quite clear, just as with bilateral modifications P00017 and P00019, Axion received the benefit of additional time to perform, and an Alleviation of the risk of termination for default when it agreed to Modification P00020." .................................................................. 36

V. Because The Contracting Officer Either Knew or Should Have Known of the Unilateral Mistake Made By Mr. Latifi Concerning Modifications P00017, P00019, and P00020, these Modifications Should Be Reformed To Remove the Accord and Satisfaction Provisions ........................................................................ 37

VI. Plaintiff is Entitled to Summary Judgment that the Accord and Satisfaction Provisions in P00017, P00019, and P00020 Do Not Apply to Counts II, III, IV, V, VI, VII, IX, XII, XV, XVI, and XVIII ........................................................ 39

CONCLUSION ........................................................................................................ 47

TABLE OF AUTHORITES

CASES PAGE(S)

*Acme Process Equipment Co. v. United States*,
347 F.2d 509 (Ct.Cl. 1965) ........ 10

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ........ 10

*Anlagen und Sanierungstechnik GmbH*,
ASBCA No. 49869, 97-2 BCA ¶ 29, 1997 WL 429703 ........ 24

*Austin Eng'r Co. v. United States*,
88 Ct. Cl. 559 (1939) ........ 16

*Benchmark Resources Corp. v. United States*,
2005 WL 627565 (Fed.Cl. 2005) ........ 17

*C & H Commercial Contractors, Inc. v. United States*,
35 Fed. Cl. 246 (1996) ........ 41

*Celotex Corp. v. Catrett*,
477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed. 265 (1986) ........ 10

*Central Pines Land Company v. United States*,
61 Fed. Cl. 527, (2004) ........ 11, 17, 25

*Chernick v. U.S.*,
372 F.2d 492, 178 Ct.Cl. 498 (1967) ........ 39

*Conley v. Gibson*,
355 U.S. 41, 45-46 (1957) ........ 10, 11

*Contel Advance Systems*,
ASBCA No. 49,076, 03-1 BCA ¶32,155 ........ 19, 37

*D. L. Auld Co. v. Chroma Graphics Corp.*,
714 F.2d 1144, 1146-47 (Fed.Cir. 1983) ........ 10

*Defense Systems Company, Inc.*,
ASBCA No. 50, 918, 01-1 BCA ¶ 31,152 ........ 42

*Defense Systems Corporation and Hi-Shear Technology Corporation*,
ASBCA No. 42,939, 95-2 BCA 27,721 ........ 12

*DeMarco Durzo Dev. Co. v. United States*,
60 Fed.Cl. 632, 635 (2004), C.A. Fed., 2003 .......... 9

*DeVito v. United States*,
413 F.2d 1147 188 Ct.Cl. 979 (1969) .......... 10

*Freedom NY, Inc.*,
ASBCA No. 43965, 01-2 BCA ¶ 31,585 .......... 28, 31, 32, 35

*Godwin v. United States*,
338 F.3d 1374, (Fed.Cir. 2003) .......... 9

*Harrison Eng. & Const. Corp. v. United States*,
107 Ct.Cl. 205, 68 F.Supp 350 (1946) .......... 43, 44

*Helene Curtis Indus. Inc. v. United States*,
312 F.2d. 774 160 Ct. Cl. 437 (1963) .......... 40

*Hermes Consol., v. United States*,
58 Fed. Cl. 3, 20 (2003) .......... 23

*Holton, Seelye & Co. v. United States*,
106 Ct. Cl. 477, 65 F. Supp. 903 (1946) .......... 16

*Inland Empire Builders, Inc.*,
ASBCA No. 8077, 67-1 BCA ¶ 6162 .......... 40

*Johnson, Drake & Piper, Inc. v. United States*,
209 Ct.Cl. 313, 531 F.2d 1037 (1976) .......... 14

*Kinsey v. United States*,
852 F.2d 557 (Fed. Cir. 1988) .......... 14

*Logics, Inc.*,
ASBCA No. 46914, 97-2 BCA ¶ 29,125 .......... 20

*Martinez v. United States*,
333 F.3d 1295 (Fed. Cir. 2003) .......... 16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) .......... 10

*Mil-Spec Contractors, Inc. v. United States*,
837 F.2d 865 (Fed. Cir. 1987) .......... 25, 39

*Nagel Electric Company, Inc. v. United States*,
368 F.2d 847, 117 Ct. Cl. 234 (1966) .......... 16

*Neal and Company, Inc.*,
DOT No. 2984, 90-2 BCA ¶ 22789 .......... 40

*Northeast Savings v. United States,*
63 Fed.Cl. 507 (2005) .......... 10

*Patton v. United States,*
2005 WL 681241 (Fed.Cl. March 23, 2005) .......... 14, 20, 21

*Pauley Petroleum Inc. v. United States*,
591 F.2d 1308, 219 Ct.Cl 24 (1979) .......... 34

*Rumsfield v. Freedom NY. Inc.*,
329 F.3d 1320 (Fed. Cir. 2003) .......... 28

*San Carlos Irrigation and Drainage District v. United States,*
23 Cl. Ct. 276 (1991) .......... 22, 46

*Scheuer v. Rhodes,*
416 U.S. 232 94 S.Ct. 1683 (1974) .......... 9, 11

*Shermco Indus., Inc. v. United States*,
6 Cl. Ct. 588 (1984) .......... 14

*Studiengesellschaft Kohle, M.B.H. v. Hercules, Inc.*,
105 F.3d 629 (Fed. Cir. 1997) .......... 41

*Tennessee Valley Authority v. Hill*,
437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) .......... 17

*Terteling v. United States*,
334 F.2d 250 (Ct. Cl. 1964) .......... 14,15

*The Boeing Company*,
ASBCA No. 52,256, 02-1 BCA ¶ 31, 811 .......... 43,44

*U.S. v. Acme Process Equipment Co.*,
385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966) .......... 11

*United States v. Lennox Metal Manufacturing,*
225 F.2d 302 (2nd Cir. 1955) .......... 39

