Nos. 03-2644C & 04-297C
(Judge Firestone)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AXION CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# AXION'S RESPONSE TO THE UNITED STATES' PARTIAL MOTION TO DISMISS AND AXION'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Richard J.R. Raleigh, Jr.
Wilmer & Lee, P.A.
100 Washington Street, Suite 200
Post Office Box 2168
Huntsville, Alabama 35804-2168
256-533-0202 Telephone
256-533-0302 Facsimile

Jerome S. Gabig
4811 Cove Creek Road
Brownsboro, Alabama 35741
256-489-0075 Telephone

Attorneys for Plaintiff

May 12, 2005

TABLE OF CONTENTS

Page(s)

AXION'S RESPONSE TO THE UNITED STATES' PARTIAL MOTION TO DISMISS AND AXION'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT.........................1

Defendant's Motion to Dismiss for Lack of Jurisdiction.....................................................1

Defendant's Motions Asserting Laches..........................................................................2

Axion's Cross-Motion for Partial Summary Judgment – Accord and Satisfaction................2

STATEMENT OF THE FACTS ..........................................................................................2

ARGUMENT.......................................................................................................................9

I. Standards of Review ......................................................................................9

A. Motion to Dismiss.........................................................................................9

B. Motions for Summary Judgment ...............................................................10

C. Terminations for Default..............................................................................10

II. Defendant's Motion to Dismiss for Lack of Jurisdiction..........................................11

A. Count XVII: Equitable Adjustment Claims Related to Axion's Attempts to Fabricate a Commercially Impractical Airgun for Navy ...................................11

B. Count XVIII: Equitable Adjustment Claims Related to Compensation for Axion's Work in Fabricating the Navy's Air Gun.............................................13

C. Count XXI: Equitable Adjustment Claims Related to Government's Superior Knowledge of Air Gun..........................................................................17

D. Count XXII: Equitable Adjustment Claims Regarding Axion Being Misled by Navy that the Air Gun Would Not Require a Significant Amount of Development Work ...........................................................................18

E. Count XXIII: Equitable Adjustment Claims Related to the Government's Breach of Implied Warranty that the Air Gun Would Either Be Commercially Available or a Non-Developmental Item ..................................20

F. Count XXIV: Claims For Equitable Adjustment with Regard to the Government's Breach of Duty to Cooperate Concerning the Air Gun..............21

G. Count XXV: Equitable Adjustment Claims Regarding the Mutual Mistakes Concerning the Air Gun ........ 23

III. Laches Does Not Bar Axion's Claims Concerning The Air Gun Because There Has Been No Prejudice to the Government and Because the Government Engaged in Inequitable Conduct ........ 23

IV. Axion Is Entitled to Summary Judgment That P00017, P00019, P00020 Are Unenforceable For Lack Of Consideration ........ 25

A. The Lack of Consideration for Modification P00017 ........ 25

1. "Pursuant to modification P00016, Axion was required to begin production lot deliveries on or before August 8, 2001." ........ 26

2. "Axion failed to meet this deadline." ........ 26

3. "Upon missing the deadline, pursuant to the termination clause, the Government gained the option of terminating the contract for default." ...28

B. The Lack of Consideration for Modification P00019 ........ 29

1. "In agreeing to modification P00019, the Government provided two forms of consideration. First it granted Axion another extension of the very date." ........ 30

2. "Second, the Government reduced the number of required first article test samples from 120 to 80." ........ 32

3. "Bilateral Modification P00017 Re-established the First Article Requirement for October 3, 2001. DA 159." ........ 33

C. The Lack of Consideration for Modification P00020 ........ 34

1. "Modification P00019 established April 23, 2002 as the new deadline for the first article test requirement. DA 162." ........ 35

2. "After Axion failed to meet the requirements of P00019, the parties bilaterally agreed to modification P00020. DA 163. Modification P00020. "Modification P00020 set forth September 9, 2002 as the new first article line, which, by agreeing to yet another extension, constituted consideration on the part of the Government." ........ 35

