*States*, 347 F.2d 509, 513, 528, 171 Ct.Cl. 324 (Ct.Cl. 1965), *overruled on other grounds*, *U.S. v. Acme Process Equipment Co.*, 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (Ct.Cl. 1966).

## II. Defendant's Motion to Dismiss for Lack of Jurisdiction.

The Government cites to no facts whatsoever in its assertion that the seven counts that it seeks to be dismissed "accrued in 1996." Thus, the Government's Partial Motion To Dismiss must fail. Applying the standard for such motions, it certainly cannot be said that Axion, the nonmovant, "can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (*quoting Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). The facts presented herein are complex. Axion's Complaints contain more than 200 paragraphs each, asserting complicated operative facts, many of which were simply admitted by the United States. Even so, the Government summarily asserts that seven counts are "outside the statute of limitations" because they "accrued in 1996." Defendant's Brief ("DB") 1. However, the Government does not provide any factual basis or analysis for why it believes that any of the underlying claims accrued in 1996. The Government's Motion to Dismiss is simply a "throw-away" argument, completely unsupported, and should be summarily denied.

In the analysis below, Axion establishes that, for the seven Counts, the facts either contradict the Government's superficial assertion or, alternatively, the facts "leave the Court with too many unanswered questions to justify a judgment on the pleadings." *Central Pines Land Company*, 61 F.Cl. at 539.

### A. Count XVII: Equitable Adjustment Claims Related to Axion's Attempts to Fabricate a Commercially Impractical Air Gun for Navy.

The Government moves to dismiss Count XVII on the basis of lack of jurisdiction, claiming that the statute of limitations bars this claim. The central issue is at what point in time Axion knew, or reasonably should have known, that the air gun that the Navy required Axion to fabricate was commercially impractical[1] to fabricate. *Appeals of Defense Systems Corporation and Hi-Shear Technology Corporation*, 95-2 BCA ¶ 27,721, ASBCA No. 42,939. As such language suggests, this is an inherently fact-intensive area.

Axion does not contest that it had a contractual obligation to fabricate the acceptance inspection equipment. DA 109. Hence, in the context of what is "commercially impractical," the question is at what time Axion knew or reasonably should have known that the fabrication of the air gun was both unreasonably difficult and unreasonably expensive. *Defense Systems,* 95-2 BCA ¶ 27,721. The extract below is from an April 15, 1997, letter from Axion to Korab. It is apparent from this letter that in April of 1997, Axion was unaware that the air gun would be unreasonably difficult and expensive to fabricate:

> Based upon Harry Diamond Laboratories revised excessively projected test time required, and the fact that we are still waiting for answers to our RFW's and letters, Axion decided to proceed and design our own Spin Gun, of which the design is complete and is currently in the process of being manufactured, and should be complete within approximately 20 days. This will permit Axion to test from 50 to 60 units each day, for a total test time of 7 to 8 days maximum in lieu of the 4 a day by Harry Diamond Lab. This will enable Axion to produce the required units *at least 100 days faster and far more accurately* than Harry Diamond Labs.

PA E at ¶ 3. Bates No. AXION00290.

This lack of awareness is similarly apparent from Hahin's deposition:

---

1 In this regard, it is useful to consider the meaning of the term "commercially impractical." As stated in *Defense Systems*, "impossibility of performance is, of course, no longer limited to strict common law impossibility. Rather the concept embraces impracticability such as existed here caused by extreme and unreasonable difficulty, expense, injury or loss

Q: Now, when Axion entered into this contract, because their background is fixed price production contracts with level three drawings, is it fair to say that they never anticipated to have – to develop an air gun?
A: Yes.

Hahin Depo at 71-2, PA B.

Q: Is it sort of a situation where he thought it was just around the corner to have it fixed, just around the corner, next week, next week, next week, and it just dragged on and dragged on and dragged on? Is that pretty much an accurate statement that was happening here?
A: Yes.

Hahin Depo at 75, PA B.

In fact, it was long after April of 1997 that Axion came to learn of the extreme difficulty and expense involved. As explained by Latifi in his deposition:

Q: -- you said the "spin gun," we are talking bout the air gun?
A: Yes. We don't know this time—oh—
Q: Pardon?
A: At this time we think that the spin gun will do the test. Since the Government not give us the gun – now we think it is possible to produce the gun at a very reasonable price—a reasonable price—which is a spin gun – you have to spin the part – at a reasonable price. And we try to do it very simple.

