The Government bears the burden of establishing that there was an accord and satisfaction. *Woerner Engineering, Inc.*, ASBCA No. 52,248, 03-1 BCA ¶ 32,196. Accordingly, the Government provided the following explanation of consideration for P00017:

> Pursuant to modification P00016, Axion was required to begin production lot deliveries on or before August 8, 2001. DA 158. Axion failed to meet this deadline. Upon missing the deadline, pursuant to the termination clause, the Government gained the option of terminating the contract for default. *Id.*

DB 17.

As support for the Government's assertion of consideration, it cites only to DA 158. That exhibit is merely a copy of P00016. Simply put, the record does not support the above assertion by the Government. To show the inaccuracy of the Government's assertion of consideration, Axion has parsed each sentence to Government's explanation in order to analyze it more closely.

**1. "Pursuant to Modification P00016, Axion was required to begin production lot deliveries on or before August 8, 2001."**

This statement is correct – long before Modification P00016 was executed, Axion had already began production of the PS-115s. Latifi Depo 135, 145; PA D; Latifi Decl ¶ 5, PA A. In fact, if it were not for leaking (that the Government's own witnesses attribute primarily to faulty design specifications), Axion would have already delivered a substantial portion of the PS-115s before the termination for default. *See* Latifi Decl ¶ 5, PA I; Stickrod Depo at 51, PA K1.

**2. "Axion failed to meet this deadline."**

This statement does not accurately convey the relevant facts. Before the deadline for Axion to deliver the first installment of 8000 units on August 8, 2001, Axion notified the Navy that the units were leaking acid. Axion Ltr to C.O., PA L. Axion sent a letter to the Contracting Officer specifically addressing the leaking acid, seeking advice and assistance on the urgent situation. Axion Ltr to C.O., PA M. Axion had completed manufacture of the 8,000 units and

was prepared to ship them.[6] Latifi Depo at 135, 145, PA D; Latifi Decl ¶ 5, PA A. However, delivery of the units was held in abeyance until the cause of the leaking acid was ascertained. Latifi Decl ¶ 5, PA A; Latifi Depo at 155-6, PA D.

The Government mischaracterizes the facts when it states that Axion "failed." The failure was by the Government for several reasons. First, the Government provided Axion with a defective specification causing the PS-115 to leak acid. Complaint I, Count VIII; Latifi Decl ¶¶ 5 & 6, PA A; Stickrod Depo at 51, PA K1; Hahin Email PA N. Further, the Government failed to inform Axion of the important fact that the PS-115 had a history of leaking acid. Complaint I, Count VII; Latifi Depo at 155, PA D; Hahin Email PA N. Finally, and perhaps most importantly, the Government required the impossible—it insisted on a standard of no corrosion for a product which the Government's own specification dictates two chemical substances that must corrode under the laws of chemistry to mix within the unit. Complaint I, Count X; Hahin Depo at 191, PA B.

Axion had manufactured the units and was prepared to deliver them. Latifi Decl ¶ 5, PA A. However, because of a defective specification, delivery was held in abeyance. For the reasons set forth in Complaint I, Counts VII, VIII, and X, Axion was granted an extension of the delivery schedule established in Modification P00016.

---

6 See generally, the deposition of the Defense Contract Management Command's Quality Assurance Representative assigned to the contract:

Q: How many PS-115s united did you see at Axion around that time period?
A: Almost the entire production. Was it ten – 10,000, 12,000, 15,000? I have forgotten the exact number, but it was up in the thousands that were actually completed, sitting in tubs waiting. The production run had been made, yes, insofar as the manufacture of them was concerned.

Deposition of Henry Strickrod ("Strickrod Depo") at 51, PA K1.

**3. "Upon missing the deadline, pursuant to the termination clause, the Government gained the option of terminating the contract for default."**

The United States argues that the Navy obtained a right to terminate Axion for default as a result of "missing the deadline" of delivering 8000 units on August 8, 2001. As established in Argument IV(A)(2) above, the Government had no right to terminate for default, because the Government itself was responsible for Axion's delay in delivery.

