Nos. 03-2644C & 04-297C
(Judge Firestone)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AXION CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# APPENDICES TO AXION'S RESPONSE TO THE UNITED STATES' PARTIAL MOTION TO DISMISS AND AXION'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Richard J.R. Raleigh, Jr.
Wilmer & Lee, P.A.
100 Washington Street, Suite 200
Post Office Box 2168
Huntsville, Alabama 35804-2168
256-533-0202 Telephone
256-533-0302 Facsimile

Jerome S. Gabig
4811 Cove Creek Road
Brownsboro, Alabama 35741
256-489-0075 Telephone

Attorneys for Plaintiff

May 12, 2005

# APPENDICES


Latifi Declaration ........ Plaintiff's Appendix A

Hahin Deposition ........ Plaintiff's Appendix B

Korab Deposition ........ Plaintiff's Appendix C

Latifi Deposition ........ Plaintiff's Appendix D

Axion Letter to C.O., April 15, 1997 ........ Plaintiff's Appendix E

Notes from ARL, March 21, 1997 ........ Plaintiff's Appendix F

NTIS Drawings ........ Plaintiff's Appendix G

Stickrod E-mail, September 5, 2002 ........ Plaintiff's Appendix H

Stickrod E-mail, September 6, 2002 ........ Plaintiff's Appendix I

TCO Memorandum ........ Plaintiff's Appendix J

Stickrod Deposition ........ Plaintiff's Appendix K1

Axion QA Memorandum, May 30, 1997 ........ Plaintiff's Appendix K2

Axion Letter to C.O., August 6, 2001 ........ Plaintiff's Appendix L

Axion Letter to C.O., August 6, 2001 ........ Plaintiff's Appendix M

Hahin E-mail, November 23, 1999 ........ Plaintiff's Appendix N

Axion Letter, August 25, 2000 ........ Plaintiff's Appendix O

Axion Letter, October 11,2002 ........ Plaintiff's Appendix P

Navy Letter to Axion January 26, 1996 ........ Plaintiff's Appendix Q

# Plaintiff's Appendix A

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **AXION CORPORATION,** <br> **Plaintiff,** <br> **v.** <br> **THE UNITED STATES,** <br> **Defendant.** | **No. 03-2644C & 04-297C** <br> **(Judge Firestone)** |

## Declaration Of Alex Latifi

I, Alex Latifi, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct:

1. I am the Chief Executive Officer and majority shareholder of the Axion Corporation. Axion has been in business for approximately twenty years. Axion's core business is winning and performing relatively small, build-to-print (*i.e.,* Level III), Federal government production contracts. Axion has been awarded approximately 200 contracts since the company was incorporated. In almost every instance, the contracts have been firm-fixed price. Axion has never been awarded an R&D contract; R&D is not a core competence of Axion. Prior to contract N00106-96-C-KA09, Axion has never had a contract terminated for default. Although Axion has requested equitable adjustments, prior to contract N00106-96-C-KA09, Axion has never submitted a claim under the Disputes clause.

2. Axion is a minority owned small business. I immigrated to the United States in 1970 from Iran. My native language is Farsi. I am a professional engineer; I pride

5. I was sensitive to the fact that the base quantity of PS-115s for contract N00106-96-C-KA09 should have been delivered in 1996. At the time that P00016 was signed, Axion had already manufactured more than ten thousand units. Axion was prepared to make delivery but, because of the leaking of acid that Axion had brought to the attention of the Government, the Government was unwilling to take delivery. Additionally, before the Government would take delivery, a lot test had to be completed. The malfunctioning of the air gun was preventing the completion of lot testing.

6. After discovering the problem with the leaking acid, I was under the impression that the acid was corrodes the copper reservoir. I recommended substituting the copper reservoir with a PCV reservoir. Although Axion was losing millions of dollars on the contract, I remained optimistic that I could recover my losses. There are millions of PS-115s in the DOD inventory—especially the Army. Because I had proposed a fix, I was hopeful that I could capture future orders to replace the defective PS-115 in DOD.

