# Plaintiff's Appendix B

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
NO. 03-2644C

AXION CORPORATION PLAINTIFF

VS.

THE UNITED STATES DEFENDANT

**********

DEPOSITION OF JERRY HAHIN

FEBRUARY 10, 2005

**********

TAKEN BY PLAINTIFF

AT

510 WEST BROADWAY

LOUISVILLE, KENTUCKY

**********

KATHY NOLD
ACCURATE COURT REPORTING, LLC
SUITE 419
730 WEST MAIN STREET
LOUISVILLE, KENTUCKY 40202
(502) 589-1413 - FAX: (502) 568-3788

Q. He didn't tell you anything specific, he just said that was the case then?

A. Yes.

Q. Okay. What did you do when you were assigned to this in terms of getting your stuff up to speed?

A. I basically just reviewed the drawing package and talked with Brian about that particular battery, the type of testing that was involved, and I made a visit to Accudyne who also produced that battery.

Q. Okay. Were you involved in the First Article, the first FAT test?

A. Yes.

Q. It's my understanding this is the first time the Navy acquired a PS-115, is that correct?

A. No.

Q. The Navy's had previous contracts of PS-115s?

A. Yes.

Q. Do you happen to know when the first contract was let?

A. No.

Q. Can you give me an idea? Was it '80s, '90s?

A. I don't really have any idea.

Q. No?

A. I would guess the '80s, but I'm guessing. Brian would know for sure.

Q. Well, was Crane responsible in terms of providing the technical oversight for that contract?

A. Yes.

Q. But Brian would know that?

A. Yes.

Q. Do you know the name of the vendor who had the contract?

A. Accudyne.

Q. Accudyne. Did you ever talk to Brian about the Accudyne contract?

A. Yes.

Q. Was there more than one Accudyne contract?

A. I don't know.

Q. Do you happen to know the quantities that were ordered?

A. No, I don't.

Q. How did Accudyne perform the spin test, the destructive test?

A. They basically had a vacuum tube similar to what Alex had and they shot the battery down this vacuum into a wooden block that stopped it inside

09:34:42 correct?

09:34:43 A. Yes.

09:34:43 Q. You made a few trips down to Huntsville to

09:34:46 look at the air gun?

09:34:47 A. Yes.

09:34:48 Q. All told, how many trips did you make?

09:34:52 A. I would be guessing. I would say probably

09:34:55 fifteen maybe.

09:34:56 Q. Fifteen trips? Of those trips, how many

09:34:59 of them were pretty much -- primary purpose had to

09:35:02 do with the air gun?

09:35:06 A. The primary purpose of most of the trips

09:35:08 was to witness testing.

09:35:10 Q. Witness testing, okay.

09:35:12 A. Which of course involved the air gun.

09:35:17 Q. And of course the air gun was having

09:35:19 problems before you came on in 1999, is that

09:35:22 correct?

09:35:22 A. Yes.

09:35:25 Q. When you look back at how the contract

09:35:28 progressed, did it surprise you that Axion was

09:35:33 having problems with the air gun?

09:35:35 A. No.

09:35:37 Q. Why don't you explain that to me. Why

09:35:40 wasn't it surprising?

10:12:32 A. It appears it was Harry Diamond Labs.
Q. Is there a time when they promulgated the document, as far as you can tell from the cover?
10:12:40 A. It's dated September, 1979.
10:12:48 Q. Just take a second and just thumb through it since you've never seen the document before.
10:12:53 (WITNESS REVIEWS DOCUMENT.)
10:16:28 Q. Would you agree those are the drawings on the air gun?
10:16:31 A. It appears to be some drawings on the air gun, it does not appear to be a complete set.
10:16:37 Q. Would you also agree those would have been very helpful to Axion Corporation when they were trying to figure out how to proceed with an air gun?
10:16:45 A. Yes.
10:16:49 Q. Is it safe to say that the public can buy these things from this Department of Commerce, NTIS?
10:16:58 A. I would assume so, it doesn't say the public.
10:17:07 Q. This is a tough question for you, but can you explain why essentially this is available to the public to buy, but we have ARL saying, quote, can't just sell him drawings, legal reasons. Does that make any sense to you?
A. No.

