# Plaintiff's Appendix C

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| AXION CORPORATION,<br>Plaintiff<br><br>vs.<br><br>THE UNITED STATES,<br>Defendants | NO. 03-2644C<br><br>JUDGE FIRESTONE |

Deposition of: JOHN KORAB

Taken by: Plaintiff

Date: July 27, 2004, 10:00 a.m.

Before: Vicki L. Fox, RMR, Reporter-Notary

Place: Naval Inspection Depot
Mechanicsburg, Pennsylvania

APPEARANCES:

WILMER & LEE
BY: RICHARD J. R. RALEIGH, JR., ESQUIRE
JEROME S. GABIG, ESQUIRE

For - Plaintiff

UNITED STATES DEPARTMENT OF JUSTICE
BY: DOUGLAS K. MICKLE, ESQUIRE
RICHARD A. MARTINELLI, ESQUIRE

For - Defendant

received

OF DEPOSITON TRANSCRIPT

To be attached to the deposition of John Korab

Taken on July 27, 2004 in the matter of Axion Corp. v. US

Reporter Vicki L. Fox, RMR

**INSTRUCTIONS TO DEPONENT:** In accordance with the Rules of Civil Procedure (reproduced on the reverse side for your information), we are submitting and making available to you this transcript of your testimony for your review. Please list the page number, line number, change or correction, and the reason for the change. **PLEASE SIGN** this form and date it. **RETURN THIS FORM** to Filius & McLucas Reporting Service, Inc., 1427 East Market Street, York, PA 17403, within thirty days in the enclosed envelope.

| PAGE | LINE | CHANGE/CORRECTION and REASON |
|---|---|---|
| 23 | 22 | change clause to case |
| 54 | 21 | change mill to MIL |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

I hereby certify that I have read my deposition transcript and that it is, to the best of my knowledge, true and accurate, with the exception of the changes noted above.

8/18/04
Date

John Korab
Signature of Deponent

that. We are going to look at the issue of accord and satisfaction today.

You put the language accord and satisfaction into modifications I believe it is 17, 19 and 20; is that correct?

A. Yes.

Q. You put the language in it. Can you tell me in your own words what you think accord and satisfaction means?

A. It is an agreement between the parties involved in the contract, and there is something of value given by both parties which seals the agreement.

Q. All right. I am pretty much going to be following that theme then most of day here just to let you know where we are going here.

Typically when you have done accord and satisfaction, does that essentially go to claims, requests for equitable adjustment and things like that; has that been your experience?

A. Not necessarily having to go to claims. It can just be an agreement for a modification incorporating something into a contract.

(Korab Deposition Exhibit 2 was introduced.)

BY MR. GABIG:

Q. What I would like to do is spend a little time looking at the request for equitable adjustments. Will you take

A. I said that I remember talking to him about it, but I don't remember writing this document. It is 1996. It is a long time ago.
Q. That is fine. But you would agree that Axion did unsuccessfully try to obtain an airgun as government furnished property?
A. Yes.
Q. Let's turn the page to page five. Could you read for me the header up there italicized number two?
A. Axion sought to replicate the government's airgun, but the government would not provide Axion with the drawings.
Q. Is that correct?
A. That's correct.
Q. Could you read the third one down there that is italicized and bolded?
A. Axion attempted to contract with ARL to test the PS-115s using ARL's airgun.
Q. Is that correct?
A. Yes.
Q. Would you turn the page?
A. (Witness complies.)
Q. On page six, we have a number four there that is bold and italicized. Would you read that, please?
A. Axion tried to enter into a Cooperative Research and

Development Agreement with ARL to develop an airgun that would be satisfactory to test the PS-115s.
Q. Is that correct?
A. Yes.
Q. Going to page seven, the header number five?
A. Axion attempted to develop an airgun without the assistance of the government.
Q. Is that correct?
A. Yes.
Q. Is it safe to say back on October 2nd when P00017 was signed, that you knew that Axion was struggling with this airgun?
A. I was aware that Axion was struggling with the airgun, yes.
Q. So when this first REA -- when you first received the REA and you read REA number one, the topic of the airgun as a basis for an REA, that didn't surprise it; did it?
A. Yes, it did.
Q. What did it surprise you?
A. Because previously, he executed a first article of using an airgun.
Q. You are saying because he passed the first article test with the airgun, he didn't have problems thereinafter with the airgun, or there weren't problems with this airgun?

