# Plaintiff's Appendix D

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AXION CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. 63-2644C |
| | ) | |
| THE UNITED STATES, | ) | Judge Firestone |
| | ) | |
| Defendant. | ) | |

COPY

* * * * * * * * * *

DEPOSITION OF ALEX LATIFI

January 28, 2005
Huntsville, Alabama
9:15 a.m.

* * * * * * * * * *

A P P E A R A N C E S

For the Plaintiff:

Mr. Richard Raleigh
Wilmer Lee
100 Washington Street
Huntsville, Alabama 35801
and
Mr. Jerome S. Gabig
Attorney at Law
515 Sparkman Drive
Huntsville, Alabama 35816

For the Defendant:

Mr. Douglas K. Mickle
United States Department of Justice
1100 L Street N.W.
Room 4062
Washington, D.C. 20005
and
Mr. Rick Martinelli
Assistant Counsel for Naval Inventory Control Point
5450 Carlisle Pike, Bldg. 410
Mechanicsburg, PA 17055

A No problem.
Q -- because I would really like to get a good history of the contract.
A I will be glad to be of any help I can.
Q Well, I appreciate that. Thank you very much.
How long have you served as President of Axion Corporation?
A Since 1984.
Q And what are your duties as the President of Axion Corporation?
A Since the company is small, I do a lot of stuff.
Q What would be some of that stuff?
A I am involved in bidding, production, quality. I oversee most everything.
Q So you are a hands-on manager?
A Yes.
Q And is your primary customer the U.S. Government?
A Yes.
Q And during this time as President of Axion Corporation, has your company grown in size or has it

A January 17, 1996.

Q So on January 17, 1996, you were aware --

A That is when I made that request.

Q That is when you requested it, and several days later they came back and said, "No air gun"?

A And by the way, I think it was January 17th.

(Discussion off the record.)

A Sometime in January, after they send the contract, I requested the gun, because I felt I should be equal contractor -- just like previous contractor -- I should get the same gun.

Q And you believe some place in the contract that there was specific language that required the Government to provide you with an air gun?

A The actual language said the Government had the right to use a Howitzer to test the units. So I figure if they don't give me the gun, then they are going to take the part and test it themselves.

Q But pursuant to Exhibit 4 -- is that 4?

A This is 3.

Q -- 3 -- you just told me that pursuant to the contract, you were responsible for First Article Testing?

A The contractor is responsible for the First Article Testing, yes, sir, but you have to define the testing.

Q But who defines the testing?

A The testing is defined in First Article Testing.

Q Right, but if you are responsible for that, doesn't that mean that you are responsible to conduct that testing?

A I am responsible for testing but not for the equipment. I mean, the clause says the Government has the gun, and the Government previously showed that they give the gun to other contractors, so --

Q Where does the clause say that?

A Somewhere it says the Government has a right to use a Howitzer to shoot the units.

Q But part of Exhibit 1 -- Exhibit 2. Excuse me.

A Yes, sir.

Q And Paragraph (A) -- what does Paragraph (A) state?

A "The contractor shall test 540 units of Lot/Item --" so and so -- "as specified in this

A Well, how would I -- after I did the quantities -- after I did everything and did not obtain the equality of -- of the right of every contractor -- they give the other contractors a gun. I went to their facility. I flew to their facility and interviewed four of the employees, tried to hire them. They told me the Government give them the gun, and the gun was okay -- it was a good gun — and any contractor would get it -- when you get the contract, you get the gun. And that's the people that were in that -- it was really clear to me by my research that the Government has to give me the gun. I didn't think that the Government was one sided -- only give the big contractors a gun, not little contractors.

Q All right. But post-award did you have a meeting with Government officials to discuss the contract?

A Yes.

Q And at that time did you talk about the testing mechanism?

A They talk about the gun, yes.

Q And did you at that time say, "When will I be getting the gun?"

A Oh, I was sure they were going to give me the gun.

Q If that is the case, then, why did you start entering negotiations with ARL?

A I started negotiations with ARL after the Government says that they are not going to give me a gun.

