manufacturing defects. While the second FAT testing was being conducted, the Government's Quality Assurance Representative ("QAR") observed that the failed tests were being caused by a defective air gun and that there was no indication that the PS-115s had been defectively manufactured. *Id.* For example, in an email dated Sept. 5, 2002 to the Contracting Officer, the QAR observed:

> We had a total of aprx 14 good shots during the past 3 working days (6 consecutive last week Thursday and 8 consecutive yesterday)—with some minor consuming problems early on with positioning of parts on the 'bird' to enable accurate recording of data.
>
> Yesterday we shot a total of 14 of which 8 had good data collected (split between cold (3), hot (3) and room temp (2)); 3 of the 14 had no data because the batteries on the recording computer died without us being aware (we checked the voltage on the cells after and found between 16 and 26 volts existent that seems to indicate probable good units even though not acceptable from the data standpoint); and 3 that broke at impact that provided only partial data and are not acceptable. . . .
>
> The majority of the failed items (failed to capture data) provide sufficient voltage after data collection failure to seem to indicate the cell functioned correctly to requirements despite the inability to collect data.

PA H.

Similarly, the following day, the QAR sent another email to the Contracting Officer stating:

> He has successfully completed testing (recorded successful data) on at least 90 items.... At this point, the testing system functions very well -- Axion can shoot and record, optimally, 4 per hour; human error has caused every non-acceptable data collection problem that has been encountered over the past couple of weeks. On 3 most recent separate days we observed at least 6 consecutive successful shots before failures occurred. In one case, failure to record acceptable data resulted from the normal wearing out of batteries used to power the recording computer in the system. At least 6 failures happened because the shot units broke on impact. Another anomaly that was discovered was that one the technicians put his hand on part of the testing apparatus and touched a

> grounded table with the other and shorted all data immediately to ground and lost it all….
>
> The majority of the failed items (failed to capture acceptable data) provide sufficient voltage after data collection failure to seem to indicate that the cell functioned correctly to requirements despite the inability to collect the data.

PA I.

38. On July 11, 2002, Axion and NAVICP agreed to a bilateral modification P00020, again reestablishing the requirement for FAT. DA 163; Korab Decl. ¶ 6 at DA 355; Latif Depo. p. 209 at DA 338.

Response: Agree .

39. This modification included a delivery date for submission of a FAT report by September 9, 2002. DA 163; Korab Decl. ¶ 6 at DA 355; Latifi Depo. p. 209 at DA 238.

Response: Agree.

40. Modification P00020 included the following language relating to release and accord and satisfaction:

> This modification constitutes a full and final disposition of all matters relating to this contract and is a full release and accord and satisfaction of any and all claims, demands, or causes of action that either the contractor or Government may have against the other arising out of or related to the contract to date.

DA 163 (Modification P00020).

Response: Agree.

41. At the time Axion and the United States agreed to bilateral modification P00020, Axion was at risk for termination for default because Axion had failed to meet the delivery requirements of P00019. Korab Decl. ¶¶ 8 and 9 at DA 356-57; Latifi Depo. p. 206 at DA 235.

Response: Disagree. According to Mr. Hahin, the contract could have been "wrapped up" in 1999 but for the plating issue and problems with the air gun. Hahin depo at 64. Axion was never a risk of being in default because Axion was excused from meeting the delivery date set forth in P00020 for the reasons set forth in Complaint No. 03-2644C. For example, Count XV ("Application of Spearin Doctrine to Axion's Plates") establishes why Axion was excused from meeting the delivery date because of a defective specification for the plating. Similarly, Counts I-VI establish why meeting the delivery date was excused for reasons pertaining to the air gun.

42. On September 9, 2002, Axion resubmitted a FAT report. Latifi Depo.at 210-211 at DA 339-340; Hahin Decl. ¶ 11 at DA 351; Korab Decl. ¶ 10 at DA 357.

