**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **AXION CORPORATION,** | ) | |
| **Plaintiff** | ) | |
| | ) | **No. 03-2644C & 04–297C** |
| **v.** | ) | **(Judge Firestone)** |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S RESPONSES TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS AND PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

Pursuant to Rule 56(h) of the Rules of the United States Court of Federal Claims, the Plaintiff responds to the Defendant's proposed findings of uncontroverted facts and respectfully submits additional findings of uncontroverted facts.

1. On December 14, 1995, the Naval Inventory Control Point ("NAVICP") confirmed its award of contract N00104-96-C-KA09 ("contract") to Axion. Defendant's Appendix ("DA") 1, and Deposition of Mr. Alex Latifi ("Latifi Depo.") p. 51 at DA 266.

Response: Agree.

2. The contract required delivery of 55,209 PS-115s exclusive of first article samples, production lot samples, and option quantities. DA 2.

Response: Agree.

3. The PS-115 is a battery used in Navy munitions. Declaration of Mr. John Korab ("Korab Decl.") ¶ 3 at DA 354-355.

Response: Agree.

4. The contract was a firm-fixed price contract. DA 1; Latifi Depo. p. 29 at DA 251.

Response: Agree.

5. The contract's unit price was $23.80, and the total price, exclusive of option quantities, was $1,313,974.20. DA 1, 2, 176.

Response: Agree.

6. The contract included a First Article Test ("FAT") requirement. DA 62; Latifi Depo. p. 36 at DA 255.

Response: Agree.

7. The purpose of FAT is to ensure that the contractor can furnish a product that conforms to all contract requirements for acceptance. Federal Acquisition Regulation ("FAR") 9.302; Korab Decl. ¶ 3 at DA 354.

Response: Agree.

8. The contract's FAT requirement stated:

> FAR 52.209-3: FIRST ARTICLE APPROVAL-CONTRACTOR TESTING (SEP 1989)
> (a) The Contractor shall test 540 unit(s) of Lot/Item 0001AB as specified in this contract. At least 45 calendar days before the beginning of first article tests, the Contractor shall notify the Contracting Officer, in writing, of the time and location of the testing so that the Government may witness the tests.
>
> (b) The Contractor shall submit the first article test report within 120 DACA calendar days from the date of this contract to SPCC Code 0282 marked "First Article Test Report: Contract No. _______, Lot/Item No. _______" Within 30 calendar days after the Government receives the test report, the Contracting Officer shall notify the Contractor, in writing, of the conditional approval, approval, or disapproval of the first article. The notice of conditional approval or approval shall not relieve the

Contractor from complying with all requirements of the specifications and all other terms and conditions of this contract. A notice of conditional approval shall state any further action required of the Contractor. A notice of disapproval shall cite reasons for the disapproval.

(c) If the first article is disapproved, the Contractor, upon Government request, shall repeat any or all first article tests. After each request for additional tests, the Contractor shall make any necessary changes, modifications, or repairs to the first article or select another first article for testing. All costs related to these tests are to be borne by the Contractor, including any and all costs for additional tests following a disapproval. The Contractor shall then conduct the tests and deliver another report to the Government under the terms and conditions and within the time specified by the Government. The Government shall take action on this report within the time specified in paragraph (b) above. The Government reserves the right to require an equitable adjustment of the contract price for any extension of the delivery schedule, or for any additional costs to the Government related to these tests.

(d) If the Contractor fails to deliver any first article report on time, or the Contracting Officer disapproves any first article, the Contractor shall be deemed to have failed to make delivery within the meaning of the Default clause of this contract.

(e) Unless otherwise provided in the contract, and if the approved first article is not consumed or destroyed in testing, the Contractor may deliver the approved first article as part of the contract quantity if it meets all contract requirements for acceptance.

(f) If the Government does not act within the time specified in paragraph (b) or (c) above, the Contracting Officer shall, upon timely written request from the Contractor, equitably adjust under the changes clause of this contract the delivery or performance dates and/or the contract price, and any other contractual term affected by the delay.

