Nos. 03-2644C & 04-297C
(Judge Firestone)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

AXION CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

DEFENDANT'S REPLY TO AXION'S RESPONSE TO THE UNITED STATES' PARTIAL MOTION TO DISMISS, AND DEFENDANT'S OPPOSITION AND RESPONSE TO AXION'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

---

PETER D. KIESLER
Assistant Attorney General

DAVID M. COHEN
Director

KATHRYN A. BLEECKER
Assistant Director

DOUGLAS K. MICKLE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 353-7961
Fax: (202) 353-7988

OF COUNSEL:

RICHARD MARTINELLI
Office of Counsel
Naval Inventory Control Point
Mechanicsburg, PA 17055-0788

June 10, 2005

Attorneys For Defendant

# TABLE OF CONTENTS

PAGE(S)

DEFENDANT'S REPLY TO AXION'S RESPONSE TO THE UNITED STATES' PARTIAL MOTION TO DISMISS, AND DEFENDANT'S OPPOSITION AND RESPONSE TO AXION'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT ..... 1

ARGUMENT ..... 3

I. Axion Has Failed To Demonstrate That The Air Gun Counts Did Not Accrue In 1996, And Thus are Not Barred By The Statute Of Limitations ..... 3

A. Axion's Claims Accrued In 1996, Because That Is When The Events Occurred That Fixed Any Liability The Government Might Have Had Regarding The Air Gun Claims ..... 5

B. The FASA's Six-Year Statue Of Limitations Was Not Tolled Here ..... 10

II. Axion's Has Failed To Demonstrate That Counts XVII, XVIII, XXI, XXII, XXIII, XXIV, And XXV Of Its Complaint Are Not Barred By The Doctrine Of Laches ..... 15

III. Axion's Allegation That Accord And Satisfaction Is Not A Valid Defense For Lack Of Consideration Is Without Merit As The Government Provided Axion Consideration For Modifications P00017, P00019 And P00020 ..... 17

A. Axion Received Consideration For Modification P00017 ..... 17

B. Axion Received Consideration For Modifications P00019 And P00020 ..... 22

IV. Axion's Allegation That Modifications P00017, P00019 And P00020 Should Be Reformed To Remove The Accord And Satisfaction Language Under The Doctrine Of Unilateral Mistake Is Without Merit ..... 26

V. Axion's Request For Summary Judgment Should Be Denied Because The Accord And Satisfaction And Release Language Included In Modifications 17, 19 And 20 Bars Axion's Claims ..... 29

CONCLUSION ..... 30

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

Alder Terrace Inc. v. United States,
39 Fed. Cl. 114 (1997) .......... 9

Bonneville Assocs. Ltd. P'ship v. Barram,
165 F.3d 1360 (Fed. Cir. 1999) .......... 10

Cheyenne-Arapaho Tribes of Indians of Oklahoma v. United States,
229 Ct. Cl. 1305, 671 F.2d 1305 (1982) .......... 18

Consolidated Industries v. United States,
195 F.3d 1341 (Fed. Cir. 1999) .......... 19

Fallini v. United States,
56 F.3d 1378 (Fed. Cir. 1995), cert. denied, 517 U.S. 1243 (1996) .......... 12

Fisher v. United States,
402 F.3d 1167 (Fed. Cir. 2005) .......... 4

Frazer v. United States,
288 F.3d 1347 (Fed. Cir. 2002) .......... 10

Freedom NY, Inc., ASBCA No. 43965,
01-2 BCA ¶ 31,585 .......... 20, 21

Goltra v. United States,
119 Ct. Cl. 217, 96 F. Supp. 618 (1951) .......... 18

Hermes Consol, Inc. v. United States,
58 Fed. Cl. 3 (2003) .......... 15

Hercules v. United States,
516 U.S. 417 (1996) .......... 14

Irwin v. Department of Veteran's Affairs,
498 U.S. 89 (1990) .......... 10

JANA, Inc., v. United States,
936 F.2d 1265 (Fed. Cir. 1991) .......... 15

Johnson Mgmt. Group CFC, Inc. v. Martinez,
308 F.3d 1245 (Fed. Cir. 2002) ........................................ 26

Jones v. United States,
9 Cl. Ct. 292 (1985) ........................................ 9

Kanag'Iq Const. Co. v. U.S.,
51 Fed. Cl. 38 (2001) ........................................ 7, 19

Kinsey v. United States,
852 F.2d 556 (Fed. Cir. 1988) ........................................ 6

Lockheed Martin Corp. v. United States,
50 Fed. Cl. 550 (2001) ........................................ 20

Lockerty v. Phillips,
319 U.S. 187 (1943) ........................................ 6

Martinez v. United States,
333 F.3d 1295 (Fed. Cir. 2003) (en banc) ........................................ 4, 11

Nager Electric Company, Inc. v. United States,
177 Ct. Cl. 234, 368 F.2d 847 (1966) ........................................ 6

Patton v. United States,
No. 01-161C, 2005 WL 681241 (Fed. Cl. March 23, 2005) ........................................ 8, 9

Reynolds v. Army & Air Force Exch. Serv.,
846 F.2d 746 (Fed. Cir.1988) ........................................ 4

Seldovia Native Assoc., Inc. v. United States,
36 Fed. Cl. 593 (1996) ........................................ 12

State of Alaska v. United States,
32 Fed. Cl. 689 (1995) ........................................ 9

Tennessee Valley Auth. v. Hill,
437 U.S. 153 (1978) ........................................ 6

Terteling v. United States,
167 Ct. Cl. 331, 334 F.2d 250 (Ct. Cl. 1964) ........................................ 11, 12

United States v. Dickinson,
331 U.S. 745 (1947) ........................................ 11

## STATUTES

28 U.S.C. § 2501 .......... 10

41 U.S.C. § 605 .......... 1, 3

## FEDERAL ACQUISITION REGULATION ("FAR") PROVISIONS

FAR 4.801 .......... 21, 22

FAR 33.201 .......... 8

FAR 43.204 .......... 22

FAR 52.233-1 .......... 8

**INDEX TO SUPPLEMENTAL APPENDIX**

Document

Contract Number N00104-96-C-KA091 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Contract Modification P00001- P00021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

Letter from Axion to Department of the Navy (Dated August 4, 1994) . . . . . . . . . . . . . . . . . . 166

Letter from Axion to Department of the Navy (Dated August 11, 1995) . . . . . . . . . . . . . . . . . 167

Letter from Axion to Department of the Army (Dated September 26, 1995) . . . . . . . . . . . . . . 168

Letter from Department of the Navy to Axion (Dated September 27, 1995) . . . . . . . . . . . . . . 169

Letter from Axion to Department of the Navy (Dated October 2, 1995) . . . . . . . . . . . . . . . . . 170

Letter from Small Business Administration to Department of the Navy Regarding Certificate of Competency ("COC") (Dated October 11, 1995) . . . . . . . . . . . . . . . . . . . . . . . . 171

Letter from U.S. Small Business Administration to Mr. Artz: Regarding COC (Dated November 9, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

Letter from Dep't of the Navy to Department of Labor: Requesting Clearance (Dated November 22, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

Letter from U.S. Small Business Administration to Department of Navy: Regarding Axion (Dated December, 4, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

Letter from Department of Navy to Axion (Dated December 7, 1995) . . . . . . . . . . . . . . . . . . . 176

Letter from Axion to Department of Navy: Regarding ECP on Axion Contract (Dated January 17, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

Letter from Department of Navy to Alex Latifi, President of Axion: Regarding Dies (Dated January 26, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

