A Call them again, until they might tell us, "Okay, make a request, written request." And we make a written request. First we try to solve it as fast as possible so we don't get delayed.

Q Why would you make a written request?

A If they ask us to make a written request, then we make a written request.

Q Why would they ask you to make a written request?

A Sometimes they want to take the question to engineers to get the -- the contracting officer doesn't know; he wants to take it to engineers himself, so he says, "Okay, make a written request so I can send it to engineers." So it won't be just words; it will be, like, "Okay, the problem is here; the drawing is --" so and so and so and so -- so he can take it and give it to them.

Q All right. How many contracts are you working on right now, Government contracts?

A I believe 16.

Q You have 16 Government contracts currently active that you are managing?

A Yes.

Q And what is the dollar value of those contracts?

A I'm not exactly sure, but between five to ten million, probably.

Q Between five to ten million dollars on the 16 contracts you are currently managing?

A Yes.

Q And that doesn't include, obviously, this one, because it was terminated?

A Yes.

Q During your almost 30 years in Government contracting, have you ever had a contract terminated for default before?

A Before this?

Q Yes.

A No, sir.

Q Since Axion has been terminated -- since you were terminated in the Axion case, have you had contracts terminated for default?

A There is a contract right now we are discussing with the Government that changed from Termination for Default to "for Convenience," because the vendor we had, he has some problem -- he never

Q No, the Axion contract.

MR. RALEIGH: You are calling it the "Axion contract," but he is Axion. Do you mean this Navy contract --

MR. MICKLE: The Navy contract. I apologize. Thank you. I'm sorry.

A Okay, question, please.

Q The Navy contract, that was terminated in 2003; right?

A Yes.

Q And since 2003, how many contracts have you been awarded?

A I really don't know.

Q More than 10?

A Yes, sir.

Q But less than 20? It could be -- do you get about 16 contracts a year, or 10 to 15 contracts a year, awarded to you?

A If you average it that way, yes, but it doesn't average that way. Sometimes more one year, less another year. So you really can't --

Q But you have received Government work since your termination?

all the review of the proposal and --

A I think I had secretaries and people helping me, but I don't remember who, to be honest with you.

Q But they did more ministerial work --

A Yes.

Q -- and you did all the thinking, the number crunching --

A That is correct.

Q -- formulating the plan on how you were going to manufacture this thing?

A Yes, sir, that is correct.

MR. RALEIGH: Try to wait until he finishes his question.

THE WITNESS: Okay.

Q When you were reviewing the RFP, did you notice anything that you really thought was going to require extra work on your part?

A No. Just preparing all the bidding process and calculating all the material and labor required, the dies and everything needed to produce the PS-115.

Q But you understood it was a firm-fixed-price contract?

A Yes, sir.

Q And in my understanding, it was a firm fixed price. What did that fact -- what effect did that fact have when you were making your management decisions throughout the process?

A Which fact?

Q The fact that it was a firm-fixed-price contract.

A How did it affect what?

Q How did it affect the way you managed -- with a firm-fixed-price contract -- would you agree with me that usually on a firm-fixed-price contract you have to deliver the goods for the price you bid?

A That is correct.

Q And would you agree that the profit you make is the difference, the delta, between the firm fixed price in your proposal and the cost that you incurred in manufacturing -- in this case PS-115s?

A Yes, that is correct.

Q And if for some reason during the manufacturing process you believe that either -- you know, what usually happens in a firm-fixed-price contract that you have been involved with where costs start to be greater than you initially believed that

they were going to be? You start performing on a loss contract.

A That is correct.

Q That is correct, but, I mean, what usually happens in your case?

A I have no case before except this one.

Q This is the first time you have ever had a loss contract?

A Yes, sir.

Q So you have never ever requested an equitable adjustment before?

A No, sir.

Q But you have worked on firm-fixed-price contracts?

A Always.

Q You always work on firm-fixed-price contracts?

A Yes.

Q So, then, you are very familiar with the administration of firm-fixed-price contracts?

A Yes, sir.

Q When you were developing your manufacturing plan for the PS-115s, how long did you think it would

252A

take you from the time the contract was awarded until the time that you were going to be able to produce your first battery?

