A Well, both will spin.

Q Well, I notice sometimes we call it a "spin gun" and sometimes we call it an "air gun."

A It is a matter of who uses the word -- how they try to define it. But the result is the -- you are spinning the battery.

MR. MICKLE: Would you mark this, please.

(Marked Defendant's Exhibit No. 20.)

Q And that seems consistent, because on May 30th of '97, Mr. Weir sent a memo to Alen Artz, who was I think a contracting officer with the Navy, where -- in this thing it looks like you have decided that you are going to design and build your own spin gun.

A I would like to read it.

Q Oh, yes. I'm sorry.

A (Witness reviews document.) Okay.

Q So would you agree back in May, that is when you decided you were going to develop the air gun?

A No, spin gun.

Q The spin gun. Okay. Did you ever develop an air gun?

A Yes.

historically, the Navy always bought this part from the Army.

Q Right.

A So now we are caught in between these two giants -- agree or disagree. The Army had all the information and didn't want to help the Navy contractor, and the Navy didn't know what the hell it was doing -- because that wasn't their damn contract; they never bought the part. They had no information; they had no data, or nothing.

We got caught in the middle. We got squashed. That's the true fact of what happened. Now, we can go to the paperwork and say who did this or who did that or -- and now, to come down to it, you cannot go to the Government and ask them -- "Okay, how do you do this"? And "Well, I don't know. Wait." And for months, you have got to ask, "How do you do that?"

And then go to the Army and find out -- the Army says this wasn't their contract. We are over there begging for help, and they said, "We can't help you. It is not our contract. You have got to go through Navy." And Navy says, "Well, listen, the

Army has a procedure -- new procedure you have to play -- and "Can we have that?" "Oh, we don't know what it is."

We are asking for the gun, and "We don't know anything about that." And the Navy wasn't lying; the Navy was telling the truth. They didn't know anything about it. But to cut -- to take apart -- from 1967 drawing and take it to 2000 and put it in the market, with not good documentation -- it puts a contractor in the position that I am.

And NASA, you see, took a year and a half for them to answer only a couple of questions.

Q So as a result, though --

A As a result --

Q -- in May 1997, you told the Army -- excuse me -- you told the Navy that you had no other choice but to design and build your own spin air gun?

A By this time, I am saying, "Okay, there is no other way, there is no other choice. There is nobody I can go to, so I am going to try to do it -- because now it has been -- by this time, I have spent the money on the material -- tools and dies -- I'm stuck. There is nothing I can do at this state.

Q And this is the only notice that you gave the Navy specifically that says, "I am doing the air gun"; is that true?

A Yes.

Q Is there any other documentation regarding the air gun that you know of where the Navy sent something back to you and said, "Build an air gun, submit us the paperwork, the cost --

MR. RALEIGH: Objection to the form of the question.

Q Did the Navy ever come back and say, "We know you are building the air gun now"? Did they ever -- how did the Navy respond to this memo?

A I don't remember, to be honest with you.

Q Did they respond?

A I don't know, sir. You have to look at documents to see. I don't remember.

Q All right. After you told the Navy that you were going to design and build your own spin gun, at any time did you tell the Navy how much it would cost?

A No, because at that time we didn't think it was going to cost that much money. At this time we

are going to make a spin gun and go ahead with the hammer -- with thing -- and activate it and use it. That's what we thought we were going to do. And they didn't accept it, so we have to go for the whole thing.

Q And that's why -- the follow-on in the memo -- there is a sentence that says, "We expect to have the manufacturing of the spin gun completed in a few days"?

A Yes, because we thought we are going to get the spin -- the spin machine that we have, put the parts in it and hit it and collect the data.

Q So you couldn't provide an estimate of the cost of the air gun to the Navy?

A It was not -- this way it was not much for us to really -- it was just a simple process. And it would work, too.

Q But at bottom, you never provided an estimate of the cost to the Navy -- how much you thought the air gun would cost to develop?

A No.

Q You just developed it?

A Because we didn't know how much it was going

to cost. So there was no way -- it was something we had never done before, so we have no idea what it cost to do -- plus there was no -- Mr. Mickle, there were no drawings, there were no specifications, so you couldn't really tell what it was going to cost. So you really -- you just went --

Q You couldn't even estimate it?

