IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AXION CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 03-2644C |
| v. | ) | (Judge Firestone) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF JERRY HAHIN

1. I, Jerry Hahin, make the following declaration in accordance with 10 U.S.C. 1746. I am aware that this declaration will be used in the United States Court of Federal Claims, and that this declaration is the legal equivalent to a statement under oath.

2. I work for the Naval Surface Warfare Center (NSWC), Crane, located in Crane, Indiana as an Electronics Engineer. I have held this position since December 1985. My duties include technical oversight of production contracts for Naval products. Specifically, my group is assigned as the Acquisition Engineering Agent (AEA) for Naval Gun Ammunition. A few of my duties include preparation of technical documentation packages for Naval production buys, reviewing contractor submitted technical data required by the contract, forwarding quality requirements to be put into solicitations and providing technical oversight once the contract is awarded. For contract N00104-96-C-KA09, I was the AEA for the PS-115 power supply at the time Axion was terminated for default. I began working on this contract on approximately May 5, 1998.

3. Contract N00104-96-C-KA09 contained a First Article Test (FAT) requirement. The purpose of a FAT is to verify the manufacturer's production process and materials for use in full-rate production. FAT is a means of verifying that both the materials and the production process to be used will result in a product that conforms to all the technical requirements required by the Navy.

4. Axion experienced many problems in attempting to perform contract N00104-96-C-KA09. When I first became involved with the contract, I visited Axion to observe First Article tests. This first visit ended up consisting of tests conducted by Axion to validate their test equipment for use in FAT and Lot Acceptance Test (LAT). During this initial visit, Axion had trouble with battery wires breaking inside the package utilized to hold the PS-115 and associated electronics. The electronics were necessary to measure the rise time, voltage under load conditions and life of the power supply. Axion also had problems with components within the package being damaged due to the high acceleration forces experienced during the test. The equipment is meant to simulate a Naval gun-firing environment, which is experienced by the power supply in actual Naval use. Axion built equipment to simulate this environment utilizing a tube in which a vacuum was drawn and then released accelerating the power supply and then suddenly stopping and spinning the power supply similar to set-back force and spin seen in the gun launch environment. Along with this long plastic tube was a motor at the end of the tube connected via pulley to a smaller metal cylinder at the end of the tube. This motor is used to spin the cylinder at up to 300 revolutions per second. Axion experienced difficulties reaching this maximum speed and sustaining it for the required time. This was due to the extreme stress being exerted on the motor to produce the torque necessary to create this spin. Axion experienced problems with the design of the piece containing the power supply and electronics due to the fact that the power supplies needed to be tested within a certain time after temperature conditioning. The power supplies could not be installed in this piece and the piece closed up and fired in the required time. However, despite all these obstacles, Axion was able to conduct FAT and submit an acceptable FAT report in April 1999.

5. Axion then experienced difficulties in producing the first production lot. The most prevalent problem that I was aware of was the difficulty Axion experienced in obtaining electronic components for their test equipment to support LAT. Also, Axion informed the Government that the main computing chip used in the testing equipment was no longer available and the equipment would have to be redesigned. It took quite a while to find a suitable replacement due to the storage capacity needed on-board the chip along with the size constraints inside the electronics

housing. These problems resulted in numerous extensions to the contract's delivery schedule for the production lots.

6. Two events occurred between 2000 and 2001 that invalidated the results of Axion's successful 1999 First Article Testing. The first involved the PS-115 plate stock. Axion passed FAT in 1999 with PS-115 Power Supplies made with plate stock manufactured by another vendor. In 2000, while experiencing other difficulties with contract performance, Axion decided to attempt to produce its own plate stock. The electro deposition of the lead and lead dioxide in the plate stock are critical to acceptable performance of the power supply. The change in production process, therefore, created doubt as to whether the PS-115 used for the 1999 First Article Testing would be comparable to PS-115 using Axion produced plate stock; and a First Article function test, rather than a cell test, was the only way to remove this doubt. A cell test is performed during plate stock manufacturing to provide assurance that the plating process is producing adequate material deposition to produce the required amount of voltage for each cell. However, a cell test does not provide any indication relative to the cell's ability to withstand gun launch or its ability to produce the required voltage under load for the required life of the power supply. A First Article function test is necessary to provide these assurances to both the government and the manufacturer.

7. The second event that invalidated the results of the 1999 First Article Testing is that in 2001 Axion's PS-115 began to leak electrolyte. This raised additional doubt with respect to whether the processes and materials Axion was using in 2001 could yield conforming production deliveries. Both Axion and the Navy agreed additional First Article Testing was appropriate, and on October 2, 2001 the parties executed bilateral modification P00017 establishing a requirement for additional First Article Testing.

8. Modification P00017 required First Article Testing of 120 PS-115, with three types of tests each to be performed on 40 units. The contract specifications allow a maximum of 3 rejects per test group and a maximum number of 7 total rejects as specified on sheet 15 of drawing 11744726 and paragraph 4.4.6.1.2 of the drawing. Two groups of 40 units each were to flow down through the first and last columns

as shown on sheet 15 of drawing 11744726 from the left of the page. As shown on sheet 15, the units are broken down into two groups of 60 and then a group of 40 is taken from each group of 60. The Axion First Article sample required by modification P00017 was to be the 40 units flowing down through the environmental tests specified in each column and then the functional tests. The drawing also shows the accept/reject criteria of accept on three failures but reject on four failures for each environmental group of 20 power supplies. The required parameters for each PS-115 during a First Article test are set forth at paragraphs 3.3.1.1 through 3.3.1.7 of drawing 11744726.

9. From October 2001 Axion experienced further difficulties that prevented the company from successfully completing FAT. Axion discovered that producing plate stock was not a simple task and encountered delays due to process modifications necessary to produce the plate stock. This resulted in two additional bilateral modifications, P00019 and P00020, both extending the date for completion of First Article Testing. Modification P00019 also reduced the First Article quantity from 120 to 80. Modification P00020, which was signed on July 11, 2002, required submission of First Article Test report by September 9, 2002.

10. According to discussions I had with the Quality Assurance Representative, I understood that testing in 2002 was progressing, albeit slowly. I was unable to visit the contractor's facility during this time frame due to other assigned duties. Again, my understanding of the problems encountered during this time period were similar to those experienced in the past due to test equipment failures. Axion continued testing throughout July and August, and into early September 2002.

11. On September 9, 2002, Axion submitted a FAT report. I reviewed this report and determined the report should be rejected for failure to meet the technical data requirements. The primary basis for rejecting the FAT report was due to the fact that twenty-five of the samples failed to meet the requirements of drawing 11744726. The two major requirements the power supplies failed to meet were activation time and discharge life. A few batteries also failed peak voltage requirements. In addition to the fact Axion's FAT report indicated 25 of the tested PS-115 failed, Axion's test equipment did not collect data on two

of the tested PS-115. Also, two units were not counted in my analysis and were considered to be "no tests" because no electrical load was applied during the test as required by the technical data package. This failure rate falls below the standards set forth in the contract's specification that I have explained above in paragraph 8. I, therefore, drafted NSWC's letter of September 26, 2002 concluding that Axion's FAT report should be rejected. The contracting officer adopted my recommendation and disapproved Axion's FAT report on October 1, 2002.

12. On October 1, 2002, the contracting officer also informed Axion that the Government was considering a termination for default due to Axion's disapproved FAT report and afforded Axion the opportunity to show why the contract should not be terminated for default. In response to this "show cause" notice, Axion submitted an October 11, 2002 letter summarizing the testing data. This letter provided no information explaining the test failures noted by the government in their analysis. All that was provided was a description of the data files on the disc and whether the power supply was conditioned to hot, cold or ambient temperature. Axion's October 1, 2002 letter also states that 74 units produced good data. The government does not consider data not meeting the requirements of the technical data package to be good data. The government also did not find 74 files with data, only 68. Axion's October 11, 2002 letter provided no assurances that Axion could produce power supplies that would meet the specified performance requirements of the technical data package.

13. Although Axion experienced difficulties with its testing equipment, the information submitted in Axion's September 9, 2002 FAT report indicate that on 25 occasions a PS-115 was properly tested but failed to achieve the contract requirements for a successful test. The test data indicates a number of probable reasons for these failures. In some cases, the power supplies appeared to lose voltage rapidly, indicating leakage of the electrolyte due to poorly produced housing or damage from improper test procedures. Two units exceed the maximum allowable voltage output, indicating too many cells. Finally, a few indicated inadequate activation time due to either leaking electrolyte before the test was performed or during the test due to improper test procedures. I also note that despite Axion's air gun difficulties, the Navy had previously acquired approximately 135,000 PS-115 in

seventeen lots from another manufacturer, and in all instances, an air gun was successfully used to perform acceptance testing.

14. In 2000, the NSWC test group obtained a spin tester and in late 2001 the spin tester became available for possible use under Axion's contract. In December 2001, the Navy offered to perform functional testing for Axion using the government spin tester and this offer was repeated in April or May of 2002. The offers included both cost and time to complete estimates. Axion declined to accept these offers both times.

15. I have read the foregoing 6-page declaration and I certify under penalty of perjury that the foregoing is true and correct.

Jerry Hahin

Jerry Hahin

3/28/05

Date

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AXION CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 03-2644C |
| v. | ) | (Judge Firestone) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DECLARATION OF JOHN J. KORAB

1. I, John J. Korab, make the following declaration in accordance with 10 U.S.C. 1746. I am aware that this declaration will be used in the United States Court of Federal Claims, and that this declaration is the legal equivalent to a statement under oath.

2. I am employed as a Contract Specialist at the Naval Inventory Control Point- Mechanicsburg, and have been so employed for approximately 21 years. I was the Contract Specialist responsible for administering contact N00104-96-C-KA09 (the "Contract"), and I was responsible for recommending that the contract be terminated for default.

3. The contract, which was awarded to Axion on December 7, 1995, required Axion to deliver a production lot of 55,209 PS-115. The PS-115 is a battery used in Navy munitions. The unit price for each PS-115 was $23.80. The contract also required that prior to delivering the production lot, Axion was required to perform First Article (FA) testing and submit a FA test report within 120 days of contract award (see Contract, page 50). Pursuant to Federal Acquisition Regulation (FAR) 9.302, the purpose of FA testing is to ensure the contractor can produce an item that conforms to all contract requirements. The Navy required FA testing in this instance because Axion had not produced PS-115 previously. Due to Axion and the Navy trying to solve technical issues, Axion did not deliver the FA test report within the stated time. Subsequently, the FA delivery date was re-established three times via modifications P00002, P00004, and P00005.

