IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **AXION CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 03-2644C & 04-297C** |
| **v.** | ) | **(Judge Firestone)** |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S COUNTER-STATEMENT OF FACTS**

Pursuant to Rule 56(h)(2) of the Rules of the United States Court of Federal Claims, the United States respectfully submits the following counter-statement of facts in opposition to Axion's statement of facts and proposed additional facts.[1]

The United States responds to the cited paragraph numbers and their assertions, as set forth in Axion's statement of facts and proposed additional facts, as follows:

1. Alex Latifi is the Chief Executive Officer of Axion Corporation. Latifi Decl ¶ at Plaintiff's Appendix ("PA") A.

Response: Defendant does not disagree.

2. Axion has been in business for approximately twenty years. Latifi Depo at 13.

Response: Defendant does not disagree.

3. Axion is a minority-owned, small business. Latifi Decl ¶ 2.

Response: Defendant agrees that Axion is a small business. Defendant disagrees that Axion is minority-owned. This proposed finding raises an issue of law, not fact, regarding statutory and regulatory provisions that set forth the Government's

[1] Axion filed its response to defendant's proposed findings of uncontroverted facts and plaintiff's proposed findings of uncontroverted facts on May 24, 2005.

socioeconomic acquisition programs.

4. During its existence, Axion has been awarded between 100 and 200 government contracts. Latif Decl ¶ 1.

Response: Defendant does not disagree.

5. Axion's core business is performing relatively small, build to print, United States government production contracts. Latifi Decl ¶ 1.

Response: Defendant does not disagree.

6. In almost every instance, the Government contracts have been firm-fixed price contracts. Latifi Decl ¶ 1.

Response: Defendant does not disagree.

7. Axion has never been awarded a research and development ("R&D") contract. Latifi Decl ¶ 1.

Response: Defendant does not disagree.

8. R&D is not a core competency of Axion. Latif Decl ¶ 1.

Response: Defendant does not disagree.

9. Prior to contract N00106-96-C-KA09, Axion never had a contract terminated for default. Latif Decl ¶ 1.

Response: Defendant disagrees. The Navy did not award contract N00106-96-C-KA09 to Axion. The contract between Axion and the United States at issue here is contract N00104-96-C-KA09. To the extent Axion intended to refer to contract N00104-96-C-KA09, the defendant does not disagree with the statement contained in paragraph 9.

10. Prior to the present dispute, Axion had never submitted a claim under the

Disputes clause. Latif Decl ¶ 1.

Response: Defendant does not disagree.

11. The PS-115 power supply is a dormant battery to be placed in a munition that is fired from a large bore weapon. Complaint I ¶ 6; Answer ¶ 6 (admitting).

Response: Defendant does not disagree.

12. A PS-115 power supply becomes active when a projectile containing the PS-115 is fired from a large bore weapon. Complaint I ¶ 7; Answer ¶ 7 (admitting central allegation).

Response: Defendant does not disagree.

13. The acceleration produces as much as 25,000 Gs of force. Complaint I ¶ 7.

Response: Defendant does not disagree.

14. The force causes a cutter within the PS-115 to penetrate and cut a diaphragm. Complaint I ¶ 7.

Response: Defendant does not disagree.

15. The force causes the stored acid to pass through the penetrated diaphragm and permeates the cells. Complaint I ¶ 7.

Response: Defendant does not disagree.

16. The result of the acid reacting with the cells is a source of electrical power. Complaint I ¶ 7.

Response: Defendant does not disagree.

17. The solicitation contained detailed, “level III”, build-to-print drawings on how to produce the PS-115s. DA at 18-31; Complaint I ¶ 11, 58.

Response: Defendant does not disagree.

18. The Government expected the PS-115 to have a shelf life of approximately twenty years. Hahin Depo at 11.

Response: The citation for this assertion does not support the allegation that the Government expected the PS-115 to have a shelf life of approximately twenty years. Nevertheless, the United States does not disagree that the Government might have expected the PS-115 to have a shelf life of 20 years. The Government notes, however, that Axion's contract with the Navy did not require any particular shelf life.

19. The solicitation also contained an option quantity for an additional 55,209 units. DA at 2, Complaint I ¶ 9; Answer ¶ 9.

Response: Defendant does not disagree.

20. Initially, the Army had acquired PS-115s for the Navy. Complaint I ¶ 10; Answer ¶ 10.

Response: Defendant does not disagree.

