had completed manufacturing the 8,000 units and was prepared to ship them.[3] Latifi Depo. at 135, 145, PA D; Latifi Decl. ¶ 5, PA A. Before the deadline for Axion to deliver the first installment of 8000 units, Axion notified the Navy that the PS-115s were leaking acid. Axion Ltr. to C.O., PA L. Axion sent a letter to the Contracting Officer specifically addressing the leaking acid as well as seeking advice and assistance on how to proceed. Axion Ltrs. to C.O., PA L, M.

Before Axion was authorized to deliver the 8000 units, the Government required a lot inspection. DA 71. Axion was ready, willing, and able to perform the Lot Test but the Government refused to participate in the Lot Test. Latifi Decl. ¶ 5, PA A. Instead, the Government insisted on a second First Article Test ("FAT"). DA 159, 160. One of the factors for the decision for the second FAT was the disclosure by Axion that the PS-115s were leaking electrolyte. Hahin Depo. at 110, PSA 4, attached hereto.

The Government mischaracterizes the facts when it states that Axion "failed." The failure was by the Government for several reasons. First, the Government provided Axion with a defective specification causing the PS-115 to leak acid. Complaint I, Count VIII; Latifi Decl. ¶¶ 5, 6, PA A; Stickrod Depo. at 51, PA K1; Hahin Email PA N. In fact, the only explanation in the

---

terminate for default, because the Government itself was responsible for Axion's delay in delivery." Pl Resp. at 28.

[3] *See generally*, the deposition of the Defense Contract Management Command's Quality Assurance Representative assigned to the contract:

Q: How many PS-115s united did you see at Axion around that time period?
A: Almost the entire production. Was it ten – 10,000, 12,000, 15,000? I have forgotten the exact number, but it was up in the thousands that were actually completed, sitting in tubs waiting. The production run had been made, yes, insofar as the manufacture of them was concerned.

Deposition of Henry Strickrod ("Strickrod Depo.") at 51, PA K1.

record for the leaking electrolyte is that the Government specification was defective because it required the placing of an anode metal against a cathode metal. Defendant's CSF ¶¶ 66-78.

Second, the PS-115 has a history of leaking electrolyte—a fact the Government concealed from Axion. Complaint I, Count VII; Latifi Depo. at 155, PA D; Hahin Email PA N. Finally, and perhaps most importantly, the Government required the impossible—it insisted on a standard of no corrosion for a product notwithstanding that the Government specification required an anode metal be placed against a cathode metal. Hahin Depo. at 191, PA B Defendant's CSF at ¶¶ 66-78.

Even if the Government granted an extension to P00016 (which P00017 did not do), the grant of an extension is not consideration to a contractor where the contractor was entitled to the extension due to breach by the Government. *Freedom NY, Inc.*, 01-2 BCA ¶ 31,585 (*overturned on other grounds by Rumsfield v. Freedom NY. Inc.*, 329 F.3d 1320 (Fed. Cir. 2003)).

Though the Government claims that "Axion was at risk of termination for default for failing to meet the August 8, 2001, delivery requirement of modification P00016," it does not cite to the record, for the simple reason that there is nothing in the record to support this *post-hoc* rationalization. Assuming *arguendo* that Axion was at risk of being terminated for default for not meeting the August 8, 2001, delivery requirement, there should have been some documentation of internal deliberation within the Government. There is none. Nor was there any cure notice or other correspondence to Axion. These facts show the Government's argument to be disingenuous, and, importantly, create genuine issues of material fact that preclude judgment for Defendant.

In fact, Korab testified that he was not thinking about a possible termination for default when he signed P00017:

Q: Did you think about it between August, 2000, and let's say the time you signed P00017 October of 2002?
A: I don't recall thinking about it.
Q: Did you discuss that possibility with anybody on the technical side?
A: No.
Q: With your supervisor?
A: No, no.

Korab Depo. at 80, PA C.

