ORIGINAL

# The United States Court of Federal Claims

FILED
OCT 31 2005
U.S. COURT OF FEDERAL CLAIMS

No. 03-2644C & 04-297C
CONSOLIDATED
(Filed: October 31, 2005)

* * * * * * * * * * * * * * * * * * * *

**AXION CORPORATION,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

* * * * * * * * * * * * * * * * * * * *

**Termination for Default; Accord and Satisfaction; Release; Unilateral Mistake; Consideration; Statute of Limitations under 41 U.S.C. § 650(a); Laches.**

*Richard J. R. Raleigh, Jr.*, Huntsville, AL, for plaintiff. *Jerome S. Gabig*, Brownsboro, AL, of counsel.

*Douglas K. Mickle,* U.S. Department of Justice, Washington, DC, with whom were *Peter D. Kiesler, Assistant Attorney General* and Director *David M. Cohen* for defendant. *Richard Martinelli*, Naval Inventory Control Point, Mechanicsburg, PA, of counsel.

## OPINION

**FIRESTONE**, *Judge.*

This matter comes before the court on the parties' cross-motions for partial summary judgment and the defendant's partial motion to dismiss. In this case, the plaintiff, Axion Corporation ("Axion"), has sued the United States (the "government") challenging the termination for default of its $1,313,974.20 contract to provide PS-115

batteries ("batteries"). Axion seeks to convert the termination of the contract for default into a termination for convenience, claiming compensation under the contract in the amount of $3,747,298.[1] Based on many of the same theories, Axion also seeks compensation for a number of equitable adjustments, regardless of whether the termination for default was valid. The majority of the counts are based on Axion's expenses and work in three areas: (1) developing an air gun to test the batteries, (2) producing plating for the batteries, and (3) dealing with leaking batteries.

The government argues that Axion's claims relating to the above-noted items are barred by the "release and accord and satisfaction" ("release") clause in three contract modifications signed by the parties prior to the contract termination. In addition, the government argues that Axion's claims relating to the air gun must be dismissed because they are barred by the statute of limitations and by the doctrine of laches.

Axion argues, in response, that it has alleged sufficient facts that preclude the court from granting the government's motion to dismiss based on the statute of limitations or laches. In addition, Axion asserts that the release does not bar any of its claims because the bilateral modifications that contain the release are unenforceable for lack of consideration. In the alternative, Axion asserts that the release should not be enforced

---

[1] Axion seeks $3,747,298 under Federal Acquisition Regulations ("FAR") § 52.249-2(g), which provides for costs – including costs in the performance of the work terminated – to be paid to a contractor when the government terminates for convenience a fixed-price contract. See 48 C.F.R. § 52.249-2(g) (2000). Axion states that this amount takes into account Axion's repayment to the government of the $512,365 in unliquidated progress payments. Thus, before the repayment of the progress payments, Axion is seeking $4,259,663.

because of a unilateral mistake on Axion's part. In particular, Axion contends that the government knew or should have known that, in signing the modifications, Axion did not intend to release the government for all of the additional costs it had incurred to cure the problems it alleges were caused by the government. Axion further contends in its cross-motion that the release set forth in the modifications does not bar its claims for converting the government's termination for default to a termination for convenience.

For the reasons set forth below, the court finds that Axion has alleged sufficient facts to withstand the government's motion to dismiss and that there is not an absence of disputed issues of material fact which would allow the court to grant summary judgment for either party. Accordingly, the government's motions are **DENIED**. The plaintiff's cross-motion is also **DENIED.**

## BACKGROUND

The following facts are undisputed unless otherwise noted. On December 14, 1995, the Naval Inventory Control Point ("NAVIP" or "Navy") and Axion entered into a fixed price contract for the delivery of batteries used in Navy munitions. The contract required delivery of 55,209 batteries, exclusive of first article samples, production lot samples, and option quantities. The contract established a unit price of $23.80, and the total price, exclusive of option quantities, was $1,313,974.20. The contract included a First Article Test ("FAT") requirement. The purpose of the FAT is to ensure that the contractor will furnish a product that conforms to all contract requirements and to verify

the adequacy of the manufacturing processes and materials. The government terminated the contract for default on November 12, 2002, because the FAT requirements were not satisfied.

## I. Problem Areas Under the Contract

Axion claims that there were three major problem areas under the contract that excuse its performance and for which it is entitled to equitable adjustments or compensation under FAR § 52.249-2(g) from the government: (1) problems with development of an air gun to test the batteries, (2) problems with the plating for the batteries, and (3) problems with leaking from the batteries.

With respect to the first problem area, the air gun, the undisputed facts show that the contract required Axion to provide all acceptance-inspection equipment, although the contract did not specify the use of an air gun for testing. On January 17, 1996, Axion requested that the Navy provide it with an air gun. This was based on Axion's understanding that in two previous contracts for batteries with the United States Army ("Army"), which were identified in the solicitation, the Army had provided the contractor with an air gun. The government denies that the Army furnished an air gun or that an air gun was furnished to the Army contractor at no cost. On January 26, 1996, the Navy declined to provide Axion with an air gun. Axion then discussed with the Army Research Laboratory ("ARL") the possibility of Axion using an ARL air gun or having ARL

provide Axion with drawings for producing an air gun, but ARL did not enter into an agreement with Axion.

In April and May 1997, Axion notified the government that it planned to produce an air gun. However, Axion alleges that the government later required Axion to produce an air gun that was more complex and expensive than what Axion had initially planned to use. Axion alleges that the government's May 14, 1998, approval of Axion's FAT procedure was predicated on Axion's fabricating a specific air gun. The government states that at no time after 1996 did it have a role in Axion's decision to produce the contractually-required test equipment.

