Nos. 03-2644 C & 04-297C
(Judge Firestone)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

AXION CORPORATION,

Plaintiff,

v.

THE UNITED STATES

Defendant.

---

# PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

Richard J.R. Raleigh, Jr.
WILMER & LEE, P.A.
100 Washington Street, Suite 200
Post Office Box 2168
Huntsville, Alabama 35804-2168
(256) 533-0202 Telephone
(256) 533-0302 Facsimile

Jerome S. Gabig
4811 Cove Creek Road
Brownsboro, Alabama 35741
(256) 489-0075 Telephone

Attorneys for Plaintiff

September 1, 2006

## TABLE OF CONTENTS

TABLE OF CONTENTS .......... ii

TABLE OF AUTHORITIES .......... vii

STATEMENT OF THE ISSUES .......... 1

STATEMENT OF THE CASE .......... 2

I. Nature Of The Case .......... 2

II. Statement of the Facts .......... 3

A. The Contract. .......... 3

B. The Air Gun. .......... 3

C. Plating. .......... 4

D. Testing Problems – “No-Tests” .......... 5

E. Corrosion. .......... 6

F. The Government’s Failure to Disclose Information and the Government’s Providing Defective and Inaccurate Information Adversely Affected Axion’s Performance Under the Contract. .......... 7

STANDARD OF REVIEW .......... 8

ARGUMENT AND LAW .......... 9

I. The Government Authored Defective Specifications For Plating To Be Used In The Production Of PS-115, And Thereby Breached The Government’s Implied Warranty Of Satisfactory Performance Under The *Spearin* Doctrine, And Therefore, Axion Is Entitled To Summary Judgment. .......... 9

A. Under the *Spearin* Doctrine, Government Authored Specifications Give Rise To An Implied Warranty That Compliance With Such Specifications Will Result In Satisfactory Performance Of The End Product. .................................................... 9

i. NAVORD OD 18332, A Government Authored Specification For The Plating That Was Incorporated Into Contract N00104-96-C-KA09, Is A Design Specification Subject To The Implied Warranty Of The *Spearin* Doctrine. ............................................ 11

ii. The Government Misrepresented To Axion That The 1967 Version Of The Plating Specification Was The Most Current Version...... 12

iii. The 1967 Plating Specification Is Defective. ............................... 13

B. By Providing Defective Plating Specifications To Axion, The Government Breached Its Implied Warranty Of Satisfactory Performance. ................. 21

C. Due To The Government's Breach Of Its Implied Warranty Under the *Spearin* Doctrine, Axion's Failure To Pass The Second FAT Is Excused, And The Government's Termination Of The Contract For Default Must Be Converted To A Termination For Convenience. ................................ 21

II. The Government's Failure To Disclose Its Superior Knowledge Of Crucial Facts Affecting Axion's Performance Of The Contract Entitles Axion To A Termination Of The Contract For The Government's Convenience Rather Than A Termination For Default.......................................................................... 23

A. The Superior Knowledge Doctrine Requires The Disclosure Of Vital Knowledge In the Government's Possession Which Affects The Costs Or Duration Of A Contractor's Performance. ............................................... 23

B. The Government Failed To Disclose Its Superior Knowledge That Axion Would Be Unable To Obtain Plating From The Vendors Suggested In The Contract Documents And That Substantial Costs Would Be Involved In Manufacturing The Plating...................................................................... 24

i. Axion Undertook To Perform Under The Contract Without Knowledge That It Would Be Required To Manufacture The Plating......................................................................................... 27

ii. The Government's Failure To Inform Axion Of The Need To Manufacture The Required Plating Cannot Be Excused Based On Axion's Failure To Inquire Into The Availability Of The Plating. 28

iii. The Government Specifications Did Not Put Axion On Notice Of Its Need To Manufacture The Plating, And Thus Failed To Provide Axion With Relevant Information. 30

C. The Government Failed To Disclose Its Superior Knowledge With Respect To The Defective Nature Of The Plating Specification. 31

i. Axion Undertook To Manufacture The Plating Without Knowledge That The Plating Specification Was Defective. 31

ii. The Government Was Aware That Axion Did Not Have The Revised Versions Of The Plating Specification. 32

iii. The Government Provided Plating Specifications Were Misleading And Gave Axion No Reason To Inquire Into Their Defective Nature. 33

iv. The Government Failed To Provide Revised Plating Specifications That Would Have Allowed Axion To Manufacture Satisfactory Plating. 33

D. The Government Failed To Disclose Its Superior Knowledge With Respect To Axion's Need To Develop An Air Gun To Test PS-115. 34

i. Axion Undertook To Perform The Contract Without Knowledge That It Would Be Required To Develop An Air Gun For Final Testing. 34

ii. The Government Was Aware That Axion Had No Knowledge Of And Had No Reason To Look Into The Need To Develop An Air Gun For The Final Testing Of PS-115, As Nothing The Government Provided Axion Made Any Mention Of An Air Gun. 37

iii. The Government Failed To Notify Axion Of Its Need To Develop An Air Gun And Also Failed To Provide Documents That Would Have Assisted Axion In Developing The Required Air Gun........ 38

III. By Failing To Provide Axion With The Revised Plating Specifications And The Drawings Needed To Fabricate The Air Gun, The Government Breached Its Implied Duties To Cooperate And To Not Hinder Performance. ......................... 39

A. Pursuant To Its Implied Duties To Cooperate And To Not Hinder Performance, The Government Was Required To Do Everything Necessary To Enable Axion To Perform. ................................................ 39

B. The Government Failed To Do Everything Necessary To Enable Axion To Perform Under The Contract.................................................................. 40

C. Due To The Government's Breach Of Its Duty To Cooperate, The Government's Termination Of The Contract For Default Is Due To Be Converted To A Termination For Convenience....................................... 42

IV. The Government Wrongfully Terminated The Contract For Default Due To Its Inability To Distinguish Between "No-Tests" And Actual Failures Of The Batteries To Conform To Contractual Specifications......................................... 43

A. The Government Bears The Burden Of Proving That It Justifiably Terminated The Contract For Default..................................................... 43

B. Based On The Government's Failure To Consider The Number Of "No Tests" Of The Batteries, The Government Cannot Prove That The Tested Batteries Were Defective. ............................................................. 44

V. Defects In The Government Specification For PS-115 Led To The Leakage Of Methylene Bromide And Fluoboric Acid From the Batteries, Causing A Decrease In Battery Performance During Testing, The Effect Of Which The Government Ignored When It Decided To Terminate The Contract. ....................................... 48

A. Dr. James Baird Established Through Scientific Testing That The Government Specification Is Defective. .................................................. 49

B. The Government Admits That The Leakage of Fluoboric Acid, An Electrolyte, Can Cause The Output Voltage Of The Batteries To Decrease Below Desired Levels. .......... 52

C. The Government's FAT Process Looked Solely At Voltage And Activation Time And Entirely Failed To Evaluate The Effect Of Leakage Caused By The Government's Defective Specification.......... 54

D. Due To The Government's Defective Specifications And Incomplete Review Of The Tested Batteries, The Government Cannot Meet Its Burden Of Proof With Respect To Justifying The Termination Of The Contract For Default.......... 55

CONCLUSION .......... 57

CERTIFICATE OF SERVICE.......... 59

# TABLE OF AUTHORITIES

**Cases**

*Adarbe v. United States,* 58 Fed. Cl. 707 (2003) .................... 8

*Aerodex, Inc. v. United States*, 417 F.2d 1361 (Ct. Cl. 1969).................... 28, 29, 30

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986) .................... 8

*Axion Corporation v. United States*, 68 Fed. Cl. 468 (2005).................... 8, 9

*C. Sanchez & Son, Inc. v. United States,* 6 F.3d 1539 (Fed. Cir. 1993).................... 40

*Centex Corp. v. United States,* 395 F.3d 1283 (Fed. Cir. 2005) .................... 40

*Consolidated Diesel Electric Corp.*, ASBCA No. 10486, 67-2 BCA ¶ 6669..................... 10

*Essex v. Danzig*, 224 F.3d 1283 (Fed. Cir. 2000) .................... 21

*Hardeman-Monier-Hutcerhson v. United States*, 458 F.2d 1364 (Ct. Cl. 1972).................... 24

*Helene Curtis Industries, Inc. v. United States*, 312 F.2d 774 (Ct. Cl. 1963).................... 24

*Hercules, Inc. v. United States*, 24 F.3d 188 (Fed. Cir. 1994) .................... 23, 24

*J. Cooper & Assocs., Inc. v. United States,* 53 Fed. Cl. 8 (2002) .................... 8

*L.W. Matteson, Inc. v. United States*, 61 Fed. Cl. 296 (2004).................... 24

*Lewis-Nicholson, Inc. v. United States*, 213 Ct.Cl. 192, 550 F.2d 26 (1977). .................... 40

*Lisbon Contractors, Inc. v. United States*, 828 F.2d 759 (Fed. Cir. 1987) .................... 44, 55

*Malone v. United States,* 849 F.2d 1441 (Fed. Cir. 1988) .................... 40, 42

*Milmark Servs., Inc. v. United States,* 731 F.2d 855 (Fed.Cir.1984) ........................................... 40

*Natus Corp. v. United States*, 371 F.2d 450 (Ct. Cl. 1967)......................................................... 10

*Olympus Corp. v. United States,* 98 F.3d 1314 (Fed. Cir. 1996) ................................................. 40

*Orlosky, Inc. v. United States*, 68 Fed. Cl. 296 (2005) ......................................................... 39, 40

*P.R. Burke Corp. v. United States*, 277 F.3d 1346 (Fed. Cir. 2002)...................................... 10, 11

*R. M. Hollingshead Corp. v. U.S.*, 124 Ct. Cl. 681 (1953) ......................................................... 10

*Ragonese v. United States*, 120 F.Supp. 768 (Ct. Cl. 1954) ....................................................... 24

*Unidynamics Corp. v. Automatic Prod. Int'l.,* 157 F.3d 1311 (Fed. Cir. 1998)............................. 8

*United States ex rel. Lindenthal v. General Dynamics Corp.* 61 F.3d 1402 (9th Cir. 1995)........ 12

*United States v. Spearin*, 248 U.S. 132 (1918) ........................................................................ 9, 10

*USA Petroleum Corp. v. United States*, 821 F.2d 622 (Fed. Cir. 1987) ..................................... 22

**Rules**

RCFC 56(c) .................................................................................................................................. 8

**Treatises**

Restatement (Second) of Contracts § 205 (1981) ......................................................................... 40

**Regulations**

FAR 52.249-8(G) ......................................................................................................................... 22

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **AXION CORPORATION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**THE UNITED STATES,**<br><br>**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **No. 03-2644C & 04-297C**<br>**(Judge Firestone)** |

**AXION CORPORATION'S**
**MOTION FOR SUMMARY JUDGMENT**

**COMES NOW** Plaintiff Axion Corporation ("Axion") and moves the Court to enter summary judgment in its favor and against the United States ("United States" or "Government") on the grounds that there is no genuine issue as to any material fact and that Axion is entitled to a judgment as a matter of law. In support of this motion, Axion submits the pleadings, Proposed Findings of Uncontroverted Fact, an Appendix containing relevant documents, and the following brief containing specific references to pleadings, portions of discovery materials, and citations to legal authority.

**STATEMENT OF THE ISSUES**

1. Whether the Government's breach of its implied warranty of satisfactory performance by authoring a defective specification for the production of lead plating to be used in manufacturing PS-115 entitles Axion to summary judgment.

2. Whether the Government's failure to share its superior knowledge with respect to the availability of lead plating and Axion's need to manufacture the plating entitles Axion to summary judgment.

3. Whether the Government's failure to share its superior knowledge with respect to the defective nature of the plating specification entitles Axion to summary judgment.

4. Whether the Government's failure to share its superior knowledge with respect to Axion's need to develop an air gun to test PS-115 entitles Axion to summary judgment.

5. Whether the Government's failure to share its superior knowledge with respect to the appropriate method of fabricating the required air gun entitles Axion to summary judgment.

6. Whether the Government's breach of its implied duties to cooperate and to not hinder performance by failing to provide Axion with the revised plating specifications and drawings needed to fabricate the required air gun entitles Axion to summary judgment.

7. Whether the Government's failure to consider "no-tests" of PS-115s constitutes a wrongful termination of the Contract entitling Axion to summary judgment.

8. Whether defects in the Government's specification for PS-115 which led to corrosion and leakage of acid entitles Axion to summary judgment.

## STATEMENT OF THE CASE

### I. Nature Of The Case

Axion brings this action challenging the Government's termination for default of contract N00104-96-C-KA09, a fixed-priced contract for Axion to produce the PS-115 power supply for the Navy.[1] Axion claims the Government was not justified in terminating the contract for default, and that it should be converted to a termination for convenience.

[1] Axion filed its first complaint (03-2644C) on November 6, 2003 ("Compl. I"), and filed its second complaint on March 5, 2004 ("Compl. II"). These actions were subsequently consolidated by the Court. After consolidation of the two complaints, and after the United States filed an amended answer, the United States filed Defendant's Partial Motion to Dismiss for Lack of Jurisdiction, or in the Alternative, Partial Motion for Summary Judgment. Axion filed a cross-motion for partial summary judgment. After a hearing on the motions, this Court denied the motions of the United States and Axion, and set a discovery schedule.

## II. Statement of the Facts

Axion respectfully refers the Court to its proposed findings of uncontroverted facts, which are filed with this motion pursuant to Rule 56(h) of the RCFC. Additionally, the following is a brief summary of the relevant facts.

### A. The Contract.

On December 14, 1995, the United States (specifically, the Department of the Navy, through its agents at the Naval Inventory Control Point) and Axion entered into contract N00104-96-C-KA09, a fixed-price contract for Axion to manufacture and deliver PS-115 batteries to be used in Navy munitions (the "Contract"). PA 1-147; Compl. I ¶ 18, 21; Latifi Depo. pp. 28-29 at PA 1184-85. The unit price provided in the Contract was $23.80, and the total contract price was $1,313,974.20. PA 2; Compl. I ¶ 18, 21; Latifi Depo. pp. 28-29 at PA 1184-1185. The Contract required that a First Article Test ("FAT") be undertaken by Axion. PA 66. The initial delivery date for Axion's FAT Report was April 6, 1996. *Id.* By agreement of the parties, the delivery date for the FAT Report was reestablished on several occasions. Declaration of Jerry Hahin ("Hahin Decl.") ¶ 4, 5 at PA 414-415.

