**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **AXION CORPORATION,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 03-2644C & 04-297C** **(Judge Firestone)** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(h) of the Rules of the United States Court of Federal Claims, Axion Corporation ("Axion") respectfully submits the following proposed findings of uncontroverted fact:

## I. Solicitation And Award Of Contract N00106-96-C-KA09

1. Axion Corporation ("Axion") is a small, minority owned company that has been in business for over twenty years. Declaration of Alex Latifi ("Latifi Decl.") ¶ 1 at Plaintiff's Appendix ("PA") 548; Deposition of Alex Latifi ("Latifi Depo.") p. 15 at PA 1183.

2. Alex Latifi ("Latifi" or "Alex Latifi") is the President, Chief Executive Officer, and majority shareholder of Axion. Latifi Decl. ¶ 1 at PA 548; Latifi Depo. p. 13 at PA 1181.

3. Axion's core business is winning and performing relatively small, build-to-print (i.e., Level III) Federal government production contracts. Latifi Decl. ¶ 1 at PA 548.

4. Axion has been awarded over 200 government contracts since the company was incorporated. Latifi Decl. ¶ 1 at PA 548; Latifi Depo. p. 14 at PA 1182.

5. In almost every instance, the government contracts Axion has been awarded have been firm-fixed price. Latifi Decl. ¶ 1 at PA 548.

6. Axion has never been awarded a research and development contract, and research and development is not a core competency of Axion. Latifi Decl. ¶ 1 at PA 548.

7. In 1995, the United States Department of the Navy ("Navy") issued a solicitation for a fixed-price production contract to acquire 55,209 PS-115 power supplies. Complaint No. 03-2644 ("Complaint I"); Contract N00106-96-C-KA09 ("Contract") pp. 1-3, PA 1-3.

8. The PS-115 power supply is a dormant battery to be placed in a munition that is fired from a large bore weapon. Complaint I ¶ 6; Answer ¶ 6 (admitting).

9. A PS-115 power supply becomes active when a projectile containing the PS-115 is fired from a large bore weapon. Complaint I ¶ 7; Answer ¶ 7 (admitting central allegations).

10. The acceleration produces as much as 25,000 Gs of force. *Id.*

11. The force causes a cutter within the PS-115 to penetrate and cut a diaphragm. *Id.*

12. An acid passes through the penetrated diaphragm and permeates the cells. *Id.*

13. The resulting electrical charge causes the fuse to detonate the explosive. *Id.*

14. The solicitation for the Contract contained detailed drawings on how to produce the PS-115s. Contract Drawings, generally, PA 21-34, 148-218; Complaint I ¶ 11, 58.

15. The solicitation also contained an option quantity for an additional 55,209 units. Contract p. 2 at PA 2; Complaint I ¶ 9; Answer ¶ 9.

16. Axion submitted a proposal and was awarded the Contract by the Navy on December 14, 1995. Contract p. 1 at PA 1; Complaint I ¶¶ 18, 21; Answer ¶¶ 18, 21.

17. The Contract required Axion to produce 55,209 PS-115 power supplies/batteries at a price of $23.80 per unit, for a total cost of $1,313,974.20. Complaint I ¶¶ 18, 21; Answer ¶¶ 18, 21; Latifi Depo. p. 28-29 at PA 1184-1185; Declaration of John Korab ¶ 3, PA 420.

## II. <u>Axion's Development Of An Air Gun For Testing</u>

18. Initially, the United States Department of the Army ("Army") had acquired PS-115s for the Navy. Complaint I ¶ 10; Answer ¶ 10.

19. Before awarding the Contract to Axion, Defendant United States ("United States" or "Government") had acquired PS-115s from Accudyne Corporation. Contract, Abstract History, PA 20 (listing Accudyne Corp. as having been awarded PS-115 contracts in June 1992 and August 1993); Deposition of Jerry Hahin ("Hahin Depo.") p. 15-16 at PA 1235-1236. See also, generally, PA 429-435 (Accudyne test data and Accudyne list of Government owned property to be used); PA 438 (Accudyne report, January 21, 1984).

20. Union Carbide was also a prior contractor working with the Government on PS-115s. PA 450 (Union Carbide technical report), PA 543-544 (under the discussion of "Mechanism of Corrosion," the Government scientists report at PA544, "[t]he presence of methane ($CH_4$) found in ampules from both battery manufacturers (UCR at NSWC-WO and ACC at NWSC-Crane) is explained by the succeeding step of equation (7) . . .").

21. The Contract between the Government and Axion required a first article test before Axion could proceed to production. Complaint I ¶ 15.

22. The Contract also stated "the contractor shall provide all AIE (except for any equipment listed as available in Appendix VI) necessary to assure conformance of

components and end items to contract requirements." Contract, Acceptance Inspection Equipment Requirements, p. 97, 1.b., PA 114; Complaint I ¶ 16; Answer ¶ 16.

23. The Contract did not specifically mention an "air gun" for testing. Complaint ¶ 16; Answer ¶ 16.

24. The Contract did not contain any specification for an air gun. Complaint No. 04-297C ("Complaint II") ¶ 63; Latifi Decl. ¶ 3 at PA 549; Latifi Depo. p. 54-55 at PA 1186-1187.

25. What the Contract did specify with regard to testing was the Navy's reservation of the right to perform the test in the most realistic environment, i.e., inserting PS-115's into actual projectiles and then firing the projectiles from large bore weapons. Drawing 11744726, paragraph 4.4.6.2.2, PA 160 ("The Government may at its discretion perform the following field tests. One hundred and eighty power supplies may be fired from the designated artillery pieces specified below. Power supply information may be telemetered."); Latifi Decl. ¶ 3 at PA 549; Latifi Depo. pp. 54-55 at PA 1186-1187.

