**NO. 03-2644C & 04-297C**
**(Judge Firestone)**

---

**IN THE UNITED STATES COURT OF THE FEDERAL CLAIMS**

---

**AXION CORPORATION,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGEMENT

---

**PETER D. KEISLER**
**Assistant Attorney General**

**DAVID M. COHEN**
**Director**

**KATHRYN A. BLEECKER**
**Assistant Director**

**DOUGLAS K. MICKLE**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**Attn: Classification Unit**
**8th Floor, 1100 L St., N.W.**
**Washington, DC 20530**
**Tele: (202) 307-0383**
**Fax: (202) 353-7988**

**Attorneys for Defendant**

**OF COUNSEL:**

**Richard Martinelli**
**Office of Counsel**
**Naval Inventory Control Point**
**Mechanicsburg, PA 17055-0788**

**October 2, 2006**

# TABLES OF CONTENTS


DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . 2

I. Nature Of The Case . . . . . . . . . . 2

II. Statement Of The Facts . . . . . . . . . . 4

A. Technical Issues of Air Gun, Plating, and Leaking . . . . . . . . . . 5

1. The Air Gun . . . . . . . . . . 5

2. Plating . . . . . . . . . . 7

3. Leaking . . . . . . . . . . 8

B. The Release Modifications . . . . . . . . . . 9

C. The September 9, 2002 FAT Report . . . . . . . . . . 10

SUMMARY OF THE ARGUMENT . . . . . . . . . . 11

ARGUMENT . . . . . . . . . . 12

I. Summary Judgment Standards . . . . . . . . . . 12

II. The United States Is Entitled To Summary Judgment Upon Counts X, XI, XII Of Axion's Complaint . . . . . . . . . . 14

A. Count X Should Be Dismissed Because The Government Possessed A Valid Basis To Reject Axion's September 9, 2002 FAT Report . . . . . . . . . . 14

B. Count XI Should Be Dismissed Because The Navy Did Not Approve The Second FAT . . . . . . . . . . 18

C. Count XII Should Be Dismissed Because The Navy Did Not Breach Any Duty To Cooperate . . . . . . . . . . 21

III. The United States Renews Its Request For Summary Judgment Regarding All Of Axion's Claims Associated With The Air Gun, Plating And Leaking (Counts I - IX and XIII - XXIX) Because The Sworn Testimony Of The Contracting Officer, John Korab, Makes Clear That He Did Not Know, And Had No Reason To Know, Of Axion's Alleged Mistake When The Parties Agreed Upon The Unambiguous Accord And Satisfaction And Release Language In Modifications P00017, P00019, And P00020 . . . . . 23

IV. Axion's Motion For Summary Judgment Should Be Denied . . . . . 25

A. Axion's Request For Summary Judgment Upon The Issue Of The Plating Specifications Should Be Rejected . . . . . 26

1. Axion's Allegations Regarding Plating Are Covered By The Court's Prior Ruling Regarding Accord And Satisfaction And Release . . . . . 26

2. Even When Disregarding The Matter Of Release, Axion Is Not Entitled To Summary Judgment Upon Its Defective Plating Specification Claims . . . . . 28

3. Axion's Allegation That It Is Entitled To Summary Judgment Upon The Plating Issue Under The Spearin Doctrine Is Without Merit . . . . . 33

B. Axion's Summary Judgment Argument Concerning the Superior Knowledge Doctrine Is Without Merit . . . . . 35

1. Axion Superior Knowledge Argument Regarding The Plating Fails . . . . . 35

2. Axion's Superior Knowledge Regarding The Air Gun Also Fails . . . . . 40

C. Axion's Argument Concerning The Implied Duties To Cooperate And Not Hinder Performance Is Without Merit . . . . . 42

1. Axion's Argument That The Government Did Not Cooperate With Axion Upon The Plating Issue Is Without Merit . . . . . 42

2. Axion’s Argument That The Government Did Not Cooperate With Axion Upon The Air Gun Issue Is Without Merit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

D. Axion's Summary Judgment Argument Concerning "No Tests" Is Without Merit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

E. Axion's Summary Judgment Argument Concerning The Leakage Issue Is Without Merit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

## TABLE OF AUTHORITIES

**CASES:** **PAGES:**

Adickes v. S.H. Kress & Co.,
398 U.S. 144 (1970) . . . . . . . . . . 12

Aerodex, Inc. v. United States,
189 Ct. Cl. 344,
417 F.2d 1361 (1969) . . . . . . . . . . 38, 39

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . . . . . . 12, 13

Axion v. United States,
68 Fed. Cl. 468 (2005) . . . . . . . . . . passim

Barmag Barmer Maschinenfabrik AG v. Muratta Mach., Ltd.,
731 F.2d 831 (Fed. Cir. 1984) . . . . . . . . . . 13

Burke Corp. v. United States,
277 F.3d 1346 (Fed. Cir. 2002) . . . . . . . . . . 33

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) . . . . . . . . . . 12, 13

Curtis v. United States,
144 Ct. C1. 194,
168 F. Supp. 213 (1958) . . . . . . . . . . 13

Federal Crop Ins. Corp. v. Merrill,
332 U.S. 380 (1947) . . . . . . . . . . 20

Frankin Pavkov Construction Co. v. Roche, Secretary of the Air Force,
279 F.3d 989 (Fed. Cir. 2002) . . . . . . . . . . 34

Giesler v. United States,
232 F.3d 864 (Fed. Cir. 2000) . . . . . . . . . . 37, 40

Natus Corp. v. United States,
178 Ct. Cl. 1;
371 F.2d 450 (1967) . . . . . . . . . . 33

Orlosky, Inc. v. United States,
68 Fed. Cl. 296 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44

Schwabenbauer v. Bd. of Educ. of City School Dist. of City of Olean,
667 F.2d 305 (2d Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

TECOM, Inc. v. United States,
66 Fed. Cl. 736 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

United Food Servs., Inc. v. United States,
19 Cl. Ct. 539,
aff'd without op.,
928 F.2d 411 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

United States v. Diebold, Inc.,
369 U.S. 654 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

# INDEX TO APPENDIX


**Document** **Page**

Contract Number N00104-96-C-KA091 . . . . . 1

Contract Modifications P00001-P00021 . . . . . 143

Letter from Axion to Department of Navy: Regarding ECP on Axion Contract (Dated January 17, 1996) . . . . . 178

Letter from Department of Navy to Alex Latifi, President of Axion: (Dated January 26, 1996) . . . . . 179

Letter from Axion Mr. Weir to Mr. Alen Artz (Weir Memo) (Dated May 30, 1997) . . . . . 186

Letter from Commanding Officer, Naval Inventory Control Point to Axion: Regarding First Article Approval for Contract (Dated May 17, 1999) . . . . . 189

Letter from Axion to Naval Inventory Control Point: Regarding Plating Guidelines (Dated November 13, 2000) . . . . . 190

Letter from Department of the Navy to Axion (Dated November 22, 2000) . . . . . 192

Letter from Axion to Naval Inventory Control Point (Dated August 27, 2001) . . . . . 194

Transmittal Letter from Department of the Navy to Axion (Dated September 18, 2001) Transmitting September 6, 2001 Letter . . . . . 196

Letter from Axion to Mr. John Korab, Naval Inventory Control Point (Dated September 9, 2002) . . . . . 202

Letter from Department of the Navy to Axion (Dated October 1, 2002) . . . . . 203

Letter from Department of the Navy to Axion (Dated October 1, 2002) . . . . . 204

Letter from Axion to Mr. Korab (Dated October 11, 2002) . . . . . 205

Deposition of Mr. Jerry Hahin . . . . . 224

Deposition of Mr. John Korab . . . . . 229

Deposition of Mr. Alex Latifi . . . . . 255

Declaration of Mr. Jerry Hahin . . . . . 348

Declaration of Mr. John J. Korab . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 354

Declaration of Mr. Henry Stickrod . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 359

Deposition of Mr. Henry Stickrod . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 380

Deposition of Mr. Alex Latifi . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 400

Specification Control Drawing 19202-11744726, Power Supply . . . . . . . . . . . . . . . . . . . . . . 405

Latifi July 8, 2002 Email to Navy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 424

Axion September 9, 2002 letter to Navy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 425

Print-out of Axion's September 9, 2002 floppy disc FAT submission . . . . . . . . . . . . . . . . . . 426

Navy's October 1, 2002 letter informing Axion of FAT disapproval . . . . . . . . . . . . . . . . . . . 710

Navy's October 1, 2002 show cause notice to Axion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 711

Axion's October 11, 2002 letter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 712

Axion's Response to United States' Interrogatories . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 715

Declaration of Mr. Allan Goldberg . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 722

Declaration of Mr. Jeffry Swank . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 727

Declaration of Mr. David Pierson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 730

Supplemental Declaration of Mr. John Korab with attachments . . . . . . . . . . . . . . . . . . . . . . . 732

Documentation concerning Axion's Pre-award Survey . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 741

Navy's October 3, 1995 letter to Small Business Administration . . . . . . . . . . . . . . . . . . . . . . 748

Small Business Administration's November 9, 1995 letter to Navy . . . . . . . . . . . . . . . . . . . . 754

Axion's August 22, 2001 letter to Navy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 756

Axion's June 13, 2000 letter to Navy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 759

Navy's June 14, 2000 correspondence to Axion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 760

Axion’s August 22, 2001 letter to Navy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 761

Hahin email to Axion of December 19, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 764

Axion email to Navy of December 18, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 764

Hahin email to Axion of December 17, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 765

Axion's May 22, 1996 letter to Navy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 766

Navy's June 5, 1996 correspondence to Axion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 767

John Venskus Memo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 768

Naval Surface Warfare Center, Crane letter of June 3, 1996 . . . . . . . . . . . . . . . . . . . . . . . . . 769

Signature Page to NAVORD OD 18332 of February 13, 1967 . . . . . . . . . . . . . . . . . . . . . . . . . 770

Cover Page to NAVORD OD 18332 of February 13, 1967 . . . . . . . . . . . . . . . . . . . . . . . . . . 771

Unsigned internal Army document of 1973 associated with
NAVORD OD 18332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 772

Unsigned internal Army document of 1980 associated with
NAVORD OD 18332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 773

Distribution list for unsigned internal Army document of 1980
associated with NAVORD OD 18332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 774

Supplemental Declaration of Mr. Hahin with attachment . . . . . . . . . . . . . . . . . . . . . . . . . . . . 775

Specification Control Drawing 19202-10974349, Plating . . . . . . . . . . . . . . . . . . . . . . . . . . . . 778

Depostion of Mr. Jeffrey A. Swank . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 781

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **AXION CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 03-2644C & 04-297C** |
| **v.** | ) | **(Judge Firestone)** |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits this combined motion for summary judgment and opposition to Axion Corporation's ("Axion") motion for summary judgment, which was filed on September 1, 2006. As we demonstrate below, Axion's motion should be denied, and because there are no genuine issues of material fact, and defendant is entitled to judgment as a matter of law, the Government's motion should be granted, and Axion's complaint dismissed. In support of this motion and opposition, the United States relies upon the Complaint ("Compl."),[1] defendant's proposed findings of uncontroverted fact ("DPFUF") accompanying this motion, the accompanying appendix, and the following brief.

