Nos. 03-2644C & 04-297C
(Judge Firestone)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

AXION CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S COUNTER-STATEMENT OF FACTS

---

PETER D. KIESLER
Assistant Attorney General

DAVID M. COHEN
Director

KATHRYN A. BLEECKER
Assistant Director

DOUGLAS K. MICKLE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 353-7961
Fax: (202) 353-7988
Attorneys For Defendant

OF COUNSEL:

RICHARD MARTINELLI
Office of Counsel
Naval Inventory Control Point
Mechanicsburg, PA 17055-0788

October 2, 2006

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **AXION CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 03-2644C & 04-297C** |
| **v.** | ) | **(Judge Firestone)** |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S COUNTER-STATEMENT OF FACTS**

Pursuant to Rule 56(h)(2) of the Rules of the United States Court of Federal Claims, the United States respectfully submits the following counter-statement of facts in opposition to Axion's statement of facts and proposed additional facts.[1]

The United States responds to the cited paragraph numbers and their assertions, as set forth in Axion's statement of facts and proposed additional facts, as follows:

**I. Solicitation and Award of Contract N00106-96-C-KA09**

1. Axion Corporation ("Axion") is a small, minority owned company that has been in business for over twenty years. Declaration of Alex Latifi ("Latifi Decl.") 1 at Plaintiff's Appendix ("PA") 548; Deposition of Alex Latifi ("Latifi Depo.") p. 15 at PA 1183.

**Response**: Defendant agrees that Axion is a small business. Defendant does not agree that Axion is minority-owned. This proposed finding raises an issue of law, not fact, regarding statutory and regulatory provisions that set forth the Government's socioeconomic programs.

[1] Axion filed its response to defendant's proposed findings of uncontroverted facts and plaintiff's proposed findings of uncontroverted facts on May 24, 2005.

2. Alex Latifi ("Latifi" or "Alex Latifi") is the President, Chief Executive Officer, and majority shareholder of Axion. Latifi Decl. 1 at PA 548; Latifi Depo. p. 13 at PA 1181.

**Response**: Defendant does not disagree.

3. Axion's core business is winning and performing relatively small, build-to-print (i.e., Level III) Federal government production contracts. Latifi Decl. I at PA 548.

**Response**: Defendant does not agree because it lacks sufficient information regarding Axion's statements in paragraph 3 regarding what is Axion's "core business."

4. Axion has been awarded over 200 government contracts since the company was incorporated. Latifi Decl. 1 at PA 548; Latifi Depo. p. 14 at PA 1182.

**Response**: Defendant does not disagree.

5. In almost every instance, the government contracts Axion has been awarded have been firm-fixed price. Latif Decl. 1 at PA 348.

**Response**: Defendant does not disagree that Axion has been awarded firm-fixed prcie contracts. The term "in almost every instance" is too vague to respond further.

6. Axion has never been awarded a research and development contract, and research and development is not a core competency of Axion. Latifi Decl. 1 at PA 548.

**Response**: Defendant does not agree because it lacks sufficient information regarding Axion's statements in paragraph 6 regarding what is Axion's "core competencies." Defendant avers that Axion used this Navy contract to attempt to improve upon a proven, established PS-115 design. DA 380 (Stickrod Depo. ¶ 18).

7. In 1995, the United States Department of the Navy ("Navy") issued a solicitation for a fixed-price production contract to acquire 55,209 PS-115 power supplies. Complaint No. 03-2644 ("Complaint I"); Contract N00106-96-C-KA09 ("Contract") pp. 1-3, PA 1-3.

**Response**: Defendant does not disagree.

8. The PS-115 power supply is a dormant battery to be placed in a munition that is fired from a large bore weapon. Complaint I 6; Answer 6 (admitting).

**Response**: Defendant does not disagree.

9. A PS-115 power supply becomes active when a projectile containing the PS-115 is fired from a large bore weapon. Complaint I 7; Answer 7 (admitting central allegations).

**Response**: Defendant does not disagree.

10. The acceleration produces as much as 25,000 Gs of force. Id.

**Response**: Defendant does not disagree.

11. The force causes a cutter within the PS-115 to penetrate and cut a diaphragm. Id.

**Response**: Defendant does not disagree.

12. An acid passes through the penetrated diaphragm and permeates the cells. Id .

**Response**: Defendant does not disagree.

13. The resulting electrical charge causes the fuse to detonate the explosive. Id.

**Response**: Defendant does not disagree.

14. The solicitation for the Contract contained detailed drawings on how to produce the PS-115s. Contract Drawings, generally, PA 21-34, 148-218; Complaint I  11, 58.

**Response**: Defendant does not disagree the contract contained drawings that had varying degrees of detail. Defendant disagrees with any implication that the drawings left Axion with no discretion when performing.

15. The solicitation also contained an option quantity for an additional 55,209 units. Contract p. 2 at PA 2; Complaint I  9; Answer  9.

**Response**: Defendant does not disagree.

16. Axion submitted a proposal and was awarded the Contract by the Navy on December 14, 1995. Contract p. I at PA 1; Complaint I  18, 21; Answer  18, 21.

**Response**: Defendant does not disagree.

17. The Contract required Axion to produce 55,209 PS-115 power supplies/batteries at a price of $23.80 per unit, for a total cost of $1,313,974.20. Complaint I  18, 21; Answer  18, 21; Latifi Depo. p. 28-29 at PA 1184-1185; Declaration of John Korab  3, PA 420.

**Response**: Defendant does not disagree.

## II. Axion's Development Of An Air Gun For Testing

18. Initially, the United States Department of the Army ("Army") had acquired PS-115s for the Navy. Complaint I  10; Answer  10.

**Response**: Defendant does not disagree.

19. Before awarding the Contract to Axion, Defendant United States ("United States" or "Government) had acquired PS-115s from Accudyne Corporation. Contract,

Abstract History, PA 20 (listing Accudyne Corp. as having been awarded PS-115 contracts in June 1992 and August 1993); Deposition of Jerry Hahin ("Hahin Depo.") p. 15-16 at PA 1235-1236. See also, generally, PA 429-435 (Accudyne test data and Accudyne list of Government owned property to be used); PA 438 (Accudyne report, January 21, 1984).

**Response**: Defendant does not disagree.

20. Union Carbide was also a prior contractor working with the Government on PS-115s. PA 450 (Union Carbide technical report), PA 543-544 (under the discussion of "Mechanism of Corrosion," the Government scientists report at PA544, "[t]he presence of methane (CH4) found in ampules from both battery manufacturers at (UCR at NSWC-WO and ACC at NWSC-Crane) is explained by the succeeding step of equation (7) . . .").

**Response**: Defendant agrees that Union Carbide had worked with the Government on the PS-115 battery. Defendant disagrees that Union Carbide had worked with the Government on PS-115s of the same design called for in Axion's contract.

21. The Contract between the Government and Axion required a first article test before Axion could proceed to production. Complaint I 15.

**Response**: Defendant does not disagree.

22. The Contract also stated "the contractor shall provide all AIE (except for any equipment listed as available in Appendix VI) necessary to assure conformance of components and end items to contract requirements." Contract, Acceptance Inspection Equipment Requirements, p. 97, 1.b., PA 114; Complaint I 16; Answer 16.

**Response**: Defendant does not disagree.

23. The Contract did not specifically mention an "air gun" for testing. Complaint I, 16; Answer 16.

**Response**: Defendant does not disagree. Defendant avers, however, that Axion's contract required that Axion was responsible for all aspects of testing and that Axion knew prior to entering the contract that an air gun would be required. DA 717 (Axion's Response To Government Interrogatory # 4); DA 741 (Preaward survey documentation explaining that the "testing requirements were discussed at length during the preaward [survey]."); see also DA 62, DA 109.

24. The Contract did not contain any specification for an air gun. Complaint No. 04-297C ("Complaint II") 63; Latifi Decl. 3 at PA 549; Latifi Depo, p. 54-55 at PA 1186-1 187.

**Response**: Defendant does not disagree. Defendant avers however, that Axion's contract required that Axion was responsible for all aspects of testing. DA 62, 109.

25. What the Contract did specify with regard to testing was the Navy's reservation of the right to perform the test in the most realistic environment, i.e., inserting PS-115's into actual projectiles and then firing the projectiles from large bore weapons. Drawing 11744726, paragraph 4.4.6.2.2, PA 160 ("The Government may at its discretion perform the following field tests. One hundred and eighty power supplies may be fired from the designated artillery pieces specified below. Power supply information may be telemetered."); Latifi Decl. 3 at PA 549; Latifi Depo, pp. 54-55 at PA 1186-1187.

**Response**: Defendant does not disagree that the contract provided the Government with discretion to perform field tests. Defendant disagrees that field testing was the most "realistic environment" for testing. The extent to which field testing was

realistic was dependent upon the availability of Government personnel and weaponry to conduct such testing. Furthermore, defendant avers that failure analysis is much more problematic when testing is conducted at a full-round up level instead of sub-component testing.

26. The Contract solicitation identified the two previous contracts for PS-115s that had been awarded by the Government to the Accudyne Corporation. Contract, Abstract History, PA 20 (listing Accudyne Corp., in Janesville, Wisconsin, as having been awarded PS-115 contracts in June 1992 and August 1993); Hahin Depo. pp. 15-16 at PA 1235-1236.

**Response**: Defendant does not disagree.

27. Latifi traveled to Wisconsin to meet and discuss potential employment with an individual who had been employed by Accudyne to produce PS-115s. Latifi Depo. p. 58 at PA 1189.

**Response**: Defendant does not disagree.

28. The former Accudyne employee with whom Latifi met informed Latifi that under the previous PS-115 contracts the Government had provided Accudyne with an air gun to perform the testing of the PS-115s. Id; Latifi Decl. 20 at PA 556.

**Response**: Defendant does not disagree. However, defendant avers that pursuant to the unambiguous terms of Axion's contract with the Navy, Axion was responsible for all testing equipment. DA 109.

29. In a letter dated January 17, 1996, Axion requested the Government provide Axion with an air gun. Complaint I 26; Latifi Depo. pp. 54-55 at PA 1186-1187; Axion Letter to Contracting Officer dated January 17, 1996, PA 220.

