IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **AXION CORPORATION,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 03-2644C & 04–297C** **(Judge Firestone)** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**DEFENDANTS' PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

Pursuant to Rule 56(h) of the Rules of the United States Court of Federal Claims, the United States respectfully submits the following proposed findings of uncontroverted fact.

1. The contract included a First Article Test ("FAT") requirement obligating Axion to conduct FAT and submit a FAT report demonstrating compliance with specified testing requirements. DA 62; DA 255 (Latifi Depo. 36).

2. The contract established that Axion would be responsible for all testing equipment. DA 109; DA 260-261 (Latifi Depo. 45-46).

3. Prior to entering the contract, Axion knew that it would need an air gun to satisfy the contract's FAT requirement. DA 717 (Axion Resp. to Gov't Inter. # 4).

4. During the pre-award survey Axion presented a plan for testing that did not include use of a Government furnished air gun. DA 742 (Pre-award survey documentation: "The testing requirements were discussed at length during the pre-award survey. The offeror plans to use a local contractor, Wildwood Electronics, to test the power supply.").

5. Axion requested an air gun from the Navy on January 17, 1996. DA 178.

6. On January 26, 1997, the contracting officer denied Axion's request for an air gun. DA 179.

7. In 1996, Axion contacted the Army Research Laboratory ("ARL") concerning the contract's testing requirement. DA 727 (Swank Decl. ¶ 3); DA 277 (Latifi Depo. p. 67).

8. ARL provided Axion a cost estimate to test four Axion batteries. DA 727 (Swank Decl. ¶ 3).

9. Axion declined ARL's offer and subsequently began efforts to acquire an air gun or air gun drawings from ARL. DA 727 (Swank Decl. ¶ 3).

10. ARL and Axion discussed the possibility of entering an agreement in which ARL would lend Axion the ARL air gun, or provide a set of mechanical drawings for the air gun from which Axion would build its own unit, in exchange for Axion developing improvements in the air gun's data collection system which Axion would then provide to ARL. DA 728 (Swank Decl. ¶ 4).

11. ARL, which did not have a contractual relationship with Axion, ultimately decided not to enter such an agreement because Axion did not submit a satisfactory technical proposal DA 728 (Swank Decl. ¶ 4).

12. Axion built an air gun and used this gun to pass FAT on May 17, 1999. DA 189; DA 289-290 (Latifi Depo. 118-119).

13. The successful FAT was invalidated when Axion decided to change the plating material in the PS-115 from plating produced by an outside vendor to plates produced in-house by Axion. DA 159-160; DA 368B (Latifi Depo. 177-178).

14. Axion continued using its air gun through the remainder of the contract but experienced several problems. DA 349 (Hahin Decl. ¶ 5); DA 738, DA 739.

15. One of Axion's objectives was to improve the air gun so it could be used for future work. DA 734 (Korab Supp. Decl. ¶ 9); DA 757.

16. Several years after the contract was awarded, the Navy acquired equipment that could have been used to conduct FAT and offered to perform testing for Axion. DA 353 (Hahin Decl. 14); DA 764-765.

17. Axion declined to accept the Navy's offer to conduct testing. DA 353 (Hahin Decl. 14).

18. The contract did not limit Axion's discretion regarding how Axion could obtain plating as the relevant specification did not include any required sources, and the contact also referenced NAVORD OD 18332, which contained non-mandatory guidance on building a plating line. Plaintiff's Appendix ("PA") 218; PA 560; DA 730 (Pierson Decl. ¶ 3); DA 770.

19. NAVORD OD 18332 was signed on February 13, 1967 by the Commander of the now defunct U.S. Naval Ordnance Laboratory. PA 561, DA 770.

20. The signed cover letter of NAVORD OD 18332 states that the purpose of document is to provide a non-mandatory, working guide. PA 561, DA 770.

21. Since issuing NAVORD OD 18332 in 1967, the Navy has not revised the document and Navy records indicate such to be the case. DA 775-777 (Hahin Supp. Decl. ¶ 4).

22. From 1967 through Axion's contract, other vendors successfully used the 1967 NAVORD OD 18332. DA 192; DA 730 (Pierson Decl. ¶ 3).

23. Accudyne's plating operation requirement was significantly greater than that required of Axion's contract. Compare DA 725 (Goldberg Decl. ¶ 8) regarding the 400,000 PS-115s Accudyne produced between 1995 and 1998 with the quantity of 55,209 under Axion contract at DA 2).

24. The plating requirement was discussed during the pre-award survey where Axion presented a plan to use the plating machine of LDC Electroplating. DA 752.

25. For the first several years of the contract, Axion used the plating of a German vendor. DA 328 (Latifi Depo. 174).

26. Axion successfully passed FAT in May 1999 using the German vendor's plating. DA 328 (Latifi Depo. 174); DA 189.

27. After passing FAT, Axion decided to produce its own plating rather than acquire plating from a subcontractor. Axion letter August 22, 2001. DA 757.

28. Axion attempted to improve the plating beyond what was required in the contract. DA 194; DA 759, DA 760; DA 380 (Stickrod Depo. 18); DA 296B (Latifi Depo. 127-129).

29. The contract required Axion to provide PS-115 that did not leak methylene bromide or fluoboric acid prior to use. PA 153, DA 409.

30. Axion struggled to satisfy the contract's non-leaking requirement. DA 194; DA 303 (Latifi Depo. 136).

31. Although a prior PS-115 design did create a leaking problem, the PS-115 was re-designed in the 1980's to correct the leaking problem, and Axion's contract include the re-designed specifications. DA 723 (Goldberg Decl. ¶ 4).

