Nos. 03-2644 C & 04-297C
(Judge Firestone)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AXION CORPORATION,

Plaintiff,

v.

THE UNITED STATES

Defendant.

# PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Richard J.R. Raleigh, Jr.
WILMER & LEE, P.A.
100 Washington Street, Suite 200
Post Office Box 2168
Huntsville, Alabama 35804-2168
(256) 533-0202 Telephone
(256) 533-0302 Facsimile

Attorneys for Plaintiff

November 1, 2006

# TABLE OF CONTENTS


Table Of Contents ........................................ ii

Table Of Authorities ........................................ iii

Plaintiff's Opposition To Defendant's Motion For Summary Judgment, And Plaintiff's Reply To Defendant's Response To Plaintiff's Motion For Summary Judgment ........ 1

I. The Government's Second Motion For Summary Judgment Is Due To Be Denied. ........................................ 1

A. Substantial Evidence Exists Showing That Korab Should Have Known That Latifi Made A Unilateral Mistake When He Agreed To The Accord And Satisfaction Provisions Of P00017, P00019, P00020, And Thus The Court Should Find That These Provisions Are Unenforceable And Enter Judgment In Favor Of Axion.. ........................................ 2

B. The Government Improperly Rejected Axion's Second FAT Due To Its Failure To Adhere To Established Procedures For How The Data Would Be Considered. ........................................ 6

C. The QAR Approved The Second FAT. ........................................ 12

D. Axion Was Unable To Complete Further Testing Due To The Government's Failure To Cooperate. ........................................ 15

II. The Government Failed To Raise Genuine Issues Of Material Fact With Respect To Axion's Claims, And Thus Axion's Motion For Summary Judgment Is Due To Be Granted. ........................................ 16

A. The Government Failed To Raise Any Genuine Issue Of Material Fact With Respect To The Defective Nature Of The Plating Specification Expressly Referenced In The Contract. ........................................ 16

B. No Genuine Issue Of Material Fact Exists With Respect To The Government's Failure To Share Its Superior Knowledge Regarding The Air Gun And Plating With Axion. ........................................ 19

C. No Genuine Issue Of Material Fact Exists With Respect To The Government's Breach Of Its Implied Duty To Cooperate And To Not Hinder Performance. ........................................ 22

D. No Genuine Issue Of Material Fact Exists With Respect To The Government's Failure To Consider "No Tests" Present In Axion's Second FAT. 23

E. There Is No Genuine Issue Of Material Fact With Respect To The Leakage Problems Associated With The Government's Defective Specification For PS-115 ........................................ 26

Conclusion ........................................ 28

Certificate Of Service ........................................ 29

# TABLE OF AUTHORITIES

**Cases**

*Aerodex, Inc. v. United States*, 417 F.2d 1361, 1366-67 (Ct. Cl. 1969) .......................... 21

*Axion Corp. v. United States*, 68 Fed. Cl. 468, 479 (2005)................................................ 3

*Baitfield Industries, Div. of A-T-O, Inc.*, ASBCA No. 14582, 72-2 BCA ¶ 9676 (August 29, 1972)........................................................................................................... 12

*Barmag Barmer Maschinenfabrik AGT v. Muratta Mach., Ltd.*, 731 F.2d 831, 836 (Fed. Cir. 1984). ........................................................................................................ 17

*Carbetta Enterprises, Inc. v. United States*, 58 Fed. Cl. 563, 567 (2003) ....................... 12

*Natus Corp. v. United States*, 371 F.2d 450 (Ct. Cl. 1967)....................................... 18, 19

*Orlosky, Inc. v. United States*, 68 Fed. Cl. 296, 311 (2005). .......................................... 22

*Pittman Constr. Co. v. United States*, 2 Cl. Ct. 211, 215 (1983) ..................................... 12

*Renda Marine, Inc. v. United States*, 71 Fed. Cl. 378, 387 (2006) .................................. 15

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **AXION CORPORATION,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 03-2644C & 04-297C** |
| | ) | **(Judge Firestone)** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**COMES NOW** Plaintiff Axion Corporation ("Axion") and submits this brief in reply to the Response to Axion's Motion for Summary Judgment filed by Defendant The United States (the "Government") and in opposition to the Government's Second Motion for Summary Judgment. Axion respectfully requests that this Honorable Court deny the Government's motion for summary judgment, grant Axion's motion for summary judgment, and enter judgment in favor of Axion on all claims.

## I. The Government's Second Motion For Summary Judgment Is Due To Be Denied.

The Government's Second Motion for Summary Judgment is two fold. First, the Government renews its request for summary judgment regarding Axion's claims associated with the air gun, plating and leaking (Counts I-IX and XIII-XXIX) based upon the accord and satisfaction and release language found in modifications P00017, P00019, and P00020. This Court has already considered, and denied, summary judgment on these arguments. Additionally, the Government seeks summary judgment with respect to

Counts X, IX, and XII of Axion's Complaint[1] which relate to the Government's rejection of Axion's September 9, 2002 FAT report.[2] For the reasons set forth herein, the Government's motion is due to be denied, and judgment is due to be entered in favor of Axion on the Government's accord and satisfaction and release defense.

### A. Substantial Evidence Exists Showing That Korab Should Have Known That Latifi Made A Unilateral Mistake When He Agreed To The Accord And Satisfaction Provisions Of P00017, P00019, P00020, And Thus The Court Should Find That These Provisions Are Unenforceable And Enter Judgment In Favor Of Axion.

In its Second Motion for Summary Judgment, the Government argues that Axion's claims are barred by the doctrines of accord and satisfaction and release. The Government previously asserted this argument in support of its first Motion for Summary Judgment. In its October 31, 2005 decision, the Court denied the Government's first motion for summary judgment on the issues of accord and satisfaction and release, stating the following:

> Here, the evidence suggests that Axion may have agreed to the modifications based on its mistaken belief as to the scope of the release. The evidence indicates that (1) Mr. Latifi believed that the release in the modifications related only to the subject matter of the modifications; (2) Mr. Latifi had spent significantly more on the project than he had expected due to problems he had encountered in complying with the government's specifications; and (3) Mr. Latifi had told the contracting officer that it

[1] Throughout this brief, when referring to the Complaint, Axion is referring to the Complaint filed on or around March 5, 2004.

