Nos. 03-2644 C & 04-297C
(Judge Firestone)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

AXION CORPORATION,

Plaintiff,

v.

THE UNITED STATES

Defendant.

---

# PLAINTIFF'S SUPPLEMENTAL APPENDIX

---

Richard J.R. Raleigh, Jr.
WILMER & LEE, P.A.
100 Washington Street, Suite 200
Post Office Box 2168
Huntsville, Alabama 35804-2168
(256) 533-0202 Telephone
(256) 533-0302 Facsimile

Attorneys for Plaintiff

November 1, 2006

# INDEX TO APPENDIX

Document

First Declaration of Alex Latifi........................................................1283

Deposition of Alex Latifi.................................................................1288

Deposition of John Korab................................................................1297

Deposition of Jerry Hahin................................................................1300

Deposition of Alex Latifi (continued)...................................................1302

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **AXION CORPORATION,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 03-2644C & 04-297C** |
| **THE UNITED STATES,** | ) | **(Judge Firestone)** |
| **Defendant.** | ) | |

## Declaration Of Alex Latifi

I, Alex Latifi, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct:

1. I am the Chief Executive Officer and majority shareholder of the Axion Corporation. Axion has been in business for approximately twenty years. Axion's core business is winning and performing relatively small, build-to-print (*i.e.,* Level III), Federal government production contracts. Axion has been awarded approximately 200 contracts since the company was incorporated. In almost every instance, the contracts have been firm-fixed price. Axion has never been awarded an R&D contract; R&D is not a core competence of Axion. Prior to contract N00106-96-C-KA09, Axion has never had a contract terminated for default. Although Axion has requested equitable adjustments, prior to contract N00106-96-C-KA09, Axion has never submitted a claim under the Disputes clause.

2. Axion is a minority owned small business. I immigrated to the United States in 1970 from Iran. My native language is Farsi. I am a professional engineer; I pride

myself in being able to build almost any mechanical or electrical device. I have been a citizen of the United States since 1973.

3. In 1995, the Navy issued a solicitation for a fixed-price production contract to acquire 55,209 PS-115 power supplies. The solicitation contained detailed drawings on how to produce the PS-115. The solicitation also contained an option quantity for an additional 55,209 units. Although the contract made Axion responsible for testing the PS-115s, there was nothing in the contract concerning an air gun. Specifically, there were no detailed drawings on how to fabricate an air gun. Axion submitted a proposal. Axion was awarded Contract N00106-96-C-KA09 by the Navy in December 1995.

4. After contract award, I learned that the Navy had provided me with defective specifications for the PS-115. First, the specification was defective because it prompted corrosion which resulted in the leaking of acid. Second, the manufacturing process for the plating needed for the battery cells was defective. Additionally, the Navy was unaware of the major problems in fabricating an effective air gun to test the PS-115s. In retrospect, it is apparent to me that the contract should have been a research and development contract. In a nutshell, Axion quickly started losing money on the contract. Examples of expenses that Axion incurred that were never included in Axion's price proposal include: (1) Axion's demand for $1,534,934 involving the air gun [Complaint II, Claim I]; (2) Axion's demand for $577,004 involving the acid corroding the copper reservoir [Complaint II, Claim X]; and (3) Axion's demand for $1,416,305 involving the defective specification for the plates [Complaint II, Claim XIII]. I financed these loses from my personal savings. Specifically, I withdrew money from retirement accounts. Since I am now 57 years old, I do not have a lot of years remaining to replenish the loss.

5. I was sensitive to the fact that the base quantity of PS-115s for contract N00106-96-C-KA09 should have been delivered in 1996. At the time that P00016 was signed, Axion had already manufactured more than ten thousand units. Axion was prepared to make delivery but, because of the leaking of acid that Axion had brought to the attention of the Government, the Government was unwilling to take delivery. Additionally, before the Government would take delivery, a lot test had to be completed. The malfunctioning of the air gun was preventing the completion of lot testing.

6. After discovering the problem with the leaking acid, I was under the impression that the acid was corrodes the copper reservoir. I recommended substituting the copper reservoir with a PCV reservoir. Although Axion was losing millions of dollars on the contract, I remained optimistic that I could recover my losses. There are millions of PS-115s in the DOD inventory—especially the Army. Because I had proposed a fix, I was hopeful that I could capture future orders to replace the defective PS-115 in DOD.

7. Shortly before Mr. Korab provided me with P00017 for my signature, we had a telephone conversation in which he asked me if Axion would accept a no-cost termination for convenience. The suggestion of a no-cost termination greatly troubled me. It would mean that Axion would not be recognized as a manufacturer of PS-115s for future contracts when other DOD procurement activities would be seeking to replace the defective PS-115s in the existing inventory. Stated differently, I feared that a no-cost termination for convenience would mean that I would lose the millions of dollars that Axion had spent trying to develop (not to be mistaken for "produce") PS-115s.

