Nos. 03-2644 C & 04-297C
(Judge Firestone)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

AXION CORPORATION,

Plaintiff,

v.

THE UNITED STATES

Defendant.

---

# PLAINTIFF'S RESPONSES TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

---

Richard J.R. Raleigh, Jr.
WILMER & LEE, P.A.
100 Washington Street, Suite 200
Post Office Box 2168
Huntsville, Alabama 35804-2168
(256) 533-0202 Telephone
(256) 533-0302 Facsimile

Attorneys for Plaintiff

November 1, 2006

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **AXION CORPORATION,**<br>**Plaintiff,**<br>**v.**<br>**THE UNITED STATES,**<br>**Defendant.** | **No. 03-2644C & 04-297C**<br>**(Judge Firestone)** |

**PLAINTIFF'S RESPONSES TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(h) of the Rules of the United States Court of Federal Claims, Plaintiff Axion Corporation ("Axion") respectfully submits the following responses to the proposed findings of uncontroverted fact submitted by Defendant The United States (the "Government").

1. The contract included a First Article Test ("FAT") requirement obligating Axion to conduct FAT and submit a FAT report demonstrating compliance with specified testing requirements. DA 62; DA 255 (Latifi Depo. 36).

**RESPONSE:** Agree.

2. The contract established that Axion would be responsible for all testing equipment. DA 109; DA 260-261 (Latifi Depo. 45-46).

**RESPONSE:** Agree.

3. Prior to entering the contract, Axion knew it would need an air gun to satisfy the contract's FAT requirement. DA 717 (Axion Resp. to Gov't Inter. # 4).

**RESPONSE:** Axion does not agree. The Contract never specifically mentioned an air gun, nor did it contain any specification for an air gun. Complaint I, 16; Answer

16; Complaint II 63; Latifi Decl. 3 at PA 549; Latifi Depo., p. 54-55 at PA 1186-1187. Furthermore, Axion certainly was not aware that it would be required to develop an air gun without the assistance of the Government. Latif Decl. ¶¶ 3, 20-22 at PA 549, 556-557.

4. During the pre-award survey Axion presented a plan for testing that did not include use of a Government furnished air gun. DA 742 (Pre-award survey documentation: "The testing requirements were discussed at length during the pre-award survey. The offeror plans to use a local contractor, Wildwood Electronics, to test the power supply").

**RESPONSE:** Axion agrees that the pre-award survey cited by the Government contains no mention of an air gun. However, while the pre-award survey indicates Wildwood Electronics would be used to test the power supply, it further explains that the Wildwood Electronics representative who was contacted by the surveyor represented that he "had no knowledge of the procedure to activate the power supply, had not included the procedure in the quote from Wildwood," and that Wildwood Electronics was to be responsible for solely for data collection. DA 742. The fact that Wildwood Electronics was to be used for data collection has no bearing on Axion's need for a Government furnished air gun to complete testing (much like that furnished to Accudyne under a previous contract for the manufacture of PS-115).

5. Axion requested an air gun from the Navy on January 17, 1996. DA 178.

**RESPONSE:** Agree.

6. On January 26, 1997, the contracting officer denied Axion's request for an air gun. DA 179.

**RESPONSE:** Agree. Not only did the contracting officer refuse to provide Axion with an air gun, he indicated that the "Navy did not supply any air guns to the previous contractor, Accudyne Corporation, for test purposes." DA 179. In fact, an air gun was provided to Accudyne. *See* Listing of Government-Owned Property To Be Used For Performance of Accudyne dated 01 Aug 91, PA 435 (listing as equipment of the Government to be used on the PS-115 contract, by the prior contractor, Accudyne, one "Spin-A-Gun"); Latifi Decl. ¶ 20, PA 556; Latifi Depo. pp. 64-65 at PA 1191-1192 (Korab stated, "the Army did that. And your contract is with the Navy, not the Army."). Compared to Defendant's Responses to Plaintiff's Requests for Admission ("RFA") Nos. 86-88, PA 1266-1268 (stating that Defendant United States "lacks sufficient knowledge to respond," that "the contracting officer associated with Accudyne has passed away," and that the United States "[a]dmits only that Accudyne possessed some Government-owned equipment" but "[o]therwise, the United States lacks sufficient knowledge to respond").