*United States v. Spearin*,
248 U.S. 132, 39 S.Ct. 59 (1918) .......... 44

*Urban Plumbing & Heating Co. v. United States*,
408 F.2d 382 (Ct. Cl. 1969) .......... 28

*Vought Aircraft*,
ASBCA No. 47,357, 00-1 BCA ¶ 30,721 .......... 42, 45

*Woerner Engineering, Inc.*,
ASBCA No. 52,248, 03-1 BCA ¶ 32,196 .......... 25, 26, 30, 34

FEDERAL STATUTES, RULES, AND REGULATIONS


DFARS 216.104-70(d)(3) ........................................ 19

FAR 4.801(b)(4) ........................................ 29, 33

FAR 16.202-2 ........................................ 19

FAR 16.301-2 ........................................ 19

FAR 33.201 ........................................ 15

FAR 43.204(c)(1) ........................................ 29, 33, 34

FAR 52.245-18 ........................................ 15, 46

Pub. L. No. 103-355 § 2351 ........................................ 16

R.C.F.C. 12(c) ........................................ 9


SECONDARY MATERIALS


140 Cong.Rec. H920-01 ........................................ 16

140 Cong.Rec. S1236903 ........................................ 16

Restatement of Contracts (Second) § 155 (1979) ........................................ 34

Restatement of Contracts (Second) § 159 (1979) ........................................ 42

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **AXION CORPORATION,** *Plaintiff,* v. **THE UNITED STATES,** *Defendant.* | ) ) ) ) ) ) ) ) ) ) ) | **No. 03-2644C & 04-297C** (Judge Firestone) |

**AXION'S RESPONSE TO THE UNITED STATES' PARTIAL MOTION TO DISMISS AND AXION'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

**COMES NOW** Plaintiff Axion Corporation ("Axion") and responds to the Motion to Dismiss of Defendant, the United States ("United States" or "Government"), and in response to Defendant's Motion for Partial Summary Judgment, Axion submits that, for reasons set forth herein, this Honorable Court should deny Defendant's motion, and should grant Axion's Cross-Motion for Partial Summary Judgment.

**Defendant's Motion to Dismiss for Lack of Jurisdiction**

Plaintiff respectfully requests the Court deny the Defendant's Partial Motion to Dismiss for lack of jurisdiction (which Defendant has also raised as an alternative motion for partial summary judgment), Counts XVII, XVIII, XXI, XXII, XXIII, XXIV and XXV of Complaint 04-297C ("Complaint II"). Without any analysis of these distinct Counts, Defendant summarily

asserts each of the counts is "outside the statute of limitations" because "the claim accrued in 1996." Defendant's Brief ("DB") at 1. As established below, the Government's superficial assertion is factually incorrect, genuine issues of material fact exist, and the Government's motions based upon lack of jurisdiction are due to be denied.

**Defendant's Motions Asserting Laches**

The Government also seeks summary judgment based on laches, without presenting any evidence of the prejudice to the Government. There has in fact been none. For that reason and others set forth below, the Government's motions asserting laches are due to be denied.

**Axion's Cross-Motion for Partial Summary Judgment - Accord and Satisfaction**

The accord and satisfaction provisions contained in Modifications P00017, P00019, and P00020 are unenforceable as a matter of law for several reasons, including among others lack of consideration and a unilateral mistake by Axion that was either known or should have been known by the Contracting Officer. Therefore, Axion seeks partial summary judgment on the issue of the enforceability and applicability of the accord and satisfaction provisions.

## STATEMENT OF THE FACTS

Alex Latifi ("Latifi") is the Chief Executive Officer of Axion Corporation ("Axion"). Declaration of Alex Latifii ("Latifi Decl") ¶ 1 at Plaintiff's Appendix ("PA") A. Axion has been in business for approximately twenty years. Deposition of Latifi "Latifi Depo" at 13. It is a minority-owned, small business. Latifi Decl ¶ 2. During its existence, Axion has been awarded

between 100 and 200 government contracts. Latifi Decl ¶ 1. Axion's core business is performing relatively small, build-to-print, United States government production contracts. Latifi Decl ¶ 1. In almost every instance, the contracts have been firm-fixed price contracts. Latifi Decl ¶ 1. Axion has never been awarded a research and development ("R&D") contract; R&D is not a core competency of Axion. Latifi Decl ¶ 1.

Prior to contract N00106-96-C-KA09, Axion never had a contract terminated for default. Latifi Decl ¶ 1. Prior to the present dispute, Axion had never submitted a claim under the Disputes clause. Latifi Decl ¶ 1.

In 1995, the United States Navy ("Navy") issued a solicitation for a fixed-price production contract to acquire 55,209 PS-115 power supplies. Defendant's Appendix ("DA") at 1-2; Complaint No. 03-2644 ("Complaint I") ¶ 2. The PS-115 power supply is a dormant battery to be placed in a munition that is fired from a large bore weapon. Complaint I ¶ 6; Answer ¶ 6 (admitting). A PS-115 power supply becomes active when a projectile containing the PS-115 is fired from a large bore weapon. Complaint I ¶ 7; Answer ¶ 7 (admitting central allegations). The acceleration produces as much as 25,000 Gs of force. *Id.* The force causes a cutter within the PS-115 to penetrate and cut a diaphragm. *Id.* An acid passes through the penetrated diaphragm and permeates the cells. *Id.* The resulting electrical charge causes the fuse to detonate the explosive. *Id.*

The solicitation contained detailed drawings on how to produce the PS-115s. DA at 18-31; Complaint I ¶ 11, 58. The solicitation also contained an option quantity for an additional 55,209 units. DA at 2, Complaint I ¶ 9; Answer ¶ 9. Axion submitted a proposal and was awarded Contract N00106-96-C-KA09 by the Navy on December 14, 1995. DA at 1-2; Complaint I ¶¶ 18, 21; Answer ¶¶ 18, 21.

Initially, the Army had acquired PS-115s for the Navy. Complaint I ¶ 10; Answer ¶ 10. However, before awarding contract N00106-96-C-KA09 to Axion, the Navy had acquired PS-115s from the Accudyne Corporation. DA at 16; Deposition of Jerry Hahin ("Hahin Depo") at 15-16 at Plaintiff's Appendix ("PA") B.