3. "Again, the Government would no longer be able to terminate for default when Axion missed yet another deadline set forth in the

agreement." .......... 36

4. "It is quite clear, just as with bilateral modifications P00017 and P00019, Axion received the benefit of additional time to perform, and an Alleviation of the risk of termination for default when it agreed to Modification P00020." .......... 36

V. Because The Contracting Officer Either Knew or Should Have Known of the Unilateral Mistake Made By Mr. Latifi Concerning Modifications P00017, P00019, and P00020, these Modifications Should Be Reformed To Remove the Accord and Satisfaction Provisions .......... 37

VI. Plaintiff is Entitled to Summary Judgment that the Accord and Satisfaction Provisions in P00017, P00019, and P00020 Do Not Apply to Counts II, III, IV, V, VI, VII, IX, XII, XV, XVI, and XVIII .......... 39

CONCLUSION .......... 47

# TABLE OF AUTHORITIES

CASES PAGE(S)

*Acme Process Equipment Co. v. United States*,
347 F.2d 509 (Ct.Cl. 1965) ........ 10

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ........ 10

*Anlagen und Sanierungstechnik GmbH*,
ASBCA No. 49869, 97-2 BCA ¶ 29, 1997 WL 429703 ........ 24

*Austin Eng'r Co. v. United States*,
88 Ct. Cl. 559 (1939) ........ 16

*Benchmark Resources Corp. v. United States*,
2005 WL 627565 (Fed.Cl. 2005) ........ 17

*C & H Commercial Contractors, Inc. v. United States*,
35 Fed. Cl. 246 (1996) ........ 41

*Celotex Corp. v. Catrett*,
477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed. 265 (1986) ........ 10

*Central Pines Land Company v. United States*,
61 Fed. Cl. 527, (2004) ........ 11, 17, 25

*Chernick v. U.S.*,
372 F.2d 492, 178 Ct.Cl. 498 (1967) ........ 39

*Conley v. Gibson*,
355 U.S. 41, 45-46 (1957) ........ 10, 11

*Contel Advance Systems*,
ASBCA No. 49,076, 03-1 BCA ¶32,155 ........ 19, 37

*D. L. Auld Co. v. Chroma Graphics Corp.*,
714 F.2d 1144, 1146-47 (Fed.Cir. 1983) ........ 10

*Defense Systems Company, Inc.*,
ASBCA No. 50, 918, 01-1 BCA ¶ 31,152 ........ 42

*Defense Systems Corporation and Hi-Shear Technology Corporation*,
ASBCA No. 42,939, 95-2 BCA 27,721 ........ 12

*DeMarco Durzo Dev. Co. v. United States*,
60 Fed.Cl. 632, 635 (2004), C.A. Fed., 2003 .......... 9

*DeVito v. United States*,
413 F.2d 1147 188 Ct.Cl. 979 (1969) .......... 10

*Freedom NY, Inc.*,
ASBCA No. 43965, 01-2 BCA ¶ 31,585 .......... 28, 31, 32, 35

*Godwin v. United States*,
338 F.3d 1374, (Fed.Cir. 2003) .......... 9

*Harrison Eng. & Const. Corp. v. United States*,
107 Ct.Cl. 205, 68 F.Supp 350 (1946) .......... 43, 44

*Helene Curtis Indus. Inc. v. United States*,
312 F.2d. 774 160 Ct. Cl. 437 (1963) .......... 40

*Hermes Consol., v. United States*,
58 Fed. Cl. 3, 20 (2003) .......... 23

*Holton, Seelye & Co. v. United States*,
106 Ct. Cl. 477, 65 F. Supp. 903 (1946) .......... 16

*Inland Empire Builders, Inc.*,
ASBCA No. 8077, 67-1 BCA ¶ 6162 .......... 40

*Johnson, Drake & Piper, Inc. v. United States*,
209 Ct.Cl. 313, 531 F.2d 1037 (1976) .......... 14