Latifi Depo at 102, PA D.

Without any discussion of the facts involving Count XVII, the Government asserted that the claim "accrued in 1996." DB at 1. The Government is factually incorrect, and genuine issues of material fact are dispute, precluding judgment as a matter of law on this point.

**B. Count XVIII: Equitable Adjustment Claims Related to Compensation for Axion's Work in Fabricating the Navy's Air Gun.**

The essence of Count XVIII is that FAR 52.245-18 entitles Axion to be compensated for its costs of fabricating the air gun for the Navy. There were no applicable provisions in the contract for progress payments. DA 57. Since Axion was still working on the air gun at the time

---

involved in performance." *Appeals of Defense Systems Corporation and Hi-Shear Technology*

of the termination for default, Axion had not submitted a request for payment for the air gun; the first time that Axion sought payment pursuant to FAR 52.245-18 was in its settlement proposal. Complaint II ¶ 6.

In a recent decision involving the application of the statute of limitations to a claim, the Court of Federal Claims held:

> A claim does not accrue, however, "unless the claimant knew or should have known that the claim existed." *Kinsey*, 852 F.2d at 557 n. Alternatively, **"[a] claim accrues when 'damages are ascertainable.'"** *Shermco Indus., Inc. v. United States*, 6 Cl.Ct. 588, 591 (1984) (*quoting Johnson, Drake & Piper, Inc. v. United States*, 209 Ct.Cl. 313, 329-30, 531 F.2d 1037 (1976)).

*Patton v. United States*, 2005 WL 681241 at *6 (Fed.Cl. March 23, 2005) (emphasis added). Applying *Patton* to the present facts, Axion could not ascertain the amount that it had been damaged because Axion was still trying to fabricate a reliable air gun. The Complaint demonstrates that Axion's total costs of being forced to develop the air gun were not ascertainable while Axion was performing the contract:

> 155. Air guns used to test PS-115s often suffered from systemic failures.
> 156. The most frequent cause of air gun systemic failures is the breaking of components within the projectile caused by the thousands of G-force applied to the components during testing.
> 158. On average, Axion's air gun was only able to collect sufficient data to ascertain if a PS-115 met the specifications for 75% to 80% of the times the air gun was fired.

Complaint I.

The facts in this case are conceptually analogous to those in *Terteling v. United States*, 334 F.2d 250 (Ct.Cl. 1964). In that case, the Government had awarded the contractor a construction contract. The Government directed the contractor to obtain gravel from a designated gravel pit. *Id.* at 251. Third parties who claimed to own the gravel sued the

---

*Corporation*, 95-2 BCA ¶ 27,721, ASBCA No. 42,939.

contractor. *Id.* After the litigation was completed, the contractor submitted a claim to the Government for the costs of the litigation. *Id.* Asserting the statute of limitations, the Government refused to pay the claim. *Id.* The Court of Claims held that the claim had not accrued until the litigation had ended.

Just as in *Terteling* where the contractor did not know how much the litigation would cost until it ended, so too Axion did not know how much it would cost to develop the air gun until Axion had completed the work. As explained in Latifi's deposition:

> Q: But at bottom, you never provided an estimate of the cost to the Navy – how much you thought the air gun would cost to develop?
> A: No.
> Q: You just developed it?
> A: Because we didn't know how much it was going to cost. So there was no way –it was something we had never done before, so we have no idea what it cost to do – plus there was no – Mr. Mickle, there were no drawings, there were no specifications, so you couldn't really tell what it was going to cost. So you really – you just went –

Latifi Depo at 111-12, PA D.

The definition of a claim provided in the Federal Acquisition Regulations includes the requirement for "the payment of money in a sum certain." FAR 33.201. Obviously, Axion could not demand a payment of a "sum certain" when Axion was still incurring costs. Similarly, "claim" as defined in FAR 33.201 excludes a "routine request for payment."[2] Here, since Axion had a contractual right to payment under FAR 52.245-18, Axion's routine request for payment

---

2 In his deposition, the contracting officer essentially acknowledged that Axion's invoice under FAR 52.245-18 was a "routine request for payment":

> Q: Assuming that it was special test equipment and assuming there was contracting officer approval, this invoice that comes to you, would that be considered a claim? It would just be a routine request for payment, wouldn't it?
> A: Yes.

Korab Depo at 26-7, PA C.

did not ripen into a claim until Axion's Settlement Proposal was "deemed denied." Complaint II, ¶ 13.