As a matter of federal common law, if the Government is responsible for a contractor's inability to meet a delivery schedule, the contractor is entitled to an extension. *Urban Plumbing & Heating Co. v. United States*, 408 F.2d 382, 386, 187 Ct.Cl. 15 (Ct.Cl. 1969). If the Government gives the contractor an extension, there has been no consideration for the modification since the contractor was already entitled to the extension.

For example, the ASBCA has refused to enforce a modification for lack of consideration, notwithstanding that the modification granted an extension of the delivery schedule, because the Government was responsible for the delay. *Freedom NY, Inc.*, ASBCA No. 43965, 01-2 BCA ¶ 31, 585 (*overturned on other grounds by Rumsfeld v. Freedom NY. Inc.*, 329 F.3d 1320 (Fed. Cir. 2003). The ASBCA looked behind the extension and observed that the delay that prompted the extension was caused by the Government and not the contractor. *Id.*

The Government asserts that consideration here consisted of the Government forbearing from terminating for default. The assertion lacks merit because the Government had no right to terminate for default. Moreover, the grant of an extension is not consideration to a contractor where the contractor was entitled to the extension due to breach by the Government. *Freedom NY, Inc.*, 01-2 BCA ¶ 31,585. Hence, there was no consideration to Axion for the extension granted in Modification P00017. Without consideration to Axion, P00017 is unenforceable, and

Axion (rather than the Government) is entitled to judgment as a matter of law on the issue of accord and satisfaction.

Finally, the Government's argument that it possessed the "option of terminating the contract for default" is merely *post hoc* rationalization. Because Korab, as the Contracting Officer, failed to comply with his obligations under FAR 4.801(b)(4) (to document the contract file sufficiently to constitute a complete history in the event of litigation) and FAR 43.204(c)(1) (to ensure that all elements of the equitable adjustment have been presented and resolved), there is nothing in the contemporaneous record to document that, at the that time the parties entered into P00017, the Government perceived that it had a right to terminate the contract for default. See Argument IV(B)(3) above. In fact, Korab testified that the Government was not considering a termination for default when he signed P00017:

Q: Did you think about it between August 2000 and let's say the time you signed P00017 October of 2002?
A: I don't recall thinking about it.
Q: Did you discuss that possibility with anybody on the technical side?
A: No.
Q: With your supervisor?
A: No, no.

Korab Depo at 80, PA C.

**B. The Lack of Consideration for Modification 00019.**

On April 4, 2002, the Government issued Modification P00019, which stated:

> This modification constitutes a full and final disposition of all matters relating to this contract and is a full release and accord and satisfaction of any and all claims, demands, or causes of action that either the contractor or the Government may have against the other arising out of or related to the contract to date.

Except for the language quoted above, the only other provision of P00019 states, "In consideration of a $1,000.00 reduction of the contract price, from $800,000.00 to $799,000, the delivery date for 80 each, Item 0001AB, First Article samples reads: April 23, 2002." DA 162.

The Government has the burden of proving an accord and satisfaction. *Woerner Engineering, Inc.*, 03-1 BCA ¶ 32,196. The Government's motion identifies the following alleged consideration for P00019:

> In agreeing to modification P00019, the Government provided two forms of consideration. First, it granted Axion another extension of the delivery date. Second, the Government reduced the number of required first article test samples from 120 to 80. Bilateral Modification P00017 reestablished the first article requirement for October 3, 2001. DA 159. When Axion failed to satisfy the requirements of P00017, the Government again had the right to terminate for default. The Government gave up this right by agreeing to P00019.

DB 18. Simply put, the record does not support the Government's claim of consideration. To show the inaccuracy of the Government's assertion of consideration, Axion has parsed the above extract from the Government's motion for separate analysis.

**1. "In agreeing to modification P00019, the Government provided two forms of consideration. First, it granted Axion another extension of the delivery date."**

The Government does not explain what it means by "another extension of the delivery date." Much confusion concerning delivery dates arises from the fact that the Government, throughout the contract performance period, used many different formats for expressing dates. For example, it sometimes states a date in a month, day, year format, and other times it expresses dates in a day, month, year format. It also uses other formats. The Government claims it "granted an extension" using one format for the original deadline, and a different format for the proposed new deadline, and there is a genuine issue of material fact as to whether the change was an extension or reduction of time. Thus, there are genuine issues of fact as to whether there was

consideration. There could be three possible interpretations of this quote: (1) an extension of the date of August 8, 2001, set forth in P00016 for the delivery of 8,000 units; (2) an extension of the date of "01 OCTOBER 03" for 120 first articles samples set forth in P00017; or (3) an extension necessary to improve the air gun, inasmuch as during the seven months of testing between P00017 and P00019, flaws with the air gun precluded the Navy from being able to ascertain if the PS-115s complied with the specification. Each of these three possibilities is separately addressed, but since the Government cannot establish, with undisputed evidence, an extension, or consideration, its motion must be denied.