7. Shortly before Mr. Korab provided me with P00017 for my signature, we had a telephone conversation in which he asked me if Axion would accept a no-cost termination for convenience. The suggestion of a no-cost termination greatly troubled me. It would mean that Axion would not be recognized as a manufacturer of PS-115s for future contracts when other DOD procurement activities would be seeking to replace the defective PS-115s in the existing inventory. Stated differently, I feared that a no-cost termination for convenience would mean that I would lose the millions of dollars that Axion had spent trying to <u>develop</u> (not to be mistaken for "produce") PS-115s.

8. I distinctly remember the conversation when Mr. Korab brought up the possibility of a no-cost termination for convenience. I strongly emphasized how important it was to

myself in being able to build almost any mechanical or electrical device. I have been a citizen of the United States since 1973.

3. In 1995, the Navy issued a solicitation for a fixed-price production contract to acquire 55,209 PS-115 power supplies. The solicitation contained detailed drawings on how to produce the PS-115. The solicitation also contained an option quantity for an additional 55,209 units. Although the contract made Axion responsible for testing the PS-115s, there was nothing in the contract concerning an air gun. Specifically, there were no detailed drawings on how to fabricate an air gun. Axion submitted a proposal. Axion was awarded Contract N00106-96-C-KA09 by the Navy in December 1995.

4. After contract award, I learned that the Navy had provided me with defective specifications for the PS-115. First, the specification was defective because it prompted corrosion which resulted in the leaking of acid. Second, the manufacturing process for the plating needed for the battery cells was defective. Additionally, the Navy was unaware of the major problems in fabricating an effective air gun to test the PS-115s. In retrospect, it is apparent to me that the contract should have been a research and development contract. In a nutshell, Axion quickly started losing money on the contract. Examples of expenses that Axion incurred that were never included in Axion's price proposal include: (1) Axion's demand for $1,534,934 involving the air gun [Complaint II, Claim I]; (2) Axion's demand for $577,004 involving the acid corroding the copper reservoir [Complaint II, Claim X]; and (3) Axion's demand for $1,416,305 involving the defective specification for the plates [Complaint II, Claim XIII]. I financed these loses from my personal savings. Specifically, I withdrew money from retirement accounts. Since I am now 57 years old, I do not have a lot of years remaining to replenish the loss.

Axion to continue the contract. Although in other conversations with Mr. Korab I had alluded to Axion spending vastly more to perform the contract than Axion proposed, in this instance I candidly told Mr. Korab that I had spent millions of dollars of my own money that I had taken from my retirement account. I emphasized that Axion dearly wanted to complete the contract. Knowing that Mr. Korab had broad discretion whether to issue a termination for convenience, I also emphasized that "no-cost" was unacceptable in hope of dissuade him from terminating the contract for convenience.

9. When I received P00017 in the mail for my signature, I recalled thinking it was curious that Mr. Korab had not previously sought to discuss with me why the Government was unexpectedly requiring a new FAT. I did not give the date 01 Oct 03 a lot of thought other than to be relieved that the date was two years away. I was aware that approximately every five years, the Government would require a new FAT. Because Mr. Korab never spoke with me about P00017, I was under the impression that Axion would have to perform another FAT in 2003. If anything, P00017 appeared to be good news because it suggested that the Navy was agreeable to allowing the contract to continue for two more years.

10. In the numerous other Government contracts that Axion had performed, I had never come across the term "accord and satisfaction." As I try to re-construct my thoughts at the time that I signed P00017, I recall trying to understand the legalistic language in the last paragraph. To me, the most logical explanation was that it had to do with who had to pay for the Second FAT. I didn't want to do anything to annoy the Navy. [For example, in P00019, I accepted a $1000 price reduction although Axion was not at fault.] Hence, thinking that Axion was giving up the right to payment for matters

involving the modification (rather than the whole contract), I signed P00017. At the time, it never occurred to me that, after Axion had declined a no-cost termination for convenience, Mr. Korab was skillfully setting a trap for Axion to lose all the money that Axion had spent trying to perform the contract.

Executed this 8 day of May 2005.

Alex Latifi