Q. Okay. Is there information on there how he should have been doing his bird, if you will, is that given out, any information on how he should be essentially building his bird?

A. There's information on how to build a bird successfully --

Q. If he had this, he could have been building the bird without putting all the computer-sensitive material on the bird, is that correct?

A. Again, it would have required some level of technical expertise, but yes.

Q. This would have been very helpful to avoid the problems he had with the spin gun, is that correct?

A. Yes.

(PLAINTIFF'S EXHIBIT 8 WAS MARKED FOR IDENTIFICATION.)

BY MR. GABIG:

Q. I've now handed you Exhibit 8 and ask if you can identify it?

(WITNESS REVIEWS DOCUMENT.)

Q. Let me ask you, is the document -- John Korab the contracting officer?

A. Yes.

the -- it says third, Axion had a problem with their test equipment. It continues. Their design puts a computer inside the bird to take data from the battery after initiation. And again, your perception is that putting the computer inside the bird was essentially a fundamentally flawed idea because of just damages and because of the G force, is that a correct statement?

A. No.

Q. Go ahead, I don't want to put words in your mouth. What is your perception of that?

A. I just think it was a very difficult engineering problem to solve. It was probably one of those that was surmountable, but it was not an easily resolved problem.

Q. The word does begin their design, is that correct?

A. Yes.

Q. And their design was without the benefit of any government drawings, is that correct?

A. That's to the best of my knowledge, yes.

Q. So when they were developing this air gun, they just didn't have the benefit of any other designs to look at, to the best of your knowledge?

A. Yes.

10:50:59 Q. But they did develop an air gun?
A. Yes.
10:51:01 Q. Okay. Let's go back. You're the one that made the point earlier that this contract is PS-113 or 115, is that correct? It's not a contract to develop an air gun, is that a fair statement?
10:51:35 A. Yes.
10:51:36 Q. And it was a fixed price production contract?
10:51:38 A. Yes.
10:51:39 Q. And it had what's known as level three drawings?
10:51:41 A. Yes.
Q. Okay. Now, in your experience of a vendor's award, a fixed price production contract with level three drawings, does that entail developmental work?
10:51:54 A. No.
10:51:55 Q. Okay. So this was sort of an aberration of a typical fixed price production contract with level three drawings because it required developmental work?
10:52:10 A. No.
10:52:10 Q. Could you explain your answer?
A. I don't agree it required developmental

10:52:14 work, but yes, it was an aberration as far as the development of that test equipment.

10:52:19 Q. And when you say it didn't require developmental work, again -- starting in 1996, let's go through the options here. They asked ALR to perform the work and ALR said they would not do the testing, isn't that correct?

10:52:41 A. Again, I don't have any knowledge as to what ALR told them or didn't tell them.

10:52:46 Q. Because you don't have any knowledge back at that time, you can't testify on whether or not they had to develop this air gun, is that correct? If they had no other alternative, you don't know -- you don't know the facts that happened earlier, whether or not they had any alternative whether to develop the air gun, is that correct?

10:52:59 A. Yes, I think so.

10:53:00 Q. Let's assume hypothetically they had no alternative but to develop the air gun. Then the contract would require them to develop the air gun, would that be a fair statement?

10:53:09 A. Yes.

10:53:18 Q. Okay. Now, when Axion entered into this contract, because their background is fixed price production contracts with level three drawings, is

10:53:27 it fair to say that they never anticipated to have -- to develop an air gun?

10:53:31 A. Yes.

10:53:51 Q. With regard to the decision to ARL essentially not to work with Axion, either help develop an air gun or provide them with the drawings for it, if you heard the statement -- and then I'll read it to you and could you tell me whether you think it's a true or false statement. Here's the statement: ARL determined any agreement with the company would pose too great a risk that the Army would be compensated for their efforts. True?