Q. Do you know whether or not the airgun was itemized in the contract?
A. It was not itemized in the contract, not to my knowledge.
Q. Assuming hypothetically since it wasn't itemized in the contract, and if it had your approval, and if it was special test equipment, then the acquiring or the fabricating could have been done at government expense; is that correct?
A. You are speaking hypothetically?
Q. Yes.
A. Yes.
Q. Again since we caught you by surprise, is it fair to say this isn't anything you considered when you signed let's say P00017, this wasn't anything that was on your mind when you signed P00017, this particular matter?
A. That's correct.
Q. Or saw P00019?
A. That's correct.
Q. P00020?
A. That's correct.
Q. Could we look at language of P00017, can you pull it up?
A. (Witness complies.)
Q. You put the language in bold here on P00017?
A. That's correct.

Q. Could you read that for us?
A. This modification constitutes a full and final disposition of all matters relating to this contract and is a full release in accord and satisfaction of any and all claims, demands, or causes of action that either the contractor or the government may have against the other arising out of or related to the contract to date.
Q. It is like boilerplate. Do you use that quite frequently?
A. Yes.
Q. That is something you use from time to time when you write things; you have used it before?
A. I have used it before.
Q. In fact, it is pretty much the same thing we have seen in 19 and 20; is that correct?
A. That's correct.
Q. Let's work our way through it here. Again, I am looking at what was REA number two. Now hypothetically, Mr. Latifi was to send you a bill, an invoice and let's say without deciding whether the quantum was right, and he asked for payment.
Assuming that it was special test equipment and assuming there was contracting officer approval, would this invoice that comes to you, would that be considered a claim? It would just be a routine request for

payment; wouldn't it?
A. Yes.
Q. As a routine request for payment, it is not a claim; correct?
A. That's correct.
Q. At that particular time, it is not a demand, is it, and it is not a cause of action either; is that correct?
A. If he is asking for payment, that is a cause of action. It is requesting a cause of action.
Q. It is? Any time he sends an invoice to you, that is a cause of action?
A. I interpret it as -- hypothetically, if anyone sends a request in for payment or something, it is a cause of action. It is either affirming it or denying it.
Q. Would a routine request for a progress payment be considered a cause of action?
A. No. You didn't say it was a progress payment.
Q. Any request for -- a typical request for payment is considered a cause of action as you interpret this?
A. To finalize or execute, you have to have an action to do it.
Q. Again, you wrote the language. Can you tell me what you meant when you wrote this by the word cause of action?
A. It simply means to me that until this point in time when both parties sign this modification, there were no

requests for payment or any other thing that would have either party confront the other party.

Q. Did you intend when you signed this thing that any future requests for payment was lost by either party when this was signed?

A. When I signed this modification, it says here to that date of the signatures.

Q. So it is your understanding when this thing was signed, it would only apply to everything previously and nothing going forward in the future; is that correct?

A. That's correct.

Q. So anything that happens post the signing of this one or let's say 19 or 20, it is only retroactive, it is not futuristic; is that correct?

A. Repeat the question.

Q. I am just trying to understand what you intended when you signed this thing. That is all.

What you are saying is that it was your intention that everything that occurred before the signing it applied to, but things after the signing it did not apply prospectively to, futuristically to; is that correct?

A. That's correct.

Q. Let's just go ahead and move on to number three here. We won't spend much time. This is called the

To Cooperate.

Q. Remember number two a while back where it talked about the FAR clause for special test equipment, and you said that never even entered my mind? Does this fall into that category fall or into the category this is something as we are progressing, it could have been a possibility?

Is this something let's say on October 2nd, 2001, was it something that in the back of your mind existed or you just had no clue?