Q And that was in January, you thought?

A Yes, sir. And in that case, I thought -- I thought, How hard can it be? So I go get -- to ARL and get the drawings and stuff, and come back and I make one.

(Marked Defendant's Exhibit No. 5.)

Q I am showing you Exhibit 5, a letter dated December 15, 1995.

A Yes, sir.

Q Do you recognize that letter?

A I don't remember it, but it is my letter.

Q So you believe that you signed it?

A Yes, sir.

Q That is your signature?

A Yes, sir.

Q And in that letter you are writing to the

At any time did you go from being a nice request to a demand and cite a specific contract provision for this air gun?

A No. We tried to stay in a proper, professional way and try to do the best we can. I have a small company. You really don't have that -- we are not Boeing; we are just a little contractor. We live by the Government crumbs. We don't really take positions that are harmful to our company, so we -- even if it is our right, we try to say it as nice as possible, not demand it.

Q Right. But soon thereafter this January 17th, you were told that the Government wasn't going to provide an air gun?

A We -- yes. We kind of got a feeling that -- "Jesus, the Government is not going to do this. We had better figure it out."

Q Well, how did you kind of get that feeling?

A Because -- after this letter, I talked to Mr. Korab several times. I said, "Mr. Korab, look, Accudyne has gotten guns given to them. I should be equal contractor -- and so on -- this and that -- and he answered, "Alex, we didn't do that; the Army did

that. And your contract is with the Navy, not the Army."

Q So pursuant to this Navy contract, you knew back in January of 1996 that you weren't going to be provided an air gun to do the testing, that you were responsible for testing?

A I didn't know anything about an air gun at the time. I didn't know an air gun was involved in it. I just had to find a way to activate the battery.

Q But on January 17th, you asked if the Government would supply an air gun; right?

A Yes.

Q So you did know about an air gun back in January of 1996?

A They told me after there was a gun -- I find out from the Accudyne people.

Q Right. But in 1996, you knew that there was an air gun that could help in the testing of this PS-115?

A That is correct, sir. Yes, sir.

Q And soon after January, you were told you weren't getting this air gun?

A Yes, but I still didn't believe it.
Q You didn't believe it, but on March 18, you wrote Mr. Korab and started telling him that you had reached an agreement with Army Research Lab?
A Yes.
Q Tell me about your dealings with Army Research Lab and if -- why you went to ARL.
A Well, I understood that Mr. Korab or Mr. Hahin -- they told me that the gun is in Baltimore, Harry Diamond Laboratories.
MR. MICKLE: Would you mark this, please.
(Marked Defendant's Exhibit No. 7.)
Q This is the letter -- it is Exhibit 7, Mr. Latifi, that was referred to, March 18, 1996.
And it starts out very cordial --
A Yes.
Q It assumes that -- that Mr. Korab came down to see you and look at your facility?
A Yes, sir.
Q It looks like you were getting along and he had answered all your questions or you had resolved all your problems?
A They just told us they can't give us the gun.

Q It was around this time when they told you you weren't getting the air gun?

A Yes. And now I am going, "Jesus, this guy is not really giving me a gun, so I've got to do something."

Q So when they told you no the first time, you thought you still might have an outside chance? Back on March 18, 1996, you know that --

A I thought it was no longer --

Q You agreed there was no chance after March 18th?

A Yes.

Q All right. And thus you started trying to have a side agreement with the Army Research Lab?

A I think at that meeting Mr. Korab told me that the gun is at Army Research Lab -- or something -- or I found out before that -- so I started working with them.

Q All right. And this is the letter that you sent to Mr. Korab to explain the agreement that you are trying to enter into with the Army Research Lab?

A Yes.

Q But you also told Mr. Korab at that time that

the deal was --

A Can you bring the letter back?

Q Yes, sir.