Response: Disagree. The September 9, 2002 submission was the results from the most recent testing. Latifi Depo at 230. Hahin Depo at 182. See also letter from Latifi to Korab stating "In my conversation with you on Monday, September 9, 2002, you stated you felt that that *(sic)* quantity was adequate." PA Appendix P. Stated differently, on Sept. 9, 2002, Axion did not know if it had completed testing; hence Axion could not have completed a FAT report. Latifi Depo at 230; PA Appendix P; Hahin Depo at 182. In this regard, it was evident that the QAR was likewise confused when Axion had fired enough PS-115s to complete testing because the air gun frequently malfunctioned:

> We had a total of aprx 14 good shots during the past 3 working days (6 consecutive last week Thursday and 8 consecutive yesterday)—with some minor consuming problems early on with positioning of parts on the 'bird' to enable accurate recording of data.
>
> Yesterday we shot a total of 14 of which 8 had good data collected (split between cold (3), hot (3) and room temp (2)); 3 of the 14 had no data because the batteries on the recording computer died without us being aware (we checked the voltage on the cells after and found between 16 and 26 volts existent that seems to indicate probable good

> units even though not acceptable from the data standpoint); and 3 that broke at impact that provided only partial data and are not acceptable. . . .
>
> The majority of the failed items (failed to capture data) provide sufficient voltage after data collection failure to seem to indicate the cell functioned correctly to requirements despite the inability to collect data.

PA H.

Similarly, the following day, the QAR sent another email to the Contracting Officer stating:

> He has successfully completed testing (recorded successful data) on at least 90 items.... At this point, the testing system functions very well -- Axion can shoot and record, optimally, 4 per hour; human error has caused every non-acceptable data collection problem that has been encountered over the past couple of weeks. On 3 most recent separate days we observed at least 6 consecutive successful shots before failures occurred. In one case, failure to record acceptable data resulted from the normal wearing out of batteries used to power the recording computer in the system. At least 6 failures happened because the shot units broke on impact. Another anomaly that was discovered was that one the technicians put his hand on part of the testing apparatus and touched a grounded table with the other and shorted all data immediately to ground and lost it all....
>
> The majority of the failed items (failed to capture acceptable data) provide sufficient voltage after data collection failure to seem to indicate that the cell functioned correctly to requirements despite the inability to collect the data.

PA I.

43. This FAT report concerned testing Axion conducted in attempting to comply with the requirements of P00020. Latif Depo. p 213 at DA 342; Hahin Decl. ¶¶ 9-11 at DA 351; Korab Decl. ¶¶ 6 & 10 at DA 355 & 357.

Response: Disagree. See explanation in #43 why there was no FAT report.

44. The report did not demonstrate compliance with contract requirements. Hahin Decl. ¶ 11 at DA 351; Korab Decl. ¶ 10 at DA 357.

Response: Disagree. This statement incorrectly assumes there was a report. See explanation in # 43 why document was not a FAT report.

45. The contracting officer terminated Axion for default for failing to meet the contract's first article testing requirements. Korab Decl. ¶ 11 at DA 358.

Response: Agree that the reason asserted by the contracting officer for the termination for default was the failure of Axion to meet the first article test requirements.

46. Axion's contract with the Navy contained a clause that established that a contractor shall be deemed to have failed to make delivery within the meaning of the Default clause if FAT testing is disapproved. DA 62; FAR 52.509-3(d); Latifi Depo. p. 38 at DA 2657

Response: Disagree. FAR 52.209-3(h) states that a Contractor shall be deemed to have failed to make delivery with the meaning of the Default clause if the first article report is not delivered on time or if the first article (rather than FAT testing) is disapproved.

47. The default termination was memorialized on November 12, 2002, when NAVICP issued contract modification P00021. DA 164.

Response. Agree.