(g) Before first article approval, the acquisition of materials or components for, or the commencement of production of, the balance of the contract quantity is at the sole risk of the Contractor. Before first article approval, the costs thereof

shall not be allocable to this contract for (1) progress payments, or (2) termination settlements if the contract is terminated for the convenience of the Government.

(h) The Government may waive the requirement for first article approval test where supplies identical or similar to those called for in the schedule have been previously furnished by the offeror/contractor and have been accepted by the Government. The offeror/contractor may request a waiver.

Alternate I - (SEP 1989)

As prescribed in (a)(2) and (b)(2), add the following paragraph (i) to the basic clause: (i) The Contractor shall produce both the first article and the production quantity at the same facility and shall submit a certification to this effect on each first article.

Alternate II (Sep 1989). As prescribed in (a)(3) and (b)(3), substitute the following paragraph (g) for paragraph (g) of the basic clause:

(g) Before first article approval, the Contracting Officer may, by written authorization, authorize the Contractor to acquire specific materials or components or to commence production to the extent essential to meet the delivery schedules. Until first article approval is granted, only costs for the first article and costs incurred under this authorization are allocable to this contract for (1) progress payments, or (2) termination settlements if the contract is terminated for the convenience of the Government. If first article tests reveal deviations from contract requirements, the Contractor shall, at the location designated by the Government, make the required changes or replace all items produced under this contract at no change in the contract price.

DA 62.

Response: Agree.

9. The contract's FAT clause obligated Axion to conduct the FAT and submit a FAT report demonstrating compliance with specified testing requirements. Id., DA 140.

Response: Agree.

10. Pursuant to the contract, the purpose of FAT is to verify the adequacy of manufacturing processes and material. DA 140 (¶ (d) stating "[t]he approved first article will serve as the manufacturing standard.").

Response: Agree.

11. The contract required Axion to provide all acceptance-inspection equipment. Compl. ¶ 24; DA 109 ("(t)he contractor shall provide all AIE [except for any equipment listed as available in Appendix VI] necessary to assure conformance of components and end items to contract requirements"); Latifi Depo., page 46 at DA 261.

Response: Agree.

12. It was Axion's intent to use an air gun to meet the contract's FAT requirements. Compl. ¶ 16; Latifi Depo., page 63 at 273.

Response: Disagree. Axion's intent to use an air gun only resulted after it became infeasible to use a spin gun (Latifi Depo. at 102) and it become apparent that the Army Research Laboratory was not reasonably available to perform the testing. DA 180-183; Latifi Depo. p. 67 at DA 277, Memorandum from Axion's QA Manager to Navy Contracting Officer, May 30, 1997, PA K2, AXION00295.

13. Axion had difficulties associated with acquiring or producing an air gun for use during first article testing of the PS-115. DA 178-186; Latifi Depo. pp. 64, 66, 67, 103, 112, 123, 198 at DA 274, 276, 277, 278, 287, 294, 330.

Response: Agree.

14. On January 17, 1996, Axion requested that the Navy provide it with an air gun. DA 178; Latifi Depo. p. 63 at DA 273.

Response: Agree.

15. In 1996, Axion and the Army Research Laboratory ("ARL") discussed the possibility of Axion using an ARL air gun. DA 180-183; Latifi Depo. p. 67 at DA 277.

Response: Disagree. The discussions also took place in 1997. Memorandum from Axion's QA Manager to Navy Contracting Officer, May 30, 1997, PA K2, AXION00295.

16. After several communications with Axion, the ARL decided not to enter into any agreement with Axion regarding an air gun. DA 186; Latifi Depo. pp. 105-109 at DA 280-284.

Response: Agree.

17. When Axion learned that assistance from the ARL was not forthcoming, the company notified the Navy in April and May of 1997 of its intent to produce its own air gun. DA 185-186; Latifi Depo. pp. 109-110 at DA 284-285.

Response: Agree.