Letter from Axion to Department of the Navy: Regarding Post Award (Dated March 18, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

Letter from Axion to U.S. Army Research Laboratory: Regarding Cooperative Resolution and Development Agreement (Dated June 27, 1996).........................................................................182

Letter from Axion to Mr. John Korab, Naval Inventory Control Point: Regarding N00104-96

CKA09 (Dated April 15, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

Letter from Axion Mr. Weir to Mr. Alen Artz (Dated May 30, 1997) . . . . . . . . . . . . . . . . . . . 185

Letter from Axion to Mr. John Korab, Naval Inventory Control Point: Regarding Data of First Article in Reference to Axion Contract N00104-96 CKA09 (Dated April 12, 1999) . . . . . . . . 187

Letter from Commanding Officer, Naval Inventory Control Point to Axion: Regarding First Article Approval for Contract (Dated May 17, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .189

Letter from Axion to Naval Inventory Control Point: Regarding Plating Guidelines (Dated November 13, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

Letter from Department of the Navy to Axion (Dated November 22, 2000) . . . . . . . . . . . . . . 192

Letter from Axion to Naval Inventory Control Point (Dated August 27, 2001) . . . . . . . . . . . . 194

Transmittal Letter from Department of the Navy to Axion (Dated September 18, 2001) Transmitting September 6, 2001 Letter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196

Letter from Axion to Mr. John Korab (Dated September 18, 2001) . . . . . . . . . . . . . . . . . . . . 198

Letter from Department of the Navy to Axion (Dated November 1, 2001) . . . . . . . . . . . . . . . 199

Letter from Department of the Navy to Axion (Dated December 13, 2001) . . . . . . . . . . . . . . . 200

Letter from Department of the Navy to Axion (Dated April 30, 2002) . . . . . . . . . . . . . . . . . . . 201

Letter from Axion to Mr. John Korab, Naval Inventory Control Point (Dated September 9, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202

Letter from Department of the Navy to Axion (Dated October 1, 2002) . . . . . . . . . . . . . . . . . 203

Letter from Department of the Navy to Axion (Dated October 1, 2002) . . . . . . . . . . . . . . . . . 204

Letter from Axion to Mr. Korab (Dated October 11, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

Memorandum from John Korab Regarding Proposed Termination for Default (Dated October 17, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208

Letter from Department of the Navy to Axion (Dated June 30, 2003) . . . . . . . . . . . . . . . . . . . 209

Deposition of Mr. Jerry Hahin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 211

Deposition of Mr. John Korab . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

Deposition of Mr. Alex Latifi . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 243

Declaration of Mr. Jerry Hahin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 348

Declaration of Mr. John J. Korab . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 354

Declaration of Mr. Henry Stickrod . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 359

Letter from Axion to Mr. Korab (Dated May 30, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 363

Letter from Department of the Navy to Axion (Dated August 13, 2001) . . . . . . . . . . . . . . . . . 364

E-mail from Mr. Latifi to Mr. Korab (Dated November 11, 2001) . . . . . . . . . . . . . . . . . . . . . . 365

Letter from Department of the Navy to Axion (Dated June 30, 2003) . . . . . . . . . . . . . . . . . . . 209

Deposition extract of Mr. Alex Latifi . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 366

Deposition extract of Mr. John Korab . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 369

Deposition extract of Mr. Henry Stickrod . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 378

Deposition extract of Mr. Jerry Hahin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 382

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **AXION CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 03-2644C & 04-297C** |
| **v.** | ) | **(Judge Firestone)** |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S REPLY TO AXION'S RESPONSE TO THE UNITED STATES' PARTIAL MOTION TO DISMISS, AND DEFENDANT'S OPPOSITION AND RESPONSE TO AXION'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

In our opening motion,[1] the United States demonstrated that Counts XVII, XVIII, XXI, XXII, XXIII, XXIV, and XXV of Axion's complaint[2] (the "air gun" counts or claims) should be dismissed because they accrued outside the statute of limitations and are also barred by the doctrine of laches. The Government provided documentary and testimonial evidence that showed that all the events which fixed the Government's alleged liability concerning Axion's production of test equipment to test the PS-115 batteries accrued in 1996, but Axion never made any claims for the costs it allegedly incurred for producing the air gun until 2003. Accordingly, all claims regarding Axion and its air gun should be dismissed because they are outside the six-year statute of limitation set forth in the Federal Acquisition Streamlining Act ("FASA"). See 41 U.S.C. § 605(a). Additionally, the air gun claims are barred by the doctrine of laches because

[1] The United States filed defendant's partial motion to dismiss for lack of jurisdiction and a partial motion for summary judgment, on April 11, 2005.

[2] As we explained in our opening dispositive motion, Axion filed two complaints with Court concerning this procurement. These complaints were consolidated pursuant to this Court's Order of April 22, 2004. Accordingly, because Axion's second complaint (i.e., 04-297C) includes new claims, as well as all the allegations it raised in its initial complaint, the United States throughout this response refers to Axion's second complaint.

the Government is prejudiced by Axion's unreasonable failure in bringing any claims regarding costs to acquire test equipment until nearly eight years after the contract was awarded.

The United States also demonstrated that the claims Axion asserts in Counts I through IX, and Counts XIII through XXIX of its complaint should be denied because they are barred by the doctrines of accord and satisfaction and release. All of the facts giving rise to these claims arose before October 2, 2001. On this date, the parties jointly agreed to contract modification P00017, which contains accord and satisfaction and release language that clearly bars Axion's claims pursuant to these counts. The Government also demonstrated that Axion and the United States entered into subsequent bilateral modifications that also contain similar accord and satisfaction and release language that bars Axion's claims.

In its response,[3] Axion asserts that the United States failed to prove that Axion's claims for compensation associated with producing the contractually required test equipment are barred by the statute of limitations. Pl. Resp. pp. 11 - 23. Axion also argues that the Government's laches argument should be denied because Axion's failure to seek its costs for producing the air gun, were reasonable and excusable, and that Axion's failure to assert any claims regarding the air gun over an eight-year period did not prejudice the Government. Pl. Resp. p. 24. Finally, Axion argues that it is entitled to summary judgment upon the issues that Modifications P00017, P00019, and P00020 are unenforceable for lack of consideration. Pl. Resp. pp. 25 - 36. Axion contends that the language in these modifications should be reformed by removing the accord and satisfaction language because of a unilateral mistake. Pl. Resp. pp. 37 - 39. In the

---

[3] Axion filed its cross-motion for partial summary judgment and response to the United States' partial motion to dismiss and for summary judgment on May 12, 2005, and will be referenced to as Axion's "response" or "cross-motion" and cited to as "Pl. Resp."

alternative, Axion argues that even if the accord and satisfaction language is enforceable, it should not apply to this contract because of various legal theories to include, the Government possessed superior knowledge, failed to cooperate, and misrepresented facts throughout Axion's attempted performance upon the contract. Pl. Resp. pp. 39 - 46.