A I thought it would take the same time the contract requests delivery -- what I have to deliver by contract -- what the delivery time was in the contract. I thought I could meet that.

Q And I think the initial contract called for 90 days for the First Article Tests from the time of award?

A That is correct.

Q And, obviously, that didn't occur in this case or we wouldn't be here. What were some of the immediate problems that you started to encounter in developing the battery?

A Problems started before we developed the battery. The Government took a year and a half to just approve the process how we can measure the can -- the can that was stamped -- and every one was the same thing.

Q I guess I don't understand. What do you mean by "can"?

A The battery goes in a copper can, and they

MR. MICKLE: Mark this, please. I believe this will be Exhibit No. 4.

(Marked Defendant's Exhibit No. 4.)

Q Mr. Latifi, you now have Exhibit 4, which is entitled "Acceptance Inspection Equipment Requirements for Power Supply, PS-115"?

A Yes, sir.

Q Also, it is "NAVY 01713." Do you recognize this?

A Yes, sir.

Q Was this also included in your contract?

A I believe so.

Q There is an "X" next to 1.b, and that "X" in 1.b states "The contractor shall provide all AIE --" and "AIE" stands for "Acceptance Inspection Equipment --"

A "... except for any equipment listed as available in Appendix V."

Q "VI."

A VI.

Q All right. But if it wasn't listed in Appendix VI -- and you will agree that pursuant to this solicitation that you made a proposal for

that -- "The contractor shall provide all AIE --" Acceptance Inspection Equipment?

A Yes, Inspection -- yes, sir.

Q And that was your responsibility?

A Yes.

Q In this case what did you believe was "Acceptance Inspection Equipment" for verifying the PS-115s in this case?

A We had to provide the Government with procedure for inspection -- procedure -- that took them a year and a half to approve. In that procedure we submitted all the gauges and the stuff that we saw necessary to check every component. That was one of the requirements.

Q Well, what type of equipment did you think you needed to conduct the --

A We provided gauges, calibers, and other small hand tools to measure all the parts, and the cans and everything to put them together -- and that process. And then we provided the Government a data collection process -- system -- that would collect the data.

Q And what was that data collection system?

A We came up with a computer, a small, two-inch

computer that could collect the data.

Q And that was your design?

A Yes, sir.

Q And why did you come up with this computer?

A To collect the data.

Q And the reason you needed to collect the data was because -- you said pursuant to the -- and you did that pursuant to the Acceptance Inspection Equipment clause in here?

A Yes. We have to be able to collect the data.

Q And your ability to collect the data was required by the contract -- you were required by the contract to collect the data and submit it to the Government for approval?

A We are supposed to be able to provide a way to collect the data, yes, sir.

Q So I guess -- do you believe that the contract required you to collect that data?

A The contract required to collect the data.

Q And what were you supposed to do, according to the contract, with that data?

A We were supposed to provide a bird and a battery and a computer to collect the data.

Q You were required to provide that pursuant to the contract?

A No -- nowhere in the contract says that, but in general terms, of saying that the first contract -- the First Article -- that is what we came up with to do. But nowhere in the contract specifies how to do it.

Q It was up to you to provide the means, and you could do it any way that was approved by the Government?

A Accepted by the Government.

Q But it was still your responsibility?

A To provide the way to collect the data.

Q The way to collect the data. And what was the way to collect the data that you ended up providing to the Government?

A We provided the Government with the bird and a data collection inside the bird, that the Government could put the battery in it and shoot it and collect the data.

Q And how was the Government -- why was the Government required to shoot it?

A The Government had the gun.

Q The Government had the gun?
A Yes, sir.
Q Well, where did it say in the contract that the Government was going to shoot the bird?
A It says in the contract.
Q Where is that?
A Somewhere in the contract it says the Government has the right to use Mouser, gun, or something to shoot the parts.
(Discussion off the record.)
Q The bottom lime is that when you submitted your proposal, you believed that your requirements for First Article Testing were --
A -- to provide a collection -- a data collection form so the Government could collect data when they were shooting it.
Q And who would put that information on the form?
A The information is collected by the computer. We made the form exactly the way the Government wanted it.
Q And who was responsible for developing the computer?