A There is no way. There is no estimation until you start the -- the only way you could make estimation, if you have a drawing, specification, and you say, "Okay, that is how I am going to do it." But the Army never give us that, nor the Navy give us that. So we didn't know what we were against. We just try to -- well, okay, how are we supposed to do this -- now that we are stuck in this middle? If we had a drawing -- some kind of hint of how to do it -- it would have saved us time and money -- a lot.

Q Did you ever talk to the Navy about the cost of the air gun?

A No.

Q You never did?

A I don't believe so. I don't know if I talked on the phone and tell them that this was really too

A We submit the data to -- but when they accepted them, and they said, "Okay, that's acceptable. It's okay," then we submit the data.

Q Then, why did you submit the data to the Navy Inventory Control Point?

A I think the contract required to send the data. I think there is a place in the contract that tell you, or -- and the DDP sends you -- to send the data.

Q And who did you send the data to?

A To whatever address the contract told us to send it to -- or directed us to send it to.

Q Jerry Hahin; right, at Crane?

A I believe so. I'm not sure. But whatever they told to send it to, we send it to.

Q Well, I was just assuming from Paragraph 5 of the letter -- it says that hard copy printout of additional units are in the possession of Crane Labs. And I thought if they had those units --

A Yes. I guess at that time Mr. Hahin was involved in testing -- accepted them. He might have took some of them with him right then.

Q Subsequent to this letter, on May 17th, your

First Article was approved. Do you agree with that statement?

A The First Article was approved?

Yes, they approved the First Article.

Q And do you agree that it was 17 May 1999?

A I don't remember -- the date I don't remember, to be honest with you.

Q Well, if I show you this, maybe this will refresh your recollection.

MR. MICKLE: Please mark this.

(Marked Defendant's Exhibit No. 22.)

Q You have just been handed Exhibit 22.

A Yes.

Q And that is a memo from John Korab, dated 17 May, 1999, I believe. Do you agree? And is that the memo you received that demonstrates that your First Article Test was approved?

A Yes, and he is -- he has approved the First Article, and he is asking to proceed to production and to submit the first lot for testing.

Q All right. May I have that back, please.

So on May 17th, you had passed First Article Testing -- in 1999?

A Yes.

Q And what was the testing process, again? Describe that for me from start to finish.

A They came to my facility, and they picked up the units, and we shot them for them, and they look at the printout in their computer, and they verified the unit passed or not.

Q And this is the hot test/cold test?

A Hot test/cold test, yes. We had a refrigerator chamber for cold, and a chamber for hot, and room temperature, and they selected any one they want for us to shoot.

Q So this First Article Testing that you passed on -- that was approved on 17 May -- this was all with that air gun that you developed, as well?

A Yes.

Q All right. And how many hot tests, do you remember, did you submit -- did you shoot with the air gun that time?

A I don't remember, but they collect all the data. We just did what they told us -- "Take one of these, take one of that, take one of that --"

Q The computer collected the data, and you took

that data and forwarded it to Crane Lab?

A Some data they took with them.

Q Who is "they"?

A Mr. Hahin.

Q Mr. Hahin, who is with Crane Lab?

A Yes, sir. He took some with him, and some -- but right then -- right at this moment, they said, "Okay, this is good and is acceptable, and they -- and we knew when they left that the First Article had passed.

Q And subsequent to that First Article being approved in May, you submitted a document to the Navy asking to establish a new delivery schedule. Do you remember that document?

A No, sir.

MR. MICKLE: Mark this, please.

(Marked Defendant's Exhibit No. 23.)

Q And pursuant to this letter, you requested that on December 28, 1999 -- am I reading this correctly? -- 5,209 batteries would be delivered?

A I am going to read it for a second.

Q Yes, please.

A (Witness reviews document.)

This in here, we tell them that -- about the test -- expense that we are going through -- in this letter to Mr. Korab. And we are saying "During this time, Axion has facilitated visits from the Navy Crane Division and has not requested any reimbursement for those expenses." Because at that time we discussed with Mr. Korab about the cost incurred to us to develop the gun -- to make the air gun. And he was saying to us -- he said that even though we spend a lot of time, he -- we developed all the stuff, and they -- we never were reimbursed for any of the expenses that we incurred from the top of the contract.