4. On May 17, 1999, Axion's FA test report was approved and Axion was released to production. Modification P00011 established delivery dates for the production units. Axion failed to deliver any production units, and modifications P00013, P00014, P00015, and P00016 again set new delivery schedules, none of which Axion met. The clause at FAR 52.249-8, Default (Fixed Price Supply and Service), which was incorporated by reference on page 46 of the Contract, authorizes the Government to terminate a contract for default if the contractor fails to deliver the supplies within the time specified. The Navy, however, continued to work with Axion in the hope the company would be able to successfully produce and deliver acceptable PS-115.

5. In 2000, Axion made a decision to produce its own plate stock. Plate stock is a component within the PS-115. Axion's decision to produce its own plate stock was a change in plans as the PS-115 that had passed FA testing in 1999 were produced with plate stock manufactured by an outside vendor. The Navy Engineering Agent for the PS-115, Naval Surface Warfare Center (NSWC), Crane (located in Crane, Indiana) determined that this change invalidated the approved FA testing since there was no way of knowing whether Axion would be successful in producing its own plate stock and incorporating that plate stock into the PS-115. The ability of Axion to successfully produce production lots was placed in further doubt during this timeframe as some of Axion's PS-115s began to leak electrolyte. On September 28, 2001, NSWC recommended that Axion be subject to additional FA testing (see September 28, 2001 NSWC letter). Axion did not disagree that there should be further FA testing, and on October 2, 2001, the Navy and Axion entered a bilateral modification (P00017) establishing a requirement for additional FA testing on 120 PS-115.

6. Axion failed to accomplish FA testing as required by modification P00017 and was experiencing testing delays due to malfunctioning test equipment. On December 13, 2001, I sent a letter to Axion requesting an assurance that Axion had the expertise to continue FA testing (see December 13, 2001 NAVICP letter). Axion responded by setting forth a plan to produce new testing equipment (see December 27, 2001 Axion letter). After reviewing this letter, I decided to continue working with Axion in the hope they would be able to satisfy the FA test requirement. However, Axion's

difficulties continued, and it was not until April 4, 2002 that a new date for completion of FA testing was established. On April 4, 2002, the Navy and Axion bilaterally modified the contract (P00019) to require completion of FA testing by April 23, 2002. Modification P00019 also changed the number of units for FA testing from 120 to 80. After Axion failed to meet the requirements of modification P00019, the Navy and Axion bilaterally modified the contract (P00020) to require completion of FA testing and submission of the FA test report by September 9, 2002. Mr. Latifi, President of Axion, and myself signed P00020 on July 11, 2002.

7. Modifications P00017, P00019, and P00020 all contained accord and satisfaction, and release language in which Axion relinquished the right to raise claims, demands and causes of action arising out of or related to the contract prior to the date of the modifications. During my deposition on July 27, 2004, Axion's attorney asked me numerous questions related to the parties' intent when executing these three bilateral modifications. As I stated during the deposition, Mr. Latifi and I did not discuss specific claims that would be barred by the accord and satisfaction, and release language. However, I consider the language contained in the three modifications to be unambiguous, and I have no reason to suspect Mr. Latifi made a mistake when signing the modifications. Contract issues related to the air gun, leaking electrolyte and plating specification had arisen long before the date of these modifications, and I believe Mr. Latifi should have understood the accord and satisfaction, and release language of the modifications might limit his future ability to raise claims related to these issues.

8. During my deposition, Axion's attorney also questioned me repeatedly on whether Axion received consideration for modifications P00017, P00019, and P00020. As I stated during the deposition, Axion received the consideration of a revised delivery schedule in each of the three modifications. In each of the three instances, Axion was in non-compliance with the contract's delivery schedule when the modifications were executed. Also, I did not mention during the deposition that for modification P00019, Axion also received the benefit of a reduction in the number of units required for FA testing. With respect to the first of the three modifications (P00017), the Government gave up the ability to terminate Axion for

default for failure to comply with the schedule set for in modification P00016 as P00016 required delivery of a production lot by August 8, 2001. With respect to P00019, Axion received the benefit of a reduction in the number of units required for FA testing and the Government gave up the ability to terminate Axion for default for failure to comply with the requirements of P00017. And with respect to P00020, the Government gave up the ability to terminate Axion for default for failure to comply with the requirements of P00019.

9. I note that during the deposition I mentioned that the "Government released nothing" when executing P00017. I made this statement with reference to the fact the accord and satisfaction, and release language also stated Axion was released from claims the Government had against Axion and at the time of the modifications the Government had no claims against Axion. My deposition statement regarding "[releasing] nothing" should not be interpreted to mean that I think the modifications did not contain consideration for Axion. As I stated repeatedly during the depositions, Axion obtained the benefit of a revised delivery schedule. My deposition statement regarding "[releasing] nothing should not be interpreted as meaning that I think the Government did not have the right to terminate for default when P00017, P00019 and P00020 were executed. If the right to terminate for default is legally a Government "claim," then the Navy was, in fact, releasing Axion from a claim when executing modifications P00017, P00019, and P00020.

10. On September 09, 2002, Axion submitted the FA test report to the Navy for evaluation. While the contract establishes that the contracting officer approves or disapproves FA testing, it was the responsibility of the NSWC to evaluate the FA test report and provide a recommendation to the contracting officer. NSWC evaluated Axion's FA test report and concluded the test should be rejected (see September 26, 2002 NSWC letter). The deficiencies associated with Axion's report included, (1) the report indicated that only 66 units were tested when modification P00019 required the testing of 80 units; (2) the data indicated that 25 of 66 units failed; and (3) the report did not include other data required by the contract's data requirements list. Based on NSWC's letter, I sent a letter to Axion on October 1, 2002 stating that FA testing was disapproved. FAR 52.209-3(d), which is

included in the Contract on page 50, states that the contractor shall be deemed to have failed to make delivery within the meaning of the Default clause if FA testing is disapproved.

11. On October 01, 2002, I also forwarded a "show cause" notice to Axion providing the company the opportunity to show why the contract should not be terminated for default. Axion responded by letter of October 11, 2002 but this response did not provide an adequate excuse for Axion's failure to provide an acceptable FA test report by September 9, 2002. I then reviewed the situation in the context of FAR 49.402-3(f), which sets forth factors a contracting officer must consider when determining whether to terminate a contract for default. Based on this review, I determined the contract should be terminated for default and I prepared a memorandum discussing my decision. Naval Inventory Control Point management then reviewed the memorandum and determined that Axion should be terminated for default (see NAVICP termination memorandum). On November 12, 2002, the contract was terminated for default through issuance of contract modification P00021.

12. During the course of the contract, the Government provided Axion progress payments in the amount of $512,365, yet Axion was unable to make a single production lot delivery. The contract included the clause at Federal Acquisition Regulation 52.232-16, entitled Progress Payments. The clause provides that if the contract is terminated for default the contractor shall repay to the Government, on demand, the amount of unliquidated progress payments. On June 30, 2003, I entered an agreement with Axion that defers re-payment of the $512,365 until Axion's appeal of the termination for default is decided.

13. I have read the foregoing 5-page declaration and I certify under penalty of perjury that the foregoing is true and correct.

John Korab
John Korab

28 March 2005
Date

AXION CORPORATION

TELEPHONE: (256) 851-9770
FAX: (256) 851-9771

May 30, 2001

Department of the Navy
Naval Inventory Control Point
5450 Carlisle Point
Mechanicsburg, PA 17055-0788

Re: N00104-96-C-KA09

Dear Mr. Korab:

In reference to your telephone request, please be advised that Axion Corporation can provide listed below delivery schedule.

1. Quantity of 8000 within 10 weeks from today
2. Quantity of 8000 every 30 days after that, until contract complete.

We appreciate your help and cooperation in this matter. Should you have any questions, kindly contact the undersigned.

55,209
- 48,000
7,209

6 @ 8000 = 48,000
1 @ 7,209 = 7,209
total 55,209

Sincerely,

Alex Latifi
President
Axion Corporation

AUG 8
Sept 10
01 Oct 10
Nov 13
Dec 13
JAN 14
Feb 14

363

317 Nick Fitcheard Road • Huntsville, Alabama 35806
axion@sprintmail.com

P.16

DEPARTMENT OF THE NAVY
NAVAL INVENTORY CONTROL POINT
700 ROBBINS AVENUE
PHILADELPHIA PA 19111-5098
5450 CARLISLE PIKE - PO BOX 2020
MECHANICSBURG PA 17055-0788

IN REPLY REFER TO:

Ser: 0242.6/JK
N00104-96-C-KA09
August 13, 2001

BY FACSIMILE
Axion Corporation
P O Box 5366
317 Nick Fitcheard Road
Huntsville, Al 35806

Gentlemen:

Reference is made to contract N00104-96-C-KA09. Item 0001AA, 8,000 each, was due for delivery on August 08, 2001. Our records indicate that delivery has not been made to date.

Since you have failed to perform the subject contract within the time required by the terms thereof, the Government is considering terminating said contract pursuant to Federal Acquisition Regulation (FAR) 52.259-8 entitled "Default." Pending a final decision in this matter, it will be necessary to determine whether your failure to perform arose out of causes beyond your control and without fault or negligence on your part. Accordingly, you are hereby afforded the opportunity to present, in writing, any facts bearing on the question to Commanding Officer, Naval Inventory Control Point, Code 0242.6, 5450 Carlisle Pike, P.O. Box 2020, Mechanicsburg, PA 17055-0788, within ten (10) days after receipt of this notice. Your failure to present any excuses within this time may be considered as an admission that none exits, your attention is invited to the respective rights of the Contractor and the Government under FAR 52.249-8 "Default" and the liabilities that may be invoked in the event a decision is made to terminated for default of the Contractor.
Any assistance rendered to you on this contract or acceptance by the Government of delinquent goods or services hereunder, will be solely for the purpose of mitigating damages, and is not to be construed as any intention on the part of the Government to condone any delinquency, or as a waiver of any rights the Government may have under subject contract.