21. Before awarding contract N00106-96-C-KA09 to Axion, the Navy had acquired PS-115s from Accudyne Corporation. DA at 16; Deposition of Jerry Hahin ("Hahin Depo") at 15-16 at PA B.

Response: Defendant disagrees. The Navy did not award contract N00106-96-C-KA09 to Axion. The contract between Axion and the United States at issue here is contract N00104-96-C-KA09. To the extent Axion intended to refer to contract N00104-96-C-KA09, the defendant does not disagree with the statement contained in paragraph 21.

22. The contract required a first article test before Axion could proceed to production. Complaint I ¶ 15.

Response: Defendant does not disagree.

23. The contract did not state that an "air gun" was required for testing. Complaint I ¶ 16; Answer ¶ 16.

Response: Defendant does not disagree. Defendant avers, however, that contract N00104-96-C-KA09 only required that the awardee be responsible for all aspects of testing and did not specifically require the use of an air gun. DA 62, 109-11.

24. The contract contained no information on how to fabricate the acceptance inspection equipment.

Response: Defendant does not disagree. Defendant avers that contract N00104-96-C-KA09 only required that Axion was responsible for all aspects of testing. DA 62, 109-11.

25. The acceptance inspection equipment required by the contract was special test equipment defined in FAR 45.101. Complaint II, ¶ 247, Hahin Depo at 68.

Response: Defendant disagrees. The statements contained in paragraph 25 constitute Axion's argument and legal conclusions, not statements of fact.

26. The contract never contained any specification for an air gun. Complaint No. II, ¶ 63, Latifi Depo at 54-55, PA D.

Response: Defendant does not disagree.

27. The contract reserved the right for the Navy to perform the testing in the operational environment of inserting PS-115s into projectiles and then firing the projectiles from large bore weapons. DA at 7 incorporating technical data package

19202-11744726, paragraph 4.4.6.2.2; Latifi Depo at 54-55, PA D.

Response: Defendant agrees that the contract reserved the right for the Navy to perform testing in an operational environment. The Government disagrees with any implication that the Navy was required to exercise that right or even that operational testing was a feasible option. The cited technical data package stated the Government "may at its discretion" perform field testing. In addition, the Navy did not possess the equipment required to conduct operational testing. Finally, defendant avers that Axion's citation to page seven of defendant's appendix for support of its assertion in paragraph 27 is inaccurate. The document at page seven of the defendant's appendix is an amendment to the solicitation, and it has nothing to do with the technical data package.

28. The solicitation identified the two previous contracts for PS-115s that had been awarded by the Navy to the Accudyne Corporation. DA at 4; Hahin Depo at 15-16, PA B.

Response: Defendant does not disagree. Defendant avers, however, that Axion's citation to page four of defendant's appendix is inaccurate. Page four of defendant's appendix includes inspection and delivery information included in the contract. This information is unrelated to Accudyne.

29. Accudyne was provided with one or more air guns by the U.S. Army. Latifi Depo at 58, PA D.

Response: The United States agrees only that Accudyne had an air gun, but disagrees that it was provided to Acudyne by the Army and with any implication that it was provided at no cost. See Hahin Depo at 17.

30. In a letter dated January 17, 1996, Axion requested the Government provide

Axion with an air gun. Complaint I ¶ 26; Latifi Depo at 54-55, PA D.

<u>Response</u>: Defendant does not disagree.

31. The Government declined to provide Axion with an air gun. Complaint I ¶ 27; Latifi Depo at 54-55, PA D.

<u>Response</u>: Defendant does not disagree. The Government avers, however, that there was no requirement to provide any offeror with any testing equipment. The Government also avers that the contract explained to each offeror that if an offeror was planning to use Government furnished equipment when performing upon the contract, the offeror's bid would be modified to reflect that fact. DA 68.

32. The Contracting Officer stated was that "[t]he Navy did not supply any air guns to the previous contractor, Accudyne Corporation, for test purposes." Plaintiff's Appendix ("PA") at Q.

<u>Response</u>: Defendant does not disagree. The Government avers that the Navy has never contracted with Accudyne to produce PS-115s,

33. The Army Research Laboratory ("ARL") agreed to sell Axion the drawings for the air gun. Complaint I ¶ 31, Deposition of Korab ("Korab Depo") at 21-22; PA C; Latifi Depo at 59, PA D.

<u>Response</u>: Defendant disagrees. The Government agrees that Axion and ARL conducted negotiations for the purpose of entering a binding written agreement through which ARL would have provided drawings or technical support for the building of an air gun. The United States disagrees that a formal agreement was ever consummated.