In its reply, regarding the lack of consideration issues, the Government states: "In agreeing to P00017 schedule extension, the Government provided consideration to Axion in that it relinquished its ability to terminate the contract for default at that time." Defendant's Reply at 17. The Government is factually incorrect. P00017 did not extend the P00016 schedule; instead, P00017 required Axion to deliver 8,000 units. DA 159. Hence, contrary to the Government's assertion, there was no schedule extension.

Second, P00017 established a Second FAT as well as a schedule for the Second FAT. Axion's Response stated (and the Government has not disputed) that "the Government had no contractual right to 120 first article test samples." Axion Response at 33. Hence, the Government gave no consideration for P00017.

The alleged relinquishing of a right to terminate for default is another *post hoc* rationalization that is simply not supported by the record. If the consideration for P00017 was that the Government was relinquishing a hypothetical right (but certainly not a right based on law or fact) to termination for default, this surrendered right should have been documented as required by FAR 15.406-3. There was no such documentation. Hence, the record does not support the Government's *post hoc* rationalization.

Defendant cites *Goltra v. United States*, 119 Ct. Cl. 217, 96 F. Supp. 618, 626 (1951) for the proposition that "even a tenuous cause of action is good consideration." Defendant's Reply

at 18. The issue in *Goltra* was whether the Government had relinquished title to a large crane. The court found that Mr. Goltra gave the following consideration to the Government for the crane: "It was relieved from claim for rental at some $6,000 a year or a dismantling and salvage loss of some $35,000." *Id.* at 626. The decision also states that "the authorized Government officials realized that they could not leave the crane on Goltra's land indefinitely without incurring liability for occupancy. Goltra was by this time making repeated demands for rental on the property." *Id.* at 621. Unlike the facts in *Goltra* where both parties were fully aware of Goltra's claim for rent, the current facts involve alleged consideration (*i.e.,* "forbearance") that was never contemplated by the parties at the time they signed P00017.

In *Aviation Contractor Employees, Inc. v. United States*, 945 F.2d 1568 (Fed. Cir. 1991), the Federal Circuit made the following observation when addressing the surrender of a legal right as a form of consideration: "Of course, the pre-existing duty must be the subject of 'honest dispute,' or in other words, the parties must hold their positions in good faith." *Id.* at 1574. Here, the alleged forbearance was never the subject of an honest dispute—at the time, neither party perceived that the government had a right to terminate the contract for default. Simply put, creative legal arguments by the Government attorneys after the contract was terminated do not constitute an "honest dispute" between the parties at the time they signed P00017.

In *Aviation Constructor Employees, Inc.*, *supra*, the Federal Circuit remanded the case for a finding of fact as to whether there was an honest dispute. Similarly, under the present facts, because there is strong evidence in the record suggesting there was no honest dispute regarding forbearance; the Government's motion cannot be granted.

## V. The Government Strains Credibility By Asserting "The Record Leaves No Doubt That The Term 01 OCTOBER 03 As Used In P00017 Was Referring To October 3, 2001"

Summary judgment is only appropriate were there are no genuine issues of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (2005). Here the Government strains credibility when it asserts that "the record leaves no doubt that the term 01 OCTOBER 03 as used in P00017 was referring to October 3, 2001." Defendant's Reply at 23.

First, "[t]he United States acknowledges that O1 OCTOBER 03 is not a typical means a layman writes October 3, 2001." Defendant's Reply at 23. Second, in his deposition, Korab, admitted that the notation in P00017 meant "October 1st, 03":

> Q: Can you go back and look at P00017 again and tell me what delivery date was established there?
> A: October 1st, '03.
> Q: Am I correct then on P00019, Axion gave up several months of time on the delivery order on the deliver schedule?
> A: That has to be a typo on the 03.
> Q: You are saying that is a typo, is that what you are saying?
> A: The 03 on P 17 has to be.

Korab Depo. at 58, PA C.