There is no dispute that Axion had difficulties developing an air gun. Axion alleges that producing an air gun that would test the batteries amounted to a major research and development effort. The government disagrees with this characterization.

Based on the air gun testing data Axion submitted in April 1999, the Navy approved Axion's FAT in May 1999. The contract provided for delivery of the first production quantities 90 days after FAT approval. Axion did not make delivery in accordance with this schedule, and on five occasions Axion and the Navy entered into bilateral modifications to extend the delivery schedule. Eventually, the Navy required Axion to resubmit a number of batteries for FAT. Axion conducted the second FAT in September 2002. Axion claims that the air gun malfunctioned during the testing and that the failure of several batteries to meet the contract's performance requirements was due to

the air gun itself. Axion argues that the government's failure to accept responsibility for the problems associated with the air gun resulted in an improper termination for default.

With respect to second problem area, the plating stock, the following facts are not disputed. Prior to the termination of the contract for default, Axion identified problems with obtaining the plating stock for the batteries. Axion initially obtained the plating stock from an outside vendor. The batteries that passed the first FAT were made with plating stock from the outside vendor. After passing the first FAT, Axion decided to produce its own plating stock rather than acquire the item from an outside vendor. Axion encountered difficulties in producing the plating stock that Axion alleges increased its costs. Axion alleges that its difficulties in producing plating were attributable to defective specifications provided by the government. Axion also alleges that in changing the materials used to produce the plating stock, Axion improved the quality of the plating stock.

Finally, with regard to the third problem area, the leaking batteries issue, the following facts are not disputed. In the summer of 2001, Axion discovered that the batteries it had manufactured were beginning to leak acid. Axion alleges the leaking was due to defective specifications. Axion proposed a solution that would involve changing the material used for storing the batteries. The government claims that it gave Axion adequate specifications.

## II. Modifications to the Contract, the Second FAT Requirement, and the Termination for Default

As noted above, although the contract provided for delivery of the first production quantities 90 days after FAT approval, Axion and the Navy entered five bilateral modifications to extend the contract's delivery schedule (P00011, P00013, P00014, P00015, and P00016). None of these modifications contained a "release and accord and satisfaction" clause. The last such modification, modification P00016, signed by the parties on June 4, 2001, extended the delivery schedule with the following language:

> The delivery schedule is established as follows: 8,000 ea, 01 Aug 08; 8,000 ea 01 Sep 10; 8,000 ea, 01 Oct 10; 8,000 ea, 01 Nov 19; 8,000 ea, 01 Dec 13; 8,000 ea, 02 Jan 14; 7,209 ea, 02 Feb 14.

Def.'s App. 158. Axion did not deliver any batteries on August 8, 2001. On August 13, 2001, the contracting officer, John Korab, sent Axion a letter regarding Axion's failure to make delivery on August 8, 2001. The letter informed Axion that the government was considering terminating the contract for default. Def.'s Supp. App. 364 ("Since you have failed to perform the subject contract within the time required . . . the government is considering terminating said contract pursuant to . . . FAR 52.259-8 entitled "DEFAULT").

In response, Axion provided the government with an explanation for its delay. Letter from Mr. Latifi to Mr. Korab, August 27, 2001, Def.'s Supp. App. 194-197. In Axion's letter, Axion's Chief Executive Officer, Alex Latifi, indicated that Axion believed it had improved the product by developing the air gun and changing the plating

for the batteries. In his letter, Mr. Latifi also revealed that the batteries manufactured by Axion were leaking acid. In response to Axion's letter, the government debated whether to terminate the contract for default or to terminate the contract for convenience of both parties. Def.'s Supp. App. 198. Eventually, the government decided to give Axion additional time to submit a second FAT. Hahin Decl., Def.'s Supp. App. 350. This decision is reflected in modification P00017.

Before the execution of modification P00017, the government discussed the possibility of a no-cost termination settlement with Axion. Axion rejected the no-cost settlement. In his declaration, Mr. Latifi explained:

> The suggestion of a no-cost termination greatly troubled me. It would mean that Axion would not be recognized as a manufacturer of PS-115s for future contracts when other DOD procurement activities would be seeking to replace the defective PS-115s in the existing inventory. Stated differently, I feared that a no-cost termination for convenience would mean that I would lose the millions of dollars that Axion had spent trying to <u>develop</u> (not to be mistaken for "produce") PS-115s.

Latifi Decl., Pl.'s App. A at 3.

> I emphasized that Axion dearly wanted to complete the contract. Knowing that Mr. Korab had broad discretion whether to issue a termination for convenience, I emphasized that "no-cost" was unacceptable in hope of dissuad[ing] him from terminating the contract for convenience.

Latifi Decl., Pl.'s App. A at 4.

Following the discussions on the no-cost termination, the government and Axion entered into modification P00017 on October 2, 2001. It is not disputed that there were no discussions regarding the substance of P00017. As noted, modification P00017 provided Axion with relief from the delivery schedule, but required Axion to resubmit

FAT samples. Modification P00017 provides as follows:

> The delivery schedule for the re-submission of 120 ea. First Article Samples is established as follows: 01 October 03. Page 2 of this modification incorporates the First Article Testing requirements.[2]

Def.'s App. 159. Modification P00017 also contained the following language in connection with the release that is at the core of the present motions:

> This modification constitutes a full and final disposition of all matters relating to this contract and is a full release and accord and satisfaction of any and all claims, demands, or causes of action that either the contractor or the government may have against the other arising out of or related to the contract to date.

Def.'s App. 159.