### B. The Air Gun.

While the Contract provided that Axion was responsible for testing the PS-115 batteries, it failed to indicate that Axion would be required to develop (without the Government's assistance and at great expense) an air gun to be used in such testing. PA 114; Compl. I ¶ 16; Answer ¶ 16. The Contract did not contain any specifications or drawings for an air gun. Compl. II ¶ 63; Latifi Decl. ¶ 3 at PA 549; Latifi Depo. pp. 54-55 at PA 1186-1187. Even though the Government had previously provided an air gun to the immediately preceding contractor, Accudyne, for use in testing the batteries, the Government refused to provide Axion

with an air gun, and also refused to provide drawings in the Government's possession that would have greatly reduced the time and expense associated with producing the air gun. PA 435; Compl. I ¶¶ 26, 27; Latifi Depo. pp. 54-55 at PA 1186-1187; Latifi Decl. ¶ 21 at PA 556-557. Without the drawings, Axion was forced to undertake a significant research and development effort to produce an air gun for testing. Latifi Decl. ¶ 21 at PA 556-557; Latifi Depo. pp. 102, 110-11 at PA 1197-1197b. In short, the Government refused to cooperate with Axion, hindering Axion's ability to perform and causing great delays and expense that ultimately led to the Government's wrongful termination of the Contract for default.

**C. <u>Plating.</u>**

Also, as a direct result of the Government withholding its superior knowledge, Axion encountered significant problems when it undertook to manufacture the plating required to produce the batteries. Latifi Depo. pp. 140-141 at PA 1199-1200; Latifi Decl. ¶¶ 4-19 at PA 549-556. First and foremost, in the Technical Data Package associated with the Contract, Axion was provided a copy of a specification outlining the processes involved in manufacturing the plating. PA 23 (referencing OD18332); 1967 Version of NAVORD OD 18332, PA 560-713; Latifi Decl. ¶ 5 at PA 550. Such specification was authored by the Government in 1967. *Id.* Although Axion meticulously followed the requirements of this specification, Axion was unable to manufacture plating that would satisfy its contractual requirements. Latifi Decl. ¶ 5 at PA 550; Latifi Depo. p. 140 at PA 1199. Axion requested that the Government provide it with a revised version of the plating specification that was authored in 1980. Axion Letter to C.O., April 22, 1996, PA 222; Axion Letter to C.O., May 22, 1996, PA 223; Latifi Decl. ¶ 5 at PA 550. However, instead of simply providing the requested specification, the Government misrepresented to Axion that no more recent specification existed. Navy Letter to Axion, June 5,

2006, PA 224; Latifi Decl. ¶ 5 at PA 550. In fact, as Axion later learned through discovery in this case, the plating specification was revised in 1973 and again in 1980. Latifi Decl. ¶ 6 at PA 551; 1973 Revised Version of NAVORD OD 18332, PA 718-903; 1980 Revised Version of NAVORD OD 18332, PA 904-1105.

It is indisputable that the revised versions of the plating specification contain substantial changes to the materials and processes required to produce satisfactory plating. Latifi Decl. ¶¶ 6-17, PA 551-555. Additionally, the Government knew that Axion would be unable to purchase the needed plating from the third-party vendors named in the Contract materials, yet failed to disclose this vital information to Axion. Sabonis 1993 Trip Report to Dunrite, PA 272-274. Consequently, Axion was forced to develop a production line to manufacture the plating with only the defective 1967 plating specification to rely upon, requiring Axion to devote large amounts of time to research and development (an element of the Contract that was not disclosed by the Government). Latifi Decl. ¶ 5, 18 at PA 550, 555. Axion strictly followed the 1967 plating specification, the only plating specification it was provided, but was unable to produce plating that would meet the requirements of the Contract. Latifi Decl. ¶ 5 at PA 550. Because Axion could not meet the Contract requirements using the 1967 Specification, it was left to "reinvent the wheel," building a plating line and determining the correct mixture of chemicals and other requirements on its own. Latifi Decl. ¶ 5 at PA 550.

**D. Testing Problems – "No-Tests".**

Due to the significant developmental aspects of the Contract which were unknown to Axion at the time it undertook to perform, Axion was required to seek several extensions for the delivery date of the second FAT. Declaration of Jerry Hahin ("Hahin Decl.") ¶ 4,5 at PA 414-415; Contract Modification P00017, PA 334. However, once Axion was able to provide the

Government with information related to the second FAT, the Government failed to correctly distinguish between "no-tests" (i.e., failures due to a malfunction of the test equipment) and actual failures of the batteries to conform to contractual specifications. Stickrod Depo. p. 83 at PA 1206.

The Government quality assurance representative who was present during the testing indicated that a "majority of the failed items provide sufficient voltage after data collection failure seem to indicate that the cell functioned correctly/to requirements despite the inability to collect data." Stickrod E-mail to C.O., September 6, 2002, PA 329. Furthermore, the Government representative noted that "the majority of the failed items (failed to capture acceptable data) provide sufficient voltage after data collection failure to seem to indicate that the cell functioned correctly to requirements despite the inability to collect data." *Id.* Nevertheless, the Government contracting officer with authority to terminate the Contract ignored this vital information and terminated the Contract for default. Contract Modification P00021, PA 336-337. There were corrosion problems with many battery systems because of the Government's defective design, as discussed further below; but, had the Government administered the testing in the same manner as it did with the prior contractor Accudyne, or during the first FAT with Axion (which Axion passed), then the Government would have considered the "no-test" factor and Axion would have passed the second FAT. *See* Accudyne PS-115 Test Data, PA 429; Stickrod Depo. p. 90 at PA 1208, 1209.

**E. <u>Corrosion.</u>**

Finally, the Government specifications expressly required that the batteries not reveal any evidence of methylene bromide or fluoboric acid leakage prior to use. Specification Control Drawing 11744726 ¶ 3.3.2.3, PA 153. But, when Axion meticulously followed all of the

requirements outlined in the specifications, it was unable to prevent acid leakage and corrosion. Latifi Decl. ¶¶ 23-24 at PA 558. Dr. James Baird, an expert in the filed of chemistry (and the only expert identified in this case), testified that the specification for the PS-115 battery was defective because, among other things, it allowed the copper-beryllium cutter blades to come into contact with the copper housing of the methylene bromide ampule that, over time, necessarily results in corrosion and facilitates leakage of the methylene bromide and fluoboric acid. Expert Witness Report of Dr. James Baird ("Baird Expert Report"), PA 339. The Government admitted that such leakage, over time, causes a decrease in the discharge life of the batteries. Government's Response to Axion's First Series of Requests For Admission ("RFA") # 45 at PA 1262; Government's Initial Response to Axion's First Set of Interrogatories # 8 at PA 1280. Thus, during the second First Article Testing, even where there was an inability of batteries to meet the specified voltage requirements, this was likely caused by the corrosion and leakage that resulted due to the Government's defective specifications. *Id.* The true causes of the failures, when they occurred, are not conclusively known, however, as the Government terminated the Contract for default prior to undertaking any analysis of the effect of the corrosion (caused by defective specifications) on the voltage of the batteries. Government's Initial Response to Axion's First Set of Interrogatories # 4 at PA 1279 (indicating that "chemical compositions of PS-115 components were not evaluated").

### F. The Government's Failure to Disclose Information and the Government's Providing Defective and Inaccurate Information Adversely Affected Axion's Performance Under the Contract.

Axion and its President, Alex Latifi, were forced to spend millions of dollars developing an air gun and plating line to meet the requirements of the Contract (even though the total contract price was only $1,313,974.20). Latifi Decl. ¶ 24 at PA 558-559. The need for such

expense was known by the Government at the time it solicited proposals, but the Government failed to disclose such information. Honeywell Proposal, June 12, 1967, PA 408-409; HDL Memorandum Regarding Government Owned Electroplater, September 23, 1991, PA 412. Furthermore, the Government provided Axion with defective specifications that further increased the costs of performance under the Contract. Latifi Decl. ¶ 5 at PA 550; Latifi Depo. p. 140 at PA 1199. Through this Motion for Summary Judgment, Axion seeks a conversion of the Government's termination of the Contract for default to a termination for the Government's convenience, which will allow Axion to recover the costs it incurred in attempting to comply with the requirements of the Contract. As there is no genuine issue as to any material fact, Axion is entitled to judgment as a matter of law, and Axion moves this Court to enter summary judgment in its favor.

## STANDARD OF REVIEW

In *Axion Corporation v. United States*, 68 Fed. Cl. 468 (2005), this Court articulated the following standard of review for summary judgment:

> Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." RCFC 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Unidynamics Corp. v. Automatic Prod. Int'l.,* 157 F.3d 1311, 1316 (Fed. Cir. 1998); *Adarbe v. United States,* 58 Fed. Cl. 707, 714 (2003). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247-48, 106 S. Ct. 2505. A fact is material "if it will make a difference in the result of a case under the governing law. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment." *J. Cooper & Assocs., Inc. v. United States,* 53 Fed. Cl. 8, 14 (2002) (citing *Anderson,* 477 U.S. at 247-48, 106 S.Ct. 2505). "In deciding whether a genuine issue of material fact exists, the evidence must be viewed in the light most favorable to the nonmoving party with doubts resolved in its favor." *Unidynamics,* 157 F.3d at 1316.

*Axion Corporation*, 68 Fed. Cl. at 474-75.

## ARGUMENT AND LAW

### I. The Government Authored Defective Specifications For Plating To Be Used In The Production Of PS-115, And Thereby Breached The Government's Implied Warranty Of Satisfactory Performance Under The *Spearin* Doctrine, And Therefore, Axion Is Entitled To Summary Judgment.

In order to meet the requirements of the Contract, Axion was forced to develop a plating line to manufacture the lead plating needed for the PS-115 batteries. Latifi Decl. ¶ 4 at PA 549-550. To do so, Axion relied on a 1967 Government specification contained within the Contract's technical data package. Contract, PA 23 (referencing OD18332); 1967 Version of NAVORD OD 18332, PA 560-713. By authoring specifications for plating to be used in the production of PS-115, the Government impliedly warranted that if Axion complied with such specifications, satisfactory performance would result. *United States v. Spearin*, 248 U.S. 132 (1918). Axion strictly followed the Government's specifications, but because such specifications were defective, Axion could not produce plating that would satisfy the Government's requirements. Latifi Decl. ¶ 4 at PA 549-550. Consequently, the Government breached its implied warranty to Axion, and because there are no genuine issues of material fact related to the Government's authoring defective specifications for plating to be used in the production of the PS-115, Axion is entitled to summary judgment, and the Government's termination of the Contract for default is due to be converted to a termination for convenience.

#### A. Under the *Spearin* Doctrine, Government Authored Specifications Give Rise To An Implied Warranty That Compliance With Such Specifications Will Result In Satisfactory Performance Of The End Product.

Federal courts and administrative boards have consistently held that if the Government prepares a specification for a product, the Government assumes the risk of nonperformance if the product is fabricated in accordance with the specification. As this Court's predecessor tribunal

stated in *Natus Corp. v. United States*, 371 F.2d 450 (Ct. Cl. 1967):

> Where the Government authors the specifications, it warrants that, if they are complied with, satisfactory performance will result. *United States v. Spearin*, 248 U.S. 132 (1918); *R. M. Hollingshead Corp. v. U.S.*, 124 Ct. Cl. 681 (1953). That warranty speaks not only to the contractor's right to assume that the end product will perform satisfactorily, it includes as well his right to rely upon the indicated method of manufacturing the end product. In short, it means that the product shown can be made in the manner shown.

*Natus,* 371 F.2d at 455. This rule of law is frequently referred to as the *Spearin* doctrine, as it was originally set out by the United States Supreme Court in *United States v. Spearin*, 248 U.S. 132 (1918).[2]

Specifications that are warranted by the Government to produce a satisfactory result are commonly known as "design" specifications:

> [T]he distinction between performance and design specifications is well established: 'Performance specifications set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, *selecting the means and assuming a corresponding responsibility* for that selection.' ··· Design specifications, on the other hand, describe in precise detail the materials to be employed and *the manner in which the work is to be performed.* The contractor has no discretion to deviate from the specifications, but is 'required to follow them as a **road map**.'

*P.R. Burke Corp. v. United States*, 277 F.3d 1346, 1357 (Fed. Cir. 2002)(emphasis added)(citations omitted).

---

[2] The Armed Services Board of Contract Appeals has previously provided the following restatement of the *Spearin* doctrine:

> When one of the parties to a contract undertakes to prepare the specifications, that party is responsible for the correctness, adequacy and feasibility of the specifications, and the other party is under no obligation to check and verify the work product of the party who assumed responsibility for the preparation of the specification, even though he may be as much or more of an expert than the party who prepared the specifications.

*Consolidated Diesel Electric Corp.*, ASBCA No. 10486, 67-2 BCA ¶ 6669.

**i. NAVORD OD 18332, A Government Authored Specification For The Plating That Was Incorporated Into Contract N00104-96-C-KA09, Is A Design Specification Subject To The Implied Warranty Of The *Spearin* Doctrine.**

The specification for contract N00104-96-C-KA09 (the "Contract") incorporated by reference "OD18332 PROCEDURES FOR PREPARING LEAD: LEAD DIOXIDE RESERVE ERERGIZER ELECTRODE STOCK BY ELECTRODEPOSITION." Contract, PA 23. An examination of NAVORD OD 18332, February 13, 1967 (the "Plating Specification"), manifests that (1) the specification was prepared by the Navy, and (2) the specification was prepared as a "road map" for vendors to satisfactorily manufacture the plates. 1967 Version of NAVORD OD 18332 ("1967 Specification"), PA 560-561. For example, the opening paragraph to the Plating Specification states:

> The purpose of this document is to describe <u>known satisfactory procedures</u> and equipment for the preparation, manufacture and quality control of reserve energizer lead: lead dioxide electrode stock in a continuous strip and batch sheet plating operation.