26. The Contract solicitation identified the two previous contracts for PS-115s that had been awarded by the Government to the Accudyne Corporation. Contract, Abstract History, PA 20 (listing Accudyne Corp., in Janesville, Wisconsin, as having been awarded PS-115 contracts in June 1992 and August 1993); Hahin Depo. pp. 15-16 at PA 1235-1236.

27. Latifi traveled to Wisconsin to meet and discuss potential employment with an individual who had been employed by Accudyne to produce PS-115s. Latifi Depo. p. 58 at PA 1189.

28. The former Accudyne employee with whom Latifi met informed Latifi that under the previous PS-115 contracts the Government had provided Accudyne with an air gun to perform the testing of the PS-115s. *Id.*; Latifi Decl. ¶ 20 at PA 556.

29. In a letter dated January 17, 1996, Axion requested the Government provide Axion with an air gun. Complaint I ¶ 26; Latifi Depo. pp. 54-55 at PA 1186-1187; Axion Letter to Contracting Officer dated January 17, 1996, PA 220.

30. The Government, however, declined to provide Axion with an air gun. Complaint I ¶ 27; Latifi Depo. pp. 54-55 at PA 2286-1187; Latifi Decl. ¶ 21 at PA 556-557.

31. The Contracting Officer on Axion's PS-115 Contract was an employee of the United States Department of the Navy, John Korab. Letter from John Korab, Contracting Officer, 26 January 1996, PA 221.

32. The Contracting Officer's rationale for declining to provide Axion with an air gun was that "[t]he Navy did not supply any air guns to the previous contractor, Accudyne Corporation, for test purposes." Letter from Contracting Officer to Axion dated January 26, 1996, PA 221.

33. The Government did provide an air gun to Accudyne. See Listing of Government-Owned Property To Be Used For Performance of Accudyne dated 01 Aug 91, PA 435 (listing as equipment of the Government to be used on the PS-115 contract, by the prior contractor, Accudyne, one "Spin-A-Gun"); Latifi Decl. ¶ 20, PA 556; Latifi Depo. pp. 64-65 at PA 1191-1192 (Korab stated, "the Army did that. And your contract is with the Navy, not the Army."). Compared to Defendant's Responses to Plaintiff's Requests for Admission ("RFA") Nos. 86-88, PA 1266-1268 (stating that Defendant

United States "lacks sufficient knowledge to respond," that "the contracting officer associated with Accudyne has passed away," and that the United States "[a]dmits only that Accudyne possessed some Government-owned equipment" but "[o]therwise, the United States lacks sufficient knowledge to respond").

34. The United States, through the Department of the Army, supplied an air gun to Accudyne. *Id.* See also Complaint I ¶ 25; Answer ¶ 25.

35. The Department of the Army worked with the Department of the Navy on earlier PS-115 contract issues, including at least one pre-award survey and a meeting with a prospective contractor. 22 Jul 93 Memorandum From Andrew J. Sabonis, Jr. Thru Allan Goldberg To Robert Hamlen, PA 272 (explaining, in this document produced by Defendant United States in this case, how Sabonis was "invited by Brian Gage to assist Navy in evaluating this potential contractor").

36. Brian Gage was an employee of the Navy involved in PS-115 manufacturing contracting in 1993. 22 Jul 93 Sabonis Memorandum, PA 272.

37. Andrew J. Sabonis, Jr. was an employee of the Army involved in PS-115 manufacturing contracting in 1993. 22 Jul 93 Sabonis Memorandum, PA 272.

38. Jerry Hahin is an engineer and was one of the Navy employees who was working with Axion on the PS-115 Contract. See generally, Hahin Depo. at PA 1233-1260; Hahin Decl. ¶ 2, PA 414.

39. Jerry Hahin met with Brian Gage, the Navy employee that had worked with the Army employee, Andrew Sabonis; and, Jerry Hahin made a visit to Accudyne who had also produced the battery. Hahin Depo., p. 15, PA 1235 ("I basically just reviewed the

drawing package and talked with Brian about that particular battery, the type of testing that was involved, and I made a visit to Accudyne who also produced that battery.").

40. Brian Gage, the Navy employee that worked with Sabonis in 1993, also called Alex Latifi at Axion in April 1997 and talked to him about Axion's PS-115 manufacturing efforts. Letter from Axion to John Korab, Navy Contracting Officer, April 15, 1997, PA 225 ("On 10 April, 1997, I talked to Brian Gage (he called me) about the RFW's and letters that we have submitted, and as of yet have not been answered. Brian indicated that Craig and he have some concern with the RFW # W-KA-09-02, solder ring dimension change.").

41. By July 1993, both the Army and the Navy were aware of problems with finding suppliers of materials for PS-115 power supply manufacturing efforts. 22 Jul 93 Memorandum, supra, at PA 272-273 (wherein Sabonis notes that there were no suppliers for plated electrode stock, and comments he made regarding same during this joint Army and Navy meeting); Navy Small Business Set Aside Form, Addendum, January 1993 (Navy employee stating, "Accudyne has the only plater in operation to provide plated stock which is a critical process in the manufacture").

42. The Contracting Officer, John Korab ("Korab"), knew that the Army had provided an air gun to Accudyne. Latifi Depo. pp. 64-65 at PA 1191-1192 (Korab stated, "the Army did that. And your contract is with the Navy, not the Army.").

43. The Government's air gun had been designed by the Army Research Laboratory ("ARL"). Deposition of John Korab ("Korab Depo."), pp. 21-22, PA 1125-1126; Latifi Depo. p. 59, PA 1190.

44. In 1993, when Andrew J. Sabonis, Jr. was working with the Navy, interviewing possible contractors for PS-115 production contracts, Sabonis was an employee of the Department of the Army at the Army Research Laboratory ("ARL"). PA 272-274.