**STATEMENT OF THE ISSUES**

1. Whether Count X of Axion's complaint should be dismissed because the Government properly rejected Axion's September 9, 2002 First Article Test ("FAT") report.

---

[1] Axion filed two complaints with Court. These complaints were consolidated pursuant to this Court's Order of April 22, 2004. Accordingly, because Axion's second complaint (i.e. 04-297C) includes new claims, as well as all the allegations it raised in its initial complaint, the United States will direct its motion to the latter complaint.

2. Whether Count XI of Axion's complaint should be dismissed because Mr. Charles Vartan, a Government Quality Assurance Representative ("QAR"), never approved Axion's FAT, nor did he have the authority to approve the FAT, because only the contracting officer can approve a FAT.

3. Whether Count XII of Axion's complaint should be dismissed because the United States fully cooperated with Axion during the second FAT.

4. Whether, in light of the Court's prior ruling that if the Court determines the doctrine of unilateral mistake is inapplicable, then Counts I through IX, and XIII through XXIX must be dismissed, does the sworn testimony of the contracting officer demonstrating that he had no reason to suspect Axion was making a mistake when Axion agreed to bilateral modifications P00017, P00019 and P00020, now mandate dismissal of Axion's claims set forth in Counts I through IX and XIII through XXIX of its Complaint

5. Whether the Court's holding in its October 31, 2005 decision that, Axion's claims would be barred by the doctrines of accord and satisfaction and release if Axion failed to prove unilateral mistake, precludes summary judgment upon Axion's behalf.

6. Whether, even assuming that Axion's motion for summary judgment was not affected by the Court's prior decision in this case, Axion is entitled to summary judgment.

## STATEMENT OF THE CASE

### I. Nature Of The Case

Plaintiff, Axion Corporation ("Axion"), brings this action challenging the Navy's termination for default of contract N00104-96-C-KA09. Axion claims the Navy was not justified in terminating the contract for default and that the default should be converted to a

termination for convenience. In addition, Axion claims entitlement to equitable adjustments under the contract regardless of whether the termination for default was valid.

Axion's case involves 29 counts. On April 11, 2005, the United States filed a summary judgment motion arguing 26 of the 29 counts, specifically counts I through IX, and XIII through XXIX, were barred by the affirmative defenses of accord and satisfaction and release in addition to being time-barred. These twenty-six counts all involve technical issues related to Axion's air gun, leaking electrolyte, and plating specifications. After additional filings by both parties and oral argument, the Court issued an opinion on October 31, 2005, ruling that at that time, there were disputed facts as to whether the doctrine of unilateral mistake bars application of the affirmative defenses of accord and satisfaction and release. Axion v. United States, 68 Fed. Cl. 468, 479 (2005). The Court then stated that, if the Court determines the doctrine of unilateral mistake is inapplicable, then counts I through IX, and XIII through XXIX must be dismissed as the Court has ruled that unilateral mistake is the only theory that can prevent all claims related to the air gun, leaking electrolyte or plating specifications from being barred by the doctrine of release. Axion Corp. v. United States, 66 Fed. Cl. at 480.

The subject of this motion concerns the remaining three counts, X, XI and XII of Axion's complaint, and a renewed motion for summary judgment regarding the Government's accord and satisfaction and release defense and Axion's contention of unilateral mistake. Count X alleges that the Navy's disapproval of Axion's second FAT was improper. Compl. ¶¶ 137-154. Despite the allegations contained in Count X, Count XI alleges that the Navy actually approved Axion's

second FAT. Compl. ¶¶ 155-167. Count XII of Axion's complaint alleges that the Navy failed to cooperate with Axion when Axion was conducting the second FAT. Compl. ¶¶ 168-177.[2]

## II. Statement Of The Facts

The United States respectfully refers the Court to our proposed findings of uncontroverted fact, which are filed with this motion pursuant to RCFC 56(h). In addition to our Rule 56(h) submission, a short summary of salient facts follows.

On December 14, 1995, the Naval Inventory Control Point ("NAVICP") awarded contract N00104-96-C-KA09 to Axion. DA 1. The contract required delivery of 55,209 PS-115 exclusive of option quantities. DA 2. The PS-115 is a battery used in Navy munitions. Compl. ¶ 15. The contract's unit price was $23.80, and the total contract price, exclusive of option quantities, was $1,313,974.20. DA 2.

The relevant facts fall into three areas. The first involves the technical difficulties Axion experienced associated with the air gun, plating, and leaking. The second concerns the contract modifications in which Axion agreed to a release of claims. The third involves the Navy's decision to disapprove Axion's September 9, 2002 First Article Test report and terminate the contract for default. Each of these three areas are addressed below.

---

[2] Defendant's appendix ("DA") contains documents referred to in this motion. Many of these documents were contained in Defendant's Appendix and Supplemental Appendix that was previously filed with this Court in conjunction with the Government's opening motion. To avoid potential confusion, the Government has not renumbered these previously filed documents. Most documents that are submitted to the Court for the first time in this motion and opposition are numbered beginning at DA 400.

### A. Technical Issues of Air Gun, Plating, and Leaking

Axion experienced difficulties in performing upon the contract from the very beginning. DA at 354-356, 357-58 (Korab Decl. ¶¶ 3-6, 10-11); DA at 349-52 (Hahin Decl. ¶¶ 4-11) . The difficulties Axion experienced that are relevant to this case include those associated with the air gun, plating, and leaking as all claims in this litigation relate to problems Axion experienced in one of these three areas. The following describes the relevant facts associated with each of these three issues.

#### 1. The Air Gun

The contract included a First Article Test ("FAT") requirement obligating Axion to conduct FAT and submit a FAT report demonstrating compliance with specified testing requirements. DA 62. The contract also established that Axion would be responsible for all testing equipment. DA 109. Prior to entering the contract, Axion knew that it would need an air gun to satisfy the contract's FAT requirement. DA 717 (Axion Resp. to Gov't Inter. # 4). During the pre-award survey, Axion presented a plan for testing that did not include use of a Government furnished air gun. DA 741-747. As noted in the pre-award survey documentation,

> The testing requirements were discussed at length during the pre-award survey. The offeror plans to use a local contractor, Wildwood Electronics, to test the power supply.

DA 742.[3]

[3] Axion did not pass the pre-award survey, in part because of Axion's lack of understanding regarding the testing requirements, and the Navy determined Axion non-responsible. DA 748. However, under the Small Business Administration ("SBA") certificate of competency ("COC") program, Axion applied for a COC and was determined responsible by the SBA. DA 754. In issuing the COC, the SBA informed the Navy that "Axion has a written quote to test unit by activating power supply at test lab" and "Wildwood Electronics will perform the destructive testing and monitor the voltage produced by the power supply with Axion's

Although Axion had presented a plan to both the Navy and SBA that it would use a private test facility to satisfy the FAT requirement, Axion requested an air gun from the Navy on January 17, 1996, approximately one month after the award of the contract. DA 178. On January 26, 1997, the contracting officer denied Axion's request for an air gun. DA 179. In denying Axion's request, the contracting officer used the phrase "the Navy did not supply any air guns to the previous contractor. . . ." DA 179. The contracting officer used this phrase because, as a Navy contracting officer, he was in no position to acquire an air gun from another agency for Axion's use. DA 735 (Korab Supplement Decl. 12).

In 1996, Axion contacted the Army Research Laboratory ("ARL") concerning the contract's testing requirement. DA 727 (Swank Decl. ¶ 3); DA 277 (Latifi Depo. 67). ARL provided Axion a cost estimate to test four Axion batteries. DA 727 (Swank Decl. ¶ 3). Axion declined ARL's offer and subsequently began efforts to acquire an air gun or air gun drawings from ARL. Id. ARL and Axion discussed the possibility of entering an agreement in which ARL would lend Axion the ARL air gun, or provide a set of mechanical drawings for the air gun from which Axion would build their own unit, in exchange for Axion developing improvements in the air gun's data collection system which Axion would then provide to ARL. DA 728 (Swank Decl. ¶ 4). ARL, which did not have a contractually relationship with Axion, ultimately decided not to enter such an agreement because Axion did not submit a satisfactory technical proposal. Id.

---

equipment." Id. The United States emphasizes that Axion realized during this pre-award stage that it would need an air gun. DA 717 (Axion's Resp. To Gov't Inter. # 4).

Axion built an air gun and used this gun to pass FAT on May 17, 1999. DA 189. However, the successful FAT was invalidated when Axion decided to change the plating material in the PS-115 from an outside vendor to plates produced in-house by Axion. DA 159-160. Axion continued using its air gun through the remainder of the contract but experienced several problems. DA 349; DA 738, 739. One of Axion's objectives was to improve the air gun so it could be used for future work. DA 734 (Korab Supp. Decl. ¶ 9); DA 194; DA 757. Several years after the contract was awarded, the Navy acquired equipment that could have been used to conduct FAT and offered to perform testing for Axion. DA 353 (Hahin Decl. ¶ 14); DA 764-765 (Hahin, Latifi emails December 17 - 19, 2001). Axion declined to accept the Navy's offer to conduct testing. DA 353 (Hahin Decl. ¶ 14).

**2. Plating**

Plating is a component of the PS-115 that is necessary for the battery to produce voltage. DA 160. The contract did not limit Axion's discretion regarding how Axion could obtain plating, as the relevant specification did not include any required sources and the contract also referenced NAVORD OD 18332, which contained non-mandatory guidance upon building a plating line. Plaintiff's Appendix ("Pl. App.") 218; Pl. App. 560; DA 730 (Pierson Decl. ¶ 3); DA 770.

NAVORD OD 18332 was signed on February 13, 1967 by the Commander of the now defunct, U.S. Naval Ordnance Laboratory. Pl. App. 561; DA 770. The signed cover letter of NAVORD OD 18332 states that the purpose of document is to provide a non-mandatory, working guide. Pl. App. 561; DA 770. NAVORD OD 18332 has not been revised since February 13, 1967. DA 775-777 (Hahin Supp. Decl. ¶ 4). From 1967, through the time Axion was attempting to

perform upon its contract, other vendors successfully used the 1967 NAVORD OD 18332. DA 192; DA 730 (Pierson Decl. ¶¶ 2-3). For example, in the 1970's, a plating line was successfully built at Accudyne Corporation using the 1967 document as a guide. DA 730 (Peirson Decl. ¶ 3). Accudyne's plating operation was significantly greater than that required of Axion's contract. Compare DA 725 (Goldberg Decl. ¶ 8) regarding 400,000 Accudyne PS-115s produced between 1995 and 1998 verses the quantity of 55,209, at DA 2, which was the maximum number of PS-115s Axion would be required to produce.

The plating requirement was discussed with Axion during the pre-award survey, and Axion presented a plan to have LDC Electroplating perform Axion's plating. DA 752. The pre-award survey team was initially skeptical of Axion's plan for meeting the plating requirement. Id. However, in issuing the COC, the SBA informed the Navy that it would take LDC Electroplating a total of six weeks to satisfy the contract's plating requirement.[4] DA 755.