**Response**: Defendant does not disagree.

30. The Government, however, declined to provide Axion with an air gun. Complaint I 27; Latifi Depo, pp. 54-55 at PA 2286-1187; Latifi Decl. 21 at PA 556-557.

**Response**: Defendant does not disagree. However, defendant avers that pursuant to the unambiguous terms of Axion's contract with the Navy, Axion was responsible for all testing equipment. DA 109. Defendant further avers that the Navy did not have an air gun to give Axion. DA 735 (Korab Supp. Decl. ¶ 12).

31. The Contracting Officer on Axion's PS-115 Contract was an employee of the United States Department of the Navy, John Korab. Letter from John Korab, Contracting Officer, 26 January 1996, PA 221.

**Response**: Defendant does not disagree.

32. The Contracting Officer's rationale for declining to provide Axion with an air gun was that "[t]he Navy did not supply any air guns to the previous contractor, Accudyne Corporation, for test purposes." Letter from Contracting Officer to Axion dated January 26, 1996, PA 221.

**Response**: Defendant disagrees. Regardless of the language used in denying Axion's request for an air gun, the contracting officer's rationale for denying Axion's request was that the Navy did not have an air gun to provide Axion. DA 735 (Korab Supp. Decl. ¶ 12). Defendant avers that pursuant to the unambiguous terms of Axion's contract with the Navy, Axion was responsible for all testing equipment. DA 109.

33. The Government did provide an air gun to Accudyne. See Listing of Government-Owned Property To Be Used For Performance of Accudyne dated 01 Aug

91, PA 435 (listing as equipment of the Government to be used on the PS-115 contract, by the prior contractor, Accudyne, one "Spin-A-Gun"); Latifi Decl. 20, PA 556; Latifi Depo. pp. 64-65 at PA 1191-1192 (Korab stated, "the Amy did that. And your contract is with the Navy, not the Army."). Compared to Defendant's Responses to Plaintiff's Requests for Admission ("RFA") Nos. 86-88, PA 1266-1268 (stating that Defendant United States "lacks sufficient knowledge to respond," that "the contracting officer associated with Accudyne has passed away," and that the United States "[a]dmits only that Accudyne possessed some Government-owned equipment" but "[o]therwise, the United States lacks sufficient knowledge to respond").

**Response**: Defendant does not disagree that equipment provided to Accudyne may have included an air gun. However, defendant avers that the issue is not relevant. Pursuant to the unambiguous terms of Axion's contract with the Navy, Axion was responsible for all testing equipment. Da 109.

34. The United States, through the Department of the Army, supplied an air gun to Accudyne. Id. See also Complaint I 25; Answer 25.

**Response**: Defendant does not disagree that equipment provided to Accudyne may have included an air gun. However, defendant avers that the issue is not relevant. Pursuant to the unambiguous terms of Axion's contract with the Navy, Axion was responsible for all testing equipment. DA 109.

35. The Department of the Army worked with the Department of the Navy on earlier PS-115 contract issues, including at least one pre-award survey and a meeting with a prospective contractor. 22 Jul 93 Memorandum From Andrew J. Sabonis, Jr. Thru AIlan Goldberg To Robert Hamlen, PA 272 (explaining, in this document produced by

Defendant United States in this case, how Sabonis was "invited by Brian Gage to assist Navy in evaluating this potential contractor").

**Response**: Defendant does not disagree that there was some coordination between the Army and Navy upon certain PS-115 issues; however, defendant disagrees with any implication that the Army was in anyway a party to Axion's contract or that Axion had any contractual relationship with the Army.

36. Brian Gage was an employee of the Navy involved in PS-115 manufacturing contracting in 1993. 22 Jul 93 Sabonis Memorandum, PA 272.

**Response**: Defendant does not disagree.

37. Andrew J. Sabonis, Jr. was an employee of the Amy involved in PS-115 manufacturing contracting in 1993. 22 Jul 93 Sabonis Memorandum, PA 272.

**Response**: Defendant does not disagree.

38. Jerry Hahin is an engineer and was one of the Navy employees who was working with Axion on the PS-115 Contract. See generalIy, Hahin Depo. at PA 1233-1260; Hahin Decl. 2, PA 414.

**Response**: Defendant does not disagree.

39. Jerry Hahin met with Brian Gage, the Navy employee that had worked with the Army employee, Andrew Sabonis; and, Jerry Hahin made a visit to Accudyne who had also produced the battery. Hahin Depo., p. 15, PA 1235 ("I basically just reviewed the drawing package and talked with Brian about that particular battery, the type of testing that was involved, and I made a visit to Accudyne who also produced that battery.").

**Response**: Defendant does not disagree.

40. Brian Gage, the Navy employee that worked with Sabonis in 1993, also called Alex Latifi at Axion in April 1997 and talked to him about Axion's PS-115 manufacturing efforts. Letter from Axion to John Korab, Navy Contracting Officer, April 15, 1997, PA 225 ("On 10 April, 1997, I talked to Brian Gage (he called me) about the RFW's and letters that we have submitted, and as of yet have not been answered. Brian indicated that Craig and he have some concern with the RFW #W-KA-09-02, solder ring dimension change.").

**Response**: Defendant does not disagree.

41. By July 1993, both the Army and the Navy were aware of problems with finding suppliers of materials for PS-115 power supply manufacturing efforts. 22 Jul 93 Memorandum, supra, at PA 272-273 (wherein Sabonis notes that there were no suppliers for plated electrode stock, and comments he made regarding same during this joint Army and Navy meeting); Navy Small Business Set Aside Form, Addendum, January I993 (Navy employee stating, "Accudyne has the only plater in operation to provide plated stock which is a critical process in the manufacture").

**Response**: Defendant disagrees. Defendant avers that Axion was able to find a vendor to supply Axion with plate stock. DA 327-28. Defendant further avers that Axion used its vendor's plate stock to produce PS-115 which successfully passed FAT prior to Axion's decision to produce its own plate stock, thereby invalidating that FAT approval. DA 328.

42. The Contracting Officer, John Korab ("Korab"), knew that the Army had provided an air gun to Accudyne. Latifi Depo. pp. 64-65 at PA 1191-1192 (Korab stated, "the Army did that. And your contract is with the Navy, not the Army.").

**<u>Response</u>**: Defendant agrees that after Mr. Latifi told Mr. Korab that the Army provided Axion an air gun, Mr. Korab may have stated, "the Army did that." Defendant avers that to the extent Mr. Korab used that phrase, it was because, as a Navy contracting officer, he had no ability to acquire an air gun from another agency for Axion to use. DA 735 (Korab Supp. Decl. ¶ 12). Defendant further avers that the issue is not relevant because Axion's contract was with the Navy, not the Army, and the Navy did not have an air gun to provide Axion. <u>Id.</u>

43. The Government's air gun had been designed by the Army Research Laboratory ("ARL"). Deposition of John Korab ("Korab Depo."), pp. 21-22, PA 1125-1126; Latifi Depo. p. 59, PA 1190.

**<u>Response</u>**: Defendant does not disagree that the Army Research Laboratory has designed an air gun; otherwise disagrees as the Government has been involved with more than one air gun and Axion has not specified which air gun the statement concerns.

44. In 1993, when Andrew J. Sabonis, Jr. was working with the Navy, interviewing possible contractors for PS-115 production contracts, Sabonis was an employee of the Department of the Army at the Army Research Laboratory ("ARL"). PA 272-274.

**<u>Response</u>**: Defendant does not disagree that Mr. Sabonis was an employee of the Army Research Laboratory (ARL) in 1993. Defendant disagrees that Mr. Sabonis was "interviewing" contractors.

45. In his deposition in this case, Jerry Hahin, testified that, instead of attempting to build an air gun, Axion could have purchased an air gun from ARL or Accudyne. Hahin Depo. p. 47, PA 1238.

**Response**: Defendant does not disagree that Mr. Hahin said that Axion could have purchased an air gun when he was addressing the various ways Axion could have satisfied the contract's testing requirements.

46. ARL had originally agreed to sell Axion the drawing for the air gun. Complaint I 31; Latifi Decl. 21 at PA 556-557; Letter from Mel Morganstein at ARL to Alex Latifi at Axion, April 3, 1997, PA 234.

**Response**: Defendant disagrees. Defendant avers that while Axion and ARL may have discussed the possibility of entering into an agreement where ARL would have loaned Axion an air gun or provided Axion with mechanical drawings, ARL decided not to enter into such an agreement because Axion failed to provide a satisfactory technical proposal. DA 728 (Swank Decl. ¶ 4).

47. Axion sent a check to ARL to pay for an air gun drawing. Complaint ¶ 31; Letter from Axion to Contracting Officer dated April 15, 1997, PA 225; Latifi Decl. 21 at PA 556-557; ARL Letter to Axion, April 3, 1997, PA 234.

**Response**: Defendant does not disagree

48. After receiving the check, claiming "legal reasons," ARL refused to sell the drawings to Axion. Complaint I 31; Notes from ARL dated March 21, 1997, PA 235 ("Told him: (1) Can't just sell him dwgs; legal reasons."); Latifi Depo. pp. 64-69 at PA 1191-1196; ARL Letter to Axion, April 3, 1997, PA 234.

**Response**: Defendant does not disagree that ARL did not enter into an agreement with Axion. Defendant avers that while Axion and ARL may have discussed the possibility of entering into an agreement where ARL would have loaned Axion an air gun or provided Axion with mechanical drawings, ARL decided not to enter into such an

agreement because Axion failed to provide a satisfactory technical proposal. DA 728 (Swank Decl. ¶ 4). Defendant also disagrees with any implication that ARL needed a "legal reason" to refrain from entering an agreement with Axion. Defendant further avers that the Axion's contract was with the Navy, not the Army, and the Army had no obligation to enter an agreement with Axion.

49. Axion unsuccessfully tried to obtain an air gun as government furnished equipment. Korab Depo. p. 2 1, lines 4-7, PA 1225.

**Response**: Defendant does not disagree. However, defendant avers that pursuant to the unambiguous terms of Axion's contract with the Navy, Axion was responsible for all testing equipment. DA 109.