32. The Government explained the differences between the prior design and the design in Axion's contract to Axion both before and after award of the contract. DA 723 (Goldberg Decl. ¶ 4).

33. Since the PS-115 re-design in 1985, the Government has no record of any leaking problem other than Axion's. DA 725 (Goldberg Decl. ¶¶ 4, 8).

34. The Army has more than 400,000 PS-115s that were delivered by Accudyne between 1995 and 1998 using the same design as in Axion's contract, with no known leakage issues either in the plant or in the stockpile. DA 725 (Goldberg Decl. ¶ 8).

35. Axion, by its own admission, experienced thousands of instances of leaking. DA 194; DA 303 (Latifi Depo. 136).

36. Improper welding can result in the type of leaking Axion experienced. DA 725 (Goldberg Decl. ¶ 7).

37. The United States permitted Axion to inspect hundreds of non-leaking PS-115 in storage at the Army Research Laboratory in addition to providing Axion with samples for the plaintiff's examination. DA 725 (Goldberg Decl. ¶ 8).

38. Axion's expert witness with respect to leaking makes findings concerning copper on beryllium-copper without considering the rate at which such corrosion would occur or the type of corrosion that would result. DA 723-724 (Goldberg Decl. ¶ 5).

39. Axion's expert witness failed to account for the fact Axion's leakage theory is premised on corrosion occurring in an oxygen depleted environment. DA 724-725 (Goldberg Decl. ¶ 6).

40. Modification P00020 required Axion to deliver a FAT report by September 9, 2002 concerning the testing of 80 FAT samples. DA 162; DA 163; DA 338 (Latifi Depo. 209).

41. Axion submitted floppy discs on or about September 9, 2002 that addressed FAT testing on fewer than 80 PS-115. DA 425; DA 341 (Latifi Depo. 212).

42. Axion's submission on or about September 9, 2002 did not include testing procedures as required by paragraph 10.2.6.3 of the contract's Data Item Description, DI-NDTI-80809A, Test/Inspection Reports. DA 97; DA 425 - 704.

43. The contract set forth the parameters for testing an individual FAT sample and how many individual FAT samples could fail to meet the parameters before the entire FAT is rejected. DA 413; DA 419 (sheets 9 and 15 of drawing 11744726); DA 350-351 (Hahin Decl. ¶ 8).

44. The contract did not permit 25 out of 80 FAT samples to fail. DA 413; DA 419 (sheets 9 and 15 of drawing 11744726); DA 350-351 (Hahin Decl. ¶ 8).

45. The information provided in Axion's September 9, 2002 submission indicated that 25 FAT samples did not satisfy the contract requirements. Compl. ¶¶ 149-150; DA 705-09; DA 351-52 (Hahin Decl. ¶ 11).

46. The contract's FAT clause provided that disapproval of FAT shall be deemed a failure to make delivery within the meaning of the contract's default clause. DA 62 (paragraph (d)); DA 258A (Latifi Depo. 42).

47. The contract's Default clause provided that the Government may terminat a contract for default for failure to deliver in accordance with the contract. DA 58.

48. The contract's FAT clause provided that the contracting officer was the official responsible for approving or disapproving FAT. DA 62; DA 258A (Latifi Depo. 42).

49. The contract's FAT clause provided that the contracting officer's approval or disapproval of FAT would be in writing. DA 62.

50. The contract included the following clause:

> 5252.243-9400 AUTHORIZED CHANGES ONLY BY THE CONTRACTING OFFICER (JAN 1992)
>
> (a) Except as specified in paragraph (b) below, no order statement, or conduct of Government personnel who visit the Contractor's facilities or in any other manner communicates with Contractor personnel during the performance of this contract shall constitute a change under the "Changes" clause of this contract.
>
> (b) The Contractor shall not comply with any order, direction or request of Government personnel unless it is issued in writing and signed by the Contracting Officer, or is pursuant to specific authority otherwise included as part of this contract.
>
> (c) The Contracting Officer is the only person authorized to approve changes in any of the requirements of this contract and notwithstanding provisions contained elsewhere in this contract, the said authority remains solely with the Contracting Officer. In the event the Contractor effects any changes at the direction of any person other than the Contracting Officer, the change will be considered to have been made without authority and no adjustments will be made in contract price to cover any increase in charges incurred as a result thereof. DA 11

51. Axion sent several letters to the contracting officer between mid-2001 and July 2002 in which Axion either provided status on contract performance or addressed the progress Axion was making. DA 734 (Korab Supp. Decl. ¶ 10); DA 736-740.

52. Axion never provided the Government with specifics on how much money Axion had spent on the contract. DA 734 (Korab Supp. Decl. ¶ 9); DA 287, 287-287A (Latifi Depo. 112-113).

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Kathryn A. Bleecker
KATHRYN A. BLEECKER
Assistant Director

s/Douglas K. Mickle
DOUGLAS K. MICKLE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530
Tele: (202) 307-0383

OF COUNSEL:

Richard Martinelli
Office of Counsel
Naval Inventory Control Point
Mechanicsburg, PA 17055-0788

October 2, 2006

Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on October 2, 2006, a copy of the foregoing "**DEFENDANTS' PROPOSED FINDINGS OF UNCONTROVERTED FACTS**" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Douglas K. Mickle
Douglas K. Mickle