[2] The Government argues that, to the extent Counts X, XI, and XII relate to problems with the air gun Axion developed to test the batteries, these counts should be considered "air gun counts" and thus barred by the affirmative defenses of accord and satisfaction and release. Defendant's Second Motion for Summary Judgment ("Def. Mot."), pp. 21-22 n. 13, 14. This argument must fail, as each of these counts relates to claims arising from actions undertaken by the Government after the modifications containing the accord and satisfaction and release language were signed. DA 159, 162-63. As each of the releases applied only to "claims, demands, or causes of action" that each of the parties may have had up to the date the modifications were signed, Axion did not release the Government from the claims presented in Counts X, XI, and XII. *Id.*

> was because of these additional costs that he could not accept a "no-cost" termination for convenience prior to signing modification P00017. The question of whether, under these circumstances, it was reasonable for the contracting officer to believe that Mr. Latifi had agreed to relinquish Axion's claims for costs in exchange for a chance to complete the contract is not amenable to resolution on summary judgment. As in *T.L. Roof*, the court in the present case cannot say based on the limited record presented whether there is an absence of disputed facts on the question of unilateral mistake.
>
> For all of these reasons, the cross-motions for summary judgment on the issue of the release must be denied. A trial will be required to resolve the issue of "unilateral mistake," both as to whether Mr. Latifi made a mistake, and, if so, whether the government knew or should have known of the mistake.

*Axion Corp. v. United States*, 68 Fed. Cl. 468, 479 (2005)(emphasis added).

Notwithstanding the Court's holding that resolution of the issue of unilateral mistake will require a trial, the Government once again asks the Court to grant summary judgment in its favor based on the presence of the release language in modifications P00017, P00019, and P00020. The only additional evidence presented by the Government in support of its position is the supplemental declaration of John J. Korab ("Korab"), the Contracting Officer, which purports to set out the facts of which Korab had knowledge, and those of which he lacked knowledge, when the parties executed the subject modifications. DA 732-735. But, Korab's actual knowledge of Latifi's unilateral mistake is not required for reformation. As the Court stated in its prior opinion in this case, "courts may use the equitable remedy of reformation to correct a unilateral mistake if the government knew or should have known of a mistake." *Axion v. United States*, 68 Fed. Cl. at 478 (emphasis added).

The Court previously held that genuine issues of material fact exist with respect to whether Korab had reason to know of Latifi's mistake. It is clear from the facts that

Korab had reason to know of Latifi's mistake. As a matter of background, English is Latifi's second language. First Latifi Decl. ¶ 2 at PA 1283. Thus, Korab had reason to know that Latifi was more prone than the average vendor to misunderstand the legalistic prose in the accord and satisfaction provisions. Additionally, Korab had reason to know that Axion had grounds for significant monetary claims. In fact, Axion informed Korab that the delays in production, which ultimately led to the subject contract modifications, were the responsibility of the Navy:

> The cause of the delay has been the accumulative effects of events that were beyond Axion's control. … Since the Government did not have a spin gun to test the unit Axion had to develop an air gun for testing and collecting the data. Axion has developed a spin gun, automated data gathering system which includes a flying bird, miniaturized on board computer, data collecting interface board, resistor automated load board and data collecting software. But it took much longer…. Again, Axion's manufacturing contract was being treated as a research and development contract with Axion carrying the cost without any cost to the Government.
>
> After first article approval Axion had no choice but to proceed with developing a plating line per Government supplied document #NAVORD OD 18332 dated February 1967. This data was obsolete and the Government did not respond to Axion's written request for updated information.
>
> After approval of the first article Axion ordered and received every item in the part list in quantities to produce 60,000 units. … Currently, Axion has 4 trained individuals dedicated to the production of the power supply. By September 8, 2000, based on our current production all assemblies will be 100% complete.
>
> Due to the above facts and the time and effort that both Axion and the Government have invested in this contract, at this stage it is premature, illogical and unfair to stop production. <u>Axion is a small disadvantaged company that would be deeply financially hurt by this cancellation and possibly not recover</u>.

Axion Letter, August 25, 2000, PA 228 (emphasis added).

Furthermore, as Latifi testified in his sworn declaration in support of Axion's previous motion for summary judgment, Axion and Latifi spent significantly more money in performance of the Contract than was expected due to Axion's reliance on the defective specifications provided by the Government. First Latifi Decl. ¶ 4 at PA 1284. Latifi informed Korab of these significant costs when Korab suggested the possibility of a no-cost termination of the Contract, telling Korab that he had taken millions of dollars of his own money from his retirement account in attempting to perform under the Contract. First Latifi Decl. ¶ 8 at PA 1285-86. In his supplemental declaration, Korab disputes that he was ever provided specific information regarding the substantial amount of money Axion spent on the Contract. Korab Decl. ¶ 9 at DA 734 (stating "I also think it is important to emphasize that Axion never provided me with specifics on how much it has spent on the contract."). These facts are material in that the significant costs associated with the Contract makes it highly unlikely that Latifi would consent to a release of any claim Axion may have to recover these costs. Latifi further informed Korab that, due to the significant costs incurred by Axion under the Contract, a no-cost termination of the Contract was unacceptable. First Latifi Decl. ¶ 8 at PA 1285-86. Korab does not dispute that Latifi said he would lose a lot of money if he accepted a no cost termination for convenience. When asked in his deposition about the offer of a no-cost termination for convenience, Korab stated:

> Q. Did Mr. Latifi explain to you that he would lose a lot of money if he accepted it?
>
> A. I'm sure he said that.

Korab Depo. p. 77 at PA 1299. It defies logic that Latifi would suddenly change his mind and agree to give up payment for contractual expenses that Latifi had financed from his retirement accounts and were directly attributable to the Government.