8. I distinctly remember the conversation when Mr. Korab brought up the possibility of a no-cost termination for convenience. I strongly emphasized how important it was to

Axion to continue the contract. Although in other conversations with Mr. Korab I had alluded to Axion spending vastly more to perform the contract than Axion proposed, in this instance I candidly told Mr. Korab that I had spent millions of dollars of my own money that I had taken from my retirement account. I emphasized that Axion dearly wanted to complete the contract. Knowing that Mr. Korab had broad discretion whether to issue a termination for convenience, I also emphasized that "no-cost" was unacceptable in hope of dissuade him from terminating the contract for convenience.

9. When I received P00017 in the mail for my signature, I recalled thinking it was curious that Mr. Korab had not previously sought to discuss with me why the Government was unexpectedly requiring a new FAT. I did not give the date 01 Oct 03 a lot of thought other than to be relieved that the date was two years away. I was aware that approximately every five years, the Government would require a new FAT. Because Mr. Korab never spoke with me about P00017, I was under the impression that Axion would have to perform another FAT in 2003. If anything, P00017 appeared to be good news because it suggested that the Navy was agreeable to allowing the contract to continue for two more years.

10. In the numerous other Government contracts that Axion had performed, I had never come across the term "accord and satisfaction." As I try to re-construct my thoughts at the time that I signed P00017, I recall trying to understand the legalistic language in the last paragraph. To me, the most logical explanation was that it had to do with who had to pay for the Second FAT. I didn't want to do anything to annoy the Navy. [For example, in P00019, I accepted a $1000 price reduction although Axion was not at fault.] Hence, thinking that Axion was giving up the right to payment for matters

involving the modification (rather than the whole contract), I signed P00017. At the time, it never occurred to me that, after Axion had declined a no-cost termination for convenience, Mr. Korab was skillfully setting a trap for Axion to lose all the money that Axion had spent trying to perform the contract.

Executed this 8 day of May 2005.

Alex Latifi

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AXION CORPORATION, | ) | |
| Plaintiff, | ) | |
| vs. | ) | NO. 63-2644C |
| THE UNITED STATES, | ) | Judge Firestone |
| Defendant. | ) | |

* * * * * * * * * *

DEPOSITION OF ALEX LATIFI

January 28, 2005
Huntsville, Alabama
9:15 a.m.

* * * * * * * * * *

A P P E A R A N C E S

For the Plaintiff:

Mr. Richard Raleigh
Wilmer Lee
100 Washington Street
Huntsville, Alabama 35801
and
Mr. Jerome S. Gabig
Attorney at Law
515 Sparkman Drive
Huntsville, Alabama 35816

For the Defendant:

Mr. Douglas K. Mickle
United States Department of Justice
1100 L Street N.W.
Room 4062
Washington, D.C. 20005
and
Mr. Rick Martinelli
Assistant Counsel for Naval Inventory Control Point
5450 Carlisle Pike, Bldg. 410
Mechanicsburg, PA 17055

reduction --

A No, they told me to do that -- I think when they doing the test, they found out they are looking pretty good. There is no reason to destroy them. So they -- I think they told me -- e-mailed me or told me by phone -- I think they e-mailed me. They sent an e-mail that said, "Go ahead and send that --" They told me -- and they called Henry Stickrod to go ahead and submit a request to drop them down -- or they are the ones who did it. Somehow or other -- they are the ones who initiated this.

Q And when it said to submit 360 units -- what is a "unit"?

A One battery.

Q And what was the success rate that you needed for a successful First Article Test? Do you know?

A I don't know.

Q You don't know? So did they give you the standard that they were going to use to review the material you submitted?

A I don't think they had any standard.

Q You don't think they had a standard?

A No.

units. Mr. Hahin --

(Discussion off the record.)

Q All right, what you told me was Stickrod 90, Vartan 30, and you were about to tell me how many Mr. Hahin --

A Mr. Hahin was there in this period of time. And I don't know what he took with him, but we offered him what we had for him to look at and take with him. What he left we sent later on, but that afternoon -- that afternoon and the day before, we all agree that that is done and it is finished and it is good and we should start shipping.

Q You all agreed. Who agreed?

A Me and DCAS and everybody else that was --

Q Did Korab agree?

A Mr. Korab, no.

Q Did Mr. Hahin agree?

A I don't know at that time what he thought, but we all thought it was done properly, that it is working pretty good, and this is very successful, having 30 consecutive units. And Henry saw 90 that he collected. We all happy that everything is done properly and it is good and we should go ahead and

start shipping the part.

Q Now, you said you had 90 good ones. Well, why in your September 9, 2002, letter did you say data was only collected from 74 units?