7. In 1996, Axion contacted the Army Research Laboratory ("ARL") concerning the contract's testing requirement. DA 727 (Swank Decl. ¶ 3); DA 277 (Latifi Depo. p. 67).

**RESPONSE:** Agree.

8. ARL provided Axion a cost estimate to test four Axion batteries. DA 727 (Swank Decl. ¶ 3).

**RESPONSE:** Agree.

9. Axion declined ARL's offer and subsequently began efforts to acquire an air gun or air gun drawings from ARL. DA 727 (Swank Decl. ¶ 3).

**RESPONSE:** Axion agrees that it did not send the batteries to ARL for testing.

10. ARL and Axion discussed the possibility of entering an agreement in which ARL would lend Axion the ARL air gun, or provide a set of mechanical drawings for the air gun from which Axion would build its own unit, in exchange for Axion developing improvements in the air gun's data collection system which Axion would then provide to ARL. DA 728 (Swank Decl. ¶ 4).

**RESPONSE:** Axion agrees that it discussed with ARL the possibility of ARL testing the PS-115s. However, after being informed by ARL that it would not be able to test the units at a rate that would allow Axion to meet its contractual obligations under the Contract, Axion decided against this option. DA 557 (Second Latifi Decl. ¶ 21).

11. ARL, which did not have a contractual relationship with Axion, ultimately decided not to enter such an agreement because Axion did not submit a satisfactory technical proposal. DA 728 (Swank Decl. ¶ 4).

**RESPONSE:** Axion agrees that the agreement was never fully carried out by the parties. The Government cited "legal problems" with providing Axion the requested drawings, but never explained what these "legal problems" were. PA 234.

12. Axion built an air gun and used this gun to pass FAT on May 17, 1999. DA 189; DA 289-290 (Latifi Depo. 118-119).

**RESPONSE:** Agree.

13. The successful FAT was invalidated when Axion decided to change the plating material in the PS-115 from plating produced by an outside vendor to plates produced in-house by Axion. DA 159-160; DA 368B (Latifi Depo. 177-178).

**RESPONSE:** Axion agrees that the Government required a second FAT after learning that the plating was being produced in-house. Axion does not agree with the Government's assertion that Plaintiff "decided" to change plating material from plating produced by an outside vendor, and states that the outside vender could not provide Axion with enough plating to satisfy the Contract requirements, forcing Axion to produce the plating in-house. Latifi Decl. 4 at PA 549-550; Latifi Depo. pp. 174-75 at PA 1201-1202.

14. Axion continued using its air gun through the remainder of the contract but experienced several problems. DA 349 (Hahin Decl. ¶ 5); DA 738, DA 739.

**RESPONSE:** Axion agrees that it occasionally encountered problems with the air gun it used for the remainder of the contract.

15. One of Axion's objectives was to improve the air gun so it could be used for future work. DA 734 (Korab Supp. Decl. ¶ 9); DA 757.

**RESPONSE:** Axion does not agree that one of its "objectives" was to "improve" the air gun so that it could be used for future work. Axion avers that while it had hoped to use the air gun to produce PS-115 in the future, its only concern was building an air gun that would allow it to satisfy the requirements of the Contract.

16. Several years after the contract was awarded, the Navy acquired equipment that could have been used to conduct FAT and offered to perform testing for Axion. DA 353 (Hahin Decl. 14); DA 764-765.

**RESPONSE:** Axion agrees that the Navy represented that it had acquired equipment which would allow the Navy to conduct FAT and then offered to perform the

testing for Axion. Axion has no knowledge as to whether the equipment acquired by the Navy would have actually allowed the Navy to conduct FAT.

17. Axion declined to accept the Navy's offer to conduct testing. DA 353 (Hahin Decl. 14).

**RESPONSE:** Agree. However, at the time such offer was made, Axion had already spent a substantial amount of time and money developing an air gun without the assistance of the Government, and would have incurred additional costs should it have accepted the Navy's offer. Second Latifi Decl. ¶¶ 20-22 at PA 556-557.