The contract required a first article test before Axion could proceed to production. Complaint I ¶ 15. The contract also stated "the contractor shall provide all AIE (*i.e.*, acceptance inspection equipment) ... necessary to assure conformance of components and end items to contract requirements." DA at 97; Complaint I ¶ 16; Answer ¶ 16. The contract did not specifically mention an "air gun" for testing. Complaint I ¶ 16; Answer ¶ 16. The contract never contained any specification for an air gun. Complaint No. II ("Complaint II") ¶ 63; Latifi Depo at 54-55, PA D.

What the contract did specify, with regard to testing, was the Navy's reservation of the right to perform the test in the most realistic environment, *i.e.*, inserting PS-115s into actual projectiles and then firing the projectiles from a large bore weapons. DA at 7 incorporating technical data package 19202-11744726, paragraph 4.4.6.2.2; Latifi Depo at 54-55, PA D.

The solicitation identified the two previous contracts for PS-115s that had been awarded by the Navy to the Accudyne Corporation. DA at 4; Hahin Depo at 15-16, PA B. Latifi traveled to Wisconsin to meet and discuss potential employment with an individual who had been employed by Accudyne to produce PS-115s. Latifi Depo at 58, PA D. This individual informed Latifi that the Government had provided Accudyne with two air guns to perform the testing. *Id.*

In a letter dated January 17, 1996, Axion requested the Government to provide Axion with an air gun. Complaint I ¶ 26; Latifi Depo at 54-55, PA D. The Government, however, declined to provide Axion with an air gun. Complaint I ¶ 27; Latifi Depo at 54-55, PA D. The

Contracting Officer's rationale was that "[t]he Navy did not supply any air guns to the previous contractor, Accudyne Corporation, for test purposes." Plaintiff's Appendix ("PA") at Q. However, the Contracting Officer, John Korab ("Korab"), knew that the Army had provided an air gun to Accudyne. Latifi Depo at 64, PA D.

The air gun had been designed by the Army Research Laboratory ("ARL"). Deposition of Korab ("Korab Depo") at 21-22; PA C; Latifi Depo at 59, PA D. ARL agreed to sell Axion the drawing for the air gun. Complaint I ¶ 31. Axion sent a check to ARL to pay for the drawing. Complaint I ¶ 31; Axion Ltr to C.O., April 15, 1997, PA E. After receiving the check, claiming "legal reasons," ARL refused to sell the drawings to Axion. Complaint ¶ 31; Notes from ARL dated March 21, 1997, PA F; Latifi Depo at 64-69, PA D.

After contract N00104-96-C-KA09 was terminated for default, Axion learned that the drawings for the air gun could be purchased for a nominal fee from the U.S. Department of Commerce National Technical Information Service ("NTIS"). PA G.

Concerning the NTIS drawings of the air gun, the Navy's Lead Project Engineer testified as follows:

> Q: Would you also agree those would have been very helpful to Axion Corporation when they were trying to proceed with an air gun?
> A: Yes.

Hahin Depo at 55, PA B.

> Q: This is a tough question for you, but can you explain why essentially this is available to the public to buy, but we have ARL saying, quote, can't just sell him drawings, legal reasons. Does that make any sense to you?
> A: No.
> Q: Okay. Is there information on there how he should have been doing his bird, if you will, is that given out, any information on how he should essentially build his bird?
> A: There's information on how to build a bird successfully –
> Q: If had this, he could have been building the bird without putting all the computer-sensitive material on the bird, is that correct?
> A: Again, it would have required some level of technical expertise, but yes.

Q: This would have been very helpful to avoid the problems he had with the spin gun, is that correct?
A: Yes.

Hahin Depo at 55-56, PA B.

The "bird" mentioned in the above text was the housing in which the PS-115 was placed when the PS-115 was fired in an air gun. Hahin Depo at 69, PA B. As explained by Latifi in his deposition:

> There is no information in the contract, or nobody can help us at this stage. We don't even know the size of the bird. We ask them what the bird size should be, what the weight should be. 'What size should it be?' "What size do you need?' And we got no answer from nobody, not Army, not Navy. Nobody in this case tell us 'Hey, the bird should be this size. This size is the way. If you want to shoot it, it has to be this way.' There is no indication anywhere that anybody knows what to do.

Latifi Depo at 68, PA D.

Concerning Axion's approach to placing a processor inside the "bird," Hahin has testified that: "I just think it was a very difficult engineering problem to solve. It was probably one of those that was surmountable, but it was not an easily solved problem." Hahin Depo at 69, PA B.

When Axion first attempted to develop the air gun, Axion did not know that it had begun a significant research and development effort. Latifi Depo at 102, 110-1, PA D. Likewise, the Navy's lead project engineer was aware that Axion did not know that the air gun would evolve into a significant development effort:

Q: Is it sort of a situation where he thought it was just around the corner to have it fixed, just around the corner, next week, next week, next week, and it just dragged on and dragged on and ragged on? Is that pretty much an accurate statement that was happening here?"
A: Yes

Hahin Depo at 75, PA B.

Because of the expense of trying to develop an air gun, contract N00104-96-C-KA09 became a significant financial burden on Axion. Latifi financed Axion's loses from his personal savings. Latifi Decl ¶ 4, PA A. Specifically, he withdrew money from retirement accounts. Latifi Decl ¶ 4, PA A. Since he is now 58 years old, he does not have a lot of years remaining to replenish the loss. Latifi Decl ¶ 4, PA A.

The Contracting Officer has acknowledged that he was aware that Axion struggled to develop an air gun and that Axion did so without the assistance of the Government. Korab Depo at 21, PA C.