*Kinsey v. United States*,
852 F.2d 557 (Fed. Cir. 1988) .......... 14

*Logics, Inc.*,
ASBCA No. 46914, 97-2 BCA ¶ 29,125 .......... 20

*Martinez v. United States*,
333 F.3d 1295 (Fed. Cir. 2003) .......... 16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) .......... 10

*Mil-Spec Contractors, Inc. v. United States*,
837 F.2d 865 (Fed. Cir. 1987) .......... 25, 39

*Nagel Electric Company, Inc. v. United States*,
368 F.2d 847, 117 Ct. Cl. 234 (1966) ........................................................................16

*Neal and Company, Inc.*,
DOT No. 2984, 90-2 BCA ¶ 22789 ........................................................................40

*Northeast Savings v. United States*,
63 Fed.Cl. 507 (2005) ........................................................................10

*Patton v. United States*,
2005 WL 681241 (Fed.Cl. March 23, 2005) ........................................................................14, 20, 21

*Pauley Petroleum Inc. v. United States*,
591 F.2d 1308, 219 Ct.Cl 24 (1979) ........................................................................34

*Rumsfield v. Freedom NY. Inc.*,
329 F.3d 1320 (Fed. Cir. 2003)........................................................................28

*San Carlos Irrigation and Drainage District v. United States*,
23 Cl. Ct. 276 (1991) ........................................................................22, 46

*Scheuer v. Rhodes*,
416 U.S. 232 94 S.Ct. 1683 (1974)........................................................................9, 11

*Shermco Indus., Inc. v. United States*,
6 Cl. Ct. 588 (1984) ........................................................................14

*Studiengesellschaft Kohle, M.B.H. v. Hercules, Inc.*,
105 F.3d 629 (Fed. Cir. 1997)........................................................................41

*Tennessee Valley Authority v. Hill*,
437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978)........................................................................17

*Terteling v. United States*,
334 F.2d 250 (Ct. Cl. 1964) ........................................................................14,15

*The Boeing Company*,
ASBCA No. 52,256, 02-1 BCA ¶ 31, 811 ........................................................................43,44

*U.S. v. Acme Process Equipment Co.*,
385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966)........................................................................11

*United States v. Lennox Metal Manufacturing*,
225 F.2d 302 (2nd Cir. 1955)........................................................................39

*United States v. Spearin*,
248 U.S. 132, 39 S.Ct. 59 (1918)........................................................44

*Urban Plumbing & Heating Co. v. United States*,
408 F.2d 382 (Ct. Cl. 1969)........................................................28

*Vought Aircraft*,
ASBCA No. 47,357, 00-1 BCA ¶ 30,721........................................................42, 45

*Woerner Engineering, Inc.*,
ASBCA No. 52,248, 03-1 BCA ¶ 32,196........................................................25, 26, 30, 34

## FEDERAL STATUTES, RULES, AND REGULATIONS

DFARS 216.104-70(d)(3) .......... 19

FAR 4.801(b)(4) .......... 29, 33

FAR 16.202-2 .......... 19

FAR 16.301-2 .......... 19

FAR 33.201 .......... 15

FAR 43.204(c)(1) .......... 29, 33, 34

FAR 52.245-18 .......... 15, 46

Pub. L. No. 103-355 § 2351 .......... 16

R.C.F.C. 12(c) .......... 9

## SECONDARY MATERIALS

140 Cong.Rec. H920-01 .......... 16

140 Cong.Rec. S1236903 .......... 16

Restatement of Contracts (Second) § 155 (1979) .......... 34

Restatement of Contracts (Second) § 159 (1979) .......... 42

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **AXION CORPORATION,** *Plaintiff,* v. **THE UNITED STATES,** *Defendant.* | ) | **No. 03-2644C & 04-297C** (Judge Firestone) |

**AXION'S RESPONSE TO THE UNITED STATES' PARTIAL MOTION TO DISMISS AND AXION'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

**COMES NOW** Plaintiff Axion Corporation ("Axion") and responds to the Motion to Dismiss of Defendant, the United States ("United States" or "Government"), and in response to Defendant's Motion for Partial Summary Judgment, Axion submits that, for reasons set forth herein, this Honorable Court should deny Defendant's motion, and should grant Axion's Cross-Motion for Partial Summary Judgment.