The Government argues that, as a result of changes instituted in the Federal Acquisition Streamlining Act ("FASA") of 1994,[3] contractors who wish to avoid the statute of limitations must submit piecemeal claims. Of course, there is nothing in FASA or its legislative history[4] which suggests that Congress intended to legislatively overrule *Nagel Electric Company, Inc. v. United States*, 368 F.2d 847, 177 Ct.Cl. 234 (1966), which held that "no more than one judicial claim should flow from one indivisible contract":[5]

> Separate suits on individual items have been discountenanced as wasteful and burdensome. *(Citations omitted.)* More specifically, it has been said that "as a general rule, a cause of action or a claim under a contract does not accrue piecemeal and that where the contract contains a provision * * * with reference to the time when the contract shall be regarded as finally concluded the statute of limitation with reference to bringing suit does not begin to run until that date" (*Austin Eng'r Co. v. United States*, 88 Ct.Cl. 559, 564 (1939)); that "it was not intended by Congress that section 156 of the Judicial Code, supra, [Section 2501 of Title 28, our limitations provision] should be interpreted to require a multiplicity of suits on various items of a claim arising under an entire contract", but rather that "all rights of the parties under the contract" are to "be heard and determined at the same time and in one suit" ( *Holton, Seelye & Co. v. United States*, 106 Ct.Cl. 477, 499, 65 F. Supp. 903, 906 (1946)); and that "a suit to recover increased compensation for the performance of contracts predicated upon the terms of contracts, does of necessity involve whatever claims which may be asserted as due under the contracts" *(Citation omitted.)* In addition, we have warned, in contract cases and in others, that a claimant who splits his cause of action may have to give up the part on which he fails to sue the first time. *(Citations omitted.)*

*Nagel,* 368 F.2d at 855. (emphasis added).

---

[3] Pub. L. No. 103-355, § 2351, 108 Stat. 3243 (Oct. 13, 1994) (amending 41 USC § 605(a)).

[4] *See* Conference Agreement on S. 1587, Federal Acquisition Streamlining Act of 1994, 140 Cong.Rec. S1236903, Aug. 23, 1994, 140 Cong Rec. H920-01, Sept 20, 1994.

[5] *Nagel* is cited with approval in *Martinez v. United States*, 333 F.3d 1295, 1303, C.A.Fed.,2003, (Fed. Cir. 2003).

Simply put, an Act of Congress whose stated purpose is to "streamline" would not seek to institute a process that is "wasteful and burdensome." *Id.* The Government's argument also runs afoul of a cardinal rule of statutory construction that repeal by implication is disfavored. *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 190, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117, (1978). As explained by the United States Supreme Court, "In practical terms, this 'cardinal rule' means that 'in the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable.'" *Id.*

### C. Count XXI: Equitable Adjustment Claims Related to Government's Superior Knowledge of Air Gun.

The statute of limitations is tolled in cases where the claimant did not have sufficient opportunity to discover the facts giving rise to its claim on the accrual date. *Central Pines Land Co. v. United States,* 61 Fed. Cl. 527, 533 (2004); *Benchmark Resources Corp. v. United States,* 2005 WL 627565 at *6 (Fed.Cl. 2005). In this analysis, the court focuses on the claimant's *access to the facts*, rather than the claimant's actual knowledge of the facts giving rise to the claim. *Central Pines Land Co.,* 61 Fed.Cl. at 533. If the claim was inherently unknowable at the time that the claim accrued, then the statute of limitations will be tolled. *Id.*

In this case, the Government has admitted its indisputably superior knowledge about the air gun that Axion was fabricating for the Navy. First, the Government was the original designer of the air gun. Korab Depo at 21-22, PA C; Defendant's Answer ¶ 33. Axion attempted to buy the drawings to build the air gun from the Army Research Laboratory ("ARL"), which designed the air gun, but the ARL refused to sell them to Axion. Notes from ARL dated March 21, 1997, PA F. The Government has admitted that it was aware that Axion did not know that the air gun would evolve into a significant development effort, when its efforts to obtain an air gun or the

drawings to build one failed. Hahin Depo at 75, PA B. The Contracting Officer has admitted that he knew at the time that Axion was struggling with the development and that it was doing so without the assistance of the Government. Korab Depo at 21, PA C. In the discussion of Count XVII above, Axion established that it did not learn of the difficulty and expense of developing an air gun until well past 1997, and the Government has presented no evidence to the contrary. Tragically, only after the contract had been terminated for default did Axion learn that the Government actually sells the drawings for a nominal fee through the National Technical Information Service of the U.S. Department of Commerce. PA G.