**a. The date of August 8, 2001, set forth in P00016 for the delivery of 8,000 units.**

There is no language in Modification P00019 extending the delivery date for the 8,000 units that were required to be delivered on August 8, 2001, pursuant to P00016. Hence, if the Government was referring to the delivery date set forth in P00016, it is factually incorrect. There is nothing in P00019 establishing such an extension.

Assuming *arguendo* that the delivery date set forth in P00016 was implicitly extended, there still was no consideration to Axion, because, as discussed above, Axion was entitled to the extension due to Government breaches. *Freedom NY, Inc.,* 01-2 BCA ¶ 31,585. Accordingly, there was no consideration based on an extension of the delivery date set forth in Modification P00016.

**b. The delivery date of "01 OCTOBER 03" for 120 first articles samples set forth in Modification P00017.**

Modification P00017 set a delivery date of "O1 OCTOBER 03" for 120 first article test samples. The subsequent Modification P00019 changed the delivery date for the first article test

samples to "April 23, 2001." If the delivery schedule was reduced by over a year, it is self-evident that reducing the time to perform could not be viewed as consideration to Axion.

Assuming, for the sake of argument, that P00019 actually extended the amount of time that Axion had to submit the first article test samples beyond the delivery date set by P00017, the Government's claim of consideration is still fundamentally flawed. Since there was no consideration for the earlier modification, P00017, the delivery date established in P00017 was unenforceable—hence, there was no delivery date for P00019 to extend. See Argument IV(A)(1) above. Simply put, because there was no extension of a delivery date, there was no consideration.

**c. An extension was necessary to improve the air gun since during the seven months of testing that occurred between P00017 and P00019, flaws with the air gun precluded the Navy from being able to ascertain if the PS-115s complied with the specification.**

During the seven month period between P00017 and P00019, flaws with the air gun precluded the Navy from being able to ascertain if the PS-115s complied with the specification. Complaint I ¶¶ 155, 156, 158. PA H, I. In terms of what was actually occurring at the time that P00019 was signed, any extension contemplated by the parties was the result of the air gun malfunctioning during testing. The Government, not Axion, is responsible for the consequences of the malfunctioning air gun. As discussed, there is no consideration to the contractor where the Government grants an extension where the Government is responsible for the delay. *Freedom NY, Inc.*, 01-2 BCA ¶ 31,585. Therefore, Axion received no consideration for any extension attributable to flaws with the air gun.

**2. "Second, the Government reduced the number of required first article test samples from 120 to 80."**

The Government contends that it "reduced the number of required first article test samples from 120 to 80." DA 18. However, the Government had no contractual right to 120 first article test samples. The Government alleges that its entitlement to this number of samples stems from Modification P00017. However, P00017 is unenforceable for lack of consideration, as established in Argument IV(A) above. Because the Government possessed no contractual right to the 120 first article test samples, it gave up nothing when the number was reduced to 80. Because the Government gave up nothing, there was no consideration to Axion.

**3. "Bilateral Modification P00017 Reestablished The First Article Requirement For October 3, 2001. DA 159"**

The Government contends that Modification P00017 "reestablished the first article requirement for October 3, 2001." Defendant's Brief ("DB") 5. In support, the Government cites "DA159." DB 5. The Government is mistaken at best. An examination of P00017 in DA 159 shows that the date is "03 OCTOBER 01" and not "October 3, 2001," as stated by the Government. DA 159. In his deposition, the Contracting Officer, Korab, clearly acknowledged that the notation in P00017 meant "October 1st, 03":

Q: Can you go back and look at P00017 again and tell me what delivery date was established there?
A: October 1st, '03.
Q: Am I correct then on P00019, Axion gave up several months of time on the delivery order on the deliver schedule?
A: That has to be a typo on the 03.
Q: You are saying that is a typo, is that what you are saying?
A: The 03 on P 17 has to be.