10:54:43 A. True.

10:54:46 Q. When they say compensated for their efforts, what does that mean?

10:54:50 A. That they would receive some sort of benefit from working an agreement with the contractor.

10:54:57 Q. Doesn't compensated mean being paid?

10:55:01 A. It can mean that, it doesn't necessarily always mean that.

10:55:04 Q. Okay. Let's go back to when the contract was awarded. Even though you weren't there in the early part of it, is it fair to say that when the Navy awarded this contract to Axion, the Navy didn't

10:55:25 anticipate that Axion would have to do a significant
29 developmental effort?
10:55:30 A. Yes.
10:55:58 Q. Okay. You mentioned earlier there was a
10:56:00 time when you had acquired your own air gun there at
10:56:05 Crane. Do you remember when it was that you
10:56:08 acquired your own air gun?
10:56:11 A. I'll have to look at some notes and tell
10:56:14 you.
10:56:14 Q. Okay.
10:57:06 (WITNESS REVIEWS DOCUMENT)
10:57:26 A. I believe it was in the spring of 2001.
10:57:30 Q. Can I see the document that refreshed your
10:57:32 memory on that, please?
10:57:34 A. Yeah. It was basically December, 2001
10:57:36 E-mail. It mentioned that we needed testing.
10:58:23 Q. Let's go ahead and put this in as an
10:58:26 exhibit if that's all right.
10:58:27 A. Sure.
10:59:07 (PLAINTIFF'S EXHIBIT 13 WAS
10:59:07 MARKED FOR IDENTIFICATION.)
10:59:12 BY MR. GABIG:
10:59:14 Q. We're looking at Exhibit 13 and it's my
10:59:18 understanding this is an E-mail from you to Mister
22 Latifi and in it you suggest that Crane now has an

11:02:53 Q. Did you have a telephone conversation with Mister Latifi following up your offer for that starting in January?

11:03:00 A. I don't recall.

11:03:01 Q. To your best recollection, why wasn't it done there at Crane?

11:03:05 A. Again, he felt he had his test equipment working and that he could do it himself.

11:03:10 Q. Is it sort of a situation where he thought it was just around the corner to have it fixed, just around the corner, next week, next week, next week, and it just dragged on and dragged on and dragged on? Is that pretty much an accurate statement that was happening here?

11:03:25 A. Yes.

11:03:25 Q. And if he looked back, he would have wished like hell he would have done this then and just taken you up on your offer?

11:03:34 A. I can't speak for him, but yes.

Q. Let's go back to Exhibit 5. But before I do that, let me ask you here: Did it get to the point where you came to the conclusion that he was never going to get this air gun to work reliably or did you also think it was just a matter of time that it was going to happen?

03:08:39 has proven to have a corrosive effect on copper?

A. That's correct.

03:08:45 Q. And that's the reason for the change,

03:08:47 wasn't it, is they put a simple ampule in there to

03:08:50 keep the methylene bromide away from the fluoboric

03:08:55 acid? That was the change?

03:08:56 A. Fluoboric acid, yes, that's correct.

03:08:59 Q. But what we just discussed is at the very

03:09:01 beginning of the corrosion is where we have these

03:09:02 two metals touching each other and that essentially

03:09:05 creates a little bit of a hole. And in that hole,

03:09:08 we then have an opportunity for the Fluoboric acid

03:09:09 to meet with the methylene bromide and that would

start this chain reaction you're talking about,

03:09:14 wouldn't it?

03:09:15 A. Yes, if all those assumptions are correct.

03:09:18 Q. Uh-huh. And, of course, it takes a fair

03:09:20 amount of time because these metals are relatively

03:09:23 close, but they do have different properties to

03:09:25 them?

03:09:26 A. Yes.

03:09:28 Q. So if I was to put on my expert and he was

03:09:31 to testify, based on he examined everything that he

03:09:34 can and trying to study what happened, this is the

most probable explanation as to why the leakage is