A. No, my position was the government did not breach any duty to cooperate.

Q. Did you ever have any suspicion that you might have breached it?

A. No.

Q. Let's take a look at number nine. Can you tell us what the topic of that one is?

A. Request For Equitable Adjustment Number Nine, Assuming The Government Did Not Have Superior Knowledge, Then There Was A Mutual Mistake That The Airgun Would Require Significant Research And Development.

Q. Earlier, you agreed that you saw that Axion was struggling with the airgun; is that correct?

A. That's correct.

Q. And from Axion's perspective, they were doing what they

Q. With respect to the language, the accord and satisfaction language, the bold language you have in 17, 19 and 20, you drafted that?
A. Are you asking me did I fabricate it?
Q. Who put it in the contract?
A. I put it in the contract.
Q. Did Mr. Latifi try to change it or modify it?
A. No.
Q. All right. Let's do this: Let's now spend some time and look at Deposition Exhibit 1 which is the Complaint. Let's sort of spend a little time in the Complaint.

My thought going into the deposition was I am trying to figure out how accord and satisfaction applied to the first Complaint, but there is sufficient overlap between the first and second that I think we can continue to proceed that way.

It will parallel what we did earlier. On page five of the Complaint, the header on there tells us what it is about. Can you tell us what that header says?
A. Count I?
Q. Yes.
A. Impossibility/impracticability - Airgun Test Equipment.
Q. Just to make sure I understand it, during the negotiations of the accord and satisfaction modifications, was it your intent that Axion was

the first article?
A. There had to be because there was a change in process which required a second FAT.
Q. If there had to be, can you show me the first delivery schedule for the second FAT?
A. P-21
Q. We are at P-17. That is in the future.
A. I am sorry. I am sorry. P-17 established that delivery schedule for the second first article test.
Q. Yes.
A. Right.
Q. And prior to P-17, there was not a delivery schedule for the second first article test?
A. That's correct.
Q. My question is: What consideration did the government give to Axion for P00017?
A. We agreed to keep the contract going, gave them a delivery schedule because it was required because of changing the process of production.
Q. We agreed to keep the contract ongoing; is that consideration?
A. We gave them the delivery schedule that he wanted -- that Axion wanted.
Q. Are you saying that Axion wanted this schedule?
A. During the execution of the contract after he changed

Q. If you are wrong hypothetically and it wasn't required, but it was discretionary, would you agree then that there wasn't any consideration for P00017?
A. I still say the consideration was the release in the accord and satisfaction.
Q. Could you tell me what the government released?
A. The government released nothing.
Q. All right. So if the government released nothing, where is the consideration?
A. The contractor relinquished his right to submit any -- well, for example, requests for equitable adjustment or claim.
Q. What did the government give up? Didn't you just say nothing?
A. The government kept the contract going by giving a delivery schedule.
Q. Can you show me some sort of documentation where previously you were not going to keep the contract going?
A. No. Because both parties were working to try and get this material shipped.
Q. If you were going to end the contract, would that have been done with a termination for convenience?
A. Repeat that.
Q. You told me the consideration the government gave was to

A. In modification P 19?
Q. Yes, for 19.
A. April 23, 2002.
Q. Can you go back and look at P00017 again and tell me what delivery date was established there?
A. October 1st, '03.
Q. Am I correct then on P00019, Axion gave up several months of time on the delivery order on the delivery schedule?
A. That had to be a typo on the 03.
Q. You are saying that is a typo, is that what you are saying?
A. The 03 on P 17 has to be.
Q. You are saying the new delivery date was April, 2003?
A. No. Which modification are you speaking of?
Q. Let's go back. You are saying that on P00017?
A. Right.
Q. October --
A. I am sorry. I am sorry. I am sorry. I am getting my dates mixed up here. Okay.
Q. Okay?
A. The delivery -- because we write our dates using maybe the last two digits, it was October 3rd of 2001 on P 17.
Q. So you are saying that the date was intended to be October 1 of 2000 --