A I want to show you -- since you like to understand my position at that time, my mentality, I show you how much we didn't know. We asked them to give the size of the bird; we asked them to give the weight of the bird. That's that we tried to find out -- basically, we have no information. There is no information in the contract, or nobody can help us at this stage. We don't even know the size of the bird. We asked them what the bird size should be, what the weight should be. "What size should it be?" "What size do you need?" And we got no answer from nobody, not Army, not Navy. Nobody in this case tell us, "Hey, the bird should be this size. The size is this way. If you want to shoot it, it has to be this way." There is no indication anywhere that anybody knows what to do.

Look at the letter. It says, "Provide guidance regarding bird size and weight." You know what that -- that is a very basic need for me to understand to produce something, and in your

contracts you don't have it.

Q I guess the question is, though: When you bid on the contract, you realized that you would have to collect this data?

A I have no problem with that. My collected data was perfectly made -- in fact, it is so good now they are using it.

Q Who is using it?

A The Government is using it.

Q The Government is using it?

A Yes.

Q How are they using it?

A I don't know. I understand they are using the same process that I went through. That is not -- I guess --

Q All right. But when you submitted your proposal, you realized that you had to provide data, testing data, to the Government?

A Yes. Test data collection.

Q And how did you think, when you submitted your proposal, when you were, you know, coming up with the figures, that you were going to collect that data? How did you budget for that?

prior review, but it looks like at this time the employees' vacations were holding up the CDRL, and at that time you also said you intend to provide a detailed drawing of the spin gun to the Government. And when --

A Yes.

Q -- you say the "spin gun," we are talking about the air gun?

A Yes. We don't know at this time -- oh --

Q Pardon?

A At this time we think --

Q You think --

A At this time we think that the spin gun will do the test. Since the Government not give us the gun -- now we think it is possible to produce the gun at a very reasonable price -- a reasonable price -- which is a spin gun -- you have to spin the part -- at a reasonable price. And we try to do it very simple.

Q When you say "spin gun," is that the same as an air gun?

A Not really.

Q Not really?

Q And this is the only notice that you gave the Navy specifically that says, "I am doing the air gun"; is that true?

A Yes.

Q Is there any other documentation regarding the air gun that you know of where the Navy sent something back to you and said, "Build an air gun, submit us the paperwork, the cost --

MR. RALEIGH: Objection to the form of the question.

Q Did the Navy ever come back and say, "We know you are building the air gun now"? Did they ever -- how did the Navy respond to this memo?

A I don't remember, to be honest with you.

Q Did they respond?

A I don't know, sir. You have to look at documents to see. I don't remember.

Q All right. After you told the Navy that you were going to design and build your own spin gun, at any time did you tell the Navy how much it would cost?

A No, because at that time we didn't think it was going to cost that much money. At this time we

are going to make a spin gun and go ahead with the hammer -- with thing -- and activate it and use it. That's what we thought we were going to do. And they didn't accept it, so we have to go for the whole thing.

Q And that's why -- the follow-on in the memo -- there is a sentence that says, "We expect to have the manufacturing of the spin gun completed in a few days"?

A Yes, because we thought we are going to get the spin -- the spin machine that we have, put the parts in it and hit it and collect the data.

Q So you couldn't provide an estimate of the cost of the air gun to the Navy?

A It was not -- this way it was not much for us to really -- it was just a simple process. And it would work, too.

Q But at bottom, you never provided an estimate of the cost to the Navy -- how much you thought the air gun would cost to develop?

A No.

Q You just developed it?

A Because we didn't know how much it was going

to cost. So there was no way -- it was something we had never done before, so we have no idea what it cost to do -- plus there was no -- Mr. Mickle, there were no drawings, there were no specifications, so you couldn't really tell what it was going to cost. So you really -- you just went --

Q You couldn't even estimate it?

A There is no way. There is no estimation until you start the -- the only way you could make estimation, if you have a drawing, specification, and you say, "Okay, that is how I am going to do it." But the Army never give us that, nor the Navy give us that. So we didn't know what we were against. We just try to -- well, okay, how are we supposed to do this -- now that we are stuck in this middle? If we had a drawing -- some kind of hint of how to do it -- it would have saved us time and money -- a lot.

Q Did you ever talk to the Navy about the cost of the air gun?