48. This modification provided the following:

> Contract N00104-96-C-KA09 was awarded to Axion Corporation (Axion) on December 7, 1995 for the production of 55,209 Power Supplies at a unit price of $23.80 for a total contract price in the amount of $1,313,974.20. The delivery date for Axion's First Article Test Report (FATR) was 06 April 1996. That April delivery date had been extended on numerous occasions per Axion's request. Contract modification P00002 extended the delivery date of FATR to October 29, 1996. Contract modification P00004 extended the delivery date of FATR

> to December 29, 1996. Modification P00005 extended the delivery of FATR to May 15, 1997. Subsequently, Axion's FATR was approved on 17 May 1999. Furthermore, from the time Axion successfully passed the FATR, the delivery schedule for the production lot was modified on 5 separate occasions since Axion failed to meet its required delivery dates. In the interim, based on Axion's unilateral decision to change its manufacturing process by plating at Axion's plant in lieu of using an outside vendor as originally conducted, Axion was required to submit a second FATR. This decision was made because the results of the initial FATR were no longer reliable. Resubmission of the FATR was due on October 3, 2001. This date was changed per modification P000019 to April 23, 2002. Modification P00020 further extended delivery of the FATR to September 9, 2002. Axion submitted its second FATR by letter and five floppy disks on September 09, 2002. The Navy examined Axion's FATR and disapproved the First Article for failure to meet the requirements of Contract Data Requirements list A004 and the lack of information that would pertain to test procedures, test equipment, or data analysis that is relevant to the performance requirements. Furthermore, a total of 25 out of the 66 First Article Power Supplies failed to meet the performance requirements of drawing 11744726. The Navy's letter of October 01, 2002 advised Axion of its First Article disapproval. A Show Cause letter of October 01, 2002 was also sent to inform Axion that the Navy was considering terminating the contract for default for failure to make delivery unless facts were presented in writing, indicating that failure to perform was due to causes beyond Axion's control and without fault or negligence on Axion' s part. Axion's letter of October 11, 2002 does not provide an adequate excuse for Axion's failure of the First Article thereby failing to meet the September 09, 2002 delivery schedule.

DA 164.

Response: Agree that the above text correctly repeats P00021.

49. Although Axion never made a single production lot delivery, the Government nonetheless provided it with progress payments in the amount of $512,365.00. DA 209; Korab Decl. ¶ 12 at DA 358; Latifi Depo. p. 237 at DA 345.

Response: Agree.

50. Axion signed an agreement with the Government prior to filing this lawsuit that acknowledges this debt. DA 209.

Response: Agree.

51. Contract issues related to the air gun first arose in 1996, long before modifications P00017, P00019, and P00020. DA 178-186; DA 159, 161 & 163; Korab Decl. ¶ 7 at DA 356; Latifi Depo. pp. 52, 64 –67; 110-112, 119, 130-131 at DA 267, 274, 275, 276, 277, 285, 286, 290, 297, 298.

Response: Disagree. Without identifying the contract issues, this broad statement is not completely accurate. For example, in 1997, Axion was still negotiating with ARL to perform the testing. Memorandum from Axion's QA Manager to Navy Contracting Officer, May 30, 1997, PA K2, AXION00295.

52. Contract issues related to the leaking electrolyte first arose in 2001, long before modifications P00017, P00019, and P00020. DA 194; DA 159, 161, 163; Korab Decl. ¶ 7 at DA 356; Latifi Depo. p. 150-157 at DA 316-323.

Response: Disagree. Without defining the contract issues, this broad statement is not completely untrue. For example, it was not until after the contract termination that Plaintiff learned of the Government's superior knowledge regarding the leaking of electrolyte. Latifi Depo at 155, PA D.

53. Contract issues related to the plating specifications first arose in 2000, long before modifications P00017, P00019, and P00020. DA 190; DA 159, 162, 163; Korab Decl. ¶ 7 at DA 356; Latifi Depo. p. 136-144 at DA 303-311.

Response: Disagree. Without defining the contract issues, this broad statement is not completely true. For example, Complaint I, paragraph 207 addresses the Navy "trumping up" a termination for default. Complaint I, paragraph 195 identifies a Navy memorandum dated 9/29/01 in which the Navy changes its mind from a decision made fourteen months before not to require a second FAT. This 2001 memorandum which memorializes the Navy's pretense of concern about plating is one of the basis for the "trumping up" of the termination for default. Latifi Depo at 155, PA D; Hahn Depo at 89-90, Document Axion00386.