18. Axion did develop an air gun and used its gun to conduct FAT and submit a FAT report on April 12, 1999. DA 187; Latifi Depo. p. 119 at DA 290.

Response: Disagree. Axion never submitted a FAT report; it merely submitted "valid collected data." DA 187. Because of air gun failures, the parties, modified by their conduct the obligations regarding a second FAT. For example, Mr. Korab stated in his deposition:

Q. The purpose is to let you make an informed decision when
enough is enough, isn't that really, and the first
article test has been passed; is that correct?
A. Yes.
Q. Since you are the decision maker, can you tell me when

have enough units been shot that you are satisfied that
they have passed the first article test? How many units
do they have to successfully shoot?
A. I base my decision on approval or disapproval of either
first article testing or production lot testing based on
the input from the engineering activity.
Q. So if the engineering community tells you we are
satisfied, you will go ahead and pass the first article?
A. If the first article -- if they approve the first
article -- in this case, they look at the data and they
recommend approval, I would approve the first article.
Q. So it doesn't matter how many are shot. It is just
whether or not the engineering community comes to you
and says we're satisfied that there has been enough shot
that we can reach the conclusion that the batteries I
have seen all appear to be built without quality
defects, when they tell you that and they think they
have had enough shooting, you are satisfied; is that
correct?
A. No. I want it explicitly stated that a first article is
approved.
Q. When they tell you they recommend approval, you approve?
A. If it is explicitly stated.

Korab Deposition at p. 114.

Likewise, concerning the First FAT, Mr. Hahin stated in an email to Mr. Korab:

> I was at Axion March 1-4 to witness some of the First Article Test.... Axion tested approximately 30 batteries while I was there. The test fixture was still causing some battery failures. When I left, it appeared that the test fixture problems had been resolved, and roughly ten batteries in a row were tested successfully. Due to the problems with the fixture, Axion has expended a significant number of batteries I consider to be "NO TESTS" which did not meet functional requirements.

Hahin Depo at Exhibit 26; testimony at 147, 148.

Similarly, in his deposition, Mr. Hahin testified that because of the unreliability of the air gun, it was his subjective judgment when a sufficient number of PS-115s had been fired:

Q: When you say sufficient, explain that more to me. Are we talking absolute numbers or does sufficient mean it's reached the point where you're satisfied that the PS-115 has been properly manufactured?

A: Yes, I mean, you nee some sort of statistical sample. So, I mean, you couldn't test like five and say it was good. But yeah, I mean , you know, he tested a significant number. I don't know what I would define as significant, I would probably have to think about that.

Q: Normally, it's sort of a judgment call, would you agree to that?

A: Yes.

Hahin Depo at 130.

The same process of firing PS-115s in the air gun until the Government was subjectively satisfied likewise applied to the Second FAT. For example, as shown by his emails, the QAR was under the impression that the PS-115s had been manufactured properly and that additional testing only reflected air gun failures:

> We had a total of aprx 14 good shots during the past 3 working days (6 consecutive last week Thursday and 8 consecutive yesterday)—with some minor consuming problems early on with positioning of parts on the 'bird' to enable accurate recording of data.
>
> Yesterday we shot a total of 14 of which 8 had good data collected (split between cold (3), hot (3) and room temp (2)); 3 of the 14 had no data because the batteries on the recording computer died without us being aware (we checked the voltage on the cells after and found between 16 and 26 volts existent that seems to indicate probable good units even though not acceptable from the data standpoint); and 3 that broke at impact that provided only partial data and are not acceptable. . . .
>
> The majority of the failed items (failed to capture data) provide sufficient voltage after data collection failure to seem to indicate the cell functioned correctly to requirements despite the inability to collect data.

PA H.