As we demonstrate, Axion's cross-motion should be denied, the United States' motion should be granted, and the complaint dismissed. In this reply and opposition, the United States relies upon Axion's second complaint ("Compl."), the following brief, documents in defendant's appendix, and the accompanying supplemental appendix.[4]

## ARGUMENT

### I. Axion Has Failed To Demonstrate That The Air Gun Counts Did Not Accrue In 1996, And Thus Are Not Barred By The Statute Of Limitations

It is undisputed that Counts XVII, XVIII, XXI, XXII, XXIII, XXIV, and XXV of Axion's second complaint involve difficulties Axion experienced with developing and using its air gun to test the PS-115 batteries. Pursuant to the air gun counts, Axion claims entitlement for an equitable adjustment to this fixed-price contract for the increased costs Axion incurred in producing a functioning air gun. As shown in our initial motion, and explained below, these claims are barred by the six-year statute of limitations requirement of the FASA because they accrued in 1996. See 41 U.S.C. § 605(a). The testimony and documentary evidence make clear that Axion was fully aware by that time that it was responsible for all costs associated with

---

[4] We are submitting a supplemental appendix that contain the documents that we cite for support in this response. The pages cited for the first time begin at 363. When citing to these new documents, and those submitted with our opening appendix, we will refer to them as "DA."

testing the PS-115, to include development and production for all test equipment.[5] Accordingly, all counts in Axion's complaint that seek any costs associated with the development, production, and testing of the air gun or any other test equipment are barred by the statute of limitations.

In its response, Axion contends that the Government did not prove that Axion's claims concerning the air gun accrued in 1996. Pl. Resp. p. 11. Indeed, Axion asserts the Government has not provided any factual basis or analysis demonstrating that these claims accrued in 1996. Id. After making this bold pronouncement, Axion spends a considerable amount of time discussing the merits of each of its equitable adjustment claims concerning the air gun. However, in doing so, Axion fails to appreciate that its arguments going to the merits of its claims are inapplicable to the central issue here: does the statute of limitations preclude this Court from entertaining these claims at all. See Martinez v. United States, 333 F.3d 1295, 1318 (Fed. Cir. 2003) (en banc) and Fisher v. United States, 402 F.3d 1167, 1175-76 (Fed. Cir. 2005). Moreover, Axion fails to appreciate that it bears the burden by establishing this Court's jurisdiction by a preponderance of the evidence. Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir.1988). Nevertheless, stripping away these merits-based arguments, it becomes clear that Axion's defense upon this issue is based upon two legal theories: 1) Axion's claims did not accrue in 1996 or 1997, and 2) the statute of limitation period should be tolled, neither of which have merit.

---

[5] Axion candidly admits in its response that "Axion does not contest that it had a contractual obligation to fabricate the acceptance inspection equipment." Pl. Resp. p. 12.

**A. Axion's Claims Accrued In 1996, Because That Is When The Events Occurred That Fixed Any Liability The Government Might Have Had Regarding The Air Gun Claims**

Axion unconvincingly contends that its air gun claims did not accrue until after 1996. Pl. Resp. pp. 12, 14-15, 17-18, 19, 21, 23. The Government provided ample documentary and testimonial evidence that shows all facts that fixed the Government's alleged liability were "fixed" by 1996. See e.g., DA 178, 179, 186, 252-252A, 261-263, 274-277, 367-368. Moreover, Axion is simply confusing a proper accrual date, i.e. when the facts fix liability, with its mistaken belief that the accrual date is not fixed until Axion had fully developed its legal theories and ascertained its monetary damages.[6]

Axion's response to this issue reflects its apparent misunderstanding of what Axion was required to produce pursuant to this fixed-price contract. The contract is clear, Axion was required to produce PS-115 batteries, and not an air gun. DA 2. Accordingly, the cost of the test equipment should have been included in Axion's unit price. Once the Government told Axion that it was not furnishing Axion test equipment, and Axion decided to produce its own testing equipment, Axion was certainly aware that its costs would be significantly more than anticipated. At that time Axion knew, or should have known, that by producing its own air gun, its proposed costs to produce the PS-115s were suspect. Furthermore, at no time after 1996 did the Government have any role in Axion's decision to produce the contractually required test equipment. Accordingly, by 1996 "all the events [had] occurred which fix the liability of the

[6] If Axion's theory of accrual date is adopted, it would effectively create a per se rule that the accrual date for any breach of contract matter is when the contract is finally closed out, because damages from a complex breach of contract are rarely ascertainable until that time.

Government and entitle the claimant to institute an action." Kinsey v. United States, 852 F.2d 556, 557 (Fed. Cir. 1988).

Moreover, Mr. Latifi, Axion's Chief Executive Officer, admitted that in early 1996 he realized Axion had to "do something" about the testing equipment. DA 277. Furthermore, it can not be disputed that by May of 1997, Mr. Latifi told the Government that Axion was going to build its own air gun. DA p. 186; DA 274, 277. Finally, no one disputes that Axion first filed a claim with the contracting officer for building the air gun over six years later on October 31, 2003. Compl. ¶¶ 6-13. These undisputed facts clearly show that Axion's equitable adjustment claims associated with the building of the air gun to test the PS-115s are outside the six-year FASA statute of limitations, whether they accrued in 1996 or even 1997.

Axion argues that the FASA did not intend for contractors to submit "piecemeal claims," nor is there any evidence of congressional intent to "overrule Nager Electric Company, Inc. v. United States, 368 F.2d 847, 177 Ct. Cl. 234 (1966)." Pl. Resp. p. 16-17. First, Nager is inapplicable because it predates the present day procurement rules set forth in the Contracts Disputes Act ("CDA") and it involves a pre-FAR disputes clause, neither of which are at issue here. Second, Axion's argument here is misplaced because there is no constitutional requirement for Congress to address judicial opinions when legislating matters that affect a court's jurisdiction, to include sovereign immunity. See U.S. Const. Article III, Sect. 1 and 2; Lockerty v. Phillips, 319 U.S. 187 (1943).

Furthermore, the case Axion cites for the proposition that repeals by implication are not favored, Tennessee Valley Auth. v. Hill, 437 U.S. 153 (1978), does not support Axion's argument. See Pl. Resp. p. 17. The Hill decision is factually distinguishable because it involved

a repeal of a statute by implication in a subsequent appropriations bill. As the Supreme Court held, "the doctrine disfavoring repeals by implication 'applies with full vigor when . . . the subsequent legislation is an appropriations measure.'" Id. at 190. When enacting the FASA, Congress did not repeal any substantive act, nor was FASA part of an appropriations bill.

Finally, pursuant to the CDA, it is well-settled that a single government contract may give rise to more than one claim, and a contractor may pursue its rights by filing "two or more suits" in either one or more fora; the only limitation is that a single, unified claim based upon a common and related set of facts cannot be fragmented for the purpose of eluding the CDA's certification requirement. Kanag'Iq Const. Co. v. U.S., 51 Fed. Cl. 38 (2001). Here, all of Axion's claims for equitable adjustment are based upon a related set of facts, facts that were fixed in 1996.

Axion next argues that its air gun claims could not be raised before Axion submitted its settlement proposal, eight years after the contract was awarded, because there were “no applicable provisions in the contract for progress payments,”[7] and, Axion was “still working on the air gun at the time of the termination for default.” Pl. Resp. pp. 13-14. Axion’s defense here is without merit because Axion was being paid upon a fixed price basis to build PS-115 batteries; Axion was not to be paid for producing an air gun. The costs associated with producing test equipment should have been included in the unit price of Axion’s offer to build the PS-115s. Accordingly, once Axion determined it was going to produce its own an air gun, if Axion believed these costs were separate from the cost of producing the batteries or outside the scope

[7] Contrary to Axion’s assertion upon this point, the contract did include FAR 52.232-16 Progress Payments. DA 57. Indeed, Axion received $512,365.00 in progress payments that Axion has agreed to refund to the Government if this lawsuit is unsuccessful. DA 209-209A.

of the contract, it was at that time that it should have sought these equitable adjustments and not several years later after it had been terminated for default.