A We developed the computer.
Q And where did the computer get its information from?
A From the battery.
Q From the battery?
A Yes, sir.
Q And how did the battery transmit its information to the computer?
A The battery had -- we give those to the Government, and the battery had to be shot in the Howitzer.
Q In the Howitzer?
A Yes, sir.
Q All right. What Howitzer did you use?
A I didn't have a Howitzer.
Q Why didn't you have a Howitzer?
A Sir?
Q Why didn't you have a Howitzer?
A The Government was supposed to give us one. We never got one.
Q You never got one?
A No, sir.
Q Did you ever ask the Government for a

Howitzer?

A Yes, sir -- I asked for the gun.

Q You asked for the gun?

A Yes.

Q And when was that?

A Three days after I got the contract.

Q So you knew back in -- when did you get the contract?

A '65, '66 --

Q '95?

A '95, yes.

MR. RALEIGH: You can't look to me for answers. But most of this didn't happen during the '60s.

(Discussion off the record.)

Q All right. So in '95 you got the award?

A Yes.

Q And within three days or four days of getting the award, you asked the Government to provide you with an air gun?

A Yes.

Q Or a Howitzer?

A Just for the gun.

Q A gun?

A Yes. I didn't know what it was. I just said "a gun."

Q And what did the Government tell you?

A They said, "The Navy doesn't have a gun."

Q And when did you learn this information?

A A couple of days after.

Q A couple of days after that?

A Yes.

Q And then at that point did you believe the Government was not living up to its end of the bargain, so to speak?

A Yes.

Q And did you write anybody?

A No, I just asked them for the gun, and I called them, and so and so -- and I talked to them several times after that, and I told them that they should give me the gun, just like they give the previous producer, that I should be equal -- I should have equal rights, like other contractors, that they provided other contractors with a gun and they should provide a gun, that I bid on this one on the basis they were going to give me a gun, and why they not

give me a gun.

Q Are you saying that you had a mistake in your bid?

A No.

Q But you made a bid believing that -- you thought the Government was going to provide you with an air gun?

A Yes.

Q And three days after you were notified of award, you were told that you weren't going to get that air gun?

A Yes, sir.

Q And at that point you realized that you had to develop the air gun?

A I didn't know air gun or anything -- I had to develop a way -- by that time I realized the Government is -- well, by that time I understood the Government was not going to give me a gun, like they should.

Q And that was when in 1996? Or was that in 1995?

A It was 1996, January of 1996.

Q January of 1996?

Navy, and -- "Dear Allen." Who is Allen?
A "A.L. Artz."
Q Is that Mr. Artz?
A I guess so.
Q And was he the contracting officer before Mr. Korab?
A Or somebody working with him.
Q But he was the representative for the Government you were dealing with in that time --
A Yes.
Q And on December 15th, you were asking for use of tools and things like that?
A Yes, sir.
Q But in this letter you never mentioned the air gun. Why not?
A Because I thought they -- they already give me -- at this point, we need it because we are at the beginning of the product -- we need the air gun now -- we are just trying to get the cans.
Q All right. But you were telling me earlier that within three days of getting the award, you were contacting the Government about the air gun.
A In January somewhere.

Q But at that time -- so in January, then --

A Would you like for me to explain this for you?

Q Yes, please.

A We understood that the Government owned a lot of dies -- that they paid for it and they were owned by the Government. We wanted to use the dies to produce the cans. It is a legal right of the Government when they pay for it that they could use it. We called these people to get the can from them. Accudyne called and said the cans belonged to them and not the Government, they cannot use them. But legally they belonged to the Government.

Q So when you made your proposal on this contract you also expected the Government to provide you with the tooling?

A No, just the gun.

Q But you were asking the Government for tooling here?

A If they had it, it would expedite the delivery.

Q All right. This is a January 17th letter. This must be the letter you were talking about, Alex.

A Yes, sir.
Q I will show it to you in a second.
MR. MICKLE: Would you mark that, please, and hand it to the witness.
(Marked Defendant's Exhibit No. 6.)
Q This is a letter dated January 17, 1996?
A Yes, sir.
Q And I believe this is the letter you were referring to earlier, regarding when you asked the Government for the air gun?
A Yes. I mean, in this letter we asked them for any ECPs. We were trying to make sure that any changes the Government made previously we could have a copy of it.
Q What is an "ECP"?
A "Engineering Change Procedure." We thought there were some changes made by Accudyne that maybe on paper, or contract -- or drawing does not have it. And we requested to give us any changes they may have.
Q And I see from the letter it says, "We understand that the Government has supplied two air guns --"

A Yes.