Q Right, but also with this letter -- getting back to my question -- you did ask at that time that you would be able to deliver 5,209 PS-115s by December 28th, 1999?

A Let me read it, please.

(Witness reviews document.)

All right, in this letter, they already have agreed to the December 28th delivery, because we mutually agreed in telephone call.

Q And by mutually agreeing to that -- that's

why you entered into --

A And the --

MR. RALEIGH: Listen to his question.

THE WITNESS: Okay.

MR. MICKLE: Please mark this.

(Marked Defendant's Exhibit No. 24.)

Q Pursuant to Exhibit 24 -- what you were saying, Mr. Latifi, is that this was a delivery schedule that the parties had agreed upon, and it was memorialized in P00011, dated June 2, 1999?

MR. RALEIGH: It's the next exhibit.

Q Which is Exhibit 23 -- well, pardon me. Exhibit 24.

A Yes, sir, they are asking us to go ahead and go in production and produce this quantity.

Q All right.

A At this date.

Q And what were those dates, then? Are those the same dates of 5,209 on December 28, 1999?

A Yes, I believe they reflect what we agreed on.

Q And then 10,000 the following month -- and it looks like you will be doing 10,000 for the next

30 days -- 10,000 on January 28th, 2000?

A Yes.

MR. MICKLE: Would you mark this, please.

(Marked Defendant's Exhibit No. 25.)

Q You have just been handed Exhibit 25, which is a letter that you wrote on December 7th -- or purports to be. Is that your signature on that letter?

A Yes, sir.

Q And that letter -- and let me know if you disagree with how I characterize it -- it appears that -- it doesn't look like you will make the December 28, 1999, delivery date, and you are asking to be able to deliver the 5,280 units now on March 20, 2000.

A No, we discussed that -- since the test takes so much time to perform -- it's five units per day -- it is going to take a long time to perform the test -- on a Lot Test -- before we ship them, because we are required to -- the first lot -- every lot we are supposed to test 80 units before we ship them.

Q Right, but at that time, what you are asking for in this letter is to --

A -- extension.

Q -- an extension --

A Yes.

Q -- to provide that first -- initial delivery?

A Yes.

MR. MICKLE: Mark this, please.

(Marked Defendant's Exhibit No. 26.)

Q And pursuant to Exhibit No. 26, which is P00013, it looks like the Government agreed to that extension and established a new delivery date. I read Block 14 -- and tell me if you disagree -- that pursuant to your request of December 7th, 5,209 batteries were going to be delivered now on -- well, you can't read it, but I am assuming that is 20 March -- 31 March 2000. Do you agree?

A I would like -- I am trying to see the date.

Q All right.

A Where is the date? March -- yes -- it says, "each to March 31 --" well, "Each 00," and -- okay, March -- I guess it is the year 2000.

Q 2000. And then it would be 10,000 on 30 April 2000?

A Yes, sir.

MR. MICKLE: Mark this, please.

(Marked Defendant's Exhibit No. 27.)

Q And then for some reason, you weren't able to deliver the 5,000 batteries in March, because -- it appears you agreed to another modification establishing a new delivery date. Am I wrong in my characterization of P00014?

A For some reason. I don't know what the reason was.

Q But you agree that it was a bilateral modification between you and the Government on April 10, 2000?

MR. RALEIGH: I object to the form, to the extent that it calls for a legal conclusion by this witness.

Q Did you sign this document?

A Yes, sir.

Q And what did you agree to when you signed this document?

A I agreed to the delivery.

Q And what is the delivery?

A I agree to production deliver 8,000 units.

Q When did you agree to deliver 8,000 units?

had you received that said that the contract was going to change?

A The conversation with Mr. Korab -- previous to that conversation -- we had some discussion about the cost of the air gun that incurred to Axion and were they going to give us any money for it or not.

Q And when did you have those conversations with Mr. Korab?