Sincerely,

John Korab
Contracting Officer

cc: DCMC Birmingham
SBA Atlanta
NSWC Crane Div
NALC 32J

axion@pgtv.net (axion)
11/06/01 09:58 AM

To: <john_j_korab@icpmech.navy.mil>
cc:
Subject: RE: N00104-96-C-KA09

November 6, 2001

In reference to your letter received by fax on November 1, 200, and First Article sub -mission, please be advised that Axion Corporation has submitted 120 units to DCAS, the government representative Mr. Henry Stickrod. Also 40 units were selected and sent to an independent laboratory for environmental and vibrations test and Seven ft. drop test. At the return of these units, Axion Corporation will perform First Article test and they will be witness by the Government representative Mr. Henry Stickrod and Mr. Jerry Hahin, as soon as the units are returned so that the necessary travel arrangements can be made.

Thank you for your help and corporation in this matter, should you have any further questions kindly, contact the undersigned.

Sincerely,

Alex Latifi
President
Axion Corporation

# Condensed Transcript of the Testimony of **Alex Latifi**

January 28, 2005

Axion Corporation v. The United States

COPY

Shoemaker & Associates
Phone: 256-881-8900
Fax: 256-882-2692
Email: i.shoemaker@mindspring.com

Page 69

contracts you don't have it.
Q I guess the question is, though: When you bid on the contract, you realized that you would have to collect this data?
A I have no problem with that. My collected data was perfectly made -- in fact, it is so good now they are using it.
Q Who is using it?
A The Government is using it.
Q The Government is using it?
A Yes.
Q How are they using it?
A I don't know. I understand they are using the same process that I went through. That is not -- I guess --
Q All right. But when you submitted your proposal, you realized that you had to provide data, testing data, to the Government?
A Yes. Test data collection.
Q And how did you think, when you submitted your proposal, when you were, you know, coming up with the figures, that you were going to collect that data? How did you budget for that?

Page 70

A We budgeted to produce the computer and the bird to collect the data.
Q So you knew you had to produce a bird prior to submission?
A Yes. We -- the bird is a piece that size (indicating) -- so we put a certain amount of money to make this bird. We already knew the computer, because we worked with UAH to produce computer. So all our prices correctly provided to us to produce that, for them to shoot the bird. And this time we asked them, "What should the bird size be? What is the weight requirement?"
Q Well, why didn't you ask those questions before you submitted your proposal?
A Well, when we did the bird, we knew it had to be around two inches, because -- it is very simple. The thing is two-inch size, so we knew the limit was two-inch size -- or basically two-inch. But, still, you want a weight, height, length --
Q Well, why didn't you ask those questions before you submitted your proposal?
A You can't -- the proposal said to produce a PS-115. It did not say produce anything else.

Page 71

Q Well, you knew that you were required to --
A Produce it, to test it.
Q To test it?
A Right, and --
Q And how were you going to test it --
A We thought the Government --
MR. RALEIGH: Wait until he asks the question.
Q Pardon me?
A We felt based on what the Government has in its contract, they are going to test it.
Q Well, you just told me that you knew you would have to produce a bird.
A We knew now, at this time.
Q Well, which is it? When did you first realize that you had to produce a bird to collect data on your computer?
A At a meeting that we had with them.
Q Well, how did you think when you submitted your proposal you were going to collect that data?
A Collect with the computer.
Q And how was the computer going to collect that data?

Page 72

A It was going to be hooked to the battery.
Q And how was the battery going to be hooked to the computer?
A Just a straight hook.
Q All right. And then you were just going to put a battery next to the computer and then were going to measure it, without any turning or --
A It's automatic.
Q How is it automatic?
A When you shoot it, the computer comes on and collects the data.
Q Well, what do you mean "when you shoot it"?
A When you accelerate.
Q So you knew prior to submitting your proposal that you would have to come up with some accelerating -- some way to accelerate the battery?
A No, no. The Government was going to give me the air gun, or whatever gun they had.
Q So you knew prior to submitting your proposal that you had to at least have some type of air gun mechanism?
A No, the Government has to provide a gun, like they provide to Accudyne.

Page 73

Q All right. But as I said, you knew that there was going to be an air gun requirement prior to your submission of your RFP?
A Some kind of gun. I didn't know air gun or anything. At that time I was --
Q You knew that there was going to have to be some type of projectile system?
A Yes.
Q Prior to submitting your bid?
A That the Government give to Accudyne. They have to give me one just like it -- or take mine and use it at Accudyne -- whatever.
Q Take yours, but you didn't have a gun prior to submission?
A No, I mean take my parts and use my collection data and shoot it at Accudyne. That was another choice they might have. So I thought they might just take my part and -- that was their gun, so they shoot it -- why should they not do that?
Q All right. But back in '96, though -- and we will move on --
A Yes.
Q -- you knew that you were going to get with

Page 74

ARL?
A Yes, sir.
Q And then on April 30th, you sent a letter to Mr. Korab again, explaining that you are almost -- close to developing an agreement with ARL?
A Yes.
Q And we will submit that.
MR. MICKLE: Would you please mark this as Exhibit 8.
(Marked Defendant's Exhibit 8.)
Q Do you recognize that letter, Exhibit 8?
A Yes, sir.
Q And this is the letter where you told Mr. Korab that now you are going to develop an air gun -- in fact, you are working with Army Research Laboratory to develop -- the quote in the letter is "a second-generation spin air gun"?
A That is correct, sir.
Q And if you go to the last page, on the bottom of this exhibit -- I think it is marked "NAVY01898" --
A Yes, sir.
MR. RALEIGH: You are not at 898. Turn to

Page 75

898.
A Yes, sir.
Q Why did you think that would be no cost to ARL? If you look at the top there, it says, "It is not expected that ARL will expend any resources beyond the cost of regular phone contacts...."
A That's what ARL wanted to do. And what they said, they are going to provide all the engineering there, and it won't cause them to buy any material or anything. I will provide all the material.
Q And with this document, starting on page -- it looks like "895," running through "897" -- there is a list of recitals that start with Paragraph A and go through F, and then it also has Nos. 8 through 15, and it ends with "Appendix A-Statement of Work." Why did you include all that information to Mr. Korab?
A That's what ARL had included.
Q But did you believe that that was a testing mechanism that you could use to test the PS-115s in this case?
A I thought by that time they help me to produce it, and then I wouldn't have any problem.

Page 76

Yes, sir.
Q You thought ARL would help you?
A Yes. And in exchange, they will get whatever I develop.
Q All right.
(Discussion off the record.)
(Recess.)
(Examination Resumed by Mr. Mickle:
Q All right, we are back on the record, and you know you are still under oath, Mr. Latifi?
A Yes.
Q I would like to show you now -- let's move to June 20, 1996, when one of the several modifications were issued here.
MR. MICKLE: Would you mark this as Exhibit No. 9, please.
(Marked Defendant's Exhibit No. 9.)
Q Do you recognize that document, Mr. Latifi?
A It is Mod No. 2.
Q It's Mod No. 2. And the purpose of Mod No. 2 -- it should be down there in Block 14.
A "The delivery schedule for Item --" I am trying to read it. (Witness reviews document.)

Page 97

more, so now you have no contract coming. So the cost is not just the cost of sitting; the cost -- you cannot perform no more. Your schedule is closed, so --

**Q It wasn't an increased cost to the contract; it was money that was already going to be spent on the contract?**

A It's the ability of Axion to receive a new contract because that contract was scheduled to be delivered and we are not delivering it. So now we are sitting over there not getting more scheduled -- idling -- and we are not getting any more contracts because we are thinking we are going to do this contract.

**Q But you knew -- the contract was for 1.3 million; right?**

A Yes.

**Q So, I mean, was it over and above the 1.3 million?**

A At that time?

**Q Yes.**

A I don't know.

**Q You don't know?**

Page 98

A No.

**Q Well, you still thought you had a profitable contract?**

A Yes, but -- at this time you feel like it is beating you out.

**Q Well, that gets me back to, like, the air gun. At the time did you ever talk to the Navy about giving you some money for the air gun?**

A I don't know at that time --

**Q Was that some of the extra money you are talking about back here --**

A At this time I don't know where we are.

**Q What do you mean "where we are"?**

MR. RALEIGH: Wait for him to ask the question.

Go ahead.

**Q What do you mean "where we are"?**

A Well, at this time, this date, I don't know where we are mentally. I mean, now I don't know where we are then -- working this, working which one, working -- what we are doing.

**Q What you are saying here is you want an answer from the Government so that you can start**

Page 99

**production?**

A Production, yes.

**Q But at that time you have also said -- talking about that heavy monetary burden -- many dollars' worth of material -- that is in addition to the extra money on the air gun you had to spend?**

A I don't know if at that time we spend money on the air gun or not. I don't know what we are doing at that time, this date.

**Q Well, wasn't that part of your inspection plan?**

A At that time we still working with the Government trying to figure out how we going to do it, what we are going to get -- who is going to do it for us -- we are going to do it ourselves or they are going to do it -- they are going to give us the drawing -- we don't know at that time. This is not -- I am not supposed to assume anything, but based on that date I don't remember. I am trying to be helpful.

(Discussion off the record.)

**Q So you don't remember at that time if the money -- if it was actually talking about the air gun**

Page 100

**or if it was also the dies on hand or -- you just said "material" --**

A Yes, but we are frustrated because this is not going through and we are idle.

**Q All right.**

MR. MICKLE: Would you mark this, please.

(Marked Defendant's Exhibit No. 17.)

(Discussion off the record.)

**Q It looks like -- once again, I am trying to get through the history here. Even though the contract was let in '95, through the Government's approval process, on 3 April '97, you still were submitting some waivers trying to make this all come together so everyone could begin production?**

A Yes.

MR. RALEIGH: Just for purposes of our record here: I think we have two different things -- at least the document -- well, maybe not.

MR. MICKLE: Yes, they are different.

MR. RALEIGH: There are two different letters -- what Rick handed me and what has been marked.

MR. MICKLE: That's the one that I --

368A

Page 177

Article --
A Usually, yes, sir.
Q That is usually?
A Usually. The contract has -- the Government has the right every five years to ask the vendor to produce a new First Article --
Q Is that in the FAR?
A I think so. I think every five years -- if you -- (To Mr. Raleigh:) Am I right or not?
MR. RALEIGH: You can't ask us. You know, you are not supposed to -- he wants to know what you know, not what you assume.
A Okay, I don't know -- they asked me to produce the First Article in 2003.
Q All right. And you agreed that you would submit to a new First Article Test process?
A At no cost to the Government.
Q At no cost to the Government?
A Yes.
Q So when you signed P00017, you are basically saying that at no cost to the Government, on 1 October 2003, we have to have a new First Article sample to verify my process?