34. Axion sent a check to ARL to pay for the drawings. Complaint I ¶ 31; Axion Ltr to C.O., April 15, 1997, PA E.

Response: Defendant does not disagree.

35. ARL refused to sell the drawings to Axion for what ARL claimed were "legal reasons". Complaint ¶ 31; Notes from ARL dated March 21, 1997, PA F; Latifi Depo at 64-69, PA D.

Response: Defendant does not disagree. The defendant also avers that the attempted agreement between Axion and ARL regarding production of an air gun involved more than ARL providing drawings. DA 180.

36. The drawings for the air gun could be purchased by the public for a modest fee from the U.S. Department of Commerce National Technical Information Service ("NTIS"). PA G.

Response: Defendant does not disagree.

37. Axion did not know until after the contract was terminated for default that the drawings for the air gun could be purchased by the public for a modest fee from the U.S. Department of Commerce National Technical Information Services ("NTIS"). PA G. Latifi Depo at 105.

Response: Defendant disagrees. The Government has no information regarding when Axion became aware that drawings for an air gun were available from the Department of Commerce.

38. If Axion had access to the NTIS drawings of the air gun shortly after contract award, Axion would have had less difficulty in developing an air gun. Hahin Depo at 55-66, 75: PA B, Latifi Depo at 68, PA D.

Response: Defendant agrees that the NTIS drawings of the air gun may have aided Axion in producing the air gun; however, it is speculation to assume whether

Axion would have had less difficulty in developing the air gun or develop one that would successfully test the PS-115 batteries. The Government avers, however, that Axion's air gun was able to properly test the PS-115s that Axion produced using a foreign vendor's plate stock. DA 189, 290. The Government further avers that Axion experienced significantly more difficulty with providing valid test results after Axion started testing PS-115s that it produced using plate stock that Axion manufactured in-house.

39. Because testing difficulties involving the air gun, Mr. Hahin made approximately fifteen trips to the Axion facility. Hahin Depo at 26.

Response: Defendant does not disagree; however, defendant avers that Axion's citation to page 26 of Mr. Hahin's deposition does not support Axion's assertion upon this point.

40. When Axion first attempted to develop the air gun, Axion did not know that it had begun a significant research and development effort. Latifi Depo at 102, 110-1, PA D; Hahin Depo at 75, PA B.

Response: Defendant neither agrees or disagrees with the assertions contained in paragraph 40 because defendant lacks sufficient information regarding these matters. Defendant avers, however, that Axion's citation to page 75 of Mr. Hahin's deposition does not support Axion's assertion upon this point. The United States also avers that it disagrees with the implication that Axion's efforts were, in fact, a significant research and development effort.

41. Because of the expense of trying to develop an air gun, contract N00104-96-C-KA09 became a significant financial burden on Axion.

Response: Defendant agrees that Axion incurred costs in attempting to build an

air gun, but has insufficient information as to whether these costs rose to the level of a significant financial burden.

42. Latifi financed Axion's losses from his personal savings to include his retirement savings. Latifi Decl ¶ 4, PA C.

Response: Defendant neither agrees or disagrees with the assertions contained in paragraph 42 because defendant lacks sufficient information regarding these matters.

43. Axion struggled to develop an air gun. Korab Depo at 21, PA C.

Response: Defendant does not disagree.

44. Axion did not receive any assistance from the Government in developing the air gun. Korab Depo at 21, PA C.

Response: Defendant agrees that pursuant to the contract, Axion was responsible for all aspects of acquiring test equipment. DA 62, 109-11. Accordingly, defendant agrees that the Government offered no assistance with the design and fabrication of the air gun. The defendant avers, however, that the Navy did offer to test the batteries for Axion with a Government spin tester, and Axion declined this offer. See Hahin Decl ¶ 14, DA at 353.

45. Concerning PS-115s, prior to the award of contract N00104-96-C-KA098, the Government had experienced problems with PS-115s because an earlier design had allowed "the electrolyte to leak out of the ampule causing severe reliability degradation." Hahin email, Nov. 23, 1999, PA N.

Response: Defendant does not disagree. Defendant avers, however, that the leaking electrolyte problem experienced in previous contracts had been corrected. DA 196-197.

46. The reason the Navy awarded contract N00104-96-C-KA09 was to acquire new PS-115s to replace those that were experiencing problems with leaking acid. Hahin depo at 21-23.

Response: Defendant does not disagree.