Third, aware that the Government routinely requires a new FAT approximately every five years, Latifi believed that Modification P00017 meant that the new FAT was to be performed in 2003. Latifi Depo. at 163, 189, 200-1, PA D; Latifi Decl. ¶ 9, PA A. Latifi signed P00017 thinking that 01 OCTOBER 03 meant that he was required to perform a second FAT in 2003. *Id.*

For the three reasons stated above, the Government strains credibility when it asserts that "the record leaves no doubt that the term 01 OCTOBER 03 as used in P00017 was referring to October 3, 2001." Defendant's Reply at 23. Certainly, at the very least, there are genuine issues of material fact in dispute that preclude judgment for the Government.

## VI. The Government Mistakenly States "Axion Also Fails To Note That P00019 Included A Second Form Of Consideration Flowing To Axion In That The Modification Reduced The Number Of PS-115s For First Article Testing From 120

**to 80"**

Defendant's Reply states "Axion also fails to note that P00019 included a second form of consideration flowing to Axion in that the modification reduced the number of PS-115s for First Article Testing from 120 to 80." *Id.* at 25. The Government is mistaken. The following is an extract from Axion's Response:

> The Government contends that it "reduced the number of required first article test samples from 120 to 80." DA 18. However, the Government had no contractual right to 120 first article test samples. The Government alleges that its entitlement to this number of samples stems from Modification P00017. However, P00017 is unenforceable for lack of consideration, as established in Argument IV(A) above. Because the Government possessed no contractual right to the 120 first article test samples, it gave up nothing when the number was reduced to 80. Because the Government gave up nothing, there was no consideration to Axion.

Axion's Response at 33.

The Government's failure to recognize Axion's response to the "second form of consideration" argument may simply have been an oversight. But, it illustrates the Government's failure in this case to establish, with <u>uncontested facts</u>, a right to judgment in its favor. When considering Defendant's motions to dismiss and motions for summary judgment, disputes of fact are resolved in the non-movant's, Axion's, favor. Here, instead of relying on undisputed, uncontested facts to establish consideration, Defendant argues (mistakenly) that Axion failed to address the Government's argument.

**VII. The Government Implicitly Acknowledges That There Is A Genuine Issue Of Material Fact Whether Korab Knew That Latifi Made A Unilateral Mistake When He Agreed To The Accord and Satisfaction Provisions In P00017, P00019, And P00020**

Axion's Response explained that Latifi (for whom English is a second language) believed that the accord and satisfaction language meant that Axion would not be entitled to any compensation arising out of the modification. *Id.* at 37. Axion's Response provided compelling

evidence why Korab knew or should have known of Latifi's unilateral mistake:

> Korab had reason to know that Axion had grounds for significant monetary claims. The original delivery date for the production lot of 10,000 PS-115s was August 14, 1996. DA 3. When Modification P00017 was executed on Oct. 2, 2001, over sixty months had expired without delivery of any production lot. DA 159. Axion had informed Korab that these delays were the responsibility of the Navy, and that Axion had experienced significant costs resulting from the defective specifications and from the Navy's use of a fixed-price production contract to develop an air gun:
>
>> The cause of the delay has been the accumulative effects of events that were beyond that were beyond Axion's control. ... Since the Government did not have a spin gun to test the unit Axion had to develop an air gun for testing and collecting the data. Axion has developed a spin gun, automated data gathering system which includes a flying bird, miniaturized on board computer, data collecting interface board, resistor automated load board and data collecting software. But it took much longer.... Again, Axion's manufacturing contract was being treated as a research and development contract with Axion carrying the cost without any cost to the Government.
>>
>> After first article approval Axion had no choice but to proceed with developing a plating line per Government supplied document #NAVORD OD 18332 dated February 1967. This data was obsolete and the Government did not respond to Axion's written request for updated information.
>>
>> After approval of the first article Axion ordered and received every item in the part list in quantities to produce 60,000 units. ... Currently, Axion has 4 trained individuals dedicated to the production of the power supply. By September 8, 2000, based on our current production all assemblies will be 100% complete.
>>
>> Due to the above facts and the time and effort that both Axion and the Government have invested in this contract, at this stage it is premature, illogical and unfair to stop production. Axion is a small disadvantaged company that would be deeply financially hurt by this cancellation and possibly not recover.
>
> Axion letter, August 25, 2000, PA O.