Axion did not deliver the FAT samples on October 3, 2001, in accordance with modification P00017. Thereafter, on November 1, 2001, the contracting officer sent a letter to Axion in which he indicated that, because Axion had missed the FAT date, the government was considering terminating the contract for default. Def.'s Supp. App. 199. Rather than terminate the contract, the government once again extended the contract. On April 4, 2002, Axion and the Navy entered into bilateral modification P00019 which established a date of April 23, 2003 for FAT. This modification also reduced the number

---

[2] Mr. Latifi states in his declaration that he understood the "01 October 03" date set forth in the modification meant that he had until October 1, 2003, to re-submit his first articles for testing. Mr. Latifi does not claim that the dates in any other modification were ambiguous. For example he does not contend that under modification P00016, which included the dates "01 Aug 08," "01 Sep 10," and "01 Nov 19," he had until 2008, 2010 or 2019 for deliveries of the batteries, although those would be the delivery dates if Mr. Latifi's interpretation of the dates in modification P00017 were correct.

of FAT samples to be provided by Axion from 120 to 80 and provided for a reduction in the contract price. "In consideration of a $1,000.00 reduction of the contract price from $800,000 to $799,000, the delivery date for 80 each, Item 0001 AB, First Article samples reads: April 23, 2002." Def.'s App. 162.

Modification P00019 also included the same language as in modification P00017 regarding a release:

> This modification constitutes a full and final disposition of all matters relating to this contract and is a full release and accord and satisfaction of any and all claims, demands, or causes of action that either the contractor or the government may have against the other arising out of or related to the contract to date.

Def.'s App. 162.

Axion did not meet the schedule set in modification P00019. On April 30, 2002, the contracting officer sent a letter to Axion stating, "This situation is most serious in that Axion has not been able to test the PS-115 Power Supply successfully due to the malfunctioning test equipment for the past 4-6 months. The Navy does not have confidence in Axion's ability to produce the PS-115 Supply without a First Article Test." Def.'s Supp. App. 201.

Once again, however, the government decided to give Axion more time to comply. On July 11, 2002, Axion and the Navy agreed to bilateral modification P00020. This modification established a final delivery date for a FAT report. The modification stated, "the delivery date for the First Article Test Report is established as: September 09,

2002." Def.'s App. 163. The modification also provided for the same release that was included in modifications P00017 and P00019:

> This modification constitutes a full and final disposition of all matters relating to this contract and is a full release and accord and satisfaction of any and all claims, demands, or causes of action that either the contractor or the government may have against the other arising out of or related to the contract to date.

Def.'s App. 163.

Axion submitted the results from the second FAT to the Navy on September 9, 2002, the date provided by modification P00020. However, on October 1, 2002, the contracting officer sent a letter to Axion indicating that the submission did not satisfy the contract in that 25 of the 66 batteries tested failed to meet the performance requirements of the contract. Def.'s Supp. App. 203. On the same date, the contracting officer sent a second letter to Axion disapproving Axion's FAT. The letter indicated that the government was considering terminating the contract for default. Def.'s Supp. App. 204.

Axion sent a letter in response, on October 11, 2002, in which it stated that it believed it had met the requirements of the contract. Def.'s Supp. App. 205-207. Axion explained that there was an error in the data it had submitted to the government and that it had, in fact, collected good data on 74 batteries of the 127 batteries it had tested. Axion explained that it did not perform more tests because it believed that the government representative who was present at the testing was satisfied with Axion's results. Axion offered to test more batteries. Axion also offered to accept a termination of the contract

in return for some compensation. "If the government no longer requires these items, I am willing to sit with you and find a resolution by possibly accepting the cancellation of this contract with Axion Corporation receiving a small amount of funds to compensate for all the investments we have made or the government helping us to proceed and finish the project." Def.'s Supp. App. 207A.

The government terminated the contract for default on November 12, 2002, in modification P00021. In its decision, the government stated that "A Show Cause letter of October 1, 2002 was sent to inform Axion that the Navy was considering terminating the contract for default for failure to make delivery unless facts were presented, in writing, indicating that failure to perform was due to causes beyond Axion's control and without fault or negligence on Axion's part. Axion's letter of October 11, 2002 does not provide an adequate excuse for Axion's failure of the First Article thereby failing to meet the September 09, 2002 delivery schedule." Def.'s App. 165.

### 3. Proceedings to Date

Following the government's termination of the contract for default, Axion appealed to the Armed Services Board of Contract Appeals ("ASBCA"). The government moved to dismiss for lack of jurisdiction for failure to appeal within 90 days of receipt of contracting officer's final decision. On June 17, 2003, the ASBCA dismissed Axion's appeal.

On August 5, 2003, Axion and the government entered into an agreement under which the government deferred Axion's repayment of $512,365 in unliquidated progress payments to the government. The agreement states that Axion will repay the debt in full when the appeal to the United States Court of Federal Claims is decided or when the government and Axion reach agreement on the debt amount. The agreement also states that Axion will be assessed interest accrued from the date of the government's March 4, 2003, demand letter. Def.'s Supp. App. 209-210.

On October 31, 2003, Axion mailed a settlement proposal containing requests for equitable adjustments to the contracting officer. The contracting officer did not issue a final decision.[3]

Axion filed suit in the United States Court of Federal Claims on November 6, 2003 (Case No. 03-2644C). Axion filed a second suit on March 5, 2004 (Case No. 04-297C). On April 22, 2004, this court, with the agreement of the parties, consolidated the two cases under Case No. 03-2644C.