1967 Specification, PA 561 (emphasis added). Inasmuch as the Plating Specification describes "known satisfactory procedures and equipment for the preparation, manufacture, and quality control," the Defendant cannot credibly deny that the Plating Specification is a "road map" prepared by the Government for manufacturing the plating. *See P.R. Burke Corp,* 277 F.3d at 1357.

The Navy's Lead Project Engineer on the contract was Jerry Hahin ("Hahin"). Declaration of Jerry Hahin ("Hahin Decl.") ¶ 2 at 414. In his deposition, Hahin acknowledged that the contract contained "level three drawings:"

> Q: And it was a fixed price contract?
> A: Yes.
> Q: And it had what's known as **level three drawings**?
> A: Yes.

Deposition of Jerry Hahin ("Hahin Depo.") p. 69 at PA 1237 (emphasis added). In this regard, a level three drawing means a competent manufacturer can reproduce the item based on the drawing. *See United States ex rel. Lindenthal v. General Dynamics Corp.* 61 F.3d 1402, 1405 (9th Cir. 1995) (stating that "[a]lthough MIL-D-1000A does not specify precisely the kind of data to be included on Level 3 drawings, it does describe Level 3 drawings as those that would allow a competent manufacturer to reproduce the item based on the drawings"). In summary, the Plating Specification was a "level three" drawing for the manufacturing of the plating that was incorporated into the Contract and had been prepared by the Navy as a "road map" for vendors to satisfactorily manufacture the plating. Accordingly, the Plating Specification is subject to the implied warranty established by the *Spearin* doctrine.[3]

#### ii. The Government Misrepresented To Axion That The 1967 Version Of The Plating Specification Was The Most Current Version.

The Contract did not specify the version or the date of the Plating Specification to be used. Contract, PA 23. However, the February 1967 version of the Plating Specification was included in the technical data package ("TDP") prepared by the Navy and incorporated into the

[3] In its response to Axion's Request for Admissions, the Government asserted that the Plating Specification was "intended only as a working guide rather than a mandatory procedure." RFA # 57 at PA 1263-1264. The Government's assertion is predicated on paragraph 2 of the introduction to the Plating Specification which states "[t]he detailed description of the techniques and equipment is for the purpose of providing a working guide and is not intended as mandatory inflexible instructions precluding improvements based on sound investigation." 1967 Specification p.2 at ¶ 2, PA 561. However, when the Plating Specification is read as a whole, it is apparent that "the detailed description of the techniques and equipment" must be followed unless the contractor has made "improvements based on sound investigation." ***Id.*** Thus, pursuant to the express terms of the Plating Specification, Axion was required to follow the procedures set out in the Plating Specification, and could only deviate from such procedures where it could establish that "improvements [were] made based on sound investigation." *Id.* The Government's mischaracterization of the Plating Specification as a "working guide" should be recognized as nothing more than an attempt to bypass the implied warranty arising under the *Spearin* doctrine (which was indisputably breached by the Government).

contract by reference. 1967 Specification, PA 560. Upon studying the 1967 Specification, Alex Latifi, Axion's President, realized that important information was missing. Latifi Decl. ¶ 5 at PA 550. In a letter dated April 22, 1996, Axion requested that the Government Contracting Officer (hereinafter sometimes referred to as "C.O.") provide it with a version of the plating specification that was revised in 1980. Axion Letter to C.O., April 22, 1996, PA 222. A month later, in a letter dated May 22, 1996 from Axion to the Government Contracting Officer, Axion again requested the 1980 version of the Plating Specification:

> In reference to our telephone conversation earlier today regarding the above subjects, the plating specifications of lead and lead dioxide that we received in the TDP is dated February 1967 (NAVORD OD 18332). This document has been revised in 1980 to specify the amperage requirement and time requirement of the plating process necessary to achieve optimum plating for lead nitrate and lead acetate. Therefore, it is necessary for us to have a copy of the document to insure that we achieve the required plating.

Axion Letter to C.O., May 22, 1996, PA 223. The Government's written response to Axion's request stated the following: "ACCORDING TO THE NAVY'S RECORDS, THE 'BASIC' REVISION, DATED 2 FEBRUARY 1967, IS THE LATEST REVISION OF NAVORD OD 18322." Navy Letter to Axion, June 5, 1996, PA 224. The Government's response was a blatant misrepresentation of the truth, as discovery in this case revealed the Plating Specification was revised in both 1973 and 1980. 1973 Revised Version of NAVORD OD 18332 ("1973 Specification"), NA 718-903; 1980 Revised Version of NAVORD OD 18332 ("1980 Specification"), NA 904-1105.

**iii. The 1967 Plating Specification Is Defective.**

While Defendant complained of delays in Axion's production of PS-115, Defendant's own conduct, such as its material misrepresentations regarding plating requirements and

specifications, led to the delays and ultimately to Defendant's termination of the Contract. In a letter dated August 25, 2000 to the Government Contracting Officer, Axion stated:

> After first article approval Axion had no choice but to proceed with developing a plating line, per Government document #NAVORD OD 18332 dated February 1967. This data is obsolete and the Government did not respond to Axion's written request for updated information. … Nor could they provide any help in personal discussions during their visits regarding plating process. Since no company in the United States produces these plating strips shouldn't the Government be appreciative of the effort and cost incurred by Axion in order to be an available source to the U.S. and friendly governments who use this battery?

Axion Letter to C.O., August 25, 2000, PA 228-229. Similarly, in a letter dated November 13, 2000, Axion provided the following explanations of its difficulties in complying with OD 18332:

- We have spent 1 week on lead plating solution and one week on lead dioxide plating solution and 1 week on acetate lead dioxide plating trying to make a solution to Government specifications and be able to pass the required cell test. We were unable to do so.

- Our chemist and factory chemical representative came to the conclusion that the amount per ounce or gram given by the Government document for each element solution was not correct and completely off. Therefore we have spent the past 2 weeks and have mixed the 3 solutions with help from the chemical representative and our chemist to find the correct amount of mixture for each solution.

- The documents provide us current density and plating time, based on 4 foot per minute travel time and 69 ASF for lead dioxide plating and 13.2 ASF for lead acetate plating.

- Our plating line has been designed based on above current density and was designed to run 4 foot per minute and we have purchased rectifiers to provide the required ASF for each solution. This past Thursday and Friday that we ran the machine we find out the ASF called out by the Government was not adequate.

Axion Letter to C.O., August 25, 2000, PA 230-231.

It is indisputable that Axion made every effort to manufacture the plating in accordance with the Plating Specifications. Latifi Decl. ¶ 5 at PA 550. However, as Alex Latifi testified during his deposition, the plating manufactured in accordance with the Plating Specification *was not capable* of producing the necessary voltage:

Q: Well, why didn't you just build it to the specification as asked, even if it didn't work?

A: I did. I did make it to specification. It didn't work. And I told them, "It won't work."

Deposition of Alex Latifi ("Latifi Depo.") p. 140 at PA 1199. Axion scrupulously followed the 1967 version of the Plating Specification in attempting to manufacture the plating stock; there is absolutely no evidence to the contrary. Latifi Decl. ¶ 5 at PA 550.

The defects in the 1967 Specification become clearer when the three versions of the plating specification are compared. The 1973 Specification contained several significant alterations to the plating process, including a change in the chemicals used, a change in the frequency at which the solution "baths" were to be analyzed, a change in the pH/Specific Gravity requirements, and a change in the minimum temperature at which at least one of the solution tanks was to be heated. Latifi Decl. ¶¶ 8-10 at PA 551-553; Latifi Decl., Exhibit C, PA 718-903. For example, one of the differences between the 1973 and 1967 Specifications is a revised bill of materials, which provides for the use of entirely different chemicals to produce the plating. *Id*. In the 1973 Specification, pages 15 through 18, which contain the bill of materials, have all been revised (and thus crossed out). *Id.* Significant changes were made in the materials used, including the addition of items numbers 36 through 43 on page 18. *Id*.

It is evident from a review of the 1973 Specification that, between 1967 and 1973, the Government realized it should use different chemicals and materials in plating. *Id*. Looking at the "Plating Solutions" portion of the 1973 and 1967 Specifications, found on pages 21 through 34, the requirements for the solution "baths," which play important part of plating the nickel with lead and lead dioxide, were significantly altered. Latifi Decl. ¶ 9, PA 552; 1973 Specification, PA 755-782 (where many entire pages from the 1967 Specification are struck out entirely and replaced in the 1973 Specification with other entirely different requirements). The strips of

metal to be electroplated – in this case nickel – pass through "baths" of chemicals where they receive electrical charges that result in lead and lead dioxide adhering to the nickel. *Id.; See also* Photographs, Exhibit B to Latifi Decl., PA 714-717 (in particular, see band of metal being passed through chemical bath, PA 717). There are glaring differences in the bathing methods outlined in the 1967 and 1973 versions of the specification. For instance, in paragraph 3.1.1 on page 21, under the "Maintenance" subheading, the 1967 Specification provides in step 1 for analyzation of the alkaline cleaner solution "at least twice a week." However, the 1973 Specification provides for analyzation after "each 16 hours of operation or more frequently." Latifi Decl. ¶ 9, PA 552. By relying on the 1967 Specification given to it by the Government, Axion was not analyzing the solutions at the appropriate frequency. *Id*.

Additionally, in paragraph 3.1.2 on page 21 of the 1967 Specification, pursuant to step 2 of the subheading "Make-up," Axion was told by the Government to heat the alkaline cleaner tank to 180 degrees Fahrenheit. However, in the same paragraph of the 1973 Specification (which the Government refused to give Axion), the Government provided instructions to heat the tank to 180 degrees Fahrenheit ***minimum***. Latifi Decl. ¶ 10, PA 552-553; 1973 Specification, PA 755-756. The difference in temperature from the 1967 to the 1973 version of the Plating Specification for the alkaline clear tank is a very important difference, as Axion was under the impression that 180 degrees was the maximum temperature, when in actuality Axion needed to be using a much higher temperature to get the lead to plate on the nickel. Latifi Decl. ¶ 10, PA 552-553; 1973 Specification, PA 755-756.

Further, the specification was changed from 1967 to 1973 with regard to the provisions for Specific Gravity requirements for plating. In the 1967 Specification, pH 2 to 4 was stated as a requirement. 1967 Specification p.66, PA 832. In the 1973 Specification, pH 1 to 4 was stated

as a requirement. 1973 Specification p.66, PA 833. Also, the temperatures specified for the chemical bath were different. In paragraph 31 on page 67 of the 1967 Specification, 80 degrees Fahrenheit was called for; whereas 95-105 degrees Fahrenheit was called for in paragraph 31 on page 67 of the 1973 Specification. Latifi Decl. ¶ 10, PA 552-553; 1973 Specification, PA 832-835.

There are also many differences found when comparing the 1980 Specification (which the contracting officer, Mr. Korab, represented to Axion as being non-existent) to the 1967 version. Latifi Decl. ¶¶ 11-17, PA 553-555; 1967 Specification, PA 560-713; 1980 Specification, PA 904-1105. On page 41 of the 1980 Specification, at paragraph 4.2, there are 9 different solutions listed for use in plating the nickel, including a Degreasing (Perchlorethylene) solution and a Nickel Anodization (4% Nitric Acid) solution. However, when looking at the comparable provision in the 1967 Specification (the crossed out page 37 contained in the 1973 Specification), there are only 7 solutions listed, with the two solutions mentioned above being absent. Thus, in accordance with the 1967 Specification (the only specification Axion had at the time), Axion originally built a plating line which contained two less solution baths than the Government recommended in 1980 to produce satisfactory plating. Latifi Decl. ¶ 12, PA 553-554; 1967 Specification, PA 790; 1980 Specification, PA 953.

On pages 36 and 37 of the 1980 Specification, detailed instructions are provided as to the correct methods of testing the various solutions to determine if they have been correctly mixed. These procedures are completely absent from the 1967 Specification (they were added as pages 34a, 34b, and 34c in the 1973 Specification). Latifi Decl. ¶ 13, PA 554; 1967 Specification, PA 781-784; 1980 Specification, PA 948-949.

On pages 64 through 69 of the 1980 Specification, instructions are provided as to the appropriate manner of controlling the different plating baths required by the specification. These instructions detail exactly the appropriate temperatures at which to maintain the baths, and also indicate how to appropriately start up and shut down the baths each day. None of these instructions are found in either the 1967 or the 1973 plating specifications. Latifi Decl. ¶ 14, PA 554; 1967 Specification, PA 627-632; 1980 Specification, PA 976-981.

The test equipment outlined in paragraph 6.2.3 of the 1980 Specification, at page 72, is entirely different from that set out in the same paragraph of the 1967 Specification (crossed out page 57 of the 1973 Specification). Latifi Decl. ¶ 15, PA 554; 1967 Specification, PA 819; 1980 Specification, PA 984.

One of the most important differences in the 1980 Specification, which the Navy refused to provide to Axion, and the 1967 Specification, which Axion was provided as part of the Contract and required to work from, is found in paragraph 7.4.2.1, page 93, of the 1980 Specification. This paragraph outlines the typical single cell voltages that should be obtained when testing the plating. The voltages provided are entirely different from those found in the 1967 Specification at the same paragraph (page 74 of the 1973 Specification). Furthermore, the indicated "Pb(Ac) life" is indicated as 75 seconds in the 1967 Specification, while the 1980 Specification has the life at only 30 seconds. Again, Axion was relying on a specification which indicated it should be getting more than double the life out of one the cells than the 1980 Specification required. Latifi Decl. ¶ 16, PA 554-555; 1967 Specification, PA 843; 1980 Specification, PA 1005.