45. In his deposition in this case, Jerry Hahin, testified that, instead of attempting to build an air gun, Axion could have purchased an air gun from ARL or Accudyne. Hahin Depo. p. 47, PA 1238.

46. ARL had originally agreed to sell Axion the drawing for the air gun. Complaint I ¶ 31; Latifi Decl. ¶ 21 at PA 556-557; Letter from Mel Morganstein at ARL to Alex Latifi at Axion, April 3, 1997, PA 234.

47. Axion sent a check to ARL to pay for an air gun drawing. Complaint I ¶ 31; Letter from Axion to Contracting Officer dated April 15, 1997, PA 225; Latifi Decl. ¶ 21 at PA 556-557; ARL Letter to Axion, April 3, 1997, PA 234.

48. After receiving the check, claiming "legal reasons," ARL refused to sell the drawings to Axion. Complaint I ¶ 31; Notes from ARL dated March 21, 1997, PA 235 ("Told him: (1) Can't just sell him dwgs; legal reasons."); Latifi Depo. pp. 64-69 at PA 1191-1196; ARL Letter to Axion, April 3, 1997, PA 234.

49. Axion unsuccessfully tried to obtain an air gun as government furnished equipment. Korab Depo. p. 21, lines 4-7, PA 1225.

50. By as early as May 30, 1997, the Government was aware that Axion would be attempting to design and build a spin gun for testing. Memorandum to Alen Artz, 5/30/97, PA 227.

51. The Government was aware, on May 30, 1997, that Axion contended that the Government, through its agency, the Harry Diamond Laboratories, refused to provide air gun drawings. *Id.*

52. The Navy had referred Axion, in Contract documents, to USA Harry Diamond Laboratories. Contract, Drawing 11744726, Subsection 2.1.2, PA 149.

53. The Government, USA Harry Diamond Laboratories, refused to provide Axion access to its air gun and refused to provide Axion drawings for an air gun. Complaint I ¶ 31; Notes from ARL dated March 21, 1997, PA 235; Latifi Depo. pp. 64-69 at PA 1191-1196; ARL Letter to Axion, April 3, 1997, PA 234.

54. After the Contract was terminated for default, Axion learned that the drawings for the air gun, published by USA Harry Diamond Labs (sometimes "HDL"), Adelphi, Maryland, could be purchased for a nominal fee from the U.S. Department of Commerce National Technical Information Service ("NTIS"). Latifi Decl. ¶ 21 at PA 556-557 and Exhibit F thereto; The High Speed Tabletop Artillery Simulator report, PA 236-270.

55. The High Speed Tabletop Artillery Simulator was developed before September 1979; and, a full report on the project and the simulator that was developed was issued by Harry Diamond Laboratories on September 1979. Simulator Report at PA 238.

56. The simulator developed by the Government at Harry Diamond Laboratories, before September 1979, fulfilled "the requirements for a procedure to test the PS115 power supply for the M732 fuze." Simulator Report at PA 242.

57. The Government did not provide Axion with the simulator report that it had at its Harry Diamond Laboratories. Latifi Decl. ¶ 21, PA 556-557; Complaint I ¶ 31; Notes

from ARL dated March 21, 1997, PA 235; Latifi Depo. pp. 64-69 at PA 1191-1196; ARL Letter to Axion, April 3, 1997, PA 234.

58. Hahin, the Navy's Lead Project Engineer, testified that having the gun drawings from HDL would have been very helpful to Axion in avoiding the problems it encountered. Hahin Depo. pp. 55-56 at PA 1239-1240.

59. After the Government refused to provide the air gun drawings, Axion undertook to develop an air gun on its own. Latifi Decl. ¶ 21 at PA 556-557.

60. When Axion began developing the air gun, it did not know that it had begun a significant research and development effort. Latifi Depo. pp. 102, 110-111 at PA 1197, PA 1997a, and PA 1197b.

61. Korab, the Contracting Officer for the Contract, acknowledged that he was aware that Axion struggled to develop an air gun and that Axion did so without the assistance of the Government. Korab Depo. p. 21 at PA 1225.

62. Latifi and Axion spent a great deal of money attempting to develop an air gun to test the PS-115 batteries. Latifi Decl. ¶ 23, PA 558-559; Latifi Decl. ¶ 24, PA 558 ("$1,545,934 involving the air gun"); Complaint II, Count I.

63. Axion's President, Alex Latifi, took several pictures of the air gun he developed, which are attached to his Declaration. Latifi Decl. ¶ 22, PA 557; Exhibit G to Latifi Decl., PA 1176-1179.

64. What is referred to with regard to this Contract, by Axion and the Government, as an "air gun" or "gun" is actually a long tube in which a vacuum is created through the use of an air pump. One end of the tube is open, and at the other end of the tube is a motorized cylinder used to spin the battery being tested. The "bird," a piece of plastic in

which the battery is encapsulated for testing, is placed in the open end of the tube, and the tube is then closed and the vacuum turned on. Once a sufficient vacuum is built up in the tube, the tube is again opened, with the vacuum shooting the bird into the spinning cylinder to create the effect of being shot out of a large bore weapon. A computer then recorded the required test data. Latifi Decl. ¶ 22, PA 557; Exhibit G to Latifi Decl., PA 1176-1179.

## III. <u>Axion's Reliance On The Defective 1967 Plating Specification</u>

65. Specification Control Drawing 19202-10974349, which describes the plating required for production of PS-115, was expressly incorporated into the Scope of Work of the Contract. Contract, PA 22.

66. The Contract, in the Technical Data Package Lists, also identified and incorporated Specification OD18332 - Procedures for Preparing Lead : Lead Dioxide Reserve Energizer Electrode Stock By Electrodeposition. Contract, PA 23.