**3. Leaking**

The Army re-designed the PS-115 in 1985 to correct a leaking problem. DA 725 (Goldberg Decl. ¶ 4). The Army received more than 400,000 PS-115s from Accudyne between 1995 and 1998. DA 725 (Goldberg Decl. ¶ 8). Accudyne manufactured the PS-115s using the same design as that in Axion's contract, with no known leakage issues either in the plant or in the stockpile. Id. Axion, by its own admission, experienced thousands of instances of leaking.[5] DA

[4] Like Wildwood Electronics, LDC Electroplating vanishes from the record the moment Axion was awarded the contract.

[5] It is possible that some of the PS-115s Axion believed to have been leaking only appeared to be so due to contamination from a battery that actually was leaking. DA 725 (Goldberg Decl. ¶ 7).

194. Improper welding can result in the type of leaking Axion experienced. DA 725 (Goldberg Decl. ¶ 7). The United States permitted Axion to inspect hundreds of non-leaking PS-115s that had been in storage at the Army Research Laboratory for approximately 10 years in addition to providing Axion with samples for the plaintiff's examination. DA 725 (Goldberg Decl. ¶ 8).

With respect to Axion's leaking PS-115s, Dr. Baird's report makes findings concerning copper on beryllium-copper without considering the rate at which such corrosion would occur or the type of corrosion that would result. DA 723-724 (Goldberg Decl. ¶ 5). Furthermore, Dr. Baird failed to account for the fact Axion's leakage theory is premised upon corrosion occurring in an oxygen depleted environment. DA 724-725 (Goldberg Decl. ¶ 6).

### B. <u>The Release Modifications</u>

The technical difficulties Axion experienced, addressed above, resulted in ten modifications revising the contract delivery schedule. DA 144, 146, 153, 155, 156, 157, 158, 159, 162, 163. For purposes of this motion, the last three of these modifications, P00017, P00019 and P00020, are the most significant. DA 159, 162, 163.

Bilateral modification P00017 required Axion to conduct FAT upon 120 units and established that each of the tested units would be exposed to one of three environmental conditions prior to testing.[6] DA at 159. Bilateral modification P00019 reduced the required number of FAT samples from 120 to 80. DA 162. Bilateral modification P00020 required Axion to deliver a FAT report by September 9, 2002. DA 163. All three bilateral modifications

[6] Axion and the Navy bilaterally agreed that Axion's decision to use its own plating invalidated the prior successful FAT in which Axion used the plating of a German vendor. DA 159-160.

included the following language, prominently displayed directly above the blocks in which Axion and the contracting officer signed,

> This modification constitutes a full disposition of all matters relating to this contract and is a release and accord and satisfaction of any and all claims, demands, or causes of action that either the contractor or the Government may have against the other arising out of or related to the contract to date.

DA 159, DA 162, DA 163; see also Axion v. United States, 68 Fed Cl. at 472-73.

**C. The September 9, 2002 FAT Report**

In attempting to meet the P00020 FAT requirement, Axion conducted testing on numerous occasions during the period between July 11, 2002 and September 6, 2002. DA 424, DA 403 (Latifi Depo. pp. 215-216); DA 361 (Stickrod Decl. ¶ 8). Quality assurance personnel from the Defense Contract Management Agency, Redstone Arsenal ("DCMA"), attended FAT testing during this period on more than a dozen occasions. DA 361 (Stickrod Decl. ¶ 8). The role of the quality assurance personnel was to observe testing, and not approve the FAT. DA 62; DA 381A (Stickrod Depo. 63); DA 362 (Stickrod Decl. ¶ 10).

At times during contract performance, the parties used the term "no-test" to describe a test that was impacted by faulty test equipment. Pl. App. 1258-1259. Axion interprets the significance of a "no-test" to mean that it permitted Axion to "substitute" a new PS-115 for the PS-115 that was tested and deemed a "no test." Pl. MSJ p. 45. The contract's FAT requirement, as bilaterally agreed to by the parties, required the testing of 80 PS-115s and did not include a process for "no test" substitutions. DA 162; DA 163. However, regardless of whether Axion's interpretation is correct, the contract required Axion to deliver a FAT report by September 9, 2002 that included testing documentation on 80 PS-115s since under Axion's own theory the

company would have been able to continue substituting new PS-115 for "no tests" until good testing data was obtained on 80 PS-115. DA 162; DA 163.

Axion's FAT report, which Axion submitted on September 9, 2002, did not meet the requirements of modification P00020. DA 705-09, 710; DA 425-704. The FAT report contained testing documentation on fewer than 80 samples, did not include required information regarding testing procedures, and indicated that at least 25 of the tested samples did not meet contract requirements. DA 165; Compl. ¶¶ 149-150; DA 351-352 (Hahin Decl. ¶ 11). The contracting officer disapproved the FAT report and, after considering Axion's response to a show cause notice, terminated the contract for default. DA 164, 165; DA 711.

## SUMMARY OF THE ARGUMENT

Counts X, XI and XII, all of which involve events immediately preceding the Government's termination for default of the contract, should be dismissed. Count X challenges the Government's evaluation of Axion's September 9, 2002 FAT report. Count XI alleges a Government quality assurance representative approved the FAT. Count XII states that the Government breached an implied duty to cooperate. As discussed below, Axion's claims set forth in these three counts are without legal merit, and because there are no material issues of fact surrounding any of these three counts, judgment in the Government's favor should be granted upon Counts X, XI and XII.

Additionally, the United States is entitled to summary judgment upon Counts I through IX and XIII through XXIX because they are barred by the doctrine of accord and satisfaction and release. The sworn testimony of John Korab makes clear the contracting officer had no reason to

suspect Axion's alleged mistake regarding the unambiguous accord and satisfaction and release language upon three different occasions.

Finally, leaving aside that Axion's motion for summary judgment ignores this Court's holding in its October 31, 2005 decision that all of Axion's claims relating to the air gun, leaking and plating will be barred if the Government shows that Axion cannot prevail upon the issue of unilateral mistake, as we demonstrate below, Axion's argument for summary judgment is without merit.

## ARGUMENT

### I. Summary Judgment Standards

RCFC 56(c) provides that summary judgment shall be granted if "there is no genuine issue as to any material fact" and the "moving party is entitled to a judgment as a matter of law." Thus, the Court may streamline the litigation process by isolating and disposing of factually unsupported claims or defenses.

The respective burdens to be borne by the movant and by the opponent of a summary judgment motion have been established by several Supreme Court decisions. Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970). Adickes governs the movant's obligations under the summary judgment rule. A movant for summary judgment has the burden of establishing "the absence of a genuine issue as to any material fact." Adickes, 398 U.S. at 157. A movant, however, is not required to prove the absence of a factual dispute with respect to an issue upon which the non-moving party bears the burden of proof. Celotex Corp., 477 U.S. at 323. In such

a case, the movant discharges its burden by showing an absence of evidence to support the non-moving party's case. Id.

A party is obliged to “make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof . . . at trial.” Celotex, 477 U.S. at 322. Thus, a failure of proof concerning an essential element of the non-moving party's case entitles the moving party to judgment. Id. at 323.

Courts are required to resolve doubts "in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). When evaluating the merits of the motion, a court must resolve reasonable factual disputes against the movant. Schwabenbauer v. Bd. of Educ. of City School Dist. of City of Olean, 667 F.2d 305, 313-14 (2d Cir. 1981). Mere denials or conclusory statements, however, are not sufficient to create an evidentiary conflict. Barmag Barmer Maschinenfabrik AG v. Muratta Mach., Ltd., 731 F.2d 831, 836 (Fed. Cir. 1984).

A material fact is one that will make a difference in the result of a case. Curtis v. United States, 144 Ct. Cl. 194, 199, 168 F. Supp. 213, 216 (1958). Substantive law provides the basis for identifying the material facts. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issues of material fact. Only disputes over facts that might affect the outcome of the suit may prevent an entry of judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. at 248.

## II. The United States Is Entitled To Summary Judgment Upon Counts X, XI, XII Of Axion's Complaint

### A. Count X Should Be Dismissed Because The Government Possessed A Valid Basis To Reject Axion's September 9, 2002 FAT Report

Count X of Axion's complaint alleges the Navy did not have a valid basis for rejecting Axion's September 9, 2002 FAT report. Compl. ¶¶ 137-154. As explained below, there is no dispute that: 1) Axion was required to deliver a FAT report by September 9, 2002 that complied with specific contract requirements regarding the number of FAT samples tested, a description of testing procedures, and the test results; 2) the FAT report Axion submitted on September 9, 2002 did not comply with these contract requirements; and 3) the contract provided that disapproval of FAT by the contracting officer shall constitute a failure to deliver within the meaning of the termination for default clause. The Navy's rejection of the FAT report and the subsequent termination for default were therefore warranted. There is no material question in dispute concerning this matter. As such, judgment should be granted to the Government upon Count X.

On July 11, 2002, the parties agreed to contract modification P00020. DA 163. This modification established a September 9, 2002 delivery date for a FAT report covering 80 units. DA 163. Indeed, Axion acknowledges that, even under Axion's own "no test" theory, this meant the FAT report had to include "good data" on 80 units even if it meant replacing units when "good data" was not achieved. DA 404 (Latifi Depo. 231). Axion proposed the September 9, 2002 delivery date in a July 8, 2002 e-mail to the contracting officer.[7] DA 424. There is no

---

[7] Axion's July 8, 2002 e-mail to Mr. Korab mentions testing 120 units. However, modification P00020 should be interpreted as requiring FAT testing of only 80 units as modification P00019 had reduced the quantity of FAT samples from 120 to 80. Axion still failed to meet this lesser minimum standard.

dispute that Axion was required to submit a FAT report by September 9, 2002 and that this report had to address the testing of 80 units.

Axion's FAT report did not address the testing of 80 units. Axion submitted its FAT report in the form of a letter dated September 9, 2002 and several floppy discs.[8] DA 425-704. In its September 9, 2002 letter, Axion admits that its FAT report included data on fewer than 80 tested PS-115s. DA 425, DA 402 (Latifi Depo. 212); DA 205. Given that Axion stated that the floppy discs contained data on the testing of 74 units, Axion can not dispute that it submitted a FAT report that did not include testing information upon the required number of units.[9]

There is also no dispute with respect to the fact that Axion's FAT report did not include sufficient information to permit the Navy to analyze whether the tests that Axion did conduct were performed in accordance with the procedures required by the contract. The contract included Data Item Description DI-NDTI-80809A, which sets forth the information that must be included in FAT reports. DA 93-99. Pursuant to Section 10.2.6.3 of DI-NDTI-80809A, FAT reports must include a complete description of procedures used in conducting FAT, including a description of the sequence of testing steps and any conditions imposed. DA 97. Axion's September 9, 2002 FAT report merely included a series of voltage readings with none of the required information concerning the testing process. <u>See</u> DA 427-704. The Navy was therefore

[8] Information contained on those discs has been printed and is contained in the appendix at pages 426-704.