50. By as early as May 30, 1997, the Government was aware that Axion would be attempting to design and build a spin gun for testing. Memorandum to Alen Artz, 5/30/97, PA 227.

**Response**: Defendant does not disagree. However, defendant avers there was nothing significant about the Government's being aware that Axion would build its own testing equipment because the unambiguous terms of the contract made Axion responsible for all testing equipment. DA 109.

51. The Government was aware, on May 30, 1997, that Axion contended that the Government, through its agency, the Harry Diamond Laboratories, refused to provide air gun drawings. Id.

**Response**: Defendant does not disagree. However, defendant avers there was nothing significant about Axion contending that the Army would not provide Axion an air gun. The Army had no relationship with Axion with respect to Axion's contract with

the Navy. Further, the unambiguous terms of the contract made Axion responsible for all testing equipment.

52. The Navy had referred Axion, in Contract documents, to USA Harry Diamond Laboratories. Contract, Drawing 11744726, Subsection 2.1.2, PA 149.

**Response**: Defendant does not disagree that the contract specification referred Axion to ARL for parts and equipment lists. However, defendant avers that the contract specification did not refer Axion to ARL with regard to air gun drawings.

53. The Government, USA Harry Diamond Laboratories, refused to provide Axion access to its air gun and refused to provide Axion drawings for an air gun. Complaint I 31; Notes from ARL dated March 21, 1997, PA 235; Latifi Depo. pp. 64-69 at PA 1191-1196; ARL Letter to Axion, April 3, 1997, PA 234.

**Response**: Defendant disagrees. Defendant avers ARL offered to conduct some testing for Axion. DA 727 (Swank Decl. ¶ 3); DA 783 (Swank Depo. 23-24). Defendant further avers that while Axion and ARL may have discussed the possibility of entering into an agreement where ARL would have loaned Axion an air gun or provided Axion with mechanical drawings, ARL decided not to enter into such an agreement because Axion failed to provide a satisfactory technical proposal. DA 728 (Swank Decl. ¶ 4). Defendant also avers that the Army had no relationship with Axion with respect to Axion's contract with the Navy.

54. After the Contract was terminated for default, Axion learned that the drawings for the air gun, published by USA Harry Diamond Labs (sometimes "HDL"), Adelphi, Maryland, could be purchased for a nominal fee from the U.S. Department of Commerce National Technical Information Service ("NTIS"). Latifi Decl. 21 at PA

556-557 and Exhibit F thereto; The High Speed Tabletop Artillery Simulator report, PA 236-270.

**<u>Response</u>**: Defendant disagrees. DA 729 (Swank Decl ¶ 7). Defendant avers that it does not know the precise point in time that Axion became aware that any air gun document could be purchased from the U.S. Department of Commerce. Further, the Navy does not know the point in time that any air gun document first became available from the U.S. Department of Commerce for purchase.

55. The High Speed Tabletop Artillery Simulator was developed before September 1979; and, a full report on the project and the simulator that was developed was issued by Harry Diamond Laboratories on September 1979. Simulator Report at PA 238.

**<u>Response</u>**: Defendant does not disagree that a report entitled High Speed Tabletop Simulator was written in September 1979. The defendant does not know which simulator Axion refers to being developed before September 1979. Further, the United States objects to the term "full report" as the term is too vague for the defendant to provide a response concerning the contents of the document.

56. The simulator developed by the Government at Harry Diamond Laboratories, before September 1979, fulfilled "the requirements for a procedure to test the PS 115 power supply for the M732 fuze." Simulator Report at PA 242.

**<u>Response</u>**: The defendant does not disagree that the words "this report fulfills the requirements for a procedure to test the PS115 power supply for the M732 fuze" are contained in the High Speed Tabletop Simulator report. Defendant disagrees that the

report set forth Axion's testing obligations as it was Axion's contract, not the High Speed Tabletop Simulator report, that set forth Axion's testing requirements.

57. The Government did not provide Axion with the simulator report that it had at its Harry Diamond Laboratories. Latifi Decl. 21, PA 556-557; Complaint I 31; Notes from ARL dated March 21, 1997, PA 235; Latifi Depo. pp. 64-69 at PA 119I -1196; ARL Letter to Axion, April 3, 1997, PA 234.

**Response**: The defendant does not disagree. However, defendant avers that the Army had no obligation to enter into any agreement with Axion as Axion's contract was with the Navy, not the Army. Further, the unambiguous terms of the Axion's contract made Axion responsible for all test equipment. DA 109. Finally, defendant further avers that it is unaware of Axion requesting every technical report that may have been remotely related to the PS-115, and defendant also avers that it may not have been feasible to provide Axion with every such technical report.

58. Hahin, the Navy's Lead Project Engineer, testified that having the gun drawings from HDL would have been very helpful to Axion in avoiding the problems it encountered. Hahin Depo. pp. 55-56 at PA 1239-1240.

**Response**: Defendant does not disagree that Mr. Hahin made such a statement. However, defendant avers that the contact made Axion responsible for all test equipment. DA 109. Defendant further avers that the document in question does not involve drawings. DA 729 (Swank Decl. ¶ 7).

59. After the Government refused to provide the air gun drawings, Axion undertook to develop an air gun on its own. Latifi Decl. 21 at PA 556-557.

**Response**: Defendant does not disagree. Defendant also denies any implication that the Department of Commerce made air gun drawings available. DA 729 (Swank Decl. ¶ 7).

60. When Axion began developing the air gun, it did not know that it had begun a significant research and development effort. Latifi Depo, pp. 102, 110-111 at PA 1197, PA 1997a. and PA 1197b.

**Response**: Defendant disagrees. Defendant objects to the terms "significant research and development effort" as the word "significant" is vague and whether Axion's effort was "research and development" is a legal, rather than a factual, matter. Defendant is also unable to speculate upon matters associated with what Axion knew. Further, Axion indicated during contract performance that it intended to use the air gun for purposes other than the Navy contract; thus, Axion may have been willing to make an air gun with more functionality than required by the Navy contract. DA 734 Korab Supp. Decl. ¶ 9; DA 757; DA 380 (Stickrod Depo. 18).

61. Korab, the Contracting Officer for the Contract, acknowledged that he was aware that Axion struggled to develop an air gun and that Axion did so without the assistance of the Government. Korab Depo. p. 21 at PA 1225.

**Response**: Defendant does not disagree that the contracting officer was aware that Axion experienced difficulties in making an air gun. The defendant avers, however, that the contract made Axion responsible for all testing equipment. DA 109. Defendant also avers that Axion produced an air gun that was used to successfully pass FAT prior to Axion's decision to manufacturer its own plate stock, thereby invalidating the successful FAT.

62. Latifi and Axion spent a great deal of money attempting to develop an air gun to test the PS-115 batteries. Lalifi Decl. 23, PA 558-559; Latifi Decl. 24, PA 558 ("$1,545,934 involving the air gun"); Complaint II, Count I.

**Response**: Defendant does not disagree that Axion spent money building an air gun. Defendant avers that the term "great deal of money" is too vague to permit a response. Defendant further avers that during the course of the contract Axion never informed the Government of how much money it had spent. DA 734; DA 287-287A (Latifi Depo. 112-113).

63. Axion's President, Alex Latifi, took several pictures of the air gun he developed, which are attached to his Declaration. Latifi Decl. 22, PA 557; Exhibit G to Latifi Decl., PA 1176-1179.

**Response**: Defendant does not disagree.

64. What is referred to with regard to this Contract, by Axion and the Government, as an "air gun" or "gun" is actually a long tube in which a vacuum is created through the use of an air pump. One end of the tube is open, and at the other end of the tube is a motorized cylinder used to spin the battery being tested. The "bird," a piece of plastic in which the battery is encapsulated for testing, is placed in the open end of the tube, and the tube is then closed and the vacuum turned on. Once a sufficient vacuum is built up in the tube, the tube is again opened, with the vacuum shooting the bird into the spinning cylinder to create the effect of being shot out of a large bore weapon. A computer then recorded the required test data. Latifi Decl. 22, PA 557; Exhibit G to Latifi Decl., PA 1176-1179.

**Response**: Defendant does not disagree.

## III. Axion's Reliance On The Defective 1967 Plating Specification

65. Specification Control Drawing 19202-10974349, which describes the plating required for production of PS-115, was expressly incorporated into the Scope of Work of the Contract. Contract, PA 22.

**Response**: Defendant does not disagree.

66. The Contract, in the Technical Data Package Lists, also identified and incorporated Specification OD18332 -Procedures for Preparing Lead : Lead Dioxide Reserve Energizer Electrode Stock By Electrodeposition. Contract, PA 23.

**Response**: Defendant does not disagree that the contract identified and incorporated NAVORD OD 18332. Defendant, however, disagrees with any implication that NAVORD OD 18332 included mandatory procedures for producing plate materials. Defendant also disagrees that NAVORD OD 18332 is a "specification" to the extent the term means a document that includes mandatory procedures that limit the contractor's discretion.

67. Specification Control Drawing 19202-10974349 suggested two sources of supply for the required plating: Accudyne Corporation and Union Carbide Corporation. Specification Control Drawing 19202-10974349, Sheet 2 at PA 218 ("3. Suggested Source(s) of Supply: Accudyne Corporation Janesville, Wisconsin . . . Union Carbide Corporation Bennington, VT . . ."); Defendant's response to RFA No. 157, PA 1270.

**Response**: Defendant does not disagree. Defendant avers the contract expressly made no guarantees with respect to suggested sources. DA 778; Pl. App. 217.

68. Neither Accudyne Corporation nor Union Carbide Corporation were suppliers of plating at the time the Contract was entered into. Latifi Decl. 4 at PA 549-550.

**Response**: Defendant disagrees. Defendant avers that Accudyne produced plating during the time of Axion's contract. DA 725 (Goldberg Decl. ¶ 8); DA 730 (Pierson Decl. ¶ 2). Defendant has no knowledge of whether Axion attempted to obtain plating from either Accudyne or Union Carbide.

69. The Government was aware in 1993, three years prior to soliciting the Contract, that neither Accudyne Corporation nor Union Carbide Corporation would be able to supply the required plating. Andrew Sabonis 1993 Trip Report, PA 172-274.