Finally, as the Government points out in its brief in support of summary judgment, the contract delivery schedule was altered ten different times by the execution of Contract modifications. Def. Mot. p. 9. Significantly, only the last three modifications (which were entered into after Latifi informed Korab of the significant costs it had incurred in performing the Contract) contained the accord and satisfaction and release language. DA 159, 162, 163. Notwithstanding the addition of such significant language to the final three contract modifications, Korab never discussed the language with Latifi. Korab Depo. p 47 at PA 1298.

Despite Korab's supplemental declaration in which he asserts that he had no actual knowledge of Latifi's mistake concerning the effect of the release language contained in modifications P00017, P00019, and P090020, Korab clearly had reason to know of Latifi's mistake. Accordingly, the Government's Second Motion for Summary Judgment with respect to Counts I – IX and XIII – XXIX is due to be denied, and the Court should hold that the accord and satisfaction and release language contained in the modifications is unenforceable as a matter of law and enter judgment in favor of Axion.

**B. The Government Improperly Rejected Axion's Second FAT Due To Its Failure To Adhere To Established Procedures For How The Data Would Be Considered.**

In support of its motion for summary judgment, the Government argues that it had a valid basis to reject Axion's second FAT because Axion failed to present data on 80 units in its second FAT report and also failed to include in the FAT report all of the

testing information required under the Contract. While Axion does not dispute that its second FAT report (which was presented in a letter addressed to Korab dated September 9, 2002) did not contain every piece of information purportedly required under the Contract, Axion's failure to strictly comply with Data Item Description DI-NDTI-80809A is immaterial, because the parties established different standards and procedures during the first FAT that were binding on the Government (and were, in fact, not followed by the Government in evaluating the second FAT).

On April 12, 1999, Latifi sent a letter to Korab for the purpose of submitting the data collected pursuant to the required First Article testing (hereinafter referred to as the "First Letter"). DA 187-188. No other FAT report was submitted for Korab's review. The First Letter indicated that "609 units were subjected to the environmental requirement of the Technical Data Package," and went on to state that a total of 581 units were destructively tested for which "verified successful data" was collected on 221 units. *Id.* The data on the 221 units was placed on computer floppy disks and enclosed with the

First Letter, and data on 22 additional units was in the possession of Jerry Hahin. *Id.* Thus, data on approximately 240 units was submitted for Korab's review and approval.[3]

The First Letter was subject to Data Item Description DI-NDTI-80809A, just like Axion's letter of September 9, 2002 (the "Second Letter") that the Government claims was deficient. DA 93-99. Despite being subject to this requirement, the First Letter did not contain the detailed description of testing procedures and testing steps that the Government now argues were necessary to determine whether Axion complied with the Contract. Def. Mot. pp. 15, 16 n. 10. The Government did not ask Axion to provide additional information with respect to testing procedures and steps, nor did the Government require Axion to file a FAT report that strictly complied with Data Item Description DI-NDTI-80809A. Nevertheless, **Axion's first article was approved** on May 17, 1999. DA 189. Therefore, the Government cannot now argue that the lack of information presented by Axion is a valid basis for rejecting Axion's second FAT. The Government was provided information nearly identical to that provided during the first

[3] Axion was originally required to submit data on 540 units for First Article approval. DA 62. The Contract was subsequently modified to require the submission of data on only 360 units. DA 149. In the First Letter, Axion requested that this number be further reduced to 240. DA 187. As Latifi explained during his deposition, this request was made based on the Government's representations that data on 240 units was sufficient:

> Q. A reduction. So with this letter, in addition to submitting the data, you also requested a reduction –
>
> A. No, they told me to do that – I think when they doing the test, they found out they are looking pretty good. There is no reason to destroy them. So they – I think they told me – e-mailed me or told me by phone – I think they e-mailed me. They sent an e-mail that said, "Go ahead and send that –" They told me – and they called Henry Stickrod to go ahead and submit a request to drop them down – or they are the ones who did it. Somehow or other – they are the ones who initiated this.

Latifi Depo. p. 115 at PA 1289.

FAT, and felt comfortable enough with the information it was given to approve the first FAT. The Government's positions with respect to the Second Letter should be seen as nothing more than an attempt to justify the Government's wrongful termination of the PS-115 Contract.

Furthermore, the Government cannot now argue that Axion's second FAT Report was properly rejected because it contained data on less than 80 units. Much like Axion's first FAT Report (which was originally required to contain data on 360 units but the Government determined that data on only 240 units was sufficient), the Government acquiesced to Axion sending data on less than the total number of units that was originally required. During a conversation with Latifi, Korab agreed that submitting test data on approximately 80 units would be sufficient. Latifi Letter to Korab, October 11, 2002, DA 207A. Furthermore, Latifi testified in his deposition that data on 90 units was submitted, with data on 74 of the units being sent with the Second Letter and data on the other 16 units being in the possession of Jerry Hahin. Latifi Depo. p. 217-18 at PA 1290-91. Thus, genuine issues of material fact exist with respect to whether Axion submitted data on the amount of units agreed upon by the Government.[4]

[4] It should also be pointed out that the Government does not seem to know the exact number of units that it requested Axion to send data on for the second FAT. Contract Modification P00017 states that 120 first articles samples should be submitted, while Contract Modification P00019 references 80 samples. DA 159, 162. Henry Stickrod, the Government representative who observed testing of the units at Axion's facilities, seemed to indicate in an e-mail to Korab, dated September 6, 2002, that he was unsure of the exact number of units required to be tested. DA 329 ("Axion says that they are required to shoot 80 items for First Article…..I told Alex that I have to stick to what the Contract has in writing and that the last that I knew 120 was needed to complete the First Article Testing."). Given these inconsistencies, it is understandable that Latifi called Korab on September 9, 2002, to verify that submission of data on "around 80 units" would be sufficient, which Korab agreed to. DA 207A.