A Because some went with Mr. Hahin.

Q Well, why didn't you say in your letter, then, "74 good units are included in this report, and the other 16 units went with Mr. Hahin"?

A I thought he knows. But I talked to Mr. Korab Monday myself --

Q September the 9th?

A The date before -- after the Friday, whatever the date was. I talked to him, and I said, "Mr. Korab, we have done this here, and they are all happy, and everything is okay. Do you want me to shoot some more?" "Mr. Hahin said, '80 is good enough.'" "Do you want to shoot some more?" And he said, "That's adequate."

Q 80 was good enough?

A Yes.

Q But even by your September 9th report, you only submitted 74.

A We shoot 80.

tested, and we only got two hundred and some pieces -- good units -- and they passed the First Article. The percentage of this P000 compared to the first one -- it was much higher here than then.

Q Were there any modifications that you signed with the Government that said First Article Testing was based not on numbers but actually percentages?

A They were --

Q "Yes" or "No"? Was it percentages or was it numbers?

A Numbers or what?

Q I mean, were you required to produce a percentage of PS-115s that tested with good data or a certain number of PS-115s that tested with good data?

A The contract provided me the ability to shoot one unit and if there is no test, replace it. So you put as much as you can -- but in true fact, I shot as long as required -- until the Government was satisfied.

Q All right. But, once again, did the contract require you to submit a percentage of good data or a number of PS-115s with good data?

MR. RALEIGH: I object to the form.

A Vartan. Mr. Vartan came two days, Thursday and Friday. And the Friday -- which we proceeded test to test -- and he decided that we shot enough, that there was no reason to continue. We had 31 continuous good test results, and he saw there was no reason to proceed anymore.

So he went and called Mr. Korab and asked him should -- that he don't see any reason to proceed anymore, destroying good units. And he didn't get Mr. Korab, and he called his boss -- his name is Steve somebody -- and asked him to get ahold of Mr. Korab and tell us what to do -- that there was no reason for shooting those things -- we already shot 90, and now we shoot 30 more pieces over that -- so what they want us to do?

So he waited for at least an hour or so, and nobody answered, so he is going to go, and if they want to come back, he will come back Monday. We still had a lot to shoot if they want us to shoot. But he did not come back Monday.

Q Monday. What date was Monday?

A Well, the Monday after that Friday. I don't recall the date -- whatever date it was.

Q In response to that, I believe -- and this is what I am asking -- that you sent Exhibit 52 to the Government. I only say "I believe," because I don't have a signed version. Am I correct in that assumption?

A (Witness reviews document.) Yes. We thought at that time that the secretary made a mistake and duplicated some of the stuff.

Q So this was your response to the 1 October letter --

A Yes.

Q -- that explains -- it wasn't the show-cause letter; it was the letter that stated -- by letter of September 9th -- and explained why they didn't think your 9 September submission was adequate?

A Yes. This showed the "C" and "R" -- and so on and so on -- so it can specify heat and cold and stuff.

Q Were there any other reasons besides what you expressed in your October 11, 2002, letter that is Exhibit 52 -- why you believed that you complied with the First Article Testing?

A Because I was ready to test some more, and

they just stopped it.

Q They just stopped it?

A Yes.

Q How long was -- the test period between P00020 and P00021 was about three months -- if I remember correctly.

MR. RALEIGH: Look at the documents.

THE WITNESS: Sir? What did you say?

MR. RALEIGH: 20 and 21.

MR. GABIG: I think it's 47.

Q Exhibit 47?

A Yes, sir.

Q So between July 11, 2002 -- and at that time, where you agreed that you would submit your First Article Test Report on September 9, 2002 -- that's approximately -- it's a little bit less than three months. Do you agree?

A Yes.

Q And during that three months, you are required to test -- 80 or 120 good units; is that correct?

A Somewhere between 80 and 120 units, yes.

Q All right. And you stated that you tested

127 units and collected good data on 74?

A I said that it looked to DCAS that it was not necessary to proceed shooting good units and wasting them when 127 units had been shot and approximately 80 good data were collected.

Q Are there any other reasons why you believe you complied with the FAT or is that -- are all your reasons incorporated in this letter?

A Well, most of the reasons that I think are factual -- is that Henry Stickrod collected 90 data.

Q So, going back to my question, is there anything else besides what is mentioned in this letter why you believe back in October of 2002 you had complied with submitting your First Article Test Report?

A Yes. All the people that were involved in test, they agreed that we were doing pretty good -- passed the test -- and the representatives of the Government tell us don't proceed in test any more.

Q The Government stopped you from testing?

A Any more, yes, sir.

Q And when did they stop you from testing? On September 9th?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

. . . . . . . . . . . . . .

AXION CORPORATION,
Plaintiff . NO. 03-2644C

vs.