18. The contract did not limit Axion's discretion regarding how Axion could obtain plating as the relevant specification did not include any required sources, and the contract also referenced NAVORD OD 18332, which contained non-mandatory guidance on building a plating line. Plaintiff's Appendix ("PA") 218; PA 560; DA 730 (Pierson Decl. ¶ 3); DA 770.

**RESPONSE:** Axion agrees that the Contract did not limit the means by which plating could be obtained, and further agrees that the Contract expressly referenced NAVORD OD 18332. Axion does not agree with the Government's assertion that NAVORD OD 18332 contained "non-mandatory guidance on building a plating line." Under the Contract, the Government required Axion to build PS-115 to meet required specifications. The Contract refers to OD 18332 as a "specification." PA 23. In order to meet its contractual requirements, Axion relied on the government authored plating specification, NAVORD OD 18332, which explained the procedures required for building a plating line (that Axion later learned were defective). By expressly referencing this specification, the Government represented that the procedures contained

therein were required to be followed in order to produce plating that would satisfy the requirements of the Contract.

19. NAVORD OD 18332 was signed on February 13, 1967 by the Commander of the now defunct U.S. Naval Ordnance Laboratory. PA 561, DA 770.

**RESPONSE:** Axion agrees that NAVORD OD 18332 contains a signature page which appears to be signed by E.F. Schreiter, Captain, U.S. Navy, as well as by C.F. Brown. Axion has no information with respect to the Government's assertion that the U.S. Naval Ordnance Laboratory is now defunct. Axion avers that these facts are immaterial, as NAVORD OD 18332 was expressly referenced in the Contract; it makes no difference who signed it.

20. The signed cover letter of NAVORD OD 18332 states that the purpose of the document is to provide a non-mandatory, working guide. PA 561, DA 770.

**RESPONSE:** Axion agrees that NAVORD OD 18332 provides "[t]he detailed description of the techniques and equipment is for the purpose of providing a working guide and is not intended as mandatory inflexible instructions precluding improvements based on sound investigations." PA 561. While the person preparing this cover letter in 1967 may not have intended NAVORD OD 18332 to be a "mandatory" specification, NAVORD OD 18332 was expressly incorporated into the Contract, and the Contract refers to NAVORD OD 18332 as a "specification." PA 23.

21. Since issuing NAVORD OD 18332 in 1967, the Navy has not revised the document and Navy records indicate such to be the case. DA 775-777 (Hahin Supp. Decl. ¶ 4).

**RESPONSE:** Axion does not have sufficient information to either agree or disagree. However, it is indisputable that two revised versions of NAVORD OD 18332 exist and were not provided to Axion upon request. DA 718-903, 904-1105. It is not clear from the documents who revised them. *Id.*

22. From 1967 through Axion's contract, other vendors successfully used the 1967 NAVORD OD 18332. DA 192; DA 730 (Pierson Decl. ¶ 3).

**RESPONSE:** Axion does not have sufficient information to either agree or disagree.

23. Accudyne's plating operation requirement was significantly greater than that required of Axion's contract. <u>Compare</u> DA 725 (Goldberg Decl. ¶ 8) regarding the 400,000 PS-115s Accudyne produced between 1995 and 1998 <u>with</u> the quantity of 55,209 under Axion contract at DA 2).

**RESPONSE:** Axion agrees that it was required to produce a quantity of 55,209 PS-115 batteries. Axion does not have sufficient information to agree or disagree with the assertion that Accudyne produced 400,000 PS-115s. However, Axion avers that the quantity of PS-115s produced by either Axion or Accudyne is immaterial. NAVORD OD 18332 does not set out separate plating procedures where different quantities are required. DA 718-903, 904-1105.

24. The plating requirement was discussed during the pre-award survey where Axion presented a plan to use the plating machine of LDC Electroplating. DA 752.

**RESPONSE:** Axion agrees that the referenced pre-award survey mentions that Axion presented a plan to have LDC Electroplating plate "the raw stock." DA 752.

25. For the first several years of the contract, Axion used the plating of a German vendor. DA 328 (Latifi Depo. 174).

**RESPONSE:** Agree. (Axion could not find the above citation to Latifi's deposition in the Government's appendix. However, the relevant portions of Axion's appendix can be found at PA 1201.)