Axion had completed the First Article Test (FAT). Complaint I, ¶ 124; Latifi Depo at 116-118, PA D ("Yes, they approved the First Article."). Prior to contract award, the Government had experienced problems with PS-115s because an earlier design had allowed "the electrolyte to leak out of the ampoule causing severe reliability degradation." Hahin email, Nov. 23, 1999, PA N. In the summer of 2001, Axion discovered that the PS-115s that Axion had manufactured were beginning to leak acid. PA L and M; Latifi Depo at 131-133, PA D. Axion was never informed that the PS-115 had a history of leaking acid. Latifi Depo at 155, PA D. Axion reported the leaks to the Navy; Latifi Depo at 132, PA D. According to Hahin, the leaking "played in my decision to require another second first article." Hahin Depo at 110, PA B.

While the second FAT testing was being conducted, the Government's Quality Assurance Representative ("QAR") observed that the failed tests were being caused by a defective air gun and that there was no indication that the PS-115s had been defectively manufactured. *Id.* For example, in an email dated Sept. 5, 2002 to the Contracting Officer, the QAR observed:

> We had a total of aprx 14 good shots during the past 3 working days (6 consecutive last week Thursday and 8 consecutive yesterday)—with some minor consuming problems early on with positioning of parts on the 'bird' to enable accurate recording of data.

> Yesterday we shot a total of 14 of which 8 had good data collected (split between cold (3), hot (3) and room temp (2)); 3 of the 14 had no data because the batteries on the recording computer died without us being aware (we checked the voltage on the cells after and found between 16 and 26 volts existent that seems to indicate probable good units even though not acceptable from the data standpoint); and 3 that broke at impact that provided only partial data and are not acceptable. ...
>
> The majority of the failed items (failed to capture data) provide sufficient voltage after data collection failure to seem to indicate the cell functioned correctly to requirements despite the inability to collect data.

PA H.

Similarly, the following day, the QAR sent another email to the Contracting Officer stating:

> He has successfully completed testing (recorded successful data) on at least 90 items.... At this point, the testing system functions very well -- Axion can shoot and record, optimally, 4 per hour; human error has caused every non-acceptable data collection problem that has been encountered over the past couple of weeks. On 3 most recent separate days we observed at least 6 consecutive successful shots before failures occurred. In one case, failure to record acceptable data resulted from the normal wearing out of batteries used to power the recording computer in the system. At least 6 failures happened because the shot units broke on impact. Another anomaly that was discovered was that one the technicians put his hand on part of the testing apparatus and touched a grounded table with the other and shorted all data immediately to ground and lost it all....
>
> The majority of the failed items (failed to capture acceptable data) provide sufficient voltage after data collection failure to seem to indicate that the cell functioned correctly to requirements despite the inability to collect the data.

PA I.

The contract was terminated for default on November 12, 2002. DA 164; Latifi Depo at 237-38, PA D. The stated reason for the termination for default was "a total of 25 out of the 66 First Article Power Supplies failed to meet the performance requirements of drawing 11744726." DA 164. However, the 25 alleged failures that the Navy relied upon for the termination for

default were attributable to a systematic failure of the air gun. Complaint II ¶ 149; Emails of Government Quality Assurance Representative PA H & I; Hahin Depo,191 PA B.

According to the Contracting Officer, it was proper to terminate Axion for default for failures of the air gun even if the PS-115s were properly manufactured:

> Q: And without the data, you can't establish that it successfully passed; isn't that correct?
> A: That is correct.
> Q: That would be a failure, correct?
> Y: Yes, because there is no data for it.
> Q: So your definition of a failure is no data; correct?
> A: No. That is not my definition of a failure?
> Q: What is a failure?
> A: It is the unit not functioning the way it is supposed to function.
> Q: And if the failure is attributable to the air gun not functioning properly, is that a failure or not a failure?
> A: I would say it is a failure.

Korab Depo at 135, PA C.

According to the memorandum prepared by the contracting officer justifying the termination for default, the government no longer has a requirement for PS-115 power supplies. PA J.

**ARGUMENT**

**I. Standards of Review.**

**A. Motion To Dismiss.**

When considering a motion to dismiss a claim under R.C.F.C. 12(b)(6), a court must accept as true all factual allegations made by the plaintiff and draw all reasonable inferences in the plaintiff's favor. *DeMarco Durzo Dev. Co. v. United States,* 60 Fed.Cl. 632, 635 (2004), C.A. Fed., 2003 (citing *Godwin v. United States,* 338 F.3d 1374, 1377, (Fed.Cir. 2003)). Such a motion should be granted only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes,* 416 U.S.

232, 236, 94 S.Ct. 1683 (1974) (*quoting Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). Therefore, the Court must determine if, given Axion's allegations, it is beyond doubt that there are no set of circumstances that would entitle Axion to relief for its claims.

**B. Motions for Summary Judgment.**

Summary judgment is only appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Northeast Savings v. United States,* 63 Fed. Cl. 507, 514 (2005). The movant bears the burden of establishing the absence of genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed. 265 (1986). In ruling on a motion for summary judgment, a court does not weigh the evidence to determine the truth of the matter, but rather whether there are any genuine issues for trial. *Anderson,* 477 U.S. at 249, *Northeast Savings,* 63 Fed. Cl. at 514. All inferences must be drawn in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Further, summary judgment must be granted with caution, because it denies a party the chance to prove its case at trial. *Northeast Savings,* 63 Fed. Cl. at 514, *citing D.L. Auld Co. v. Chroma Graphics Corp.,* 714 F.2d 1144, 1146-47 (Fed.Cir. 1983).

**C. Terminations for Default.**

Terminations for default are a species of forfeiture, and as such, must be strictly construed. *DeVito v. United States,* 413 F.2d 1147, 1153, 188 Ct.Cl. 979 (Ct.Cl. 1969). Forfeiture is "the most drastic civil penalty known to common law," and the Government must have proper justification for such harsh consequences. *Acme Process Equipment Co. v. United*

*States,* 347 F.2d 509, 513, 528, 171 Ct.Cl. 324 (Ct.Cl. 1965), *overruled on other grounds, U.S. v. Acme Process Equipment Co*., 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (Ct.Cl. 1966).