**Defendant's Motion to Dismiss for Lack of Jurisdiction**

Plaintiff respectfully requests the Court deny the Defendant's Partial Motion to Dismiss for lack of jurisdiction (which Defendant has also raised as an alternative motion for partial summary judgment), Counts XVII, XVIII, XXI, XXII, XXIII, XXIV and XXV of Complaint 04-297C ("Complaint II"). Without any analysis of these distinct Counts, Defendant summarily

asserts each of the counts is "outside the statute of limitations" because "the claim accrued in 1996." Defendant's Brief ("DB") at 1. As established below, the Government's superficial assertion is factually incorrect, genuine issues of material fact exist, and the Government's motions based upon lack of jurisdiction are due to be denied.

**Defendant's Motions Asserting Laches**

The Government also seeks summary judgment based on laches, without presenting any evidence of the prejudice to the Government. There has in fact been none. For that reason and others set forth below, the Government's motions asserting laches are due to be denied.

**Axion's Cross-Motion for Partial Summary Judgment - Accord and Satisfaction**

The accord and satisfaction provisions contained in Modifications P00017, P00019, and P00020 are unenforceable as a matter of law for several reasons, including among others lack of consideration and a unilateral mistake by Axion that was either known or should have been known by the Contracting Officer. Therefore, Axion seeks partial summary judgment on the issue of the enforceability and applicability of the accord and satisfaction provisions.

## STATEMENT OF THE FACTS

Alex Latifi ("Latifi") is the Chief Executive Officer of Axion Corporation ("Axion"). Declaration of Alex Latifii ("Latifi Decl") ¶ 1 at Plaintiff's Appendix ("PA") A. Axion has been in business for approximately twenty years. Deposition of Latifi "Latifi Depo" at 13. It is a minority-owned, small business. Latifi Decl ¶ 2. During its existence, Axion has been awarded

between 100 and 200 government contracts. Latifi Decl ¶ 1. Axion's core business is performing relatively small, build-to-print, United States government production contracts. Latifi Decl ¶ 1. In almost every instance, the contracts have been firm-fixed price contracts. Latifi Decl ¶ 1. Axion has never been awarded a research and development ("R&D") contract; R&D is not a core competency of Axion. Latifi Decl ¶ 1.

Prior to contract N00106-96-C-KA09, Axion never had a contract terminated for default. Latifi Decl ¶ 1. Prior to the present dispute, Axion had never submitted a claim under the Disputes clause. Latifi Decl ¶ 1.

In 1995, the United States Navy ("Navy") issued a solicitation for a fixed-price production contract to acquire 55,209 PS-115 power supplies. Defendant's Appendix ("DA") at 1-2; Complaint No. 03-2644 ("Complaint I") ¶ 2. The PS-115 power supply is a dormant battery to be placed in a munition that is fired from a large bore weapon. Complaint I ¶ 6; Answer ¶ 6 (admitting). A PS-115 power supply becomes active when a projectile containing the PS-115 is fired from a large bore weapon. Complaint I ¶ 7; Answer ¶ 7 (admitting central allegations). The acceleration produces as much as 25,000 Gs of force. *Id.* The force causes a cutter within the PS-115 to penetrate and cut a diaphragm. *Id.* An acid passes through the penetrated diaphragm and permeates the cells. *Id.* The resulting electrical charge causes the fuse to detonate the explosive. *Id.*

The solicitation contained detailed drawings on how to produce the PS-115s. DA at 18-31; Complaint I ¶ 11, 58. The solicitation also contained an option quantity for an additional 55,209 units. DA at 2, Complaint I ¶ 9; Answer ¶ 9. Axion submitted a proposal and was awarded Contract N00106-96-C-KA09 by the Navy on December 14, 1995. DA at 1-2; Complaint I ¶¶ 18, 21; Answer ¶¶ 18, 21.