Thus, at each step along the way, the Government was the sole possessor of the facts that would have made clear to Axion that it would, in the end, be forced to develop the air gun from scratch, at enormous effort and expense. Axion had no access to the facts involving the availability of the Government's own air guns, and the drawings to build them, or the significant engineering effort involved in designing and building one. Based on this complete lack of access to the relevant facts that would have led Axion to the understanding that it possessed a claim for the eventual development effort, it would be draconian to bar Axion's claim under the statute of limitations.

**D. Count XXII: Equitable Adjustment Claims Regarding Axion Being Misled by Navy that the Air Gun Would Not Require a Significant Amount of Developmental Work.**

With regard to Count XXII of the Complaint II, the Government admits that the "Navy's solicitation consisted of a design specification for which the Navy was seeking a previously manufactured, build-to-print deliverable" and "[t]he specification did not inform Axion that the awardee must fabricate an air gun that would require a significant amount of developmental work." Complaint ¶¶ 278, 279; Answer ¶¶ 278, 279. The Federal Acquisition Regulations

("FAR") provide guidance on the appropriate choice of contract type depending on the nature of the effort involved in performance. *See generally* FAR Part 16. The FAR specifically provides that firm-fixed price contracts, such as the contract between the Navy and Axion, are suitable for use when acquiring items based on "reasonably definite functional or detailed specifications" and when the contracting officer can establish "fair and reasonable prices at the outset." FAR 16.202-2. In contrast, cost-reimbursement contracts are suitable when the "uncertainties involved in contract performance do not permit costs to be estimated with sufficient accuracy to use any type of fixed-price contract." FAR 16.301-2. Further, the Department of Defense Supplement to the FAR provides that for engineering development, which describes the effort involved in designing the air gun, contracting officers should only use fixed-price contracts "when risk has been reduced to the extent that realistic pricing can occur." DFARS 216.104-70(d)(3). Not only did the Government fail to provide Axion with "reasonably definite" specifications for the air gun, it provided no specifications for the manufacture of the air gun whatsoever, a piece of equipment which the Government knew to be indispensable to the performance of the contract by Axion. As demonstrated by the loss sustained by Axion in the development of the air gun, it clearly cannot be said that the costs associated with performance were able to be "estimated with sufficient accuracy," so that "realistic pricing" could occur at the time of contracting. The Government chose a contract type which binding regulations dictate should not be used in a case such as this, inappropriately and unfairly placing the entire unknown cost of the development effort on Axion. Since only the Government, and not Axion, possessed the facts indicating that the air gun would be a significant development effort for Axion under the contract, the Government should not be allowed to unjustly reap the benefits of having selected an improper contract type that resulted in overreaching.

The Government moves to dismiss Count XXII on the basis that the claim accrued in 1996, and was therefore barred by the statute of limitations before Axion filed its Complaints. The analysis is, again, when Axion knew or should have known that the air gun would require a significant amount of development work. *Patton,* 2005 WL 681241 at *6. That issue is addressed in the discussions of Counts XVII and XXI above, and for the reasons set forth there, the Government's motion is due to be denied.

**E. Count XXIII: Equitable Adjustment Claims Related to the Government's Breach of Implied Warranty that the Air Gun Would Either Be Commercially Available or a Non-Developmental Item.**

Count XXIII is based on federal common law, as articulated in *Logics, Inc.*, 97-2 BCA ¶ 29,125, ASBCA No. 46914:

> The general rule is that there is ordinarily no implied warranty that materials specified in the contract specifications will be commercially available. However, **the risk of unavailability is shifted to the Government when there are special circumstances where the Government has a prior relationship with the supplier of the unavailable material and there are no specifications for that material which the contractor can use to either make it itself or have it made.** *(Emphasis added; citations omitted).*

In this instance, it appeared as late as May of 1997 that the ARL would, for a fee, use its air gun to perform the testing of the PS-115s manufactured by Axion:

> Today, Axion received a call from Mr. Alen Artz, about how much time extension we need for First Articles. I told him we would need 90 days after we received approval of the CDRL A003, Inspection/Test Plan, that will have to be resubmitted. By changing the place of Spin Testing, we must, by contract, resubmit the Test Plan. The reason for resubmittal is due to Harry Diamond Labs not holding up their agreement to perform the Spin Testing as was agreed upon and approved in our precious *[sic]* submission of CDRL A003.