Korab Depo at 58, PA C.

Because Korab did not comply with his obligations to document the file under FAR 4.801(b)(4) and to ensure that all matters in dispute are addressed in an equitable adjustment under FAR 43.204(c)(1), there is no contemporaneous record to support Korab's allegation of a

clerical error. Korab Depo at 55, 59, 90, PA C. Specifically, pursuant to FAR 43.204(c)(1), Korab should have discussed the terms of P00017 with Latifi. Instead, Korab simply drafted P00017 and mailed it to Axion without any discussion. Korab Depo at 90, PA C. Moreover, notwithstanding Korab's obligation under FAR 4.801(b)(4) to document the contract file, there is no Memorandum for the Record explaining the circumstances surrounding this very significant modification. Korab Depo at 55, 59, PA C.

Aware that the Government routinely requires a new FAT approximately every five years, Latifi believed that Modification P00017 meant that the new FAT was to be performed in 2003. Latifi Depo at 163, 189, 200-1, PA D; Latifi Decl ¶ 9, PA A. Latifi signed P00017 thinking that it meant that he was required to perform a second FAT in 2003. *Id.*

If the date is a typographical error, as suggested by Korab, this clerical error would be characterized as a unilateral mistake in integration. When a mistake in integration is committed, "[r]eformation is granted only where an antecedent expression to which the parties agreed is clearly and convincingly demonstrated." Restatement of Contracts (Second) § 155 (1979). *See also Pauley Petroleum Inc. v. United States*, 591 F.2d 1308, 219 Ct.Cl. 24, (1979). Here, there is no "antecedent expression to which the parties agreed." *Id.* The facts are not in dispute. Latifi agreed to a date of 2003, not 2001. Latifi Depo at 189, 200-1, PA D. As a matter of law, Modification P00017 cannot be reformed. The Government is bound by the date of "October 1st, 2003."

**C. The Lack of Consideration for P00020.**

The Government bears the burden of proving an accord and satisfaction. *Woerner Engineering, Inc.*, ASBCA No. 52, 248, 03-1 BCA ¶ 32,196. In support thereof, the Government's motion alleges the following consideration for Modification P00020:

> Modification P00019 established April 23, 2002 as the new deadline for the first article test requirement. DA 162. After Axion failed to meet the requirements of P00019, the parties bilaterally agreed to modification P00020. DA 163. Modification P0020. Modification P00020 set forth September 9, 2002 as the new first article deadline, which, by agreeing to yet another extension, constituted consideration on the part of the Government. *Id.* Again, the Government would no longer be able to terminate for default when Axion missed yet another deadline set forth in the agreement. It is quite clear, just as with bilateral modifications P00017 and P00019, Axion received the benefit of additional time to perform, and an alleviation of the risk of termination for default when it agreed to Modification 00020.

DB 18-19. The record does not support this assertion by the Government. To show the inaccuracy of the Government's assertion, Axion has parsed the quoted extract from the Government's motion for separate analysis.

**1. "Modification P00019 established April 23, 2002 as the new deadline for the first article test requirement. DA 162."**

As set forth in Argument IV(B) above, Modification P00019 is unenforceable. Therefore, contrary to the Government's assertion, April 23, 2002, was not a binding deadline for the first article requirement. In fact, since both P00017 and P00019 are unenforceable for lack of consideration, Axion had no obligation with regard to what the Government asserts is a "first article test requirement."

Second, malfunctioning of the air gun was the reason that Axion was unable to complete the Second FAT by April 23, 2002. Complaint I, ¶¶ 155, 156, 158, PA H, I. Since the malfunctioning of the air gun was attributable to breaches by the Government, there was no consideration to Axion. *See Freedom NY, Inc.*, ABSCA No. 43965, 01-2 BCA ¶ 31,585. Therefore, Modification P00020 is unenforceable for lack of consideration as well.