A. No, October 3rd of 2001.
Q. Let's go up and look at the date when this thing was signed. When was it effective?
A. October 2nd.
Q. You are saying that the very next day after this thing was signed, it was the intent of the parties that they were going to deliver the samples?
A. That's correct.
Q. That was your intent at the time?
A. Both of our intent, exactly.
Q. Was this ever changed in any way, this P00017 to reflect what your intent was?
A. No. No. I would have conversed with Axion, and we both agreed to this date.
Q. Do you have any records that show that was the date you had in your negotiations?
A. It could have been a phone conversation. I would have to search the entire file to see if we had anything -- a letter.
Q. But to the best of your knowledge, there is no documentation; is that correct?
A. I can't say that. I would have to look really.
Q. Does it seem reasonable that he delivered the very next day? Doesn't transition time take time?
A. Not necessarily. We could have been testing. I can't

Q. Half the time?
A. It depends on the issue being discussed.
Q. Did you do anything in preparation for that?
A. No.
Q. Did you talk to anyone to get authorization?
A. No.
Q. Was there anybody else on the telephone with you at the time?
A. Absolutely not.
Q. Do you recall Mr. Latifi's response to that suggestion for a no-cost termination for convenience?
A. It was obviously negative because we didn't execute a termination for convenience.
Q. Did Mr. Latifi explain to you that he would lose a lot of money if he accepted it?
A. I'm sure he said that.
Q. Did he actually say he had spent his retirement money on this project?
A. I can't recall those words.
Q. Did he say anything about spending hundreds of hours trying to get the airgun to perform?
A. I can't recall.
Q. Did he just talk in general about the economic hardship it would have for the Axion Corporation?
A. I would say probably so.

A. No, it did not.
Q. Previously, we looked at a cure notice, is that correct, or a show cause notice?
A. Here it is.
Q. After the response to the August of 2000 show cause notice, I presume you made a decision not to terminate the contract for default; is that correct?
A. That's correct.
Q. When was the next time that the thought entered your mind to terminate this contract for default?
A. I can't recall that.
Q. Did you think about it between August 2000 and let's say the time you signed P00017 October of 2002?
A. I don't recall thinking about it.
Q. Did you discuss that possibility with anybody on the technical side?
A. No.
Q. With your supervisor?
A. No, no.
Q. When was the first time it crossed your mind then to terminate P00017 or terminate this contract for default?
A. After the second first article testing.
Q. We will talk about that a little later on. Let's go back. When was the first time that someone in the technical community came to you and said we need a

Q. Yes.
A. Yes.
Q. It says they release their rights to any claims. It does use the word claims in it, in P00017?
A. Yes.
Q. So we are talking about a complete and final equitable adjustment, correct, the modification P00017?
A. I see it as an agreement of minds. I don't know.
Q. I want to show you now 43.204(c) where we have italics complete and equitable adjustment, can you read the remainder of that for me?
A. To avoid subsequent controversies that may result from a supplemental agreement containing an equitable adjustment as a result of a change order, the contracting officer should.
Q. Please go and continue.
A. One, make sure all elements of the equitable adjustment have been presented and resolved.
Q. That is fine. You agree we have a controversy here; don't you?
A. Yes.
Q. Previously, you testified you never had any discussion with Mr. Latifi on the accord and satisfaction language; is that correct?
A. That's correct.

Q. And without the data, you can't establish that it successfully passed; isn't that correct?
A. That's correct.
Q. That would be a failure; correct?
A. Yes, because there is no data for it.
Q. So your definition of a failure is no data; correct?
A. No. That is not my definition of a failure.
Q. What is a failure?
A. It is the unit not functioning the way it is supposed to function.
Q. And if the failure is attributable to the airgun not functioning properly, is that a failure or not a failure?
A. I would say it is a failure.

(Korab Deposition Exhibit 13 was introduced.)

BY MR. GABIG:
Q. I am now showing you what has been marked as Exhibit 13. Can you identify that for us?
A. Yes. That is a copy of notes that I took over the telephone.
Q. Does the memo identify the number of shots without failures?
A. According to my writing, it looks like it says over 70 shots.
Q. Is that consistent with this Exhibit 10, the report that