A No.

Q You never did?

A I don't believe so. I don't know if I talked on the phone and tell them that this was really too

Q So when you submitted 360 units that were tested -- 221 which you said were successful -- you didn't -- how did you know they were successful?

A They said it was successful?

Q They said it was successful?

A They wanted to witness the test.

Q And did he say that?

A By witnessing the test.

Q By witnessing the test. I mean, did he say, "These are successful tests or --"

A They have to accept each test or reject each test as I was doing it.

Q And by accepting it, was that accepting the process or accepting the battery?

A Accepting the test -- and the battery -- the one who shot -- the unit was shot; they accepted it. It was a test or no test. If it was a test, they look at data and -- they say, "Okay, this is a good one. Put it here."

Q And then what did you do with the data?

A We collected data in the computer.

Q I know, and then what did you do with that data that you collected?

A We submit the data to -- but when they accepted them, and they said, "Okay, that's acceptable. It's okay," then we submit the data.

Q Then, why did you submit the data to the Navy Inventory Control Point?

A I think the contract required to send the data. I think there is a place in the contract that tell you, or -- and the DDP sends you -- to send the data.

Q And who did you send the data to?

A To whatever address the contract told us to send it to -- or directed us to send it to.

Q Jerry Hahin; right, at Crane?

A I believe so. I'm not sure. But whatever they told to send it to, we send it to.

Q Well, I was just assuming from Paragraph 5 of the letter -- it says that hard copy printout of additional units are in the possession of Crane Labs. And I thought if they had those units --

A Yes. I guess at that time Mr. Hahin was involved in testing -- accepted them. He might have took some of them with him right then.

Q Subsequent to this letter, on May 17th, your

First Article was approved. Do you agree with that statement?

A The First Article was approved?

Yes, they approved the First Article.

Q And do you agree that it was 17 May 1999?

A I don't remember -- the date I don't remember, to be honest with you.

Q Well, if I show you this, maybe this will refresh your recollection.

MR. MICKLE: Please mark this.

(Marked Defendant's Exhibit No. 22.)

Q You have just been handed Exhibit 22.

A Yes.

Q And that is a memo from John Korab, dated 17 May, 1999, I believe. Do you agree? And is that the memo you received that demonstrates that your First Article Test was approved?

A Yes, and he is -- he has approved the First Article, and he is asking to proceed to production and to submit the first lot for testing.

Q All right. May I have that back, please.

So on May 17th, you had passed First Article Testing -- in 1999?

matter we pay for it or not."

Q And when was this? Was this back in --

A At the same time we were going through the -- I can't recall the time. But there are e-mails and stuff that show that they directed us to -- even though we didn't want to do this, they directed us to submit all data to the Government.

Q You sent e-mails to Mr. Korab telling him what the cost of the air gun was?

A Not a total amount, but we said -- we tried to get to some agreement to say they were going to pay something for the cost.

Q All right.

A But it never --

Q But you were still experiencing difficulty producing the PS-115 back in 2000; right?

A We saw some leakage at that time. We tried to figure out where the leakage was.

Q Leakage --

A Acid leakage.

Q Where?

A When we do production -- when we went to production quantities, we experienced some leakage.

Q What was the cause of the leakage?

A At that time we tried to figure out what the cause of the leakage. So we went through looking at all our vendors to verify the product that we were using was what exactly the contract stated. And we went through all our invoices and all our COCs to verify the vendors provide us what we were supposed to receive.

Q All right. And what did you determine?

A We determined that the vendors give us the right product -- and right COCs --

Q And what does "COC" mean?

A "Certificate of Compliance." And all the vendors that we bought the product from was the ones that the Government qualify them to purchase from -- every one of them. So we eliminated that possibility that we have a bad component -- maybe bad acid or bad copper, because of the leakage. But after we determined that wasn't the case, we informed the Government.

Q And what did you tell the Government?

A We told them that we were experiencing a leakage on those units and do they have any ideas of

why the leakage is.

Q And what did they tell you?

A They say they had no data that shows there has been any leakage ever.