**PLAINTIFF'S UNCONTROVERTED FACTS**

1. Alex Latifi is the Chief Executive Officer of Axion Corporation. Latifi Decl ¶ 1 at Plaintiff's Appendix ("PA") A.

2. Axion has been in business for approximately twenty years. Latifi Depo at 13.

3. Axion is a minority-owned, small business. Latifi Decl ¶ 2.

4. During its existence, Axion has been awarded between 100 and 200 government contracts. Latifi Decl ¶ 1.

5. Axion's core business is performing relatively small, build-to-print, United States government production contracts. Latifi Decl ¶ 1.

6. In almost every instance, the Government contracts have been firm-fixed price contracts. Latifi Decl ¶ 1.

7. Axion has never been awarded a research and development ("R&D") contract. Latifi Decl ¶ 1.

8. R&D is not a core competency of Axion. Latifi Decl ¶ 1.

9. Prior to contract N00106-96-C-KA09, Axion never had a contract terminated for default. Latifi Decl ¶ 1.

10. Prior to the present dispute, Axion had never submitted a claim under the Disputes clause. Latifi Decl ¶ 1.

11. The PS-115 power supply is a dormant battery to be placed in a munition that is fired from a large bore weapon. Complaint I ¶ 6; Answer ¶ 6 (admitting).

12. A PS-115 power supply becomes active when a projectile containing the PS-115 is fired from a large bore weapon. Complaint I ¶ 7; Answer ¶ 7 (admitting central allegations).

13. The acceleration produces as much as 25,000 Gs of force. Complaint I ¶ 7.

14. The force causes a cutter within the PS-115 to penetrate and cut a diaphragm. Complaint I ¶ 7.

15. The acceleration causes the stored acid to pass through the penetrated diaphragm and permeates the cells. Complaint I ¶ 7.

16. The results of the acid reacting with the cells is a source of electrical power. Complaint I ¶ 7.

17. The solicitation contained detailed, "level III", build-to-print drawings on how to produce the PS-115s. DA at 18-31; Complaint I ¶ 11, 58.

18. The Government expected the PS-115 to have a shelf life of approximately twenty years. Hahin Depo at 11.

19. The solicitation also contained an option quantity for an additional 55,209 units. DA at 2, Complaint I ¶ 9; Answer ¶ 9.

20. Initially, the Army had acquired PS-115s for the Navy. Complaint I ¶ 10; Answer ¶ 10.

21. Before awarding contract N00106-96-C-KA09 to Axion, the Navy had acquired PS-115s from the Accudyne Corporation. DA at 16; Deposition of Jerry Hahin ("Hahin Depo") at 15-16 at PA B.

22. The contract required a first article test before Axion could proceed to production. Complaint I ¶ 15.

23. The contract did not state that an "air gun" was required for testing. Complaint I ¶ 16; Answer ¶ 16.

24. The contract contained no information on how to fabricate the acceptance inspection equipment.

25. The acceptance inspection equipment required by the contract was special test equipment as defined in FAR 45.101. Complaint II, ¶ 247, Hahin Depo at 68.

26. The contract never contained any specification for an air gun. Complaint No. II, ¶ 63; Latifi Depo at 54-55, PA D.

27. The contract reserved the right for the Navy to perform the testing in the operational environment of inserting PS-115s into projectiles and then firing the projectiles from large bore weapons. DA at 7 incorporating technical data package 19202-11744726, paragraph 4.4.6.2.2; Latifi Depo at 54-55, PA D.

28. The solicitation identified the two previous contracts for PS-115s that had been awarded by the Navy to the Accudyne Corporation. DA at 4; Hahin Depo at 15-16, PA B.

29. Accudyne was provided with one or more air guns by the U.S. Army. Latifi Depo at 58, PA D.

30. In a letter dated January 17, 1996, Axion requested the Government to provide Axion with an air gun. Complaint I ¶ 26; Latifi Depo at 54-55, PA D.