> He has successfully completed testing (recorded successful data) on at least 90 items.... At this point, the testing system functions very well -- Axion can shoot and record, optimally, 4 per hour; human error has caused every non-acceptable data collection problem that has been encountered over the past couple of weeks. On 3 most recent separate days we observed at least 6 consecutive successful shots before failures occurred. In one case, failure to record acceptable data resulted from the normal wearing out of batteries used to power the recording computer in the system. At least 6 failures happened because the shot units broke on impact. Another anomaly that was discovered was that one the technicians put his hand on part of the testing apparatus and touched a grounded table with the other and shorted all data immediately to ground and lost it all....
>
> The majority of the failed items (failed to capture acceptable data) provide sufficient voltage after data collection failure to seem to indicate that the cell functioned correctly to requirements despite the inability to collect the data.

PA I.

Axion's response to the Show Cause letter issued by Mr. Korab further reflects the intent of the parties that there would be no report; instead Axion would continue shooting PS-115s until the Government was satisfied that, notwithstanding problems with the air gun, the PS-115s were properly manufactured:

> On Friday, September 6, 2002, while performing the tests, DCAS had a question that should we test beyond the 120 units that were previously selected by DCAS, We tried to contact you at that time and the chief of our local DCAS was trying to do the same. Axion could have performed the tests very easily since we were now capable of testing four (4) units per hour, when previously the best we could do was five (5) units per day. The question was not if Axion Corporation was capable of performing the test, but if the government would accept a quantity over 120 units. The local DCAS felt it was not necessary to proceed shooting good units and wasting them when 127 units had been shot and approximately 80 good day were collected. Originally, Jerry Hahin stated that a quantity round 80 units would be sufficient. In my conversation with you on Monday,

> September 9, 2002, **you stated you felt that the quantity was adequate.** We should not proceed wasting more units.
>
> We believe we performed as required. Should you want us to shoot more units, we would be glad to shoot with one day's notice.

DA 209-210. (emphasis added).

19. After evaluating the FAT report, the Navy notified Axion in May 1999 that the FAT was approved. DA 189; Declaration of Mr. Jerry Hahin ("Hahin Decl.") ¶ 4 at DA 349; Latifi Depo. p. 119 at DA 290.

Response: Disagree. For reasons set forth above in # 18, there was no FAT report.

20. The contract provided for delivery of the first production quantities 90 days after FAT approval. DA 3, 177 (5,209 units to be delivered "90 DAAFA," or 90 days after approval of first article).

Response: Agree.

21. On June 2, 1999 the parties bilaterally agreed to modification P00011 which incorporated a revised delivery schedule into the contract requiring the first production lot delivery by December 28, 1999. DA 153; Latifi Depo. p. 122 at DA 293.

Response: Agree.

22. Axion did not make delivery in accordance with modification P00011. Korab Decl. ¶ 4 at DA 354; Latifi Depo. p. 124 at DA 295.

Response: Agree.

23. On five occasions, Axion and the Navy entered bilateral modifications to extend the contract`s delivery schedule. DA 153, 155, 156, 157, 158 (Modifications

P00011, P00013, P00014, P00015, and P00016); Latifi Depo., pp. 122, 124, 125, 133, 146 at DA 293, 295, 296, 300, 313.

Response: Agree.

24. The PS-115 that passed first article testing included plate stock manufactured by an outside vendor. Hahin Decl. ¶ 6 at DA 350; Korab Decl. ¶ 5 at DA 354; Declaration of Mr. Henry Stickrod ("Stickrod Decl.") ¶ 5 at DA 360; Latifi Depo. p. 174 at DA 328.

Response: Agree.

25. After passing the FAT, Axion decided to produce plate stock itself rather than acquire the item from the foreign vendor. Hahin Decl. ¶ 6 at DA 350; Latifi Depo. p. 174 at DA 328.

Response: Agree.

26. Axion's decision to change the approved manufacturing process invalidated the previously approved FAT. Hahin Decl. ¶ 6 at DA 350.