Axion also contends that its air gun claims did not accrue until it was fully aware of the costs of producing the air gun. Pl. Resp. p. 14-15. This argument is based upon a flawed analysis of the concept of claim accrual under the CDA because it ignores the plain language of the governing Federal Acquisition Regulation ("FAR") clause. First, the FAR specifically defines a claim to include Axion's circumstances, where the contractor should have sought an "interpretation of [the] contract terms, or other relief arising under or related to a contract." FAR 52.233-1(c). Second, the term "accrual of a claim" for purposes of the CDA is defined by the FAR as,

> the date when all events, that fix the alleged liability of either the Government or the contractor and permit assertion of the claim, were known or should have been known. For liability to be fixed, some injury must have occurred. However, **monetary damages need not have been incurred**.

FAR 33.201 (emphasis added).

Axion also unconvincingly references Patton v. United States, No. 01-161C, 2005 WL 681241 (Fed. Cl. March 23, 2005), as precedent that a claim cannot accrue until damages are ascertainable. See Pl. Resp. 14, 20, 21. Patton not only does not stand for such a proposition, it actually supports the United States' position upon this matter.

Patton, which does not involve the CDA, concerned a dispute between a paid criminal informant and the Federal Bureau of Investigations ('FBI") over the FBI's alleged breach of promise in 1991 to pay rental fees for two storage units in which the informant was storing personal items. Patton, 2005 WL 681241, at *1-4. In March 2001, after the storage facility had

auctioned plaintiff's personal property for failure to pay storage fees, the plaintiff brought an action against the United States seeking $182,000 in damages. Id. at *1. This Court, in dismissing the plaintiff's claim as being outside the statute of limitations, did not consider for purposes of determining when the claim accrued, the date the plaintiff "ascertained" the full amount of his damages. Id. at *6-7. Rather, the Court looked to when plaintiff should have known that he would be receiving no additional storage facility assistance from the Government. Id.

The ruling in Patton is therefore consistent with the United States' position in the present case: the fact that Axion did not know the exact amount of damages, or appreciate the full potential amount of its damages, is not dispositive. See Alder Terrace Inc. v. United States, 39 Fed. Cl. 114, 120-21 (1997). Although the limitations period does not begin to run until a claimant has suffered a compensable injury, that juncture is not to be confused with the point at which the claimant is finally able to calculate the precise quantum of damages. State of Alaska v. United States, 32 Fed. Cl. 689, 700 (1995); Jones v. United States, 9 Cl. Ct. 292, 295 (1985). Consistent with Patton, Axion's claim accrued in 1996, when it should have known that it would be receiving no Government assistance with producing an air gun.

At bottom, Axion's arguments with respect to the statute of limitations are inconsistent with the plain meaning of the language in the CDA and FAR, and this Court's precedent. The facts are clear and beyond dispute that Axion was placed on notice in 1995 by the terms of the solicitation that it was responsible for the costs associated with acquiring equipment to test the PS-115s. See DA 109, 252-252A, 261-263, 367. By his own admission, Mr. Latifi knew in January 1996 that the Government was not going to supply the testing equipment and Axion

needed to "do something." DA 277. After seven years spent trying to produce the air gun, Axion now argues that the Government should be responsible for the costs it incurred in acquiring test equipment, and that Axion did not realize it had a claim for these costs until 2003. The plain language of the contract, the FAR, and the facts of the case do not support Axion's assertions upon this point. Accordingly, for the reasons provided above, and those discussed in our opening motion, the air gun counts accrued in 1996, and they should therefore be dismissed as outside the statute of limitations.

**B. The FASA's Six-Year Statue Of Limitations Was Not Tolled Here**

Axion also contends that its air gun claims are not barred because the statute of limitations in this case should be tolled. Pl. Resp. pp. 12, 18-19, 21-23. It is well settled that the doctrine of equitable tolling is extended "only sparingly," and, if at all, only where "the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." Irwin v. Department of Veteran's Affairs, 498 U.S. 89, 96 (1990). Nevertheless, the Federal Circuit has not ruled upon whether the statute of limitations set forth in the FASA is subject to this doctrine. Furthermore, the Federal Circuit has declined to decide "whether equitable principles may ever toll the statute of limitations codified in § 2501." Frazer v. United States, 288 F.3d 1347, 1353 (Fed. Cir. 2002). Similarly, the court of appeals has left open the question whether equitable tolling applies to the limitations period for challenging a contracting officer's decision under the CDA. Bonneville Assocs. Ltd. P'ship v. Barram, 165 F.3d 1360, 1365 (Fed. Cir. 1999).

However, to dispose of the present case, this Court need not determine whether equitable principles may ever toll the statute of limitations codified in the FASA (or 28 U.S.C. § 2501), because as the Supreme Court has explained:

> Federal courts have typically extended equitable relief only sparingly. We have allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass. We have generally been much less forgiving in receiving late filings where the claimant failed to exercise due diligence in preserving his legal rights.

Irwin v. Dep't of Veterans Affairs, 498 U.S. at 96; See also Martinez v. United States, 333 F.3d 1295, 1318 (Fed. Cir. 2003) (en banc) citing Irwin, 498 U.S. at 96.

Axion can not claim, nor could it credibly dispute, that the Navy misled Axion about its obligation to be fully responsible for the test equipment. Moreover, as we discuss below, any possible "inducement" or "trickery" upon the part of the United States was known to Axion by 1996. At that time, Mr. Latifi admitted he knew he had to "do something." DA 277. Furthermore, Axion can not contend that its delay in filing these claims was caused by its filing of defective claims or pleadings. It was not until nearly eight years after this time frame when Axion raised these issues for the very first time. Accordingly, because "equitable tolling is available only when the lateness is attributable, at least in part, to misleading governmental action." Frazer, 288 F.3d at 1353-54, Axion cannot rely upon the doctrine of equitable tolling.

Furthermore, the case Axion relies upon for support here is unpersuasive. See Pl. Resp. pp. 14-15, citing Terteling v. United States, 167 Ct. Cl. 331, 334 F.2d 250 (Ct. Cl. 1964). First, Terteling is another pre-CDA case. Moreover, Terteling is inapplicable because that decision

was based upon a theory of equitable tolling known as"stabilization doctrine," not relevant here, that was first articulated in United States v. Dickinson, 331 U.S. 745 (1947). The stabilization doctrine was established to determine the commencement of the limitations period occurs when a takings claim accrues from an event that occurred as a gradual, continuing process, i.e., rising river pool levels, as opposed to one unique and distinct event. See Dickenson, 331 U.S. at 746-747. The Supreme Court reasoned that a plaintiff is not required to resort to piecemeal or premature litigation and, instead, can wait until all the circumstances upon which a cause of action is premised have stabilized before filing suit. Id. at 748-49. Following this reasoning, the court in Terteling, found that the dispute did not occur on a specified date but on a later date that was not discernible during the time of contract. See Terteling v. United States, 167 Ct. Cl. 331, 340-41, 334 F.2d 250, 256 (1964). This is not the case at bar.