Q And "We hereby request one unit supplied to Axion Corp. for performance of final testing"?

A Yes, sir.

Q Why did you request it?

A Because Accudyne got one.

Q Why didn't you just say, "Pursuant to the contract, you are supposed to provide it"?

A The contract says there, too. We asked for that.

Q But in your letter you requested it.

A What else could I do besides request it?

Q But if it was contained in the contract -- if the Government owes you something, wouldn't you usually demand it from the Government?

A Usually we just send letter just like -- that is a demand in itself. I mean, you don't say, "I am demanding right now." I mean, you just make a letter -- as nice as it can be -- you know, try to get the parts. If you demand it, they cancel the contract --

Q Sugar always works better than lemon, I believe. You're right.

At any time did you go from being a nice request to a demand and cite a specific contract provision for this air gun?

A No. We tried to stay in a proper, professional way and try to do the best we can. I have a small company. You really don't have that -- we are not Boeing; we are just a little contractor. We live by the Government crumbs. We don't really take positions that are harmful to our company, so we -- even if it is our right, we try to say it as nice as possible, not demand it.

Q Right. But soon thereafter this January 17th, you were told that the Government wasn't going to provide an air gun?

A We -- yes. We kind of got a feeling that -- "Jesus, the Government is not going to do this. We had better figure it out."

Q Well, how did you kind of get that feeling?

A Because -- after this letter, I talked to Mr. Korab several times. I said, "Mr. Korab, look, Accudyne has gotten guns given to them. I should be equal contractor -- and so on -- this and that -- and he answered, "Alex, we didn't do that; the Army did

that. And your contract is with the Navy, not the Army."

Q So pursuant to this Navy contract, you knew back in January of 1996 that you weren't going to be provided an air gun to do the testing, that you were responsible for testing?

A I didn't know anything about an air gun at the time. I didn't know an air gun was involved in it. I just had to find a way to activate the battery.

Q But on January 17th, you asked if the Government would supply an air gun; right?

A Yes.

Q So you did know about an air gun back in January of 1996?

A They told me after there was a gun -- I find out from the Accudyne people.

Q Right. But in 1996, you knew that there was an air gun that could help in the testing of this PS-115?

A That is correct, sir. Yes, sir.

Q And soon after January, you were told you weren't getting this air gun?

A Yes, but I still didn't believe it.

Q You didn't believe it, but on March 18, you wrote Mr. Korab and started telling him that you had reached an agreement with Army Research Lab?

A Yes.

Q Tell me about your dealings with Army Research Lab and if -- why you went to ARL.

A Well, I understood that Mr. Korab or Mr. Hahin -- they told me that the gun is in Baltimore, Harry Diamond Laboratories.

MR. MICKLE: Would you mark this, please.

(Marked Defendant's Exhibit No. 7.)

Q This is the letter -- it is Exhibit 7, Mr. Latifi, that was referred to, March 18, 1996.

And it starts out very cordial --

A Yes.

Q It assumes that -- that Mr. Korab came down to see you and look at your facility?

A Yes, sir.

Q It looks like you were getting along and he had answered all your questions or you had resolved all your problems?

A They just told us they can't give us the gun.

Q It was around this time when they told you you weren't getting the air gun?

A Yes. And now I am going, "Jesus, this guy is not really giving me a gun, so I've got to do something."

Q So when they told you no the first time, you thought you still might have an outside chance? Back on March 18, 1996, you know that --

A I thought it was no longer --

Q You agreed there was no chance after March 18th?

A Yes.

Q All right. And thus you started trying to have a side agreement with the Army Research Lab?

A I think at that meeting Mr. Korab told me that the gun is at Army Research Lab -- or something -- or I found out before that -- so I started working with them.

Q All right. And this is the letter that you sent to Mr. Korab to explain the agreement that you are trying to enter into with the Army Research Lab?

A Yes.

Q But you also told Mr. Korab at that time that