A Prior to the letter that we said we not ask for reimbursement -- because that was -- we always brought that up. I think Exhibit 25 -- no, I don't -- one exhibit here we said that -- no, Exhibit 23. We said that the Government has not reimbursed for any testing. Prior to that time, we were talking about how much it was going to cost us and I wished there was a way they could help us, with the amount of money we spent on it. And somehow -- somewhere -- I don't know if there is an e-mail somewhere that has come to your attention -- they asked us to submit all the drawings and all the development material that we had to the Government. And we discussed with them that they have to pay for this, but Mr. Korab said, "The contract says that you have to supply it no

matter we pay for it or not."

Q And when was this? Was this back in --

A At the same time we were going through the -- I can't recall the time. But there are e-mails and stuff that show that they directed us to -- even though we didn't want to do this, they directed us to submit all data to the Government.

Q You sent e-mails to Mr. Korab telling him what the cost of the air gun was?

A Not a total amount, but we said -- we tried to get to some agreement to say they were going to pay something for the cost.

Q All right.

A But it never --

Q But you were still experiencing difficulty producing the PS-115 back in 2000; right?

A We saw some leakage at that time. We tried to figure out where the leakage was.

Q Leakage --

A Acid leakage.

Q Where?

A When we do production -- when we went to production quantities, we experienced some leakage.

Q What was the cause of the leakage?
A At that time we tried to figure out what the cause of the leakage. So we went through looking at all our vendors to verify the product that we were using was what exactly the contract stated. And we went through all our invoices and all our COCs to verify the vendors provide us what we were supposed to receive.
Q All right. And what did you determine?
A We determined that the vendors give us the right product -- and right COCs --
Q And what does "COC" mean?
A "Certificate of Compliance." And all the vendors that we bought the product from was the ones that the Government qualify them to purchase from -- every one of them. So we eliminated that possibility that we have a bad component -- maybe bad acid or bad copper, because of the leakage. But after we determined that wasn't the case, we informed the Government.
Q And what did you tell the Government?
A We told them that we were experiencing a leakage on those units and do they have any ideas of

why the leakage is.

Q And what did they tell you?

A They say they had no data that shows there has been any leakage ever.

Q All right.

A And they sent Mr. Hahin to our facility.

Q When was this?

A I can't recall, to be honest with you, but I am sure there is some paper that shows that.

Q All right. I am trying to figure out -- because on August 29th --

(Discussion off the record.)

MR. MICKLE: Mark this, please.

(Marked Defendant's Exhibit No. 29.)

Q On August 29th, P00015 -- it appears to be agreed upon by the parties. Is that your signature?

A Yes, sir.

Q And why was the contract price reduced by ten -- why did you agree to a reduction in the contract price of $10,000?

A Mr. Korab said the cost -- it cost that much to produce a Mod.

Q $10,000? And you agreed to that?

A Yes, sir.
Q And pursuant to this modification, what was the final price of the contract to be?
A $10,000 less than it was before.
Q Did you agree, then -- I guess -- what it says is in August of 2000 -- the end result was that the contract you were going to be paid at the end was $1,295,974.20?
A Or he was going to cancel it.
Q Cancel it?
A I mean, that's --
Q Or terminate it?
A Terminate.
Q All right. And it appears that we also established -- we, the Government and the Navy and --
A -- Mr. Korab.
Q -- Mr. Korab and you, Mr. Latifi. Did you also agree upon a new delivery schedule?
A Yes, sir.
Q And am I reading it correctly by saying "28 November 2000, you agreed to 5,209 batteries"?
A That is correct.
Q And 28 December 2000, 8,000?

A Yes, sir.
Q And 28 January 2001?
A Yes, sir.
Q So despite some problems that are ongoing in Axion at that time and getting the batteries built -- for leakage or for whatever reason --
A At that time -- when we do this here (indicating), we are making them, and we haven't seen leakage yet.
Q You had not seen leakage yet?
A No.
Q But for whatever reason -- you were telling me earlier, though, that was one of the reasons why there was some --
A I don't know the reason. We found out about the leakage sometime during this time period. I don't know if it was before this or after this. But it could be -- I am going to say -- at that time, possibly. I can't recall the exact date, but possibly we were still trying to find out if there was anything we had done wrong. Did we buy bad material? Did somebody give us something wrong? Or the process is wrong.

delivery schedule in this May 30th letter?

A Yes, sir.

MR. MICKLE: Mark this, please.

(Marked Defendant's Exhibit No. 33.)

A Production quantity.