Page 178

A Yes.
Q Let me show you Exhibit 38. As you were discussing earlier -- you said a lot of the dates in the contract are easy to understand because you are reading them with some knowledge you obtained through either outside conversations or through subsequent letters, or something like that. And you signed P00017 on October 2, 2001, and then subsequent to that, though, on 1 November 2001 -- and Exhibit 38 -- Mr. Korab sends you a letter, and in that letter Mr. Korab says -- do you recognize that letter?
A I don't remember it, but if he sent it to me, he sent it to me.
Q But in that letter he says, "Axion, First Article was due on October 3, 2001. Where is the First Article?"
A Sir, but you just said already approved First Article. The exhibit before you give me -- that First Article was already approved.
Q Well, why did you agree, then, on Exhibit 37 to a new First Article submission?
A There was no new First Article submission; there was -- if you look at everything, it says

Page 179

80 units to be tested. And that was required by contract -- that I test 80 unitS for every lot that I ship.
Q Where does it say "80 units" in Exhibit 37?
A In the contract.
Q Where?
MR. RALEIGH: He said in Exhibit 37 where does it say that.
A In Exhibit 37 it says First Article in 2003.
Q But that means you have to submit a First Article in 2003?
A Yes.
Q All right. And then when he writes back and says that your First Article was due for October 3, 2001, how did you respond?
A I assumed the -- talking about the production quantity I was supposed to do.
Q Well, how could you do production delivery when you were saying you were going to deliver a First Article Test?
A They already approved the First Article Test.
Q You already approved it, but --
A They already approved it.

Page 180

Q But pursuant to -- what was the purpose of P00017, then?
A To do a First Article in 2003.
Q Why would you need to do a new First Article if you already had one approved?
A You have to ask him.
Q But you agreed that you needed to do a new First Article --
A -- in 2003.
MR. RALEIGH: I object to the form.
A In 2003.
Q All right. In P00017?
A Yes, sir.
Q And he sent you a letter saying no, that First Article had to be delivered on October 3, 2001? Do you agree?
A He didn't say "new" about anything. This is the date this letter is -- what is the date of this letter?
Q November 1, 2001.
A Yeah, he says that he need 120 pieces to be tested again.
Q And that it was supposed to have been tested





368 B

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AXION CORPORATION, .
Plaintiff . NO. 03-2644C
vs. .
. JUDGE FIRESTONE
THE UNITED STATES, .
Defendants .

Deposition of: JOHN KORAB
Taken by: Plaintiff
Date: July 27, 2004, 10:00 a.m.
Before: Vicki L. Fox, RMR, Reporter-Notary
Place: Naval Inspection Depot
Mechanicsburg, Pennsylvania

APPEARANCES:
WILMER & LEE
BY: RICHARD J. R. RALEIGH, JR., ESQUIRE
JEROME S. GABIG, ESQUIRE
For - Plaintiff
UNITED STATES DEPARTMENT OF JUSTICE
BY: DOUGLAS K. MICKLE, ESQUIRE
RICHARD A. MARTINELLI, ESQUIRE
For - Defendant

Page 2

INDEX

WITNESS

JOHN KORAB Examination
By Mr. Gabig 4

EXHIBITS

Korab Deposition Exhibit Numbers Introduced
1. Complaint in Axion Corporation v. The United States. 13
2. Contract No. N00104-96-C-KA09 Requests for Equitable Adjustments, 1-13. 14
3. Memo stamped 9/28/02, From Crane Division to Commanding Officer, Naval Ammunition Logistics Center. 82
4. 6/13/2000 letter, Latifi to Korab. —
5. Same as Exhibit 3. 96
6. 4/12/99 letter, Latifi to Korab. 104
7. DD Form 1998, dated 5/6/99 signed by Steve Thomas. 104
8. E-mail of 3/23/99, John Ellis to John Korab. 107
9. Ee-mail of 1/25/02, King to Stickrod. 116
10. Letter stamped 9/26/02, Crane Division to Commanding Officer, with attachments. 116
11. 9/5/02 e-mail, Henry Stickrod to John Korab. 121
12. 9/6/02 e-mail, Henry Stickrod to John Korab. 130
13. Handwritten notes of John Korab. 135

Page 3

EXHIBITS

Korab Deposition Exhibits Introduced
14. 1/26/96 letter, John Korab to Alex Latifi. 20
15. Information and/or Action Form, 5/11/98 To Axion Corp. 64
16. 8/16/2000 letter, John Korab to Axion Corp. 65
17. 8/25/2000 letter, Alex Latifi to Mr. Korab. 66
18. 6/13/2000 letter, Alex Latifi to John Korab. 70
19. 8/27/01 letter, Alex Latifi to John Korab. 71
20. Information and/or Action Form, 6/14/00, to Axion Corporation. 71
21. Complaint in Axion Corporation v. The United States, No. 04-297C. 75
22. Defendant's Amended Answer to Consolidated Complaint. 75
23. Letter to Officer in Charge from Commander, Crane Division, Ref: Axion Corporation letter Dated 22 August, 2001. 85

Page 4

STIPULATION

It is hereby stipulated by and between the respective parties that sealing, certification and filing are waived; and that all objections except as to the form of the question are reserved until the time of trial.

JOHN KORAB, called as a witness, being duly sworn, was examined and testified, as follows:

BY MR. GABIG:

Q: Mr. Korab, my name is Jerry Gabig. I have been retained by Mr. Latifi to represent him on the dispute he has with you on the termination of the contract for PS-115.
And as you know, I am going to be asking you a series of questions today. Before I start, I just have some preliminary matters to make sure we have an understanding here.
The first one is that you have just received an oath from the court reporter. You realize you are testifying today under the penalty of perjury?
A: Yes.
Q: Do you understand that your testimony is the same importance as if you were testifying in a court?
A: I do.
Q: And you will do your best to tell the truth; is that

A: I said that I remember talking to him about it, but I don't remember writing this document. It is 1996. It is a long time ago.

Q: That is fine. But you would agree that Axion did unsuccessfully try to obtain an airgun as government furnished property?

A: Yes.

Q: Let's turn the page to page five. Could you read for me the header up there italicized number two?

A: Axion sought to replicate the government's airgun, but the government would not provide Axion with the drawings.

Q: Is that correct?

A: That's correct.

Q: Could you read the third one down there that is italicized and bolded?

A: Axion attempted to contract with ARL to test the PS-115s using ARL's airgun.

Q: Is that correct?

A: Yes.

Q: Would you turn the page?

A: (Witness complies.)

Q: On page six, we have a number four there that is bold and italicized. Would you read that, please?

A: Axion tried to enter into a Cooperative Research and



Development Agreement with ARL to develop an airgun that would be satisfactory to test the PS-115s.

Q: Is that correct?

A: Yes.

Q: Going to page seven, the header number five?

A: Axion attempted to develop an airgun without the assistance of the government.

Q: Is that correct?

A: Yes.

Q: Is it safe to say back on October 2nd when POOO17 was signed, that you knew that Axion was struggling with this airgun?

A: I was aware that Axion was struggling with the airgun, yes.

Q: So when this first REA — when you first received the REA and you read REA number one, the topic of the airgun as a basis for an REA, that didn't surprise it; did it?

A: Yes, it did.

Q: What did it surprise you?

A: Because previously, he executed a first article of using an airgun.

Q: You are saying because he passed the first article test with the airgun, he didn't have problems thereinafter with the airgun, or there weren't problems with this airgun?



A: I wasn't aware of any during the first article testing, no.

Q: Are you aware of any problems before the first article of testing with the airgun?

A: Only to the degree we have covered, these five bold titles.

Q: Okay. Let's go ahead and take a look at the second REA. It is my understanding you spent some time looking at that so you are somewhat topically familiar with it?

A: Yes.

Q: Before you read this REA, did the basis for it ever occur to you?

A: No, it did not.

Q: I am not surprised. Let's spend some time in it here. Down at the middle of page one here on the second REA, it cites to the FAR for the proposition about the need in solicitation for special test equipment. Let me just strike that and start over again.

At the bottom of page one, it cites to FAR part 45. It references a situation in which you are supposed to place the FAR clause 52.245-18; is that correct?

A: Are you saying that in each clause of each contract we are to insert this clause?

Q: No. I am just asking you — let's just do it this way. Let me give you the FAR here. If you could, read for us



FAR 45.307-3.

A: The contracting officer shall insert the clause at 52.245-18, Special Test Equipment, in solicitations and contracts when contracting by negotiations and the contractor will require or fabricate special test equipment for the government, but the exact identification of the special test equipment to be acquired or fabricated is unknown.

Q: So if — and this is hypothetical. If the airgun was special test equipment, should you have put the 52.245-18 clause into the contract?

A: I am not sure this is special test equipment.

Q: Hypothetically if it was special test equipment, should you have put into the contract the 52.245-18 clause?

A: According to this clause, that is what it states.

Q: Why don't you just — let's take a look here. Let's just take a look at that clause, the 52.245-18 clause. I am now showing you the 52.245-18 clause. It is called Special Test Equipment.

Going down here to (b), could you just go ahead and read to us the first sentence in there?

A: The contractor may either acquire or fabricate special test equipment at government expense when the equipment is not otherwise itemized in the contract and the prior approval of the contracting officer has been obtained.

applies to it is, what did the parties intend.
My question to you is: Did you intend the accord and satisfaction to apply to what Axion perceived to be impossibility because of the plating?
A: I don't know how to answer your question. To say that this was on my mind, I looked at the overall problems with the contract. I was aware of the plating thing; all right? But to say that it conjured into my mind the day we signed the MOD, I can't say yes. I can't say no.
Q: What was your intent? Did you intend it to apply to this?
A: I intended the accord and satisfaction to apply to everything in the contract to that point.
Q: This was in the contract?
A: Of course.
Q: You intended it to apply to this?
A: If you use that terminology, yes, I have to agree with you.
Q: Let's move on to the next one here. Let's take a look at number five. Do you want to tell us what the title to that one is?
A: Request for Equitable Adjustment Number Five, The Government Had Superior Knowledge Of The Difficulties In Producing the airgun But Failed To Disclose Its Superior Knowledge To Axion.