47. In the summer of 2001, Axion discovered that the PS-115s that Axion had manufactured were beginning to leak acid. PA L and M; Latifi Depo at 131-133, PA D.

Response: Defendant does not disagree.

48. Axion was never informed by the Government that the PS-115 had a history of leaking acid. Latifi Depo at 155, PA D.

Response: Defendant disagrees. In September 2001, the Navy notified Axion that a prior version of the PS-115 had experienced leaking. DA 196-197. Defendant further avers that paragraph two of this letter explained that the problem had been resolved. Id.

49. Axion reported the leaks to the Navy; Latifi Depo at 132, PA D.

Response: Defendant does not disagree.

50. The reported leaking of the acid was a factor in the decision of the Navy to require a second first article test. Hahin Depo at 110, PA B.

Response: Defendant does not disagree. Defendant avers that the primary reason that a second first article test was required because Axion had altered its manufacturing process. DA 160.

51. There was no effect between the change in the plating and the subsequent leaking of acid. Hahin Depo at 192.

Response: Defendant does not disagree.

52. As a result of a May 24, 2000 meeting, the Navy was informed that Axion intended to substitute pure nickel for the steel plated nickel for the cells. Hahin Depo at 78.

Response: Defendant disagrees. Mr. Hahin's deposition does not indicate Axion was substituting pure nickel for steel plated nickel. Rather, the deposition indicates that Axion had always used pure nickel. Hahin Depo at 78.

53. Pure nickel improved performance of the cell. Hahin Depo at 88.

Response: Defendant does not disagree. Defendant avers, however, that the improved performance was of no benefit to the Government. Hahin Depo at 88.

54. In a letter dated November 22, 2000 the Navy was put on notice that Axion was going to manufacture the pure nickel plating for the cells. Hahin Depo at 79.

Response: Defendant agrees that the Navy was notified in November 2000 that Axion was going to manufacture its own plating. Defendant disagrees that a November 22, 2000 letter provided the Navy this notice because the November 22, 2000 letter was authored by the Navy.

55. In light of the change in plating, in November 2000, the Navy considered a second FAT. Hahin Depo at 80.

Response: Defendant does not disagree.

56. After learning about the change in plating in 2000, the Navy made a decision not to require a second FAT.

Response: Defendant does not disagree. Defendant avers, however, that the parties subsequently agreed through a bilateral modification that additional FAT was necessary. DA 159-160.

57. The decision not to require a second FAT was based on the fact that the plate stock was tested for electrical storage in a cell test. Hahin Depo Exhibit 9, testimony at 89-90, Document Axion00386.

Response: Defendant does not disagree. Defendant avers, however, that the parties subsequently agreed through a bilateral modification that additional FAT was necessary. DA 159-160.

58. Although aware of the changes in the plating, the Contracting Officer sent a letter to Axion advising "[it] is recommended that Axion proceed with production." Document Bates No. Axion0000361.

Response: Defendant does not disagree.

59. At the time the Government made the decision to proceed to production rather than conduct a second FAT, Mr. Hahin was of the opinion that a cell test was adequate to test the plate stock. Hahin Depo at 91.

Response: Defendant does not disagree. Defendant avers, however, that the parties subsequently agreed through a bilateral modification that additional FAT was necessary. DA 159-160.

60. The amount of time between the Navy being aware that Axion was switching from nickel plating to pure nickel was in excess of thirteen months. DA 160. Hahin Depo at 79.

Response: Defendant disagrees. Defendant possesses insufficient information regarding this allegation because Axion fails to describe a beginning and ending event for the alleged thirteen-month period. Defendant avers, however, that the Navy was under the impression from the time Axion began producing batteries that Axion was using pure

nickel in lieu of nickel-plated steel.

61. The amount of time between the Navy being aware that Axion would manufacture the plating and the Navy's decision to require a second FAT was in excess of nine months. DA 160. Hahin Depo at 79.

Response: Defendant does not disagree. Defendant avers, however, that Axion's leaking problem was also a factor in the decision to conduct a second FAT. Hahin Depo at 110. Defendant also avers that the decision to conduct a second FAT was bilateral. DA 159-160.

62. In reliance on the Contracting Officer advising Axion to proceed into production, Axion produced tens of thousand of PS-115s. Stickrod Depo at 51, PA K1; Latifi Depo at 135, 145; PA D; Latifi Decl ¶ 5, PA A.