A few weeks before mailing Modification P00017 to Axion, Korab offered Latifi a no-cost termination for convenience. Axion Ltr. October 11,

> 2002, PA P. Latifi informed Korab that "Axion Corporation could not accept that offer due to the tremendous amount of money invested in the project." *Id.* When asked in his deposition about the offer of a no-cost termination for convenience, Korab stated:
>
> Q. Did Latifi explain to you that he would lose a lot of money if he accepted it?
> A. I'm sure he said that.
>
> Korab Depo. at 77, PA C.
>
> In light of the above facts, Korab knew that if Axion signed the accord and satisfaction terms, the consequences would be financially devastating to Axion. It defies logic that Latifi would suddenly change his mind and agree to give up payment for contractual expenses that Latifi had financed from his retirement accounts. Latifi Decl. ¶ 4, PA A.

Axion Response 37-38.

Defendant's Reply implicitly acknowledges that there are genuine issues of material facts concerning Korab knowing that Latifi was making a unilateral mistake when he signed P00017, P00019, and P00020:

- "The evidence simply does not support the allegation Axion now makes that Latifi did not understand the significance of the modifications." Defendant's Reply at 27.

- "Axion places unwarranted emphasis on the fact that Axion rejected the Government's offer of a no-cost termination settlement prior to modification P00017. However, from a contracting officer's perspective, it would not be unreasonable for a contractor at risk for termination for default to reject a non-cost settlement, and yet be willing to accept an accord and satisfaction that would grant the contractor additional time to perform and collect the contract price." Defendant's Reply at 28.

- "Axion also makes the misguided argument that the contracting officer knew that the consequences of the accord and satisfaction would be devastating to Axion." Defendant's Reply at 28.

In light of the genuine issues of material fact whether Korab knew or should have known of Latifi's unilateral mistake regarding P00017, P00019, and P00020, summary judgment is inappropriate. Stated differently, until the issue of reformation for Korab's apparent

overreaching is resolved, the enforceability of the accord and satisfaction provisions in P00017, P00019, and P00020 cannot be decided.

## VIII. The Government Did Not Address Plaintiff's Motion For Partial Summary Judgment That The Accord And Satisfaction Provisions Do Not Apply To Counts II, III, IV, V, VI, VII, IX, XII, XV, XVI, And XVIII Because The Government Has No Credible Basis To Dissuade This Court From Granting Plaintiff's Motion

In its Cross Motion For Summary Judgment, Axion asserts that there are no genuine issues of material fact that the accord and satisfaction provisions do not apply to Counts II, III, IV, V, VI, VII, IX, XII, XV, XVI, and XVIII. Axion Response at 39. The Government does not address the merits of Axion's arguments. Instead, the Government merely states: "Axion raises numerous theories as to why the unambiguous language of these modifications does not bar Axion's claims; however, a reading of these arguments make clear they are simply arguments going to the very claims barred by the accord and satisfaction, and release language of the three modifications." Defendant's Reply at 29.

As shown below, the matters raised by Axion were not "simply arguments going to the very claims barred by the accord and satisfaction." *Id.* Instead, the arguments address matters for which the Government had no credible basis to dissuade this Court to grant Plaintiff's motion.

### a. The Government had Superior Knowledge

With regard to Superior Knowledge (Claims VII, XXI, XXVI, and XXVIII), Axion argued: There is no authority for the proposition that the Government can circumvent the prohibition against betraying a contractor into a ruinous course of action by having the contractor unwittingly sign an accord and satisfaction. Axion Response at 40. Axion's argument raises a significant policy issue of whether the Government can engage in inequitable misconduct, and then avoid liability by having a contractor unwittingly sign an accord and satisfaction.