Axion requests that the termination for default be converted to a termination for convenience and requests compensation of $3,747,298 (after repayment of the unliquidated progress payments to the government) under FAR § 52.249-2(g). Axion

---

[3] This court has jurisdiction under the Contracts Disputes Act, which provides that the failure by the contracting officer to issue a decision on a contract claim exceeding $100,000 within sixty days of its receipt, will be "deemed to be a decision by the contracting officer denying the claim and will authorize the commencement of the appeal or suit on the claim." 41 U.S.C. § 605(c)(5) (2000).

also seeks equitable adjustments, regardless of whether the termination for default was valid, in the amounts of: (1) $1,534,934 for Axion's additional expenses in attempting first to purchase and later to produce an air gun to test the batteries; (2) $1,416,309 for Axion's additional expenses in attempting to manufacture plating for the batteries; and (3) $577,004 for Axion's additional expenses in attempting to comply with the government's specifications, which Axion claims led to leaking batteries.

Counts subject to the parties' cross-motions related to the termination for default and compensation under FAR § 52.249-2(g) involve five areas related to: (1) the air gun: counts I-VI and count XIII; (2) the plating: count XV; (3) the leaking batteries: counts VII and IX; (4) the Second FAT: count XIV; and (5) the termination for default: count XVI.

Counts subject to the parties' cross-motions related to the requests for equitable adjustments involve three areas: (1) the air gun: counts XVII, and XXI through XXV; (2) the plating: counts XX, XXVIII, and XXIX; and (3) the leaking batteries: counts XIX, XXVI, and XXVII.

In addition, Axion also asserts in its Motion for Partial Summary Judgment that the release in the modifications signed by the parties does not apply to the following counts: count X (The Navy's reasons for the termination for default of the contract were not a valid basis to reject the FAT); count XI (The Government's Quality Assurance Representative's assistant approved the second FAT); and count XII (The government

breached its duty to cooperate by not making an inspector available for Axion to continue the FAT testing). These counts are related to Axion's request that the termination for default be converted to a termination for convenience and Axion's request for compensation under FAR § 52.249-2(g). The government does not address Axion's contention that the release does not apply to counts X, XI, and XII.

The government has moved for partial summary judgment, pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), asserting that the claims related to the air gun, the plating, and the leaking batteries (counts I through IX, and XIII through XXIX) are barred by the release in the modifications signed by the parties. In addition, the government has filed a Partial Motion to Dismiss for Lack of Jurisdiction under RCFC 12(b)(1), asserting that counts XVII, XVIII, XXI, XXII, XXIII, XXIV, and XXV, which relate to problems in producing an air gun, are barred by the statute of limitations and the doctrine of laches.

In response, Axion argues that its claims related to the air gun did not accrue outside of the statute of limitations and that the doctrine of laches does not apply because the government has not suffered prejudice. Axion has also moved for partial summary judgment, pursuant to RCFC 56. Axion asserts that the release does not bar its claims because the modifications that contain the release are unenforceable for lack of consideration. In the alternative, Axion argues that modifications P00017, P00019 and P00020 should be reformed to remove the release because Axion did not understand or

agree to a release of its claims. Finally, Axion argues that the release should not bar its claim to convert the termination for default to a termination for convenience.

## DISCUSSION

### I. Parties' Cross-Motions for Partial Summary Judgment

### A. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." RCFC 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Unidynamics Corp. v. Automatic Prod. Int'l., 157 F.3d 1311, 1316 (Fed. Cir. 1998); Adarbe v. United States, 58 Fed. Cl. 707, 714 (2003). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48. A fact is material "if it will make a difference in the result of a case under the governing law. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment." J. Cooper & Assocs., Inc. v. United States, 53 Fed. Cl. 8, 14 (2002) (citing Anderson, 477 U.S. at 247-48). "In deciding whether a genuine issue of material fact exists, the evidence must be viewed in the light most favorable to the nonmoving party with doubts resolved in its favor." Unidynamics, 157 F.3d at 1316.

In this case, both parties have moved for summary judgment and allege an absence of genuine issues of material fact. In such a case, "the court is not relieved of its responsibility to determine the appropriateness of summary disposition." J. Cooper & Assocs., 53 Fed. Cl. at 15. Rather, the court evaluates the same standard for summary judgment to each motion. Simply because each party asserts a contradictory claim, it does not follow that "if one is rejected the other necessarily is justified." Id. "On cross-motions for summary judgment, the court must evaluate each motion in its own right and resolve any reasonable inferences against the party whose motion is being considered. . . . A cross-motion for summary judgment is one party's claim that it alone is entitled to summary judgment." Commercial Fed. Corp. v. United States, 55 Fed. Cl. 595, 615 (2003) (citing First Fed. Savings Bank of Hegewisch v. United States, 52 Fed. Cl. 774, 780 (2002)).

**B. "Release and Accord and Satisfaction" Clause**

In its motion for partial summary judgment, the government argues that Axion's claims with respect to the air gun, plating and leaking batteries are all barred by the release agreed to by the parties in modifications P00017, P00019, and P00020, which reads as follows:

> This modification constitutes a full and final disposition of all matters relating to this contract and is a full release and accord and satisfaction of any and all claims, demands, or causes of action that either the contractor or the government may have against the other arising out of or related to the contract to date.

The government contends that this release is clear on its face and bars all of Axion's claims for compensation. Def.'s Mot. 12.