Finally, the pictures, drawings, and graphs contained in the 1980 Specification at pages 100 through 193, are far more accurate, detailed, and informative than that in the 1967

Specification at pages 94 through 171 (found at the same page numbers in the 1973 Specification). Latifi Decl. ¶ 17, PA 555. Thus, based on the many differences between the three versions of the plating specification, Axion's need for the most current version of the plating specification (which it asked for and was told did not exist) is evident.

In addition to the revised plating specifications, the Government had other information that would have been invaluable to Axion in attempting to build a plating line. In May of 1975, the Army's Harry Diamond Laboratories formulated a report entitled "Strip Plater For Lead/Lead Dioxide Electrode Stock," which contained instructions for lead plating that, in many instances, are more detailed and informative than the Plating Specification incorporated into the Contract. Exhibit E to Latifi Decl., PA 1106-1175. For example, the Strip Plater Report from Harry Diamond Laboratories contained a machine components subsection on pages 7 through 8 that provides a great deal of information concerning the specific parts required to build the plating machine, including such details as the tank sizes and dimensions. Exhibit E to Latifi Decl., PA 1114-1115. Having such a report would have allowed Axion to put together a plating machine in a more timely and efficient manner, as it unquestionably contained more detailed information about the appropriate methods of manufacturing the required plating.

Axion expects the Government to argue that the Plating Specifications were not defective, in an attempt to create an issue of fact that will preclude summary judgment. However, the Government will be unable to support such a position. On February 7, 2005, Plaintiff provided to Defendant a Notice of Plaintiff's Deposition Pursuant to RCFC 30(b)(6). Axion Notice of 30(b)(6) Deposition of Government, PA 379-389. Topic/Area Number 5 called for the Government to identify the "[p]erson with most experience with the plating process identified in OD18332 (which Plaintiff believes is entitled "Procedures for Preparing Lead:

Lead Dioxide Reserve Energizer Electrotrode Stock By Electrodeposition."). *Id.* at PA 380. The Government provided the following response:

> Finally, you sought a 30(b)(6) witness from the Government with the "most" experience with the plating process identified in OD 18332. I explained to Mr. Gabig at Mr. Hahin's deposition that we can not identify a Government witness to testify regarding this subject because the document you identified is 38 years old and it has been decades since the Government undertook its own plating line.

Letter from Government Counsel, February 15, 2005, PA 333. In short, the Government has conceded that it has no basis to know whether or not the 1967 version of the Plating Specification is defective (even though the Government provided such specification for Axion to use in manufacturing PS-115).

The fact that there is no genuine issue of material fact regarding the 1967 version of the Plating Specification being defective is also apparent from the deposition of Hahin, the Defendant's Lead Project Engineer on the contract. Hahin Decl. ¶ 2 at PA 414. In his deposition, Hahin stated:

> Q: So if Mister Latifi was to testify that based on his experience the document was inaccurate, you would have no personal knowledge to refute his statement that the OD18332 document was inaccurate?
> A: No, no personal knowledge.
> Q: In the same manner, if Mister Latifi was to testify that it was inaccurate with regard to plating time, would you have any personal knowledge to refute that statement?
> A: No.
> Q: And if he was to testify that the document was inaccurate with regard to a solution mix, would you have any basis to refute?
> A: No personal knowledge.
> Q: And if he was to testify it was inaccurate with regard to temperatures, would you have any personal knowledge on that to refute it?
> A: No.

Hahin Depo. pp. 123-24 at PA 1256-1257.

In summary, as shown by the analysis above, it is beyond contention that the 1967 version of the Plating Specification was defective. The very fact the Government declined to

provide a Rule 30(b)(6) witness to testify about the subject is compelling evidence that there are no genuine issues of material fact.

**B. By Providing Defective Plating Specifications To Axion, The Government Breached Its Implied Warranty Of Satisfactory Performance.**

As the United States Court of Appeals for the Federal Circuit held in *Essex v. Danzig*, 224 F.3d 1283 (Fed. Cir. 2000), "[w]hen the government provides a contractor with defective specifications, the government is deemed to have breached the implied warranty that satisfactory contract performance will result from adherence to the specifications…." *Essex*, 224 F.3d at 1289. Based on the evidence set out above, it is indisputable that the Government's 1967 version of the Plating Specification is defective.

Applying the *Spearin* Doctrine to the present facts, the Government warranted that Axion would be able to render satisfactory performance if Axion followed the Plating Specification. Following the 1967 version it was given, Axion was unable to plate the material. Latifi Decl. ¶ 5 at PA 550; Latifi Depo. pp. 140-41 at PA 199-1200. The plating specifications were defective, and Axion was unable to render satisfactory performance by complying with the defective specifications; therefore, the Government breached its implied warranty. No genuine issue of material fact exists with respect to such breach, and thus Axion is entitled to summary judgment.

**C. Due To The Government's Breach Of Its Implied Warranty Under the *Spearin* Doctrine, Axion's Failure To Pass The Second FAT Is Excused, And The Government's Termination Of The Contract For Default Must Be Converted To A Termination For Convenience.**

According to the Government, after the first FAT, a second FAT was necessary because Axion substituted plating that Axion manufactured for plating that Axion had previously acquired from a German vendor. Modification P00021, PA337; Hahin Depo. pp. 98-110 at PA

1243-1255; Hahin Decl. ¶ 6 at PA 416**.** In a letter dated September 28, 2001, the Government explained why it required a second FAT:

> The First Article Test (FAT) samples were produced with plate stock provided by an outside vendor. The contractor changed the material thereby invalidating the First Article. The Government requires another FAT of a reduced quantity of batteries be done to validate the manufacturing process currently being utilized to produce the energizers.

Whorral Letter to Axion dated September 6, 2001, PA 335. Since the Government breached its warranty under the *Spearin* Doctrine regarding the plating, and since the sole reason for the second FAT was to test the plating manufactured by Axion, Axion's failure to pass the second FAT must be excused, with the termination for default being converted to a termination for convenience. *See USA Petroleum Corp. v. United States*, 821 F.2d 622, 624 (Fed. Cir. 1987)("applying the *Spearin* doctrine, the government breached its implied warranty to provide accurate strapping tables and is responsible for the consequences of its breach, so far as prejudicial to its contractor.").

The Contract between Axion and the Government incorporated by reference FAR 52.249-8, which states that "[i]f, after termination, it is determined that the Contractor was not in default, or that the default was excusable, the rights and obligations of the parties shall be the same as if the termination had been issued for the convenience of the Government." Contract, PA 62; FAR 52.249-8(G). Because Axion's failure to pass the second FAT must be excused due to the Government's breaches, under the aforementioned FAR regulation, the Government's termination of the contract for default is due to be converted to a termination for convenience. Accordingly, Axion respectfully requests the Court enter summary judgment in its favor and against the United States.

## II. The Government's Failure To Disclose Its Superior Knowledge Of Crucial Facts Affecting Axion's Performance Of The Contract Entitles Axion To A Termination Of The Contract For The Government's Convenience Rather Than A Termination For Default.

From the time Axion undertook to perform its Contract with the Government, the Government had superior knowledge of crucial facts that affected both the costs and the duration of Axion's performance that it failed to share with Axion. First, the Government knew as early as 1993 that Axion would have difficulty obtaining the plating required to perform under the Contract from the suggested vendors, and that based on such difficulty Axion would likely be required to manufacture the plating at a substantial cost. Sabonis Trip Report to Dunrite, July 23, 1993, PA 272-274. Additionally, the Government knew that Axion would be required to develop an air gun to test PS-115. *See generally* Accudyne List Of Government Owned Property, PA 437. As there are no genuine issues of material fact with respect to the Government's failure to share these important facts with Axion, Axion is entitled to summary judgment, and the Government's termination of the Contract for default is due to be converted to a termination for convenience.

### A. The Superior Knowledge Doctrine Requires The Disclosure Of Vital Knowledge In the Government's Possession Which Affects The Costs Or Duration Of A Contractor's Performance.

As the United States Court of Appeals for the Federal Circuit recognized in *Hercules, Inc. v. United States*, 24 F.3d 188, 196 (Fed. Cir. 1994):

> The doctrine of superior knowledge is generally applied to situations where (1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration, (2) the government was aware that contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor or did not put it on notice to inquire, and (4) the government failed to provide the relevant information.

The *Hercules* Court went on to state that "a claim under the doctrine of superior knowledge is tenable where the government fails to provide a contractor with vital knowledge in the government's possession which bears upon the contractor's performance of the contract at issue." *Hercules*, 24 F.3d at 196. "The Court must focus its inquiry on the government's knowledge at the time of contracting and its relationship to the contractor's lack of knowledge." *L.W. Matteson, Inc. v. United States*, 61 Fed. Cl. 296, 316 (2004). For other cases applying the doctrine of superior knowledge, see *Hardeman-Monier-Hutcerhson v. United States*, 458 F.2d 1364, 1371-72 (Ct. Cl. 1972)("It is well settled in this court that where the Government possesses special knowledge, not shared by the contractor, which is vital to the performance of the contract, the Government has an affirmative duty to disclose such knowledge. It cannot remain silent with impunity."); *Helene Curtis Industries, Inc. v. United States*, 312 F.2d 774, 778 (Ct. Cl. 1963)("Although it is not a fiduciary duty towards its contractors, the Government-where the balance of knowledge is so clearly on its side-can no more betray a contractor into a ruinous course of action by silence than by the written or spoken word."); *Ragonese v. United States*, 120 F.Supp. 768, 771 (Ct. Cl. 1954)("The withholding of this information, especially in the view of its representation that it had given bidders the best information available, was a breach of contract.").

**B. The Government Failed To Disclose Its Superior Knowledge That Axion Would Be Unable To Obtain Plating From The Vendors Suggested In The Contract Documents And That Substantial Costs Would Be Involved In Manufacturing The Plating.**

With respect to Axion's purchase of the plating required to manufacture PS-115, the Scope of Work for the Contract incorporated by reference Specification Control Drawing 19202-10974349 (the "Drawing") of the required plating. Contract, PA 22. The Drawing identified

two sources of supply for the plating: Accudyne Corporation ("Accudyne") and Union Carbide Corporation ("Union Carbide"). Drawing 1097439, PA 218; RFA # 157 at PA 1270.

The Government had superior knowledge that Axion would not be able to obtain the plating from either of the suggested vendors. Specifically, Andrew Sabonis ("Sabonis"), an Army employee assigned to the Army Research Laboratory at Adelphi, Md. (formerly Harry Diamond Laboratory), made the following observation in a 1993 trip report concerning a pre-award survey of a small business that had been selected for a contract to produce PS-115's for the Government:

> Since I found no electrode plate stock quote among the quotes presented and without which quote Dunrite would be unable to manufacture the PS-115, I asked for this quote. I was informed Dunrite had no problem in this area since Union Carbide, Accudyne and DOW could supply this material. I informed Dunrite as follows: A. Union Carbide Corp. was now Eveready Battery Inc. and no longer had an electrode stock plater, since Rock Island personnel considered it to be surplus to the government needs. B. Accudyne, up to now, had always maintained the position that they were a supplier of power supplies and not a supplier of any power supply components and or materials such as electrode plated supply components and or materials such as electrode plated stock. (Phone calls to Accudyne were made by both Dunrite and Nav. Ships Industrial Specialist however no quotes were received before the meeting was adjourned.) (NOTE: I was interested in pursuing their statement that DOW could supply electrode stock. Therefore, on 20 Jul 93, I made a phone call to Ms. Claudia Montuori requesting info. on DOW as a supplier of electrode plated stock and was informed Dunrite may have confused separator material with electrode plated stock. Dow was not a producer of electrode stock.)

Sabonis Trip Report to Dunrite, July 23, 1993, PA 273-274. The Government admits that the Sabonis trip report is factually accurate regarding the statement that "Union Carbine Corp. was now Eveready Battery Inc. and no longer has an electrode stock plater." RFA # 164 at PA 1271. Additionally, the Government admits it has no basis to refute the statement in the Sabonis trip report that Accudyne was not a supplier of electrode plated stock. RFA # 165 at PA 1271.

In 1995, Sabonis was a member of the pre-award survey team that examined Axion prior to the award of the Contract. His trip report for the Axion visit does not reflect a similar disclosure. Sabonis Trip Report to Axion, August 31, 1995, PA 275-277. Additionally, no Government employee, agent, or representative informed Axion that Accudyne would not sell the plating to Axion, or that Union Carbide (later Eveready Battery) no longer produced plating. Latifi Decl. ¶ 4 at 549-550. Thus, although the Drawing represented that two separate vendors were available to provide the plating, in actuality, neither vendor was willing or capable to sell the required plating to Axion.

The Government knew of the substantial costs associated with developing a manufacturing process for the plating. In 1993, in an addendum to a Small Business/Labor Surplus Form concerning a previous procurement of PS-115s without setting the procurement aside for small businesses, a Navy contracting officer stated the following:

> The Industrial Specialist has advised that Accudyne possesses some special tooling (i.e**. a special plater valued at $3 million dollars**) for this item. According to NSWC Crane Accudyne has the **only plater in operation** to provide plated stock which is a critical process in the manufacture of Liquid Reserve Energizers. This raises doubt as to whether any firm could make an offer at fair market price and would have the technical ability to manufacture the item.

Navy Small Business Set-Aside Form, PA 278-279 (emphasis added). Additionally, the following information points to the Government's knowledge of the substantial costs of manufacturing the plating:

- In the early 1990's, the Government was studying whether to fund a plating line after Eveready Battery Company stopped making the plating. The Government concluded that "the cost to buy a new plater…is estimated to be $1.5 to $2.5 million."

HDL Memorandum Regarding Government Owned Electroplater, September 23, 1991, PA 412.

The Government also had the following cost information:

- In November 1967, Honeywell Ordnance submitted a proposal to Harry Diamond Laboratories "For Fabrication, Installation, and Start Up Of A Lead/Lead Dioxide Plating Facility." The total estimate was $1,646,849.