67. Specification Control Drawing 19202-10974349 suggested two sources of supply for the required plating: Accudyne Corporation and Union Carbide Corporation. Specification Control Drawing 19202-10974349, Sheet 2 at PA 218 ("3. Suggested Source(s) of Supply: Accudyne Corporation Janesville, Wisconsin . . . Union Carbide Corporation Bennington, VT . . ."); Defendant's Response to RFA No. 157, PA 1270.

68. Neither Accudyne Corporation nor Union Carbide Corporation were suppliers of plating at the time the Contract was entered into. Latifi Decl. ¶ 4 at PA 549-550.

69. The Government was aware in 1993, three years prior to soliciting the Contract, that neither Accudyne Corporation nor Union Carbide Corporation would be able to supply the required plating. Andrew Sabonis 1993 Trip Report, PA 272-274.

70. Axion was able to obtain a small quantity of lead and lead dioxide plated nickel from a German Vendor to produce Axion's initial PS-115 units. Latifi Decl. ¶ 4 at PA 549-550; Latifi Depo. pp. 174-75 at PA 1201-1202.

71. However, the German vendor that Axion identified on its own was unable to provide Axion with enough plating to satisfy the requirements of the Contract. *Id.*

72. With no other sources of plating available, Axion was required to produce the lead and lead dioxide plated nickel using the information provided by the Government. Latifi Decl. ¶ 4 at PA 549-550.

73. Prior to solicitation of the Contract, the Government was aware that a small business (such as Axion) would be unable to feasibly manufacture the plating due to the significant costs associated with the plating equipment. Navy Small Business Set Aside Form, NAVSO Form 4380, dated "1/8/93", PA 278-279.

74. As of January 1993, the Navy believed that the only plater in operation to provide plated stock which is a critical process in the manufacture of PS-115s was Accudyne; and, therefore the Navy doubted that any other firm could make the PS-115s at fair market price or would have the technical ability to manufacture the PS-115s at all. Navy Small Business Set Aside Form, Addendum, PA 279.

75. The Government knew that Accudyne would not supply plating stock to any potential PS-115 manufacturer. Andrew Sabonis 1993 Trip Report, PA 272 ("Accudyne . . . has always maintained that they were a supplier of power supplies and not a supplier of any power supply components and or materials such as electroded plated stock.").

76. Since the Government knew, in 1993, that Accudyne was <u>not</u> a supplier for any power supply components or materials, the Government's conduct in listing Accudyne as

one of two "[s]uggested sources of supply," in the Contract, was misleading. Andrew Sabonis 1993 Trip Report, dated 22 Jul 93; Specification Control Drawing 19202-10974349, Sheet 2, PA 218.

77. As of January 1993, the Navy valued the special plating line that Accudyne used for PS-115 plating stock plating at approximately $3 million. *Id*.

78. The Government was aware that the cost of building a plating line would range from $1.5 million dollars to $2.5 million dollars. Honeywell Proposal For Plating Machine, PA 390-409, 409 ("Total Budgetary Estimate $1,646,849"); Memorandum For Commander HDL, 23 SEP 1991, PA 410-413, 412 ("The cost to buy a new plater . . . is estimated to be $1.5 to $2.5M.").

79. The specification for the Contract incorporated by reference "OD 18332 PROCEDURES FOR PREPARING LEAD: LEAD DIOXIDE RESERVE ENERGIZER ELECTRODE STOCK BY ELECTRODEPOSITION" (the "Plating Specification"). Contract, PA 23.

80. The Contract provided that the Plating Specification was to be used in preparing the electrode stock plating. *Id.*

81. The 1967 version of the Plating Specification (sometimes referred to hereinafter as "1967 Specification") was included in the Technical Data Package accompanying the Contract, and incorporated into the Contract. Latifi Decl. ¶ 5 at PA 550-551; Contract, PA 23; 1967 Specification, PA 560-713; Axion Letter to Contracting Officer dated May 22, 1996 ("May 22 Letter"), PA 223; Memorandum from Contracting Officer to Axion dated June 5, 2006, PA 224.

82. The 1967 Plating Specification indicates that its purpose "is to describe known satisfactory procedures and equipment for the preparation, manufacture and quality control of reserve energizer lead: lead dioxide electrode stock in a continuous strip and batch sheet plating operation." Latifi Decl. Exhibit A, PA 561.

83. In a letter dated April 22, 1996, Axion requested that the Government provide it a 1980 revised version of the Plating Specification. Axion Letter to Contracting Officer dated April 22, 1996, PA 222.

84. In a letter dated May 22, 1996, Axion again requested that the Government provide a 1980 revised version of the Plating Specification, as this revised version was supposed to specify "the amperage requirement and time requirement of the plating process necessary to achieve optimum plating for lead nitrate and lead acetate." May 22, 1996 Letter from Axion to Contracting Officer, PA 223.

85. In response to Axion's May 22, 1996 letter, the Navy Contracting Officer, John Korab, sent an "Information And/Or Action Memorandum" to Axion indicating the following:

> ACCORDING TO THE NAVY'S RECORDS, THE "BASIC" REVISION, DATED 2 FEBRUARY 1967, IS THE LATEST REVISION OF NAVORD OD 18332. THE NAVY IS NOT AWARE OF ANY OTHER REVISION.

Memorandum from Contracting Officer to Axion dated June 5, 2006, PA 224.

86. The 1967 Plating Specification was revised in 1973. Latifi Decl., Exhibit C, 1973 Specification, PA 718.

87. The 1973 version of the Plating Specification (sometimes referred to hereinafter as "1973 Specification") contained several significant alterations to the plating process, including a change in the chemicals used, a change in the frequency at which the solution

"baths" were to be analyzed, a change in the pH/Specific Gravity requirements, and a change in the minimum temperature at which at least one of the solution tanks was to be heated. Latifi Decl. ¶¶ 8-10, PA 551-553; Latifi Decl., Exhibit C, PA 718-903.