[9] The Government believes that due to duplicate records in the floppy discs Axion actually submitted data upon fewer than the 74. DA 203; DA 352 (Hahin Decl. ¶ 352). Regardless of the number of test units, there is no dispute that Axion’s submission did not satisfy the requirement to provide testing information on even the least restrictive requirement of 80 units.

unable to determine whether Axion conducted FAT in accordance with the required processes set forth in the contract.[10] Furthermore, Axion's October 11, 2002 response to the Navy's show cause letter did not alleviate this problem. DA 712-15. Although the October 11, 2002 response identifies units that were exposed to hot, cold or ambient temperatures as required by the contract, Axion's report does not address whether the units underwent Extreme Temperature Storage or 7-Foot Drop in accordance with paragraph 3.3.3 of sheet 5 and the columns beginning with "Extreme Temperature Storage" and "7-foot Drop" on sheet 15 of the drawing.

Additionally, there is no dispute that Axion's FAT report showed that an unacceptable number of the samples tested failed. Axion's FAT report showed that 25 units failed FAT testing. Compl. ¶¶ 149-150; DA 705-09; DA 351-52 (Hahin Decl. ¶ 11). Pursuant to the paragraph 4.4.6.1.2 beginning on sheet 9 and the bottom row of sheet 15, no more than three samples could fail for every group of 20 operational tests and a maximum of seven units could fail among the 80 samples required for FAT.[11] See DA 413, 419. Axion's FAT report included

---

[10] The following illustrates the significance of Axion's failure to provide a description of the steps performed during FAT. Sheet 15 of drawing 11744726 sets forth the various types of environmental conditions PS-115 must be exposed to during FAT. DA 419. One such condition is 7-ft. drop in accordance with paragraph 3.3.3.4 of the drawing (see far right hand column of sheet 15). Id. Section 3.3.3.4 sets forth specific orientations from which samples must be dropped. DA 409. In addition, drawing 11744726, sheet 12 paragraph 4.6.2 specifies that the power supply be tested within one and one-half minutes after removal from the conditioning chamber. DA 416. Axion's failure to describe the FAT process as required by the contract rendered the report meaningless in that it did not provide any indication that testing was performed in accordance with contract requirements.

[11] Paragraph 4.4.6.1.2 and the bottom row of sheet 15 use the terminology "AC-3, RE-4," which means accept if there are 3 or fewer failures and reject if there are 4 or more failures. Similarly, for the full sample set forth in paragraph 4.4.6.1.2, "Acc/Rej 7/8" means that the test is acceptable if there are 7 or less total failures and is rejected if there are 8 or more failures. This issue and the testing procedures in general are explained in greater detail in paragraph 8 of Mr. Hahin's March 28, 2005 declaration. See DA 350-51 (Hahin Decl. ¶ 8).

25 failures which is more than triple the permissible amount and, as discussed above, the FAT report did not even address the testing of 80 samples. There is no dispute that Axion's September 9, 2002 FAT report evidenced an unacceptable number of failures.

To the extent Axion claims that the 25 failures were attributable to problems with its air gun, then count X should be considered an "air gun count" and barred by the affirmative defenses of accord and satisfaction, and release as discussed in the United States' April 11, 2005 motion. Compl. ¶¶ 149-150. In fact, the Court, apparently recognizing that Count X is potentially an air gun claim, stated in footnote 7 of its October 31, 2005 decision, that the issue of release may impact Count X. Axion v. United States, 68 Fed. Cl. at 480 n. 7.

In sum, it cannot be disputed that: 1) Axion's FAT report did not include data upon the required number of FAT samples; 2) Axion's FAT report did not describe its FAT processes as required by the contract; and 3) Axion's report indicated that an unacceptable number of samples failed during FAT testing. Furthermore, there is also no dispute that the Navy had every right to terminate the contract for default for a disapproved FAT report. The contract's FAT clause provided that disapproval of a FAT shall be deemed to a failure to make delivery within the meaning of the contract's default clause. DA 62 (paragraph (d)). Additionally, it is beyond dispute that the contract's default clause, FAR 52.249-8 Default (Fixed-Price Supply and Service) (APR 1984), provides that the Government may terminate a contract for default for failure to deliver in accordance with the contract. DA 58.

Accordingly, because there is no dispute that Axion's FAT report did not satisfy the contract's requirements and that Axion's submission of a deficient FAT report is grounds for a termination for default, the Government should be granted summary judgment upon Count X.

**B. Count XI Should Be Dismissed Because The Navy Did Not Approve The Second FAT**

Axion alleges in Count XI that verbal communications between Axion and a Government quality assurance representative ("QAR") on September 6, 2002 resulted in FAT approval. Compl. ¶¶ 155-167. The Government should be granted judgment upon this count because the contract provides for neither verbal approval of FAT nor authorizes the QAR to approve FAT.

Pursuant to the unambiguous terms of the contract, verbal communications between Axion and the Government could never result in approval of FAT. First, the contract required Axion to submit a written FAT report; second, the contract provided that FAT approval would be in writing.

There is no dispute that the contract required Axion to submit a written FAT report. Both the contract's FAT clause and modification P00020 expressly called for contractor submission of a FAT "report." DA 62; DA163. Furthermore, the contract included Data Item Description DI NDTI 80809A, which established the information that must be included in FAT reports. DA 93-99. Pursuant to Section 10.2.6.3 of DI NDTI 80809A, FAT reports must include a complete description of procedures used in conducting FAT, including a description of the sequence of testing steps. DA 97. Given these specific requirements, Axion cannot successfully argue that verbal communications with the QAR satisfied the contract requirement for Axion to submit a written FAT report.

Furthermore, the contract also expressly rules out the potential for the Government to verbally approve FAT. The FAT clause sets forth a process in which the Government's FAT approval or disapproval determination is made after receipt of the FAT report and that approval shall be in writing. DA 62 (paragraph (b)). There is no dispute that the contract did not provide

for a verbal FAT approval. At bottom, verbal communications between Axion and the Government could never constitute FAT approval pursuant to the clear, express terms of the contract.

Additionally, there is no dispute that a QAR does not have authority to approve FAT, verbally or otherwise. The FAT clause unambiguously establishes that the contracting officer is the official who approves or disapproves FAT. DA 62. Moreover, pursuant to the unambiguous terms of the contract, the QAR is not responsible, and had no authority, to approve FAT. Nor does the QAR have any authority to change the FAT process required by the contract as the contract included the following clause:

> 5252.243-9400 AUTHORIZED CHANGES ONLY BY THE CONTRACTING OFFICER (JAN 1992)
>
> (a) Except as specified in paragraph (b) below, **no order statement, or conduct of Government personnel who visit the Contractor's facilities or in any other manner communicates with Contractor personnel during the performance of this contract shall constitute a change under the "Changes" clause of this contract**.
>
> (b) **The Contractor shall not comply with any order, direction or request of Government personnel unless it is issued in writing and signed by the Contracting Officer**, or is pursuant to specific authority otherwise included as part of this contract.
>
> (c) **The Contracting Officer is the only person authorized to approve changes in any of the requirements of this contract and notwithstanding provisions contained elsewhere in this contract, the said authority remains solely with the Contracting Officer**. In the event the Contractor effects any changes at the direction of any person other than the Contracting Officer, the change will be considered to have been made without authority and no adjustments will be made in contract price to cover any increase in charges incurred as a result thereof.

DA 11 (emphasis added).

At bottom, the contract called for submission of a written FAT report and a written FAT approval, and stated that the contracting officer was the official responsible for FAT approval. Pursuant to the "Authorized Changes Only by the Contracting Officer" clause, purported oral statements made by the QAR could not modify the requirements for a written FAT report and written FAT approval from the contracting officer.

This is consistent with the long standing legal principle that the Government may only be bound by those possessing actual authority. Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380 (1947); see also, United Food Servs., Inc. v. United States, 19 Cl. Ct. 539, aff'd without op., 928 F.2d 411 (Fed. Cir. 1991)(mess sergeant whose responsibilities included coordination with food service contractor had no authority to change food service contract). Pursuant to the terms of the contract, the QAR had no actual authority to approve FAT and, therefore, the Government cannot be bound by any purported QAR "approval" of the FAT.

Furthermore, the record shows that even if the facts as presented by Axion are presumed to have occurred, Axion could not have reasonably been misled by the QAR into believing the QAR had authority to approve FAT. Axion asserts that on September 6, 2002, the QAR failed in an attempt to contact the contracting officer to discuss the need for further testing. DA 403 (Latifi Depo. 214). The QAR's attempt to discuss the situation with the contracting officer only underscores the fact the QAR had no authority to approve FAT on his own and Axion could not reasonably have been misled into believing the QAR possessed such authority.

Finally, pursuant to the terms of the contract, verbal exchanges between Axion and the QAR could never result in FAT approval or otherwise change the FAT process required by the contract. Although there may be an outstanding factual issue regarding exactly what was

discussed between Axion and the QAR on September 6, 2002, nothing that was said between the parties could legally have constituted FAT approval or reasonably misled Axion into believing FAT had been approved.[12] Accordingly, the Government should be granted judgment upon Count XI.[13]

### C. Count XII Should Be Dismissed Because The Navy Did Not Breach Any Duty To Cooperate

Axion alleges in Count XII that the Government breached a duty to cooperate when the QAR departed Axion the afternoon of September 6, 2002. Compl. 168-177. The Government is entitled to summary judgment upon this count because the facts establish that the QAR's actions did not constitute a breach of any Government obligation.

The implied duty to cooperate prohibits the Government from substantially impeding contractor performance by acting in an evasive or untimely manner. TECOM, Inc. v. United States, 66 Fed. Cl. 736, 770 (2005). There are no facts to indicate the Government acted in such a manner, or any other manner, that could have prevented Axion from passing FAT.

On July 11, 2002, the parties bilaterally agreed to modification P00020 requiring Axion to conduct FAT upon 80 samples and then provide a FAT report to the Government by September 9, 2002. During the period between July 11, 2002 and September 9, 2002, a DCMA

[12] Further, the record demonstrates that Axion was told by senior QA personnel that on no uncertain terms, the QA personnel could neither make FAT determinations nor otherwise change the contract. DA 362 (Stickrod Decl. ¶ 10).

[13] Additionally, as the Court recognized in its previous opinion in this matter, Axion v. United States, 68 Fed. Cl. at 480 n.7, to the extent Axion claims its difficulties in the final days of FAT testing were attributable to problems with the air gun, then count XI should be considered an "air gun count" and barred by the affirmative defenses of accord and satisfaction, and release as discussed in the United States' April 11, 2005 motion. See Compl. ¶¶ 149-150.

QAR was present at Axion to observe FAT on more than a dozen occasions, including the afternoon of Friday, September 6, 2002, which was the last workday prior to the September 9, 2002 deadline. DA 361 (Stickrod Decl. ¶ 8); Compl. ¶ 171. None of Axion's testing problems were attributable to DCMA's QARs. DA 401 (Latifi Depo. at 208-209). There is no indication the Government QARs acted in an untimely or evasive manner so as to cause Axion to fail FAT.