**Response**: Defendant does not disagree the Sabonis trip report indicates that Accudyne and Union Carbide were not supplying plating in 1993. Defendant has no knowledge of whether Accudyne or Union Carbide could have provided plating when the Axion contract was awarded more than two years later or if Axion attempted to obtain plating from either Accudyne or Union Carbide.

70. Axion was able to obtain a small quantity of lead and lead dioxide plated nickel from a German Vendor to produce Axion's initial PS-115 units. Latifi Decl. 4 at PA 549-550; Latifi Depo. pp. 174-75 at PA 1201-1202.

**Response**: Defendant does not disagree that Axion obtained plating from a German vendor that was used by Axion to successfully pass FAT. Defendant lacks knowledge regarding whether the quantity Axion obtained was "small."

71. However, the German vendor that Axion identified on its own was unable to provide Axion with enough plating to satisfy the requirements of the Contract. Id.

**Response**: Defendant does not disagree that Axion elected to produce its own plating rather than use the plating of the German vendor. Defendant is unaware of precise reasons Axion's relationship with the German vendor ceased.

72. With no other sources of plating available, Axion was required to produce the lead and lead dioxide plated nickel using the information provided by the Government. Latifi Decl. 4 at PA 549-550.

**Response**: Defendant does not disagree that Axion decided to produce its own plating. Defendant disagrees there were no other sources of plating as, at the very least, both the German vendor and Accudyne could produce plating. DA 725 (Goldberg Decl. ¶ 8); DA 730 (Pierson Decl. ¶ 2). Further, defendant disagrees Axion was required to use the information provided by the Government as NAVORD OD 18332 was a non-mandatory guideline.

73. Prior to solicitation of the Contract, the Government was aware that a small business (such as Axion) would be unable to feasibly manufacture the plating due to the significant costs associated with the plating equipment. Navy SmalI Business Set Aside Form, NAVSO Form 4380, dated "1/8/93", PA 278-279.

**Response**: Defendant does not disagree that the Government was aware that the production of plating was a significant effort. Defendant avers that the Axion's contract did not require Axion to produce plate stock and that Axion produced PS-115 that passed FAT using the plating of another vendor.

74. As of January 1993, the Navy believed that the only plater in operation to provide plated stock which is a critical process in the manufacture of PS-115s was Accudyne; and, therefore the Navy doubted that any other firm could make the PS-115s

at fair market price or would have the technical ability to manufacture the PS-115s at all. Navy Small Business Set Aside Form, Addendum, PA 279.

**Response**: Defendant does not disagree that a 1993 Navy document indicates that Accudyne had the only domestic plater capable of producing plate stock necessary for the manufacture of PS-115s. PA 278-279. Defendant avers that to the extent the individuals responsible for this 1993 document believed only Accudyne could produce acceptable plating, such a belief was incorrect with respect to Axion's contract because Axion produced PS-115s that passed FAT using the plating of another vendor. Defendant further avers that any comparison between the value of Accudyne's plating equipment and Axion's plating needs is irrelevant since Accudyne's plating needs far exceed those of Axion's. DA 725 (Goldberg Decl. ¶ 8).

75. The Government knew that Accudyne would not supply plating stock to any potential PS-115 manufacturer. Andrew Sabonis 1993Trip Report, PA 272 ("Accudyne . . .has always maintained that they were a supplier of power supplies and not a supplier of any power suppIy components and or materials such as electroded plated stock.").

**Response**: Defendant does not disagree the Sabonis trip report indicates that Accudyne was not supplying plating in 1993. Defendant has no knowledge of whether Accudyne would have supplied Axion plating when the Axion contract was awarded more than two years later or if Axion attempted to obtain plating from Accudyne.

76. Since the Government knew, in 1993, that Accudyne was not a supplier for any power supply components or materials, the Government's conduct in listing Accudyne as one of two "[s]uggested sources of supply," in the Contract, was

misleading. Andrew Sabonis 1993 Trip Report, dated 22 Jul 93; Specification Control Drawing 19202-10974349, Sheet 2, PA 218.

**<u>Response</u>**: Defendant disagrees. The statements contained in paragraph 76 constitute plaintiff's argument, not statements of fact. The contract did not warrant that Accudyne would supply Axion with plating. As Axion admits, these were merely "suggested sources." Defendant further avers that the plain language of the specification states that,

> Identification of the "suggested source(s) of supply" hereon is not to be construed as a guarantee of preent or continued availability as a source of supply for the item(s).

PA 217, DA 778,

77. As of January 1993, the Navy valued the special plating line that Accudyne used for PS-115 plating stock plating at approximately $3 million. Id.

**<u>Response</u>**: Defendant does not disagree that an employee of the Navy estimated in 1993 that a plating machine could be valued at $3 million. Defendant avers that Axion's contract did not require Axion to build or acquire a plating machine. Defendant further avers that Accudyne required a much larger plating machine than that which would have been necessary to fulfill Axion's requirements. <u>Compare</u> DA 725 (Goldberg Decl. ¶ 8) <u>with</u> the maximum quantities Axion could be tasked to produce DA 2).

78. The Government was aware that the cost of building a plating line would range from $1.5 million dollars to $2.5 million dollars. Honeywell Proposal For Plating Machine, PA 390-409, 409 ("Total Budgetary Estimate $1,646,849"); Memorandum For Commander HDL, 23 SEP 1991, PA 410-413, 412 ("The cost to buy a new plater…is estimated to he $1.5 to $2.5M).

**<u>Response</u>**: Defendant disagrees. Axion cites to a proposal Honeywell Ordnance provided the Army nearly 3 decades before the Navy awarded the contract to Axion. Defendant is unaware of anyone in the Government that was familiar with the contents of this document at the time of Axion's contract. Further, the question of whether proprietary information forwarded to other agencies, decades earlier, is imputed to Navy contracting officials is a matter of law, not fact.

79. The specification for the Contract incorporated by reference "OD 18332 PROCEDURES FOR PREPARING LEAD: LEAD DIOXIDE RESERVE ENERGIZER ELECTRODE STOCK BY ELECTRODEPOSITION" (the "Plating Specification"). Contract, PA 23.

**<u>Response</u>**: Defendant does not disagree that Axion's contract incorporated NAVORD OD 18332. Defendant, however, disagrees with any implication that NAVORD OD 18332 included mandatory procedures for producing plate materials. Defendant also disagrees that NAVORD OD 18332 is a "specification" to the extent the terms means a document that includes mandatory procedures that limit the contractor's discretion.

80. The Contract provided that the Plating Specification was to be used in preparing the electrode stock plating. <u>Id.</u>

**<u>Response</u>**: Defendant does not disagree that the contract included a plating specification 10975349, Material, Plated Type I, that addressed preparation of electrode stock plating. DA 778-780. Defendant, however, disagrees with any implication that NAVORD OD 18332 included mandatory procedures for producing plate materials. Defendant also disagrees that NAVORD OD 18332 is a "specification" to the extent the

terms means a document that includes mandatory procedures that limit the contractor's discretion.

81. The 1967 version of the Plating Specification (sometimes referred to hereinafter as "1967 Specification") was included in the Technical Data Package accompanying the Contract, and incorporated into the Contract. Latifi Decl. 5 at PA 550-551; Contract, PA 23; 1967 Specification, PA 560-713; Axion Letter to Contracting Officer dated May 22, 1996 ("May 22 Letter"). PA 223; Memorandum from Contracting Officer to Axion dated June 5, 2006, PA 224.

**Response**: Defendant does not disagree. Defendant avers, however, that NAVORD OD 18332 did not include mandatory procedures.

82. The 1967 Plating Specification indicates that its purpose "is to describe known satisfactory procedures and equipment for the preparation, manufacture and quality control of reserve energizer lead: lead dioxide electrode stock in a continuous strip and batch sheet plating operation." Latifi Decl. Exhibit A, PA 561.

**Response**: Defendant does not disagree that NAVORD OD 18332 contains the quoted words. Defendant avers, however, that NAVORD OD 18332 did not include mandatory procedures.

83. In a letter dated April 22, 1996, Axion requested that the Government provide it a 1980 revised version of the Plating Specification. Axion Letter to Contracting Officer dated April 22, 1996, PA 222.

**Response**: Defendant does not disagree.

84. In a letter dated May 22, 1996, Axion again requested that the Government provide a 1980 revised version of the Plating Specification, as this revised version was

supposed to specify "the amperage requirement and time requirement of the plating process necessary to achieve optimum plating for lead nitrate and lead acetate." May 22, 1996 Letter from Axion to Contracting Officer, PA 223.

**Response**: Defendant does not disagree made a request with the quoted words; however, defendant disagrees with any implication that the purported 1980 document was necessary.

85. In response to Axion's May 22, 1996 letter, the Navy Contracting Officer, John Korab, sent an "Information And/Or Action Memorandum" to Axion indicating the following:

> ACCORDING TO THE NAVY'S RECORDS, THE "BASIC" REVISION. DATED 2 FEBRUARY 1967. IS THE LATEST REVISION OF NAVORD OD 18332. THE NAVY IS NOT AWARE OF ANY OTHER REVISION.

Memorandum from Contracting Officer to Axion dated June 5, 2006, PA 224.

**Response**: Defendant does not disagree.

86. The 1967 Plating Specification was revised in 1973. Latifi Decl., Exhibit C, 1973 Specification, PA 7 I 8.

**Response**: Defendant disagrees. Defendant avers that the unsigned document Axion asserts to be a 1973 revision did not formally revise the Navy's NAVORD OD 18332, but was rather an internal Army document.

87. The 1973 version of the Plating Specification (sometimes referred to hereinafter as "1973 Specification") contained several significant alterations to the plating process, including a change in the chemicals used, a change in the frequency at which the solution "baths" were to be analyzed, a change in the pH/Specific Gravity

requirements, and a change in the minimum temperature at which at least one of the solution tanks was to be heated. Latifi Decl. 8-10, PA 551-553; Latifi Decl., Exhibit C, PA 718-903.