Finally, the Government states that "25 out of 66" first article samples failed to meet contractual standards. Once again, the Government points to the strict requirements of the Contract rather than considering the methods and procedures the Government and Axion actually relied upon in approving the original first article test. Moreover, the Government can only act through its agents, and the Government's representatives on the ground agreed to standards and requirements of testing vastly different than those agreed to years before in the original Contract documents. As Latifi indicated in his First Letter to the Government, 581 units were destructively tested, but only 221 units provided successful data. DA 187. Latifi further indicated in his letter that

> Mr. Jerry Hahin, Naval Warfare Center, Crane, Indiana, has made four trips to Axion facility: May 1989, August 1989, September 1989, and March 1999; to observe, witness and verify the unique Spin Vacuum Gun system, processes and procedures that we have developed to meet the requirements of the contract. On his last visit March 2, 3, 4, 1999, he witnessed the Final First Article Testing and Data Collection. Mr. Henry Stickrod, our DCMC representative has been witnessing the operation and collection of test data for the past four months. Mr. Stickrod and Mr. Hahin were satisfied with the results of the test data.

DA 188 (emphasis added). Although only 221 successful tests results were observed out of a total of 581 tests, the Government approved Axion's first FAT based on the recommendations by Stickrod. There is no evidence that Korab looked at the test results for the individual units to determine if each unit passed or failed; rather, Korab justifiably relied along the way on the eyes and ears of the persons who observed the testing to determine whether the FAT should be approved.

Much like the test results from the first FAT, Axion tested 127 units for the second FAT but only successfully collected data from 74 of the tests. DA 202. In an e-

mail to Korab on September 5, 2006, Stickrod explained that, even though valid data was not collected, many of the units provided sufficient voltage:

> The majority of the failed items (failed to capture acceptable data) provide sufficient voltage after data collection failure to seem to indicate that the cell functioned correctly/to requirements despite the inability to collect the data…

DA 328. In another e-mail to Korab the following day, Stickrod gave his approval to Axion's test results:

> [Axion] has successfully completed testing (recorded successful data) on at least 90 items….At this point, the testing system functions very well - - Axion can shoot and record, optimally, 4 per hour; human error has caused every non-acceptable data collection problem that has been encountered over the past couple of weeks…<u>Bottom line is: I think the PS115 and the testing apparatus have matured to the point that any number of shots can be made and the successful collection of reliable data can be accomplished at will.</u>

DA 329. Thus, the QAR on the ground, who actually observed the testing, felt Axion was in compliance with contractual requirements, and that any problems were caused by "human error" rather than defective units.[5] Based on Stickrod's representations to Korab, all instances of non-successful data found in Axion's report should have been counted as "no-tests," just as they were for the first FAT. Latifi Depo. p. 230 at PA 1292. Instead, the Government counted these instances as "failures," and relied upon these alleged failures to reject the FAT and terminate the Contract for default. DA 705-710. This time, rather than rely on the eyes and ears of persons who observed the testing, Korab decided Axion failed the test. It is undisputed that Korab did not attend the testing, and it

[5] Stickrod attempts to back away from this position in his declaration by stating that "[i]t was not my responsibility to determine or to know whether the problems evidenced in Axion's report were due to defective PS-115 or problems with the testing equipment, or a combination of the two." Stickrod Declaration, ¶ 2 at DA 362. Nevertheless, Stickrod noticeably does not deny that he witnessed Axion successfully test 90 units and felt that many more could have been successfully tested had such testing been required. *Id.*

is undisputed that he never reviewed or inspected individual units to determine if the units passed or failed.

It is indisputable that by relying on Axion's First Letter to approve the first FAT, the Government acquiesced that the information contained therein was sufficient and that strict compliance with the Contract was not required. *See, e.g., Carbetta Enterprises, Inc. v. United States,* 58 Fed. Cl. 563, 567 (2003)("A contract is validly modified if the party who did not propose the changes is shown to acquiesce in the modification through a course of conduct consistent with acceptance."); *Pittman Constr. Co. v. United States*, 2 Cl. Ct. 211, 215 (1983). Additionally, the Government was bound to follow the testing and evaluation procedures that it established with respect to Axion's first FAT. *See, e.g., Baitfield Industries, Div. of A-T-O, Inc.*, ASBCA No. 14582, 72-2 BCA ¶ 9676 (August 29, 1972)("[W]e conclude that appellant conducted its water test pursuant to an implied agreement with the Government as to how paragraph 3.3.1.9 should be interpreted and the Government became bound by that interpretation."). Thus, the Government's attempt at arguing that it validly rejected Axion's second FAT must fail.

Genuine issues of material fact exist with respect to the Government's claim that Count X should be dismissed because the Government possessed a valid basis to reject Axion's September 9, 2002 FAT Report. Accordingly, the Government's motion for summary judgment with respect to Count X is due to be denied.

**C. The QAR Approved The Second FAT.**

In Count XI of the Complaint, Axion alleges that its second FAT was approved by the Government based on Charles Vartan's representations to Latifi regarding the successful testing of the PS-115s. The Government argues that it is entitled to summary

judgment with respect to Count XI because "the contract provides for neither written nor verbal approval of FAT nor authorizes the QAR to approve FAT." Def. Mot. p. 18. Once again, the Government fails to consider the effect of its course of dealings with Axion during the first FAT.

Latifi explained the following during his deposition:

> Q. So when you submitted 360 units that were tested -- 221 which you said were successful -- you didn't -- how did you know they were successful?
> A. They said it was successful?
> Q. They said it was successful?
> A. They wanted to witness the test.
> Q. And did he say that?
> A. By witnessing the test.
> Q. By witnessing the test. I mean, did he say, "These are successful tests or –"
> A. They have to accept each test or reject each test as I was doing it.
> Q. And by accepting it, was that accepting the process or accepting the battery?
> A. Accepting the test – and the battery – the one who shot – the unit was shot; they accepted it. It was a test or a no test. If it was a test, they look at data and – they say, "Okay, this is a good one. Put it here."

Latifi Depo. p. 116 at PA 1302. Thus, Latifi relied on the QAR's representations that a successful test had occurred to satisfy the contractual requirements.