. JUDGE FIRESTONE

THE UNITED STATES,
Defendants

. . . . . . . . . . . . . .

Deposition of: JOHN KORAB

Taken by: Plaintiff

Date: July 27, 2004, 10:00 a.m.

Before: Vicki L. Fox, RMR, Reporter-Notary

Place: Naval Inspection Depot
Mechanicsburg, Pennsylvania

APPEARANCES:

WILMER & LEE
BY: RICHARD J. R. RALEIGH, JR., ESQUIRE
JEROME S. GABIG, ESQUIRE

For - Plaintiff

UNITED STATES DEPARTMENT OF JUSTICE
BY: DOUGLAS K. MICKLE, ESQUIRE
RICHARD A. MARTINELLI, ESQUIRE

For - Defendant

have annotated on this page was not paramount in my mind.
Q. If it wasn't in your mind, you didn't discuss it with Mr. Latifi; is that simple to say?
A. No, we didn't discuss this.
Q. Was there any discussion at all with Mr. Latifi about the accord and satisfaction language before P00017? Did you have any discussion at all with him about the accord and satisfaction language for P00017?
A. The only discussion we had was establishing the delivery schedule.
Q. There was no discussion about the accord and satisfaction language for P00017; is that correct?
A. That's correct.
Q. What about P00019, was there any discussion between you and Mr. Latifi?
A. No.
Q. On the accord and satisfaction?
A. No.
Q. What about P00020, was there any discussion between you and him on the accord and satisfaction language?
A. No.
Q. All right. Let's take a look at Count II then. It is on page eight. Can you tell us what that topic is all about?

Q. Half the time?
A. It depends on the issue being discussed.
Q. Did you do anything in preparation for that?
A. No.
Q. Did you talk to anyone to get authorization?
A. No.
Q. Was there anybody else on the telephone with you at the time?
A. Absolutely not.
Q. Do you recall Mr. Latifi's response to that suggestion for a no-cost termination for convenience?
A. It was obviously negative because we didn't execute a termination for convenience.
Q. Did Mr. Latifi explain to you that he would lose a lot of money if he accepted it?
A. I'm sure he said that.
Q. Did he actually say he had spent his retirement money on this project?
A. I can't recall those words.
Q. Did he say anything about spending hundreds of hours trying to get the airgun to perform?
A. I can't recall.
Q. Did he just talk in general about the economic hardship it would have for the Axion Corporation?
A. I would say probably so.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
NO. 03-2644C

AXION CORPORATION PLAINTIFF

VS.

ORIGINAL

THE UNITED STATES DEFENDANT

**********

DEPOSITION OF JERRY HAHIN

FEBRUARY 10, 2005

**********

TAKEN BY PLAINTIFF

AT

510 WEST BROADWAY

LOUISVILLE, KENTUCKY

**********

ORIGINAL

KATHY NOLD
ACCURATE COURT REPORTING, LLC
SUITE 419
730 WEST MAIN STREET
LOUISVILLE, KENTUCKY 40202
(502) 589-1413 - FAX: (502) 568-3788

02:15:38 Q. All right. If we go over to the remarks category, it says number one, we had a failed, number two failed, three passed, four failed, down the line. Why is it I don't see any no test?

02:15:52 A. Again, because the data he submitted, he was requested to send all the good data, no bad data he considered to be no test.

02:16:01 Q. All right. Can you explain to me why it is that Mister Stickrod said he observed at least ninety successful tests, but in this instance we are only talking about sixty-six tests in this report?

02:16:32 A. I don't know why Alex sent sixty-six tests.

02:16:36 Q. Did you make any inquiries as to why it is that Mister Stickrod told you there were ninety successful ones, and that was earlier, but here you're only saying you submitted sixty-six?

02:16:48 A. I asked Mister Stickrod and he didn't have an answer for that. I never asked Alex.

02:16:57 Q. How many of the tests did you personally observe of the second FATs?

02:17:01 A. From what I recall, I would say probably around four.

02:17:03 Q. Just four? It was a full day out there for four?

Q So when you submitted 360 units that were tested -- 221 which you said were successful -- you didn't -- how did you know they were successful?

A They said it was successful?

Q They said it was successful?

A They wanted to witness the test.

Q And did he say that?

A By witnessing the test.

Q By witnessing the test. I mean, did he say, "These are successful tests or --"

A They have to accept each test or reject each test as I was doing it.

Q And by accepting it, was that accepting the process or accepting the battery?

A Accepting the test -- and the battery -- the one who shot -- the unit was shot; they accepted it. It was a test or no test. If it was a test, they look at data and -- they say, "Okay, this is a good one. Put it here."

Q And then what did you do with the data?

A We collected data in the computer.

Q I know, and then what did you do with that data that you collected?