26. Axion successfully passed FAT in May 1999 using the German vendor's plating. DA 328 (Latifi Depo. 174); DA 189.

**RESPONSE:** Agree.

27. After passing FAT, Axion decided to produce its own plating rather than acquire plating from a subcontractor. Axion letter August 22, 2001. DA 757.

**RESPONSE:** Axion does not agree with the Government's assertion that Plaintiff "decided" to change plating material from plating produced by an outside vendor, and states that the outside vender could not provide Axion with enough plating to satisfy the Contract requirements, forcing Axion to produce the plating in-house. Second Latifi Decl. 4 at PA 549-550; Latifi Depo. pp. 174-75 at PA 1201-1202.

28. Axion attempted to improve the plating beyond what was required in the contract. DA 194; DA 759, DA 760; DA 380 (Stickrod Depo. 18); DA 296B (Latifi Depo. 127-129).

**RESPONSE:** Axion does not agree. Due to the defective plating specification provided by the Government, Axion was forced to make changes in the specified manner in which the plating was to be carried out. Second Latifi Decl. ¶ 5 at PA 550. Axion did the best it could with the information it was provided.

29. The contract required Axion to provide PS-115 that did not leak methylene bromide or fluoboric acid prior to use. PA 153, DA 409.

**RESPONSE:** Agree.

30. Axion struggled to satisfy the contract's non-leaking requirement. DA 194; DA 303 (Latifi Depo. 136).

**RESPONSE:** Axion does not agree with the Government's characterization that Axion "struggled" with the Contract's non-leaking requirement. In fact, Axion could not meet the Contract's non-leaking requirement due to defects in Drawing 11744726, which was expressly incorporated into the contract. PA 153; Expert Report of Dr. James Baird ("Baird Report") at PA 339-340.

31. Although a prior PS-115 design did create a leaking problem, the PS-115 was redesigned in the 1980's to correct the leaking problem, and Axion's contract included the redesigned specifications. DA 723 (Goldberg Decl. ¶ 4).

**RESPONSE:** Axion does not have sufficient information to either agree or disagree. Significantly, however, the Government failed to insert into its appendix any documents related to the prior version of the PS-115 which was allegedly redesigned due to the leakage problem.

32. The Government explained the differences between the prior design and the design in Axion's contract to Axion both before and after award of the contract. DA 723 (Goldberg Decl. ¶ 4).

**RESPONSE:** Axion does not disagree. However, Axion states that this issue is irrelevant. Even assuming the Government did explain the reasons that the design was revised, there is no evidence showing that Axion did not comply with the revised design.

In fact, even though Axion followed the design provided by the Government, it was impossible for Axion to produce batteries that would not leak. DA 338-352 (Expert Report of Dr. James Baird).

33. Since the PS-115 re-design in 1985, the Government has no record of any leaking problem other than Axion's. DA 725 (Goldberg Decl. ¶¶ 4, 8).

**RESPONSE:** Axion does not have sufficient information to either agree or disagree. However, Axion avers that the Declaration of Alan Goldberg, cited by the Government in support of this assertion, does not indicate that the Government has no record of any leaking problem other than Axion's. It merely states that Accudyne produced the PS-115 battery without experiencing leakage problems. DA 725.

34. The Army has more than 400,000 PS-115s that were delivered by Accudyne between 1995 and 1998 using the same design as in Axion's contract, with no known leakage issues either in the plant or in the stockpile. DA 725 (Goldberg Decl. ¶ 8).

**RESPONSE:** Axion does not have sufficient information to either agree or disagree. Axion is aware that the Government possesses a number of PS-115s that it was told were manufactured by Accudyne.

35. Axion, by its own admission, experienced thousands of instances of leaking. DA 194; DA 303 (Latifi Depo. 136).

**RESPONSE:** Agree.

36. Improper welding can result in the type of leaking Axion experienced. DA 725 (Goldberg Decl. ¶ 7).

**RESPONSE:** Axion has no basis upon which it can disagree that improper welding can result in the type of leaking Axion experienced. However, Axion avers that the Government has absolutely no evidence that the PS-115s manufactured by Axion were improperly welded, thus making this issue immaterial.