## II. Defendant's Motion to Dismiss for Lack of Jurisdiction.

The Government cites to no facts whatsoever in its assertion that the seven counts that it seeks to be dismissed "accrued in 1996." Thus, the Government's Partial Motion To Dismiss must fail. Applying the standard for such motions, it certainly cannot be said that Axion, the nonmovant, "can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (*quoting Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). The facts presented herein are complex. Axion's Complaints contain more than 200 paragraphs each, asserting complicated operative facts, many of which were simply admitted by the United States. Even so, the Government summarily asserts that seven counts are "outside the statute of limitations" because they "accrued in 1996." Defendant's Brief ("DB") 1. However, the Government does not provide any factual basis or analysis for why it believes that any of the underlying claims accrued in 1996. The Government's Motion to Dismiss is simply a "throw-away" argument, completely unsupported, and should be summarily denied.

In the analysis below, Axion establishes that, for the seven Counts, the facts either contradict the Government's superficial assertion or, alternatively, the facts "leave the Court with too many unanswered questions to justify a judgment on the pleadings." *Central Pines Land Company*, 61 F.Cl. at 539.

### A. Count XVII: Equitable Adjustment Claims Related to Axion's Attempts to Fabricate a Commercially Impractical Air Gun for Navy.

The Government moves to dismiss Count XVII on the basis of lack of jurisdiction, claiming that the statute of limitations bars this claim. The central issue is at what point in time Axion knew, or reasonably should have known, that the air gun that the Navy required Axion to fabricate was commercially impractical[1] to fabricate. *Appeals of Defense Systems Corporation and Hi-Shear Technology Corporation*, 95-2 BCA ¶ 27,721, ASBCA No. 42,939. As such language suggests, this is an inherently fact-intensive area.

Axion does not contest that it had a contractual obligation to fabricate the acceptance inspection equipment. DA 109. Hence, in the context of what is "commercially impractical," the question is at what time Axion knew or reasonably should have known that the fabrication of the air gun was both unreasonably difficult and unreasonably expensive. *Defense Systems,* 95-2 BCA ¶ 27,721. The extract below is from an April 15, 1997, letter from Axion to Korab. It is apparent from this letter that in April of 1997, Axion was unaware that the air gun would be unreasonably difficult and expensive to fabricate:

> Based upon Harry Diamond Laboratories revised excessively projected test time required, and the fact that we are still waiting for answers to our RFW's and letters, Axion decided to proceed and design our own Spin Gun, of which the design is complete and is currently in the process of being manufactured, and should be complete within approximately 20 days. This will permit Axion to test from 50 to 60 units each day, for a total test time of 7 to 8 days maximum in lieu of the 4 a day by Harry Diamond Lab. This will enable Axion to produce the required units *at least 100 days faster and far more accurately* than Harry Diamond Labs.

PA E at ¶ 3. Bates No. AXION00290.

This lack of awareness is similarly apparent from Hahin's deposition:

---

[1] In this regard, it is useful to consider the meaning of the term "commercially impractical." As stated in *Defense Systems*, "impossibility of performance is, of course, no longer limited to strict common law impossibility. Rather the concept embraces impracticability such as existed here caused by extreme and unreasonable difficulty, expense, injury or loss

Q: Now, when Axion entered into this contract, because their background is fixed price production contracts with level three drawings, is it fair to say that they never anticipated to have – to develop an air gun?
A: Yes.

Hahin Depo at 71-2, PA B.

Q: Is it sort of a situation where he thought it was just around the corner to have it fixed, just around the corner, next week, next week, next week, and it just dragged on and dragged on and dragged on? Is that pretty much an accurate statement that was happening here?
A: Yes.

Hahin Depo at 75, PA B.

In fact, it was long after April of 1997 that Axion came to learn of the extreme difficulty and expense involved. As explained by Latifi in his deposition:

Q: -- you said the "spin gun," we are talking bout the air gun?
A: Yes. We don't know this time—oh—
Q: Pardon?
A: At this time we think that the spin gun will do the test. Since the Government not give us the gun – now we think it is possible to produce the gun at a very reasonable price—a reasonable price—which is a spin gun – you have to spin the part – at a reasonable price. And we try to do it very simple.

Latifi Depo at 102, PA D.

Without any discussion of the facts involving Count XVII, the Government asserted that the claim "accrued in 1996." DB at 1. The Government is factually incorrect, and genuine issues of material fact are dispute, precluding judgment as a matter of law on this point.

**B. Count XVIII: Equitable Adjustment Claims Related to Compensation for Axion's Work in Fabricating the Navy's Air Gun.**

The essence of Count XVIII is that FAR 52.245-18 entitles Axion to be compensated for its costs of fabricating the air gun for the Navy. There were no applicable provisions in the contract for progress payments. DA 57. Since Axion was still working on the air gun at the time

---

involved in performance." *Appeals of Defense Systems Corporation and Hi-Shear Technology*

of the termination for default, Axion had not submitted a request for payment for the air gun; the first time that Axion sought payment pursuant to FAR 52.245-18 was in its settlement proposal. Complaint II ¶ 6.

In a recent decision involving the application of the statute of limitations to a claim, the Court of Federal Claims held:

> A claim does not accrue, however, "unless the claimant knew or should have known that the claim existed." *Kinsey*, 852 F.2d at 557 n. Alternatively, **"[a] claim accrues when 'damages are ascertainable.'"** *Shermco Indus., Inc. v. United States*, 6 Cl.Ct. 588, 591 (1984) (*quoting Johnson, Drake & Piper, Inc. v. United States*, 209 Ct.Cl. 313, 329-30, 531 F.2d 1037 (1976)).

*Patton v. United States*, 2005 WL 681241 at *6 (Fed.Cl. March 23, 2005) (emphasis added). Applying *Patton* to the present facts, Axion could not ascertain the amount that it had been damaged because Axion was still trying to fabricate a reliable air gun. The Complaint demonstrates that Axion's total costs of being forced to develop the air gun were not ascertainable while Axion was performing the contract:

> 155. Air guns used to test PS-115s often suffered from systemic failures.
> 156. The most frequent cause of air gun systemic failures is the breaking of components within the projectile caused by the thousands of G-force applied to the components during testing.
> 158. On average, Axion's air gun was only able to collect sufficient data to ascertain if a PS-115 met the specifications for 75% to 80% of the times the air gun was fired.