Initially, the Army had acquired PS-115s for the Navy. Complaint I ¶ 10; Answer ¶ 10. However, before awarding contract N00106-96-C-KA09 to Axion, the Navy had acquired PS-115s from the Accudyne Corporation. DA at 16; Deposition of Jerry Hahin ("Hahin Depo") at 15-16 at Plaintiff's Appendix ("PA") B.

The contract required a first article test before Axion could proceed to production. Complaint I ¶ 15. The contract also stated "the contractor shall provide all AIE (*i.e.*, acceptance inspection equipment) … necessary to assure conformance of components and end items to contract requirements." DA at 97; Complaint I ¶ 16; Answer ¶ 16. The contract did not specifically mention an "air gun" for testing. Complaint I ¶ 16; Answer ¶ 16. The contract never contained any specification for an air gun. Complaint No. II ("Complaint II") ¶ 63; Latifi Depo at 54-55, PA D.

What the contract did specify, with regard to testing, was the Navy's reservation of the right to perform the test in the most realistic environment, *i.e.,* inserting PS-115s into actual projectiles and then firing the projectiles from a large bore weapons. DA at 7 incorporating technical data package 19202-11744726, paragraph 4.4.6.2.2; Latifi Depo at 54-55, PA D.

The solicitation identified the two previous contracts for PS-115s that had been awarded by the Navy to the Accudyne Corporation. DA at 4; Hahin Depo at 15-16, PA B. Latifi traveled to Wisconsin to meet and discuss potential employment with an individual who had been employed by Accudyne to produce PS-115s. Latifi Depo at 58, PA D. This individual informed Latifi that the Government had provided Accudyne with two air guns to perform the testing. *Id.*

In a letter dated January 17, 1996, Axion requested the Government to provide Axion with an air gun. Complaint I ¶ 26; Latifi Depo at 54-55, PA D. The Government, however, declined to provide Axion with an air gun. Complaint I ¶ 27; Latifi Depo at 54-55, PA D. The

Contracting Officer's rationale was that "[t]he Navy did not supply any air guns to the previous contractor, Accudyne Corporation, for test purposes." Plaintiff's Appendix ("PA") at Q. However, the Contracting Officer, John Korab ("Korab"), knew that the Army had provided an air gun to Accudyne. Latifi Depo at 64, PA D.

The air gun had been designed by the Army Research Laboratory ("ARL"). Deposition of Korab ("Korab Depo") at 21-22; PA C; Latifi Depo at 59, PA D. ARL agreed to sell Axion the drawing for the air gun. Complaint I ¶ 31. Axion sent a check to ARL to pay for the drawing. Complaint I ¶ 31; Axion Ltr to C.O., April 15, 1997, PA E. After receiving the check, claiming "legal reasons," ARL refused to sell the drawings to Axion. Complaint ¶ 31; Notes from ARL dated March 21, 1997, PA F; Latifi Depo at 64-69, PA D.

After contract N00104-96-C-KA09 was terminated for default, Axion learned that the drawings for the air gun could be purchased for a nominal fee from the U.S. Department of Commerce National Technical Information Service ("NTIS"). PA G.

Concerning the NTIS drawings of the air gun, the Navy's Lead Project Engineer testified as follows:

> Q: Would you also agree those would have been very helpful to Axion Corporation when they were trying to proceed with an air gun?
> A: Yes.

Hahin Depo at 55, PA B.

> Q: This is a tough question for you, but can you explain why essentially this is available to the public to buy, but we have ARL saying, quote, can't just sell him drawings, legal reasons. Does that make any sense to you?
> A: No.
> Q: Okay. Is there information on there how he should have been doing his bird, if you will, is that given out, any information on how he should essentially build his bird?
> A: There's information on how to build a bird successfully –
> Q: If had this, he could have been building the bird without putting all the computer-sensitive material on the bird, is that correct?
> A: Again, it would have required some level of technical expertise, but yes.

Q: This would have been very helpful to avoid the problems he had with the spin gun, is that correct?
A: Yes.