Memorandum from Axion's QA Manager to Navy Contracting Officer, May 30, 1997, PA K2, AXION00295. Hence, it was not until May of 1997 that it became apparent that it was necessary

for Axion to develop an air gun because, until then, Axion honestly and reasonably believed that the testing would be performed on ARL's air gun. Even so, the claim did not accrue in May of 1997 simply because at approximately that time Axion had learned that it must fabricate the air gun. As explained in the discussion of Count XVIII, above, "a claim accrues when damages are ascertainable." *Patton,* 2005 WL 681241 at *6. For the reasons set forth in the discussion of Count XVIII above, Axion was not able to ascertain its damages until the contract was terminated. Therefore, the claim accrued in 2002 upon occurrence of that event.

Without any discussion of the facts involving Count XXIII, the Government alleged the claim "accrued in 1996." DB at 1. Because genuine issues of material fact exist as to the date of accrual, the Government's motion is due to be denied.

**F. Count XXIV: Claims For Equitable Adjustment with Regard to the Government's Breach of Duty to Cooperate Concerning the Air Gun.**

The Government admits that the "Navy Contracting Officer was told, in a letter by Axion dated April 15, 1997 [that] Axion was ... informed that [ARL] would furnish [Axion] a set of drawings of the spin gun, and Axion sent a check to cover copy costs per the requested amount for copies but [was later] informed that they could not furnish the drawings." Complaint II, ¶¶ 40, 41; Answer ¶¶ 40, 41. The Government also admits, "The Navy Contracting Officer did not assist Axion by obtaining the drawings of the air gun from ARL to provide to Axion." Complaint II, ¶¶ 40, 41; Answer ¶¶ 40, 41. If the Government breached its implied duty to cooperate, it did so in 1997—not in 1996, as evidenced by the fact that it admits it was told, in April 1997, about Axion's attempt to get air gun drawings from the Government. *Id.* Moreover, the Government breached its implied duty to cooperate in other ways as well. *See, e.g.,* Complaint ¶ 42-53. The implied duty to cooperate is a continuing duty. *Contel Advance*

*Systems*, 03-1 BCA ¶ 32,155, ASBCA No. 49,074. As explained by the ASBCA, "The basic principles governing the breach of the duty to cooperate and not to hinder performance are well settled. The implied duty to cooperate imposes an affirmative obligation 'to do what is reasonably necessary to enable the contractor to perform.'" *Contel Advance Systems*, 03-1 BCA ¶ 32,155 (internal citations omitted).

In *San Carlos Irrigation and Drainage District v. United States*, 23 Cl. Ct. 276 (1991), the Claims Court did not apply the statute of limitations to a contractor's obligation to maintain a dam's spillway gates because the duty to cooperate was continuing. The court explained:

> On the subject of continuing contracts, Professor Corbin stated:
> There are contracts, however, that have been said to require continuing (or continuous) performance for some specified period of time, a period that may be definite or indefinite when the contract is made. These contracts too are capable of a series of "partial" breaches, as well as of a single total breach by repudiation or by such a material failure of performance when due as to go "to the essence" and to frustrate substantially the purpose for which the contract was agreed to by the injured party. For each "partial" breach a separate action is maintainable, just as in the case of an "installment" contract; and for a series of "partial" breaches occurring before any action is brought only one action is maintainable.

*San Carlos Irrigation and Drainage District,* 23 Cl. Ct. at 279.

Applying *San Carlos Irrigation* to the present facts, every time the Government failed to comply with its affirmative duty to assist Axion, there was a partial breach, and for each partial breach a separate action is maintainable. *Id.* In its Answer, the Government "[a]dmits that Axion informed the Navy it was having difficulty developing an air gun." Answer ¶ 53. Hence, since the Government admits that it knew of the difficulty that Axion was experiencing, the duty to cooperate continued until the end of the contract. Axion's claim did not accrue in 1996, as alleged by the Government, but rather continued to accrue during the length of the contract.

Absent any discussion of facts, the Government argues that the claim "accrued in 1996." DB at 1. Genuine issues of material fact are in dispute; therefore, the Government's motion is due to be denied.