**2. "After Axion failed to meet the requirements of P00019, the parties bilaterally agreed to modification P00020. DA 163. Modification P00020. "Modification P00020 set forth September 9, 2002 as the new first article**

**deadline, which, by agreeing to yet another extension, constituted consideration on the part of the Government."**

As discussed in Argument IV.B.1 above, Axion had no duty to comply with P00019, since it was unenforceable for lack of consideration. Further, the underlying reason for Axion's inability to meet the FAT deadline was the malfunctioning air gun. Complaint I, ¶¶ 155, 156, 158, PA H, I. Axion was excused from meeting the requirements of Modification P00019 due to Government breaches involving the air gun. See Argument IV.C.1. Hence, there was no consideration to Axion for Modification P00020.

**3. "Again, the Government would no longer be able to terminate for default when Axion missed yet another deadline set forth in the agreement."**

Modification P00019 was unenforceable for lack of consideration, as established in Argument IV(B) above. Therefore, since the deadline which Axion was unable to meet stemmed from that modification, there was no enforceable deadline, and the Government never possessed the right to terminate for default. Moreover, even if there were a valid deadline, the underlying reason for Axion's inability to meet it was the malfunctioning air gun. Complaint I, ¶¶ 155, 156, 158, PA H, I. Axion was excused from meeting the deadline as a result of Government breaches involving the air gun. See Argument IV.C.1.

**4. "It is quite clear, just as with bilateral modifications P00017 and P00019, Axion received the benefit of additional time to perform, and an alleviation of the risk of termination for default when it agreed to Modification 00020."**

This sentence merely repeats the Government's extension-of-time argument. See Argument IV(C)(1) above.

**V. Because the Contracting Officer Either Knew or Should Have Known of the Unilateral Mistake Made by Mr. Latifi Concerning Modifications P00017, P00019, and P00020, these Modifications Should Be Reformed to Remove the Accord and Satisfaction Provisions.**

In his declaration, Latifi explains that, at the time that he signed Modifications P00017, P00019, and P00020, he was under the impression that the accord and satisfaction language meant that Axion would not be entitled to any compensation arising out of the modification. Latifi Decl ¶ 10. The law regarding unilateral mistake is clear:

> With respect to unilateral mistakes, the controlling legal principle is that a mistake of one party at the time of contract formation may permit rescission or reformation only if the mistaken party does not bear the risk of the mistake and ... (b) **the other party had reason to know of the mistake** or his fault caused the mistake. (emphasis added)

The Restatement (Second) of Contracts § 151 (1979). The Restatement likewise advocates reformation for a unilateral mistake if "the other party had reason to know of the mistake or his fault caused the mistake." *Id.*

Here, the facts strongly support that Korab, the Contracting Officer, had reason to know of the mistake. English is Latifi's second language. Latifi Decl ¶ 2, PA A. Hence, Korab had reason to know that Latifi was more prone than the average vendor to misunderstand the legalistic prose contained in the accord and satisfaction provisions.

Korab had reason to know that Axion had grounds for significant monetary claims. The original delivery date for the production lot of 10,000 PS-115s was August 14, 1996. DA 3. When Modification P00017 was executed on Oct. 2, 2001, over sixty months had expired without delivery of any production lot. DA 159. Axion had informed Korab that these delays were the responsibility of the Navy, and that Axion had experienced significant costs resulting from the defective specifications and from the Navy's use of a fixed-price production contract to develop an air gun:

The cause of the delay has been the accumulative effects of events that were beyond that were beyond Axion's control. ... Since the Government did not have a spin gun to test the unit Axion had to develop an air gun for testing and collecting the data. Axion has developed a spin gun, automated data gathering system which includes a flying bird, miniaturized on board computer, data collecting interface board, resistor automated load board and data collecting software. But it took much longer.... Again, Axion's manufacturing contract was being treated as a research and development contract with Axion carrying the cost without any cost to the Government.

After first article approval Axion had no choice but to proceed with developing a plating line per Government supplied document #NAVORD OD 18332 dated February 1967. This data was obsolete and the Government did not respond to Axion's written request for updated information.

After approval of the first article Axion ordered and received every item in the part list in quantities to produce 60,000 units. ... Currently, Axion has 4 trained individuals dedicated to the production of the power supply. By September 8, 2000, based on our current production all assemblies will be 100% complete.