Q All right.

A And they sent Mr. Hahin to our facility.

Q When was this?

A I can't recall, to be honest with you, but I am sure there is some paper that shows that.

Q All right. I am trying to figure out -- because on August 29th --

(Discussion off the record.)

MR. MICKLE: Mark this, please.

(Marked Defendant's Exhibit No. 29.)

Q On August 29th, P00015 -- it appears to be agreed upon by the parties. Is that your signature?

A Yes, sir.

Q And why was the contract price reduced by ten -- why did you agree to a reduction in the contract price of $10,000?

A Mr. Korab said the cost -- it cost that much to produce a Mod.

Q $10,000? And you agreed to that?

A Yes, sir.
Q And 28 January 2001?
A Yes, sir.
Q So despite some problems that are ongoing in Axion at that time and getting the batteries built -- for leakage or for whatever reason --
A At that time -- when we do this here (indicating), we are making them, and we haven't seen leakage yet.
Q You had not seen leakage yet?
A No.
Q But for whatever reason -- you were telling me earlier, though, that was one of the reasons why there was some --
A I don't know the reason. We found out about the leakage sometime during this time period. I don't know if it was before this or after this. But it could be -- I am going to say -- at that time, possibly. I can't recall the exact date, but possibly we were still trying to find out if there was anything we had done wrong. Did we buy bad material? Did somebody give us something wrong? Or the process is wrong.

Q So you really haven't -- you have begun production, but you haven't been able to give the Government any units at this time?

A It could be we are still going to find out what the leak is about. It's possible that -- that leakage thing was a long period of time. We kept trying to figure out what to do. And if you look at the e-mail, maybe you will find out what period of time this leakage we discussed with them, and when they said -- the engineers -- I can't recall. But somewhere in this new ball game.

Q But it appears that this time, too, you think you are close to solving the problem, because you did tell the Government that "Within 10 weeks from today --" you know, "10 weeks from May 30th, we are going to be able to give you 8,000"?

A No, it doesn't mean -- we are producing the quantity of 8,000, and we are hoping that a leakage does not show up.

Q But, I mean --

A Possibly we don't know about leakage at this time.

Q I guess this is -- you are proposing a

A Because the Army has experienced leakage -- I know now -- I didn't know then --

Q You were experiencing leakage --

A The Navy come back in this memo and says no one experienced leakage -- I am thinking maybe I did something wrong --

Q Or did you think you did something right and the Navy was wrong?

A I went through all the -- I want to find out -- and later on I find out -- and the Army had problems for a long time and had a seminar and talked about what is supposed to fix it, and I -- I didn't know nothing about it then.

Q Going back -- even though you didn't know anything about it back in September of 2001 and August of 2001, you were talking to the Navy about this leakage problem -- and they are telling you it is not a problem -- and that is affecting your ability to deliver the PS-115s; right?

A Yes, but the Navy -- the Navy representative and DCAS representative were already aware of the problem. We showed it to them in our product. I said, "Look, this is leakage." They know the

problem, and they went through our process to see if anything wrong, and they didn't find anything wrong. But they couldn't answer why it was doing it.

Q But they just told you that it's not copper in the -- or it is not acid in the copper?

A They never said that. You see what it says in the second paragraph -- it says, "However, fluoboric acid when combined with methylene bromide has proved to have a corrosive effect on copper."

Q Right, but then doesn't the letter also go on to state that corrective action was taken?

A This is what they think was corrective, but nobody has made them at this moment the way we are talking about.

Q But when you received this letter and they were telling you that corrective action was taken to isolate the methylene bromide from the fluoboric acid by encapsulating the -- blah, blah, blah --

A Yes. Do I believe them? Is that what you are asking, do I believe them? Do I believe them at that moment?

Q Yes.

A They put doubt in my mind, but after going

(Recess.)

(Examination Resumed by Mr. Mickle:)

Q I know we were going back over this date -- and maybe I am confused. What I was showing you was, I guess, Exhibit 37.

A Yes.

Q And you were saying you believed that was 1 October 2003?