31. The Government declined to provide Axion with an air gun. Complaint I ¶ 27; Latifi Depo at 54-55, PA D.

32. The Contracting Officer stated was that "[t]he Navy did not supply any air guns to the previous contractor, Accudyne Corporation, for test purposes." Plaintiff's Appendix ("PA") at Q.

33. The Army Research Laboratory ("ARL"). ARL agreed to sell Axion the drawing for the air gun. Complaint I ¶ 31, Deposition of Korab ("Korab Depo") at 21-22; PA C; Latifi Depo at 59, PA D.

34. Axion sent a check to ARL to pay for the drawings. Complaint I ¶ 31; Axion Ltr to C.O., April 15, 1997, PA E.

35. ARL refused to sell the drawings to Axion for what ARL claimed were "legal reasons". Complaint ¶ 31; Notes from ARL dated March 21, 1997, PA F; Latifi Depo at 64-69, PA D.

36. The drawings for the air gun could be purchased by the public for a modest fee from the U.S. Department of Commerce National Technical Information Service ("NTIS"). PA G.

37. Axion did not know until after the contract was terminated for default that the drawings for the air gun could be purchased by the public for a modest fee from the U.S. Department of Commerce National Technical Information Service ("NTIS"). PA G. Latifi Depo at 105.

38. If Axion had access to the NTIS drawings of the air gun shortly after contract award, Axion would have had less difficulty in developing an air gun. Hahin Depo at 55-66, 75; PA B, Latifi Depo at 68, PA D.

39. Because testing difficulties involving the air gun, Mr. Hahin made approximately fifteen trips to the Axion facility. Hahin Depo at 26.

40. When Axion first attempted to develop the air gun, Axion did not know that it had begun a significant research and development effort. Latifi Depo at 102, 110-1, PA D; Hahin Depo at 75, PA B.

41. Because of the expense of trying to develop an air gun, contract N00104-96-C-KA09 became a significant financial burden on Axion.

42. Latifi financed Axion's loses from his personal savings to include his retirement savings. Latifi Decl ¶ 4, PA A.

43. Axion struggled to develop an air gun. Korab Depo at 21, PA C.

44. Axion did not receive any assistance from the Government in developing the air gun. Korab Depo at 21, PA C.

45. Concerning PS-115s, prior to the award of contract N00104-96-C-KA09, the Government had experienced problems with PS-115s because an earlier design had allowed "the electrolyte to leak out of the ampoule causing severe reliability degradation." Hahin email, Nov. 23, 1999, PA N.

46. The reason the Navy awarded contract N00104-96-C-KA09 was to acquire new PS-115s to replace those that were experiencing problems with leaking acid. Hahin depo at 21-23.

47. In the summer of 2001, Axion discovered that the PS-115s that Axion had manufactured were beginning to leak acid. PA L and M; Latifi Depo at 131-133, PA D.

48. Axion was never informed by the Government that the PS-115 had a history of leaking acid. Latifi Depo at 155, PA D.

49. Axion reported the leaks to the Navy; Latifi Depo at 132, PA D.

50. The reported leaking of the acid was a factor in the decision of the Navy to require a second first article test. Hahin Depo at 110, PA B.

51. There was no effect between the change in the plating and the subsequent leaking of acid. Hahin Depo at 192.

52. As a result of a May 24, 2000 meeting, the Navy was informed that Axion intended to substitute pure nickel for the steel plated nickel for the cells. Hahn Depo. at 78.

53. Pure nickel improved performance of the cell. Hahn depo at 88.

54. In a letter dated November 22, 2000 the Navy was put on notice that Axion was going to manufacture the pure nickel plating for the cells. Hahin Depo at 79.

55. In light of the change in plating, in November 2000, the Navy considered a second FAT. Hahn Depo at 80.

56. After learning about the change in plating in 2000, the Navy made a decision not to require a second FAT. Hahn Depo Exhibit 9, testimony at 89-90, Document Axion00386.

57. The decision not to require a second FAT was based on the fact that the plate stock was tested for electrical storage in a cell test. Hahn Depo Exhibit 9, testimony at 89-90, Document Axion00386.