Response. Disagree. Axion never changed the approved manufacturing process. As a result of a May 24, 2000 meeting, the Navy was informed that Axion intended to substitute pure nickel for the steel plated nickel for the cells. Hahn Depo. at 78. In a letter dated November 22, 2000, the Navy was put on notice that Axion was going to manufacture the pure nickel plating. Hahn Depo at 79. Pure nickel improved performance of the cells. Hahn depo at 88. Hahin Decl. ¶ 6 at DA 350; Latifi Depo. p. 174 at DA 328.

Pursuant to the FAR 52.203(h) provision in the contract, the pure nickel plating used by Axion was "similar to those called for in the schedule." DA 62 Also under FAR

52.203(h), the Navy waived an additional FAT for this similar component. After learning about the change in plating in 2000, the Navy considered, but decided not to purse, a second FAT. Hahn Depo at 80, 89-90, Document Axion00386.

The decision not to require a second FAT was based on the fact that the plate stock is tested for electrical storage in a cell test before it is utilized in the energizer. Hahn Depo at 89-90, Document Axion00386. At the time the Government made the decision to proceed to production rather than conduct a second FAT, Mr. Hahn was of the opinion that a cell test was adequate to test the plate stock. Hahn Depo at 91.

Although aware of the changes in the plating, the Contracting Officer sent a letter to Axion advising "[i]t is recommended that Axion proceed with production." Document Bates No. A361.

The amount of time between the Navy changing its mind about requiring a second FAT was in excess of thirteen-months change. During that time and in reliance upon being advised to proceed to production, Axion produced tens of thousands of PS-115s. Strickrod Depo at 51, PA K1.

27. The validity of the approved FAT was placed in further doubt by the leaking electrolyte. Hahin Decl. ¶ 7 at DA 350; Deposition of Mr. Jerry Hahin ("Hahin Depo."), p. 110 at DA 224.

Response. Disagree. The first FAT tested for leakage. Hahin Depo. at 142, 192. Hence, whether or not the Navy had subsequent doubts was not a basis to invalidate the first FAT.

28. Axion experienced leaking of electrolyte from the PS-115 and believed the leaking was due to defective specifications. DA 194; Latifi Depo. pp. 150-157 at DA 316-323.

Response: Agree.

29. Axion had difficulties producing the PS-115 plate stocking and alleged in 2000 that this was attributable to defective specifications. DA 190; Latifi Depo. pp. 136-144 at DA 303-311.

Response: Agree.

30. On October 2, 2001, Axion and NAVICP agreed to bilateral modification P00017 establishing a requirement for resubmission of FAT samples by October 3, 2001. DA159; Deposition of Mr. John Korab ("Korab Depo.") p. 51 at DA 233.

Response: Agree.

31. Modification P00017 also included the following statement:

> This modification constitutes a full and final disposition of all matters relating to this contract and is a full release and accord and satisfaction of any and all claims, demands, or causes of action that either the contractor or the government may have against the other arising out of or related to the contract to date.

DA 159; Korab Depo. p. 26 at DA 231.

Response: Agree.

32. At the time Axion and the United States agreed to modification P00017, Axion was at risk for termination for default pursuant to the contract's termination clause because it failed to make delivery in accordance with the requirements of P00016. DA 158; Korab Decl. ¶ 4 at DA 355; Latifi Depo. p. 158 at DA 324.

Response: Disagree. According to Mr. Hahin, the contract could have been "wrapped up" in 1999 but for the plating issue and problems with the air gun. Hahin Depo at 64. Axion was never at risk of being in default because Axion was excused from meeting the delivery date set forth in P00017 for the reasons set forth in Complaint No. 03-2644C. For example, Count XV ("Application of Spearin Doctrine to Axion's Plates") establishes why the delivery date was excused because of a defective specification for the plating. Similarly, Counts I-VI establish why delivery date was excused for reasons pertaining to the air gun.