The facts here clearly did not develop over time like rising flood waters central to the holding in Terteling. Indeed, the flood waters in Axion's "air gun" river clearly reached their crest in 1996, when the Government told Axion in no uncertain terms that Axion would be responsible for all work and costs associated with acquiring test equipment and testing the PS-115 batteries. DA 179; 274-277; 367. The Government had no involvement after that time. Moreover, even if the Government had done something after 1996 to exacerbate Axion's damages, it would be irrelevant to determining when Axion's claims first accrued. It is simply not necessary, as Axion contends, that its damages be fully ascertainable in order for their claims to have accrued. Fallini v. United States, 56 F.3d 1378, 1382 (Fed. Cir. 1995), cert. denied, 517 U.S. 1243 (1996); Seldovia Native Assoc., Inc. v. United States, 36 Fed. Cl. 593, 595 (1996). Accordingly, if there had been a breach by the Government, its liability was fixed in 1996, and

thus, all claims for costs associated with producing the air gun to test the PS-115s batteries accrued at that time.

Axion next asserts that, if its claim accrued more than six years before filing, the statute of limitations should be tolled in this matter because it did not "have sufficient opportunity to discover the facts giving rise to its claims upon the accrual date." Pl. Resp. p. 17. Axion goes on to assert that if "the claim was inherently unknowable at the time that the claim accrued," the statute of limitations is tolled. Id. Regardless of whether tolling could be applied here, it is difficult to imagine how Axion could contend that its claims for production costs of the test equipment were "inherently unknowable" at the time that the claim accrued in 1996. At that time Axion knew that it had bid upon a fixed price contract with the total price based upon a fixed unit price. DA 2. Furthermore, Axion knew in 1996 that the Government would not be providing Axion testing equipment and that given the structure of the contract's schedule all expenses associated with testing equipment must be recouped through the contract's fixed unit price. DA 274-277. If in proposing what became the contract's firm fixed unit price, Axion assumed the Navy would be providing testing equipment, Axion learned that this assumption was incorrect in 1996. DA 274-277; DA 367-368. By May 1997, Axion knew that it would have to build an air gun itself. To the extent costs associated with the air gun were not contemplated in Axion's unit price, Axion knew by May 1997, at the latest, that its assumptions with respect to the contract's unit price were incorrect. Accordingly, even given a liberal reading of when the facts fixed the Government's liability for any claim associated with Axion having to produce an air gun, it was certainly no later than at that point. The evidence is clear, Axion

knew, or should have known, at that time, that it was going to have to acquire by some means an air gun, and in doing so, incur additional costs.

In arguing the Government had superior knowledge[8] as an additional ground for tolling, Axion relies upon a statement made by Mr. Hahin, who is an Electronics Engineer for the Naval Warfare Center, at his deposition where he acknowledged that in his opinion he did not realize how difficult of a time Axion would encounter in developing its air gun. Pl. Resp. p. 23. Mr. Hahin's statement clearly does not indicate that in 1996 the Government had any superior knowledge regarding this matter. Indeed, Mr. Hahin did not begin working upon this project until 1998. DA 348. Furthermore, any knowledge the Navy possessed regarding the development of the test equipment was based upon information provided by Axion. The Government, upon numerous occasions, questioned Mr. Latifi about Axion's ability to produce a functioning air gun, and Mr. Latifi always responded with assurances that Axion was up to the task at hand. See DA 186. 188. Indeed, Mr. Latifi thought that producing the air gun would be a "simple process." DA 286. Finally, Axion's argument that the Government had superior knowledge regarding the test equipment is even more remarkable, given that Mr. Latifi testified that regarding the air gun, the "Navy didn't know what the hell it was doing" and that the Navy "didn't know anything about" the test equipment because it "wasn't their damn contract." DA 283-284. Therefore, the concept of superior knowledge is of no avail to Axion because the

[8] The doctrine of superior knowledge has derived from court decisions finding that Government contracts include implied warranties that the cost to perform will not increase due to the Government's failure to disclose known, vital information. See Hercules v. United States, 516 U.S. 417, 432 (1996).

company has not shown a link between any alleged increased costs and undisclosed knowledge by the Government.

For the reasons set forth above, Axion can not rely upon the doctrine of equitable tolling, regardless of the reason. Accordingly, Axion's argument upon this issue should be rejected.

## II. Axion Has Failed To Demonstrate That Counts XVII, XVIII, XXI, XXII, XXI, XXII, XXIII, XXIV, And XXV Of Its Complaint Are Not Barred By The Doctrine Of Laches

The air gun counts should also be barred by the doctrine of laches. As discussed above, each of these claims involves difficulties Axion experienced with procuring test equipment for testing the contract's end-product, the PS-115 batteries. As we demonstrated in our opening motion, the two elements for laches are (1) unreasonable and unexcused delay in bringing a claim; and (2) prejudice to the defendant as a result of the delay. JANA, Inc., v. United States, 936 F.2d 1265, 1269 (Fed. Cir. 1991); Hermes Consol, Inc. v. United States, 58 Fed. Cl. 3, 20 (2003). Both elements are satisfied in the present case.

Axion's response argues that the doctrine of laches does not apply in this case because its delay in filing the air gun claims were "reasonable and excused," the Government has not "identified any evidence of prejudice," and the Government has "unclean hands." Pl. resp. at 24-25.

Clearly, Axion's delay in bringing these claims for costs incurred for producing its own test equipment was unreasonable and unexcused, regardless of the theory Axion's air gun claims are based upon. Axion knew when it bid on the solicitation that the offeror was responsible for the providing test equipment. DA 263. Axion was also aware that the cost of the test equipment should be included as part of its fixed price offer. DA 252-252A, 261-263, 367. Indeed, a clause

in the solicitation provided that if a bidder was to use Government property in testing the equipment, it should notify the Government so a price adjustment could be made to the bid. DA 68. Furthermore, Axion knew in January 1996 that its initial plan for acquiring test equipment, i.e. receiving an air gun from the Navy, was not going to work. DA 178, 179; 274-277. Axion's knowledge of this point is also evidenced by Axion asking the Navy to provide an air gun and the Navy's response. DA 178-179. Moreover, Axion formally stated in May of 1997 that it would build its own air gun. DA 186. There is simply no excuse for Axion's failure to claim entitlement above the contract's firm fixed price for the costs of producing test equipment until more than six years later.

The analysis of prejudice is equally apparent. The United States is prejudiced both economically and from an evidentiary perspective. Had Axion not waited until after the termination for default to request an equitable adjustment for the air gun, the parties may have been able to resolve the issue during contract performance and avert the potential liability associated with the present litigation.

From an evidentiary perspective, the United States is experiencing significant prejudice. In many instances, witnesses have not remembered key events due to the length of time between their occurrence and this litigation. Indeed, Mr. Latifi himself said under oath that he could not remember key events because they ocurred so long ago. DA 285, 314, 368A, 368B. Mr. Stickrod, the Government's Quality Assurance Representative, Mr. Hahin, and Mr. Korab, the contracting officer, also had difficulty trying to recall events that occurred almost a decade ago. See generally DA 369-394. Finally, there is no evidence that the Government had "unclean hands" in any of its dealing with Axion, regardless of the issue.

For these reasons, and those stated in our opening motion, Axion's air gun claims should also be dismissed as being barred by the doctrine of laches.

## III. Axion's Allegation That Accord And Satisfaction Is Not A Valid Defense For Lack Of Consideration Is Without Merit As The Government Provided Axion Consideration For Modifications P00017, P00019 And P00020

Axion does not contest that the claims set forth in Counts I through IX, and Counts XIII through XXIX of Axion's complaint, accrued before the parties agreed to modifications P00017, P00018, and P00020. Nor does Axion dispute the language of these contested modifications which provide,

> This modification constitutes a full and final disposition of all matters relating to this contract and is a full release and accord and satisfaction of any and all claims, demands, or causes of action that either the contractor or the government may have against the other arising out of or related to the contract to date.