Q And then -- it appears to me -- and maybe I am wrong -- that you wrote this letter on May 30th, and then a few days later, on June 4th, you and Mr. Korab agreed to Modification 16. Is that correct?

A Yes.

Q And pursuant to Modification 16, you established a new delivery schedule?

A Yes, sir.

Q And tell me if I am reading this wrong. Is this thing on August 8, 2001, you will deliver 8,000 units?

A Yes, sir.

Q And then on 10 September, 2001, you said you would give them 8,000 -- another 8,000?

A Yes.

Q And so on and so forth?

A Yes, sir.

Q 10 October -- all right.

A Yes.

Q And at this time, though, there have not been any deliveries -- you were still trying to work out some problems -- but you thought that you were going to be close?

A Yes.

Q Now, back to P00016, 8 August 2001 is the new delivery date, when you have to deliver the PS-115s?

A Yes.

(Marked Defendant's Exhibit No. 34)

Q I have a question on Exhibit 34, which is a letter dated August 6, 2001 -- and it appears to be signed by you. I am just confused because the letter is dated August 6, 2001, but it says "In reference to your letter received September 18, 2001...." And I just didn't quite understand -- what is the right date? Is August 6 correct and September 18th should be -- or should it be November -- October 6 -- I guess I -- I don't understand -- what is the correct date in this letter, if you can remember?

A I wouldn't remember, sir. I guess the date is what is -- I guess the date of the letter -- oh,

Q And at this point, for whatever reason, you still have not delivered any batteries to the Government?
A Yes.
Q And we come along, and then it is October, and we come to the first -- P00017.
MR. MICKLE: Please mark this.
(Marked Defendant's Exhibit No. 37.)
(Discussion off the record.)
Q Now, P00017 --
MR. MICKLE: What exhibit is this, again?
MR. RALEIGH: It's 37, but we have got a sticker over it probably -- well, over some language --
(Discussion off the record.)
Q When did P00017 become effective? Is that October 2, 2001?
A 10/2/01.
Q Is that October 2, 2001?
I think it is.
A October -- it says "2" on top.
Q All right. October 2, 2001?
A Yes, sir.

Q All right. And part of P00017 I see re-establishes the new First Article sample as --

A -- 2003.

Q 2003?

A Yes.

Q 1 October 2003?

A That is correct.

Q And that is your interpretation?

A That is what it says.

Q Why do you think it says "1 October 2003"?

A Because that is what it says.

Q But why -- when I showed you the previous P000s, you said that the year would go second -- or first -- and the date last.

A Where?

Q In the previous modifications.

A I didn't say about the date.

(Mr. Mickle hands document to the witness.)

A Where?

Q In referring to Exhibit 33 -- remember when we were talking about when you established delivery schedules?

A Yes, sir.

Q And you told me that you were going to deliver 8,000 on August 8, 2001?
A Yes, 2001.
Q August 8; right?
A Yes.
Q So why -- and in the previous other P000s we discussed when you were re-establishing delivery dates it was always year, month, date. Why do you think on P00017 all of a sudden that it is month, year, date -- month --
A I always put a date at end --
Q No, I'm talking about this date right here (indicating).
MR. MICKLE: Could I please have 17.
Q This date right here (indicating).
A It is the same as the date on top. It's year end.
Q Right here (indicating).
A Yes, I know, but this date is same as here (indicating). The year is at the end. And the same as here (indicating), and the same as others.
Q Well, why isn't it the same there?
A I don't know why it is not there, but

question -- there is no question pending. Ask me the question.

(Discussion off the record.)

Q Regardless if it was a First Article Test or a Lot Test --

A Yes.

Q -- on April 23, 2002, 80 units weren't successfully tested, were they?

A No, sir.

Q And as a result of that, on May 10, 2002 --

MR. MICKLE: Let's go off the record for a second.

(Recess.)

(Marked Defendant's Exhibit Nos. 45 through 52, inclusive.)

(Examination Resumed by Mr. Mickle:)

Q I guess we are done with Exhibit 44, which is P00019. Let's go to the next document. And I just need some explanation. And that's Exhibit 45. That is a May 10, 2002, letter you sent. And it looks like up until this point you are still having difficulty with your measuring apparatus -- with the air gun and the computer on board?