Q: We have been over the difficulties with the airgun so we won't belabor this. From your perspective, did you intend the accord and satisfaction to apply to this?
A: Based on the resolution of the previous request for equitable adjustment, based on our talking about it, yes.
Q: Okay. Let's take a look at number seven here. We are making progress. What is the topic of that one?
A: Request For Equitable Adjustment # 7, Under The Facts Involving Contract N00104-96-KA09, The Navy Breached An Implied Warranty That the Airgun Would Be Either Commercially Available Or A Nondevelopmental Item.
Q: Has the contracting officer ever been exposed to this implied warranty?
A: Yes.
Q: This isn't new?
A: The concept of implied warranty is not new.
Q: Again, when you signed POOO17, POOO18, POOO20, was this intended to be covered in the accord and satisfaction?
A: No. There was no implied warranty that the airgun would be either commercially available or nondevelopmental.
Q: Let's move on. Just quickly, can you give me the topic of REA number eight?
A: Request for Equitable Adjustment Number Eight - Concerning the Airgun, The Government Breached Its Duty



To Cooperate.
Q: Remember number two a while back where it talked about the FAR clause for special test equipment, and you said that never even entered my mind? Does this fall into that category fall or into the category this is something as we are progressing, it could have been a possibility?
Is this something let's say on October 2nd, 2001, was it something that in the back of your mind existed or you just had no clue?
A: No, my position was the government did not breach any duty to cooperate.
Q: Did you ever have any suspicion that you might have breached it?
A: No.
Q: Let's take a look at number nine. Can you tell us what the topic of that one is?
A: Request For Equitable Adjustment Number Nine, Assuming The Government Did Not Have Superior Knowledge, Then There Was A Mutual Mistake That The Airgun Would Require Significant Research And Development.
Q: Earlier, you agreed that you saw that Axion was struggling with the airgun; is that correct?
A: That's correct.
Q: And from Axion's perspective, they were doing what they



considered a fair amount of research and development on the gun, is that correct from their perspective as you see it?
A: I would hate to pass judgment on Axion's perspective.
Q: You were aware of his spending considerable resources on this; is that correct?
A: I am not aware of the resources he expended.
Q: When was the contract awarded, what year?
A: 1996.
Q: When was it terminated? Just the year. What year?
A: That is what I am looking for. 2002.
Q: So how many years is that that this contract was active for?
A: Six years.
Q: A lot of time for a production contract?
A: Yes.
Q: Were you under a lot of pressure to get these things out to the fleet?
A: No.
Q: No? The customer wasn't asking for these things?
A: The customer wanted the items, but there was no pressure or expediting.
Q: Do you remember when the first FATs was over?
A: No, I do not.
Q: After the first article test, what was required before

Page 57

A: Yes.
Q: What was that?
A: There was a decrease in the contract price, and Axion agreed to the accord and satisfaction language.
Q: So there was a decrease in the contract price; is that correct?
A: Yes.
Q: That was a thousand dollars?
A: That's correct.
Q: That means Axion got paid a thousand dollars less for the contract; right?
A: A thousand dollars was reduced from the contract price.
Q: Axion gave up a thousand dollars; right?
A: Yes.
Q: Can you explain to me how that is consideration to Axion?
A: Axion agreed to that price to reestablish the first article.
Q: Axion is giving the government a thousand dollars; correct?
A: That's correct.
Q: What is the government giving Axion?
A: A revised delivery schedule.
Q: Can you tell me what that revised schedule is? What is the new date on the schedule?

Page 58

A: In modification P 19?
Q: Yes, for 19.
A: April 23, 2002.
Q: Can you go back and look at POOO17 again and tell me what delivery date was established there?
A: October 1st, '03.
Q: Am I correct then on POOO19, Axion gave up several months of time on the delivery order on the delivery schedule?
A: That had to be a typo on the 03.
Q: You are saying that is a typo, is that what you are saying?
A: The 03 on P 17 has to be.
Q: You are saying the new delivery date was April, 2003?
A: No. Which modification are you speaking of?
Q: Let's go back. You are saying that on POOO17?
A: Right.
Q: October —
A: I am sorry. I am sorry. I am sorry. I am getting my dates mixed up here. Okay.
Q: Okay?
A: The delivery — because we write our dates using maybe the last two digits, it was October 3rd of 2001 on P 17.
Q: So you are saying that the date was intended to be October 1 of 2000 —

Page 59

A: No, October 3rd of 2001.
Q: Let's go up and look at the date when this thing was signed. When was it effective?
A: October 2nd.
Q: You are saying that the very next day after this thing was signed, it was the intent of the parties that they were going to deliver the samples?
A: That's correct.
Q: That was your intent at the time?
A: Both of our intent, exactly.
Q: Was this ever changed in any way, this POOO17 to reflect what your intent was?
A: No. No. I would have conversed with Axion, and we both agreed to this date.
Q: Do you have any records that show that was the date you had in your negotiations?
A: It could have been a phone conversation. I would have to search the entire file to see if we had anything — a letter.
Q: But to the best of your knowledge, there is no documentation; is that correct?
A: I can't say that. I would have to look really.
Q: Does it seem reasonable that he delivered the very next day? Doesn't transition time take time?
A: Not necessarily. We could have been testing. I can't

Page 60

remember the particulars. As I said, you know, when is the mutual date? We both agreed the next day.
Q: Go back to POOO19 again. Let's just start with a thousand dollars. You would agree that giving up a thousand dollars in itself is not consideration to Axion; is that correct?
When Axion has to give up a thousand dollars, that is not them receiving consideration from the government; correct?
A: They are not receiving the thousand dollars.
Q: Would you agree with me that if that is the correct date that Axion intended, one, October, rather than 03, rather that be 01, if that was the intent of Axion, so it was a unilateral mistake?
A: It was not a unilateral mistake.
Q: Let's just say if that is the date, then in this instance, Axion is giving up time rather than getting time; is that correct?
A: You are referring to MOD 17?
Q: Yes. We went from 17 to 19. Axion was actually giving up several months if that is the correct date; is that right?
A: No.
Q: Hypothetically, if that is the right date —
A: The right date, first of all, is October 3rd of 2001.

Page 69

for production if you had concerns about at that time the plating being substituted?
A: I'm not sure if the plating issue arose before I sent this first article or after I sent the first article.
Q: All right.
A: So that is my answer.
Q: Let's follow it a little bit. Let's assume that the plating issue arose before you sent the cure notice. Okay?
If that was the case is it safe to say that before you sent this cure notice before they were in production mode, if you knew about the plating, it wasn't of significance to the government?
A: It is significant to the government if the contractor changes his process. So I am responding to you that if up to this point in time he had not changed his process, then we would have expected delivery.
Q: All right. So by the fact that you expected delivery would suggest that you were under the impression he hadn't changed his process at that particular time; correct?
A: Yes.
Q: Let's pursue it. If he had changed his process prior to this, and you knew about it, it wasn't significant to you back then; is that correct?

Page 70

A: No. We would have required a first article.
Q: You would have required a first article. You would have required a first article shortly after learning that he changed his process; is that correct?
A: Yes.
MR. GABIG: Please mark that as an exhibit, please.
(Korab Deposition Exhibit 18 was introduced.)
BY MR. GABIG:
Q: I am handing you Exhibit 18. I ask if you can identify the letter?
A: That is an Axion letter of June 13, 2000.
Q: Take a look at the bottom of the letter. Do you see any fax notations on there?
A: Yes.
Q: Would it surprise you if I told you I took that out of your file yesterday?
A: I can't question you. If you did, you did.
Q: You have seen this document before?
A: If it was in the file, I certainly saw it before.
Q: It talks about a conversation in that memo; doesn't it? Can you tell me what that date is?
A: May 24, 2000.
Q: Can you go back and give me the date on the show cause notice?

Page 71

A: August 16, 2000.
Q: It is correct to state that before the show cause notice, you had notice of a change of process; is that correct?
A: That is not correct.
Q: That is not correct. Why isn't it correct?
A: It says Axion intends to use. Intend doesn't mean necessarily in my estimation.
Q: So it is your testimony now that you were not put on notice of the change of process?
A: I was put on notice that Axion stated they intend to use pure nickel.
Q: That isn't enough to suggest that they are changing their processes to you?
A: In my estimation, it isn't.
Q: Can you tell me when you were first put on notice of the change of process?
A: I'm not sure if it would have been as in this case this letter or verbally. I just don't remember.
MR. GABIG: Excuse me. I am rearranging my documents here. Can you mark another document here?
(Korab Deposition Exhibit 19 was introduced.)
MR. GABIG: Can you also, please, mark this one?
(Korab Deposition Exhibit 20 was introduced.)

Page 72

BY MR. GABIG:
Q: I am going you what has been marked as Exhibit 20. I ask if you can identify it?
A: Yes. It is an information and/or action letter dated June 14, 2000.
Q: What is the information down there at the bottom?
A: As stated in reference (a), it is Axion's decision to use nickle in lieu of steel plated nickle. The government is not responsible for the price difference.
Q: Were you aware then that there had been a change in process?
A: Certainly.
Q: And so you were aware of the change of process a couple of months before you issued the show cause notice; is that correct?
A: Yes.
Q: But the show cause notice goes to production; correct?
A: Yes.
Q: When in fact they had changed their process and you knew they changed their process months before; is that correct?
A: Yes.
Q: And at that particular time, you didn't require a second FATs; did you?
A: I'm not sure when we required the second FATs.

Q: Let's go back and take a look at POOO17. Why don't you give me the date on POOO17 again?
A: October 3rd, 2001.
Q: So we show that in June of 2000, you knew about the change of process, and it wasn't until October of 2001 that you required a second FATs; is that correct?
A: That's correct.
Q: Can you explain the delay?
A: The reasoning would be that we were probably communicating back and forth on various problems. That is my answer.
Q: When you say we, who are you communicating with?
A: Axion.
Q: It is not an internal government decision back and forth; is that correct?
A: Well, the technical people would have wanted the second FAT. And it is also probably in the contract somewhere if you change your process, you need a second FAT.
Q: Didn't you tell me earlier that it required there be a second FAT if you change your process?
A: It is required if the engineering activity wants it.
Q: I am looking at document 20 again. At the very bottom, it says copy to. Do you see it down there at the bottom?
A: Yes.