Response: Defendant does not agree that Axion produced tens of thousands of PS-115s in reliance on the contracting officer's November 22, 2000 letter recommending Axion proceed with production. The record does not support this assertion or even that Axion produced tens of thousands of PS-115s after November 22, 2000. Axion supports its assertion by citing to page 135 of Mr. Latifi's deposition; however, this area of Mr. Latifi's deposition indicates the PS-115s had been manufactured prior to November 2000. Defendant also avers that of the of PS-115s Axion produced, Axion never could demonstrate that its PS-115s worked.

63. There was no contractual prohibition against Axion manufacturing the plating to be used in the cells. Hahin Depo at 85-86.

Response: Defendant does not disagree.

64. While the second FAT testing was being conducted, the Government's

Quality Assurance Representative ("QAR") observed that many of the failed tests were being caused by a defective air gun. PA H, I.

Response: Defendant disagrees. The QAR did not observe that the air gun was defective. Defendant also avers that it was not the responsibility of the QAR to determine or know if Axion's testing problems were due to defective PS-115s or problems with the testing equipment. DA at 362; Stickrod Decl ¶ 11.

65. While the second FAT testing was being conducted, the Government's Quality Assurance Representative ("QAR") observed that there was no indication that the PS-115s had been defectively manufactured. PA H, I.

Response: Defendant disagrees. Defendant avers that the QAR only stated the testing seemed to indicate the cell functioned correctly on the majority of the failed tests. Defendant also avers that it was not the responsibility of the QAR to determine or know if Axion's testing problems were due to defective PS-115s or problems with the testing equipment. DA at 362; Stickrod Decl ¶ 11.

66. The contract was terminated for default on November 12, 2002. DA 164; Latifi Depo at 237-238, PA D.

Response: Defendant does not disagree.

67. The Government's explanation for the termination for default states: "a total of 25 out of the 66 First Article Power Supplies failed to meet the performance requirements of drawing 11744726." DA 164.

Response: Defendant does not disagree.

68. At the time the contract was terminated for default, the Navy no longer needed the PS-115s. Hahin Depo at 92.

Response: Defendant disagrees. Defendant agrees that at the time the contract was terminated for default it was no longer **necessary** for the Navy to acquire PS-115s. Defendant avers, however, that the Navy would have found a use for the PS-115s had Axion been able to deliver.

69. Corrosion can result if two metals with different electrical properties coming in contact with each other for a prolonged amount of time. Hahin Depo at 116, 187.

Response: Defendant does not disagree.

70. The specifications required a plate bromide weld on the bromide ampules. Hahin Depo at 185.

Response: Defendant does not disagree.

71. The plate bromide weld is made of copper. Hahin Depo at 186.

Response: Defendant does not disagree.

72. A cutter blade rests on the plate bromide weld. Hahin Depo at 185.

Response: Defendant does not disagree.

73. The cutter blade is made of copper beryllium. Hahin Depo at 188.

Response: Defendant does not disagree.

74. When the copper beryllium of the cutter and the copper of the plate bromide weld come in contact for a prolonged amount of time, there is a possibility that one may act as a cathode and one may act as an anode. Hahin Depo. 188, 189, 191.

Response: Defendant does not disagree.

75. It is plausible that the copper in the plate bromide weld could corrode based on the copper coming in contact with the copper beryllium for a prolonged amount of time. Hahin Depo. 188, 189, 191.

Response: Defendant does not disagree.

76. The corrosion of the copper in the plate bromide weld could result in a pin hole. Hahin Depo. 189-190, 191.

Response: Defendant does not disagree.

77. A pin pole in the plate bromide weld could result in the mixing of bromide and flouboric acid. Hahin Depo. 189-190, 191.

Response: Defendant does not disagree.

78. If the bromide and flouboric acid mixed, the result could result in the type of leaking of acid that the Navy experienced with older PS-115s prior to contract N00106-96-C-KA09 was awarded. Hahin Depo. 190.

Response: Defendant does not disagree.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Kathryn A. Bleecker
KATHRYN A. BLEECKER
Assistant Director

s/Douglas K. Mickle
DOUGLAS K. MICKLE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530
Tele: (202) 307-0383

OF COUNSEL:

Richard Martinelli
Office of Counsel
Naval Inventory Control Point
Mechanicsburg, PA 17055-0788

June 10, 2005

Attorneys for Defendant

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on June 10, 2005, a copy of the foregoing "**DEFENDANTS' COUNTER-STATEMENT OF FACTS**" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Douglas K. Mickle
Douglas K. Mickle