**b. The Government's Misrepresentations**

With regard to the Government's misrepresentations, citing *C & H Commercial Contractors, Inc. v. United States*, 35 Fed. Cl. 246, 251 (1996) ("However, we further conclude that the modifications were procured through the government's misrepresentations which render the releases voidable."); and the RESTATEMENT (SECOND) OF CONTRACTS § 159, Axion argues that misrepresentations regarding the air gun voids the accord and satisfaction provisions. Axion Response at 42.

**c. Warranties**

Counts IV and XXIII involve judicially established warranties. Axion argues that the accord and satisfaction provisions are unenforceable because "a contacting officer has no authority to change the allocation of risk that is contrary to public policy." Axion Response at 42.

**d. Implied Duty**

Counts V and XXIV involve the judicially established implied duty to cooperate. Axion provided case law to support that this implied duty is imposed by courts "to achieve fairness and justice." Axion Response at 43. Axion argued "under these inequitable facts, the Court should not permit the accord and satisfaction prose to exculpate the Government from its implied duty to cooperate." *Id.* at 43-44.

**e. Mutual Mistake**

Concerning Count VI, Axion cites *The Boeing Company*, ASBCA No. 52,256, 02-1 BCA ¶ 31,811 for authority that an accord and satisfaction can be reformed where there has been a mutual mistake. Defendant's Reply does not dispute the existence of a mutual mistake.

**f. Accord and Satisfaction Does Not Apply**

With regard to Counts IX, X, XI, XII, XIII, XIV, and XVI, Axion argues that the accord & satisfaction terms were never intended to apply prospectively. Korab testified that the accord and satisfaction modifications were never intended to apply prospectively. Korab Depo. 28, PA C.

**g. Routine Request**

Concerning Count XVIII and the routine requests for payments argument, the accord and satisfaction was limited to "all claims, demands, or causes of actions." DA 159-163. Routine requests for payment are not within the scope of accord and satisfaction provisions. Korab testified that routine requests for payment were not within the accord and satisfaction provisions. Korab Depo. at 27-28, PA C.

**h. The Government's Continued Duties**

The Government had continuing duties beyond the accord and satisfaction modifications (Counts V, VII, XXI, XXIV and XXVIII). Superior knowledge and the implied duty to cooperate were continuing duties of the Government that were still binding on the Navy after the signing of the accord and satisfaction modification.

Contrary to the Government's assertion, Axion's arguments are not "simply arguments going to the merits of the very claims barred by the accord and satisfaction." Defendant's Reply at 29. The Government had chosen not to address the merits of these arguments because the Government has no credible basis to dissuade this Court to grant Plaintiff's motion.

For the foregoing reasons, the Government's motions are due to be denied and Axion's Cross-Motion for Partial Summary Judgment should be granted.

Dated this the 27th day of June, 2005.

**ATTORNEY OF RECORD:**

s/Richard J.R. Raleigh, Jr.
**RICHARD J.R. RALEIGH JR.**
**WILMER & LEE, P.A.**
100 Washington Street, Suite 200
Huntsville, Alabama 35801
(256) 533-0202 Telephone
(256) 533-0302 Facsimile
rraleigh@wilmerlee.com
**OF COUNSEL:**

**JEROME S. GABIG, JR.**
4811 Cove Creek Drive
Brownsboro, AL 35741
(256) 509-0279 Telephone
(256) 512-0020 Facsimile
gabig3@comcast.net

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on June 27, 2005, a copy of the foregoing "AXION'S REPLY IN OPPOSITION TO DEFENDANT'S REPLY TO AXION'S RESPONSE TO THE UNITED STATES' PARTIAL MOTION TO DISMISS, AND DEFENDANT'S OPPOSITION AND RESPONSE TO AXION'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system, except at indicated below. Parties may access this filing through the Court's system.

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

KATHRYN A. BLEECKER
Assistant Director

DOUGLAS K. MICKLE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530

U.S. Mail, postage prepaid to:
Richard Martinelli
Office of Counsel
Naval Inventory Control Point
Mechanicsburg, PA 17055-0788

s/Richard J.R. Raleigh, Jr.
**OF COUNSEL**