A release with an accord and satisfaction provision is a means to discharge an existing right and "constitutes 'a perfect defense in an action for the enforcement of a previous claim, whether that claim was well founded or not.'" Valcon II, Inc. v. United States, 26 Cl. Ct. 393 (1992) (quoting Chesapeake & Potomac Tel. Co. v. United States, 228 Ct. Cl. 101, 108, 654 F.2d 711, 716 (1981)). "The essential elements of an effective accord and satisfaction are proper subject matter, competent parties, meeting of the minds of the parties, and consideration." Brock & Blevins Co. v. United States, 170 Ct. Cl. 52, 59, 343 F.2d 951, 955 (1965) (quoting Nevada Half Moon Mining Co. v. Combined Metals Reduction Co., 176 F.2d 73, 76 (10th Cir. 1949)). "As a general rule, the execution by a contractor of a release which is complete on its face reflects the contractor's unqualified acceptance and agreement with its terms and is binding on both parties." C & H Commerical Contractors, Inc. v. United States, 35 Fed. Cl. 246, 252 (1996) (quoting Clark Mech. Contractors, Inc. v. United States, 5 Cl. Ct. 84, 86 (1984)).

A court may void or reform a release on several grounds, including "lack of consideration, lack of performance, lack of authority, unilateral or mutual mistake, misrepresentation, duress, or under other circumstances in which the parties' conduct evinces an intent to allow additional claims." Jackson Constr. Co. v. United States, 62 Fed. Cl. 84, 93 (2004). See also C & H Commercial Contractors, Inc., 35 Fed. Cl. 246

(holding that the government's misrepresentations – concerning whether the release language contained in modifications would bar certain claims – rendered the releases void as to those claims); Urban Plumbing & Heating Co. v. United States, 187 Ct. Cl. 15, 408 F.2d 382 (1969) (voiding a modification signed by a contractor under duress); Cmty. Heating & Plumbing Co. v. Kelso, 987 F.2d 1575, 1581 (Fed. Cir. 1993) (holding that there was no accord and satisfaction of claims where the government continued to negotiate the claims with the contractor).

The government contends on summary judgment that all of the elements for a valid release have been met. Axion argues that the defense fails for lack or consideration or because of Axion's unilateral mistake. Each of Axion's arguments is addressed below.

**1. Consideration**

The parties disagree as to whether there was consideration for the release contained in modifications P00017, P00019, and P00020. The government contends that the relinquishment of its right to terminate the contract in exchange for Axion's relinquishment of all its claims under the contract was valid consideration. According to the government, Axion, by relinquishing its claims in exchange for receiving more time to complete the contract, secured the opportunity to collect on the contract. Def.'s Mot. 17-18. Axion contends that because the government did not have an unqualified right to terminate the contract when it entered into modifications P00017, P00019 and P00020, the government did not provide consideration. For modification P00017, Axion states

that the delay was attributable to the government, and thus Axion was already entitled to an extension. Pl.'s Cross-Mot. 25. Axion also argues that at the time of the execution of the modification, the government was not considering terminating the contract for default, so the government gave no consideration when it relinquished its right to terminate the contract for default. Pl.'s Cross-Mot. 29. For modification P00019, Axion argues that the extension of the schedule and the reduction of FAT samples required in P00017 did not constitute consideration because P00017 was unenforceable for lack of consideration. Pl's Cross-Mot. 29-33. For modification P00020, Axion argues that the extension of the schedule set in P00019 did not constitute consideration because P00019 was unenforceable for lack of consideration. Furthermore, Axion argues that any delay was attributable to the government. Pl.'s Cross-Mot. 34-36.

In determining whether there was consideration, courts look to the language of the contract modifications. McLain Plumbing & Elec. Serv., Inc. v. United States, 30 Fed. Cl. 70, 81 (1993) ("[T]he contract modification represents the best source of evidence regarding intent."). Courts do not evaluate the adequacy of consideration, only the existence of consideration. "As there is no indication of fraud or misrepresentation on the part of the plaintiff, the court is not concerned with the adequacy of the consideration furnished by the plaintiff." Silverman v. United States, 230 Ct. Cl. 701, 711, 679 F.2d 865, 871 (1982) (citing Mills v. United States, 187 Ct. Cl. 696, 700-01, 410 F.2d 1255, 1258 (1969)). Where the consideration consists of one party giving up a legal right,

"even a tenuous cause of action" is good consideration for a bargain. Goltra v. United States, 96 F. Supp. 618, 626 (Ct. Cl. 1951). "[I]t is well settled that once the parties enter into a valid settlement agreement, the merits of the compromised claims become inconsequential." Cheyenne-Arapaho Tribes of Indians of Oklahoma v. United States, 671 F.2d 1305, 1310-11 (Ct. Cl. 1982).

Tested by these standards, the court finds that the release provided for in modifications P00017, P00019 and P00020 was supported by adequate consideration. It is not disputed that at the time that the parties agreed to modifications P00017, P00019, and P00020, Axion had not met its contractual deadlines.[4] In each of these modifications, the government provided Axion with additional time to meet its contractual requirements and in doing so, the government relinquished its right to terminate the contract for default. Axion's assertion that it had defenses to any termination for default on various grounds does not undermine the value of the government's consideration. The relinquishment of even a tenuous claim may be valid consideration. See Goltra, 96 F. Supp. at 626. The fact that the government may have been responsible for the delay costs does not invalidate

[4] The court will not entertain Axion's contention, as set forth in Mr. Latifi's declaration, that the use of the date, "01 October 03," in modification P00017 created an ambiguity regarding compliance with FAT and that Axion did not believe that it would have to comply with FAT until October 1, 2003. It is well settled that the court will not consider parole evidence to create an ambiguity where the language is plain on its face. King Fisher Marine Serv., Inc. v. United States, 16 Cl. Ct. 231, 234 (1989). Here, there is no dispute that earlier modifications used the date notation that appeared in P00017. Indeed, P00016 provided that Axion would have until "01 Aug 08" for the first delivery and until "02 Feb 14" for the final delivery. There is no suggestion in this litigation that the contract was extended until 2008 or 2014. Indeed, within the context of this contract there was no ambiguity as to when deliveries were due. Axion cannot create an ambiguity by proposing an unreasonable reading of the government's date notation. Id.