Honeywell Proposal, June 12, 1967, PA 408-409. This knowledge of the substantial costs (between $1.5 million and $2.5 million) associated with manufacturing the plating was certainly "vital" information, as it vastly increased the costs of Axion's performance under the Contract, for which the base price to be paid by the Government was only $1,313,940. PA 1. As such, the Government had a duty to disclose this vital information it had to Axion, and its failure to do so excuses Axion's inability to timely manufacture PS-115 in accordance with the Contract.

**i. Axion Undertook To Perform Under The Contract Without Knowledge That It Would Be Required To Manufacture The Plating.**

Axion did not know at the time that it undertook to perform the Contract that it would be required to manufacture the plating to be used in producing PS-115. Latifi Decl. ¶ 4 at 549-550. Although Axion soon learned that neither supplier named in the contract would actually provide the plating stock, Axion thought it had identified a supplier on its own – a foreign company. *Id.* Axion was initially able to acquire some plating from a German vendor; however, the vendor was soon unable to provide Axion with the quantity of plating needed to meet the requirements of the Contract. *Id.* With no available supplier, Axion was forced to build a plating line to manufacture the material itself. *Id.* As explained by Axion in a letter dated August 25, 2000 to Korab, the Contracting Officer:

> After first article approval Axion had no choice but to proceed with developing a plating line, per Government supplied document #NAVORD OD 18332 dated February 1967. This data is obsolete and the Government did not respond to Axion's written request for updated information. … Nor could they provide any help in personal discussions during their visits regarding the plating process. Since no company in the United States produces these plating strips shouldn't the Government be appreciative of the effort and cost incurred by Axion in order to be available source to the U.S. and friendly governments who use this battery?

Axion Letter to C.O., August 25, 2000, PA 228-229. Due to Axion's inability to obtain the plating from third-party vendors, Axion was required to develop, at great expense, a process to manufacture the plating, a fact unknown to Axion (but known to the Government) at the time the Contract was entered into. Latifi Decl. ¶ 4, 24 at 549-550, 558-559.

**ii. The Government's Failure To Inform Axion Of The Need To Manufacture The Required Plating Cannot Be Excused Based On Axion's Failure To Inquire Into The Availability Of The Plating.**

The second prong of the superior knowledge doctrine requires that the Government be aware that Axion had no knowledge of and had no reason to obtain knowledge of its need to manufacture the plating. As the names of two available vendors are expressly stated on the Drawing provided Axion by the Government, Axion had no reason to believe that it would need to manufacture the plating. Drawing 1097439, PA 218; RFA # 157 at PA 1270. Indeed, based on the Government's representation, Axion had every reason to believe it would <u>not</u> have to manufacture the plating itself. Thus, the Government's own document, coupled with the above evidence that the Government knew these sources no longer supplied the plating, establishes that the Government failed to disclose crucial information that Axion did not know and had no reason to discover.

Axion had no duty to further inquire into the availability of the plating prior to contracting. Where the Government has made arguments in prior cases that contractors had a duty to further inquire pre-contract award, courts have considered all facts and undertaken a balancing of the relative culpability of the parties to determine which party is at fault. For example, in *Aerodex, Inc. v. United States*, 417 F.2d 1361 (Ct. Cl. 1969), Aerodex was awarded a firm fixed price contract to manufacture 233 probe thermistors for the Army at a price of $61.94 each. *Aerodex*, 417 F.2d at 1363. A component of the thermistors was a thermal resistor

manufactured by the Western Electric Company ("WEC"). *Id.* In preparing its bid, Aerodex, Inc ("Aerodex") assumed it could manufacture the component. *Id.* Prior to award, Aerodex made no effort to obtain the drawings from the Government or confirm that WEC would sell the component. *Id.* After contract award, Aerodex learned that the Government had no drawings and WEC would only sell the component for $310.41 each. *Id.* at 1364. Aerodex submitted a claim for its unexpected costs involving the component. The Court of Claims summarized the parties' arguments as follows:

> The Government's contention is that the plaintiff could have averted its problem in the bidding stage by learning upon inquiry that Western Electric would neither sell its thermal resistors nor divulge its composition to permit duplication, and could have thereafter refrained from tendering a bid, which is by implication an assumption of risk argument. Positing the proposition in this fashion shifts the burden from the Government to the contractor to show justification, whereas since the Government's actual or imputed knowledge of the availability and uniqueness of the thermal resistor was necessarily superior to that of bidders because of its contract relationship to Western Electric, the question should not be whether the circumstances which existed excuse plaintiff from not making the indicated inquiries, but whether they excuse the Government for issuing an invitation to bid on a contract which it knew or should have found out could not be performed with a reasonable expenditure of effort and cost because of the unknown nonavailability of the thermal resistor or its material specifications.

*Aerodex*, 417 F.2d at 1366-67 (emphasis added). The *Aerodex* Court ultimately held in favor of the contractor, Aerodex, stating that "[u]nder these circumstances, in order to avoid an erroneous impression to bidders, it was a more grievous fault for the Government not to warn bidders of the

potential problem of obtaining or manufacturing resistors, than it was for the plaintiff to fail to make advance inquiry."[4] *Id.* at 1367.

The same conclusion the *Aerodex* Court reached is applicable here. Under the circumstances, it was a more grievous fault for the Government not to warn Axion about the potential problem of obtaining plating than it was for Axion to fail to make an advance inquiry. Accordingly, the second prong of the superior knowledge doctrine is established by Axion.

**iii. The Government Specifications Did Not Put Axion On Notice Of Its Need To Manufacture The Plating, And Thus Failed To Provide Axion With Relevant Information.**

The Scope of Work for the contract incorporated by reference the Drawing of the plating required to produce PS-115. Contract, PA 22. While the Drawing specified two sources of supply for the plating, it failed to mention that the Government had specific knowledge that neither of these sources could (or would) supply the required plating. *See* Sabonis Trip Report to Dunrite, PA 272-274. Thus, Axion was mislead into believing that sources were available from which it could purchase the plating, when in actuality Axion's only alternative was to undertake the manufacturing of the plating at its own expense.

The Government knew at the time Axion undertook to perform under the Contract that Axion would be unable to obtain the plating from the sources suggested in the Drawing. *Id.*

[4] The *Aerodex* Court also pointed out that it reached this conclusion "despite the boilerplate term of the invitation placing the risk on bidders for not examining drawings, specifications, schedule and all instructions in the preparation of bids. Under the circumstances in this case, as has been pointed out, it was not at all obvious that the Western Electric or equal resistors were not procurable, and plaintiff had good reason to believe that the Government had and would make available the material specifications." *Aerodex*, 417 F.2d at 1367 n.7. Similarly, while the Drawing provided by the Government states that "IDENTIFICATION OF THE SUGGESTED SOURCES OF SUPPLY HEREON IS NOT TO BE CONSTRUED AS A GUARANTEE OF PRESNET OR CONTINUED AVAILABILITY AS A SOURCE OF SUPPLY FOR THIS ITEM(S)," there was no indication that Axion would have to manufacture the plating itself. Drawing 1097439, PA 217.

Furthermore, the Government knew that manufacturing the plating would be a prohibitively expensive endeavor for a small business such as Axion. Navy Small Business Set-Aside Form, PA 278-279. The Government's own estimate of the cost of creating a plating line was $1.5 million to $2.5 million. HDL Memorandum Regarding Government Owned Electroplater, Septebmer 23, 1991, PA 412. Nevertheless, the Government chose to withhold this relevant information, and in doing so violated the superior knowledge doctrine. As there is no genuine issue of material fact with respect to the Government's failure to disclose its superior knowledge related to the availability of the plating, Axion is entitled to summary judgment.

### C. The Government Failed To Disclose Its Superior Knowledge With Respect To The Defective Nature Of The Plating Specification.

Once Axion learned that it would be unable to obtain the plating required to perform under the Contract, Axion undertook to manufacture the production quantities of the plated metal for use in the PS-115 production based on the Plating Specification provided by the Government. Axion Letter to C.O., August 25, 2000, PA 229. It is indisputable that the Plating Specification was defective, and the Government's failure to disclose its defective nature and to provide a revised version of the Plating Specification constitutes a breach of the superior knowledge doctrine. As there is no genuine issue of material fact with respect to the Government's failure to disclose its superior knowledge, Axion is entitled to summary judgment.

#### i. Axion Undertook To Manufacture The Plating Without Knowledge That The Plating Specification Was Defective.

The Contract expressly incorporated the Plating Specification into its terms. Contract, PA 23. As part of the technical data package ("TDP") for the solicitation was a copy of the Plating Specification dated February 1967. *Id.*; Latifi Decl. ¶ 5 at PA 550. In a letter dated May 22, 1996 from Axion to the Contracting Officer, Axion requested a version of the Plating

Specification more current than the 1967 version. Axion Letter to C.O., May 22, 1996, PA 223. Instead of providing either the 1973 or the 1980 revised versions of the Plating Specification, which existed and which the Government had, the Government responded that the 1967 version of the Plating Specification was the latest revision. Navy Letter to Axion, June 5, 1996, PA 222; 1973 Specification, PA 560-713; 1980 Specification, PA 904-1105. Thus, it is indisputable that the Government misrepresented facts related to the existence of a revised Plating Specification. The Government had two more recent versions of the Plating Specification and refused to provide Axion with either one.

The information in the 1973 and 1980 versions was vital because it corrected numerous defects in the 1967 Plating Specification that prevented Axion from being able to produce plating that was satisfactory. For example, significant alterations were made to the plating process, including a change in the chemicals used, a change in the frequency at which the solution "baths" were to be analyzed, a change in the pH/Specific Gravity requirements, and a change in the minimum temperature at which at least one of the solution tanks was to be heated. Latifi Decl. ¶¶ 8-10, PA 551-553; Latifi Decl., Exhibit C, PA 718-903. For a more detailed look at the substantial differences between the 1967, 1973, and 1980 versions of the plating specification, see section I.A.iii., *supra* at p. 13.

**ii. The Government Was Aware That Axion Did Not Have The Revised Versions Of The Plating Specification.**

It is indisputable that the Government knew Axion did not have the revised versions of the Plating Specification that corrected the defects present in the 1967 Plating Specification. In Axion's May 22, 1996 letter to the Contracting Officer, Axion requested a more current version of the Plating Specification. PA 223. However, instead of providing one of the two revised versions of the Plating Specification, the Government responded by stating that the 1967 version

was the most current (a blatant misrepresentation, as the Plating Specification was revised in 1973 and 1980). Navy Letter to Axion, June 5, 1996, PA 224. Thus, the Government cannot credibly argue that it was unaware Axion did not have the most current, non-defective, version of the Plating Specification.

**iii. The Government Provided Plating Specifications Were Misleading And Gave Axion No Reason To Inquire Into Their Defective Nature.**

With respect to the third element of the superior knowledge doctrine, the Government provided Plating Specifications misled Axion into relying on them to manufacture the required plating. The opening sentence to the Plating Specification states:

> The purpose of this document is to describe known satisfactory procedures and equipment for the preparation, manufacture and quality control of reserve energizer lead: lead dioxide electrode stock in a continuous strip and batch sheet plating operation.

1967 Plating Specification, PA 561 (emphasis added). Thus, the 1967 version of the Plating Specification misled Axion to believe that if Axion were to follow the procedures set forth in the Plating Specification, Axion could produce plating that was satisfactory. Latifi Decl. ¶ 5, PA 550. Until Axion undertook to manufacture the plating and realized that the Plating Specification was defective, Axion had no reason to inquire as to the correctness of the procedures set out in the Plating Specification.

**iv. The Government Failed To Provide Revised Plating Specifications That Would Have Allowed Axion To Manufacture Satisfactory Plating.**

There is no genuine issue of material fact with respect to the defective nature of the 1967 Plating Specification. *See* I.A.iii., *supra*. Furthermore, once Axion realized that the 1967 Plating Specification was defective, the Government failed to comply with Axion's request for a revised version of the Plating Specification. Navy Letter to Axion, June 5, 1996, PA 224.

Thus, it is indisputable that the Government refused to share its superior knowledge of the appropriate manner of manufacturing the plating with Axion, even though revised versions of the Plating Specifications were readily available. Accordingly, Axion is entitled to summary judgment based on the superior knowledge doctrine.

### D. The Government Failed To Disclose Its Superior Knowledge With Respect To Axion's Need To Develop An Air Gun To Test PS-115.

In addition to failing to disclose its superior knowledge related to the defective Plating Specifications and Axion's need to manufacture the required plating, the Government also failed to disclose the fact that Axion would be required to develop an air gun to perform the final testing of PS-115. As the development of the air gun was very expensive and time consuming, the fact that such development would be required was a vital piece of information that should have been disclosed to Axion, and the Government's failure to make such disclosure constitutes a breach of the superior knowledge doctrine.

#### i. Axion Undertook To Perform The Contract Without Knowledge That It Would Be Required To Develop An Air Gun For Final Testing.

Axion made inquiries about testing of the PS-115s before it was awarded the Contract. Latifi Depo. p. 58 at PA 1189; Latifi Decl. ¶ 20 at PA 556. While the Contract stated that Axion was to provide all Acceptance Inspection Equipment, the Contract contained little in the way of specifics about testing. Contract, PA 114; Latifi Decl. ¶ 3 at PA 549. But, prudently, prior to contract award, Latifi spoke with an employee of Accudyne (the prior contractor on the PS-115s manufacturing effort), who told him that Accudyne's air gun was government furnished equipment ("GFE"). Latifi Depo. p. 58 at PA 1189; Latifi Decl. ¶ 20 at PA 556. Consequently, Axion entered the contract believing it could obtain an air gun as GFE. *Id.* This fact is corroborated in a letter dated January 17, 1996 from Axion to the Contracting Officer: "We

understand that the government has supplied two air guns as government furnished material to [a] previous contractor, Accudyne, to perform the final testing. We hereby request one unit supplied to Axion Corp. for performance of final test." Axion Letter to C.O., January 17, 1996, PA 220. In reply, the Contracting Officer stated: "The Navy did not supply any air guns to the previous contractor, Accudyne Corporation, for test purposes." Navy Letter to Axion, January 26, 1996, PA 221. In fact, the Government (although it was the Army rather than the Navy) *did provide* Accudyne with an air gun. Defendant's Answer to Complaint I at ¶ 25; Accudyne List of Government Owned Property, PA 435-436 (listing as equipment of the Government to be used on the PS-115 contract, by the prior contractor, Accudyne, one "Spin-A-Gun"); Latifi Decl. ¶ 20, PA 556; Latifi Depo. pp. 64-65 at PA 1191-1192 (Korab stated, "the Army did that. And your contract is with the Navy, not the Army."), c*ompared to* RFA # 86-88, PA 1266-1268 (stating that Defendant United States "lacks sufficient knowledge to respond," that "the contracting officer associated with Accudyne has passed away," and that the United States "[a]dmits only that Accudyne possessed some Government-owned equipment" but "[o]therwise, the United States lacks sufficient knowledge to respond"). Again, the Government misstated important facts to Axion.