88. One of the differences between the 1973 and 1967 Specifications is a revised bill of materials, which provides for the use of entirely different chemicals to produce the plating. *Id.*

89. In the 1973 Specification, pages 15 through 18, which contain the bill of materials, have all been revised (and thus crossed out). Significant changes were made in the materials used, including the addition of items numbers 36 through 43 on page 18. *Id*.

90. Between 1967 and 1973, the Government realized it should use different chemicals and materials in plating. *Id*.

91. Another difference in the 1973 and 1967 Specifications is the "Plating Solutions" portion of the specifications, found on pages 21 through 34, which describes the methods used in making the solution "baths" which are an important part of plating the nickel with lead and lead dioxide. Latifi Decl. ¶ 9, PA 552; 1973 Specification, PA 755-782 (where many entire pages from the 1967 Specification are struck out entirely and replaced in the 1973 Specification with other entirely different requirements).

92. The strips of metal to be electroplated – in this case nickel – pass through "baths" of chemicals where they receive electrical charges that result in lead and lead dioxide adhering to the nickel. Id. See also Photographs, Exhibit B to Latifi Decl., PA 714-717 (in particular, see band of metal being passed through chemical bath, PA 717).

93. There are glaring differences in the methods outlined in the 1967 and 1973 versions of the Plating Specification. For instance, in paragraph 3.1.1 on page 21, under the "Maintenance" subheading, the 1967 Specification provides in step 1 for analyzation of the alkaline cleaner solution "at least twice a week." However, the 1973 Specification provides for analyzation after "each 16 hours of operation or more frequently." Latifi Decl. ¶ 9, PA 552.

94. By relying on the 1967 Specification given to it by the Government, Axion was not analyzing the solutions at the appropriate frequency. *Id*.

95. Additionally, in paragraph 3.1.2 on page 21 of the 1967 Specification, pursuant to step 2 of the subheading "Make-up," Axion was told by the Government to heat the alkaline cleaner tank to 180 degrees Fahrenheit. However, in the same paragraph of the 1973 specification (which the Government refused to give Axion), the Government provided instructions to heat the tank to 180 degrees Fahrenheit *minimum*. Latifi Decl. ¶ 10, PA 552-553; 1973 Specification, PA 755-756.

96. The difference in temperature from the 1967 to the 1973 version of the Plating Specification for the alkaline clear tank is a very important difference, as Axion was under the impression that 180 degrees was the maximum temperature, when in actuality Axion needed to be using a much higher temperature to get the lead to plate on the nickel. Latifi Decl. ¶ 10, PA 552-553; 1973 Specification, PA 755-756.

97. Further, the specification was changed from 1967 to 1973 with regard to the provisions for Specific Gravity requirements for plating. In the 1967 Specification, pH 2 to 4 was stated as a requirement. Page 66 of the 1967 Specification. In the 1973 Specification, pH 1 to 4 was stated as a requirement. Page 66 of the 1973 Specification.

Also, the temperatures specified for the chemical bath were different. In paragraph 31 on page 67 of the 1967 Specification, 80 degrees Fahrenheit was called for; whereas 95-105 degrees Fahrenheit was called for in paragraph 31 on page 67 of the 1973 Specification. Latifi Decl. ¶ 10, PA 552-553; 1973 Specification, PA 832-835.

98. There are differences found when comparing the 1980 version of the Plating Specification (which the contracting officer, Mr. Korab, represented to Axion as being non-existent) to the 1967 version. Latifi Decl. ¶¶ 11-17, PA 553-555; 1967 Specification, PA 560-713; 1980 Specification, PA 904-1105.

99. On page 41 of the 1980 version of the Plating Specification (sometimes hereinafter referred to as "1980 Specification"), at paragraph 4.2, there are 9 different solutions listed for use in plating the nickel, including a Degreasing (Perchlorethylene) solution and a Nickel Anodization (4% Nitric Acid) solution. However, when looking at the comparable provision in the 1967 Specification (the crossed out page 37 contained in the 1973 Specification), there are only 7 solutions listed, with the two solutions mentioned above being absent. Thus, in accordance with the 1967 Specification (the only specification Axion had at the time), Axion originally built a plating line that contained two less solution baths than the Government recommended in 1980 to produce satisfactory plating. Latifi Decl. ¶ 12, PA 553-554; 1967 Specification, PA 600; 1980 Specification, PA 953 (with the additional two solutions highlighted).

100. On pages 36 and 37 of the 1980 Specification, detailed instructions are provided as to the correct methods of testing the various solutions to determine if they have been correctly mixed. These procedures are completely absent from the 1967

Specification (they were added as pages 34a, 34b, and 34c in the 1973 Specification). Latifi Decl. ¶ 13, PA 554; 1967 Specification, PA 597; 1980 Specification, PA 948-949.

101. On pages 64 through 69 of the 1980 Specification, instructions are provided as to the appropriate manner of controlling the different plating baths required by the specification. These instructions detail exactly the appropriate temperatures at which to maintain the baths, and also indicate how to appropriately start up and shut down the baths each day. None of these instructions are found in either the 1967 or the 1973 Specifications. Latifi Decl. ¶ 14, PA 554; 1967 Specification, PA 560-713; 1973 Specification, PA 718-903; 1980 Specification, PA 976-981.

102. The test equipment outlined in paragraph 6.2.3 of the 1980 Specification, at pages 72-73, is entirely different from that set out in the same paragraph of the 1967 Specification (crossed out page 57 of the 1973 Specification). Latifi Decl. ¶ 15, PA 554; 1967 Specification, PA 620; 1980 Specification, PA 984-985.