Count XII amounts to no more than Axion claiming the Government should have made a QAR available through the weekend of September 7-8, 2002. Said another way, Axion is arguing that had it been able to continue testing throughout the weekend its September 9, 2002, FAT would have been deserving of approval. The argument is without merit because Axion was not required by modification P00020 to conduct an unlimited number of tests until it had demonstrated its PS-115 performed correctly. Rather, modification P00020 required Axion to test 80 units and submit a FAT report by September 9, 2002. Furthermore, there is no evidence of Axion requesting that DCMA provide a quality assurance representative for on-site overtime coverage during the weekend of September 7-8, 2002. DA 362 (Stickrod Decl. ¶ 12). There are simply no facts that indicate the QAR acted in an untimely or evasive manner so as to cause Axion's FAT report to be disapproved, and the Government is entitled to summary judgment upon Count XII.[14]

[14] As with Counts X and XI, to the extent Axion claims its difficulties in the final days of FAT testing were attributable to problems with the air gun, then count XII should also be considered an "air gun count" that is barred by the affirmative defenses of accord and satisfaction, and release as discussed in the United States' April 11, 2005 motion. Compl. ¶¶ 149-150; see also Axion v. United States, 68 Fed. Cl. at 480 n.7.

## III. The United States Renews Its Request For Summary Judgment Regarding All Of Axion's Claims Associated With The Air Gun, Plating And Leaking (Counts I - IX and XIII - XXIX) Because The Sworn Testimony Of The Contracting Officer, John Korab, Makes Clear That He Did Not Know, And Had No Reason To Know, Of Axion's Alleged Mistake When The Parties Agreed Upon The Unambiguous Accord And Satisfaction And Release Language In Modifications P00017, P00019, And P00020

In its October 31, 2005 decision, the Court found that summary judgment in favor of the Government as to Counts I - IX and XIII - XXIX was not appropriate at that time due to the limited record that had been presented to the Court upon the issue of unilateral mistake as it related to the United States' release defense. Axion v. United States, 68 Fed. Cl. at 479-480. However, now that discovery has concluded and the record is complete, the sworn declaration of the contracting officer, John Korab, is directly relevant to the issue of unilateral mistake.

Mr. Korab's sworn testimony addresses both his state of mind and the information available to him when the parties executed the release modifications. DA 732. It is clear from Mr. Korab's testimony, and the documents he refers to in his declaration, that Axion cannot prevail under the doctrine of unilateral mistake as the doctrine requires that the contracting officer either knew or should have known of the contractor's mistake. Giesler v. United States, 232 F.3d 864, 869 (Fed. Cir. 2000). This conclusion is all the more apparent in that, when the unilateral mistake concerns the legal significance of a contract, such as in Axion's case, courts are less likely to reform a contract than if the mistake involves a mathematical error. Axion v. United States, 68 Fed. Cl. at 478. Mr. Korab's sworn statement makes clear that he did not know that Axion intended on reserving any right, nor did he have any reason to believe Axion intended on reserving any claims, when the parties executed modifications P00017, P00019, and P00020. DA 732.

As was established in our previous motion for summary judgment, the parties executed three modifications, P00017, P00019, and P00020, which contained unambiguous accord and satisfaction, and release language. DA 159, 162, 163. In these modifications, the parties agreed to waive "any and all claims, demands, or causes of action" that either the Navy or Axion might "have against the other arising out of or related to the contract to date." Id. Each of these modifications extended the contract's delivery schedule and were executed at a time when Axion was in delinquent status for non-delivery and at risk for a possible termination for default. Axion v. United States, 68 Fed. Cl. at 475. When he signed each modification, Mr. Korab thought the release language was important from the Navy's perspective in that by receiving a release of claims from Axion the Navy was getting something in return for granting Axion additional time to perform. DA 356 (Korab Decl. ¶ 8). At no time before, or during, the time these modifications were being executed by the parties, did Mr. Latifi state otherwise, and Mr. Korab thought Mr. Latifi completely understood the clear meaning of the language when he agreed to the modifications.

Mr. Korab's testimony shows that prior to the signing of these modifications, Mr. Korab had spoken to Mr. Latifi upon numerous occasions and read dozens of pieces of correspondence from Axion, and never once did he believe, or was lead to believe, that Mr. Latifi did not understand the words "full release . . . of any and all claims, demands, or causes of action . . . related to the contract to date" was anything but a full release of all claims known or unknown to Axion at that time. DA 733 (Korab Supp. Decl. ¶ 5). Mr. Korab's belief is buttressed by the fact that at all times prior to the execution of these modifications, Mr. Latifi displayed a great attention to detail in performing upon the contract, and upon numerous occasions Mr. Latifi

brought his questions and concerns to Mr. Korab's attention. Id. Furthermore, the fact that Mr. Korab was aware that Axion was unwilling to agree to a no-cost termination for convenience did not change Mr. Korab's understanding of the modifications because Mr. Korab still believed that Axion would be able to perform upon the contract. DA 733-734 (Korab Supp. Decl. ¶¶ 8, 10). Indeed, Mr. Latifi certainly thought this was the case as he upon numerous occasions subsequent to executing these modifications told Mr. Korab and other Government agents that he was close to fully performing. DA 734 (Korab Supp. Decl. ¶ 10). Indeed, prior to Axion executing modification P00017, Axion had in fact passed a FAT, indicating that it could perform, albeit with plating done by a subcontractor.

Accordingly, because unilateral mistake is dependant upon the knowledge of the contracting officer at the time the Government executed the modifications, and Mr. Korab has now testified that he did not know, nor had reason to know, that Axion was not agreeing to release "all claims" at that time, the Government is entitled to summary judgment upon these counts.

## IV. Axion's Motion For Summary Judgment Should Be Denied

Axion presents five broad arguments in its summary judgment motion, all of which relate to the air gun, leaking, or plating issues. Axion's motion fails for several reasons. Initially, Axion's motion must be rejected because it is inconsistent with the Court's October 31, 2005 decision holding that all claims related to the air gun, leaking and plating will be barred unless Axion can show that the contracting officer knew, or should have known of Axion's alleged mistake when it signed three bilateral modifications barring past claims. See Axion v. United States, 68 Fed. Cl. at 479. It is simply illogical at this point for Axion to demand summary

judgment upon the merits when the Court has determined the very same claims will be dismissed if the Government shows that Axion's unilateral mistake contention is meritless. This is especially true given the fact that, as we demonstrated above, the testimony of the contracting officer, John Korab, makes clear that Axion is not entitled to a defense of unilateral mistake. Nevertheless, even assuming that the issue of unilateral mistake is not present in this case, as we show below, Axion's motion for summary judgment is still without merit.

### A. Axion's Request For Summary Judgment Upon The Issue Of The Plating Specifications Should Be Rejected

Axion's motion for summary judgment regarding plating is premised upon the following three assertions: 1) the contract included an incorrect version of NAVORD 18332; 2) the NAVORD 18332 referenced in the contract was defective; and 3) the NAVORD 18332 should be viewed as a mandatory design specification for purposes of the Spearin doctrine (even though the express terms of NAVORD 18332 established that the document is merely a non-mandatory, working guide). See Pl. Mot. 9-22. Although Axion's motion does not tie any of its summary judgment arguments to specific counts in its complaint, Axion's plating counts are XV, XX, XXVIII, and XXIX. As we demonstrate below, these claims are without merit.

#### 1. Axion's Allegations Regarding Plating Are Covered By The Court's Prior Ruling Regarding Accord And Satisfaction And Release

Axion's motion for summary judgment upon the counts that concern "plating" issues must be rejected because they are clearly covered by the "accord and satisfaction and release language" discussed in the Court's previous decision. Axion v. United States, 68 Fed. Cl. at 479.

The record shows that on May 22, 1996, Axion sent a letter to the contracting officer requesting a 1980 version of NAVORD 18332. Pl. Mot. 13; DA 766. On June 5, 1996, the

contracting officer notified Axion that the Navy was only aware of the 1967 version of the document. DA 767. More than five years later, Axion executed the first of three bilateral modifications in which Axion agreed to the release of all claims arising under or related to the contract to date. DA 159, 162, 163. The issue of whether the contract included the most current version of NAVORD 18332 was therefore encompassed by the release language.

Similarly, the second premise of Axion's summary judgment motion, which alleges that the version of NAVORD 18332 included in the contract was defective, is also covered by the release language. The record shows that on November 13, 2000, Axion alleged to the contracting officer that guidance contained in NAVORD 18332 was defective. DA 190. On November 22, 2000, the contracting officer forwarded a letter to Axion asserting NAVORD 18332 was not defective. DA 192. Nearly a year later, Axion executed the first of three bilateral modifications under which Axion agreed to the release of all claims arising under or related to the contract to date. DA 159, 162, 163.

Finally, the third and final premise of Axion's theory, i.e., that NAVORD 18332 should be viewed as a mandatory design specification for purposes of the Spearin doctrine, is also an issue that arose long before Axion agreed to the above described release language. Thus, it too is covered by the release language of modifications P00017, P00019, and P00020. Mr. Korab's November 22, 2000 letter to Axion in which he informs Axion that the Navy did not believe the 1967 version of NAVORD 18332 was defective, also stated that NAVORD 18332 was a guideline that did not prevent the contractor from using its own procedures. DA 192. Therefore, Axion's assertion that NAVORD 18332 should be viewed as mandatory design specification is among those claims that are barred by the release language.

Accordingly, because all issues associated with Axion's defective plating specification claim are encompassed within the Court's release/unilateral mistake decision, Axion is not entitled to summary judgment.

**2. Even When Disregarding The Matter Of Release, Axion Is Not Entitled To Summary Judgment Upon Its Defective Plating Specification Claims**

Axion would not be entitled to summary judgment upon the defective plating specification claims even if the United States did not have the affirmative defense of release. There are material issues in dispute with respect to these claims. Furthermore, Axion has misapplied the law in arguing for summary judgment upon these claims.

Axion alleges the Navy lied in its response to Axion's request for a 1980 revision to the contract's plating document, NAVORD OD 18332. Pl. Mot. 57. The facts, however, indicate otherwise. On May 22, 1996, Axion forwarded a letter to the contracting officer asserting NAVORD OD 18332 was revised in 1980 and requesting a copy of such revision. DA 766. The contracting officer promptly referred the matter to the responsible engineering activity, Naval Surface Warfare Center Crane, for a review of Navy records associated with NAVORD 18332. DA 735 (Korab Supp. Decl. ¶ 13). Based upon NWSC's response, the contracting officer informed Axion that the Navy's records indicated NAVORD OD 18332 had not been revised since 1967. DA 767; DA 769.

Furthermore, the evidence obtained during discovery shows that rather than "lie" to Axion about the accuracy of the specification, the Navy actually tried to cooperate with Axion upon this issue. While reviewing Axion's assertion that NAVORD OD 18332 had been revised, the Navy provided Axion the opportunity to identify the revised document. DA 768. (John

Venskus's statement, "Alex [Latifi] was to call me today, with his POC at the Army concerning OD 18332. As of this time I have heard nothing."). There is simply no evidence indicating that Axion ever provided any additional information for the Navy to assess whether the document had been revised.