**Response**: Defendant does not disagree that the document Axion asserts to be a 1973 revision is not identical to NAVORD OD 18332 of 1967. However, the term "significant" is too vague for the defendant to respond further.

88. One of the differences between the 1973 and 1967 Specifications is a revised bill of materials, which provides for the use of entirely different chemicals to produce the plating. Id.

**Response**: Defendant disagrees. Defendant avers that the unsigned document Axion asserts to be a 1973 revision did not formally revise the Navy's NAVORD OD 18332, but was rather an internal Army document.

89. In the 1973 Specification, pages 15 through 18, which contain the bill of materials, have all been revised (and thus crossed out). Significant changes were made in the materials used, including the addition of items numbers 36 through 43 on page 18. Id.

**Response**: Defendant disagrees. Defendant avers that the unsigned document Axion asserts to be a 1973 revision did not formally revise the Navy's NAVORD OD 18332, but was rather an internal Army document.

90. Between 1967 and 1973, the Government realized it should use different chemicals and materials in plating. Id.

**Response**: Defendant disagrees. The guidelines set forth in the NAVORD OD 18332 of 1967 have been used by other contractors to successfully produce plating. DA 730 (Pierson Decl. ¶ 2-3).

91. Another difference in the 1973 and 1967 Specifications is the "Plating Solutions" portion of the specifications, found on pages 21 through 34, which describes the methods used in making the solution "baths" which are an important part of plating the nickel with lead and lead dioxide. Latifi Decl. 9, PA 552; 1973 Specification, PA 755-782 (where many entire pages from the 1967 Specification are struck out entirely and replaced in the 1973 Specification with other entirely different requirements).

**Response**: Defendant does not disagree that the document Axion asserts to be a 1973 revision is not identical to NAVORD OD 18332 of 1967. Defendant avers, however, that the unsigned document Axion asserts to be a 1973 revision did not formally revise the Navy's NAVORD OD 18332, but was rather an internal Army document.

92. The strips of metal to be electroplated - in this case nickel - pass through "baths" of chemicals where they receive electrical charges that result in lead and lead dioxide adhering to the nickel. Id. See also Photographs, Exhibit B to Latifi DecI., PA 714-717 (in particular, see band of metal being passed through chemical bath, PA 717).

**Response**: Plaintiff's assertion is too vague to permit a response. Defendant cannot determine if plaintiff is referring to an internal procedure or a section of NAVORD OD 18332.

93. There are glaring differences in the methods outlined in the 1967 and 1973 versions of the Plating Specification. For instance, in paragraph 3.1.1 on page 21, under the "Maintenance" subheading, the 1967 Specification provides in step 1 for analyzation of the alkaline cleaner solution "at least twice a week." However, the 1973 Specification provides for analyzation after "each 16 hours of operation or more frequently." Latifi

Decl. 9, PA 552.

**<u>Response</u>**: Defendant does not disagree that the document Axion asserts to be a 1973 revision is not identical to NAVORD OD 18332 of 1967. However, the term "glaring" is too vague for the defendant respond further.

94. By relying on the 1967 Specification given to it by the Government, Axion was not analyzing the solutions at the appropriate frequency. Id.

**<u>Response</u>**: Defendant disagrees. The guidelines set forth in the NAVORD OD 18332 of 1967 have been used by other contractors to successfully produce plating. DA 730 (Pierson Decl. ¶¶ 2-3)

95. Additionally, in paragraph 3.1.2 on page 21 of the 1967 Specification, pursuant to step 2 of the subheading "Make-up," Axion was told by the Government to heat the alkaline cleaner tank to 180 degrees Fahrenheit. However, in the same paragraph of the 1973 specification (which the Government refused to give Axion), the Government provided instructions to heat the tank to 180 degrees Fahrenheit minimum. Latifi Decl . 10, PA 552-553; 1973 Specification, PA 755-756.

**<u>Response</u>**: Defendant does not disagree that Axion has identified an area where the document Axion asserts to be a 1973 revision is not identical to NAVORD OD 18332 of 1967. However, defendant avers that the unsigned document Axion asserts to be a 1973 revision did not formally revise the Navy's NAVORD OD 18332, but was rather an internal Army document.

96. The difference in temperature from the 1967 to the 1973 version of the Plating Specification for the alkaline clear tank is a very important difference, as Axion was under the impression that 180 degrees was the maximum temperature, when in

actuality Axion needed to be using a much higher temperature to get the lead to plate on the nickel. Latifi Decl. 10, PA 552-553;1973 Specification, PA 755-756.

**Response**: Defendant disagrees. The guidelines set forth in the NAVORD OD 18332 of 1967 have been used by other contractors to successfully produce plating. DA 730 (Pierson Decl. ¶¶ 2-3)

97. Further, the specification was changed from 1967 to 1973 with regard to the provisions for Specific Gravity requirements for plating. In the 1967 Specification, pH 2 to 4 was stated as a requirement. Page 66 of the 1967 Specification. In the 1973 Specification, pH 1 to 4 was stated as a requirement. Page 66 of the 1973 Specification. Also, the temperatures specified for the chemical bath were different. In paragraph 31 on page 67 of the 1967 Specification, 80 degrees Fahrenheit was called for; whereas 95-105 degrees Fahrenheit was called for in paragraph 31 on page 67 of the 1973 Specification. Latifi Decl. 10, PA 552-553; 1973 Specification, PA 832-835.

**Response**: Defendant does not disagree that Axion has identified an area where the document Axion asserts to be a 1973 revision is not identical to NAVORD OD 18332 of 1967. However, defendant avers that the unsigned document Axion asserts to be a 1973 revision did not formally revise the Navy's NAVORD OD 18332, but was rather an internal Army document.

98. There are differences found when comparing the 1980 version of the Plating Specification (which the contracting officer. Mr. Korab, represented to Axion as being non-existent) to the 1967 version. Latifi Decl. 1 1-17, PA 553-555; 1967 Specification, PA 560-713; 1980 Specification, PA 904-1105.

**Response**: Defendant does not disagree that the document Axion asserts to be a 1980 revision is not identical to NAVORD OD 18332 of 1967. However, defendant avers that the unsigned document Axion asserts to be a 1980 revision did not formally revise the Navy's NAVORD OD 18332, but was rather an internal Army document.

99. On page 41 of the 1980 version of the Plating Specification (sometimes hereinafter referred to as "1980 Specification"), at paragraph 4.2, there are 9 different solutions listed for use in plating the nickel, including a Degreasing (Perchlorethylene) solution and a Nickel Anodization (4% Nitric Acid) solution. However, when looking at the comparable provision in the 1967 Specification (the crossed out page 37 contained in the 1973 Specification), there are only 7 solutions listed, with the two solutions mentioned above being absent. Thus, in accordance with the 1967 Specification (the only specification Axion had at the time), Axion originally built a plating line that contained two less solution baths than the Government recommended in 1980 to produce satisfactory plating. Latifi Decl. 12, PA 553-554; 1967 Specification, PA 600; 1980 Specification, PA 953 (with the additional two solutions highlighted).

**Response**: Defendant does not disagree that Axion has identified an area where the document Axion asserts to be a 1980 revision is not identical to NAVORD OD 18332 of 1967. However, defendant avers that the unsigned document Axion asserts to be a 1980 revision did not formally revise the Navy's NAVORD OD 18332, but was rather an internal Army document. Defendant further avers that other contractors have used the 1967 document to successfully produce plating. DA 730 (Pierson Decl. ¶¶ 2-3).

100. On pages 36 and 37 of the 1980 Specification, detailed instructions are provided as to the correct methods of testing the various solutions to determine if they have been correctly mixed. These procedures are completely absent from the 1967 Specification (they were added as pages 34a, 34b, and 34c in the 1973 Specification). Latifi Decl. 13, PA 554; 1967 Specification, PA 597; 1980 Specification, PA 948-949.

**Response**: Defendant does not disagree that Axion has identified an area where the document Axion asserts to be a 1980 revision is not identical to NAVORD OD 18332 of 1967. However, defendant avers that the unsigned document Axion asserts to be a 1980 did not formally revise the Navy's NAVORD OD 18332 but was rather an internal Army document. Defendant further avers that other contractors have used the 1967 document to successfully produce plating. DA 730 (Pierson Decl. ¶¶ 2-3).

101. On pages 64 through 69 of the 1980 Specification, instructions are provided as to the appropriate manner of controlling the different plating baths required by the specification. These instructions detail exactly the appropriate temperatures at which to maintain the baths, and also indicate how to appropriately start up and shut down the baths each day. None of these instructions are found in either the 1967 or the 1973 Specifications. Latifi Decl. 14, PA 554; 1967 Specification, PA 560-713; 1973 Specification, PA 718-903; 1980 Specification, PA 976-981.

**Response**: Defendant does not disagree that Axion has identified an area where the document Axion asserts to be a 1980 revision is not identical to NAVORD OD 18332 of 1967. However, defendant avers that the unsigned document Axion asserts to be a 1980 revision did not formally revise the Navy's NAVORD OD 18332, but was rather an

internal Army document. Defendant further avers that other contractors have used the 1967 document to successfully produce plating. DA 730 (Pierson Decl. ¶¶ 2-3).

102. The test equipment outlined in paragraph 6.2.3 of the 1980 Specification, at pages 72-73, is entirely different from that set out in the same paragraph of the 1967 Specification (crossed out page 57 of the 1973 Specification). Latifi Decl. 15, PA 554; 1967 Specification, PA 620; 1980 Specification. PA 984-985.

**Response**: Defendant does not agree. The statements contained in paragraph 102 constitute plaintiff's argument and legal conclusions, not statements of fact. Defendant avers, however, that it does not disagree that Axion has identified an area where the document Axion asserts to be a 1980 revision is not identical to NAVORD OD 18332 of 1967. However, defendant avers that the unsigned document Axion asserts to be a 1980 revision did not formally revise the Navy's NAVORD OD 18332, but was rather an internal Army document. Defendant further avers that other contractors have used the 1967 document to successfully produce plating. DA 730 (Pierson Decl. ¶¶ 2-3).