The same sequence of events occurred with respect to the second FAT. Latifi explained during his deposition:

> Mr. Vartan came two days, Thursday and Friday. And the Friday – which we proceeded test [sic] to test – and he decided that we shot enough, that there was no reason to continue. We had 31 continuous good test results, and he saw there was no reason to proceed anymore.
>
> So he went and called Mr. Korab and asked him should – that he don't see any reason to proceed anymore, destroying good units. And he didn't get Mr. Korab, and he called his boss – his name is Steve somebody – and asked him to get ahold of Mr. Korab and tell us what to do – that there was

> no reason for shooting these things – we already shot 90, and now we shoot 30 more pieces over that – so what they want us to do?
>
> So he waited for at least an hour or so, and nobody answered, so he is going to go, and if they want to come back, he will come back Monday. We still had a lot to shoot if they want us to shoot. But he did not come back Monday.

Latifi Depo. p. 214 at PA 1293. To confirm no more shooting was required, Latifi called Korab on Monday, September 9, during which conversation Korab indicated that no more shooting was necessary. Latifi Depo. p. 218 at PA 1291. Thus, as of September 9, 2002, Axion had completed the requirements for First Article Approval, and Vartan had given his approval to the results of the test.

The Government points to a clause of the Contract entitled "Authorized Changes Only By The Contracting Officer" in support of its position that only Korab could have approved the second FAT. Def. Mot. p. 19. Subsection (b) of this clause states that "[t]he Contractor shall not comply with any order, direction or request of Government personnel unless it is issued in writing and signed by the Contracting Officer, <u>or is pursuant to specific authority otherwise included as part of this Contract</u>." DA 11 (emphasis added). The Government noticeably fails to mention the portion of the Contract providing that "[a]cceptance or rejection shall be accomplished by the cognizant GQAR based upon his own inspection(s) and the results of the First Articles….from the testing activity…." DA. 43. As the Contract expressly gives the Government's QAR the authority to accept or reject the results of the first article testing, Vartan had the authority to accept Axion's second FAT after witnessing 31 consecutive successful tests.

The Government's QAR approved Axion's second FAT. Accordingly, the Government's Motion for Summary Judgment on Count XI of the Complaint is due to be denied.

### D. Axion Was Unable To Complete Further Testing Due To The Government's Failure To Cooperate.

In Count XII of its complaint, Axion asserts a claim against the Government for the Government's breach of its implied duty to cooperate. "The implied duty to cooperate is encompassed within the duty of good faith and fair dealing implied in every government contract." *Renda Marine, Inc. v. United States*, 71 Fed. Cl. 378, 387 (2006).

The Government argues that there are no facts indicating that the Government failed to cooperate with Axion in its attempt to pass the second FAT. Def. Mot. p. 21. To the contrary, the Government's QAR, Charles Vartan, told Latifi on Friday, September 6, 2002, that Axion had tested a sufficient number of units and there was no need to destroy any more of the batteries. Latifi Depo. p. 214 at DA 1293. Vartan was to return on Monday if the Government felt that more testing was needed, but did not return. *Id.* Additionally, Latifi spoke with Korab by telephone on September 9, 2002, at which time Korab indicated that Latifi had tested a sufficient number of units. Latifi Depo. p. 218 at DA 1291. Axion was ready to shoot more units had the Government felt it necessary. Latifi Depo. p. 234-36 at DA 1294-1296. The Government's employees on the ground verified this fact. PA 329. Nevertheless, the Government stopped Axion from testing, and then terminated the contract for default based, in part, on the submission of test data on fewer than 80 batteries. *Id.* Due to the Government's refusal to allow Axion to continue testing the units, and its misrepresentation that an adequate number of units had been tested, the Government acted in bad faith and breached its duty to cooperate.

Accordingly, the Government's Motion for Summary Judgment is due to be denied, and judgment should be entered in favor of Axion.

## II. The Government Failed To Raise Genuine Issues Of Material Fact With Respect To Axion's Claims, And Thus Axion's Motion For Summary Judgment Is Due To Be Granted.

In its response to Axion's Motion for Summary Judgment, the Government failed to raise genuine issues of material fact with respect to Axion's claims. Accordingly, Axion respectfully requests that the Court grant its motion for summary judgment and enter judgment in its favor on all claims asserted in the Complaint.[6]

### A. The Government Failed To Raise Any Genuine Issue Of Material Fact With Respect To The Defective Nature Of The Plating Specification Expressly Referenced In The Contract.

In its attempt to raise genuine issues of material fact with respect to Axion's claim that the 1967 version of NAVORD OD 18332 (the "1967 Specification") was defective, the Government presents no evidence to refute Axion's claims. In fact, the Government does nothing more than attack Latifi's statements concerning his interpretation of the 1967 Specification and the importance of the information contained in the 1973 and 1980 revised versions of the 1967 Specification (which were not provided to Axion despite Latifi's request for such information). Def. Mot. pp. 29-30. For example, as Latifi testifies in his declaration, the 1967 specification was defective in that it instructed Latifi to "turn on steam and heat to 180 degress Fahrenheit," while in actuality the 180 degrees

[6] In opposition to Axion's motion for summary judgment, the Government argues that each of Axion's claims are barred by the accord and satisfaction and release language found in Modifications P00017, P00019, and P00020. Def. Mot. p. 25. As Axion has established that Korab had reason to know of Latifi's mistake with respect to the release language contained within the modifications, this argument must fail, and judgment should be entered for Axion and against the Government on the Government's defenses of accord and satisfaction and release. *See* I.A., *supra*.

Fahrenheit was the minimum temperature (which the 1980 revised specification makes clear) required for the plating process to work properly. PA 552-553. The Government offers no evidence to contradict Latifi's testimony that the temperature was an important aspect of the process, but simply assigns error to Latifi's interpretation of the specified instruction. *Id.* In short, the Government questions Latifi's testimony, but presents no evidence that raises any issue of fact with respect to the defective nature of the 1967 specification. The Government has no expert on this subject. As the Government pointed out in its motion, "[m]ere denials or conclusory statements…are not sufficient to create an evidentiary conflict." Def. Mot. p. 13 (*citing Barmag Barmer Maschinenfabrik AGT v. Muratta Mach., Ltd.*, 731 F.2d 831, 836 (Fed. Cir. 1984). Thus, the Government's attempt at raising genuine issues of material fact with respect to the defective nature of the 1967 Specification must fail.