37. The United States permitted Axion to inspect hundreds of non-leaking PS-115s in storage at the Army Research Laboratory in addition to providing Axion with samples for the plaintiff's examination. DA 725 (Goldberg Decl. ¶ 8).

**RESPONSE:** Axion does not agree. While Axion's counsel may have had access to ARL's storage facilities, no Axion employee or engineer ever inspected any non-leaking units in storage at ARL, much less "hundreds" of units.

38. Axion's expert witness with respect to leaking makes findings concerning copper on beryllium-copper without considering the rate at which such corrosion would occur or the type of corrosion that would result. DA 723-724 (Goldberg Decl. ¶ 5).

**RESPONSE:** Axion does not have enough information to agree or disagree with the Government's representations regarding what Axion's expert witness considered in making his findings.

39. Axion's expert witness failed to account for the fact Axion's leakage theory is premised on corrosion occurring in an oxygen depleted environment. DA 724-725 (Goldberg Decl. ¶ 6).

**RESPONSE:** Axion does not have enough information to agree or disagree with the Government's representations regarding what Axion's expert witness considered in making his findings.

40. Modification P00020 required Axion to deliver a FAT report by September 9, 2002 concerning the testing of 80 FAT samples. DA 162; DA 163; DA 338 (Latifi Depo. 209).

**RESPONSE:** Axion does not agree. Modification P00020 does not state a specific quantity of samples for which the FAT report was to contain data. PA 163. Rather, Modification P00017 states that 120 first article samples are to be delivered, while Modification P00019 references 80 samples. DA 159, 162. It is not clear from the modifications which number of samples the Government required.

41. Axion submitted floppy discs on or about September 9, 2002 that addressed FAT testing on fewer than 80 PS-115. DA 425; DA 341 (Latifi Depo. 212).

**RESPONSE:** Agree. However, John Korab, the Contracting Officer, agreed that submitting a report with data on "around 80 units" was sufficient. DA 207A (Latifi Letter to Korab, October 11, 2002). Additionally, Charles Vartan, the Government's Quality Assurance Representative, instructed Alex Latifi that he had shot enough units, and that he was satisfied with what he had seen while witnessing the tests. Latifi Depo. p. 214 at PA 1293.

42. Axion's submission on or about September 9, 2002 did not include testing procedures as required by paragraph 10.2.6.3 of the contract's Data Item Description, DI-NDTI-80809A, Test/Inspection Reports. DA 97; DA 425-704.

**RESPONSE:** Axion agrees that its letter of September 9, 2002, did not strictly comply with the requirements of Data Item Description, DI-NDTI-80809A. This is because Axion and the Government had established different standards and procedures during the first FAT that also applied to the second. It is indisputable that Axion's first

FAT Report, also sent in letter form, did not contain all of the information required under the aforementioned Data Item Description. DA 187-188; DA 93-99. Nevertheless, the first article was approved. DA 189. Thus, the fact that Axion's second FAT Report did not strictly comply with the referenced Data Item Description is irrelevant.

43. The contract set forth the parameters for testing an individual FAT sample and how many individual FAT samples could fail to meet the parameters before the entire FAT is rejected. DA 413; DA 419 (sheets 9 and 15 of drawing 11744726); DA 350-351 (Hahin Decl. ¶ 8).

**RESPONSE:** Axion agrees that the Contract set forth testing parameters and rejection standards. However, Axion and the Government established different standards and procedures than those set out in the Contract. PA 1292 (Latifi Depo. p. 230); DA 705-710.

44. The contract did not permit 25 out of 80 FAT samples to fail. DA 413; DA 419 (sheets 9 and 15 of drawing 11744726); DA 350-351 (Hahin Decl. ¶ 8).

**RESPONSE:** Agree. However, Axion avers that the Government failed to consider the effect of "no-tests" on the FAT data submitted, and thus did not appropriately consider the date provided by Axion. Stickrod Depo. p. 83 at PA 1206.