Complaint I.

The facts in this case are conceptually analogous to those in *Terteling v. United States*, 334 F.2d 250 (Ct.Cl. 1964). In that case, the Government had awarded the contractor a construction contract. The Government directed the contractor to obtain gravel from a designated gravel pit. *Id.* at 251. Third parties who claimed to own the gravel sued the

---

*Corporation*, 95-2 BCA ¶ 27,721, ASBCA No. 42,939.

contractor. *Id.* After the litigation was completed, the contractor submitted a claim to the Government for the costs of the litigation. *Id.* Asserting the statute of limitations, the Government refused to pay the claim. *Id.* The Court of Claims held that the claim had not accrued until the litigation had ended.

Just as in *Terteling* where the contractor did not know how much the litigation would cost until it ended, so too Axion did not know how much it would cost to develop the air gun until Axion had completed the work. As explained in Latifi's deposition:

> Q: But at bottom, you never provided an estimate of the cost to the Navy – how much you thought the air gun would cost to develop?
> A: No.
> Q: You just developed it?
> A: Because we didn't know how much it was going to cost. So there was no way –it was something we had never done before, so we have no idea what it cost to do – plus there was no – Mr. Mickle, there were no drawings, there were no specifications, so you couldn't really tell what it was going to cost. So you really – you just went –

Latifi Depo at 111-12, PA D.

The definition of a claim provided in the Federal Acquisition Regulations includes the requirement for "the payment of money in a sum certain." FAR 33.201. Obviously, Axion could not demand a payment of a "sum certain" when Axion was still incurring costs. Similarly, "claim" as defined in FAR 33.201 excludes a "routine request for payment."[2] Here, since Axion had a contractual right to payment under FAR 52.245-18, Axion's routine request for payment

---

[2] In his deposition, the contracting officer essentially acknowledged that Axion's invoice under FAR 52.245-18 was a "routine request for payment":

Q: Assuming that it was special test equipment and assuming there was contracting officer approval, this invoice that comes to you, would that be considered a claim? It would just be a routine request for payment, wouldn't it?
A: Yes.

Korab Depo at 26-7, PA C.

did not ripen into a claim until Axion's Settlement Proposal was "deemed denied." Complaint II, ¶ 13.

The Government argues that, as a result of changes instituted in the Federal Acquisition Streamlining Act ("FASA") of 1994,[3] contractors who wish to avoid the statute of limitations must submit piecemeal claims. Of course, there is nothing in FASA or its legislative history[4] which suggests that Congress intended to legislatively overrule *Nagel Electric Company, Inc. v. United States*, 368 F.2d 847, 177 Ct.Cl. 234 (1966), which held that "no more than one judicial claim should flow from one indivisible contract":[5]

> Separate suits on individual items have been discountenanced as wasteful and burdensome. *(Citations omitted.)* More specifically, it has been said that "as a general rule, a cause of action or a claim under a contract does not accrue piecemeal and that where the contract contains a provision * * * with reference to the time when the contract shall be regarded as finally concluded the statute of limitation with reference to bringing suit does not begin to run until that date" (*Austin Eng'r Co. v. United States*, 88 Ct.Cl. 559, 564 (1939)); that "it was not intended by Congress that section 156 of the Judicial Code, supra, [Section 2501 of Title 28, our limitations provision] should be interpreted to require a multiplicity of suits on various items of a claim arising under an entire contract", but rather that "all rights of the parties under the contract" are to "be heard and determined at the same time and in one suit" ( *Holton, Seelye & Co. v. United States*, 106 Ct.Cl. 477, 499, 65 F. Supp. 903, 906 (1946)); and that "a suit to recover increased compensation for the performance of contracts predicated upon the terms of contracts, does of necessity involve whatever claims which may be asserted as due under the contracts" *(Citation omitted.)* In addition, we have warned, in contract cases and in others, that a claimant who splits his cause of action may have to give up the part on which he fails to sue the first time. *(Citations omitted.)*

*Nagel,* 368 F.2d at 855. (emphasis added).

---

3 Pub. L. No. 103-355, § 2351, 108 Stat. 3243 (Oct. 13, 1994) (amending 41 USC § 605(a)).

4 *See* Conference Agreement on S. 1587, Federal Acquisition Streamlining Act of 1994, 140 Cong.Rec. S1236903, Aug. 23, 1994, 140 Cong Rec. H920-01, Sept 20, 1994.

5 *Nagel* is cited with approval in *Martinez v. United States*, 333 F.3d 1295, 1303, C.A.Fed.,2003, (Fed. Cir. 2003).

Simply put, an Act of Congress whose stated purpose is to "streamline" would not seek to institute a process that is "wasteful and burdensome." *Id.* The Government's argument also runs afoul of a cardinal rule of statutory construction that repeal by implication is disfavored. *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 190, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117, (1978). As explained by the United States Supreme Court, "In practical terms, this 'cardinal rule' means that 'in the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable.'" *Id.*

### C. Count XXI: Equitable Adjustment Claims Related to Government's Superior Knowledge of Air Gun.

The statute of limitations is tolled in cases where the claimant did not have sufficient opportunity to discover the facts giving rise to its claim on the accrual date. *Central Pines Land Co. v. United States,* 61 Fed. Cl. 527, 533 (2004); *Benchmark Resources Corp. v. United States,* 2005 WL 627565 at *6 (Fed.Cl. 2005). In this analysis, the court focuses on the claimant's *access to the facts*, rather than the claimant's actual knowledge of the facts giving rise to the claim. *Central Pines Land Co.,* 61 Fed.Cl. at 533. If the claim was inherently unknowable at the time that the claim accrued, then the statute of limitations will be tolled. *Id.*

In this case, the Government has admitted its indisputably superior knowledge about the air gun that Axion was fabricating for the Navy. First, the Government was the original designer of the air gun. Korab Depo at 21-22, PA C; Defendant's Answer ¶ 33. Axion attempted to buy the drawings to build the air gun from the Army Research Laboratory ("ARL"), which designed the air gun, but the ARL refused to sell them to Axion. Notes from ARL dated March 21, 1997, PA F. The Government has admitted that it was aware that Axion did not know that the air gun would evolve into a significant development effort, when its efforts to obtain an air gun or the

drawings to build one failed. Hahin Depo at 75, PA B. The Contracting Officer has admitted that he knew at the time that Axion was struggling with the development and that it was doing so without the assistance of the Government. Korab Depo at 21, PA C. In the discussion of Count XVII above, Axion established that it did not learn of the difficulty and expense of developing an air gun until well past 1997, and the Government has presented no evidence to the contrary. Tragically, only after the contract had been terminated for default did Axion learn that the Government actually sells the drawings for a nominal fee through the National Technical Information Service of the U.S. Department of Commerce. PA G.