Hahin Depo at 55-56, PA B.

The "bird" mentioned in the above text was the housing in which the PS-115 was placed when the PS-115 was fired in an air gun. Hahin Depo at 69, PA B. As explained by Latifi in his deposition:

> There is no information in the contract, or nobody can help us at this stage. We don't even know the size of the bird. We ask them what the bird size should be, what the weight should be. 'What size should it be?' "What size do you need?' And we got no answer from nobody, not Army, not Navy. Nobody in this case tell us 'Hey, the bird should be this size. This size is the way. If you want to shoot it, it has to be this way.' There is no indication anywhere that anybody knows what to do.

Latifi Depo at 68, PA D.

Concerning Axion's approach to placing a processor inside the "bird," Hahin has testified that: "I just think it was a very difficult engineering problem to solve. It was probably one of those that was surmountable, but it was not an easily solved problem." Hahin Depo at 69, PA B.

When Axion first attempted to develop the air gun, Axion did not know that it had begun a significant research and development effort. Latifi Depo at 102, 110-1, PA D. Likewise, the Navy's lead project engineer was aware that Axion did not know that the air gun would evolve into a significant development effort:

Q: Is it sort of a situation where he thought it was just around the corner to have it fixed, just around the corner, next week, next week, next week, and it just dragged on and dragged on and ragged on? Is that pretty much an accurate statement that was happening here?"
A: Yes

Hahin Depo at 75, PA B.

Because of the expense of trying to develop an air gun, contract N00104-96-C-KA09 became a significant financial burden on Axion. Latifi financed Axion's loses from his personal savings. Latifi Decl ¶ 4, PA A. Specifically, he withdrew money from retirement accounts. Latifi Decl ¶ 4, PA A. Since he is now 58 years old, he does not have a lot of years remaining to replenish the loss. Latifi Decl ¶ 4, PA A.

The Contracting Officer has acknowledged that he was aware that Axion struggled to develop an air gun and that Axion did so without the assistance of the Government. Korab Depo at 21, PA C.

Axion had completed the First Article Test (FAT). Complaint I, ¶ 124; Latifi Depo at 116-118, PA D ("Yes, they approved the First Article."). Prior to contract award, the Government had experienced problems with PS-115s because an earlier design had allowed "the electrolyte to leak out of the ampoule causing severe reliability degradation." Hahin email, Nov. 23, 1999, PA N. In the summer of 2001, Axion discovered that the PS-115s that Axion had manufactured were beginning to leak acid. PA L and M; Latifi Depo at 131-133, PA D. Axion was never informed that the PS-115 had a history of leaking acid. Latifi Depo at 155, PA D. Axion reported the leaks to the Navy; Latifi Depo at 132, PA D. According to Hahin, the leaking "played in my decision to require another second first article." Hahin Depo at 110, PA B.

While the second FAT testing was being conducted, the Government's Quality Assurance Representative ("QAR") observed that the failed tests were being caused by a defective air gun and that there was no indication that the PS-115s had been defectively manufactured. *Id.* For example, in an email dated Sept. 5, 2002 to the Contracting Officer, the QAR observed:

> We had a total of aprx 14 good shots during the past 3 working days (6 consecutive last week Thursday and 8 consecutive yesterday)—with some minor consuming problems early on with positioning of parts on the 'bird' to enable accurate recording of data.

> Yesterday we shot a total of 14 of which 8 had good data collected (split between cold (3), hot (3) and room temp (2)); 3 of the 14 had no data because the batteries on the recording computer died without us being aware (we checked the voltage on the cells after and found between 16 and 26 volts existent that seems to indicate probable good units even though not acceptable from the data standpoint); and 3 that broke at impact that provided only partial data and are not acceptable. ...
>
> The majority of the failed items (failed to capture data) provide sufficient voltage after data collection failure to seem to indicate the cell functioned correctly to requirements despite the inability to collect data.

PA H.