### G. Count XXV: Equitable Adjustment Claims Regarding the Mutual Mistakes Concerning the Air Gun.

Hahin acknowledged that the Navy did not know at the time that it awarded the contract that the air gun would require a significant development effort:

> Q: Let's go back to when the contract was awarded. Even though you weren't there in the early part of it, is it fair to say that when the Navy awarded this contract to Axion, the Navy didn't anticipate that Axion would have to do a significant development effort?
> A. Yes.

Hahin Depo at 72-3, PA B.

The Government's statute of limitations argument must fail because neither Axion nor the Navy knew or should have known that the air gun would require a significant amount of development work until very late in the chain of events. This issue is also addressed in the discussions of Counts XVII and XXI above. Without any discussion of the facts involved in Count XXII, the Government alleges that the claim "accrued in 1996." DB at 1. For the reasons set forth above, the Government is factually incorrect and its own admissions, made both in its Answer and in the depositions of its representatives, establish that neither Axion nor the Government had reason to anticipate the significant amount of development work that would be required.

## III. Laches Does Not Bar Axion's Claims Concerning the Air Gun Because There Has Been No Prejudice to the Government and Because the Government Engaged in Inequitable Conduct.

Citing *Hermes Consol., v. United States*, 58 Fed.Cl. 3, 20 (2003), the Government states: "It is well-established that the defense of laches requires a showing of: '(1) unreasonable and unexcused delay in bringing about a claim, and (2) prejudice to the defendant as a result of the delay'." DB 9-10. Here, however, any delays were reasonable and excused based on the facts recited in Count XXI (The Government's Superior Knowledge of Air Gun); Count XXI (The Government Misled Axion about Air Gun); and Count XXIV (The Government's Breach of Implied Duty to Cooperate).

The Government has failed to identify any evidence of prejudice. Instead, the Government merely makes the conclusory statement that the claims are "clearly materially prejudicial to the Navy," without reference to any supporting facts. DB 10. The Government cannot establish that it was prejudiced when, in its Answer, the Government "[a]dmits that Axion informed the Navy it was having difficulty developing an air gun." Answer ¶ 53. The Government is required to show that it was unaware of the facts underlying the claim. But, here, the Government can hardly assert that it was unaware of the difficulties Axion was experiencing with the air gun when, for example, the Navy's lead project engineer made approximately fifteen trips to Axion for matters that involved the air gun. Hahin Depo at 28, PA B.

Laches, as a doctrine of equity, is not available to the Government because it has unclean hands. *See generally Anlagen und Sanierungstechnik GmbH*, ASBCA 49869, 97-2 BCA ¶ 21,168 ("Therefore, [the Government's] hands are not clean since it contributed to the circumstances which led to AST's delay ...."). The Government's unclean hands are apparent as shown in the discussion of Complaint II, Count XXI (Defendant's Superior Knowledge of Air Gun); Count XXI (Defendant Misled Axion About Air Gun); and Count XXIV (Defendant's Breach Of Implied Duty To Cooperate), below.

Furthermore, the doctrine of laches does not apply because the delays were reasonable and excused. See Argument IV(A) (2) below. Finally, laches is inappropriate because the facts "leave the Court with too many unanswered questions to justify a judgment on the pleadings." *Central Pines Land Company*, 61 F.Cl. at 539. Therefore, the Government's motion is due to be denied.

**IV. Axion Is Entitled to Summary Judgment that Modifications P00017, P00019, P00020 Are Unenforceable for Lack of Consideration.**

Where a modification involves an accord and satisfaction, there must be consideration. "The essential elements of an effective accord and satisfaction are proper subject matter, competent parties, meeting of the minds of the parties, and consideration." *Mil-Spec Contractors, Inc. v. United States*, 837 F.2d 865, (Fed. Cir. 1987).

As shown by the analysis below, Modifications P00017, P00019, and P00020 are unenforceable because the Government provided no consideration for the accord and satisfaction provision contained therein.

**A. The Lack of Consideration for Modification P00017.**

On October 2, 2001, the parties signed Modification P00017 which stated:

> This modification constitutes a full and final disposition of all matters relating to this contract and is a full release and accord and satisfaction of any and all claims, demands, or causes or action that either the contractor or the government may have against the other arising out of or relating to the contract to date.

Except for the language cite above, the only other provision of P00017 states, "The delivery schedule for the re-submission of 120 ea. first article samples is established as follows: 01 OCTOBER 03. Page 2 of this modification incorporates the first article test requirements." DA at 159-60.