Due to the above facts and the time and effort that both Axion and the Government have invested in this contract, at this stage it is premature, illogical and unfair to stop production. Axion is a small disadvantaged company that would be deeply financially hurt by this cancellation and possibly not recover.

Axion letter, August 25, 2000, PA O.

A few weeks before mailing Modification P00017 to Axion, Korab offered Latifi a no-cost termination for convenience. Axion Ltr October 11, 2002, PA P. Latifi informed Korab that "Axion Corporation could not accept that offer due to the tremendous amount of money invested in the project." *Id.* When asked in his deposition about the offer of a no-cost termination for convenience, Korab stated:

Q. Did Mr. Latifi explain to you that he would lose a lot of money if he accepted it?
A. I'm sure he said that.

Korab Depo at 77, PA C.

In light of the above facts, Korab knew that if Axion signed the accord and satisfaction terms, the consequences would be financially devastating to Axion. It defies logic that Latifi would suddenly change his mind and agree to give up payment for contractual expenses that Latifi had financed from his retirement accounts.[7] Latifi Decl ¶ 4, PA A. In *United States v. Lennox Metal Manufacturing*, 225 F.2d 302, 310 (2nd Cir. 1955), the Second Circuit rejected a similar Government position:

> The government now seeks to construe the contract, it comes close to being "such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other"; accordingly, that construction should be rejected if possible. (citations omitted)

In summary, because Korab knew or had reason to know of Axion's ruinous unilateral mistake, Axion is entitled to reformation of the modifications to remove the accord and satisfaction provisions.[8]

## VI. Plaintiff Is Entitled To Summary Judgment That The Accord And Satisfaction Provisions In P00017, P00019, and P00020 Do Not Apply To Counts II, III, IV, V, VI, VII, IX, XII, XV, XVI, And XVIII.

Assuming *arguendo* that P00017, P00019, and P00020 are enforceable, the accord and satisfaction provisions do not apply, for reasons explained below.

### 1. Superior Knowledge.

With regard to Counts VII, XXI, XXVI, and XXVIII, the doctrine of superior knowledge, which is imposed by courts and boards to prevent Government overreaching, precludes the

---

7 *See generally, Chernick v. U.S.*, 372 F.2d 492, 178 Ct.Cl. 498 (1967) ("We are of the opinion that under the circumstances, the contracting officer, if he did not know, should have known that the bid was erroneous.")

8 The facts underlying the unilateral mistake likewise establish that there was no "meeting of the minds." Meeting of the minds is an essential element of accord and satisfaction. *Mil-Spec Contractors Inc. v. United States*, 835 F.2d 865, 867, 34 Cont.Cas.Fed. (CCH) P 75,412, (Fed.

application of the accord and satisfaction provision against Axion. This is evident in the seminal case of *Helene Curtis Indus. Inc. v. United States*, 312 F.2d. 774, 778, 160 Ct.Cl. 437, (1963) where the court stated:

> Although it is not a fiduciary toward its contractors, the Government – where the balance of knowledge is so clearly on its side – can no more betray a contractor into a ruinous course of action by silence than by the written or spoke word.

*Id.*

There is no authority for the proposition that the Government can circumvent the prohibition against betraying a contractor into a ruinous course of action by having the contractor unwittingly sign an accord and satisfaction.

2. **Superior Knowledge, Misrepresentation, and Duty to Cooperate.**

With regard to the accord and satisfaction language and Counts III, V, VII, IX, XIX, XXI, and XXVI, the term "all matter relating to this contract" in P00017, P00019, and P00020 is ambiguous because it is uncertain if the term refers to all matters known or unknown. According to the ASBCA, "however conclusive the language of the release may appear to be, it cannot be read to comprehend claims wholly unknown to the parties at the time of the execution." *Inland Empire Builders, Inc.*, ASBCA No. 8077, 67-1 BCA ¶ 6162. The ASBCA's rule of interpreting releases is consistent with the behavior of a reasonable person, since a reasonable person is unlikely to grant releases on unknown matters.

Alternatively, the ambiguity of whether the term "all matter relating to this contract" applies to unknown matters should be resolved against the Government using the *rule of*

---

Cir. 1987). Accordingly, the Government cannot meet its burden of proof that there was a meeting of the minds.