A Yes, because the other -- the date is on the top, and the date is at the end -- the year is at the end. And at the bottom the year is at the end. And I signed the year as the end. And the other Mod that he sent to me, that was the same thing, too.

Q All right. Well, let's look into that.

A Yes, sir.

Q Because this is where I get, I guess, confused -- and that is easy to do.

A Yes, sir.

Q If you look at, say, Exhibit 24 --

A Why don't we look at all these and find out --

Q Well, let's do that. Let's start with Exhibit 24, please.

Q Where in the contract?

A In the contract it say, "Prior to shipping any lot, 80 units have to be tested."

Q 80 units?

A Yes, sir.

Q All right.

A And if you see the months -- see the e-mails -- we talk about 80-unit lot tests.

Q Then -- I still don't understand it -- why did you agree to P00017 that required --

A In 2003?

Q Yes.

A In 2003 tests -- I thought I was supposed to do a 2003 test.

Q And you thought you needed to do a First Article Test again because of the Government requirement that you had to do a new one every five years?

A I thought they wanted me to do another test within five years.

Q But you never mentioned that in any documents or any letters or e-mails to Mr. Korab saying, "Is this Production Test? Is this First Article Test?"

are going to deliver 80 batteries that they call First -- that are called "First Article Samples." Do you agree?

A Yes.

Q And you agreed that you would produce those 80 First Article samples by April 23, 2002?

A Yes.

Q All right. And at this point, when you signed this agreement --

A Notice the date is 2002, and the year is behind.

Q I know. Did you ask yourself then what happened to the 2003 First Article Test?

A On here? No, because 2003 is not -- this is 80 units. 80 units is a Lot Test.

Q It's a Lot Test?

A To ship the quantities.

Q All right. Well, then, what are you going to provide in 2003?

A The First Article that they want to see after three or four years.

Q Why would they need to see First Articles after three or four years when if you met the

delivery schedule, you would be done with the contract?

A No, if you -- if you want to stay producing -- continue producing -- every once in a while they have to ask you for First Article. That's what I understood -- maybe it's in the FAR; maybe it not in the FAR, but that is what I understood normally happens. You can look at the FAR and find out. I don't know, but -- but every 5 years I think the Government has the right to ask you for another First Article -- as a qualified producer. But see here, it asked for 80 units. The 80 units only came from the contract -- if you look at a clause in the contract -- I will be glad to show it to you. It says, "80 units should be tested for every lot prior to shipping." And this is the Lot Test.

Q Well, why didn't they call it "Lot Test"?

A I have no idea why they didn't call it "Lot Test."

Q Well, you signed off on this.

A I understand, but they use it back and forth -

Q Where did they call it "Lot Test" --

A The Friday -- that Friday.
Q That Friday?
A Yes, sir.
Q And then to close out the story, the saga, this contract -- well, a good portion of your life -- I don't mean to minimize it. And that's P00021 -- which on November 12, 2002, the contract was terminated for default?
A Yes. Seven years.
Q And at the time the contract was terminated, how many batteries did you deliver to the Government?
A They didn't -- I had them all packed up to ship them, and I couldn't ship them.
Q So you delivered no batteries --
A They didn't allow me to ship them.
Q So I guess the question is: What number of batteries did you submit to the Government?
A I submit --
MR. RALEIGH: I object to the form.
Q How many batteries did you deliver to the Government for their use?
A I had them all packed up. I couldn't ship them because they canceled the contract.

Q What books do you have on your desk, Alex? Do you have a desk at work?

A Yes.

Q Do you have a dictionary?

A No.

Q You don't have a dictionary. Do you ever use a dictionary?

A Yes.

Q What dictionary do you use? Do you know?

A I don't use often dictionary, but --

Q Well, when you have a need to look up a word, you use it?

A I assume Webster's or something like that. I don't remember. Maybe Webster or --

Q Webster?

A Yes.

Q Well, I have got, like, two or three, and whatever is closest I use.

MR. MICKLE: Can we go off the record for a minute?

(Discussion off the record.)

(Recess.)