58. Although aware of the changes in the plating, the Contracting Officer sent a letter to Axion advising "[i]t is recommended that Axion proceed with production." Document Bates No. Axion00361.

59. At the time the Government made the decision to proceed to production rather than conduct a second FAT, Mr. Hahn was of the opinion that a cell test was adequate to test the plate stock. Hahn Depo at 91.

60. The amount of time between the Navy being aware that Axion was switching from nickel plating to pure nickel was in excess of thirteen months. DA 160. Hahin Depo at 79.

61. The amount of time between the Navy being aware that Axion would manufacture the plating and the Navy's decision to require a second FAT was in excess of nine months. DA 160. Hahin Depo at 79.

62. n reliance on the Contracting Officer advising Axion to proceed into production, Axion produced tens of thousands of PS-115s. Strickrod Depo at 51, PA K1; Latifi Depo 135, 145; PA D; Latifi Decl ¶ 5, PA A.

63. There was no contractual prohibition against Axion manufacturing the plating to be used in the cells. Hahn Depo at 85-86.

64. While the second FAT testing was being conducted, the Government's Quality Assurance Representative ("QAR") observed that many of the failed tests were being caused by a defective air gun. PA H, I.

65. While the second FAT testing was being conducted, the Government's Quality Assurance Representative ("QAR") observed that there was no indication that the PS-115s had been defectively manufactured. PA H, I.

66. The contract was terminated for default on November 12, 2002. DA 164; Latifi Depo at 237-38, PA D.

67. The Government's explanation for the termination for default states: "a total of 25 out of the 66 First Article Power Supplies failed to meet the performance requirements of drawing 11744726." DA 164.

68. At the time the contract was terminated for default, the Navy no longer needed the PS-115s. Hahin Depo at 92.

69. Corrosion can result if two metals with different electrical properties coming in contact with each other for a prolonged amount of time. Hahin Depo at 116, 187.

70. The specifications required a plate bromide weld on the bromide ampules. Hahin Depo at 185.

71. The plate bromide weld is made of copper. Hahin Depo. at 186.

72. A cutter blade rests on the plate bromide weld. Hahin Depo. at 185.

73. The cutter blade is made of copper beryllium. Hahin Depo at 188.

74. When the copper beryllium of the cutter and the copper of the plate bromide weld come in contact for a prolonged amount of time, there is a possibility that one may act as a cathode and one may act as an anode. Hahin Depo. 188, 189. 191.

75. It is plausible that the copper in the plate bromide weld could corrode based on the copper coming in contact with the copper beryllium for a prolonged amount of time. Hahin Depo. 188, 189. 191.

76. The corrosion of the copper in the plate bromide weld could result in a pin hole. Hahin Depo. 189-190, 191.

77. A pin hole in the plate bromide weld could result in the mixing of bromide and flouboric acid. Hahin Depo. 189-190, 191.

78. If the bromide and flouboric acid mixed, the result could result in the type of leaking of acid that the Navy experienced with older PS-115s prior to contract N00106-96-C-KA09 was awarded. Hahin Depo. 190.

Dated this the 24th day of May, 2005.

Respectfully submitted,

**ATTORNEY OF RECORD:**

s/Richard J.R. Raleigh Jr.
**RICHARD J.R. RALEIGH JR.**
**WILMER & LEE, P.A.**
100 Washington Street, Suite 200
Huntsville, Alabama 35801
(256) 533-0202 Telephone
(256) 533-0302 Facsimile
rraleigh@wilmerlee.com

**OF COUNSEL:**

s/Jerome S. Gabig, Jr.
**JEROME S. GABIG, JR.**
4811 Cove Creek Drive
Brownsboro, AL 35741
(256) 509-0279 Telephone
(256) 512-0020 Facsimile
gabig3@comcast.net

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been electronically filed this 24th day of May, 2005. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

KATHRYN A. BLEECKER
Assistant Director

DOUGLAS K. MICKLE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530

Richard Martinelli
Office of Counsel
Naval Inventory Control Point
Mechanicsburg, PA 17055-0788

s/Richard J.R. Raleigh, Jr.
**OF COUNSEL**