33. Axion did not satisfy the FAT requirements of modification P00017. Korab Decl. ¶ 6 at DA 355.

Response: Disagree. First, P00017 established the date for submission of first article samples as 01 OCTOBER 03. The contract was terminated prior to the date of 01 OCTOBER 03 before the Government had a right to the "FAT requirement." Second, the FAT requirements were to establish that the PS-115s were free of manufacturing defects. Federal Acquisition Regulation ("FAR") 9.302; Korab Decl. ¶ 3 at DA 354. Axion met the requirements of the second FAT because the PS-115s were free of manufacturing defects. While the second FAT testing was being conducted, the Government's Quality Assurance Representative ("QAR") observed that the failed tests were being caused by a defective air gun and that there was no indication that the PS-115s had been defectively manufactured. *Id.* For example, in an email dated Sept. 5, 2002 to the Contracting Officer, the QAR observed:

> We had a total of aprx 14 good shots during the past 3 working days (6 consecutive last week Thursday and 8 consecutive yesterday)—with some minor consuming problems early on with positioning of parts on the 'bird' to enable accurate recording of data.

> Yesterday we shot a total of 14 of which 8 had good data collected (split between cold (3), hot (3) and room temp (2)); 3 of the 14 had no data because the batteries on the recording computer died without us being aware (we checked the voltage on the cells after and found between 16 and 26 volts existent that seems to indicate probable good units even though not acceptable from the data standpoint); and 3 that broke at impact that provided only partial data and are not acceptable. . . .
>
> The majority of the failed items (failed to capture data) provide sufficient voltage after data collection failure to seem to indicate the cell functioned correctly to requirements despite the inability to collect data.

PA H.

Similarly, the following day, the QAR sent another email to the Contracting Officer stating:

> He has successfully completed testing (recorded successful data) on at least 90 items.... At this point, the testing system functions very well -- Axion can shoot and record, optimally, 4 per hour; human error has caused every non-acceptable data collection problem that has been encountered over the past couple of weeks. On 3 most recent separate days we observed at least 6 consecutive successful shots before failures occurred. In one case, failure to record acceptable data resulted from the normal wearing out of batteries used to power the recording computer in the system. At least 6 failures happened because the shot units broke on impact. Another anomaly that was discovered was that one the technicians put his hand on part of the testing apparatus and touched a grounded table with the other and shorted all data immediately to ground and lost it all....
>
> The majority of the failed items (failed to capture acceptable data) provide sufficient voltage after data collection failure to seem to indicate that the cell functioned correctly to requirements despite the inability to collect the data.

PA I.

34. On April 4, 2002, Axion and NAVICP agreed to a bilateral modification P00019 reestablishing a date of April 23, 2002 for FAT. DA 162; Latifi Depo. p. 200 at DA 332.

Response: Agree.

35. The modification included the following language:

> This modification constitutes a full and final disposition of all matters relating to this contract and is a full release and accord and satisfaction of any and all claims, demands, or causes of action that either the contractor or the government may have against the other arising out of or related to the contract to date.

DA 162.

Response: Agree.

36. At the time Axion and the United States agreed to modification P00019, Axion was at risk for termination for default because Axion failed to make delivery of the FAT pursuant to modification P00017. Korab Decl. ¶¶ 8 & 9 at DA 356-57.

Response: Disagree. According to Mr. Hahin, the contract could have been "wrapped up" in 1999 but for the plating issue and problems with the air gun. Hahin Depo at 64. Axion was never at risk of being in default because Axion was excused from meeting the delivery date set forth in P00019 for the reasons set forth in Complaint No. 03-2644C. For example, Count XV ("Application of Spearin Doctrine to Axion's Plates") establishes why the delivery date was excused because of a defective specification for the plating. Similarly, Counts I-VI establish why Axion was excused from the delivery date for reasons pertaining to the air gun.

37. Axion did not satisfy the FAT requirements of modification P00019. Korab Decl. ¶ 6 at DA 355-356; Latifi Depo. p. 206 at DA 335.

Response: Disagree. The FAT requirements were to establish that the PS-115s were free of manufacturing defects. Federal Acquisition Regulation ("FAR") 9.302; Korab Decl. ¶ 3 at DA 354. The PS-115s tested in the second FAT were free of