DA 159, 162, 163. Instead, Axion focuses its opposition by arguing the accord and satisfaction and release language of modifications P00017, P00019 and P00020 is invalid for lack of consideration. Pl. Resp. p. 25-36. Axion's position upon this issue is without merit. As we explained in our opening motion, and demonstrate below, the Government provided Axion was consideration for each modification.

### A. Axion Received Consideration For Modification P00017

While the parties disagree as to why Axion failed to deliver pursuant to P00016, it cannot be disputed that Axion did not comply with the delivery schedule set forth in modification P00016 when the parties agreed to modification P00017. Pl. Resp. 26-27. Thus, Axion was at risk of a termination for default for failing to meet the August 8, 2001 delivery requirement of modification P00016. In agreeing to the P00017 schedule extension, the Government provided

consideration to Axion in that it relinquished its ability to terminate the contract for default at that time. Additionally, by agreeing to modification P00017, the Government relinquished any and all claims it potentially had against Axion at that time.

Axion's primary counter argument is that its obligation to deliver in accordance with the requirements of modification P00016 was held in "abeyance" because the contract's allegedly defective specification caused Axion's PS-115 to leak electrolyte. This argument fails because the Government is not required at this time to demonstrate that it had the ability to issue an unassailable termination for default at the time the parties agreed to P000017. When assessing whether forbearance constitutes good consideration, courts do not look to the merits of the compromised claims. Cheyenne-Arapaho Tribes of Indians of Oklahoma v. United States, 229 Ct. Cl. 1305, 671 F.2d 1305, 1311 (1982). And the forbearance of "even a tenuous cause of action" is good consideration. Goltra v. United States, 119 Ct. Cl. 217, 96 F. Supp. 618, 626 (1951).

Furthermore, it is not disputed that pursuant to the plain language of modification P00016 Axion was required to begin production lot deliveries by August 8, 2001. DA 313, Pl. Resp. p. 26. Axion also does not dispute that it had not made delivery in accordance with P00016 at the time modification P00017 was executed. DA 324, see also Pl. Resp. pp. 26-27 (admitting Axion did not submit the required testing lot sample). When agreeing to modification P00017, the Navy contracting officer reasonably believed Axion to be at risk of a termination for default and that the Government's ability to terminate the contract for default at that time was relinquished

through execution of modification P00017.[9] DA 356-357. Consistent with this principle, P00017 expressly released Axion from claims, demands, or causes of action the Government may have had against Axion.

The very concepts of accord and satisfaction, release, and forbearance as good consideration, would be undercut if a party could simply avoid the adverse results of such agreements by asserting the opposing party gave no consideration because the compromised claim would have failed if litigated. Axion's attempt to now litigate the merits of whether the Navy could have terminated Axion for default when P00017 was executed must therefore fail.[10]

For similar reasons, Axion's second reason why modification P00017 lacked consideration, that leaking electrolyte caused by defective specifications made the requirements of P00016 unenforceable, also fails. The issue of leaking electrolyte was clearly within the scope of the accord and satisfaction, and release language of modification P00017.[11] DA 194-

---

[9] Axion attempts to make much of the contracting officer's statement during his deposition that the Government did not seriously consider terminating Axion for default prior to execution of P00017. Such a fact, even if true, is irrelevant to the question of whether Axion received consideration for P00017 in the form of an extended delivery schedule and the Government relinquishing its ability to terminate for default at that time. Pursuant to FAR 49.402-4(a), permitting a delinquent vendor to perform under a revised delivery schedule is an authorized procedure in lieu of termination for default. Indeed, on August 13, 2001, the Navy forwarded Axion a "show cause" notice stating the Government was considering terminating the contract for default. DA 364.

[10] Furthermore, if Axion actually believed it was not required to meet the test lot delivery schedule set forth in P00016, Axion should have explicitly excepted this matter when it signed modification P00017. See, Kanig'iq, 51 Fed. Cl. at 46-47. Axion did not except any issues. See DA 159, 162, 163.

[11] On August 27, 2001 Axion wrote to the Navy alleging defective specifications were causing the leaking; on September 18, 2001, the Navy responded with a letter refuting Axion's allegation. As both letters preceded modification P00017, it is apparent that the accord and satisfaction, and release language covers the leaking issue. See DA 194, 196. Furthermore, the leaking PS-115s was one of the reasons the Navy thought it was necessary to negotiate P00017

197; 350. Axion's theory with respect to the leaking electrolyte would render any accord and satisfaction meaningless because it would permit Axion to now litigate claims it previously waived by the express agreement of the parties.

This case is not unlike Consolidated Industries v. United States, 195 F.3d 1341 (Fed. Cir. 1999). In Consolidated Industries, after the contractor failed to meet numerous schedule extensions, the parties executed a modification that contained both another schedule extension and accord and satisfaction language. Id. at 1343. After the contractor again failed to meet the schedule, the Government terminated the contract for default. Id. In appealing the termination for default, the contractor alleged the delays in performance were attributable to defective Government specifications. Id. at 1344. This Court ruled that the contractor's challenges involving defective specifications were barred by accord and satisfaction because the contractor "waived all claims against the Government concerning defective specifications" when it signed the modification. Id. Like the contractor in Consolidated Industries, Axion cannot now raise claims, such as those associated with leaking electrolyte, that were waived by the accord and satisfaction, and release language in the modifications.

Axion's remaining arguments associated with P00017 include numerous references to an Armed Services Board of Contract Appeals' decision, Freedom NY, Inc., ASBCA No. 43965, 01-2 BCA ¶ 31,585, and an allegation the Navy violated FAR 4.801(b)(4) and 43.204(c)(1). Pl. Resp. pp. 28-29. These arguments do not support Axion's claims.

It is well-settled that board decisions are not binding upon this Court. Lockheed Martin Corp. v. United States, 50 Fed. Cl. 550, 561 (2001). Additionally, the facts associated with

---

so Axion could conduct an additional First Article Test ("FAT"). DA 224.

Freedom are inapposite to the facts of the present case. In Freedom, the modifications extended the delivery schedule and included a price reduction as consideration to the Government. The Government, however, subsequently agreed to rescind the price reduction. In ruling upon whether the modifications constituted an accord and satisfaction, the board stated the Government's rescission of the price reduction was a "tacit admission" that delays preceding the modifications were not contractor caused and therefore the schedule extensions did not constitute consideration flowing to the contractor. Freedom NY, Inc., 01-2 BCA ¶ 31,585 at 30. In the present case, there has been no admission by the Government, tacit or otherwise, that Axion's failure to deliver in accordance with P00016 was not caused by Axion. Therefore, Freedom provides no assistance with respect to whether Axion received consideration for P00017.

Axion’s allegation that the Navy violated FAR 4.801(b)(4) and 43.204(c)(1) also is misplaced. Pl. Resp. p. 29. FAR 4.801(b)(4) requires contracting officers to maintain file documentation sufficient to constitute a complete history of the contract. Axion fails, however, to identify what type of documents were missing from the contract file. Furthermore, the contract file clearly shows that P00016 required Axion to make delivery by August 8, 2001, that Axion did not make delivery in accordance with P00016, and that Axion and the Government then agreed to both an additional extension to the delivery schedule and an unambiguous accord and satisfaction, and release through P00017. DA 158, 159, 324. The contract file also includes numerous pieces of correspondence between the Navy and Axion that leave no doubt that claims associated with the air gun and defective specifications were within the scope of the accord and satisfaction, and release language of P00017. DA 178, 179, 186, 190-192, 194-197. Contrary to

Axion's implication with respect to FAR 4.801(b)(4), the contract file does provide a complete history of contract.