Q: Who is the copy to?
A: J. Ellis and J. Hahin.
Q: Are they the engineering community?
A: One is.
Q: Is it safe to say that the engineering community knew about this back in June of 2000?
A: Yes.
Q: They knew about it in 2000. Did they contact you in June of 2000 saying we need a second FATs?
A: Yes.
Q: They did?
A: Excuse me. I am not sure of the date.
Q: When did they first contact you?
A: I don't remember.
Q: Was it shortly after that?
A: I don't remember.
Q: Can you explain the delay between that letter and June and now to October of 2001 that you required the second FATs?
A: As I indicated earlier, Axion and myself would have been communicating. I am not sure if his plating facility was ready to go into operation during that time frame. I just don't know.
Q: I just want to go back to the question that you hadn't answered as far as I can tell. Would you explain to me



why at the time of the cure notice you are looking for production quantities when in fact you were on notice that there had been a change in the process?
A: My only answer that I can give you is the contractor and I were trying to solve issues, solve problems and so forth. And the date for the production units came and went, and therefore I issued the show cause.
Q: Let's go back to the Complaint. Could you look at paragraph 221 for me?
A: (Witness complies.)
MR. MICKLE: You must be referring to the Amended Complaint now.
MR. GABIG: You are right.
MR. MICKLE: I think one was incorporated into the second one; wasn't it?
MR. RALEIGH: Yes.

BY MR. GABIG:

Q: Can you like at 221. This is the Amended Complaint. It is Exhibit 21.
MR. MICKLE: Thanks, Jerry.
A: 221, during the telephone conversation, the contracting officer offered Axion a no cost termination for convenience.

BY MR. GABIG:

Q: Now I am showing you what is Exhibit 22, which is the



answer to the Amended Complaint. It is also paragraph 221. Could you read that for us?
A: 221. Admits the contracting officer offered Axion a no-cost termination for Axion's failure to perform upon contract N00104-96-C-KA09.
Q: In your records we reviewed yesterday, we couldn't find any memo on that conversation. Did you prepare a memo on that one?
A: No.
Q: You did not. Do you recall the conversation?
A: I do not recall it. However, I would have to say that I might have mentioned at that point in time. All right?
Q: Do you remember the date that it occurred?
A: No, I really don't.
Q: Recognizing that it has been a while, can you still tell me what you remember about the conversation?
A: All right. I'm not sure if that was really the subject of the conversation because Axion and I talked trying to solve the problems. At that point — at that point in time since we hadn't received production units, I might have — well, I suggested would Axion be amenable to a no-cost cancellation.
Q: Your normal practice is to prepare memos when you have a conversation with Mr. Latifi; is that correct?
A: Not all of the time.

Page 77

Q: Half the time?
A: It depends on the issue being discussed.
Q: Did you do anything in preparation for that?
A: No.
Q: Did you talk to anyone to get authorization?
A: No.
Q: Was there anybody else on the telephone with you at the time?
A: Absolutely not.
Q: Do you recall Mr. Latifi's response to that suggestion for a no-cost termination for convenience?
A: It was obviously negative because we didn't execute a termination for convenience.
Q: Did Mr. Latifi explain to you that he would lose a lot of money if he accepted it?
A: I'm sure he said that.
Q: Did he actually say he had spent his retirement money on this project?
A: I can't recall those words.
Q: Did he say anything about spending hundreds of hours trying to get the airgun to perform?
A: I can't recall.
Q: Did he just talk in general about the economic hardship it would have for the Axion Corporation?
A: I would say probably so.

Page 78

Q: Were you surprised when he rejected the no-cost T4C?
A: No.
Q: Why is not?
A: Not many contractors follow that route.
Q: Based on this telephone conversation, did that lead you to believe that Axion may someday be submitting some claims on this contract?
A: No.
Q: Nothing from that conversation led you to believe that you may see some claims on this?
A: That's right. Nothing led me to believe that Axion would submit a claim.
Q: He was just telling you he was going to get well on this through production units, is that what he told you?
A: I cannot recall the entire conversation.
Q: Did you have a conversation to anybody in the government about this conversation?
A: No.
Q: There is no one else you spoke to about this?
A: No. As I said earlier, we spoke many times on the telephone. I mentioned that because of the position we were in at that point in time.
Q: Let's go back to the date I asked you to remember. Do you remember what the date was on modification 17?
A: I am not absolutely sure.

Page 79

Q: Was it October, 2001?
A: Yes.
Q: It is correct that this conversation with Mr. Latifi took place before that modification; isn't it correct?
A: I don't know when it took place. I do not recall.
Q: So would it be your testimony that there was no causal relationship between that telephone conversation and you beginning to put the accord and satisfaction language into the modifications?
A: No.
Q: Why was it before POOO17, you never put accord and satisfaction language into the modifications?
A: We were trying to work hand-in-hand to get this thing manufactured.
Q: So after POOO17, you weren't trying to work hand-in-hand to get it manufactured?
A: I didn't say that.
Q: I am just trying to understand why it happened in 17 and not before.
A: If you had the timeline from the award of the contract up through, I just wanted to make sure that we preserved your rights.
Q: So again, that conversation had nothing to do with you beginning to put accord and satisfaction language into the contracts?

Page 80

A: No, it did not.
Q: Previously, we looked at a cure notice, is that correct, or a show cause notice?
A: Here it is.
Q: After the response to the August of 2000 show cause notice, I presume you made a decision not to terminate the contract for default; is that correct?
A: That's correct.
Q: When was the next time that the thought entered your mind to terminate this contract for default?
A: I can't recall that.
Q: Did you think about it between August 2000 and let's say the time you signed POOO17 October of 2002?
A: I don't recall thinking about it.
Q: Did you discuss that possibility with anybody on the technical side?
A: No.
Q: With your supervisor?
A: No, no.
Q: When was the first time it crossed your mind then to terminate POOO17 or terminate this contract for default?
A: After the second first article testing.
Q: We will talk about that a little later on. Let's go back. When was the first time that someone in the technical community came to you and said we need a

375

is what was in Exhibit 5; is that correct?
A: Yes.
Q: What is the date of that?
A: September 28, 2001.
Q: That is when they dated it; correct?
A: That is what the date says.
Q: Given typical government mail, when do you think you received that document?
A: When I received it?
Q: Yes.
A: I have no idea.
Q: How many days between the date of that document and you signing the modification?
A: About four, five days.
Q: September 29th, September 30th, 31st, okay. So the conversation took place sometime in there; is that correct?
A: Yes.
Q: How many conversations were there?
A: I don't recall.
Q: Did you take any notes of these conversations?
A: No.
Q: Let's go back to the fact I didn't get an answer I believe from my question. Since it really wasn't good business sense on his part to sign that, what do you



believe is the reason why he signed it?
A: He wanted the delivery schedule.
Q: You don't think he could have made a mistake when he signed it in terms of not knowing the consequences?
A: I don't know that.
Q: Is it probable that could have happened?
A: I don't know if it is probable.
Q: Did you ever discuss the accord and satisfaction with Mr. Herndon?
A: Herndon, no.
Q: How about Mr. Gage?
A: No.
Q: Mr. Hahin, Mr. Jerry Hahin?
A: No, I didn't discuss the accord and satisfaction with Mr. Hahin.
Q: When did you first meet Mr. Latifi in terms of having a conversation with him?
A: I don't remember. It has been a long time ago.
Q: Was it before the contract award or after the contract award?
A: I believe it was after contract award. I am certain.
Q: You talked to him a few times since then?
A: Yes.
Q: Perhaps on a weekly basis?
A: I hate to characterize it as a weekly basis, but it was

375A



often.
Q: When is the first time you met him?
A: At the post award.
Q: Are you aware that he is immigrant, not a native born American?
A: He related to me. I don't know if I remember correctly what his ethnicity is, but he told me.
Q: Did you ever detect an accent?
A: Slight.
Q: You are aware that English is not his first language?
A: I don't know if I could go that far to characterize that assertion. I understand every word he says.
Q: Would you agree that he is not as fluent in English as the other vendors you normally deal with?
A: No.
Q: You believe other vendors are just as fluent in English as he is; that is your testimony today?
A: Given the same circumstance.
Q: Would you explain the same circumstance?
A: I deal with other contractors who are not native born Americans who have accents.
Q: Now did you ever have to ask him to repeat himself because you didn't know what he's saying?
A: Not that I recall. I just wouldn't remember something like that.



Q: Were there ever instances where you weren't certain what he was telling you?
A: Not that I remember.
Q: So you don't think there is any type of communication gap from him as far as his language?
A: I would say no.
Q: Let's go back to the fact you previously offered him a no-cost T4C?
A: I wouldn't call it an offer per se. I just mentioned as I reiterated earlier that the contract had been going for an extended period of time.
Q: But that occurred before POOO17; isn't that correct?
A: I would have to say yes.
Q: Did it seem strange to you that he would decline a no-cost T4C, but yet signed POOO17 and waived what he perceived to be claims?
A: No.
Q: It doesn't?
A: No.
Q: Now let's go back to the conversation as I understood you said it. Give me more to think here. I don't want to put words in your mouth. I am not trying to restate this. Let's see.
Am I correct to say that you related that it could have been possible that Mr. Latifi told you that he

Q: The math on that would make it a 55 percent, the ratio of those at which data was successful and those that were unsuccessful?
A: Yes.
Q: The reason I asked you that is that our first FATs succeeds at a 38 percent ratio of those that were shot to those that had successful data. This time we have a better airgun. It is much faster, improved, and we get a ratio of 55 percent, and it fails.
Do you see my logic? The first time it succeeds, and the number that is shot, the ratio of success to failure is only 38 percent, but the failures are off, and it is a no test?
A: The first FAT was approved.
Q: Correct. The second FAT was not?
A: That's correct.
Q: It is not that they approved or not approved. It is what happened during the FAT. And in the first FAT, only 38 percent of those that were shot was the data any good. In the second FAT, 55 percent of the data is good, the airgun is getting better, but you fail us.
A: But the first FAT was approved.
Q: Correct. That established what should be the benchmark for what is approved and what is disapproved; correct?
A: Right. If that process that he followed for the first



FAT was followed, and he passed.
Q: If they followed the process that they did on the first FATs, and you had the same success ratio, would it be logical that the second FATs should also pass?
A: Failure was based on one unit failing.
Q: Is it your testimony that there wasn't one unit that failed in the first FATs?
A: Not to my recollection because we approved the first article.
Q: If I can prove to you this hypothetical that more than one unit failed in the first FATs, would you then say that you held Axion to an unreasonable standard in the second FATs?
A: As I said earlier, the engineering activity is the support unit for me to make my decision. If they said — in any case, whether it is this contract or any contract, if that lot where the first article or production is approved, I send out a letter saying the lot is approved.
Q: Let's go back to your statement. Every single one has to work; correct?
A: As far as I know.
Q: What work means is that what you really want is you want to take that PS-115 and put it into a real projectile the Navy is going to use and fire it, and it better



work; that is what you mean by it has to work, correct?
A: Yes.
Q: All right. Now if we take a unit and we put it in an airgun and because the airgun doesn't work properly, you get what in first FATs was called a no test, but in the second FATs is called a failure, but that unit in fact could have gone into a real Navy projectile and shot and worked, in that instance, is it a failure because the airgun failed versus what that unit can really perform?
A: If it could be proven that the airgun was malfunctioning or not operating properly, it is possible that the device that was to be tested could be good, could be approved.
Q: Okay. Just a few more questions. I am going to get you out on time. I promise.
A: Thank you. I appreciate it. Not me, but the rider.
Q: I want to go back to very early September, 2001 when the second FATs was happening. Do you recall this is happening there at the Axion facility?
Do you recall that on that day Mr. Stickrod couldn't available so his assistant was actually stepping in representing him?
A: I was not aware that that would occur.
Q: But you realize this is Mr. Chuck Vartan who is going to be deposed tomorrow; is that correct?