the consideration. In this regard, this case is similar to Consol. Ind., Inc. v. United States, 195 F.3d 1341 (Fed. Cir. 1999). In Consol. Ind., the contractor claimed that its delays in meeting delivery dates were due to defective specifications provided by the government. Id. at 1344. The contractor had however signed a modification containing similar language releasing the government from "all claims arising out of this order/contract." Id. The court held that the contractor had waived its claims against the government concerning defective specifications when it signed the release. Id. at 1344. Thus, assuming that the release is not otherwise void based on a unilateral mistake, as discussed below, Axion relinquished its claims against the government in connection with the air gun, the plating, and the leaking batteries when it signed the modifications.

In view of the foregoing, Axion's reliance on Urban Plumbing is misplaced. In Urban Plumbing, the government had acknowledged in writing to the plaintiff that the government was responsible for the delay. Urban Plumbing, 408 F.2d at 386. As such the court reasoned that the contractor was entitled to a time extension by reason of the government-caused delay and therefore the government had not given up a right to terminate. Id. at 388. Here, in contrast, the government never acknowledged to Axion that it was responsible for any of Axion's delays. Before entering into the modifications, the government wrote to Axion and stated that it was considering termination for default.[5]

---

[5] The fact that the contracting officer, Mr. Korab, did not recall in his deposition whether the government was planning to terminate its contract with Axion does not mean that the government was not planning to terminate the contract. Mr. Korab's lack of recollection does not create a material fact in dispute. Indeed, Axion has not identified any evidence to put in issue

In such circumstances the government has established, as a matter of law, that it provided adequate consideration for the release set forth in the modifications.[6]

### 2. Unilateral Mistake

Axion contends that even if consideration is established, the government is not entitled to summary judgment because Axion made a unilateral mistake that mandates reformation of the release. Axion contends, based on the declaration of Mr. Latifi and other evidence, that Axion did not understand that it was relinquishing any and all claims associated with the air gun, plating, or leaking batteries when it signed the modifications. At most, Axion states that it relinquished only the claims it had with regard to the work identified in the modifications. Axion argues that under the principles of unilateral mistake the court should reform the release set forth in the modifications to reflect Axion's understanding. Pl.'s Cross-Mot. 37.

---

the government's internal memoranda which demonstrate that the government was considering terminating the contract.

[6] See also Johnson, Drake & Piper, Inc. v. United States, 531 F.2d 1037, 1044 (Ct. Cl. 1976) in which the court distinguished Urban Plumbing. The Johnson court reasoned that in Urban Plumbing, because the government knew that the plaintiff was entitled to an extension of time by reason of the government-caused delay, the government engaged in wrongdoing when it threatened the contractor with a termination for default. Id. "Such knowledge made the officer's conduct wrongful and the release invalid for duress. The case has no bearing here, where without any wrongdoing the parties settled their bona fide differences by exchanging a release for an extension of time." Id.

Here, because there is no indication that the government believed that Axion was entitled to more time, there is no indication of wrongdoing by the government in the executions of the modifications.

The government argues, in response, that Axion has failed to meet the criteria for reformation based on a unilateral mistake because Axion has not demonstrated that the government knew or should have known of Axion's misunderstanding. According to the government, Axion has not presented any evidence to show that the government knew or should have known of Axion's interpretation of the release in modifications P00017, P00019 and P00020.

Parties to a contract are generally bound by its terms. Giesler v. United States, 232 F.3d 864, 869 (Fed. Cir. 2000). However, courts may use the equitable remedy of reformation to correct a unilateral mistake if the government knew or should have known of a mistake. Burnett Elecs. Lab., Inc. v. United States, 479 F.2d 1329, 1333 (Ct. Cl. 1973) ("The remedy [of reformation] has been extended from its traditional area of application – mutual mistake by the parties – to include cases where the Government knew or should have known of a mistake in a bid costly to the bidder.") "[W]e have recognized in limited circumstances that if the government has knowledge, or constructive knowledge, that a contractor's bid is based on a mistake, and the government accepts the bid and awards the contract despite knowledge of this mistake, then a trial court may reform or rescind the contract." Giesler, 232 F.3d at 869. The use of reformation to correct a mutual mistake reflects courts' concerns with overreaching by the government. Ruggiero v. United States, 420 F.2d 709, 713 (Fed. Cir. 1970) ("[W]hat we are really concerned with is the overreaching of a contractor by a contracting officer when

the latter has the knowledge, actual or imputed as something he ought to know, that the bid is based on or embodies a disastrous mistake and accepts the bid in face of that knowledge.") The purpose of reformation is to conform the words of the contract to those the parties actually intended. Burnett Elecs., 479 F.2d at 1333.

In cases, such as this one, where the unilateral mistake is related to understanding the legal significance of the agreement, rather than making a mathematical error in submitting a bid, courts are less likely to reform a contract. "[T]he parties to a contract generally are charged with knowledge of the law affecting their business dealings." T.L. Roof & Assocs. Constr. Co. v. United States, 28 Fed. Cl. 572, 577 (1993) (citing Fed. Crop Insur. Corp. v. Merrill, 332 U.S. 380, 384-85 (1947)). "Consequently, courts have expressed reluctance to reform a contract on the basis of mistake or misrepresentation involving issues of law unless unusual circumstances are present." Id. at 577 (citing Mills, 187 Ct. Cl. at 700, 410 F.2d at 1257). However, reformation is not barred if the party seeking reformation can establish that such unusual circumstances are present.