The PS-115s were previously manufactured by Accudyne under a U.S. Army contract, and Accudyne was provided an air gun by the U.S. Army. *Id.*; Contract, PA 20 (listing Accudyne as having been awarded PS-115 contracts in 1992 and 1993); Hahin Depo. pp. 15-16 at PA 1235-1236. The Government produced documents, in this case, that conclusively establish that, at the time the Contracting Officer made his written statement about the Government not supplying an air gun to Accudyne, the Government knew it had supplied Accudyne an air gun for testing and that the Government knew it had specifications describing

how to make an air gun. Accudyne List of Government Owned Property, PA 435-436. For the Contracting Officer to state "the Navy" did not supply an air gun, knowing the U.S. Army had supplied Accudyne one, was a misrepresentation by omission. Had the Government told the whole truth – that the United States had provided Accudyne with an air gun to test – this case would probably have never been before this Court. Like its misstatement about the plating specifications, the Governments misstatement and omissions here resulted in great expense to Axion.

It is indisputable that Axion undertook performing the contract without knowing that Axion would have to develop an air gun. As explained by Latifi in his deposition: "Nowhere in the contract do I have a drawing, specification, sheet of paper, anything that says, Mr. Latifi, Axion is supposed to produce a gun that cost $2 million." Latifi Depo. p. 57 at PA 1188. Hahin also agreed that it was reasonable for Axion to assume the contract was to manufacture PS-115 rather than to undertake a major development effort regarding an air gun:

Q: Okay. Now, when Axion entered into this contract, because their background is fixed price production contracts with level three drawings, is it fair to say that they never anticipated to have -- to develop an air gun?
A: Yes.

Hahin Depo. pp. 71-72 at PA 1241-1242. Hahin further acknowledged that "the effort of the contract was not to develop anything, it was to build batteries." Hahin Depo. p. 47 at PA 1238.

Knowledge that Axion would have to develop an air gun was "vital" in terms of both cost and duration. Swank, who was deposed as a Rule 30(b)(6) witness on behalf of the United States Government, testified that he would not be surprised if it cost a vendor who was a skilled mechanical engineer a million dollars to fabricate an air gun without the assistance of Government drawings:

Q: If you were to hire a third party vendor to design, fabricate and test a simulator and not give them any drawings for it, that you have now, how much money do you think it would cost them to do that?
A: I have no idea how much. It depends on a large extent on their expertise doing similar things.
Q: I want you to assume it's a engineer who is skilled in the art of mechanical engineering.
A: I wouldn't want to hazard a guess.
Q: Would it surprise you if it was more than a million dollars?
A: Probably not too much.

Swank Depo. p. 105 at 1216. It simply cannot be argued that the need to undertake a million dollar development effort for a fixed price production contract (where the base price was $1,313,974) is not "vital knowledge" which the Government should have disclosed.

**ii. The Government Was Aware That Axion Had No Knowledge Of And Had No Reason To Look Into The Need To Develop An Air Gun For The Final Testing Of PS-115, As Nothing The Government Provided Axion Made Any Mention Of An Air Gun.**

Axion focuses its business efforts on fixed price production contracts and is not a research and development company. Latifi Decl. ¶ 1 at PA 548. When Axion bid on the Contract to produce PS-115 and undertook performance of the Contract, it had no knowledge that it would be required to develop an air gun to perform final testing. Latifi Decl. ¶ 3 at PA 549. As evidence of this lack of knowledge, Axion certainly would not have entered into contract with a base price of $1,313,974.00 had it known that it would be required to spend $1,534,934.00 to develop an air gun. Contract, PA 1; Latifi Decl. ¶ 24 at PA 558.

The Government was aware that Axion had no reason to inquire into the need to produce an air gun. In fact, the Contract makes no mention whatsoever of an air gun or its necessity for final testing. *See generally* Contract, PA 1-147; Latifi Decl. ¶ 3 at PA 549. Furthermore, as mentioned above, Hahin, the Navy's lead engineer on the PS-115 contract, admitted in his deposition that Axion would have had no reason to anticipate its need to develop an air gun, and

that the Contract was not intended to be one for development. Hahin Depo. pp. 47, 71-72 at PA 1238, 1241-1242. Thus, the Government cannot credibly deny it was aware Axion had no reason to look into the need to develop an air gun prior to bidding on the Contract and undertaking performance.

It is indisputable that nothing provided by the Government to Axion made any mention of an air gun, and thus Axion could not have been put on notice to inquire as to the need for such a tool. The Government failed to disclose this vital information, even though it had previously provided an air gun to Accudyne. Accordingly, the Government was fully aware that Axion would need such an air gun, and that Axion would have had no reason to inquire into such need. Thus, the second and third elements of the superior knowledge doctrine are met.

**iii. The Government Failed To Notify Axion Of Its Need To Develop An Air Gun And Also Failed To Provide Documents That Would Have Assisted Axion In Developing The Required Air Gun.**

Under the fourth prong of the superior knowledge doctrine, the Government must have failed to provide the relevant information which was withheld from Axion. As previously noted, there is no genuine issue of material fact with respect to the Government's failure to provide any notice whatsoever to Axion of its need to produce an air gun to perform final testing of PS-115. *See* II.D.i. and ii., *supra*. Additionally, once it became clear to Axion that it would be required to produce an air gun, the Government failed to provide important information related to the appropriate method of manufacturing the air gun.

Swank, the Government's 30(b)(6) representative with respect to the air gun, testified that several documents available from the Harry Diamond Laboratory ("HDL") would have been helpful to Axion in manufacturing the required air gun. For example, with respect to an HDL report from 1979 titled "High-Spin Tabletop Artillery Simulator," Swank testified that such a

document would have been helpful to a person who had never built an air gun before. *See* Swank Depo. p. 95 at PA 1215; HDL Report, September 1979, PA 236-271. Additionally, Swank testified two other reports available from HDL would have been helpful to Axion in developing the air gun. Swank Depo. pp. 92-93, 109 at PA 1213-1214, 1217. However, as Swank verified, none of these reports were ever provided to Axion. Swank Depo. p. 109 at PA 1217.

There is no genuine issue of material fact with respect to the Government's failure to provide Axion with its superior knowledge of both the need to manufacture an air gun and the appropriate methods by which to do so. Accordingly, Axion is entitled to summary judgment, and the Government's termination of the contract for default is due to be converted to a termination for convenience.

## III. By Failing To Provide Axion With The Revised Plating Specifications And The Drawings Needed To Fabricate The Air Gun, The Government Breached Its Implied Duties To Cooperate And To Not Hinder Performance.

Under well established rules of law, the Government had a duty to cooperate with Axion and to not do anything that would hinder Axion's performance of the Contract. The Government breached these duties by failing to provide Axion with the revised Plating Specifications it requested and by refusing to provide the drawings needed for Axion to fabricate the air gun required for the testing of PS-115.

### A. Pursuant To Its Implied Duties To Cooperate And To Not Hinder Performance, The Government Was Required To Do Everything Necessary To Enable Axion To Perform.

In the recent case of *Orlosky, Inc. v. United States*, 68 Fed. Cl. 296 (2005), this Court provided the following explanation of the implied duties to cooperate and to not hinder performance:

> Every contract includes the implied covenant of good faith and fair dealing. *Centex Corp. v. United States,* 395 F.3d 1283, 1304 (Fed. Cir. 2005); *see also* Restatement (Second) of Contracts § 205 (1981). Two closely related aspects of the covenant of good faith and fair dealing are "the dut[ies] to cooperate and not hinder the contractor's performance." *C. Sanchez & Son, Inc. v. United States,* 6 F.3d 1539, 1542 (Fed. Cir. 1993); *Centex Corp.,* 395 F.3d at 1304 (stating that the covenant of good faith and fair dealing "imposes obligations ... that include the duty not to interfere with the other party's performance"); *see Olympus Corp. v. United States,* 98 F.3d 1314, 1318 (Fed. Cir. 1996) ("[I]nterference by the government with a contractor's access to the work site may constitute a breach of the government's duty to cooperate ...."). A breach of these duties is actually a breach of the covenant of good faith and fair dealing. *See Malone v. United States,* 849 F.2d 1441, 1445 (Fed. Cir. 1988).
>
> The duty not to hinder performance requires a party "not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Centex Corp.,* 395 F.3d at 1304. The contracting party is prohibited from "doing anything to prevent performance ... by the [contractor] or that will hinder or delay him in its performance." *Lewis-Nicholson, Inc. v. United States*, 213 Ct. Cl. 192, 550 F.2d 26, 32 (1977). "Not only must the Government refrain from hindering the contractor's performance, **it must do whatever is necessary to enable the contractor to perform**." *Id.* The specifics of the parties' duties under this covenant are dependent on the particular circumstances of the case. *See Milmark Servs., Inc. v. United States,* 731 F.2d 855, 859 (Fed. Cir. 1984).

*Orlosky*, 68 Fed. Cl. at 311 (emphasis added).

### B. The Government Failed To Do Everything Necessary To Enable Axion To Perform Under The Contract.

There is no genuine issue of material fact with respect to the Government's failure to do everything necessary to enable Axion to perform the Contract. First and foremost, it is indisputable that the Government provided Axion with a defective plating specification. *See* I.A.iii., *supra*. The Government provided Axion with a defective, incomplete, misleading and flawed 1967 version of the Plating Specification, that the Government itself no longer used, because it had been corrected and updated. *See* 1973 Specification, PA 718-903; 1980 Specification, 904-1105. Plating specification OD 18332 was expressly incorporated into the Contract, and thus the Government had a duty to provide Axion with a non-defective version of

the specification in order to ensure Axion would be able to manufacture the plating to the Government's satisfaction. Contract, PA 23. Once Axion realized that the Government had provided it with a defective specification from 1967, Axion requested that the Government provide a revised specification. Latifi Decl. ¶ 5 at PA 550; Axion Letter to Navy, April 22, 1996, PA 222; Axion Letter to Navy, May 22, 1996, PA 223. Rather than provide either the 1973 or 1980 revised plating specification, the Government misrepresented to Axion that the 1967 Specification was the most recent version. Navy Letter to Axion, June 5, 1996, PA 224. Based upon this misrepresentation, Axion undertook to manufacture the required plating pursuant to the defective specifications, causing Axion to suffer an extensive delay in the production of PS-115. Latifi Decl. ¶¶ 5, 18 at PA 550, 555.

Additionally, to perform the final testing of PS-115, Axion was required to develop an air gun. S*ee* II.D., *supra*. The Government has in its possession three separate sets of drawings of working air guns, which Government witnesses have admitted would have been useful to Axion in its development of the air gun. *See* II.D.iii., *supra*. But, when Axion requested that the Government's Army Research Laboratory provide it copies of these drawings, the Government responded by stating "we are not able to legally comply with your request." ARL Letter to Axion, April 3, 1997, PA 234. However, it is indisputable that the Army Research Laboratory has released at least one of the drawings to the U.S. Department of Commerce's National Technical Information Service ("NTIS"), making the drawing available to the public for a modest fee.[5] *See* HDL Report, September 1979, PA 236. Further, when Axion asked the Contracting Officer whether the Government had provided Accudyne, the prior contractor, with an air gun, the Contracting Officer told Axion that the Navy had not, deliberately omitting to tell

Axion that the U.S. Army had provided Accudyne with the air gun. *See* II.D.i., *supra*. Even assuming the Government, for legal reasons, could not provide the air gun drawings directly to Axion, it could have at least pointed Axion to the NTIS website so that the drawings could be obtained. However, the Government simply refused to cooperate with Axion and gave no guidance on the development of the air gun the Government required for testing PS-115. In fact, its representations and omissions misled Axion, and caused Axion to spend many years and millions of dollars on what was essentially a research and development effort. Latifi Decl. ¶ 24 at PA 558-559.

**C. Due To The Government's Breach Of Its Duty To Cooperate, The Government's Termination Of The Contract For Default Is Due To Be Converted To A Termination For Convenience.**

In *Malone v. United States*, 849 F.2d 1441, 1445 (Fed. Cir. 1988), the United States Court of Appeals for the Federal Circuit found that the Government breached its duty to cooperate where the Contracting Officer misled the contractor into relying on workmanship standards that the Contracting Officer found unacceptable. As a consequence of such breach, the Court ordered that the Government' termination of the contract for default be converted to a termination for convenience. *Id.* at 1445-46.

Similarly, in this case, the Government misled Axion by providing it defective specifications for the plating to be used in manufacturing PS-115. The Government also failed to cooperate by refusing to provide revised plating specifications or drawings which Axion could use to manufacture the required air gun. Accordingly, the Government's termination of the Contract for default is due to be converted to a termination for convenience. As there is no

[5] Axion was unaware that the drawings for an air gun could be acquired from NTIS until after the Contract was terminated for default. Latifi Decl. ¶ 21 at PA 556-557.

genuine issue as to any material fact, Axion moves the Court to enter summary judgment in its favor.

## IV. The Government Wrongfully Terminated The Contract For Default Due To Its Inability To Distinguish Between "No-Tests" And Actual Failures Of The Batteries To Conform To Contractual Specifications.