103. One of the most important differences in the 1980 Specification, which the Navy refused to provide to Axion, and the 1967 Specification, which Axion was provided as part of the Contract and required to work from, is found in paragraph 7.4.2.1, page 93, of the 1980 Specification. This paragraph outlines the typical single cell voltages that should be obtained when testing the plating. The voltages provided are entirely different from those found in the 1967 Specification at the same paragraph (page 74 of the 1973 Specification). Furthermore, the indicated "Pb(Ac) life" is indicated as 75 seconds in the 1967 Specification, while the 1980 Specification has the life at only 30 seconds. Again, Axion was relying on a specification which indicated it should be getting more than

double the life out of one the cells than the 1980 Specification required. Latifi Decl. ¶ 16, PA 554-555; 1967 Specification, PA 637; 1980 Specification, PA 1005.

104. The pictures, drawings, and graphs contained in the 1980 Specification at pages 100 through 193, are far more accurate, detailed, and informative than that in the 1967 Specification. Latifi Decl. ¶ 17, PA 555; 1967 Specification, PA 643-713; 1980 Specification, PA 1012-1105.

105. The Government had other information that would have been invaluable to Axion in attempting to build a plating line. In May of 1975, the Army's Harry Diamond Laboratories formulated a report entitled "Strip Plater For Lead/Lead Dioxide Electrode Stock," which contained instructions for lead plating that, in many instances, are more detailed and informative than the Plating Specification incorporated into the Contract. Exhibit E to Latifi Decl., PA 1106-1175.

106. The Strip Plater Report from Harry Diamond Laboratories contained a machine components subsection on pages 7 through 8 that provides a great deal of information concerning the specific parts required to build the plating machine, including such details as the tank sizes and dimensions. Exhibit E to Latifi Decl., PA 1114-1115.

107. The Contract incorporated by reference NAVORD OD18332, which is entitled PROCEDURES FOR PREPARING LEAD: LEAD DIOXIDE RESERVE ENERGIZER ELECTRODE STOCK BY ELECTRODEPOSITION. Contract, PA 23; Plating Specification, Exhibit A to Latifi Decl., PA 560-713; Latifi Decl. ¶ 5, PA 550-551.

108. "Electrodeposition" is simply depositing, using chemicals and electrical current as a catalyst, one material on another – in this case lead and lead dioxide on nickel. Latifi Decl. ¶ 5, PA 550-551.

109. Axion built a plating line and developed a plating process for use in creating the lead and lead dioxide plated reserve energizer electrode stock by eletrodeposition; attached to his Declaration, Alex Latifi, President of Axion, has photographs of the plating manufacturing line he created. Latifi Decl. ¶ 5, PA 550-551; Exhibit B to Latifi Decl., PA 714-717.

110. The 1973 Plating Specification was revised in 1980. Latifi Decl. Exhibit D, PA 904-1105.

111. Once again, the plating specification and process was significantly changed, with the addition of two solution "baths" to the plating line, changes to test equipment, a revision of the typical battery cell voltage and life, and the incorporation of more detailed pictures, drawings, and graphs. Latifi Decl. ¶¶ 11-17, PA 553-555.

112. Without the revised specifications, Axion was forced to rely on the outdated 1967 Plating Specification to produce the required plating. Latifi Decl. ¶ 17, PA 555.

113. Upon undertaking to manufacture the plating pursuant to the Plating Specification, Axion encountered problems producing plating that would satisfy the specified requirements, and notified the Government of such problems. Axion Letter to Contracting Officer dated November 13, 2000, PA 230-231.

114. Although Axion followed the Plating Specification provided by the Government, Axion was unable to produce lead plating that would meet the requirements of the Contract. Latifi Decl. ¶ 5, PA 550-551; Latifi Depo. pp. 140-41 at PA 1199-1200.

115. The Government was aware, in 2000, that Axion was having significant difficulties with plating that Axion was contending related to the inaccurate and incomplete information contained in the 1967 version of OD18332. Letter from Alex Latifi at Axion to John Korab, Navy Contracting Officer, dated November 13, 2000, PA 230.

116. Axion told the Government, in 2000, that Axion's chemist and a factory chemical representative concluded that the 1967 version of OD18332 was not correct with regard to amounts of elements in the solution. *Id.*

117. Axion was required to spend a year or more attempting to remedy the defects in the Plating Specification. Latifi Decl. ¶ 18, PA 555.

118. Before Axion began developing and building its plating line, the Government was aware that it would likely cost $1.5 million or more to do so. Richard W. Janik Memorandum To HDL, dated 23 SEP 1991, at PA 530 ("The cost to buy a new plater that is equivalent to the EBC plater in the quantity of stock produced and superior in the quality of stock produced is estimated to be $1.5 to $2.5M.").

119. Latifi and Axion spent $1,416,305 manufacturing a plating line in accordance with the defective Plating Specification. Latifi Decl. ¶ 24, PA 558.

**IV. <u>The Role Of "No-Tests" In The Termination Of The Contract</u>**

120. Without any guidance or assistance from the Government, Axion developed an air gun to test the batteries. Latifi Depo. p. 57 at PA 1188.

121. In order to test the batteries, a single battery was loaded into the air gun, fired, and then spun for a specified time. Deposition of Henry Stickrod ("Stickrod Depo.") p. 37 at PA 1205. See also Photographic Exhibits to Latifi Decl., Exhibit G, PA 1176-1179.

122. A computer was used to record the voltage of the batteries, and this information was downloaded onto an external computer to be forwarded to the Naval Inventory Control Point for review. *Id.*

123. Where the computer did not record the requisite voltage over time, often the unsuccessful test was the result of a malfunctioning air gun. *Id.*

124. Unsuccessful tests that are attributable to a malfunctioning air gun are called "no-tests." *Id.* at 84.

125. Both Accudyne and Eveready frequently experienced "no-tests" due to equipment malfunctions when they were in the business of manufacturing PS-115. Swank Memorandum Regarding PS-115 Testing, PA 280 ("Accudyne has no-tests because of equipment malfunction, and so did Eveready when they were in business."); PS115B Spin Test Data Sheets, PA 430-433 (stating in various places, with regard to various batteries tested "no test"); Lot Summary, PS115B Power Supply, Test Dates April 30 1998 - May 5 1998, from Alliant Techsystems, Janesville Operations, PA 434.