Furthermore, the United States contests Axion's assertion that the contract included the wrong version of NAVORD OD 18332 or that the 1967 NAVORD OD 18332 was revised. As evidence of NAVORD OD 18332 revisions, Axion produces two documents which the United States presumes Axion identified during discovery of Army files. Pl. App. 718-1105. The first document Axion cites for support is an altered version of the 1967 document with the following two statements typed onto the first page: 1) "Revision 1: This report was revised on August 8, 1973. The following pages were changed or added:;" and 2) "RETURN NAVORD OD 18332 DOCUMENT TO HDL [Harry Diamond Laboratories] CONTRACTS UPON COMPLETION OF THE POWER SUPPLY IPF PROPOSAL." See Pl. App. 718 (reproduced at DA 772).

The second document Axion cites to support the allegation that the 1967 NAVORD OD 18332 was revised is another altered version of the 1967 document. See Pl. App. 904 (reproduced at DA 773-774). The cover page of this version includes the statement, "Revised, February, 1980." Id. The second page of this revision sets forth a distribution list that includes two Army activities and Union Carbide Corporation. Pl. App. 905 (reproduced at DA 774).

Axion's production of these two documents does nothing to invalidate the Navy's 1996 representation to Axion that the Navy's records showed NAVORD 18332 had not been revised since 1967. The 1967 version of NAVORD 18332 was signed by a Navy Captain in the capacity of Commander of the now defunct U.S. Naval Ordnance Laboratory. See Pl. App. 561

(reproduced at DA 770). The 1973 and 1980 documents are not signed by any individual, let alone a Navy official. Furthermore, Axion identified the purported revisions in Army files, and both documents refer to Army activities with no mention of any Navy activity. Pl. App. 718, 904, 905 (DA 772, 774). Indeed, the Navy is not even listed upon the distribution list of the 1980 document. Thus, it is not surprising that the Navy had no record of the purported 1973 and 1980 revisions.

Moreover, as of this month, Navy archives shows that NAVORD OD 18332 has not been revised since 1967. DA 775-777 (Hahin Supp. Decl. ¶ 4). The documents Axion refers to as revisions to NAVORD OD 18332 appear to be, at best, informal, unsigned alterations to the 1967 document made for internal Army use.[15] The 1967 version, in fact, was merely a "working guide and . . . not intended as mandatory inflexible instructions. . . ." Pl. App. 561 (DA 770). The 1967 version, therefore, contemplated the possibility of case by case alterations to its guidance. The facts demonstrate the Navy responded to Axion's request for a 1980 version of NAVORD OD 18332 promptly, honestly and accurately. That is, the Navy correctly informed Axion that the document had not been revised since 1967.

Further evidence that NAVORD OD 18332 was not defective is that the prior PS-115 contractor, Accudyne, produced a functional plating line between 1976 and 1978 using the 1967 NAVORD OD 18332 Axion now alleges to be "defective." See DA 730 (Pierson Decl. ¶ 3). Additionally, the individual responsible at Accudyne for building this plating line is unfamiliar

---

[15] The United States acknowledges that it admitted to the "genuiness" of NAVORD OD 18322 revised 1980; however, although this is a "genuine" copy from the Army's files, we dispute that the document was a formal revision to the 1967 Navy specification.

with either a 1973 or a 1980 revision. Id. Accordingly, all facts point to a conclusion that the Navy did not mislead Axion about NAVORD OD 18332 and this guidance is not defective.

The Navy also disputes Axion's allegations that the 1967 version was defective and that the 1980 version was necessary for successful performance. Axion neither demonstrates that the 1967 document was defective nor shows any causal connection between the 1967 document and Axion's failures. Rather, Axion merely sets forth a litany of the differences between the 1967 document and the subsequent "revisions." Pl. Mot. 13-19; Pl. App. 551-555.

Axion's attempt to show the 1967 document was defective by simply referencing differences between that document and the 1973 and 1980 documents cannot withstand analysis. For instance, Axion pushes the boundaries of even nominally credible argument in addressing differences between the 1967 and 1973 documents with regard to the temperature at which a particular solution should be heated. Pl. Mot. 16. The 1967 document calls the user to "turn on steam and heat to 180 degrees Fahrenheit." Pl. App. 589. The 1973 document calls for the user to "turn on steam and heat to 180 degrees Fahrenheit minimum." Pl. App. 755. Mr. Latifi now asserts in his declaration, and Axion argues in its motion, that Mr. Latifi interpreted the 1967 document to mean 180 degrees Fahrenheit was a maximum and the solution could in fact be heated to a lower temperature. Pl. Mot. 16; Pl. App. 552-553. Axion does not address how an engineer of Mr. Latifi's pedigree could interpret words "turn on steam and heat to 180 degrees Fahrenheit" from the 1967 document to mean "turn on steam and heat to an amount that does not exceed 180 degrees Fahrenheit." Pl. App. 589. If Axion did indeed heat the solution to less than 180 degrees Fahrenheit, as Axion now implies, it certainly cannot blame the 1967 document which guided Axion to "turn on steam and heat to 180 degrees Fahrenheit."

A second example of Axion attempting to create an issue where none exists involves the alleged differences in the 1967 and 1973 documents concerning the frequency at which the solution should be analyzed. The 1967 guidance states the solution should be analyzed "at least twice a week" while the 1973 document calls for analyses "each 16 hours of operation or more frequently." Pl. Mot. 16. Without acknowledging that adherence to 1967 guidance guarantees the solution is analyzed twice per week, while adherence to the 1973 document will only result in two analyses a week if the solution is in operation nearly non-stop during working hours, Axion attempts to convince the Court that it was not analyzing the solution at the proper frequency.

The record, in fact, shows that the 1967 document was not the cause of Axion's problems. Prior vendors had successfully produced plating using the 1967 NAVORD 18332. DA 730 (Pierson Decl. ¶ 3); DA 192. In fact, Axion passed FAT using the plating of its subcontractor. DA 327-328 (Latifi Depo. 173-174); DA 189. Indeed, the record provides no indication that Axion's subcontractor struggled with the 1967 version of NAVORD OD 18332. Instead, Axion, fully aware that its subcontractor could produce acceptable plate stock with no more than the 1967 version of NAVORD 18332, now attempts to convince the Court that the 1967 document was defective.

At bottom, Axion is not entitled to summary judgment upon these counts because the evidence does not support a conclusion that the 1967 version was defective. To the contrary, the evidence shows that only Axion had difficulty with the 1967 NAVORD OD 18332.

**3. Axion's Allegation That It Is Entitled To Summary Judgment Upon The Plating Issue Under The Spearin Doctrine Is Without Merit**

Axion has also misapplied the law in arguing for summary judgment upon the issue of plating. Axion's theory is premised on the Spearin doctrine, which grants contractors a warranty that the contractor's adherence to a design specification will result in an acceptable product. Natus Corp. v. United States, 178 Ct. Cl. 1; 371 F.2d 450, 455 (1967). Design specifications mandate precisely the materials to be used and the manner of performance. Burke Corp. v. United States, 277 F.3d 1346, 1357 (Fed. Cir. 2002). In other words, design specifications leave the contractor with no discretion. The 1967 version of NAVORD OD 18332 could not be further from a design specification.

As discussed above, the document by its express terms was merely a "working guide . . . not intended as mandatory inflexible instruction precluding improvement based on sound investigation." Pl. App. 561. The Spearin doctrine, therefore, has no relevance to NAVORD OD 18332. The fact the Navy permitted Axion to change plating materials serves to further support the conclusion that the contract did not include design specifications with regard to plating. DA 759-760.

Axion's attempt to apply Spearin in the face of the obvious non-design specification nature of NAVORD OD 18332 is without merit. Axion argues that the above quoted language regarding the "non-mandatory" nature of the document should be interpreted to mean that the document was in fact a mandatory design specification unless the plate stock producer made "improvements based on sound investigation." Pl. Mot. 12 n 3. Axion's interpretation is unreasonable. The quoted language when read as whole certainly does not limit the manufacture's discretion to circumstances where a "sound investigation" had occurred.

Furthermore, even assuming that NAVORD OD 18332 was a design specification and the Spearin doctrine is applied, Axion's theory is still without merit because a contractor can only recovery costs under Spearin that proximately flow from the defective specifications. Frankin Pavkov Construction Co. v. Roche, Secretary of the Air Force, 279 F.3d 989, 995 (Fed. Cir. 2002). Putting aside that Axion has failed to show there was anything defective in the 1967 NAVORD OD 18332, Axion has also failed to show a proximate cause between any of the alleged defects and Axion's plating problems. Rather than show a proximate cause between the 1967 NAVORD OD 18332 and its plating problems, Axion merely lists the differences between the 1967 NAVORD OD 18332 and two other unsigned, internal Army documents. Axion's argument is even more curious given that Axion devotes as much time addressing the 1973 document as the 1980 document, when under Axion's own theory, the 1973 document would have been irrelevant as it would have been superseded by the 1980 document. Pl. Mot. 13-19.

Axion is simply not entitled to summary judgment upon the issue of the plating specifications even if the United States' affirmative defense of release is disregarded. There are material questions of fact in dispute, and Axion's summary judgment theory is premised upon a misapplication of the law.[16]

[16] Axion also argues that the Government cannot defend itself against the plating summary judgment motion because the United States could not provide a Rule 30(b)(6) witness. Pl. Mot. 20-21. This argument is without merit. As demonstrated in the above analysis, it does not take a 30(b)(6) witness to show that 1) Axion has provided no evidence that the 1967 NAVORD OD 18332 is defective; 2) the 1967 NAVORD OD 18332 has been used successfully in the past and is not defective; and 3) Axion's motion is premised on a faulty application of the Spearin doctrine.

### C. Axion's Summary Judgment Argument Concerning the Superior Knowledge Doctrine Is Without Merit

Axion also requests summary judgment upon the basis of the superior knowledge doctrine, arguing the Government withheld information from Axion associated with the plating and air gun. Pl. Mot. 23-29. As we demonstrate below, Axion's argument upon these claims are without merit. First, Axion has again failed to grasp the import of the Court's October 31, 2006 decision ruling that all claims related to the air gun, leaking and plating must fail unless Axion prevails upon the issue of unilateral mistake. Second, Axion would not be entitled to summary judgment upon this issue even if the United States did not have the affirmative defense of release and the merits of the issue were assessed against the summary judgment standard.

#### 1. Axion's Superior Knowledge Argument Regarding The Plating Fails

With respect to Axion's superior knowledge theory as it relates to Axion's decision to build a plating line, Axion alleges the Navy improperly failed to disclose information regarding the difficulty of building a plating line.[17] Pl. Mot. 24. This claim is encompassed by the release/unilateral mistake issue, and as we have shown, the testimony of Mr. Korab precludes Axion's defense of unilateral mistake.

On August 22, 2001, Axion forwarded a letter to the contracting officer that stated Axion had built a plating line at an "outrageous cost of money" and that a prior contractor had received substantial sums of money for building a plating line.[18] DA 762. Two months later, Axion

---

[17] While not stated in its motion, Count XXVIII of Axion's complaint is the relevant count with respect to superior knowledge of plating.