103. One of the most important differences in the 1980 Specification, which the Navy refused to provide to Axion, and the 1967 Specification, which Axion was provided as part of the Contract and required lo work from, is found in paragraph 7.4.2.1, page 93, of the 1980 Specification. This paragraph outlines the typical single cell voltages that should be obtained when testing the plating. The voltages provided are entirely different from those found in the 1967 Specification at the same paragraph (page 74 of the 1973 Specification). Furthermore, the indicated "Pb(Ac) life" is indicated as 75 seconds in the 1967 Specification, while the 1980 Specification has the Life at only 30 seconds. Again. Axion was relying on a specification which indicated it should be getting

more than double the life out of one the cells than the 1980 Specification required. Latifi Decl. 16, PA 554-555; 1967 Specification, PA 637; 1980 Specification, PA 1005.

**Response**: Defendant does not agree. The statements contained in paragraph 103 constitute plaintiff's argument and legal conclusions, not statements of fact. Defendant avers, however, that it does not disagree that Axion has identified an area where the document Axion asserts to be a 1980 revision is not identical to NAVORD OD 18332 of 1967. However, defendant avers that the unsigned document Axion asserts to be a 1980 revision did not formally revise the Navy's NAVORD OD 18332, but was rather an internal Army document. Defendant further avers that other contractors have used the 1967 document to successfully produce plating.

104. The pictures, drawings, and graphs contained in the 1980 Specification at pages 100 through 193, are far more accurate, detailed, and informative than that in the 1967 Specification. Latifi Decl. 17, PA 555; 1967 Specification, PA 643-713; 1980 Specification, PA 1012-1105.

**Response**: Defendant does not agree. The statements contained in paragraph 104 constitute plaintiff's argument and legal conclusions, not statements of fact. Defendant avers, however, that it does not disagree that Axion has identified an area where the document Axion asserts to be a 1980 revision is not identical to NAVORD OD 18332 of 1967. However, defendant further avers that the unsigned document Axion asserts to be a 1980 revision did not formally revise the Navy's NAVORD OD 18332, but was rather an internal Army document. Defendant finally avers that other contractors have used the 1967 document to successfully produce plating. DA 730 (Pierson Decl. ¶¶ 2-3).

105. The Government had other information that would have been invaluable to Axion in attempting to build a plating line. In May of 1975, the Army's Harry Diamond Laboratories formulated a report entitled "Strip Plater For Lead/Lead Dioxide Electrode Stock," which contained/instructions for lead plating that, in many instances, are more detailed and informative than the Plating Specification incorporated into the Contract. Exhibit E to Latifi Decl., PA 1106-1175.

**Response**: Defendant disagrees. The term "invaluable" is too vague to permit a response. Defendant is unable to speculate how valuable the cited document would have been to Axion. Further, prior contractors used the NAVORD OD 18332 of 1967, which Axion had, to successfully produce plating. DA 730 (Pierson Decl. ¶¶ 2-3).

106. The Strip Plater Report from Harry Diamond Laboratories contained a machine components subsection on pages 7 through 8 that provides a great deal of information concerning the specific parts required to build the plating machine, including such details as the tank sizes and dimensions. Exhibit E to Latifi Decl., PA 1114-1115.

**Response**: Defendant does not disagree that the cited document addresses specific parts that may be relevant to producing plating. Defendant avers that the term "great deal of information" is too vague for defendant to respond further.

107. The Contract incorporated by reference NAVORD OD18332, which is entitled PROCEDURES FOR PREPARING LEAD: LEAD DIOXIDE RESERVE ENERGIZER ELECTRODE STOCK BY ELECTRODEPOSITION. Contract, PA 23; Plating Specification, Exhibit A to Latifi Decl., PA 560-713; Latifi Decl. 5, PA 550-551.

**Response**: Defendant does not disagree.

108. "Electrodeposition" is simply depositing, using chemicals and electrical current as a catalyst, one material on another - in this case lead and lead dioxide on nickel. Latifi Decl. 5, PA 550-551.

**Response**: Defendant does not disagree.

109. Axion built a plating line and developed a plating process for use in creating the lead and lead dioxide plated reserve energizer electrode stock by electrodeposition; attached to his Declaration, Alex Latifi, President of Axion, has photographs of the plating manufacturing line he created. Latifi Decl. 5, PA 550-551; Exhibit B to Latifi Decl. PA 714-717.

**Response**: Defendant does not disagree.

110. The 1973 Plating Specification was revised in 1980. Latifi Decl. Exhibit D, PA 904-1105.

**Response**: Defendant disagrees. Defendant avers that the unsigned document Axion asserts to be a 1980 revision of the purported 1973 Plating Specification did not formally revise the Navy's NAVORD OD 18332 of 1967, but was rather an internal Army document. Defendant further avers that other contractors have used the 1967 document to successfully produce plating. DA 730 (Pierson Decl. ¶¶ 2-3).

111. Once again, the plating specification and process was significantly changed, with the addition of two solution "baths" to the plating line, changes to test equipment, a revision of the typical battery cell voltage and life, and the incorporation of more detailed pictures, drawings, and graphs. Latifi Decl. 11 -17, PA 553-555.

**Response**: Defendant disagrees. Defendant avers that the unsigned document Axion asserts to be a 1980 revision to the Plating Specification did not formally revise

the Navy's NAVORD OD 18332 of 1967, but was rather an internal Army document. Defendant further avers that other contractors have used the 1967 document to successfully produce plating. DA 730 (Pierson Decl. ¶¶ 2-3).

112. Without the revised specifications, Axion was forced to rely on the outdated 1967 Plating Specification to produce the required plating. Latifi Decl. 17, PA 555.

**Response**: Defendant disagrees. Defendant avers that the unsigned document Axion asserts to be a 1980 revision to the Plating Specification did not formally revise the Navy's NAVORD OD 18332, but was rather an internal Army document. Defendant further avers that other contractors have used the 1967 document to successfully produce plating. DA 730 (Pierson Decl. ¶¶ 2-3). Defendant also avers that Axion was not "forced" to rely upon any document as NAVORD OD 18332 of 1967 was a non-mandatory guideline.

113. Upon undertaking to manufacture the plating pursuant to the Plating Specification, Axion encountered problems producing plating that would satisfy the specified requirements, and notified the Government of such problems. Axion Letter to Contracting Officer dated November 13, 2000, PA 230-231.

**Response**: Defendant does not disagree that Axion notified the Government that it was having problems producing plating. Defendant disagrees that Axion's problems were attributable to the contract.

114. Although Axion followed the Plating Specification provided by the Government, Axion was unable to produce lead plating that would meet the requirements of the Contract. Latifi Decl. 5, PA 550-551; Latifi Depo. pp. 140-41 at PA 1199-1200.

**Response**: Defendant disagrees. The statements contained in paragraph 114 constitute plaintiff's argument, not statements of fact. Defendant further avers that other contractors have successfully produced plating using NAVORD OD 18332 of 1967. Further, the German vendor Axion initially used as a subcontractor was able to produce plating without being hindered by the guidance of NAVORD OD 18332 of 1967.

115. The Government was aware, in 2000, that Axion was having significant difficulties with plating that Axion was contending related to the inaccurate and incomplete information contained in the 1967 version of OD18332. Letter from Alex Latifi at Axion to John Korab, Navy Contracting Officer, dated November 13, 2000, PA 230.

**Response**: Defendant does not disagree that Axion was experiencing difficulty getting its plating line to work, but disagrees that Axion's plating problem was caused by "Inaccurate and incomplete information contained in the 1967 version of [NAVORD] OD 18332."

116. Axion told the Government, in 2000, that Axion's chemist and a factory chemical representative concluded that the 1967 version of OD18332 was not correct with regard to amounts of elements in the solution. Id.

**Response**: Defendant does not disagree that Axion used those words in a letter Axion sent to the Navy; however, defendant disagrees that "the 1967 version of OD18332 was not correct with regard to amounts of elements in the solution."

117. Axion was required to spend a year or more attempting to remedy the defects in the Plating Specification. Latifi Decl. 18, PA 555.

**__Response__**: Defendant disagrees. Defendant avers the contract was not defective. Defendant also avers that other contractors have successfully produced plating using NAVORD OD 18332 of 1967. Further, the German vendor Axion initially used as a subcontractor was able to produce plating pursuant to the specification.

118. Before Axion began developing and building its plating line, the Government was aware that it would likely cost $1.5 million or more to do so. Richard W. Janik Memorandum To HDL, dated 23 SEP 1991, at PA 530 ("The cost to buy a new plater that is equivalent to the EBC plater in the quantity of stock produced and superior in the quality of stock produced is estimated to be $1.5 to $2.5M.").

**__Response__**: Defendant does not disagree that the Government was aware that a plating line of the magnitude required by companies such as Accudyne and Everready could cost in excess of $1 million. Defendant avers, however, that the plating requirements of Axion's contract were much smaller than the plating needs of Accudyne and Everready, and the plating requirements of Axion's contract could have been satisfied with a much less costly plating line than ones used by Accudyne and Everready. Further, defendant avers that Axion's contract did not require Axion to produce a plating line. Axion, in fact, acquired plating from a German vendor and only subsequently decided to produce its own plating line.

119. Latifi and Axion spent $1,416,305 manufacturing a plating line in accordance with the defective Plating Specification. Latifi Decl. 24, PA 558.

**__Response__**: Defendant disagrees. Defendant avers the contract specification is not defective. Defendant further avers that other contractors have successfully produced plating without being hindered by the contract. DA 730 (Pierson Decl. ¶ 2-3).

Additionally, the German vendor Axion initially used as a subcontractor was able to produce plating pursuant to the specifciation. In addition, during performance of the contract Axion never informed the Government of how much money it had spent, and Axion's purported costs have never been audited. DA 734 (Korab Supp. Decl. ¶ 9).

## IV. The Role Of "No-Tests" In The Termination Of The Contract

120. Without any guidance or assistance from the Government, Axion developed an air gun to test the batteries. Latifi Depo. p. 57 at PA 1188.

**Response**: Defendant disagrees. Axion received guidance from the Government. PS-115 testing was addressed during the pre-award survey and Axion was provided assistance when it became apparent that Axion did not fully understand the requirements. DA 741. Further, although the Government did not provide Axion with an air gun, Axion did discuss air gun testing with Government officials throughout the contract and in all likelihood some of these communications proved beneficial to Axion. DA 728 (Swank Decl. ¶ 6).