The Government also attempts to show that the 1967 Specification is not defective by presenting a Declaration of David Pierson ("Pierson"), an individual who purportedly relied upon the 1967 Specification while building a plating line for Accudyne. DA 730. Pierson was never identified by any witness for the Government as having information about matters involved in this case, and his declaration was apparently drafted after the close of discovery. Regardless, noticeably absent from Pierson's declaration is any assignment of error with respect to Latifi and Axion's claims. *Id.* Furthermore, Pierson states that "the guidance contained" in the 1967 Specification was "the basis for his effort to build to [sic] the plating line," but fails to set out whether he strictly followed the procedures set out in the specification or whether wholesale changes were needed in order to correctly manufacture the plating. *Id.* By looking solely

at the evidence presented in Pierson's declaration, it is not clear whether or not Pierson ran into the identical problems that Axion experienced. In fact, Pierson hints at deficiencies in the specification, stating "[t]his document does not provide every single step necessary for production of plate stock." DA 730. Thus, Pierson's affidavit fails to create a genuine issue of material fact with respect to Axion's claim that the 1967 Specification is defective.

Finally, the Government argues that the 1967 Specification was not a "design specification," thereby precluding the application of the *Spearin* doctrine.[7] In support of this argument, the Government cites *Natus Corp. v. United States*, 371 F.2d 450 (Ct. Cl. 1967), which states the following:

> <u>The fact that the contract did not expressly direct the method of manufacture would offer defendant little aid.</u> The drawing, by clearly depicting a production sequence (i.e., piercing before forming), communicated with as much certainty as the spoken word. Thus plaintiff's argument that it was reasonable for it to have assumed the feasibility of fulfilling performance through a pierce-before-forming operation is a point well taken. Furthermore, <u>we see no reason for excepting the present situation from the long adhered to principle that, where the Government authors the specifications, it warrants that, if they are complied with, satisfactory performance will result</u>…That warranty speaks not only to the contractor's right to assume that the end product will perform satisfactorily, it includes as well his right to rely upon the indicated method of manufacturing the end product. In short, it means that the product shown can be made in the manner shown.

[7] In the alternative, the Government argues that, assuming the *Spearin* doctrine applies, Axion failed to establish that it incurred costs that proximately flowed from the defective 1967 Specification. Def. Mot. p. 34. To the contrary, it is indisputable that once Axion undertook to manufacture the plating using the 1967 Specification, the Government required Axion to undergo a second First Article Test to ensure the plating being manufactured by Axion was able to produce the required voltage. DA 165. As the Government ultimately disapproved Axion's second FAT (implicitly finding that the plating did not perform as the Contract required), it is without question that Axion's reliance on the defective 1967 Specification was the proximate cause of such disapproval.

*Id.* at 455 (emphasis added). Thus, despite the Government's argument that the *Spearin* doctrine applies only to contracts wherein the design leaves the contractor with no discretion, the *Natus* Court reached a different conclusion, finding that the fact the Contract did not "expressly direct the method of manufacture" did not protect the Government from the implied warranty arising when the Government provides a government authored specification for use by a contractor. *Id.* As the Government authored the defective 1967 Specification, the Government indisputably breached its implied warranty to Axion, and Axion is entitled to summary judgment with respect to Count XV of its Complaint.

### B. No Genuine Issue Of Material Fact Exists With Respect To The Government's Failure To Share Its Superior Knowledge Regarding The Air Gun And Plating With Axion.

In its response to Axion's Motion for Summary Judgment, the Government argues that genuine issues of material fact exist with respect to the Government's failure to share its superior knowledge regarding the air gun and plating required to perform under the Contract. For several reasons, the Government's argument must fail.

First and foremost, the Government does not dispute it knew as early as 1993 that it would cost anywhere between $1.5 million and $3 million for a company to either build or buy a plating line to be used in manufacturing the plating required under the Contract. PA 278-279 (Navy Small Business Set-Aside Form); PA 408-409 (Honeywell Proposal, June 12, 1967, PA 408-409); PA 412 (HDL Memorandum Regarding Government

Owned Electroplater).[8] The Government failed to share this superior knowledge with Axion, even though the total Contract price to be paid Axion was only $1,313,940.00. PA 1. It simply cannot be argued that the information related to the substantial cost of obtaining a plating line was not superior knowledge that the Government should have shared with Axion.

Furthermore, Axion had no reason to believe that it would be required to manufacture the plating itself, as a drawing provided in the Contract named two potential sources for the plating. Drawing 1097439, PA 218. Although the Government argues that Accudyne, one of the suggested sources, was manufacturing plating at the time of Axion's contract, the declaration of David Pierson gives no indication that Accudyne was a vendor of the required plating. DA 730. In fact, the Government knew that Accudyne was not a supplier of plating components, but had always held itself out to be a supplier of only the power supply itself. PA 273-274 (Sabonis Trip Report to Dunrite, July 23, 1993). Nevertheless, the Government failed to share its superior knowledge with Axion.

The Government attempts to distinguish the *Aerodex* opinion by pointing out that the *Aerodex* contract specification included a specific brand-name description for a component required to manufacture the contracted for part. Defendant's Second MSJ at pp. 38-39. The Government's argument is a "distinction without a difference," as the *Aerodex* court noted that "the question should be…whether…the Government [is excused] for issuing an invitation to bid on a contract which it knew or should have found

[8] The Government argues that these figures are irrelevant to Axion's claim because "Axion's plating requirements were much smaller than Accudyne's." Def. Mot. pp. 35-36 n. 18. This argument must fail, as neither the Government, the Contract, nor the 1967 Specification provides any explanation of how the volume of batteries required modifies in any way the requirements of building a plating line or the costs attributable thereto.

out could not be performed with a reasonable expenditure of effort and cost because of the unknown nonavailability of the [component] or its material specifications." *Aerodex, Inc. v. United States*, 417 F.2d 1361, 1366-67 (Ct. Cl. 1969). Based on the Government's knowledge of the impossibility of obtaining the plating from the suggested sources, coupled with its knowledge of the substantial costs related to building a plating line, it is indisputable that the Government had superior knowledge with respect to these issues that it should have shared with Axion.