45. The information provided in Axion's September 9, 2002 submission indicated that 25 FAT samples did not satisfy the contract requirements. Compl. ¶¶ 149-150; DA 705-09; DA 351-52 (Hahin Decl. ¶ 11).

**RESPONSE:** Agree. However, Axion avers that the Government failed to consider the effect of "no-tests" on the FAT data submitted, and thus did not appropriately consider the date provided by Axion. Stickrod Depo. p. 83 at PA 1206.

46. The contract's FAT clause provided that disapproval of FAT shall be deemed a failure to make delivery within the meaning of the contract's default clause. DA 62 (paragraph (d)); DA 258A (Latifi Depo. 42).

**RESPONSE:** Agree.

47. The contract's default clause provided that the Government may terminate a contract for default for failure to deliver in accordance with the contract. DA 58.

**RESPONSE:** Agree.

48. The contract's FAT clause provided that the contracting officer was the official responsible for approving or disapproving FAT. DA 62; DA 258A (Latifi Depo. 42).

**RESPONSE:** Agree. However, the Contract also states that "[a]cceptance or rejection shall be accomplished by the cognizant GQAR based upon his own inspection(s) and the results of the First Articles….from the testing activity…." DA 43.

49. The contract's FAT clause provided that the contracting officer's approval or disapproval of FAT would be in writing. DA 62.

**RESPONSE:** Axion agrees that the Contract provides, assuming it is the Contracting Officer who approves or disapproves the FAT, that such approval or disapproval shall be in writing.

50. The contract included the following clause:

> 5252.243-9400 AUTHORIZED CHANGES ONLY BY THE CONTRACTING OFFICER (JAN 1992)
>
> (a) Except as specified in paragraph (b) below, no order statement, or conduct of Government personnel who visit the Contractor's facilities or in any other manner communicates with Contractor personnel during the performance of this contract shall constitute a change under the "Changes" clause of this contract.

> (b) The Contractor shall not comply with any order, direction or request of Government personnel unless it is issued in writing and signed by the Contracting Officer, or is pursuant to specific authority otherwise included as part of this contract.
>
> (c) the Contracting Officer is the only person authorized to approve changes in any of the requirements of this contract and notwithstanding provisions contained elsewhere in this contract, the said authority remains solely with the Contracting Officer. In the event the Contractor effects any changes at the direction of any person other than the Contracting Officer, the change will be considered to have been made without authority and no adjustments will be made in contract price to cover any increase in charges incurred as a result thereof. DA 11.

**RESPONSE:** Agree.

51. Axion sent several letters to the contracting officer between mid-2001 and July 2002 in which Axion either provided status on contract performance or addressed the progress Axion was making. DA 734 (Korab Supp. Decl. ¶ 10); DA 736-740.

**RESPONSE:** While it is unclear to which letters the Defendant is referring, Axion agrees that it sent letters during the stated time period.

52. Axion never provided the Government with specifics on how much money Axion had spent on the contract. DA 734 (Korab Supp. Decl. ¶ 9); DA 287, 287-287A (Latifi Depo. 112-113).

**RESPONSE:** Axion does not agree. Alex Latifi informed Korab during a telephone conversation shortly before Modification P00017 was presented to Axion on or around October 2, 2001, that he had spent millions of dollars out of his own retirement account in his attempt to perform the Contract. DA 1286 (First Latifi Decl. ¶ 8).

Dated this the 1st day of November, 2006.

**ATTORNEY OF RECORD:**

**/s/ Richard J.R. Raleigh Jr.**
**RICHARD J.R. RALEIGH JR.**
**WILMER & LEE, P.A.**
100 Washington Street, Suite 200
Huntsville, Alabama 35801
(256) 533-0202 Telephone
(256) 533-0302 Facsimile
rraleigh@wilmerlee.com

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been furnished this 1st day of November, 2006, by **Electronic Mail** and **Next Business Day Delivery** prepaid and properly addressed to:

DOUGLAS K. MICKLE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530

Richard Martinelli
Office of Counsel
Naval Inventory Control Point
Mechanicsburg, PA 17055-0788

**/s/ Richard J.R. Raleigh Jr.**
**Counsel For Plaintiff**