Thus, at each step along the way, the Government was the sole possessor of the facts that would have made clear to Axion that it would, in the end, be forced to develop the air gun from scratch, at enormous effort and expense. Axion had no access to the facts involving the availability of the Government's own air guns, and the drawings to build them, or the significant engineering effort involved in designing and building one. Based on this complete lack of access to the relevant facts that would have led Axion to the understanding that it possessed a claim for the eventual development effort, it would be draconian to bar Axion's claim under the statute of limitations.

**D. Count XXII: Equitable Adjustment Claims Regarding Axion Being Misled by Navy that the Air Gun Would Not Require a Significant Amount of Developmental Work.**

With regard to Count XXII of the Complaint II, the Government admits that the "Navy's solicitation consisted of a design specification for which the Navy was seeking a previously manufactured, build-to-print deliverable" and "[t]he specification did not inform Axion that the awardee must fabricate an air gun that would require a significant amount of developmental work." Complaint ¶¶ 278, 279; Answer ¶¶ 278, 279. The Federal Acquisition Regulations

("FAR") provide guidance on the appropriate choice of contract type depending on the nature of the effort involved in performance. *See generally* FAR Part 16. The FAR specifically provides that firm-fixed price contracts, such as the contract between the Navy and Axion, are suitable for use when acquiring items based on "reasonably definite functional or detailed specifications" and when the contracting officer can establish "fair and reasonable prices at the outset." FAR 16.202-2. In contrast, cost-reimbursement contracts are suitable when the "uncertainties involved in contract performance do not permit costs to be estimated with sufficient accuracy to use any type of fixed-price contract." FAR 16.301-2. Further, the Department of Defense Supplement to the FAR provides that for engineering development, which describes the effort involved in designing the air gun, contracting officers should only use fixed-price contracts "when risk has been reduced to the extent that realistic pricing can occur." DFARS 216.104-70(d)(3). Not only did the Government fail to provide Axion with "reasonably definite" specifications for the air gun, it provided no specifications for the manufacture of the air gun whatsoever, a piece of equipment which the Government knew to be indispensable to the performance of the contract by Axion. As demonstrated by the loss sustained by Axion in the development of the air gun, it clearly cannot be said that the costs associated with performance were able to be "estimated with sufficient accuracy," so that "realistic pricing" could occur at the time of contracting. The Government chose a contract type which binding regulations dictate should not be used in a case such as this, inappropriately and unfairly placing the entire unknown cost of the development effort on Axion. Since only the Government, and not Axion, possessed the facts indicating that the air gun would be a significant development effort for Axion under the contract, the Government should not be allowed to unjustly reap the benefits of having selected an improper contract type that resulted in overreaching.

The Government moves to dismiss Count XXII on the basis that the claim accrued in 1996, and was therefore barred by the statute of limitations before Axion filed its Complaints. The analysis is, again, when Axion knew or should have known that the air gun would require a significant amount of development work. *Patton,* 2005 WL 681241 at *6. That issue is addressed in the discussions of Counts XVII and XXI above, and for the reasons set forth there, the Government's motion is due to be denied.

**E. Count XXIII: Equitable Adjustment Claims Related to the Government's Breach of Implied Warranty that the Air Gun Would Either Be Commercially Available or a Non-Developmental Item.**

Count XXIII is based on federal common law, as articulated in *Logics, Inc*., 97-2 BCA ¶ 29,125, ASBCA No. 46914:

> The general rule is that there is ordinarily no implied warranty that materials specified in the contract specifications will be commercially available. However, **the risk of unavailability is shifted to the Government when there are special circumstances where the Government has a prior relationship with the supplier of the unavailable material and there are no specifications for that material which the contractor can use to either make it itself or have it made.** *(Emphasis added; citations omitted).*

In this instance, it appeared as late as May of 1997 that the ARL would, for a fee, use its air gun to perform the testing of the PS-115s manufactured by Axion:

> Today, Axion received a call from Mr. Alen Artz, about how much time extension we need for First Articles. I told him we would need 90 days after we received approval of the CDRL A003, Inspection/Test Plan, that will have to be resubmitted. By changing the place of Spin Testing, we must, by contract, resubmit the Test Plan. The reason for resubmittal is due to Harry Diamond Labs not holding up their agreement to perform the Spin Testing as was agreed upon and approved in our precious *[sic]* submission of CDRL A003.

Memorandum from Axion's QA Manager to Navy Contracting Officer, May 30, 1997, PA K2, AXION00295. Hence, it was not until May of 1997 that it became apparent that it was necessary

for Axion to develop an air gun because, until then, Axion honestly and reasonably believed that the testing would be performed on ARL's air gun. Even so, the claim did not accrue in May of 1997 simply because at approximately that time Axion had learned that it must fabricate the air gun. As explained in the discussion of Count XVIII, above, "a claim accrues when damages are ascertainable." *Patton,* 2005 WL 681241 at *6. For the reasons set forth in the discussion of Count XVIII above, Axion was not able to ascertain its damages until the contract was terminated. Therefore, the claim accrued in 2002 upon occurrence of that event.

Without any discussion of the facts involving Count XXIII, the Government alleged the claim "accrued in 1996." DB at 1. Because genuine issues of material fact exist as to the date of accrual, the Government's motion is due to be denied.