Similarly, the following day, the QAR sent another email to the Contracting Officer stating:

> He has successfully completed testing (recorded successful data) on at least 90 items.... At this point, the testing system functions very well -- Axion can shoot and record, optimally, 4 per hour; human error has caused every non-acceptable data collection problem that has been encountered over the past couple of weeks. On 3 most recent separate days we observed at least 6 consecutive successful shots before failures occurred. In one case, failure to record acceptable data resulted from the normal wearing out of batteries used to power the recording computer in the system. At least 6 failures happened because the shot units broke on impact. Another anomaly that was discovered was that one the technicians put his hand on part of the testing apparatus and touched a grounded table with the other and shorted all data immediately to ground and lost it all....
>
> The majority of the failed items (failed to capture acceptable data) provide sufficient voltage after data collection failure to seem to indicate that the cell functioned correctly to requirements despite the inability to collect the data.

PA I.

The contract was terminated for default on November 12, 2002. DA 164; Latifi Depo at 237-38, PA D. The stated reason for the termination for default was "a total of 25 out of the 66 First Article Power Supplies failed to meet the performance requirements of drawing 11744726." DA 164. However, the 25 alleged failures that the Navy relied upon for the termination for

default were attributable to a systematic failure of the air gun. Complaint II ¶ 149; Emails of Government Quality Assurance Representative PA H & I; Hahin Depo,191 PA B.

According to the Contracting Officer, it was proper to terminate Axion for default for failures of the air gun even if the PS-115s were properly manufactured:

> Q: And without the data, you can't establish that it successfully passed; isn't that correct?
> A: That is correct.
> Q: That would be a failure, correct?
> Y: Yes, because there is no data for it.
> Q: So your definition of a failure is no data; correct?
> A: No. That is not my definition of a failure?
> Q: What is a failure?
> A: It is the unit not functioning the way it is supposed to function.
> Q: And if the failure is attributable to the air gun not functioning properly, is that a failure or not a failure?
> A: I would say it is a failure.

Korab Depo at 135, PA C.

According to the memorandum prepared by the contracting officer justifying the termination for default, the government no longer has a requirement for PS-115 power supplies. PA J.

## ARGUMENT

### I. Standards of Review.

#### A. Motion To Dismiss.

When considering a motion to dismiss a claim under R.C.F.C. 12(b)(6), a court must accept as true all factual allegations made by the plaintiff and draw all reasonable inferences in the plaintiff's favor. *DeMarco Durzo Dev. Co. v. United States,* 60 Fed.Cl. 632, 635 (2004), C.A. Fed., 2003 (citing *Godwin v. United States,* 338 F.3d 1374, 1377, (Fed.Cir. 2003)). Such a motion should be granted only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes,* 416 U.S.

232, 236, 94 S.Ct. 1683 (1974) (*quoting Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). Therefore, the Court must determine if, given Axion's allegations, it is beyond doubt that there are no set of circumstances that would entitle Axion to relief for its claims.

**B. Motions for Summary Judgment.**

Summary judgment is only appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Northeast Savings v. United States,* 63 Fed. Cl. 507, 514 (2005). The movant bears the burden of establishing the absence of genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed. 265 (1986). In ruling on a motion for summary judgment, a court does not weigh the evidence to determine the truth of the matter, but rather whether there are any genuine issues for trial. *Anderson,* 477 U.S. at 249, *Northeast Savings,* 63 Fed. Cl. at 514. All inferences must be drawn in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Further, summary judgment must be granted with caution, because it denies a party the chance to prove its case at trial. *Northeast Savings,* 63 Fed. Cl. at 514, *citing D.L. Auld Co. v. Chroma Graphics Corp.,* 714 F.2d 1144, 1146-47 (Fed.Cir. 1983).

**C. Terminations for Default.**

Terminations for default are a species of forfeiture, and as such, must be strictly construed. *DeVito v. United States,* 413 F.2d 1147, 1153, 188 Ct.Cl. 979 (Ct.Cl. 1969). Forfeiture is "the most drastic civil penalty known to common law," and the Government must have proper justification for such harsh consequences. *Acme Process Equipment Co. v. United*