Axion also asserts the Navy failed to comply with FAR 43.204(c)(1). Pl. Resp. p. 29. This argument also fails. FAR 43.204(c)(1) requires file documentation for supplemental agreements resulting from a prior change order. Since modification P00017 was not the result of a change order, FAR 43.204(c)(1) is inapplicable. In any event, the contract file documents a complete history with respect to modification P00017. See DA pp. 158-160, 194-198A.

In sum, the record shows that when P00017 was executed Axion was at risk of a termination for default and by agreeing to P00017, Axion received the consideration of additional time to perform, and relinquished the Navy's ability to terminate for default at that time. Axion cannot undercut the efficacy of the accord and satisfaction, and release language of P00017 to which it agreed by bringing forth the very claims Axion waived upon agreeing to P00017. Furthermore, Axion cannot use these waived claims to now litigate whether the Government had the right to terminate Axion for default when P00017 was executed.

**B. Axion Received Consideration For Modifications P00019 and P00020**

Given the validity of the accord and satisfaction and release language in modification P00017, Axion's claims should be dismissed. However, even if the plain language of modification P00017 is determined not to bar Axion's claims here, the accord and satisfaction and release language of modifications P00019 and P00020 stand on their own as effective bars to counts I through IX and XIII through XXIX.

Axion's arguments about lack of consideration for P00019 are virtually identical to those it raised for P00017, except Axion makes an additional argument that modification P00019

accelerated, rather than extended, the delivery schedule set forth in P00017. Pl. Resp. p. 31-32. This argument strains the bounds of credibility.

Modification P00017 was executed on October 2, 2001 and required Axion to submit 120 PS-115s for First Article Testing by "01 OCTOBER 03." DA 159. The record leaves no doubt that the term "01 OCTOBER 03" as used in P00017 was referring to October 3, 2001, and when Axion failed to submit 120 units for testing by that date it was again in non-compliance with the contract.[12] Axion remained in non-compliance until modification P00019 reestablished the delivery date to "April 23, 2002." DA 162. Axion now attempts to interpret P00017 as requiring delivery by October 1, 2003, and therefore rendering P00019 as an acceleration of the delivery schedule. See Pl. Resp. p. 31-34. Such an interpretation of P00017 is entirely inconsistent with the context in which it was executed and the clear intent of the parties.

On November 1, 2001, the Navy sent Axion a show cause letter stating the Navy was considering terminating the contract for default due to Axion's failure to deliver by October 3, 2001. DA 199. Rather than assert that delivery would not be required for another 23 months, or by October 1, 2003, as Axion would now have the Court believe, Axion simply responded to the contracting officer with an email stating it would soon be ready to begin First Article Testing. DA 365.

The United States acknowledges that "O1 OCTOBER 03" is not a typical means a layman writes "October 3, 2001." However, the record demonstrates this writing style was consistent with the manner in which the parties were identifying dates at the time of modification

---

[12] The reason P00017 only granted Axion one day to submit 120 PS-115s was that Axion had PS-115s on hand at the time P00017 was executed. Pl. Resp. p. 27.

P00017. In a May 30, 2001 letter, Axion proposed a delivery schedule of a quantity of 8,000 units "10 weeks from today" and a quantity of 8,000 units "every 30 days after that, until contract completion." DA 363. Accordingly, on June 4, 2001, through bilateral modification P00016, the parties agreed to a revised schedule virtually identical to that proposed by Axion with the first delivery being "01 AUG 08" (i.e., August 8, 2001, which was 10 weeks from the date of Axion's May 30, 2001 proposal, exactly as Axion had requested). DA 158. Additionally, bilateral modifications P00011, P00013, P00014, and P00015 all specified delivery dates in terms of YR MONTH DAY in the same manner as P00016 and P00017.[13] Compare DA 153, 155, 156, 157; See also, DA 293-297, 300-302.

Furthermore, Axion's response makes clear that Axion does not believe its own argument upon this point because Axion expressly concurs with the Government's position that modification P00016 required Axion to begin production by August 8, 2001. See Pl. Resp. p. 26. (Axion states the following statement is "correct:" "Pursuant to Modification P00016, Axion was required to begin production lot deliveries on or before August 8, 2001.") As discussed above, P00016 required delivery by "01 AUG 08." Had Axion seriously believed that P00017's reference to 01 OCTOBER 03 could be interpreted as October 1, 2003, Axion would also have to argue that P00016's reference to 01 AUG 08 meant that delivery was required by August 1, 2008.[14] Axion has not made this argument. Finally, the fact that there is no contemporaneous

---

[13] For example, bilateral modification P00015 contains a series of delivery dates ending with a "28." While it is clear from the record the modification is calling for a series of monthly deliveries by the 28th of each month, Axion's current assertions must be interpreted to mean Mr. Latiffi believed modification P00015 was calling for deliveries in the year 2028.

[14] Axion also attempts to bolster its argument by claiming Mr. Latiffi believed P00017 was referring to a October 2003 delivery because the Government requires First Article Testing every

evidence in the record where Axion asserts that "01 OCTOBER 03" really meant October 1, 2003 is telling as to Axion's state of mind when P00019 was executed. It strains credibility that a contractor as experienced as Axion would quietly agree to this modification if it believed it had two more years to deliver the test lots.

Axion also fails to note that P00019 included a second form of consideration flowing to Axion in that the modification reduced the number of PS-115s for First Article Testing from 120 to 80. Compare DA 159 with DA 162. Axion's challenge to the United States' position that the reduction in units required for testing constituted good consideration is to merely assert that P00017 is unenforceable for lack of consideration. See Pl. Resp. pp. 33. The record shows, however, that P00017 obligated Axion to test 120 units and this amount was reduced to 80 units through P00019. DA 159, 162. Accordingly, the benefit Axion received in having to test 40 fewer units also constitutes good consideration.

Axion also received consideration for modification P00020. Again, it is not disputed that Axion failed to comply with the April 23, 2002 delivery requirement of modification P00019. DA 335. Thus, as before, on July 11, 2002, the parties again extended the delivery schedule to require delivery of a First Article Test Report by September 9, 2002. DA 163. Axion received consideration for P00020 in that the company was in non-compliance with P00019 when P00020 was executed. Thus P00020 granted Axion additional time to perform and relinquished the Navy's ability to terminate the contract for default at that time.

---

five years. Pl. Resp. p. 34. However, Axion fails to provide any specifics as to where such a requirement is derived.

Axion's challenge to P00020 is no more than an assertion that Axion had no duty to comply with P00019, and therefore received no benefit from the additional time granted by P00020. The reason Axion gives for failing to comply with the requirements for P00019 is its difficulties associated with the air gun. As we have shown, Axion waived claims associated with the air gun when it agreed to the accord and satisfaction and release language of modifications P00017 and P00019. Axion's argument here is simply another attempt to circumvent the impact of the language to which it agreed by bringing forth the very claims barred by the doctrines of accord and satisfaction and release. Axion's challenge to modification P00020 must fail in similar fashion to its challenge of P00019.

## IV. Axion's Allegation That Modifications P00017, P00019 And P00020 Should Be Reformed To Remove The Accord And Satisfaction Language Under The Doctrine Of Unilateral Mistake Is Without Merit

Axion unconvincingly argues that the accord and satisfaction language of modifications P00017, P00019, and P00020 should be removed under the doctrine of unilateral mistake. The law controlling unilateral mistake requires that one party make a mistake as to a basic assumption of the contract where the other party has reason to know of the mistake. Johnson Mgmt. Group CFC, Inc. v. Martinez, 308 F.3d 1245 (Fed. Cir. 2002). Axion has not demonstrated either of the two required elements for unilateral mistake, and, thus, the doctrine is inapplicable to this case.