A: Yes, yes.
Q: Did you receive a voice mail from Mr. Chuck Vartan on that Friday, the 6th of September late in the afternoon?
A: I do not remember. I would have to say no, but I don't recall.
Q: But is it possible you received a voice mail?
A: Anything is possible.
Q: If he testifies he placed a voice mail to you and he said that they had fired a significant number of successful tests and he didn't see any need to go forward with it, he may have said that, and you just didn't hear it?
A: No. There was nothing on my voice mail.
Q: Could it have been from someone else, Mr. Latifi?
A: No, no.
Q: Nothing like that came to your attention?
A: No.
Q: That same afternoon later on in the afternoon — it was Friday so you might have left.
A: Excuse me. That is my day off.
Q: Friday is your day off?
A: Right.
Q: So you would know if you got back in on Monday whether there was a voice mail?
A: Well, I should know if there is a voice mail on it.

Page 141

Q: The following Monday. You don't get it on Friday?
A: No.
Q: Could there have been a voice mail from Mr. Stickrod's supervisor also relaying the same message?
A: What is his name?
Q: Steve. I don't recall the rest of it. We will find out tomorrow.
A: It is very highly unlikely.
Q: All right. The following Monday, did you get a phone call from anybody from Huntsville from Defense Contract Management and Command?
A: I can't remember.
Q: So it is a possibility that either Mr. Vartan or his supervisor called you on Monday to discuss what happened on Friday?
A: Well, it should have been on my voice mail. I don't recall. I would say no.
Q: Do you have any notes to this effect one way or another on a phone call?
A: No, because I wasn't aware of it.
Q: What about on September 9th, did you have a phone conversation with Mr. Latifi?
A: That is possible.
Q: And did Mr. Latifi explain to you what actually occurred on Friday?

Page 142

A: I can't recall the conversation.
Q: So Mr. Latifi, could it have been that he told you that they fired units to the point that Mr. Vartan decided that it was foolish to shoot any more or wasteful to shoot any more? Mr. Latifi could have told you that, and you don't remember?
A: No, I would remember something like that. He never told me that.
Q: Was there any discussion of the fact that enough was shot, and there wasn't any need to shoot any more?
A: No.
MR. GABIG: Can we take a moment to caucus among our people here?
A: Not too long. Go ahead. I still got twenty minutes or so.
(A five minute recess was taken.)

AFTER RECESS

MR. GABIG: That is all the questions.
MR. RALEIGH: We have a couple of agreements. We are going to substitute for Exhibit 21 and 22 another copy of the Complaint and the Defendants Amended Answer to the Consolidated Complaint.
And also, we have limited ourselves to discussions of accord and satisfaction and the issues that surround that today. We have some time left for a deposition.

Page 143

So if the Court ever broadens our ability to conduct discovery, then we may pick up with Mr. Korab on those issues.
Other than that, that is all we have today.
MR. MICKLE: We don't have any questions at this time.
(The deposition was concluded at 4:05 p.m.)

Page 144

COMMONWEALTH OF PENNSYLVANIA :
COUNTY OF CUMBERLAND :

I, Vicki L. Fox, Reporter and Notary Public in and for the Commonwealth of Pennsylvania and County of Cumberland, do hereby certify that the foregoing testimony was taken before me at the time and place hereinbefore set forth, and that it is the testimony of:

JOHN KORAB

I further certify that said witness was by me duly sworn to testify the whole and complete truth in said cause; that the testimony then given was reported by me stenographically, and subsequently transcribed under my direction and supervision; and that the foregoing is a full, true and correct transcript of my original shorthand notes.

I further certify that I am not counsel for nor related to any of the parties to the foregoing cause, nor employed by them or their attorneys, and am not interested in the subject matter or outcome thereof.

Dated at Camp Hill, Pennsylvania, this 6th day of August, 2004.

Vicki L. Fox
Reporter - Notary Public

(The foregoing certification does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)

# Condensed Transcript of the Testimony of **Henry Kumler Stickrod**

January 27, 2005

Axion Corporation v. The United States

COPY

Shoemaker & Associates
Phone: 256-881-8900
Fax: 256-882-2692
Email: i.shoemaker@mindspring.com

Federal Acquisition Regulations, the FAR, as it relates to contracting?
A Whatever is required of my job.
**Q Do you provide advice to contractors on the FAR? Is that part of your duties?**
A It depends upon if there is a conflicting situation that comes up between what he is contracted to do versus what I see him doing, what I perceive is going on, and I will ask him, "Do you understand the FAR clause?" But I do not tell him, "This is legally your FAR clause," or whatever. That is not -- I am not a lawyer. I can't do that.
**Q I understand. Did you have occasion with regard to Mr. Latifi to have any discussion like what you have just described, concerning any FAR clauses, that you can recall today?**
A FAR clauses specifically? Not really.
**Q Or any other FAR provisions?**
A No, sir -- contractually, we discussed from time to time -- I would tell him, "Produce what the contract calls for you to produce." But beyond that, no.
**Q Is that a particular conversation you are**



**thinking about when you say that?**
A Several different times.
**Q All right. Later on in the deposition, I am going to ask you, you know, more about conversations that you had with Mr. Latifi, but what in particular were you all discussing when you had that discussion?**
A It happened frequently. I don't -- I can't recall any particular conversation.
**Q Can you recall the particular subject of any of those conversations?**
A No.
**Q Would they be common conversations that you would have with a contractor?**
A Oh, sure.
**Q You are familiar with Mr. Alex Latifi, the owner of Axion?**
A Yes.
**Q What were your job duties with regard to the contract?**
A This particular one?
**Q Yes, sir.**
A To observe that the testing was done according to the procedure, and then -- it wasn't



required of me to observe him providing the report information, but it was essentially simply to watch the testing, to assure that they met the testing parameters and that the data was downloaded, so that he could report to Jerry Hahin and John Korab.
**Q And was that done? Was the test accomplished?**
A What do you mean by "Was the test accomplished?"
**Q Well, you just described that your job was to observe the testing, make sure that the testing was done properly.**
A Initially, there were supposed to have been 540 tests accomplished. We never did get 540 tests, no. At one point, they dropped it back to something less than that. It seems to me it was, like, 300. And then after that it was dropped back again. I think it wound up being something like 180 or 150. And don't quote me on the numbers. I am not certain exactly right now what the final numbers were. But there were a lot of communications that went on external to me, of course, that I wasn't privy to, and I didn't make decisions about First Article



Testing and whatever. All those parameters were up to John Korab and Jerry Hahin. All I was doing was observing that the testing was accomplished on each one of the units and the data downloaded successfully into his computer. And he was required to send that stuff on to them. That wasn't part of my responsibility. I wasn't required to ensure that he did that.
**Q Who was in your chain of command, so to speak, with regard to this contract?**
A My immediate supervisor was Willie Campbell.
**Q And who was above Mr. Campbell, then?**
A I don't remember whether Wayne Ryman, who is now the operations boss, was in at that point or whether -- oh, a guy that retired. I can't remember his name. But all the hierarchy above Willie at that point was in Birmingham.
**Q Was there a gentleman by the name of David King that --**
A David King came in shortly before I was taken off the contract. David was not in there from '99. David didn't come in until much, much later.
**Q Why were you taken off the contract?**

A Because of the T for D, the Termination for Default. That essentially terminated, you know, anything that we had to do with it.
Q And during the course of our deposition, if we say "T for D," it refers to "Termination for Default"?
A Yes.
Q And if we say "T for C," that would refer to "Termination for Convenience"?
A Yes.
Q Are you a contracting officer?
A No.
Q Have you ever been?
A No.
Q Do you have contracting authority?
A No.
Q Do you recall having a discussion with Mr. Latifi where you told him that in your own opinion this contract should not have been a fixed-price contract, that it should have been an R&D contract?
A That is not the wording that was used.
Q What was the wording that was used, sir?



A I said to him at that point in time, "With all the resources that you have been putting into this, you keep changing and trying to improve on this, and whatever. Why didn't you go to them originally and ask them for the R&D on the thing?"
Q All right. What brought up that conversation? What made you make that statement? What did you mean by that?
A He was continually trying to improve on what the -- the Article that he was making, the PS-115, he was continually trying to improve on it instead of doing what the contract called for him to do, what the drawings called for him to do. He kept trying to improve and improve and improve.
Q Did your conversation also concern the fact that Mr. Latifi had to expend a great deal of time developing an air gun for testing?
A No. The air gun was already done before I ever got involved.
Q The air gun was created by Mr. Latifi before you came?
A Yes. The air gun was already in existence.
Q All right. What is your understanding on how



the air gun was developed?
A I don't have any. I don't know.
Q Did you ever have any discussion with Mr. Latifi about how the air gun was developed?
A No.
Q Did you have any other discussions that you can recall about whether this should have been an R&D contract or not?
A No, just the one time I asked him why he hadn't got it originally.
Q Do you recall when that conversation took place?
A Probably in -- no, I don't remember the exact time. It was later on --
Q Do you recall --
A It wasn't early --
Q I'm sorry.
A It wasn't early; it was later on.
Q Do you recall when the contract was terminated for default?
A It was in September.
Q Of what year, sir, if you can recall?
A I don't remember -- it was '02, '03 -- I



don't remember the year.
Q Throughout the course of our deposition, I will be showing you some documents, and it will probably bring back some recollection on those things.
A Yes.
Q But suffice it to say this conversation would have taken place at least between mid-1999, when you became involved, and the date of the termination for default?
A Oh, yes. It was toward the end of it.
Q Would it have been during the First Article Testing time period?
A That whole thing was all First Article Testing.
Q I'm sorry?
A That entire period was First Article Testing.
Q All right.
A There was never any production testing accomplished.
Q Do you recall ever having a conversation with Mr. Latifi where you told him he should patent his air gun?