Axion argues that it has presented sufficient facts to show that the contracting officer, Mr. Korab, should have known that Mr. Latifi had not agreed to release the government from all claims associated with the alleged problems Axion faced in connection with the air gun, plating and leaking batteries. Axion argues that the contracting officer knew that English was a second language for Mr. Latifi and therefore Mr. Latifi would not have known the meaning of the phrase "release and accord and satisfaction." Pl.'s Cross-Mot. 37. In addition, Mr. Latifi asserts in his declaration that

the contracting officer knew that Axion had, just prior to the issuance of modification P00017, rejected the government's offer of a no-cost termination for convenience on the grounds that Axion had invested too much money to accept a termination. Mr. Latifi stated that he "had spent millions of dollars of my own money that I had taken from my retirement account." Latifi Decl., Pl.'s App. A at 4. In such circumstances, Axion argues that it was not reasonable for the contracting officer to believe that Mr. Lafiti would then turn around and give away all costs in a modification agreement. According to Mr. Latifi, the contracting officer, who had never discussed modification P00017 with him, "was skillfully setting a trap for Axion to lose all the money that Axion had spent trying to perform the contract." Latifi Decl., Pl.'s App. A at 5. Based on this evidence, Axion argues that the contracting officer should have known that Axion would not have knowingly agreed to a release that would be financially devastating to Axion and that Axion would not have entered into subsequent agreements to relinquish all of Axion's claims against the government. Pl.'s Cross-Mot. 39.

The government argues in response that it is not clear that Axion made a mistake, and that even if Axion did make a mistake, the contracting officer had no reason to know of Axion's mistake. Def.'s Reply 26. The government contends that, from the contracting officer's perspective, a contractor might well reject a no-cost settlement and then accept a release because it would give the contractor additional time to perform and thus collect the full contract price. The government states that the contracting officer considered Axion in potential default and had sent Axion show cause notices before

modifications P00017, P00019, and P00020 were agreed to by the parties. The government also notes that Axion had not provided the contracting officer with any specific costs prior to the execution of the modifications. Def.'s Reply 28.

It is well-settled that summary judgment is available only if there is an absence of dispute as to a material issue of fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Here, the evidence suggests that Axion may have agreed to the modifications based on its mistaken belief as to the scope of the release. The evidence indicates that (1) Mr. Latifi believed that the release in the modifications related only to the subject matter of the modifications; (2) Mr. Latifi had spent significantly more on the project than he had expected due to problems he had encountered in complying with the government's specifications; and (3) Mr. Latifi had told the contracting officer that it was because of these additional costs that he could not accept a "no-cost" termination for convenience prior to signing modification P00017. The question of whether, under these circumstances, it was reasonable for the contracting officer to believe that Mr. Lafiti had agreed to relinquish Axion's claims for costs in exchange for a chance to complete the contract is not amenable to resolution on summary judgment. As in T.L. Roof, the court in the present case cannot say based on the limited record presented whether there is an absence of disputed facts on the question of unilateral mistake.

For all of these reasons, the cross-motions for summary judgment on the issue of the release must be denied. A trial will be required to resolve the issue of "unilateral

mistake," both as to whether Mr. Latifi made a mistake and, if so, whether the government knew or should have known of the mistake.

### 3. Axion's Other Theories

In its cross-motion for partial summary judgment, Axion states a number of additional theories – such as superior knowledge, misrepresentation, duty to cooperate, implied warranty, mutual mistake, and the Spearin doctrine – which it argues also bars the application of the release to certain counts. These include counts II through V, VII, IX through XVI, XVIII, XIX, XXI, XXII, and XXIV through XXIX. Pl.'s Cross-Mot. 39. The government responds that all of the theories raised by Axion can be traced to the particular counts that are barred by the release. Def.'s Reply 29. The government does not address counts X, XI, or XII.

Because summary judgment is not appropriate on the issue of the release, summary judgment is not appropriate for either party on any of these counts either.[7] If the court determines, after trial, that unilateral mistake does not bar application of the release set forth in the modifications, then all of the claims relating to the air gun, the leaking electrolyte, and the plating will fail because they will be barred by the release. If, on the other hand, the court determines that unilateral mistake does bar the application of the release, then these counts will be the subject of further litigation.

---

[7] This also includes counts X, XI, and XII because the issue of release may impact the basis for these claims.

## II. Defendant's Partial Motion to Dismiss For Lack of Jurisdiction

### A. Standard of Review

The government contends that even if there are disputed facts that preclude summary judgment on the case as a whole, Axion's claims for an equitable adjustment relating to the air gun are barred by the statute of limitations and the doctrine of laches. The government argues that Axion's claims concerning the air gun are barred by the six-year statute of limitations in the Contracts Disputes Act for presenting a claim to the contracting officer. See 41 U.S.C. § 605(a) (2000). Alternatively, the government argues that these claims are barred by the doctrine of laches.

The plaintiff bears the burden of establishing jurisdiction when the government has raised the issue in a dispositive motion. Meyers v. United States, 50 Fed. Cl. 674, 680 (2001); see Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). The court construes allegations in the complaint most favorably to the plaintiff, resolving ambiguities in its favor. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). However, the court may look beyond the pleadings and "inquire into jurisdictional facts" in order to determine whether jurisdiction exists. Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991). In the present case, the court has been presented with matters outside the pleadings, namely documents offered by the plaintiff and the government in the appendices to their respective filings. The court will rely on these matters to the extent that they allow the court to determine whether it has jurisdiction over this case.