On November 12, 2002, the Government terminated the Contract for default, stating that "a total of 25 out of 66 First Article Power Supplies failed to meet the performance requirements of drawing 11744726." Contract Modification P00021, PA 337. It is indisputable that the Government improperly relied on the number of "failures" to justify terminating the Contract, as the Government failed to take into account the fact that an unsuccessful test was often the result of malfunctioning test equipment, i.e. "no tests," rather than a non-complying battery. Furthermore, while the Government representative observing the testing indicated that the batteries were performing to specification, the Government still chose to terminate the Contract. There is no genuine issue of material fact with respect to the Government's wrongful termination of the Contract for default. Accordingly, Axion moves the Court to enter summary judgment in its favor, converting the termination for default to a termination for the Government's convenience.

### A. The Government Bears The Burden Of Proving That It Justifiably Terminated The Contract For Default.

The United States Court of Appeals for the Federal Circuit has previously held the following with respect to the Government's burden of proving a contractor's default:

> [A] default termination is a drastic sanction which should be imposed (or sustained) only for good grounds and solid evidence. In view of these considerations, we conclude that the government should bear the burden of proof with respect to the issue of whether termination for default was justified….

*Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987)(citations omitted). Thus, the burden of proof is on the Government to justify its termination of the Contract for default.

**B. Based On The Government's Failure To Consider The Number Of "No Tests" Of The Batteries, The Government Cannot Prove That The Tested Batteries Were Defective.**

As discussed above, Axion was required to develop an air gun for final testing of PS-115 without any guidance from the Government. Latifi Depo. p. 57 at PA 1188; Latifi Decl. ¶ 21 at PA 556-557. By as early as May 30, 1997, the Government was aware that Axion would be attempting to design and build an air gun for testing. Axion Letter to C.O., May 30, 1997, PA 227. What is referred to with regard to this Contract, by Axion and the Government, as an "air gun" or "gun" is actually a long tube in which a vacuum is created through the use of an air pump. One end of the tube is open, and at the other end of the tube is a motorized cylinder used to spin the battery being tested. The "bird," a piece of plastic in which the battery is encapsulated for testing, is placed in the open end of the tube, and the tube is then closed and the vacuum turned on. Once a sufficient vacuum is built up in the tube, the tube is again opened, with the vacuum shooting the bird into the spinning cylinder to create the effect of being shot out of a large bore weapon. A computer then records the required test data. Latifi Decl. ¶ 22, PA 557; Exhibit G to Latifi Decl., PA 1176-1179.

Where the computer did not record the requisite voltage over time, often the unsuccessful test was the result of a malfunctioning air gun, rather than any defect in the battery itself. Stickrod Depo. p 37 at PA 1205. Unsuccessful tests that are attributable to a malfunctioning air gun were called "no-tests." Stickrod Depo. p 84 at PA 1207. The role of "no-tests" and the need for autopsy/post-mortem analysis in air gun tests is manifested in an memorandum prepared by

Swank, the Government's designee under Rule 30(b)(6) as the "Person most knowledgeable with the U.S. Army's experience in fabricating and making 'High-Spin Tabletop Artillery Simulators' (and/or 'airguns')." Axion Notice of Deposition, PA 380; Swank Memorandum Regarding PS-115 Testing, PA 280. Swank's memorandum was prepared in response to a request by Axion to the Army Research Laboratory for a price estimate to perform air gun testing of PS-115s manufactured by Axion. Swank Memo, PA 280. In preparing the price estimate, Swank informed his supervisor:

> Also, Alex MUST understand that we can't guarantee that every test will result in the successful activation of the battery and recording of data. Accudyne has **no-tests because of equipment malfunction**, and so did Everready when they were in business. We will do our best, but if things don't work out perfectly Alex will have to accept that as part of the cost of doing business. If he wants us to postmortem batteries that would also be an additional cost.

*Id.* (capitalization in original)(emphasis added). As shown by Swank's memo, regardless of whether the air gun belonged to the Army Research Laboratory, Accudyne, or Everready, air guns had a common characteristic of malfunctioning.

Swank provided the following definition of a no-test during his deposition: "Generically a no test is either obvious equipment failure, you didn't get data. It can cover -- you know, almost anything other than a successful test can initially be classified as a no test probably." Swank Depo. p. 31 at PA 1212. The significance of a no-test was that the tested PS-115 was not regarded as a failure; instead a new PS-115 battery was substituted for the PS-115 battery that was tested in what was deemed to be a no-test. Hahin Depo. p. 135-36 at PA 1258-1259; Lot Summary, PA 434; Spin Test Data Sheets, PA 430-433.

Axion's problems with no-tests and equipment malfunctions were not the first time one of the Government's contractors has experienced problems with the required air gun tests. Both Accudyne and Eveready frequently experienced "no-tests" due to equipment malfunctions when

they were in the business of manufacturing PS-115. Swank Memo, PA 280 ("Accudyne has no-tests because of equipment malfunction, and so did Eveready when they were in business."); PS115B Spin Test Data Sheets, PA 430-433 (stating in various places, with regard to various batteries tested "no test"); Lot Summary, PS115B Power Supply, PA 434.

In February of 2001, the Army Research Laboratory prepared a report entitled "Battery Lot Acceptance Test Data of Accudyne PS115B Production, Contract DAA09-92-C-0436." PA 281-327. The report summarized data from almost 3000 PS-115s tested by Accudyne (under a previous contract) using an air gun similar to Axion's. *Id.* The abstract of the report states: "Except for some aberrations that were determined to be caused by test equipment and procedural problems, the batteries performed well and relatively consistently." *Id.* at PA 284. The "aberrations" caused by the Accudyne test equipment were explained as follows:

> These problems were believed to be caused by—
>
> - "Bad hits": Bad hits is a term I use to denote the effect of a misalignment between the fixed and spinning tubes. If the tubes are not exactly coaxial, the bird can still wind up the spinner as it should, but it does so only after striking a glancing blow as it enters the tapered mouth of the spinner tube. While doing this, it encounters lateral acceleration that can disrupt the sequencing of the ampule liquids and affect activation.
> - Insufficient gun-tube vacuum: The tube pressure in the low-spin gun appeared to be somewhat inconsistent and perhaps poorly regulated.
> - Bearing wear: Evidence was clear that Accudyne was experiencing normal bearing-wear problems in the high-spin air gun.
>
> Also evident was that these problems could only be caused by inadequate maintenance of the test system—a problem that can manifest itself as attenuated or erratic battery performance **even though the power supply is not the culprit**.

*Id.* at PA 300-301 (emphasis added). Paraphrasing the bolded text, a PS-115 battery could fail the air gun test even though the PS-115 was <u>not</u> defective; the Government knew this when it terminated Axion's Contract without considering the no tests that occurred.

Stickrod, the quality assurance representative who was present at Axion when the batteries were tested for the second FAT, testified in his deposition that there were "lots of" no tests he observed, because of a malfunction in Axion's air gun or human error.[6] Stickrod Depo. p. 83 at PA 1206. Stickrod further testified that when these no tests occurred, the battery would be opened up, and "you could always determine something – a wire had broken, the PS115 had been thoroughly ruptured – too much or not enough. There was always – you could always pinpoint what it was" that caused the no test. Stickrod Depo. p. 84 at PA 1207. Where a no test would occur, Stickrod would use a voltage meter to determine if the voltage reached was sufficient to meet contractual requirements, and Stickrod testified that a majority of the batteries tested in this manner had sufficient voltage to indicate that the battery cell functioned correctly. Stickrod Depo. p. 94 at PA 1209; *see also* Stickrod E-mail to C.O., September 5, 2002, PA 328 ("The majority of the failed items (failed to capture acceptable data) provide sufficient voltage after data collection failure to seem to indicate that the cell functioned correctly/to requirements despite the inability to collect the data."). Despite the occurrence of a significant number of no tests, Stickrod indicated that "no tests" were not part of the criteria considered when reviewing Axion's test information:

> We are getting back to that test or not test business. I do not know anything about a no test. That was not in the criteria that I ever had at any point.

Stickrod Depo. p. 90 at PA 1208, 1209. Thus, while the Government justified the termination for default based on "25 out of 66 First Article Power Supplies failed to meet the performance

[6] Hahin, the Government contracting officer who studied Axion's test results and made the determination that 25 of 66 batteries failed to meet specifications, acknowledged in his deposition that he had only observed approximately four of the air gun tests for the second FAT. Exhibit 13 at 164. Thus, he would have necessarily needed to rely on Stickrod's observations to help make his decision.

requirements of drawing 11744726," the Government's failure to consider the effect of no tests on the data provided by Axion makes it impossible for the Government to meet its burden of proof that Axion defaulted under the Contract. Contract Modification P00021, PA 336-337. The Government used different testing criteria for Axion than it did with Accudyne, the previous contractor for whom it considered the "no-tests" not to be failures. Accudyne PS-115 Test Data, PA 429-434 (showing that out of 90 tests, only 80 were counted due to 10 no-tests). Further considering that the testing was conducted using an air gun Axion developed with no help from the Government, despite the fact it had helpful information that it chose not to share, faults in the testing procedures themselves are due to the Government's own conduct. Accordingly, there is no genuine issue as to any material fact, and Axion is entitled to summary judgment.

## V. Defects In The Government Specification For PS-115 Led To The Leakage Of Methylene Bromide And Fluoboric Acid From the Batteries, Causing A Decrease In Battery Performance During Testing, The Effect Of Which The Government Ignored When It Decided To Terminate The Contract.

Pursuant to the express terms of Drawing 11744726, which was incorporated into the Contract, in order to satisfy its contractual specifications, Axion was required to manufacture batteries that did not reveal any evidence of leakage of methylene bromide or fluoboric acid (two substances used in constructing the batteries). Contract, PA 23; Specification Control Drawing 11744726 at ¶ 3.3.2.3, PA 153. However, due to a defect in the Government specified manner in which the batteries were to be built, it was impossible for Axion to prevent corrosion and leakage. Expert Report of Dr. James Baird ("Baird Report") at Opinions 1-4, PA 338-343. It is indisputable (and is not disputed by the Government), that fluoboric acid, when combined with methylene bromide, has a corrosive effect on copper, and that such corrosion facilitates the

leakage of these substances.[7] RFA # 82, PA 1265; Whorral Letter dated September 6, 2001, PA 335. Furthermore, the Government admits that such leakage of fluoboric acid (an electrolyte) leads to a discharge of the battery and a depletion of stored energy. RFA # 45, PA 1262; Response to Interrogatory # 8, PA 1280-1281. Due to the fact that the Government's recommended air gun test for the batteries looked only at voltage and did not consider the effects of corrosion and leakage, the Government cannot meet its burden of proof that its termination of the Contract for default was justified (if the batteries did not work because of the Government's own defective design, the Contract should not have been terminated). No genuine issues of material fact exist with respect to the defective nature of the Government specifications, and thus Axion is entitled to summary judgment, with the Court's Order converting the termination for default into a termination for convenience.

### A. Dr. James Baird Established Through Scientific Testing That The Government Specification Is Defective.

Axion retained an expert, Dr. James Baird ("Dr. Baird"), to test the batteries and their components in order to determine the cause of the corrosion and leakage present on the exterior of the batteries. The Government has no expert on this subject. Dr. Baird is well-qualified to testify to these matters. A Professor of Chemistry at the University of Alabama, Huntsville since 1982, Dr. Baird has a Ph.D. from Harvard University in Chemical Physics. Baird Report, PA 353-372. Dr. Baird earned his bachelor's Degree, summa cum laude in Chemistry, from Yale University, and his Masters degree from Harvard University. *Id.* He also studied under a Henry

---

[7] The Government cannot dispute that it had knowledge of such corrosive effect, as the Government's Harry Diamond Laboratory has previously issued a report; entitled "The Corrosion Mechanism in the M732 Fuze Power Supply," which outlines the corrosion problems in the PS-115 battery. HDL Report, October 1985, PA 532-547. Without question the Government was aware of the corrosion problems. But, again, the Government refused to share this vital information.

Fellowship, at Cambridge University, England. *Id.* The following is an extract from Dr. Baird's expert report:

> **Opinion # 2**: Inasmuch as the specification required no leakage of methyelene bromide, the specifications for the PS-115 were defective. Leakage was inevitable, because the specification requires copper-beryllium cutter blades to come into contact with the copper housing of the methylene bromide ampule. Over time, the contact results in galvanic corrosion thus facilitating leakage of the methylene bromide.

*Id.* at PA 340. Dr. Baird's expert report contained the following analysis in support of this opinion:

> A. Drawing 11744726 has a section entitled "Non-Operating Requirements. [Ref: 3.3.2.]
>
> B. Subsection 3.3.2.3 of drawing 11744726 states: <u>Leakage</u>. The power supply shall not reveal any evidence of leakage of the methylene bromide or the fluoboric acid prior to normal initiation of the power supply in accordance with 4.4.6.
>
> C. The methylene bromide or the fluoboric acid prior to normal initiation of the power supply in accordance with 4.4.6.
>
> D. Drawing 11721238 is for a cutter blade. The cutter blade is made of copper-beryllium.
>
> E. Drawing 11007047 is the ampule assembly. The drawing requires the copper-beryllium cutter blade to contact the copper lid of the methylene bromide ampule.
>
> F. The contact of copper-beryllium cutter blade with copper lid of the bromide ampule is significant, because it is a general principle of materials science that when dissimilar metals are allowed to come into contact while immersed in an aqueous electrolyte, galvanic corrosion can be expected.
>
> G. I obtained the following components from Axion: copper-beryllium cutter blades, copper ampules for methylene bromide, and fluoboric acid. I conducted experiments with these components. These experiments support a conclusion that when the copper-beryllium cutter blades come into contact with the copper housing of the methylene bromide ampules, the copper-beryllium acts as a cathode and the copper housing of the ampule acts as an anode. As a result of the ensuing electrical current between the cathode and

the anode, copper is leached out of the ampule and deposited onto the cutter blades.

H. The conclusion in "F" is consistent with the corrosion which I observed in numerous PS-115s, which I saw in storage at the Axion plant.