126. The significance of a no-test was that the tested PS-115 was not regarded as a failure; instead a new PS-115 was substituted for the PS-115 that was deemed to be a no-test. Hahin Depo. p. 135-36 at PA 1258-1259; Lot Summary, PA 434; Spin Test Data Sheets, PA 430-433.

127. The Army Research Laboratory previously compiled a report summarizing data from over 3000 PS-115s tested by Accudyne, and determined that "no-tests" can occur from problems such as bad-hits, insufficient gun tube vacuum, or bearing wear. ARL Report dated February, 2001, PA 281-327.

128. Accudyne had a number of no-tests that Accudyne attributed cracks, operator errors, bad hits, no vaccum, and causes unknown, and both Accudyne and the Government agreed not to count these "no tests" as failures of the battery systems for purposes of testing. PA 430-434.

129. Axion used its air gun to conduct a First Article Test (FAT), and it submitted a FAT report on April 12, 1999. Latifi Depo. p. 119 at PA 1198.

130. After evaluating the FAT report, the Navy notified Axion in May 1999 that FAT was approved. Hahin Decl. ¶ 4 at PA 415 ("Axion was able to conduct FAT and submit an acceptable FAT report in April 1999"); Declaration of Mr. John Korab ("Korab Decl.") ¶ 4 at PA 421; Latifi Depo. p. 119 at PA 1198.

131. After Axion was forced to manufacture the required lead plating stock itself, because there were no available suppliers, the Government claimed that Axion's switch to manufacturing the plating wholly invalidated the approved FAT, and the Navy required a <u>Second</u> First Article Test. Hahin Depo. pp. 98-110 at PA 1243-1255; Hahin Decl. ¶ 6 at PA 416.

132. Axion manufactured its plate stock by depositing lead and lead dioxide onto pure nickel. Expert Witness Report of Dr. James Baird ¶ I, PA 376.

133. When used in power supplies, pure nickel plates yield more power supply capability than nickel-plated steel, provided all other factors are equal. *Id.*

134. A second FAT by firing PS-115 batteries in an air gun was not necessary, because the discharge cell test fully verified the electrical function of the plate stock. Expert Witness Report, Supplement # 1, of Dr. James Baird, April 13, 2006, PA 373-377.

135. The Contract documents provided a test - a discharge cell test - to ascertain whether or not the plate stock manufactured by Axion was capable of sustaining the voltage needed for a military power supply. *Id.* at PA 374. See also NAVORD OD 18332 at Section 6.2, PA 619-621, 619 ("The discharge cell test is designed to determine the characteristics of plated stock under conditions simulating those in the most heavily loaded section of the energizer - - the 'A' section.").

136. A discharge cell test, not testing using an air gun simulator, is the most logical, reliable, and efficient way to test the electrochemical characteristics of plate stock. Baird Supplemental Expert Report at F., PA 375.

137. At the same time that Axion was manufacturing plate stock and was using pure nickel, leading the Government to require a second FAT, Axion realized that the PS-115s were leaking electrolyte. Hahin Depo. p. 110 at PA 1255 ("Q. Is there any connection whatsoever, cause and effect, from the leaking of those - - of the acid that was reported to you by Axion in the decision to hold a second FAT? A. Yes, that played in my decision to require another second First Article.").

138. The parties conducted a Second First Article Test, and on September 9, 2002, Axion submitted a second FAT report. Latifi Depo. p. 213 at PA 1203.

139. Stickrod, the Quality Assurance Representative who witnessed Axion's testing for the second FAT, observed "lots of" no-tests due to malfunctions in Axion's air gun or human error. Stickrod Depo. p. 83 at PA 1206.

140. In an email dated Sept. 5, 2002 to the Contracting Officer, Stickrod observed:

> We had a total of aprx 14 good shots during the past 3 working days (6 consecutive last week Thursday and 8 consecutive yesterday)—with some minor consuming problems early on with positioning of parts on the 'bird' to enable accurate recording of data.
>
> Yesterday we shot a total of 14 of which 8 had good data collected (split between cold (3), hot (3) and room temp (2)); 3 of the 14 had no data because the batteries on the recording computer died without us being aware (we checked the voltage on the cells after and found between 16 and 26 volts existent that seems to indicate probable good units even though not acceptable from the data standpoint); and 3 that broke at impact that provided only partial data and are not acceptable. …
>
> The majority of the failed items (failed to capture data) provide sufficient voltage after data collection failure to seem to indicate the cell functioned correctly to requirements despite the inability to collect data.

Stickrod Email to Korab, September 5, 2002, PA 328.

141. The following day, Stickrod sent another e-mail to the Contracting Officer, stating:

> He has successfully completed testing (recorded successful data) on at least 90 items…. At this point, the testing system functions very well -- Axion can shoot and record, optimally, 4 per hour; human error has caused every non-acceptable data collection problem that has been encountered over the past couple of weeks. On 3 most recent separate days we observed at least 6 consecutive successful shots before failures occurred. In one case, failure to record acceptable data resulted from the normal wearing out of batteries used to power the recording computer in the system. At least 6 failures happened because the shot units broke on impact. Another anomaly that was discovered was that one the technicians put his hand on part of the testing apparatus and touched a grounded table with the other and shorted all data immediately to ground and lost it all….
>
> The majority of the failed items (failed to capture acceptable data) provide sufficient voltage after data collection failure to seem to indicate that the cell functioned correctly to requirements despite the inability to collect the data.

Stickrod Email to Korab, September 6, 2002, PA 329.