[18] Although Axion asserted to the contracting officer that the company had allegedly spent "outrageous" sums of money, Axion never provided the contracting officer with specifics as to how much money Axion had actually incurred on the plating line, or any other aspect of the

agreed to the first of three bilateral modifications in which Axion released all claims arising under or related to the contract to date. DA 159, 162, 163. When executing this release agreement, Axion knew not only that it had built a plating line, but that, the Government had experience with prior contractors building a plating line. Axion, however, failed to reserve any claims associated with either its costs of building a plating line or the superior knowledge the Government may have had regarding the experience of prior contractors with plating lines. Axion's superior knowledge claim with regard to building a plating line is, therefore, encompassed within the release/unilateral mistake issue and will be barred unless Axion prevails at trial on the issue of unilateral mistake.

Axion's superior knowledge claim as it relates to plating also reiterates the above discussed allegation that the plating specifications were defective. As addressed in detail above, Axion's claims associated with NAVORD 18332 arose long before Axion agreed to the release modifications. See DA 766; DA 767; DA 190; DA 192. In sum, summary judgment for Axion is not appropriate because these claims are barred given the contracting officer’s testimony upon the issue of unilateral mistake.

Furthermore, Axion is not entitled to summary judgment upon the issue of plating superior knowledge irrespective of the United States' affirmative defense of release. A

---

contract. DA 287-287A (Latifi Depo. 112-113); DA 734 (Korab Supp. Decl. ¶ 9). Also, Axion's August 22, 2001 reference to the amount a prior contractor, presumably Accudyne, spent upon a plating line is irrelevant because Axion’s plating requirements were much smaller than Accudyne's. See DA 725 (Goldberg Decl. ¶ 8). Without specifics, and given the nebulous nature of how much money constitutes “outrageous” sums, the contracting officer would have had no way of knowing whether Axion had actually spent a significant sum in the context of a $1.3 million contract, especially when Axion made it clear throughout contract performance that it was willing to incur additional cost under this contract to garner future business. DA 762; DA 734 (Korab Supp. Decl. ¶ 9).

Government contractor is entitled to relief pursuant to the superior knowledge doctrine when: 1) the contractor undertook to perform without vital knowledge of a fact that affects performance costs or duration; 2) the Government was aware the contractor had no knowledge of and had no reason to obtain the information; 3) a contract specification misled the contractor or did not put it on notice to inquire; and 4) the Government failed to provide the relevant information. Giesler v. United States, 232 F.3d 864, 866 (Fed. Cir. 2000).

Axion's argument that the Government possessed superior knowledge regarding the plating of the PS-115s rests upon an allegation that Axion entered into the contract unaware it would have to build a plating line because the Government failed to share "superior knowledge" associated with the plating business. Pl. Mot. 24. Axion's argument fails however because Axion cannot satisfy any, let alone all, of the elements required to prevail upon a theory of superior knowledge.

Axion is not entitled to relief under the superior knowledge doctrine for its plating claims because Axion did not lack any vital information. The solicitation clearly provided Axion with all relevant information necessary for Axion to understand the risks associated with plating. The solicitation and contract included Drawing 19102 10974349, Material Plated Type 1, which addressed the type of plating required for contract performance. DA 18. There is nothing misleading about this specification. The contract did not limit Axion's discretion regarding how Axion could obtain plating. The plating specification provided "suggested sources" for plating, rather than required sources; thus Axion was free to use a plating vendor of its choosing or

manufacture its own plating.[19] Pl. App. 218. Indeed, during the solicitation period, Axion informed the Navy it had researched both the plating drawing and NAVORD OD 18332 and it had a supplier in-line. DA 166-167.

Additionally, plating was discussed at the pre-award survey, where Axion informed the Government it would receive plating support from LDC Electroplating. DA 752. Furthermore, after Axion was awarded the contract, Axion used the plating of a German vendor before deciding to produce its own plating. DA 328 (Latifi Depo. 174); DA 189.

Another reason Axion has no basis to complain concerning the specification's "suggested sources" is Axion decided to use nickel instead of steel-plated nickel plating. DA 759, 760. Therefore, the contract did not even include suggested sources, let alone required sources, for the plating Axion desired to use.

Axion unconvincingly cites Aerodex, Inc. v. United States, 189 Ct. Cl. 344, 417 F.2d 1361 (1969), to support the proposition that Axion should be excused from waiting until after contract award to determine how it would satisfy the plating requirement. Pl. Mot. 29. In Aerodex, the contractor alleged the Government improperly failed to disclose that a required part would not be commercially available, and the Government's defense to this argument was the

[19] While Axion complains that it was unable to acquire plating from the suggested sources, the contract did not warrant that either of the suggested sources would supply Axion. Pl. Mot. 25; Pl. App. 218. The record shows that one of the suggested sources, Accudyne, was manufacturing PS-115 plating at the time of Axion's contract. DA 730 (Pierson Decl. ¶¶ 2-3). Also, even if Accudyne was not supplying plating to outside vendors in 1993, as Axion suggests, that does not mean Accudyne would not have supplied plating in 1995 and beyond, when Axion was performing. There is no indication in the record that Axion ever attempted to obtain plating from Accudyne. Finally, the plating specification stated the following about "suggested sources:" "Identification of the suggested source(s) of supply hereon is not to be construed as a guarantee of present or continued availability as a source of supply for the item(s)." DA 778; DA 217.

contractor failed to conduct a proper pre-bid inquiry. Id. The court balanced the contractor's assumption of risk in bidding upon a contract without a thorough inquiry into the contract's details against the Government's obligation to disclose information, and ruled in favor of the contractor upon the basis that the Government had the greater degree of fault. Id. at 357. The court assigned the greater degree of fault to the Government, however, because the contract specification included a specific brand-name description for the item that the contractor found to be extremely difficult to acquire during performance. Id. at 354, 358.

Unlike the situation in Aerodex, the Axion contract did not include a brand name description or otherwise require Axion to use a particular vendor's plating. Further, the Aerodex court ruled the Government did not have an obligation to assure bidders of the commercial availability of a component if the contract did not require that the component be purchased from a particular manufacturer, but rather provided a sufficient description of the item so as to permit in-house fabrication or purchase from suppliers. Id. at 354. As discussed above, the Axion contract did not mandate use of a particular manufacturer's plating and, in fact, permitted either in-house fabrication or subcontracting with a vendor of Axion's choosing. Pursuant to the rationale of Aerodex, Axion assumed the risk of its plating difficulties.

In sum, the evidence shows Axion cannot satisfy the requisite elements of the superior knowledge doctrine, and its motion for summary judgment based upon a theory of the Government's superior knowledge should be denied.

**2. Axion's Superior Knowledge Regarding The Air Gun Also Fails**

As with the above analysis of Axion's superior knowledge plating theory, Axion cannot be granted summary judgment upon the bases of its superior knowledge air gun theory because this claim is encompassed by release/unilateral mistake issue. Axion cannot credibly argue its superior knowledge, air gun theory is not an air gun claim encompassed by the Court's unambiguous ruling.[20] The record evidence is overwhelming and shows that Axion knew prior to award in 1995, and thus prior to signing the first of the three release modifications in 2001, that it needed an air gun, decided to build its own air gun in 1997, and successfully passed FAT with its air gun in May 1999. DA 717 (Axion Resp. to Inter. # 4); DA 186; DA 189; DA 159. When executing the release agreement, Axion understood the Government had knowledge of air gun testing that Axion lacked. DA 727-28 (Swank Decl. ¶ 3-4). To the extent the discrepancy in knowledge between the Government and Axion constituted a legitimate claim under the doctrine of superior knowledge, given John Korab's testimony and this Court's previous decision, Axion has lost the ability to raise this claim because the accord and satisfaction and release agreement control.

Furthermore, Axion is not entitled to summary judgment upon the issue of air gun superior knowledge irrespective of the United States' affirmative defense of release. Axion has failed to establish any facts that will enable it to satisfy all four elements of the superior knowledge doctrine. See Giesler v. United States, 232 F.3d at 866.

[20] The United States believes that Counts II and XXI of Axion's complaint concern air gun superior knowledge.

Axion cannot satisfy the first element of the superior knowledge test because Axion cannot demonstrate that it undertook performance of this contract without vital knowledge of a fact that affects performance. There is no dispute that Axion realized prior to entering the contract that it would be responsible for test equipment. DA 109; Compl. ¶ 24. There is also no dispute that Axion realized prior to contract award that its responsibilities with respect to test equipment would include an air gun to activate the PS-115 during testing. DA 717; DA 742. Therefore, Axion, having undertaken performance fully aware that it would need an air gun, cannot now claim it undertook performance without vital information.[21] Axion will not be able to satisfy the first element of the superior knowledge doctrine that requires the contractor undertake performance without vital knowledge.

Axion also will not be able to satisfy the second element of the superior knowledge doctrine that requires the Government be aware the contractor had no knowledge of and had no reason to obtain the information. From the Government's perspective, the solicitation and contract unambiguously informed Axion that the contractor would be responsible for test

[21] Axion attempts to support its superior knowledge theory by quoting the Navy engineer's statement that Axion did not anticipate it would have to develop an air gun. Pl. Mot. 36 quoting Hahin Depo. 71-72. Axion misses the point. The superior knowledge doctrine requires that Axion entered into the contract without vital information. The “vital information” in question here is that Axion was responsible for test equipment and that air gun testing would be necessary. Axion clearly knew it possessed these responsibilities when it agreed to the contract with the Navy. DA 109; DA 717; DA 742. The manner in which Axion built, bought, or borrowed test equipment was up to Axion and could never constitute “vital information” that the Government owed Axion. Indeed, Axion began with a plan to use Wildwood Electronics, shifting to an attempt to acquire an ARL air gun, and ultimately decided to build its own air gun in the hope it would generate future business. DA 742; DA 727-28 (Swank Decl. ¶¶ 3-4). In addition to using its air gun to test the PS-115s pursuant to the contract at issue here, Axion built its air gun with an eye to using it in future business arrangements. DA 734 (Korab ¶ 9).

equipment. DA 109. Additionally, the issue of testing equipment was addressed at the pre-award survey. DA 742.

There also is no doubt that Axion will not be able to demonstrate that the contract misled Axion or failed to put Axion on notice regarding an air gun. As addressed above, the record shows that prior to entering the contract, Axion was fully aware that it would have to produce, or otherwise acquire, an air gun to satisfy the contract's testing requirements. Axion, therefore, will not be able to demonstrate that it was misled by the contract specification, and thus, satisfy the third part of the superior knowledge test. Nor can Axion credibly argue that it was either misled or not put on notice to make inquiries concerning an air gun. As such, Axion will never be able to demonstrate all four of the required elements under the superior knowledge doctrine.

### D. Axion's Argument Concerning The Implied Duties To Cooperate And Not Hinder Performance Is Without Merit

Axion requests summary judgment upon the basis of the implied duties to cooperate and not hinder performance. Pl. Mot. 39-43. As with the superior knowledge theory discussed above, this argument involves plating and the air gun.[22] As we show below, Axion is not entitled to summary judgment upon its duty to cooperate theory, even if the United States' release defense is not considered.