121. In order to test the batteries, a single battery was loaded into the air gun, fired, and then spun for a specified time. Deposition of Henry Stickrod ("Stickrod Depo.") p. 37 at PA 1205. See also Photographic Exhibits to Latifi Decl., Exhibit G, PA 1176-1179.

**Response**: Defendant does not disagree.

122. A computer was used to record the voltage of the batteries, and this information was downloaded onto an external computer to be forwarded to the Naval Inventory Control Point for review. Id.

**Response**: Defendant does not disagree.

123. Where the computer did not record the requisite voltage over time, often the unsuccessful test was the result of a malfunctioning air gun. Id.

**Response**: Defendant disagrees. Defendant is unable to speculate whether problems that arose during testing were the fault of Axion's PS-115 or Axion's test equipment. Defendant further avers that the contract made Axion responsible for both the PS-115 and the testing equipment. DA 109.

124. Unsuccessful tests that are attributable to a malfunctioning air gun are called "no-tests." Id. at 84.

**Response**: Defendant does not disagree that the term "no test" may have been used at times during contract performance to describe a test in which testing equipment malfunctioned. Defendant avers, however, that the term is not defined in Axion's contract. Further, the contract made Axion responsible for both the PS-115 and the test equipment. DA 109.

125. Both Accudyne and Eveready frequently experienced "no-tests" due to equipment malfunctions when they were in the business of manufacturing PS-115. Swank Memorandum Regarding PS-115 Testing. PA 280 ("Accudyne has no-tests because of equipment malfunction, and so did Eveready when they were in business."); PS115B Spin Test Data Sheets, PA 430-433 (stating in various places, with regard to various batteries tested "no test"); Lot Summary, PS115B Power Supply, Test Dates April 30 1998 - May 5 1998, from Alliant Techsystems, Janesville Operations, PA 434.

**Response**: Defendant does not disagree that Accudyne experienced some problems with test equipment. Defendant, however, is unaware of Accudyne's contract including a "No-test" provision. Defendant further avers that several of Axion's theories

are premised upon the Government providing Accudyne an air gun. However, it is axiomatic that testing problems associated with Government equipment would be treated differently than problems with contractor provided equipment.

126. The significance of a no-test was that the tested PS-115 was not regarded as a failure; instead a new PS-115 was substituted for the PS-115 that was deemed to be a no-test. Hahin Depo. p. 135-36 at PA 1258-1259; Lot Summary, PA 434; Spin Test Data Sheets, PA 430-433.

**Response**: Defendant disagrees. Defendant avers that Axion's "no-test" issue is of no significance regardless of whether Axion could substitute new PS-115 for deemed "no tests." Axion's failed FAT report of September 9, 2002 showed that 25 of Axion's FAT samples failed to meet the technical requirements of the contract. DA 351-353 (Hahin Decl. ¶¶ 11-13). Further, by Axion's own admission, Axion's FAT report included data on fewer than 80 PS-115. DA 205. Thus, pursuant to Axion's own "no-test" substitution theory, Axion had no excuse not to have provided data on 80 units, as required by the contract, because Axion could have substituted PS-115 until data on 80 units was collected.

127. The Army Research Laboratory previously compiled a report summarizing data from over 3000 PS-115s tested by Accudyne, and determined that "no-tests" can occur from problems such as bad-hits, insufficient gun tube vacuum, or bearing wear. ARL Report dated February, 2001, PA 281-327.

**Response**: Defendant does not disagree that Accudyne experienced some problems with test equipment. Defendant, however, is unaware of Accudyne's contract including a "no-test" provision. Defendant further avers that testing problems associated

with Government furnished equipment would be treated differently than problems with contractor provided equipment, such as here.

128. Accudyne had a number of no-tests that Accudyne attributed cracks, operator errors, bad hits, no vacuum, and causes unknown, and both Accudyne and the Government agreed not to count these "no tests" as failures of the battery systems for purposes of testing. PA 430-434.

**Response**: Defendant does not disagree that Accudyne experienced some problems with test equipment. Defendant, however, is unaware of Accudyne's contract including a "No-test" provision. Defendant further avers that several of Axion's theories are premised upon the Government providing Accudyne an air gun. However, it is axiomatic that testing problems associated with Government equipment would be treated differently than problems with contractor provided equipment.

129. Axion used its air gun to conduct a First Article Test (FAT), and it submitted a FAT report on April 12, 1999. Latifi Depo. p. 119 at PA 1198.

**Response**: Defendant does not disagree.

130. After evaluating the FAT report, the Navy notified Axion in May 1999 that Axion's FAT was approved. Hahin Decl. ¶ 4 at PA 415 ("Axion was able to conduct FAT and submit an acceptable FAT report in April 1999"); Declaration of Mr. John Korab ("Korab Decl.") ¶ 4 at PA 421; Latifi Depo. p. 119) at PA 1198.

**Response**: Defendant does not disagree.

131. After Axion was forced to manufacture the required lead plating stock itself, because there were no available suppliers, the Government claimed that Axion' s switch to manufacturing the plating wholly invalidated the approved FAT, and the Navy

required a Second First Article Test. Hahin Depo. pp. 98-110 at PA 1243-1255; Hahin Decl. 6 at PA 416.

**Response**: Defendant does not disagree that Axion's decision to produce the plate stock "in-house" invalidated FAT. Defendant, avers, however that the decision that the first FAT was invalidated was mutual as both Axion and the Navy agreed to contract modification P00017. Defendant further disagrees that Axion was "forced" to make a decision regarding plating because the contract gave Axion discretion regarding the plating.

132. Axion manufactured its plate stock by depositing lead and lead dioxide onto pure nickel. Expert Witness Report of Dr. James Baird I, PA 376.

**Response**: Defendant does not disagree.

133. When used in power supplies, pure nickel plates yield more power supply capability than nickel-plated steel, provided all other factors are equal. Id.

**Response**: Defendant does not disagree.

134. A second FAT by firing PS-115 batteries in an air gun was not necessary, because the discharge cell test fully verified the electrical function of the plate stock. Expert Witness Report, Supplement # I, of Dr. James Baird, April 13, 2006, PA 373-377.

**Response**: Defendant disagrees. Dr. Baird's opinion is not fact. Defendant further avers that a cell test is not as beneficial as a FAT. DA 350 (Hahin Decl. ¶ 6). Defendant avers Axion's leaking problems were another reason the Navy believed additional FAT was necessary. DA 224 (Hahin Depo. 110).

135. The Contract documents provided a test - a discharge cell test - to ascertain whether or not the plate stock manufactured by Axion was capable of sustaining the

voltage needed for a military power supply. Id. at PA 374. See also NAVORD OD 18332 at Section 6.2, PA 619-621, 619 ("The discharge cell test is designed to determine the characteristics of plated stock under conditions simulating those in the most heavily loaded section of the energizer -- the 'A' section.").

**Response**: Defendant does not disagree that NAVORD OD 18332 addresses a discharge cell test. Defendant avers that NAVORD OD 18332 was a non-mandatory gudieline.

136. A discharge cell test, not testing using an air gun simulator, is the most logical, reliable, and efficient way to test the electrochemical characteristics of plate stock. Baird Supplemental Expert Report at F., PA 375.

**Response**: Defendant disagrees. Defendant avers that a cell test is not as beneficial as a FAT. DA 350 (Hahin Decl. ¶ 6). Defendant further avers a discharge cell test would not have been logical because Axion's leaking problems were another reason the Navy believed additional FAT was necessary. DA 224 (Hahin Depo. 110).

137. At the same time that Axion was manufacturing plate stock and was using pure nickel, leading the Government to require a second FAT, Axion realized that the PS-115s were leaking electrolyte. Hahin Depo. p. 110 at PA 1255 ("Q. Is there any connection whatsoever, cause and effect, from the leaking of those -- of the acid that was reported to you by Axion in the decision to hold a second FAT? A. Yes, that played in my decision to require another second First Article.").

**Response**: Defendant does not disagree that Axion experienced leaking problems. Defendant, however, is unaware of the precise time that these problems occurred.

138. The parties conducted a Second First Article Test, and on September 9, 2002, Axion submitted a second FAT report. Latifi Depo. p. 213 at PA 1203.

**Response**: Defendant does not disagree.

139. Stickrod, the Quality Assurance Representative who witnessed Axion's testing for the second FAT, observed "lots of" no-tests due to malfunctions in Axion's air gun or human error. Stickrod Depo. p. 83 at PA 1206.

**Response**: Defendant does not disagree. Defendant avers, however, that the contract made Axion responsible for both the PS-115 and the test equipment.

140. In an email dated Sept. 5, 2002 to the Contracting Officer, Stickrod observed:

> We had a total of aprx 14 good shots during the past 3 working days (6 consecutive last week Thursday and 8 consecutive yesterday)--with some minor consuming problems early on with positioning of parts on the 'bird' to enable accurate recording of data.
>
> Yesterday we shot a total of 14 of which 8 had good data collected (split between cold (3), hot (3) and room temp (2)); 3 of the 14 had no data because the batteries on the recording computer died without us being aware (we checked the voltage on the cells after and found between 16 and 26 volts existent that seems to indicate probable good units even though not acceptable from the data standpoint); and 3 that broke at impact that provided only partial data and are not acceptable. . . .
>
> The majority of the failed items (failed to capture data) provide sufficient voltage after data collection failure to seem to indicate the cell functioned correctly to requirements despite the inability to collect data.

Stickrod Email to Korab, September 5, 2002, PA 328.

**Response**: Defendant does not disagree.

141. The following day, Stickrod sent another e-mail to the Contracting

Officer, stating:

> He has successfully completed testing (recorded successful data) on at least 90 items…. At this point, the testing system functions very well -- Axion can shoot and record, optimally, 4 per hour; human error has caused every non-acceptable data collection problem that has been encountered over the past couple of weeks. On 3 most recent separate days we observed at least 6 consecutive successful shots before failures occurred. In one case, failure to record acceptable data resulted from the normal wearing out of batteries used to power the recording computer in the system. At least 6 failures happened because the shot units broke on impact. Another anomaly that was discovered was that one the technicians put his hand on part of the testing apparatus and touched a grounded table with the other and shorted all data immediately to ground and lost it all ....
>
> The majority of the failed items (failed to capture acceptable data) provide sufficient voltage after data collection failure to seem to indicate that the cell functioned correctly to requirements despite the inability to collect the data.