With respect to the Government's superior knowledge related to Axion's need for an air gun, the Government continually states that Axion undertook performance "fully aware" that it would need an air gun. Def. Mot. p. 41. However, the Government noticeably does not dispute that the Contract never once mentions an air gun.[9] Furthermore, the only evidence the Government points to in support of its position is the contract provision stating that Axion is responsible for test equipment. Def. Mot. p. 41, n. 21. While Axion may have been aware that it was required to test the PS-115s, there is no evidence that it was aware that it would be required to *develop* an air gun to test the batteries. It is the developmental aspect of obtaining the air gun that Axion contends is vital information of which the Government had superior knowledge, as Axion's development of an air gun affected both the cost and duration of Axion's performance under the Contract.[10]

[9] If the need for an air gun was as clear as the Government wants the Court to believe, the Court should question why neither the Contract nor any of the materials referenced therein make any mention of an air gun.

[10] With respect to the remaining elements of the superior knowledge doctrine, Axion will refer the Court to its brief in support of its motion for summary judgment.

As the Government failed to raise any genuine issues of material fact with respect to Axion's claims brought pursuant to the superior knowledge doctrine, Axion is entitled to summary judgment on Counts II, XXI, and XXVIII of its Complaint.

**C. No Genuine Issue Of Material Fact Exists With Respect To The Government's Breach Of Its Implied Duty To Cooperate And To Not Hinder Performance.**

In response to Axion's claim that the Government breached its implied duty to cooperate and to not hinder performance by failing to provide Axion with the revised version(s) of the 1967 Plating Specification, the Government points to the fact that the Navy archives show no revision has occurred since 1967, and further argues that the 1973 and 1980 revisions of the Plating Specification were, "at best, informal, unsigned alterations…made for internal Army use." Def. Mot. p. 30. While the Navy may not have a formal record of these revisions, the Navy was aware as early as May 23, 1996, that that Army possessed revised versions of the 1967 Specification. DA 768. Nevertheless, the Navy failed to take any steps to obtain these revised specifications, even though Axion had made it aware that problems existed with respect to the 1967 Specification. DA 766. Thus, it is indisputable that the Government breached its implied duty to cooperate and to not hinder performance by failing to "do whatever is necessary to enable the contractor to perform." *See Orlosky, Inc. v. United States*, 68 Fed. Cl. 296, 311 (2005).

Additionally, there can be no doubt the Government breached its implied duty to cooperate when it refused to provide Axion with an air gun, or even the drawings for the air gun, to be used in testing the batteries. The Government argues that it did not have an air gun to give Axion, and in support of this position presents Korab's Supplemental

Declaration. DA 732-735. In paragraph 12 of his declaration, Korab, very importantly, does not deny that he knew the Army had provided an air gun to Accudyne. DA 735 (Korab Supplemental Declaration, ¶ 12). While Korab reiterates that the Navy had no air gun to provide Axion, he never told Latifi this when informing him that Axion would not be provided an air gun. DA 179. Furthermore, although it is clear that the Army possessed an air gun and also possessed drawings of the air gun that would have been greatly beneficial to Axion, the Navy did nothing to obtain the gun or the drawings. DA 180-181. In short, instead of cooperating with Axion, the Government sat idle while Axion was unexpectedly forced to develop an air gun, at great expense, to test the batteries.

As no genuine issue of material fact exists with respect to Axion's claim that the Government breached its implied duty to cooperate and to not hinder performance by failing to do everything necessary to enable Axion to perform, Axion is entitled to summary judgment, and the Government's termination for default should be converted to a termination for convenience.

**D. No Genuine Issue Of Material Fact Exists With Respect To The Government's Failure To Consider "No Tests" Present In Axion's Second FAT.**

The Government asserts in its response to Axion's motion for summary judgment that Axion's "no test" theory is without merit. However, rather than provide any evidence which contradicts Axion's claims, the Government simply points to the fact that Axion presented data on less than 80 PS-115s in its second FAT report and, once again, argues that Axion failed to submit a satisfactory report. Def. Mot. pp. 45-46. The Government's argument is untenable and fails to raise any genuine issues of material fact.

It is indisputable that during the testing for the second FAT, the Government expressly agreed that Axion could send data on less than 80 units. *See* I.B., *supra*; DA 207A (Latifi Letter to Korab, October 11, 2002). On Friday, September 6, 2002, Vartan, the Government's QAR, instructed Latifi that a sufficient number of units had been tested and that there was no need to destroy any more batteries. Latifi Depo. p. 214 at DA 1293. Latifi also spoke with Korab, the Contracting Officer, by telephone on September 9, 2002, at which time Korab indicated that Axion's submission of data on approximately 80 units would be sufficient. DA 207A. Furthermore, the same sequence of events occurred with respect to Axion's first FAT Report (with Axion submitting data on fewer than the required number of units after being told by the Government that this was acceptable), and the first FAT was *approved*. DA 189. Thus, the Government's attempt at justifying its disapproval of the second FAT Report based merely on the fact that it contained data on fewer than 80 units is disingenuous and is not supported by the Government's prior course of dealings with Axion.

The Government fails to raise any genuine issue of material fact with respect to Axion's claim that the Government did not consider the effect of no tests during Axion's second FAT. As Axion explained in its Motion for Summary Judgment, Stickrod, the quality assurance representative who was present at Axion when the batteries were tested for the second FAT, testified in his deposition that there were "lots of" no tests he observed, because of a malfunction in Axion's air gun or human error.[11] Stickrod Depo.