### F. Count XXIV: Claims For Equitable Adjustment with Regard to the Government's Breach of Duty to Cooperate Concerning the Air Gun.

The Government admits that the "Navy Contracting Officer was told, in a letter by Axion dated April 15, 1997 [that] Axion was ... informed that [ARL] would furnish [Axion] a set of drawings of the spin gun, and Axion sent a check to cover copy costs per the requested amount for copies but [was later] informed that they could not furnish the drawings." Complaint II, ¶¶ 40, 41; Answer ¶¶ 40, 41. The Government also admits, "The Navy Contracting Officer did not assist Axion by obtaining the drawings of the air gun from ARL to provide to Axion." Complaint II, ¶¶ 40, 41; Answer ¶¶ 40, 41. If the Government breached its implied duty to cooperate, it did so in 1997—not in 1996, as evidenced by the fact that it admits it was told, in April 1997, about Axion's attempt to get air gun drawings from the Government. *Id.* Moreover, the Government breached its implied duty to cooperate in other ways as well. *See, e.g.,* Complaint ¶ 42-53. The implied duty to cooperate is a continuing duty. *Contel Advance*

*Systems*, 03-1 BCA ¶ 32,155, ASBCA No. 49,074. As explained by the ASBCA, "The basic principles governing the breach of the duty to cooperate and not to hinder performance are well settled. The implied duty to cooperate imposes an affirmative obligation 'to do what is reasonably necessary to enable the contractor to perform.'" *Contel Advance Systems*, 03-1 BCA ¶ 32,155 (internal citations omitted).

In *San Carlos Irrigation and Drainage District v. United States*, 23 Cl. Ct. 276 (1991), the Claims Court did not apply the statute of limitations to a contractor's obligation to maintain a dam's spillway gates because the duty to cooperate was continuing. The court explained:

> On the subject of continuing contracts, Professor Corbin stated:
> There are contracts, however, that have been said to require continuing (or continuous) performance for some specified period of time, a period that may be definite or indefinite when the contract is made. These contracts too are capable of a series of "partial" breaches, as well as of a single total breach by repudiation or by such a material failure of performance when due as to go "to the essence" and to frustrate substantially the purpose for which the contract was agreed to by the injured party. For each "partial" breach a separate action is maintainable, just as in the case of an "installment" contract; and for a series of "partial" breaches occurring before any action is brought only one action is maintainable.

*San Carlos Irrigation and Drainage District,* 23 Cl. Ct. at 279.

Applying *San Carlos Irrigation* to the present facts, every time the Government failed to comply with its affirmative duty to assist Axion, there was a partial breach, and for each partial breach a separate action is maintainable. *Id.* In its Answer, the Government "[a]dmits that Axion informed the Navy it was having difficulty developing an air gun." Answer ¶ 53. Hence, since the Government admits that it knew of the difficulty that Axion was experiencing, the duty to cooperate continued until the end of the contract. Axion's claim did not accrue in 1996, as alleged by the Government, but rather continued to accrue during the length of the contract.

Absent any discussion of facts, the Government argues that the claim "accrued in 1996." DB at 1. Genuine issues of material fact are in dispute; therefore, the Government's motion is due to be denied.

### G. Count XXV: Equitable Adjustment Claims Regarding the Mutual Mistakes Concerning the Air Gun.

Hahin acknowledged that the Navy did not know at the time that it awarded the contract that the air gun would require a significant development effort:

> Q: Let's go back to when the contract was awarded. Even though you weren't there in the early part of it, is it fair to say that when the Navy awarded this contract to Axion, the Navy didn't anticipate that Axion would have to do a significant development effort?
> A. Yes.

Hahin Depo at 72-3, PA B.

The Government's statute of limitations argument must fail because neither Axion nor the Navy knew or should have known that the air gun would require a significant amount of development work until very late in the chain of events. This issue is also addressed in the discussions of Counts XVII and XXI above. Without any discussion of the facts involved in Count XXII, the Government alleges that the claim "accrued in 1996." DB at 1. For the reasons set forth above, the Government is factually incorrect and its own admissions, made both in its Answer and in the depositions of its representatives, establish that neither Axion nor the Government had reason to anticipate the significant amount of development work that would be required.

## III. Laches Does Not Bar Axion's Claims Concerning the Air Gun Because There Has Been No Prejudice to the Government and Because the Government Engaged in Inequitable Conduct.

Citing *Hermes Consol., v. United States*, 58 Fed.Cl. 3, 20 (2003), the Government states: "It is well-established that the defense of laches requires a showing of: '(1) unreasonable and unexcused delay in bringing about a claim, and (2) prejudice to the defendant as a result of the delay'." DB 9-10. Here, however, any delays were reasonable and excused based on the facts recited in Count XXI (The Government's Superior Knowledge of Air Gun); Count XXI (The Government Misled Axion about Air Gun); and Count XXIV (The Government's Breach of Implied Duty to Cooperate).

The Government has failed to identify any evidence of prejudice. Instead, the Government merely makes the conclusory statement that the claims are "clearly materially prejudicial to the Navy," without reference to any supporting facts. DB 10. The Government cannot establish that it was prejudiced when, in its Answer, the Government "[a]dmits that Axion informed the Navy it was having difficulty developing an air gun." Answer ¶ 53. The Government is required to show that it was unaware of the facts underlying the claim. But, here, the Government can hardly assert that it was unaware of the difficulties Axion was experiencing with the air gun when, for example, the Navy's lead project engineer made approximately fifteen trips to Axion for matters that involved the air gun. Hahin Depo at 28, PA B.

Laches, as a doctrine of equity, is not available to the Government because it has unclean hands. *See generally Anlagen und Sanierungstechnik GmbH*, ASBCA 49869, 97-2 BCA ¶ 21,168 ("Therefore, [the Government's] hands are not clean since it contributed to the circumstances which led to AST's delay ...."). The Government's unclean hands are apparent as shown in the discussion of Complaint II, Count XXI (Defendant's Superior Knowledge of Air Gun); Count XXI (Defendant Misled Axion About Air Gun); and Count XXIV (Defendant's Breach Of Implied Duty To Cooperate), below.