The facts show that Mr. Latifi did not make a mistake in agreeing to modifications P00017, P00019, and P00020. In attempting to demonstrate that Mr. Latifi did not understand the legal significance of the modifications, Axion primarily argues that English is Mr. Latifi's second language. Pl. Resp. p. 37. A review of the record, however, reveals that over the

approximate seven-year course of the procurement Mr. Latifi wrote dozens of letters to the Government using very sophisticated English. DA 166, 167, 168, 170, 178, 180, 182, 184, 202, 205. The mere fact Mr. Latifi may know another language as well, or better than English, provides no indication he could fail to understand the unambiguous accord and satisfaction, and release language of modifications P00017, P00019 and P00020. It is also relevant that Mr. Latiffi has been the President of Axion since 1984 and that Axion's primary customer is the United States Government. DA 244. Moreover, Mr. Korab testified that Mr. Latifi had no problems expressing himself throughout the seven years he spent trying to produce the PS-115 batteries. DA 375A. Finally, it is also noteworthy that Axion had never once stated it was mistaken about any aspect of this procurement until several months after it was terminated.

In simple terms, the modifications provided for a "full and final disposition of all matters relating to this contract" and "full release and accord and satisfaction of any and all claims, demands, or causes of action that either the contractor and or the Government may have against the other arising out of or related to the contract to date." DA 159, 162, 163. Furthermore, the accord and satisfaction and release language was a primary element of the modifications and placed in a conspicuous position. Id. The evidence simply does not support the allegation Axion now makes that Mr. Latifi did not understand the significance of the modifications.

However, even assuming that Axion did make a mistake when agreeing to these modifications, the contracting officer would have had no reason to know of the mistake. The contracting officer and Mr. Latifi had communicated on both a written and verbal basis on dozens of occasions throughout the approximate six year life of the contract leading to modification P00017, and, as discussed above, Mr. Latifi had shown a strong grasp of English.

At no time did Mr. Latifi place the contracting officer on notice or give him reason to think that Axion misunderstood a requirement of the contract.

In attempting to demonstrate the contracting officer had reason to know of a mistake, Axion places unwarranted emphasis on the fact Axion rejected the Government's offer of a no-cost termination settlement prior to modification P00017. However, from the contracting officer's perspective, it would not be unreasonable for a contractor at risk for termination for default to reject a no-cost settlement, and yet be willing to accept an accord and satisfaction that would grant the contractor additional time to perform and collect the contract price. DA 375B. Indeed, the contracting officer considered Axion in non-compliance with contract requirements when P00017, P00019 and P00020 were executed, and forwarded Axion "show cause" notices stating the Navy was considering terminating the contract. DA 199, 364, 201.

Axion also makes the misguided argument that the contracting officer knew that the consequences of the accord and satisfaction would be devastating to Axion. Pl. Resp. p. 39. Modifications P00017, P00019 and P00020 did not bar Axion from being paid for its expenses. Rather, the modifications granted Axion additional time to deliver and collect the contract's firm fixed price of $1,313,974.[15]

At bottom, the doctrine of unilateral mistake does not apply here. There is no indication that Axion made a mistake with respect to the import of the accord and satisfaction and release

---

[15] Axion also never provided the contracting officer specifics as to what its incurred costs were prior to executing modifications P00017, P00019 and P00020. DA 287. This bolsters the Government's position that the contracting officer had no reason to suspect Axion made a mistake when agreeing to the modifications. From the Government's perspective, the modifications gave Axion additional time to deliver and earn the contract price of $1.3 million at little additional cost since Axion had already produced a substantial number of PS-115s.

language of modifications P00017, P00019 and P00020, and, even if Axion did make such a mistake, the Government would have had no reason to know of the mistake.

## V. Axion's Request for Summary Judgment Should Be Denied Because The Accord and Satisfaction And Release Language Included In Modifications 17, 19 and 20 Bars Axion's Claims

Finally, Axion argues that even if the accord and satisfaction language of modifications P00017, P00019 and P00020 is enforceable, the provisions contained in them do not apply. Pl. Resp. p. 39. Axion raises numerous theories as to why the unambiguous language of these modifications does not bar Axion's claims; however, a reading of these arguments make clear that they are simply arguments going to the merits of the very claims barred by the accord and satisfaction, and release language of the three modifications.

Each theory raised by Axion, in fact, can be traced to a particular count that is barred by both the doctrines of accord and satisfaction, and release. As addressed in the Government's motion, counts I through VI, XIII, XVII, XVIII and XXI through XXV all concern difficulties Axion experienced in attempting to obtain an air gun for testing. Axion requested an air gun in 1996, and the Navy shortly thereafter denied that request. DA 178, 179. Axion then build its own air gun that was used to successfully pass First Article Testing in May 1999. DA 189; DA 290. Axion waived claims associated with the air gun when it agreed to modification P00017 on October 1, 2001. DA 159. The waiver was reinforced by Axion's subsequent agreement to modifications P00019 and P00020. DA 162, 163.

Similarly, Axion's claims involving defective specification are barred by the doctrines of accord and satisfaction, and release. Counts XV, XX, XXVIII and XXIX involve claims alleging the specification for manufacturing plate stock is defective. Counts VII, VIII, IX, XIX,

XXVI, and XXVII involve claims alleging the specifications caused Axion's leaking electrolyte problems. Count XVI is premised on a combination of issues related to the manufacture of plate stock and leaking electrolyte. The record shows these issues were raised and in dispute prior to execution of modification P00017.

Finally, Count XIV alleges that the testing required by modifications P00017, P00019 and P00020 was not, in fact, First Article Testing. All three modifications expressly refer to the testing of "first articles." The accord and satisfaction and release language of these three modifications, which bars causes of action arising under or related to the contract up to the date of the modifications, therefore bars claims challenging the type of testing expressly called for by the modifications.

At bottom, Axion's response merely reiterates the claims Axion sets forth in it complaint without providing any basis for why these counts are not barred by the doctrines of accord and satisfaction and release. Accordingly, Axion's cross-motion should be denied.

## CONCLUSION

For the reason set forth above, and in our opening motion, the United States respectfully requests that the Court dismiss all counts asserted by Axion regarding its development of the air gun because they are barred by the statute of limitations and doctrine of laches. Additionally, the Government respectfully requests that the Court enter summary judgment in its favor and dismiss Counts I through IX and counts XIII through XXIX because they are barred by the doctrines of accord and satisfaction and release. Finally, the Government respectfully requests that Axion's cross-motion for summary judgment be denied.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Kathryn A. Bleecker
KATHRYN A. BLEECKER
Assistant Director

s/Douglas K. Mickle
DOUGLAS K. MICKLE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530
Tele: (202) 307-0383
Fax: (202) 353-7988

OF COUNSEL:
Richard Martinelli
Office of Counsel
Naval Inventory Control Point
Mechanicsburg, PA 17055-0788

June 10, 2005

Attorneys for Defendant

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on June 10, 2005, a copy of the foregoing "**DEFENDANT'S REPLY TO AXION'S RESPONSE TO THE UNITED STATES' PARTIAL MOTION TO DISMISS, AND DEFENDANT'S OPPOSITION AND TO RESPONSE TO AXION'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Douglas K. Mickle
Douglas K. Mickle