Page 37

recall?

A To be loaded into the air gun and fired and spun for the appropriate time and then the voltage readings downloaded onto an external computer, and the record kept and then forwarded to NAV ICP for their determination of whether or not the First Article stuff had been met.

**Q You gave us an acronym there, "NAV ICP." That is the Navy ICP?**

A The Navy Inventory Control Point.

**Q And where is that, sir?**

A In Mechanicsburg.

**Q Mechanicsburg, Pennsylvania?**

A Yes. John Korab was the contracting officer that all that stuff went to.

**Q When you were there observing the tests, did you see the data downloaded to the computer?**

A When there was data available to download, yes, but a lot of times it was not available. The bird -- the PS-115 either didn't work or we couldn't -- did not have the capability of capturing what did work.

**Q On the occasions that the data did come out,**

Page 38

**how was the data captured?**

A I am not sure what you are driving at, what you want to know.

**Q I think you testified that the data went to a computer, an external computer; is that right?**

A Yes.

**Q Where would it go from there?**

A I don't know.

**Q Who kept that data?**

A Mr. Latifi at Axion.

**Q Did you keep any notes of the testing?**

A Only that this one worked or that one didn't work for the time being. And then all of that got destroyed.

**Q All of what got destroyed?**

A My particular notes about which one did or which one didn't produce voltage.

**Q When did that information get destroyed?**

A When our former commander came in and told me that I was not to have paper files, that it was all to be computerized, and he said, "All of that has got to go."

**Q Do you recall at what point in time that occurred?**

Page 39

A No, I don't. It was somewhere in -- it was after the letter came out is all I can -- I can't remember for sure when, but it was just after the letter came out.

**Q What letter?**

A The T for D letter.

**Q After the Termination for Default --**

A Yes.

**Q -- you were given instructions by your supervisor to destroy your notes?**

A By the commander of the unit --

**Q All right.**

A -- that we were not to be having all these paper files, that it was all supposed to be electronic, and whatever, and to get rid of all that. We were also moving from building to building to building at the time, and it just -- it was gone. And it was my own notes about what -- say, on a given day, we would fire four of the PS-115s, and one of them might work, and two of them not, and then one would. And I would just have my own indication, "Yes, this one did, that one didn't, that one didn't, this one did," on that particular day.

Page 40

**Q Was that information that you are describing here, the information in your notes, captured electronically in any other way?**

A With what Mr. Latifi had on his computer, yes.

**Q But your own observations about which battery worked and which didn't, you say you took that down in your -- I assume handwritten notes?**

A Yes, handwritten notes.

**Q Did that get transcribed by anyone?**

A No.

**Q Would you be able to recall presently which ones had worked and which ones didn't?**

A Specific individual ones? No.

**Q So without those notes, you couldn't tell us that?**

A No.

**Q How long did the destructive testing of the assembled 115s go on?**

A I don't understand what you are asking.

**Q I am trying to figure out how long the testing occurred. I mean, was this a one-day process, where you started at 8 a.m. and you finished**

**In The Matter Of:**

*Axion Corporation v.*
*The United States*

---

*Jerry Habin*
*Vol. 1, February 10, 2005*

---

*Accurate Court Reporting, LLC*
*Kathy Nold, RPR*
*Suite 419*
*730 West Main Street*
*Louisville, KY USA 40202*
*(502) 589-1413 FAX: (502) 568-3788*

*Original File 050210~1.TXT, 207 Pages*
*Min-U-Script® File ID: 3943522866*

**Word Index included with this Min-U-Script®**

BY MR. GABIG:
Q: Mister Hahin, you recognize you're still under oath?
A: Yes.
Q: Okay. Mister Hahin, did you know that Mister Korab offered the Axion Corporation a no-cost termination for convenience settlement proposal, did you ever hear of that?
A: I think I recall hearing about that.
Q: Was that discussed with you before they made the offer?
A: Like I said, I think he just mentioned that he was thinking about doing that, I don't remember any discussion with me.
Q: Do you remember what time that was, in the relative chronology here?
A: I would say it was sometime after 2-17, I believe, but I really don't recall.
Q: Why wasn't the Navy willing to just do a regular termination for convenience?
A: The Navy — I mean, the Navy wanted batteries, obviously.
Q: Okay.
(PLAINTIFF'S EXHIBIT 23 WAS MARKED FOR IDENTIFICATION.)

Page 119

BY MR. GABIG:
Q: Let's take a look as what's been marked as Exhibit 23. It's an Axion letter dated November 13th, 2000, is that correct?
A: Yes.
Q: To Mister Korab?
A: Yes.
Q: Have you seen this letter before?
A: Yes.
Q: Let's start with the first paragraph. In the middle of the first paragraph, do you see this language starting with, "We have spent one week..."?
A: Yes.
Q: Why don't you read that and the next three sentences for me.
A: We have spent one week on lead plating solution and one week on lead dioxide plating solution and one week on acetate lead dioxide plating trying to make a solution to government specifications and be able to pass the required cell test. We were unable to do so. Our chemist and a factory chemical representative came to the conclusion that the amount per ounce or gram given by the government document for each element solution was not correct and completely off.

Q: Why don't you read the next sentence, as well?
A: Therefore we have spent the past two weeks and have mixed the three solutions with help from the chemical representative and our chemist to find the correct amount of mixture for each solution.
Q: Up a little higher, he talks about OD1832, is that correct?
A: Yes.
Q: Are you familiar with this document?
A: Yeah. I'm not sure that's the right number, but I'm familiar with that plating guideline document. It seems like he might have left out that number there.
Q: Yes, I think so too.
(PLAINTIFF'S EXHIBIT 24 WAS MARKED FOR IDENTIFICATION.)
BY MR. GABIG:
Q: I'm now showing you Exhibit 24, which is page seven from the Navy contract. Do you recognize that document?
A: Yes.
Q: And on the bottom of the page it identifies — under specifications, could you read what that number is there?

Page 121

A: Yes, OD18332.
Q: So apparently in this letter, we've missed a digit in there someplace, is that correct?
A: Yes.
Q: And how is that described in this thing, what is that?
A: The description on page seven is procedures for preparing lead, colon, lead dioxide reserve energizer electrode stock by electrodeposition.
Q: Now, the contract identifies it as a specification, is that correct?
A: Yes.
Q: And is a specification binding on the contractor?
A: Not necessarily.
Q: It's not necessarily binding?
A: No.
Q: How can you tell when a specification is binding and when it's not binding on a contractor?
A: It just depends on the specification. Some are meant as informational specifications, some are meant as requiremental specifications.
Q: And how is a vendor supposed to know that when he bids on a proposal?

Page 122

the case?
A: There are certain instances where — if you look at the data, you can tell if the battery had been activated properly. Let's say, for instance, if you get activation up to twenty-three volts or twenty-six volts, which is normal, and then suddenly it goes down and you look at that battery and there's no cracks, you can say that was a defective battery.
Q: All right.
A: Or let's say, for instance, you've got a voltage reading that was up to forty volts, you can say okay — you can cut apart that battery and more than likely you would find an extra cell in there.
Q: All right. Did that ever occur, did you ever observe any of those?
A: The data I observed in the last First Article appeared to indicate that.
(PLAINTIFF'S EXHIBIT 29 WAS MARKED FOR IDENTIFICATION.)
BY MR. GABIG:
Q: You're now looking at a letter from Crane, dated 26 September, 2002.
A: Yes, that's correct.
Q: Page six says the point of contact is

Page 163

yourself, is that correct? Paragraph six.
A: Oh, paragraph six. You said page six.
Q: Yeah, I'm sorry.
A: Yes.
Q: So you were the author of this letter?
A: Yes.
Q: Who is Mister Wong?
A: That's my boss.
Q: Okay. Let me get you to turn to paragraph five, second sentence. Would you read that for us?
A: FA reserve energizers, paragraph twenty-five out of sixty-six, parenthesis, drawing 11744726 — sorry, let me take that back.
Q: Okay.
A: After the parenthesis, twenty-five of sixty-six failed to meet the performance requirements per drawing 11744726.
Q: So you're saying that twenty-six of these units were failures?
A: Twenty-five.
Q: Twenty-five. And then this is your analysis, the following pages here, is that correct?
A: Yeah, this is just a table showing what requirements each battery had for each one of those requirements in the specification.

Q: All right. If we go over to the remarks category, it says number one, we had a failed, number two failed, three passed, four failed, down the line. Why is it I don't see any no test?
A: Again, because the data he submitted, he was requested to send all the good data, no bad data he considered to be no test.
Q: All right. Can you explain to me why it is that Mister Stickrod said he observed at least ninety successful tests, but in this instance we are only talking about sixty-six tests in this report?
A: I don't know why Alex sent sixty-six tests.
Q: Did you make any inquiries as to why it is that Mister Stickrod told you there were ninety successful ones, and that was earlier, but here you're only saying you submitted sixty-six?
A: I asked Mister Stickrod and he didn't have an answer for that. I never asked Alex.
Q: How many of the tests did you personally observe of the second FATs?
A: From what I recall, I would say probably around four.
Q: Just four? It was a full day out there for four?

Page 165

A: Yeah.
Q: Do you remember that date or approximate date you were out there?
A: I could probably find that out, but I don't know offhand. I know I planned to go out there a number of times and it just didn't work out so — I know Brian went once and I think I went once, but he had trouble with his tester and we didn't get any testing done, so —
Q: Let me find a spec again. Is there — so is it your testimony that of these — the reason you put twenty-five categories in the failed category because as you looked at the charts, you didn't see twenty-three volts per hundred and fifty seconds?
A: No.
Q: No. Why did you put them in the failed category?
A: Well, there's numerous paragraphs that they relate to, activation time, life, voltage, bolt activation and life, and that looks like — the majority of them were for life, twenty-three volts for a hundred and fifty seconds.
Q: Okay. So most of them were discharged time and then after that, it was just a discharged life or activation time, repeat voltage?

Page 166

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on June 10, 2005, a copy of the foregoing "DEFENDANT'S SUPPLEMENTAL APPENDIX" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Douglas K. Mickle
Douglas K. Mickle