## B. Discussion

### 1. Statute of Limitations

The Tucker Act provides this court jurisdiction over "any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contracts Disputes Act of 1978, including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act." 28 U.S.C. § 1491(a)(2) (2000). In order for this court to have jurisdiction, the plaintiff must have filed a claim with the contracting officer. See, e.g., Alliant Techsystems, Inc. v. United States, 178 F.3d 1260, 1264 (Fed. Cir. 1999). Section 6 of the Contracts Disputes Act, as amended by the Federal Acquisition Streamlining Act of 1994, Pub.L. No. 103-355 § 2351, 108 Stat. 3243 (codified at 41 U.S.C. § 605(a) (2000)), mandates that contractor claims be submitted to the contracting officer within six years after the accrual of the claim:

> All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision. All claims by the government against a contractor relating to a contract shall be the subject of a decision by the contracting officer. Each claim by a contractor against the government relating to a contract and each claim by the government against a contractor relating to a contract shall be submitted within 6 years after the accrual of the claim.

41 U.S.C § 605(a). See also Motorola, Inc. v. West, 125 F.3d 1470 (Fed. Cir. 1997) (holding that the provision does not apply retroactively to contracts entered into before the 1994 amendments).

The Contracts Disputes Act does not define when a claim "accrues" for the purposes of Section 6. However, the FAR defines "accrual of a claim" as "the date when all events that fix the alleged liability of either the Government or the contractor and permit assertion of the claim, were known or should have been known. For liability to be fixed, some injury must have occurred. However, monetary damages need not to have been incurred." 48 C.F.R. § 33.201 (2005).[8] The statute of limitations does not begin to run until some injury arises. SAB Constr., Inc. v. United States, 66 Fed. Cl. 77, 88 (2005).

The parties do not dispute that Axion first submitted claims with the contracting officer for building an air gun on October 31, 2003. However, Axion alleges that there are facts in dispute regarding when Axion's claims accrued as to the air gun and thus when the statute of limitations under the Contracts Disputes Act began to run. The government argues that all events that fixed the government's alleged liability related to the air gun occurred by January 1996, when the government informed Axion that the Navy would not provide Axion with an air gun. Def.'s Mot. 9. At the very latest, the government argues, Axion's claim accrued in May 1997, when Axion informed the Navy that it would be producing its own air gun. Def.'s Reply 6. In response, Axion argues that the claim did

---

[8] The definition of "accrual of a claim" was added to the FAR in 1995. The 1995 version differed slightly in the wording of the first sentence: "Accrual of a claim occurs on the date when all events, which fix the alleged liability of either the Government or the contractor and permit assertion of the claim, were known or should have been known." 60 Fed. Reg. 48224 (Sept. 18, 1995). In 2001, the FAR was revised to include the current wording of the definition. 66 Fed. Reg. 2117-01 (Jan. 10, 2001).

not accrue until 1998 when Axion learned that the Navy would not accept a FAT without an air gun that could meet certain specifications. Pl.'s Reply 7. Axion therefore claims that it met the six-year statute of limitations. Furthermore, Axion alleges that it was not until the contract was terminated in 2002 that it was able to ascertain its damages. Pl.'s Cross-Mot. 14.

In so much as Axion has alleged facts regarding the Navy's demands for an air gun that could meet specific testing criteria, which, if true, may make its claims for an equitable adjustment relating to manufacturing the air gun timely, dismissal at this time is not appropriate. The court finds that the question of whether Axion's claim accrued outside of the statute of limitations set forth in the Contracts Disputes Act is a "mixed question of law and fact that cannot be resolved upon the record before the court" and reserves decision on the issue. Arakaki v. United States, 62 Fed. Cl. 244, 259 (2004).

**2. Doctrine of Laches**

The government also argues that the doctrine of laches also bars Axion's claims regarding the air gun. Laches is an affirmative defense that requires the showing of "(1) unreasonable and unexcused delay by the claimant, and (2) prejudice to the other party, either economic prejudice or 'defense prejudice' – impairment of the ability to mount a defense due to circumstances such as loss of records, destruction of evidence, or witness unavailability." Jana, Inc. v. United States, 936 F.2d 1265, 1269-70 (Fed. Cir. 1991). Because laches is an affirmative defense, the government bears the burden of proving it. Cornetta v. United States, 851 F.2d 1372, 1380 (Fed. Cir. 1988).

However, as with the statute of limitations, Axion has alleged facts that its claims regarding the air gun accrued at a later time. Furthermore, here there is a statute of limitations that mandates that a contractor must file a claim with the contracting officer within six years. Because the government does not appear to be arguing that the doctrine of laches would have required Axion to have filed a claim within a shorter amount of time, the government's reliance on the doctrine of laches adds nothing to its argument that the claims should be dismissed.[9]

**CONCLUSION**

In light of the foregoing, the court **DENIES** both the defendant's motion for partial summary judgment and partial motion to dismiss. The court also **DENIES** the plaintiff's cross-motion for partial summary judgment. On or before December 1, 2005, the court will schedule a status conference with the parties to set a schedule for a trial on liability.

**IT IS SO ORDERED.**

NANCY B. FIRESTONE
Judge

[9] In a military pay case where the statute had been tolled, the Federal Circuit held that the doctrine of laches applied to an action at law brought within the applicable statute of limitations. However, the court also noted its uncertainty as to the "continued vitality of the laches defense in these military pay cases, particularly within the six years from the accrual of a cause of action normally allowed by the statute of limitations." Cornetta, 851 F.2d at 1383. The Federal Circuit also observed that the defense of laches "has been traditionally unavailable in actions at law brought within the applicable statute of limitations." Id. at 1376.