*Id.* Based on Dr. Baird's analysis, the Government's requirement that the cutter blade come into contact with the copper lid will inevitably cause corrosion of the metals and thus facilitates leakage of the metholyene bromide from its ampule. *Id.* Therefore, the Government specifications are defective, in that Axion could not prevent the leakage of metholyene bromide, which was expressly prohibited by the Contract. Drawing 11744726 at ¶ 3.3.2.3, PA 153**.**

Dr. Baird also stated the following in his expert report:

**Opinion # 4**: In as much as the specification prohibited leakage of fluoboric acid, the specification was defective. Over time, the corrosion resulting from the fluoboric acid coming in contact with the copper diaphragm would facilitate leakage of fluoboric acid.

Exhibit 47. In support of this opinion, Dr. Baird prepared the following analysis:

A. Drawing 11744726 has a section entitled "Non-Operating Requirements. [Ref: 3.3.2.]

B. Subsection 3.3.2.3 of drawing 11744726 states:

<u>Leakage</u>. The power supply shall not reveal any evidence of leakage of the methyelene bromide or the fluoboric acid prior to normal initiation of the power supply in accordance with 4.4.6.

D. Drawing 11718307 is for a copper diaphragm of a width of .0030 +/- .0005 inches.

E. I obtained three copper diaphragms and a sample of fluoboric acid from Axion. On Dec. 28, 2004, I immersed these diaphragms in a beaker of fluoboric acid. Except for casual visual observation during the first two weeks following Dec. 28, 2004, these three diaphragms were left undisturbed until Jan. 3, 2006. The typical mass of a diaphragm that has not been immersed in fluoboric acid is 0.5111 g. One of the diaphragms was removed from the beaker, washed in water, dried and weighed. Its mass was 0.1332 g. The loss in mass of this diaphragm due to corrosion was approximately 0.3779 g or 74 % of its initial mass. The metal remaining in the diaphragm

was thin and could barely support its own weight without bending when picked up with a pair of tweezers. The liquid that remained in the beaker had a blue color that is typical of dissolved copper.

F. The blue color of the liquid reported in "D" above was consistent with the blue color of the liquid that I saw weeping from many completed PS-115s at the Axion plant.

*Id.* at 342-343. Thus, in addition to the leakage of methylene bromide, the Government specification also facilitated the leakage of fluoboric acid due to the required copper diaphragm touching the acid. *Id.* As both methylene bromide and fluoboric acid could not be prevented from leaking out of the batteries, the Government specification was defective. Even if the Government had any witness to testify on the subject of corrosion, leakage, or defects in the specification, which it does not, this compelling testimony by a chemist with Dr. Baird's pedigree, who has taught chemistry for over 20 years on the University level, is absolutely compelling. The Government has no evidence that any other contractor used this exact specification and did not experience corrosion problems. In fact, the Government's own documents establish the extensive history of corrosion and leakage with this product (information the Government did not care to share with Axion). *See, e.g.,* Accudyne Report, January 21, 1984: Remedial Research On PS115 Power Supplies, PA 438-449; HDL Report, October 1985: The Corrosion Mechanism In The M732 Fuze, PA 532-547. That the design was defective is simply without dispute.

**B. The Government Admits That The Leakage of Fluoboric Acid, An Electrolyte, Can Cause The Output Voltage Of The Batteries To Decrease Below Desired Levels.**

During his deposition, Dr. Baird explained how fluoboric acid is an electrolyte conductor, which allows for the transfer of electrons between the metals contained in the batteries. Baird

Deposition p. 111 at PA 1221. This is significant, as the Government, in response to a request for admission and interrogatory propounded by Axion, stated the following:

> **Request for Admission No. 45:** An activated PS-115 would be unlikely to produce 23 volts for 150 seconds if a significant portion of the electrolyte had previously leaked from the reservoir.
>
> **Response:** Admits only that leaking electrolyte can degrade the performance of a PS-115. Otherwise, objects that the term "significant portion" is undefined and is too vague, general and broad to permit a response.

RFA # 45 at PA 1262 (emphasis added).

> **Interrogatory No. 8:** Identify each and every way that leaking electrolyte can degrade the performance of a PS-115. [Reference: Response to Request for admission No. 45].
>
> **Answer:** The performance of PS-115s is measured in voltage activation time (paragraph 3.3.1.2 of drawing 11744726), discharge life (3.3.1.3), voltage fluctuations (3.3.1.4), peak voltage (3.3.1.5), and the level of electrical noise in two specific frequency ranges (3.3.1.6). If electrolyte leaks through the diaphragm into the cell stack area prior to intended usage, it will begin the discharge the battery and deplete the energy stored in the electrodes. The longer this goes on prior to the intended activation of the battery, the more capacity will have been lost, which will decrease discharge life. Depending upon how the electrodes are affected, output voltage could decrease below desired levels, and activation time could increase. Also, prolonged exposure of the cell stack to leaking electrolyte could compromise the mechanical bond between the electrodes and the separators at the perimeter of the stack, which could allow electrolyte to escape the cell stack prior to and/or during intended usage, again resulting in degraded electrical performance due to capacity loss. In the extreme, the battery could be so degraded as to provide no usable output. Of course, if electrolyte is able to reach the exterior of the battery, and that battery is being stored in close proximity to other batteries, cross-contamination of those units would be expected, which may compromise their mechanical integrity. The exposed copper surfaces of the neighboring batteries would be at greatest risk. However, the United States lacks knowledge with regard to each and every way performance would be degraded as the degree of degradation would be battery specific depending on the amount of leaking on the particular battery.

Interrogatory # 8 at PA 1280-1281 (emphasis added). Thus, the Government expressly admits that the leakage of fluoboirc acid, an electrolyte conductor essential to the battery's performance,

can cause a decrease in the output voltage of the battery "below desired levels." Thus, that the corrosion and leakage negatively affected the PS-115s is without dispute.

### C. The Government's FAT Process Looked Solely At Voltage And Activation Time And Entirely Failed To Evaluate The Effect Of Leakage Caused By The Government's Defective Specification.

In his deposition, Hahin confirmed that the Government was aware of Axion's problem with leaking acid before the second FAT, and that such problem played a role in requiring the second FAT:

> Q: Okay. So it is a fair statement that you were aware of the leakage problem before the decision was made to have a second FAT, is that correct?
> A: Yes, that's correct.

Hahin Depo. p. 108 at PA 1253.

> Q: Is there any connection whatsoever, cause and effect, from the leaking of those – of the acid that was reported to you by Axion in the decision to hold a second FAT?
> A: Yes, that played in my decision to require another second First Article.

Hahin Depo. p. 110 at PA 1255.

Despite the Government's admission that the leakage of fluoboric acid can cause a decrease in battery voltage, and even though such leakage played a part in the decision to require a second FAT, the Government acknowledged in its discovery responses that, in considering the test data from the second FAT, the Government looked solely at whether the batteries performed within the specified standards for voltage and activation time and did not consider whether corrosion or leakage contributed in any way to low voltage results:

> The FAT process set forth in the contract was intended to determine whether Axion's PS-115's, when exposed to specified environmental conditions, performed within specified standards set forth in the contract (Drawing 11744726, Sheet 15). Dimensions, tolerances and <u>chemical compositions of PS-115 were not evaluated</u>.

Interrogatory # 4 at PA 1279 (emphasis added). Thus, even though leakage was a stated reason for requiring the second FAT, the Government admits that it did not consider the effect of the leakage on the batteries, as it did not evaluate the chemical compositions of the batteries prior to or after testing. Without considering the effect of leakage, the Government could not determine whether the batteries, absent the leakage caused by the Government's defective specifications, were capable of being produced in a manner that would meet contractual requirements. The corrosion and leakage were a direct result of the Government's defective design. If the batteries could not produce the necessary voltage, this was a result of the Government's defective design and should not have resulted in a termination for default.

**D. Due To The Government's Defective Specifications And Incomplete Review Of The Tested Batteries, The Government Cannot Meet Its Burden Of Proof With Respect To Justifying The Termination Of The Contract For Default.**

As previously stated, "the government...bear[s] the burden of proof with respect to the issue of whether termination for default was justified…." *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987). The Government simply cannot meet its burden of proof with respect to the termination of Axion's contract.

No expert was identified and no expert report was provided by the Government with respect to its specifications or with respect to Axion's allegations about the defective nature of the specifications. Furthermore, Allan Goldberg, the Government's designated 30(b)(6) representative with respect to the corrosion and leaking issues, indicated in his deposition that neither he nor any of his colleagues were prepared to challenge Dr. Baird's findings:

Q: Have you talked to anybody other than the lawyers?
A: I've talked to other team members within the electrochemistry branch about certain technical issues.
Q: And can you tell me who you spoke to?
A: I spoke with Michael Ding, Dr. Michael Ding, and Dr. Richard Jow and Dr. Cindy Lonergan..

Q: Can you tell me what you talked to Dr. Ding about?
A: I talked to him about the issues of corrosion between beryllium copper and copper, and whether this was likely or not.
Q: And what were his thoughts on this?
A: Neither of us were familiar enough with alloys to say whether this would be possible.
Q: What about Dr. Jow?
A: The same topic. And also Dr. Lonergan. I should add, of course, that I have been speaking with Jeff Swank continuously about the issues.
Q: And what are his thoughts about the copper and copper beryllium?
A: He has absolutely no knowledge of it. He does not have any chemistry background.

Goldberg Depo. pp. 8-9 at 1228-1229. The Government simply has no evidence to counter Dr. Baird's opinions that the specifications were defective. Additionally, the Government admitted in its response to a series of requests for admission to Axion that: (1) the specification in the Axion-Navy Contract required copper-beryllium blades (Supplement Response to RFA # 3 at PA 1273); (2) the copper-beryllium blades required in the Axion-Navy Contract, were required, by the contract specification, to touch other copper parts of the PS-115s (Supplement Response to RFA # 4 at PA 1273); and (3) fluoboric acid when combined with methylene bromide has proven to have a corrosive effect on copper (RFA # 82 at PA 1265). As each of these admissions are in line with Dr. Baird's opinions, and the Government failed to provide any evidence that would refute Dr. Baird's scientific conclusions regarding corrosion and leakage, the Government cannot disprove Dr. Baird's findings.[8] Therefore, no genuine issue of material fact exists with respect to

[8] Allan Goldberg, the Government's 30(b)(6) representative with respect to corrosion and acid leakage, stated in his deposition that he did not have enough information to either agree or disagree with Dr. Baird's findings. Goldberg Depo. pp. 93-94 at PA 1231-1232. Furthermore, while Goldberg challenged Dr. Baird's test procedures by stating that the PS-115 is a closed system and that any testing should have been undertaken without an oxygen source (Goldberg Depo. p. 49 at PA 1230), Dr. Baird's testing concluded that the presence of a mere one-milliliter of oxygen inside the battery, concentrated in one spot, is capable of making a hole in the copper ampule that is 1/16 of an inch in diameter. Baird Depo. pp. 71-72, 194-195 at PA 1219-1220, 1222-1223.

the defects present in the Government's specification for PS-115, and Axion is entitled to summary judgment.

## CONCLUSION

Although the Government had in its possession revised versions of the 1967 Plating Specification that contained substantial improvements to the materials and procedures to be used in producing the plating required to manufacture PS-115, the Government refused to provide these revisions to Axion lied to Axion and told Axion that they did not exist. As there is no genuine issue of material fact with respect to the superior information contained within the revised specification, Axion is entitled to summary judgment under both the *Spearin* doctrine and the superior knowledge doctrine.

The Government also failed to disclose its superior knowledge with respect to the need to manufacture, at great expense, an air gun to test PS-115. The Government told Axion that "the Navy" never provided Accudyne (the previous contractor) an air gun to test its batteries. But, the United States Army did. Once Axion became aware of a need for an air gun, it sought drawings from the Government which would have assisted in manufacturing the air gun. Again, the Government refused to provide any assistance whatsoever to Axion in producing the required air gun, breaching its duty to cooperate and causing delays in production which ultimately led to the Government's termination of the Contract. The Government mislead Axion with its misstatements and omissions, refused to provide documents that it possessed, and generally acted obtuse.

Further, even though the Government was aware that the air gun testing procedures lead to "no-tests," the Government failed to consider the effect of no tests on the data provided by Axion.

Finally, the Government's specification for PS-115 is defective in that the materials required to build the battery and the method in which they interact indisputably leads to corrosion of the copper ampule and leakage of fluoboric acid. Although the Government admitted that such leakage can have a negative effect on battery voltage and that the presence of leakage played a role in the Government's decision to require a second FAT, the Government failed to determine whether leakage led to any of the 25 failures upon which the Government based its termination of the Contract for default. Accordingly, the Government unjustifiably terminated the Contract for Default, and Axion is entitled to summary judgment.

WHEREFORE, PREMISES CONSIDERED, Axion moves this Court to enter summary judgment in its favor, converting the TERMINATION FOR DEFAULT to a TERMINATION FOR CONVENIENCE, and ordering that Axion is entitled to the fair compensation, after liquidation of partial payments, of $3,747,298.00.

Dated this the 1st day of September, 2006.

**ATTORNEY OF RECORD:**

**/s/Richard J.R. Raleigh Jr.**
**RICHARD J.R. RALEIGH JR.**
**WILMER & LEE, P.A.**
100 Washington Street, Suite 200
Huntsville, Alabama 35801
(256) 533-0202 Telephone
(256) 533-0302 Facsimile
rraleigh@wilmerlee.com

**OF COUNSEL:**
**JEROME S. GABIG, JR.**
4811 Cove Creek Drive
Brownsboro, AL 35741
(256) 509-0279 Telephone
(256) 512-0020 Facsimile
gabig3@comcast.net

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been furnished this 1st day of September, 2006, by **Electronic Mail** and **Next Business Day Delivery** prepaid and properly addressed to:

DOUGLAS K. MICKLE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530

Richard Martinelli
Office of Counsel
Naval Inventory Control Point
Mechanicsburg, PA 17055-0788

**/s/Richard J.R. Raleigh Jr.**
**Counsel For Plaintiff**