142. On November 12, 2002, the Government terminated the Contract for default, stating that "a total of 25 out of 66 First Article Power Supplies failed to meet the performance requirements of drawing 11744726." Contract Modification P00021, PA 336; Navy Letter to Axion, October 1, 2002 at PA 233.

143. Despite the occurrence of a significant number of no-tests, Stickrod indicated that "no tests" were not part of the criteria considered when reviewing Axion's test information:

> We are getting back to that test or not test business. I do not know anything about a no test. That was not in the criteria that I ever had at any point.

Stickrod Depo. p. 83 at PA 1206.

## V. <u>Defects In The Government Specification Led To Leakage Of Electrolytes</u>

144. Pursuant to the express terms of Drawing 11744726, which was incorporated into the Contract, in order to satisfy its contractual specifications, Axion was required to manufacture batteries that did not reveal any evidence of leakage of methylene bromide or fluoboric acid (two substances used in constructing the batteries). Contract, Drawing, PA 153 ("the power supply shall not reveal any evidence of leakage"); Expert Report of Dr. James Baird ("Baird Report") at PA 339-340.

145. The Government's specification for the Contract requires the use of copper-beryllium blades. Defendant's Supplemental Response to RFA No. 3, PA 1273; Drawing, PA 174-216.

146. The copper-beryllium blades provided for in the Contract were required, by the Contract specification, to touch other copper parts of the PS-115s. Defendant's Supplemental Response to RFA No. 4, PA 1273; Drawing, PA 174-216.

147. The fact that the copper blades were required to touch other copper parts of the PS-115s made leakage scientifically inevitable, as such touching leads to corrosion and to leakage. Baird Report at PA 339-340.

148. Over time, the resulting corrosion leads to the leakage of both metholyene bromide and fluoboric acid from the PS-115s. Expert Report of Dr. James Baird, PA 338-378.

149. Fluoboric acid, when combined with methylene bromide, has a corrosive effect on copper. Defendant's Response to RFA No. 82, PA 1265; Whorral Letter dated September 6, 2001, PA 335.

150. Fluoboric acid is an electrolyte conductor that allows for the transfer of electrons between the metals contained in the batteries. Deposition of Dr. James Baird ("Baird Deposition") p. 111 at PA 1221.

151. Leaking electrolyte can degrade the performance of the PS-115s, causing output voltage to decrease below desired levels and possibly contaminating other batteries. Defendant's Response to RFA No. 45, PA 1262; Defendant's Response to Interrogatory 8, PA 1280-1281.

152. The Government was aware that Axion was experiencing the leaking of electrolyte from the PS-115s prior to requiring a second First Article Test ("FAT"). Hahin Deposition p. 108, 110 at PA 1253, PA 1255.

153. The Government was aware of corrosion and leakage problems experienced by other contractors in producing PS-115 power supplies well before the Government awarded Axion this Contract. Harry Diamond Laboratories Report, dated October 1985, "The Corrosion Mechanism in the M732 Fuze Power Supply," PA 533

("A materials incompatibility and corrosion problem was discovered in the PS115 power supply for the M732 artillery fuze. The problem manifests itself in occasional leakage from the battery ampule.").

154. In fact, as early as 1984, Accudyne and the Government were both aware of premature deterioration of the PS115s and spillage of their contents. "Proposal: Remedial Research on PS115 Power Supplies," From W.J. Blaedel To Dennis Jaecks, January 21, 1984, PA 438-439.

155. The Government knew that both manufacturers of PS115s that it had contracted with, Union Carbide and Accudyne found the presence of methane in their battery ampules, indicating corrosion. PA 543-544 (under the discussion of "Mechanism of Corrosion," the Government scientists report at PA544, "[t]he presence of methane ($CH_4$) found in ampules from both battery manufacturers (UCR at NSWC-WO and ACC at NWSC-Crane) is explained by the succeeding step of equation (7) . . .").

156. The leaking fluoboric acid played a role in the Government's decision to require a second FAT. Hahin Depo. p. 110 at PA 1255.

157. Nevertheless, the Government failed to consider the effect of the leaking electrolyte on the batteries, stating that the "chemical compositions of PS-115 were not evaluated." Defendant's Response to Interrogatory # 4, PA 1279.

## VI. <u>Other Facts Not In Dispute</u>

158. Axion has been in business for approximately twenty years. Latifi Decl. ¶ 1, PA 548.

159. Prior to contract N00106-96-C-KA09, Axion never had a contract terminated for default. *Id*.

160. Although Axion has requested equitable adjustments, prior to Contract N00106-96-C-KA09, Axion has never submitted a claim under the Disputes clause. *Id*.

161. Axion is a minority owned small business. Alex Latifi immigrated to the United States in 1970 from Iran and his native language is Farsi. Latifi Decl. ¶ 2, PA 548-549.

162. Alex Latifi has been a citizen of the United States since 1973. *Id*.

Dated this the 1st day of September, 2006.

**ATTORNEY OF RECORD:**

/s/ **Richard J.R. Raleigh Jr.**
**RICHARD J.R. RALEIGH JR.**
**WILMER & LEE, P.A.**
100 Washington Street, Suite 200
Huntsville, Alabama 35801
(256) 533-0202 Telephone
(256) 533-0302 Facsimile
rraleigh@wilmerlee.com

**OF COUNSEL:**

**JEROME S. GABIG, JR.**
4811 Cove Creek Drive
Brownsboro, AL 35741
(256) 509-0279 Telephone
(256) 512-0020 Facsimile
gabig3@comcast.net

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been furnished this 1st day of September, 2006, by **Electronic Mail** and **Next Business Day Delivery** prepaid and properly addressed to:

DOUGLAS K. MICKLE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530

Richard Martinelli
Office of Counsel
Naval Inventory Control Point
Mechanicsburg, PA 17055-0788

**/s/ Richard J.R. Raleigh Jr.______**
**Counsel For Plaintiff**