#### 1. Axion's Argument That The Government Did Not Cooperate With Axion Upon The Plating Issue Is Without Merit

Axion's duty to cooperate theory as it relates to plating merely rehashes Axion's defective plating specification theory. Compare Pl. Mot. 40 with Pl. Mot. 9-19. That is, Axion

[22] Axion has again failed to consider the Court's October 31, 2005 decision that all claims associated with plating and the air gun will be barred by release unless Axion prevails upon the issue of unilateral mistake, which Mr. Korab's testimony makes clear it cannot do.

alleges a breach of the duty to cooperate for the Government's failure to provide Axion with the purported revisions to NAVORD OD 18332. As addressed above, there are material facts in dispute regarding whether the 1967 version of NAVORD OD 18332 was ever revised and whether the 1967 NAVORD OD 18332 is defective.

### 2. Axion's Argument That The Government Did Not Cooperate With Axion Upon The Air Gun Issue Is Without Merit

Axion's argument regarding the Government's alleged failure to cooperate in developing the air gun involves the contracting officer's response to Axion's request for an air gun shortly after award of the contract. In that response, the contracting officer informed Axion that the Navy had never provided an air gun to a previous contractor. There was nothing disingenuous about this truthful statement from the contracting officer. DA 735 (Korab Supp. Decl. ¶ 12). Moreover, Axion's attempt to frame the air gun issue as a failure to cooperate is particularly feeble in that Axion entered into the contract fully aware that the an air gun would be required, and that the contract's express terms made Axion responsible for all testing equipment. DA 109, 717; DA 742.

As Axion's brief acknowledges, the duty to cooperate must be assessed in the context of the particular circumstances of the case. Pl. Mot. p. 40 (quoting Orlosky, Inc. v. United States, 68 Fed. Cl. 296 (2005)). However, Axion's motion completely fails to show how the duty to cooperate requires an agency to furnish a contractor with equipment the agency does even possess, and where the contractor willingly entered a contract fully aware that the equipment would be the contractor's responsibility.[23]

[23] An analysis of the context in which the Orlosky Court addressed the implied duties to cooperate and not hinder performance reveals that the case is of no benefit to Axion. In

Axion's duty to cooperate theory as it relates to the air gun also alleges the Army, who was not even a party to the contract, breached the duty to cooperate by failing to either provide Axion with air gun documents or inform Axion that the documents could be obtained from a third agency, the Department of Commerce. The Army, however, had no contractual relationship with Axion. Additionally, Axion has failed to produce any evidence to support a conclusion that the Army treated Axion unreasonably. For example, the Army employees remotely involved with Axion and this contract for PS-115s had no knowledge that the air gun documents might be available from the Department of Commerce's National Technical Information Service.[24] DA 786 (Swank Depo. 94-95); DA 729 (Swank Decl. ¶ 7). Moreover, the Army actually offered to test Axion's batteries, but Axion instead chose to pursue building its own air gun and conduct its own tests. DA 727 (Swank Decl. ¶ 3).

---

Orlosky, the Court found a breach of the implied duties for the Government's failure to provide the contractor access to the worksite and Government-caused confusion over whether the work had been accepted or terminated for the Government's convenience. Orlosky, 68 Fed. Cl. at 312-313. In Axion's case, the Government never hindered Axion's ability to perform, but rather repeatedly extended the contract to give Axion more opportunities to perform, and there is no confusion in Axion's case that the contract was terminated for default. Furthermore, Orlosky supports the United States' position in that the contractor could not recover claims associated with problems that would have been averted had the contractor properly researched the requirement before award. Id. at 305-306. Axion would have avoided many of its problems, for instance, had it not waited until after the contract was awarded to worry about how it would acquire an air gun.

[24] Axion's evidence concerning the Army providing an air gun document to the Department of Commerce is too marginal to have any relevance to the case. See Pl. Mot. 41-42; Pl. App. 236-237. First, Axion mischaracterizes the document in question by referring to it as "detailed drawings" when in fact the document is not a drawing and would not have been as useful as a drawing in the building of an air gun. DA 729 (Swank Decl. ¶ 7). Second, Axion provides absolutely no evidence as to whether the document was publicly available from the Department of Commerce during the period when Axion began building its air gun in 1997 through 1999 when Axion passed FAT with its air gun. DA 186; DA 189. Axion, in fact, does not even describe how the document can be obtained from the Department of Commerce today.

In sum, the Army was not a party to the contract and, therefore, owed Axion no duty to cooperate. However, even if the Army did owe Axion a duty, the record does not support a conclusion that the Army did not cooperate with Axion given that it offered to assist Axion by testing its batteries.

**E. Axion's Summary Judgment Argument Concerning "No Tests" Is Without Merit**

Axion's fourth summary judgment argument alleges the termination for default was improper because the Government failed to consider "no tests" when assessing Axion's September 2002 FAT report.[25] Axion's argument here is also without merit.

Axion's "no test" theory is a red herring in that Axion's challenge against the Navy's disapproval of FAT fails even if Axion's no-test theory is adopted. Axion's "no test" theory is premised upon an assumption that Axion was permitted during FAT to "substitute" a new PS-115 for a PS-115 that was tested and deemed a "no test." Pl. Mot. 45. Regardless of whether Axion's assumption is correct, the contract required Axion to deliver a FAT report by September 9, 2002 that included testing documentation on 80 PS-115s. DA 162; DA 163. Axion, therefore, had no excuse not to provide a FAT report with data on 80 PS-115s because, under its own theory, it could have "substituted" new PS-115s whenever a "no test" occurred until good data was obtained on 80 units. The record shows that Axion's FAT report included data on fewer than 80 tested PS-115s. DA 205, DA 402 (Latifi Depo. 212); DA 425. Axion, therefore, cannot

[25] Although Axion has not aligned its summary judgment arguments with the actual counts in its complaint, this theory most closely involves Count X (Navy's Reasons For Termination For Default Not a Valid Basis to Reject FAT).

prevail on its "no test" theory as it is based on a premise that, even if true, does not excuse Axion's failure to submit a satisfactory FAT report. [26]

Moreover, Axion’s "no test" summary judgment theory ties Count X to an air gun claim, i.e., Axion alleges difficulties associated with air gun testing altered the standards under which the FAT report should be assessed. Therefore, Count X is encompassed by the release/unilateral mistake issue and should now be dismissed in light of Mr. Korab's testimony. It is beyond dispute that prior to signing all three of the release agreements, Axion had built an air gun, used its air gun to pass one FAT, and experienced many air gun testing difficulties. DA 189; DA 738, 740. Thus, Axion's “no test” theory is at bottom, another claim involving the air gun, which is now clearly barred by the doctrines of accord and satisfaction and release.

**F. Axion's Summary Judgment Argument Concerning The Leakage Issue Is Without Merit**

Axion's fifth, and final, summary judgment argument involves an allegation that defective specifications caused Axion's batteries to leak.[27] Pl. Mot. pp. 48-57. As with the plating and air gun claims, Axion's allegation that defective specifications caused the leaking are encompassed within the release/unilateral mistake issue. Axion v. United States, 68 Fed. Cl. at 479.

---

[26] Additionally, the United States does not agree that Axion was permitted simply to “substitute” new PS-115s for those deemed “no tests” because the contract made Axion responsible for test equipment and by implication, test equipment failures. DA 109. Finally, the contract called for testing of 80 samples with no reference to a “no test” substitution process. DA 162; DA 163. In any event, Axion submitted an unacceptable FAT report even under the relaxed standard of its own “no test” theory.

[27] Axion's leakage theory counts include VII, VIII, IX, XIX, and XXVII.

On August 27, 2001, Axion forwarded a letter to the contracting officer alleging that the leaking Axion was seeing in the PS-115s that Axion had produced was attributable to the contract's specifications. DA 194. The Navy's September 6, 2001 response to Axion asserted the Navy disagreed with Axion's accusation that the contract's specifications would cause leaking. DA 196-197. The first of the three release modifications was executed on October 2, 2001. DA 159, 162, 163. Accordingly, the Court's October 31, 2005 decision correctly found that if Axion could not demonstrate that the Government knew, or should have known, of Axion's unilateral mistake, all of Axion's "claims relating to the air gun, the leaking electrolyte, and the plating will fail because they will be barred by the release." Axion v. United States, 68 Fed. Cl. at 479. Given Mr. Korab's testimony, these claims must now be dismissed.

Additionally, Axion's summary judgment theory regarding leaking must fail irrespective of the unilateral mistake issue as there are material facts in dispute. Although a prior PS-115 design did create a leaking problem, the PS-115 was re-designed in the 1980's to correct the leaking problem, and Axion's contract include the re-designed, corrected specifications. DA 723 (Goldberg Decl. ¶ 4). The Government explained the differences between the prior design and the design in Axion's contract to Axion both before, and after, award of the contract. DA 723 (Goldberg Decl. ¶ 4).

Since the PS-115 re-design in 1985, only Axion has experienced a leaking problem. DA 723 (Goldberg Decl. ¶ 4). The Army has more than 400,000 PS-115s that were delivered by Accudyne between 1995 and 1998 using the same design as that in Axion's contract, with no known leakage issues either in the plant or in the stockpile. DA 725 (Goldberg Decl. ¶ 8).

Axion, by its own admission, experienced thousands of instances of leaking.[28] DA 194. Improper welding can result in the type of leaking Axion experienced. DA 725 (Goldberg Decl. ¶ 7). The United States permitted Axion to inspect hundreds of PS-115s in storage at the Army Research Laboratory in addition to providing Axion with samples for the plaintiff's examination that were approximately 10 years old that were in pristine condition. DA 725 (Goldberg Decl. ¶ 8).

With respect to the leaking issue, Axion presents a witness who states an opinion regarding the copper on beryllium-copper aspect of the PS-115 specification without considering the rate at which such corrosion would occur or the type of corrosion that would result. DA 723-724 (Goldberg Decl. ¶ 5). Further, Axion's expert witness failed to account for the fact Axion's leakage theory is premised upon corrosion occurring in an oxygen depleted environment. DA 724-725 (Goldberg Decl. ¶ 6).

In sum, for the reason expressed above, Axion is not entitled to summary judgment on its leaking theory.

## CONCLUSION

For the reasons discussed above, the claims Axion asserts in Counts X, XI, and XII are without merit, and because there are no relevant factual disputes surrounding these claims, the Government respectfully requests that the Court enter summary judgment in its favor and dismiss Counts X through XII. Additionally, because the contracting officer has provided

---

[28] It is much more probable that many of the PS-115s Axion believed to have been leaking only appeared to be so due to contamination from a battery that actually was leaking due to bad welds and other errors Axion committed in the production process. DA 725 (Goldberg Decl. ¶ 7).

sworn, uncontroverted testimony, that he had no knowledge of Axion's alleged unilateral mistake, the Government's renewed motion for summary judgment upon Count I - IX and XII - XXIX, should be granted. Finally, Axion's motion for summary judgment should be denied.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Kathryn A. Bleecker
KATHRYN A. BLEECKER
Assistant Director

s/Douglas K. Mickle
DOUGLAS K. MICKLE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530
Tele: (202) 307-0383
Fax: (202) 353-7988

Attorneys for Defendant

OF COUNSEL:

Richard Martinelli
Office of Counsel
Naval Inventory Control Point
Mechanicsburg, PA 17055-0788

October 2, 2006

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on October 2, 2006, a copy of the foregoing "**DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Douglas K. Mickle
Douglas K. Mickle