Stickrod Email to Korab, September 6, 2002, PA 329.

**<u>Response</u>**: Defendant does not disagree.

142. On November 12, 2002, the Government terminated the Contract for default, stating that "a total of 25 out of 66 First Article Power Supplies failed to meet the performance requirements of drawing 11744726." Contract Modification PO0021, PA 336; Navy Letter to Axion, October 1, 2002 at PA 233.

**<u>Response</u>**: Defendant does not disagree. Defendant avers, however, that the quoted language was not the only reason Axion was terminated for default.

143. Despite the occurrence of a significant number of no-tests, Stickrod indicated that "no tests" were not part of the criteria considered when reviewing Axion's test information:

> We are getting back to that test or not test business. I do not know anything about a no test. That was not in the criteria that I ever had at any point.

Stickrod Depo. p. 83 at PA 1206.

**Response**: Defendant cannot respond because of the confusing nature of the assertion. Mr. Stickrod was not involved in reviewing Axion's FAT report. Mr. Stickrod was not responsible for approving the FAT. DA 62; DA 361-362 (Stickrod Decl. ¶ 10).

## V. Defects In The Government Specification Led To Leakage Of Electrolytes

144. Pursuant to the express terms of Drawing 11744726, which was incorporated into the Contract, in order to satisfy its contractual specifications, Axion was required to manufacture batteries that did not reveal any evidence of leakage of methylene bromide or fluoboric acid (two substances used in constructing the batteries). Contract, Drawing, PA 153 ("the power supply shall not reveal any evidence of leakage"); Expert Report of Dr. James Baird ("Baird Report") at PA 339-340.

**Response**: Defendant does not disagree.

145. The Government's specification for the Contract requires the use of copper-beryllium blades. Defendant's Supplemental Response to RFA No. 3, PA 1273; Drawing, PA 174-2 16.

**Response**: Defendant does not disagree.

146. The copper-beryllium blades provided for in the Contract were required, by the Contract specification, to touch other copper parts of the PS-115s. Defendant's Supplemental Response to RFA No. 4, PA 1273; Drawing, PA 174-216.

**Response**: Defendant does not disagree.

147. The fact that the copper blades were required to touch other copper parts of the PS-115s made leakage scientifically inevitable, as such touching leads to corrosion and to leakage. Baird Report at PA 339-340.

**Response**: Defendant disagrees. Defendant avers that thousands of batteries were produced pursuant to the specifications in Axion's contract that are more than 10 years old and have never leaked. Indeed, Mr. Goldberg and Mr. Swank showed plaintiff's counsel hundreds of batteries that the Army maintained that were approximately 10 years old. DA 725 (Goldberg Decl. ¶ 8). Defendant further avers that Dr. Baird's conclusion did not consider the rate at which copper upon copper corrosion would occur or the type of such corrosion. DA 723-724.

148. Over time, the resulting corrosion leads to the leakage of both metholyene bromide and fluoboric acid from the PS-115s. Expert Report of Dr. James Baird, PA 338-378.

**Response**: Defendant disagrees. Defendant avers that thousands of batteries were produced pursuant to the specifications in Axion's contract that are more than 10 years old and have never leaked. Indeed, Mr. Goldberg and Mr. Swank showed plaintiff's counsel hundreds of batteries that the Army maintained that were approximately 10 years old. DA 725 (Goldberg Decl. ¶ 8). Defendant further avers that

Dr. Baird's conclusion did not consider the rate at which copper upon copper corrosion would occur or the type of such corrosion. DA 723-724.

149. Fluoboric acid, when combined with methylene bromide, has a corrosive effect on copper. Defendant's Response to RFA No. 82, PA 1265; Whorral Letter dated September 6, 2001, PA 335.

**Response**: Defendant does not disagree. Defendant avers that thousands of batteries were produced pursuant to the specifications that are more than 10 years old and have never leaked. DA 725 (Goldberg Decl. ¶ 8).

150. Fluoboric acid is an electrolyte conductor that allows for the transfer of electrons between the metals contained in the batteries. Deposition of Dr. James Baird ("Baird Deposition") p. 111 at PA 1221.

**Response**: Defendant does not disagree.

151. Leaking electrolyte can degrade the performance of the PS-115s, causing output voltage to decrease below desired levels and possibly contaminating other batteries. Defendant's Response to RFA No. 45, PA 1262; Defendant's Response to Interrogatory 8, PA 1280-1281.

**Response**: Defendant does not disagree.

152. The Government was aware that Axion was experiencing the leaking of electrolyte from the PS-115s prior to requiring a second First Article Test ("FAT"). Hahin Deposition p. 108, 110 at PA 1253, PA 1255.

**Response**: Defendant does not disagree.

153. The Government was aware of corrosion and leakage problems experienced by other contractors in producing PS-115 power supplies well before the Government

awarded Axion this Contract. Harry Diamond Laboratories Report, dated October 1985, "The Corrosion Mechanism in the M732 Fuze Power Supply," PA 533 ("A materials incompatibility and corrosion problem was discovered in the PS 115 power supply for the M732 artillery fuze. The problem manifests itself in occasional leakage from the battery ampule.").

**Response**: Defendant does not disagree that there were leaking problems associated with a prior version of the PS-115. However, except for the PS-115s that Axion attempted to produce, the Army had not seen any leaking problems associated with other PS-115s produced pursuant to the specifications in Axion's contract. Defendant avers that thousands of batteries were produced pursuant to the specifications in Axion’s contract that are more than 10 years old and have never leaked. DA 725 (Goldberg Decl. ¶ 8).

154. In fact, as early as 1984, Accudyne and the Government were both aware of premature deterioration of the PS115s and spillage of their contents. "Proposal: Remedial Research on PS 115 Power Supplies," From W.J. Blaedel To Dennis Jaecks, January 21, 1984, PA 438-439.

**Response**: Defendant does not disagree that there were leaking problems associated with a prior version of the PS-115. However, except for the PS-115s that Axion attempted to produce, the Army had not seen any leaking problems associated with other PS-115s produced pursuant to the specifications in Axion's contract. Defendant avers that thousands of batteries were produced pursuant to the specifications in Axion’s contract that are more than 10 years old and have never leaked. DA 725 (Goldberg Decl. ¶ 8).

155. The Government knew that both manufacturers of PS115s that it had contracted with, Union Carbide and Accudyne found the presence of methane in their battery ampules, indicating corrosion. PA 543-544 (under the discussion of "Mechanism of Corrosion," the Government scientists report at PA544, "[t]he presence of methane (CH4) found in ampules from both battery manufacturers (UCR at NSWC-WO and ACC at NWSC-Crane) is explained by the succeeding step of equation (7) . . .").

**Response**: Defendant does not disagree that there were leaking problems associated with a prior version of the PS-115. However, except for the PS-115s that Axion attempted to produce, the Army had not seen any leaking problems associated with other PS-115s produced pursuant to the specifications in Axion's contract. Defendant avers that thousands of batteries were produced pursuant to the specifications in Axion's contract that are more than 10 years old and have never leaked. DA 725 (Goldberg Decl. ¶ 8).

156. The leaking fluoboric acid played a role in the Government's decision to require a second FAT. Hahin Depo. p, 110 at PA 1255.

**Response**: Defendant does not disagree.

157. Nevertheless, the Government failed to consider the effect of the leaking electrolyte on the batteries, stating that the "chemical compositions of PS-115 were not evaluated." Defendant's Response to Interrogatory # 4, PA 1279.

**Response**: Defendant cannot respond due to the confusing nature of the assertion. Defendant avers that the decision to conduct additional FAT was, in part, due to Axion's leaking problems and that leaking can have an impact on the performance of a

PS-115. The FAT evaluation was conducted in accordance with the contract. The contract did not call for a "chemical composition" analysis.

## VI. <u>Other Facts Not In Dispute</u>

158. Axion has been in business for approximately twenty years. Latifi Decl. 1, PA 548.

**<u>Response</u>**: Defendant does not disagree.

159. Prior to contract N00106-96-C-KA09, Axion never had a contract terminated for default. <u>Id.</u>

**<u>Response</u>**: Defendant does not disagree.

160. Although Axion has requested equitable adjustments, prior to Contract N00106-96-C-KA09, Axion has never submitted a claim under the Disputes clause. <u>Id.</u>

**<u>Response</u>**: Defendant does not agree because it lacks sufficient information regarding Axion's statements in paragraph 160. Defendant also avers that the issue of whether a request for equitable adjustment is a claim pursuant to the Disputes clause is a legal, not factual, matter.

161. Axion is a minority owned small business. Alex Latifi immigrated to the United States in 1970 from Iran and his native language is Farsi. Latifi Decl. 2, PA 548-549.

**<u>Response</u>**: Defendant disagrees that Axion is minority-owned. This proposed finding that Axion is minority owned raises an issue of law, not fact, regarding statutory and regulatory provisions that set forth the Government's socioeconomic programs. Defendant does not disagree that Alex Latifi immigrated from Iran and that his native

language is Farsi. Defendant avers, however, that Alex Latifi has a very strong grasp of the English language. DA 733 (Korab Supp. Decl. 5).

162. Alex Latifi has been a citizen of the United States since 1973. Id.

**Response**: Defendant does not disagree.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Kathryn A. Bleecker
KATHRYN A. BLEECKER
Assistant Director

OF COUNSEL:

Richard Martinelli
Office of Counsel
Naval Inventory Control Point
Mechanicsburg, PA 17055-0788

s/Douglas K. Mickle
DOUGLAS K. MICKLE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530
Tele: (202) 307-0383

October 2, 2006

Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on October 2, 2006, a copy of the foregoing "**DEFENDANTS' COUNTER-STATEMENT OF FACTS**" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Douglas K. Mickle
Douglas K. Mickle