[11] Hahin, the Government contracting officer who studied Axion's test results and made the determination that 25 of 66 batteries failed to meet specifications, acknowledged in his deposition that he had only observed approximately four of the air gun tests for the second FAT. Depo. of Jerry Hahin p. 165 at PA 1301. Thus, he would have necessarily needed to rely on Stickrod's observations to help make his decision.

p. 83 at PA 1206. Stickrod further testified that when these no tests occurred, the battery would be opened up, and "you could always determine something – a wire had broken, the PS115 had been thoroughly ruptured – too much or not enough. There was always – you could always pinpoint what it was" that caused the no test. Stickrod Depo. p. 84 at PA 1207. Where a no test would occur, Stickrod would use a voltage meter to determine if the voltage reached was sufficient to meet contractual requirements, and Stickrod testified that a <u>majority</u> of the batteries tested in this manner had sufficient voltage to indicate that the battery cell functioned correctly. Stickrod Depo. p. 94 at PA 1209; *see also* Stickrod E-mail to C.O., September 5, 2002, PA 328 ("The majority of the failed items (failed to capture acceptable data) provide sufficient voltage after data collection failure to seem to indicate that the cell functioned correctly/to requirements despite the inability to collect the data."). Despite the occurrence of a significant number of no tests, Stickrod indicated that "no tests" were not part of the criteria considered when reviewing Axion's test information:

> We are getting back to that test or not test business. I do not know anything about a no test. That was not in the criteria that I ever had at any point.

Stickrod Depo. p. 90 at PA 1208-1209. Thus, while the Government justified the termination for default based on "25 out of 66 First Article Power Supplies failed to meet the performance requirements of drawing 11744726," the Government's failure to consider the effect of no tests on the data provided by Axion makes it impossible for the Government to meet its burden of proof that Axion defaulted under the Contract. Contract Modification P00021, PA 336-337.

No genuine issues of material fact exist with respect to Axion's claims regarding the Government's failure to consider "no tests" during the second FAT. Accordingly, Axion is entitled to summary judgment with respect to Count X of its Complaint.

### E. There Is No Genuine Issue Of Material Fact With Respect To The Leakage Problems Associated With The Government's Defective Specification For PS-115.

Finally, the Government argues that Axion's claim with respect to the leakage of electrolyte from the batteries due to defective specifications is without merit. The Government relies solely on the Declaration of Allan Goldberg ("Goldberg") in support of its position. Def. Mot. pp. 47-48. First, Goldberg asserts that the PS-115 was redesigned in the 1980's to correct a prior problem with leaking. DA 723 (Goldberg Declaration ¶ 4). Interestingly, however, Goldberg does not argue (or present any evidence) that Axion failed to comply with this revised design. *Id.* Goldberg and the Government do nothing more than allege that a new design was implemented for the batteries. No evidence is presented that raises any issue of fact with respect to Axion's claim that it followed the "revised" design and that, due to its defective nature, it was impossible for Axion to prevent corrosion and leakage. Axion's Mot. p. 48-56.

The Government also points to Goldberg's statement that the Army has over 400,000 PS-115s delivered by Accudyne which have not experienced leakage similar to that of Axion. While Axion cannot dispute Goldberg's assertion, without any evidence from Accudyne regarding the method used in manufacturing these batteries, Goldberg's statement is wholly immaterial to this case. It simply cannot be determined whether Accudyne followed the "revised design" of the PS-115, the previous design, or some

other design that Accudyne was forced to implement based on defects in the Government's design.

Goldberg further asserts that "improper welding can result in the type of leaking Axion experienced." DA 725 (Goldberg Decl. ¶ 7). While Axion does not dispute that problems with welding may, in some instances, lead to leakage, there is absolutely no evidence that Axion improperly welded the PS-115s it manufactured relying on the Government's defective specification. Golberg does not allege that he ever inspected or tested Axion's PS-115s to see if they were welded incorrectly, nor does the Government present any other evidence supporting this allegation. Accordingly, the Government's unsupported declaration that welding could have caused the leakage experienced by Axion is wholly immaterial.

Finally, the Government questions the findings of Axion's expert witness, Dr. James Baird, by stating that "Axion's expert witness failed to account for the fact Axion's leakage theory is premised upon corrosion occurring in an oxygen depleted environment." Def. Mot. p. 48. It is important to note that Goldberg did not undertake independent testing in an attempt to disprove Dr. Baird's findings. Instead, Goldberg relies solely on textbooks and reports to support his conclusions. Simply put, Goldberg and the Government undertook no independent testing of the batteries manufactured by Axion to determine the cause of the leakage, and thus cannot prove that any of the theories it now asserts played any role in causing the leakage experienced by Axion.

Accordingly, no genuine issues of material fact exist with respect to Axion's claim that the Government's defective specifications caused the batteries manufactured

by Axion to leak, and Axion is entitled to summary judgment on Counts VII, VIII, IX, XIX, and XXVII of its Complaint.

## CONCLUSION

The Government's motion for summary judgment based on the theories of accord and satisfaction and release is due to be denied, and based on the substantial evidence that Axion presents indicating that Korab had reason to know of Latifi's unilateral mistake, Axion is entitled to the entry of judgment in its favor on this issue. Furthermore, the Government fails to raise any genuine issue of material fact with respect to the claims asserted by Axion in its motion for summary judgment.

For the reasons set out above, Axion respectfully requests that the Court deny the Government's second motion for summary judgment, grant Axion's motion for summary judgment, and enter a judgment in favor of Axion on all claims contained in its Complaint.

Dated this the 1st day of November, 2006.

**ATTORNEY OF RECORD:**

**/s/ Richard J.R. Raleigh Jr.**
**RICHARD J.R. RALEIGH JR.**
**WILMER & LEE, P.A.**
100 Washington Street, Suite 200
Huntsville, Alabama 35801
(256) 533-0202 Telephone
(256) 533-0302 Facsimile
rraleigh@wilmerlee.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been furnished this 1st day of November, 2006, by **Electronic Mail** and **Next Business Day Delivery** prepaid and properly addressed to:

DOUGLAS K. MICKLE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530

Richard Martinelli
Office of Counsel
Naval Inventory Control Point
Mechanicsburg, PA 17055-0788

**/s/ Richard J.R. Raleigh Jr.______**
**Counsel For Plaintiff**