**NO. 03-2644C & 04-297C**
**(Judge Firestone)**

---

**IN THE UNITED STATES COURT OF THE FEDERAL CLAIMS**

---

**AXION CORPORATION.,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

**DEFENDANT'S REPLY TO PLAINTIFF'S**
**OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

**PETER D. KEISLER**
**Assistant Attorney General**

**DAVID M. COHEN**
**Director**

**KATHRYN A. BLEECKER**
**Assistant Director**

**DOUGLAS K. MICKLE**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**Attn: Classification Unit**
**8th Floor, 1100 L St., N.W.**
**Washington, D.C. 20530**
**Tele: (202) 307-0383**
**Fax: (202) 353-7988**

**OF COUNSEL:**

**RICHARD MARTINELLI**
**Office of Counsel**
**Naval Inventory Control Point**
**Mechanicsburg, PA 17055-0788**

**November 20, 2006**

**Attorneys for Defendant**

# TABLE OF CONTENTS


**DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . 1**

**ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3**

**I. The Plain, Unambiguous Language Set Forth In The Release Agreements Contained In Contract Modifications P00017, P00019, And P00020 Mandate Dismissal Of Counts I Through IX, And XIII Through XXIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3**

**II. Count X Should Be Dismissed At This Time Because the Government Possessed A Valid Basis To Reject Axion's September 9, 2002 FAT Report . 6**

**III. Count XI Should Be Dismissed At This Time Because The Government Did Not Approve Axion's Second FAT . . . . . . . . . . . . . . . . . . . . 13**

**IV. Count XII Should Be Dismissed Because The Government Did Not Breach Any Duty to Cooperate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17**

**CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19**

# TABLE OF AUTHORITIES

**PAGE**

## FEDERAL CASES

Carbetta Enterprises, Inc. v. United States,
58 Fed. Cl. 563 (2003) . . . . . . . . . . 7

Doyle Shirt Mfg. Corp. v. United States,
199 Ct. Cl. 150, 462 F.2d 1150 (1972) . . . . . . . . . . 7

Gresham & Co., Inc. v. United States,
200 Ct. Cl. 97, 470 F.2d 542 (1972) . . . . . . . . . . 7

L.P. Consulting Group, Inc. v. United States,
66 Fed. Cl. 238 (2005) . . . . . . . . . . 7, 8

Pittman Constr. Co. v. United States,
2 Cl. Ct. 211 (1983) . . . . . . . . . . 7

## BOARD CASES

Baifield Industries, Div. Of A-T-O, Inc.,
72-2 BCA ¶ 9676m 1972 WL 1234 (ASBCA 1972) . . . . . . . . . . 7

Unlimited Supply Co.,
94-3 BCA ¶ 27170, 1994 WL 504148 (GSBCA 1994) . . . . . . . . . . 7

## FEDERAL REGULATIONS

48 C.F.R. § 2.101 . . . . . . . . . . 8

48 C.F.R. §9.301 . . . . . . . . . . 15, 16

48 C.F.R. §9.302 . . . . . . . . . . 15, 16

48 C.F.R. §46.101 . . . . . . . . . . 15

## TREATISES

John Cibinic, Jr., Ralph C. Nash, Jr.,
Administration of Government Contracts, (3d ed. 1995) . . . . . . . . . . 8

**INDEX TO APPENDIX**


| **Document** | **Page** |
|---|---|
| Contract Number N00104-96-C-KA091 | 1 |
| Contract Modifications P00001-P00021 | 143 |
| Letter from Axion to Department of Navy: Regarding ECP on Axion Contract (Dated January 17, 1996) | 178 |
| Letter from Department of Navy to Alex Latifi, President of Axion: (Dated January 26, 1996) | 179 |
| Letter from Axion Mr. Weir to Mr. Alen Artz (Weir Memo) (Dated May 30, 1997) | 186 |
| Letter from Commanding Officer, Naval Inventory Control Point to Axion: Regarding First Article Approval for Contract (Dated May 17, 1999) | 189 |
| Letter from Axion to Naval Inventory Control Point: Regarding Plating Guidelines (Dated November 13, 2000) | 190 |
| Letter from Department of the Navy to Axion (Dated November 22, 2000) | 192 |
| Letter from Axion to Naval Inventory Control Point (Dated August 27, 2001) | 194 |
| Transmittal Letter from Department of the Navy to Axion (Dated September 18, 2001) Transmitting September 6, 2001 Letter | 196 |
| Letter from Axion to Mr. John Korab, Naval Inventory Control Point (Dated September 9, 2002) | 202 |
| Letter from Department of the Navy to Axion (Dated October 1, 2002) | 203 |
| Letter from Department of the Navy to Axion (Dated October 1, 2002) | 204 |
| Letter from Axion to Mr. Korab (Dated October 11, 2002) | 205 |
| Deposition of Mr. Jerry Hahin | 224 |
| Deposition of Mr. John Korab | 229 |
| Deposition of Mr. Alex Latifi | 255 |
| Declaration of Mr. Jerry Hahin | 348 |
| Declaration of Mr. John J. Korab | 354 |

Declaration of Mr. Henry Stickrod . . . . . 359

Deposition of Mr. Alex Latifi . . . . . 366

Deposition of Mr. Henry Stickrod . . . . . 378

Deposition of Mr. Alex Latifi . . . . . 400

Specification Control Drawing 19202-11744726, Power Supply . . . . . 405

Latifi July 8, 2002 Email to Navy . . . . . 424

Axion September 9, 2002 letter to Navy . . . . . 425

Print-out of Axion's September 9, 2002 floppy disc FAT submission . . . . . 426

Navy's October 1, 2002 letter informing Axion of FAT disapproval . . . . . 710

Navy's October 1, 2002 show cause notice to Axion . . . . . 711

Axion's October 11, 2002 letter . . . . . 712

Axion's Response to United States' Interrogatories . . . . . 715

Declaration of Mr. Allan Goldberg . . . . . 722

Declaration of Mr. Jeffry Swank . . . . . 727

Declaration of Mr. David Pierson . . . . . 730

Supplemental Declaration of Mr. John Korab with attachments . . . . . 732

Documentation concerning Axion's Pre-award Survey . . . . . 741

Navy's October 3, 1995 letter to Small Business Administration . . . . . 748

Small Business Administration's November 9, 1995 letter to Navy . . . . . 754

Axion's August 22, 2001 letter to Navy . . . . . 756

Axion's June 13, 2000 letter to Navy . . . . . 759

Navy's June 14, 2000 correspondence to Axion . . . . . 760

Axion's August 22, 2001 letter to Navy . . . . . 761

Hahin email to Axion of December 19, 2001 . . . . . 764

Axion email to Navy of December 18, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 764

Hahin email to Axion of December 17, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 765

Axion's May 22, 1996 letter to Navy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 766

Navy's June 5, 1996 correspondence to Axion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 767

John Venskus Memo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 768

Naval Surface Warfare Center, Crane letter of June 3, 1996 . . . . . . . . . . . . . . . . . . . . . . . . . . 769

Signature Page to NAVORD OD 18332 of February 13, 1967 . . . . . . . . . . . . . . . . . . . . . . . . . 770

Cover Page to NAVORD OD 18332 of February 13, 1967 . . . . . . . . . . . . . . . . . . . . . . . . . . . 771

Unsigned internal Army document of 1973 associated with
NAVORD OD 18332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 772

Unsigned internal Army document of 1980 associated with
NAVORD OD 18332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 773

Distribution list for unsigned internal Army document of 1980
associated with NAVORD OD 18332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 774

Supplemental Declaration of Mr. Hahin with attachment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 775

Specification Control Drawing 19202-10974349, Plating . . . . . . . . . . . . . . . . . . . . . . . . . . . . 778

Depostion of Mr. Jeffrey A. Swank . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 781

Deposition of Mr. Henry Stickrod . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 788

Deposition of Mr. John Korab . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 797

Deposition of Mr. Alex Latifi . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 800

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **AXION CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 03-2644C & 04-297C** |
| **v.** | ) | **(Judge Firestone)** |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S REPLY TO PLAINTIFF'S**
**OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), and the Court's scheduling Order dated June 20, 2006, the United States, respectfully submits its reply to Axion Corporation's ("Axion") opposition to defendant's motion for summary judgment.[1] In support of this reply, the United States relies upon the Complaint ("Compl."),[2] the accompanying appendix ("DA"),[3] and the following brief.

In our second motion for summary judgment, we demonstrated that Counts X, XI and XII of Axion's complaint ("Compl."), all of which involve events immediately preceding the

---

[1] On November 1, 2006, Axion filed "Plaintiff's Opposition To Defendant's Motion For Summary Judgment, And Plaintiff's Reply To Defendant's Response To Plaintiff's Motion For Summary Judgment," which we will refer to as "plaintiff's response" or "Axion's response." We will cite to pages in Axion's response as "Pl. Resp." This reply brief will address those points raised in pages 1 - 16 of Axion's response. Because the scheduling order does not permit a sur-reply, the United States will not address the matters Axion raised in its reply to our response to Axion's motion for summary judgment, which is set forth in pages 16-28 of Axion's response. If the Court desires briefing upon anything Axion raised in its reply to our response, we will file a supplement to this brief addressing the points the Court instructs us to address.

[2] As we have previously done in this case, when referring to Axion's complaint, we will be referring to Axion's second complaint (i.e. # 04-297C).

[3] We are submitting a supplemental appendix that contain the documents that we cite for support in this reply. The pages cited for the first time begin at 788. When citing to these new documents, and those submitted with our opening appendix, we will refer to them as "DA."

Government's termination for default of the contract, should be dismissed. We showed that Count X, which challenges the Government's evaluation of Axion's September 9, 2002 First Article Test ("FAT") report; Count XI that alleges a Government quality assurance representative approved the FAT; and, Count XII, which states that the Government breached an implied duty to cooperate, are without legal merit. Furthermore, because there are no material issues of fact surrounding any of these three counts, judgment in the Government's favor should be granted upon Counts X, XI and XII.

Additionally, we showed that now that discovery is closed, the United States is entitled to summary judgment upon Counts I through IX and XIII through XXIX, because they are barred by the doctrine of accord and satisfaction and release. We demonstrated through the sworn, uncontroverted testimony of the contracting officer, John Korab, that he did not know, and had no reason to suspect Axion's alleged mistake regarding the unambiguous accord and satisfaction and release language upon three different occasions.

Finally, we also explained that Axion's motion for summary judgment must be rejected because Axion's motion ignores this Court's October 31, 2005 holding that all of Axion's claims relating to the air gun, leaking and plating will be barred if the Government shows that Axion cannot prevail upon the issue of unilateral mistake. We further showed that even if the Court's previous ruling did not preclude Axion's motion for summary judgment, Axion's argument for summary judgment is without merit.

In its response to our motion for summary judgment, Axion reiterates the arguments previously shown to lack merit. Axion first argues that the contracting officer knew, or had reason to know of, Axion's purported mistake, when the parties agreed to the unambiguous

release language set forth in modifications P00017, P00019, and P00020. Pl. Resp. pp. 2-6. Axion then makes several arguments concerning the Government's rejection of Axion's second FAT submission. Axion first argues that the Government could not reject Axion's second FAT, because the Navy had waived its right to enforce the express FAT terms in the contract when it approved Axion's first FAT. Pl. Resp. p. 6-12. Axion then alleges that, despite the terms of the contract, the Government's quality assurance representative approved Axion's second FAT. Pl. Resp. pp. 12-15. Finally, Axion argues that its failure to successfully past the second FAT was due to the Government's failure to cooperate. Pl. Resp. pp. 15-16.

As we demonstrated in our motion for summary judgment, and further below, Axion's arguments upon these points are without merit.

## ARGUMENT

### I The Plain, Unambiguous Language Set Forth In The Release Agreements Contained In Contract Modifications P00017, P00019, And P00020 Mandate Dismissal Of Counts I Through IX, And XIII Through XXIX

The United States has shown that Counts I through IX, and XIII through XXIX are barred by various releases. See Def. 2nd MSJ pps. 23-25; DA 732-735 (Korab Supp. Decl).

In its opposition, Axion reiterates the unconvincing arguments made in its earlier briefs. First, noting that English is Alex Latifi's second language, Axion contends that the contracting officer knew Axion was more prone than the "average"[4] contractor to misunderstand the significance of a release provision. Pl. Resp. p. 4. Axion attempts to bolster this argument by

[4] We agree that Mr. Latifi is not the "average" contractor. Indeed, Mr. Latifi's 20-years of experience in contracting with the United States would make him one of the more experienced contractors doing business with the Government.

declaring the parties had not agreed to release language in modifications prior to P00017 and that the contracting officer never discussed the language with Axion. Pl. Resp. p. 6. The argument is unpersuasive. The fact that Mr. Latifi learned another language prior to learning English has no bearing on either how well Mr. Latifi understood English or the contracting officer's understanding of Mr. Latifi's grasp of English. In fact, the contracting officer reasonably believed Mr. Latifi possessed a sound understanding of both English and the release language, based upon the contracting officer's extensive dealings with Mr. Latifi. DA 733 (Korab Supp. Decl. 5); Def. 2nd MSJ pp. 23-25. Finally, in as much as the parties did not discuss the release language, Axion has not provided any authority that requires the parties to discuss unambiguous terms incorporated into a contract through a mutually agreed upon, bilateral modification.

Axion also argues that the contracting officer knew Axion was making a mistake in agreeing to the release modifications, because Axion had notified the contracting officer that it would lose money if the parties agreed to a no-cost cancellation. Pl. Resp. pp. 4-6. This argument is untenable for various reasons.

First, Axion fails in its attempt to show the contracting officer knew that Axion would incur a loss. While Axion asserts Mr. Latifi verbally informed the contracting officer that it had spent millions of dollars on the contract, Axion never provided the Government with specific cost information concerning how much had actually been spent. DA 287A (Latifi Depo. 112-113); DA 734 (Korab Supp. Decl. 9). Indeed, the record shows that prior to entering the release modifications Axion had not provided the contracting officer with any means of even estimating the costs Axion had incurred.

Second, even if the contracting officer suspected that Axion would incur a loss, Mr. Korab would not have had reason to know of Axion's purported mistake. From the contracting officers perspective, when the parties executed the release modifications, Axion was at risk of a termination for default that would result in Axion recouping no money. DA 733 (Korab Suppl. Decl. 8). It is certainly reasonable for a vendor to agree to a release of claims in order to earn more time to perform and collect payment of $1.3 million, when the alternative is a termination for default with no payment. Indeed, as Axion admits in its brief, Axion informed the contracting officer, prior to modification P00017, that the company had acquired all the parts necessary to produce all 55,209 PS-115s that the contract required. Pl. Resp. p 4 (quoting Axion's August 25, 2000 letter at PA 228). Therefore, based upon the information directly communicated to the contracting officer, modifications P00017, P00019, and P00020 provided Axion the opportunity to earn $1.3 million without incurring any additional material costs. Mr. Korab's sworn testimony makes clear that simply because Axion was unwilling to accept a no-cost cancellation did not put him upon notice that Axion was not willing to avoid a termination for default and gain the opportunity to earn $1.3 million in return for a release of claims. DA 733-734 (Korab Supp. Decl. 6-11); Def. 2nd MSJ pp. 23-25.

At bottom, the record is sufficiently developed for the Court to conclude that Axion cannot demonstrate that the contracting officer knew, or had reason to know, of Axion's purported mistake with regard to the release agreements contained in contract modifications P00017, P00019, and P00020. It is beyond dispute that the record is devoid of any contemporaneous communications between Mr. Latifi and Mr. Korab even hinting that Axion reserved the claims presented here. And, moreover, Mr. Latifi's English skills, the fact that

Axion had declined a no-cost termination, and Axion's incurred costs do not create a material issue of fact with respect to what the contracting officer could reasonably have known concerning Axion's understanding of the release language. Accordingly, Counts I through IX, and XIII through XXIX should be dismissed as barred by the United States' release defense.

Finally, the remaining three Counts (X, XI, and XII), which on their face purport to involve events that occurred after modification P00020, also should be barred. The essence of the claims set forth in Counts X, XI, and XII involve Axion's air gun difficulties, and we have shown that all air gun claims are encompassed by a release. See Def. 2nd MSJ pp. 17, 21 n. 13, 22 n. 14.

## II. Count X Should Be Dismissed At This Time Because the Government Possessed A Valid Basis To Reject Axion's September 9, 2002 FAT Report

Count X of Axion's complaint alleges the Navy did not have a valid basis for rejecting Axion's September 9, 2002 FAT report. Compl. 137-154. To the contrary, we have demonstrated that there is no dispute that: 1) Axion was required to deliver a FAT report by September 9, 2002 that complied with specific contract requirements; 2) Axion submitted a FAT report on September 9, 2002 that did not comply with these contract requirements; and 3) the contract provided that disapproval of FAT by the contracting officer shall constitute a failure to deliver within the meaning of the termination for default clause. Def. 2nd MSJ pp. 14-17.

Axion's response attempts to show there are genuine issues of material fact concerning the bases upon which the Government disapproved Axion's September 9, 2002 FAT report. Pl. Resp. pp. 6-12. Axion's response claims: 1) the Government waived the ability to enforce express contract FAT requirements due to the course of dealing between the parties during Axion's 1999 FAT; and 2) the contracting officer should have approved Axion's FAT on the

basis of internal emails received from the quality assurance representative ("QAR") addressing the QAR's observations of testing. Neither argument has merit.

The law and undisputed facts simply do not support Axion's waiver argument. It is true that the contract requirements may be waived, if the Government fails to require compliance with the requirement over an extended period of time, and upon sufficiently numerous occasions thereafter, to lead the other party to reasonably believe that the requirement does not apply. L.P. Consulting Group, Inc. v. United States, 66 Fed. Cl. 238, 241 (2005). Of particular significance are the number of occasions and duration the Government failed to enforce requirement. Id. e.g i.d. Gresham & Co., Inc. v. United States, 200 Ct. Cl. 97, 470 F.2d 542, 555 (1972)(waiver found when a requirement had not been enforced in 36 previous contracts with the same party); Doyle Shirt Mfg. Corp. v. United States, 199 Ct. Cl. 150, 462 F.2d 1150, 1154 (1972)(no waiver occurred when deviations occurred on only three prior contracts); Unlimited Supply Co., 94-3 BCA ¶ 27170, 1994 WL 504148 (GSBCA 1994)(waiver found due to the Government's acceptance of non-conforming goods on 19 prior purchase orders).[5]

---

[5] Axion counters with three cases, which do not change this rule or establish waiver here. Pl. Resp. p. 12. Carbetta Enterprises, Inc. v. United States, 58 Fed. Cl. 563 (2003), involved a statutory revocation of the Department of Housing and Urban Development's ("HUD") authority to make a particular type of loan and HUD's subsequent agreement with the plaintiff to enter a new loan agreement, and the legal question of whether Congress has the authority to modify a contract. Id. at 567. Carbetta does not contradict L.P. Consulting. Pittman Constr. Co. v. United States, 2 Cl. Ct. 211, 215 (1983), involved a contractor's acquiescence to the contracting officer's approach to pricing a change order, and like Carbetta, it does not concern waiver of express contract requirements through course of dealing. Baifield Industries, Div. Of A-T-O, Inc., 72-2 BCA ¶ 9676, 1972 WL 1234 (1972), concerned the effect of a course of dealing upon the interpretation of a contract's testing requirements. Axion is not arguing for any particular interpretation to the contract's testing requirements. Rather, Axion is arguing that express contract requirements should be waived. See e.g., Administration of Government Contracts, Cibinic, Nash, Third Edition, which distinguishes the use of prior course of dealings to resolve ambiguities from their use to demonstrate waiver: "[I]t is more difficult to establish the formal

Here, Axion suggests the Government waived its ability to enforce the contract's express FAT terms through a single FAT evaluation in 1999. However, Axion cannot prevail under this theory because, as discussed above, the Government only waives its ability to enforce contract provisions by failing to enforce the provision on several occasions and over an extended period of time.

Additionally, Axion's claim that the contract's express testing requirements were waived by the Government's conduct in 1999 is barred by the United States release defense. If Axion believed the Government's conduct in 1999 waived express contract requirements concerning FAT, Axion should have excepted such a claim from the three release modifications it signed in 2001 and 2002. As we have demonstrated, these modifications included a full release for all claims arising under the contract to date.[6] DA 159, 162, 163.

In addition to presenting a legally flawed argument, Axion also ignores the factual differences between Axion's 1999 FAT process and the FAT conducted in 2002. Axion, therefore, cannot demonstrate the reasonable reliance element of waiver. L.P. Consulting, 66

---

elements of waiver and estoppel than to apply prior conduct evidence for interpretive purposes . . . [a] course of conduct must generally occur repeatedly to establish waiver or estoppel while a more limited number of occurrences may be used for intent-determinative purposes . . ." John Cibinic, Jr., Ralph C. Nash, Jr., Administration of Government Contracts, 200 (3d ed. 1995).

[6] The definition of "claim" includes a demand for an adjustment of contract terms. Federal Acquisition Regulation (FAR) 2.101. Therefore, Axion's assertion that the contract's express testing requirements should not be binding due to the Government's conduct in 1999 is a "claim" that is encompassed by the release modifications executed in 2001 and 2002. This conclusion is evident from the fact that the modifications that included the release language are the very same that called for the second FAT. DA 159, 162, 163. That is, through these modifications Axion simultaneously agreed to both a release of claims arising under, or related to, the contract to date and to conduct a second FAT. It is incongruous for Axion to assert that the second FAT is controlled by events that occurred two years prior to the modifications, rather than the contract's express terms.

Fed. Cl. at 241. In 1999, Axion was not producing its own plating and had not yet experienced leaking PS-115. The reasons Axion's 1999 FAT approval was invalidated were that Axion decided to produce its own plate stock in 2000, and that Axion's PS-115 began to leak electrolyte in 2001. DA 350 (Hahin Decl. 6-7). Further, in 1999, Axion provided the contracting officer a written request to submit fewer than the required number of samples, while in 2002 Axion simply delivered a FAT report addressing an insufficient number of samples. DA 187; DA 202. The Government's acceptance upon a single occasion in 1999 of Axion's written request to submit data upon fewer than the required number of FAT samples did not provide Axion a reasonable basis to assume it could ignore the express contract requirement to provide testing information on 80 samples during the second FAT. Thus, even if the Government did not strictly enforce every FAT requirement of the contract in 1999, it was nevertheless unreasonable for Axion to assume express contract requirements were waived given the vastly different circumstances surrounding the 1999 and 2002 FAT.

At bottom, the manner in which the Government evaluated Axion's FAT in 1999 does not create a genuine issue of material fact with respect to whether the Government properly disapproved Axion's September 9, 2002 FAT report. Axion's attempt to demonstrate the Government waived express contract FAT requirements through the 1999 course of dealing fails because: 1) a party does not waive the ability to enforce an express contract requirement through its conduct on a single occasion under a single contract; and, 2) given the vastly different circumstances surrounding the 1999 and 2002 FAT, Axion could not reasonably have believed the contract's express FAT requirements were waived.

Axion's final attempt to create a genuine issue of material fact with regard to the 2002 FAT report involves emails from the QAR, Henry Stickrod, to the contracting officer in September 2002. Pl. Resp. p. 11. Axion asserts that the contracting officer should have approved Axion's FAT on the basis of these emails, which provided the QAR's description of testing during the period shortly before the September 9, 2002 due date for Axion's FAT report. Axion confuses Mr. Stickrod's statements concerning how testing was proceeding and his observations as to whether the test equipment was functioning, with the Government's technical analysis of the information on the FAT report that indicates whether individual FAT samples satisfied contract requirements, which then forms the basis for a determination as to whether FAT is approved or disapproved. Mr. Stickrod was able to witness and verify the former, but he neither attempted, nor was he qualified, to render an opinion on the latter. The QAR's responsibilities during FAT included observing and verification of test procedures but did not include FAT approval/disapproval determinations or the provision of the expertise necessary to support such determinations. DA 359-362 (Stickrod Decl. 3, 4, 10, 11).

The United States has demonstrated the contract included detailed requirements for whether a particular unit passed or failed testing. Def. 2d MSJ, p. 16; DA 350-351 (Hahin Decl. 8, 11). The emails from Mr. Stickrod to the contracting officer in September 2002, did not address whether Axion satisfied these requirements. PA 328-329. Indeed, the record establishes Mr. Stickrod understood that he was neither qualified, nor employed to conduct this analysis. The following excerpts from Mr. Stickrod's deposition demonstrate this point:

**Question** What does it mean that Acceptance/Rejection shall be on a unit basis and not per category?

**Answer**: That is something you will have to talk to Jerry Hahin about.

DA 791-792, Stickrod Depo. 69-70.

**Question**: Based on that statement, had you come to the conclusion that where a destructive test didn't produce the 23 volts over 150 seconds, the most probable reason for the failure was that the air gun hadn't operated properly or there was some human error in the test?

**Answer**: I didn't make any conclusion about it.

DA 794, Stickrod Depo. 96-97; see also, DA 359-362 (Stickrod Decl. 3, 4, 10, 11).

Further, the contract set forth a specific FAT evaluation process which begins with Axion submitting a written FAT report describing the testing of the FAT samples. DA 62. Axion cannot credibly argue the contracting officer should have foregone the evaluation of Axion's September 9, 2002 FAT report because of prior correspondences from Mr. Stickrod describing the QAR's observation of testing. The QAR's role was to observe and verify test procedures and did not include providing the contracting officer with expert advice regarding whether the tests satisfied the contract's technical requirements. DA 359-362 (Stickrod Decl. 3, 4, 10, 11).

At bottom, the Stickrod emails do not create a genuine issue of material fact concerning whether the Government properly disapproved Axion's September 9, 2002 FAT report.

Finally, there are no issues of material fact regarding any of the three independent reasons upon which the Government disapproved Axion's September 9, 2002 FAT report.

First, it is not disputed that Axion's September 9, 2002 FAT report did not describe its FAT procedures as required by the express terms of the contract. See Pl. Resp. to Def. Prop. Findings of Uncontroverted Fact ("PFUF") # 42 ("Axion agrees that its letter of September 9, 2002 did not strictly comply with the requirements of Data Item Description,

DI-NDTI-80809A."); Pl. Resp. p. 7 (same). Second, it is not disputed that Axion's FAT report indicated an unacceptable number of samples failed during FAT testing.[7] See Pl. Resp. to Def. PFUF ## 43-45. Third, it is not disputed that Axion's FAT report did not include data upon the required number of FAT samples. DA 162; DA 163; DA 425; DA 341 (Latifi Depo. 212). Axion cannot credibly dispute that contract modification P00019 established a requirement for Axion to test 80 FAT samples and that modification P00020 established a delivery date of September 9, 2002 for the FAT report. DA 162, 163. There is also no dispute that Axion understood that these modifications required Axion to deliver a FAT report that included "good data" on the testing of 80 units. DA 404 (Latifi Depo. 231). Further, there is no dispute that

[7] Axion agrees its September 9, 2002 FAT report indicated that 25 FAT samples did not satisfy the contract requirements and that the contract did not permit 25 out of 80 FAT samples to fail. Pl. Resp. Def. PFUF #44-45. In an attempt to avoid the obvious affect of these admissions on the legitimacy of Count X, Axion suggests the Government failed to consider "no-tests." Id. Such an attempt to avoid dismissal of Count X is futile. Under Axion's "no-test" theory, Axion was permitted to substitute new FAT samples for those tested and deemed a "no-test." See Pl. MSJ p. 45; Def. 2nd MSJ p. 45. Even assuming Axion was permitted such substitutions under its "no-test" theory, Axion could have tested as many batteries before September 9, 2002 as time would allow but, by Axion's own admission, of those tested batteries in which data was obtained, 25 failures out of 80 tests was impermissible under the contract's express terms. Axion's "no-test" theory is therefore without merit, because regardless of whether substitutions were permitted, the test data that was ultimately submitted to the Government as the FAT report could not indicate that 25 of 80 samples failed. Further, although Axion's "no-test" theory is of no benefit to Axion even if adopted, the theory is, in fact, illegitimate. The contract made Axion responsible for test equipment and therefore by implication, test failures. DA 109, Pl. resp. Def. PFUF # 2, see Def. 2nd MSJ pp. 45-46. Thus, Axion's "no-test" theory is flawed in that it ignores the fact that the contract made Axion responsible for test equipment. Axion cannot credibly argue that testing equipment failures should have been ignored and Axion permitted to continue testing indefinitely, while at the same time acknowledging that Axion was responsible for all test equipment. Pl. Resp. Def. PFUF #2.

Axion's report included testing data on fewer than 80 units.[8] DA 425; DA 402 (Latifi Depo. 212); DA 205.

In sum, the Government disapproved Axion's September 9, 2002 FAT report on October 1, 2002 for three independent reasons (Axion's failed to include the required information concerning testing processes in its September 9, 2002 FAT report, failed to submit a report addressing 80 units, and because 25 of Axion's test units failed). DA 203. The record shows that there is no genuine issue of material fact with respect to any of these three independent bases (including the 1999 testing and the Stickrod e-mails). Count X should therefore be dismissed.

## III. Count XI Should Be Dismissed At This Time Because The Government Did Not Approve Axion's Second FAT

Axion alleges in Count XI that verbal communications between Axion and a Government QAR on September 6, 2002 resulted in FAT approval. Compl. ¶ 155-167. The United States demonstrated that: 1) verbal communications between Axion and the Government could never result in approval of FAT, because the contract called for a written FAT report from Axion and a written FAT approval from the contracting officer; and 2) the QAR did not have authority to approve FAT. Def. 2nd MSJ pp. 18-21.

Axion attempts to avoid summary judgment of Count XI are unpersuasive. Pl. Resp. pp. 12-15. First, Axion asserts a "course of dealing" argument, similar to the Count X waiver

[8] While Axion attempts to create a material issue of fact by asserting that Axion may have sent data on additional units to Mr. Hahin, there is no dispute that the FAT report actually submitted does not address the testing of 80 units. DA 202. There is no other indication in the record that Axion supplemented its September 9, 2002 FAT report with additional information addressing the results of other tests.

argument, to show that FAT could be approved orally. Second, Axion alleges the QAR was authorized to pass FAT. Axion can only avoid dismissal of Count XI if it prevails on both arguments. That is, Axion must show not only that verbal approval of FAT was permissible, but also that, such verbal approval could be executed by the QAR. Axion, cannot prevail under either argument.

Axion's first argument is that the Government's conduct during the 1999 FAT constituted a course of dealing that changed the express terms of the contract from the required written submission of a FAT report by Axion and written approval from the contracting officer, to a process whereby FAT could be approved through verbal communications between Axion and the QAR. As discussed above with regard to Count X, the Government's conduct during the 1999 FAT did not change these contract terms. Furthermore, Axion released any claim that the course of dealing concerning the 1999 FAT waived the contract's express FAT terms when Axion agreed to the release language that was included in each of the three second FAT modifications. DA 159, 162, 163.

Axion's course of dealing theory also is flawed, because the 1999 FAT was approved through written communications between Axion and the contracting officer, as contemplated by the contract. Axion submitted a written FAT report on April 12, 1999, which the contracting officer approved in writing on May 17, 1999. DA 187-189.

Axion's second argument is that the contract authorized the QAR to approve FAT. The United States has previously demonstrated that the QAR did not have authority to approve FAT and that Axion could not reasonably have believed that the QAR possessed such authority. Def. 2nd MSJ pp. 19-21.

In an attempt to show the QAR possessed authority to approve FAT, Axion mistakenly relies upon the contract's PS-115 inspection and acceptance provision, which states:

> **Inspection and Acceptance**
>
> Production Quality Assurance of all items to be furnished hereunder shall be made by the cognizant Government Inspector at the contractor's or subcontractor's plant.
>
> **NOTE**:
>
> Acceptance or rejection shall be accomplished by the cognizant GQAR based upon his own inspection(s) and the results of the First Articles or Periodic Production and/or Acceptance Samples from the testing activity to the GQAR via Procurement Contracting Officer.

DA 43.

However, this Inspection and Acceptance procedure has nothing to do with the FAT approval process. First, the clause addresses "Production Quality Assurance" rather than the FAT approval process. The contract schedule unambiguously establishes that the FAT process is separate and distinct from the delivery of production quantities. DA 2. The schedule, in fact, designates First Article samples as "Preproduction." Id. Therefore, a clause addressing "Production Quality Assurance" has no relevance to FAT.

Second, the clause is entitled "Inspection and Acceptance" and the "Note" provision of the clause in which Axion relies addresses the "acceptance" process. As established in both the contract and the acquisition regulations, "approval," not "acceptance" connotes passing FAT. DA 62; Federal Acquisition Regulation ("FAR") 9.301-9.302. The term "acceptance" refers to the act by which the Government assumes ownership of supplies. FAR 46.101. Because FAT in Axion's contract involved activating the FAT samples, the Government never would assume

ownership of, or "accept," the FAT samples. DA 349 (Hahin Decl. 4); DA 419.[9] Therefore, the contract language stating that the QAR can execute "acceptance" cannot be interpreted to mean the QAR can "approve" FAT. The clause Axion cites addresses the process the Government uses to assume ownership, or "accept" production quantities – not the preproduction FAT approval process.[10]

Third, interpreting the acceptance clause as relating to the FAT process is unreasonable in light of the fact that the contract contains a FAT clause. The FAT clause and the Federal Acquisition Regulation clearly establish that only the contracting officer can approve FAT. DA 62; FAR 9.301-9.302. Axion cannot reasonably argue that a clause entitled "Inspection and Acceptance" controls the FAT approval process, when the contract includes another clause that addresses FAT exclusively and specifically sets forth an approval process.

---

[9] As the FAT flow diagram shows, PS-115s are activated and destroyed during FAT. Thus, FAT samples also could never be "furnished" to the Government, as the "Inspection and Acceptance Clause" requires.

[10] While the clause provides that,

> Acceptance or rejection shall be accomplished by the cognizant GQAR based upon his own inspection(s) and the results of the First Articles or Periodic Production and/or Acceptance Samples from the testing activity to the GQAR via Procurement Contracting Officer (PCO),

DA 43, this sentence, when viewed in context, cannot reasonably be interpreted to mean that FAT approval can be accomplished by the QAR. What the sentence does mean is that the QAR has the authority to accept production quantities based upon some combination of his own inspection and the results of previously conducted FAT or Production Lot samples. That FAT approval is made by the contracting officer is further demonstrated by the fact the Inspection and Acceptance clause concludes by stating the results of FAT will be made available to the QAR "via Procurement Contracting Officer."

In sum, Axion cannot avoid summary judgment upon Count XI, because Axion cannot demonstrate that: 1) the contract allowed for verbal communications to constitute submission and approval of FAT; and 2) the QAR had authority to approve FAT. Axion has failed to make either demonstration.[11] Thus, there is no genuine issue of material fact and Count XI should therefore be dismissed.

## IV. Count XII Should Be Dismissed Because The Government Did Not Breach Any Duty to Cooperate

Axion alleges in Count XII that the Government breached a duty to cooperate when the QAR departed Axion on the afternoon of September 6, 2002. Compl. ¶¶ 168-177. The United States has demonstrated Axion's failure to satisfy the contract's FAT requirements were not attributable to any breach of a duty to cooperate by the Government. Def. 2nd MSJ pp. 21-22.

In its response, Axion reasserts its Count XI arguments concerning the QAR's alleged "approval" of FAT, and a September 9, 2002 conversation with the contracting officer addressed in footnote 11 above. Pl. Resp. pp. 15-16. As we have explained, Axion's argument fails because the QAR did not have authority to approve FAT, and the contract required Axion to deliver a FAT report addressing the testing of 80 units by September 9, 2002. DA 162; DA 163.

---

[11] Axion's response cites to Mr. Latifi's deposition in an attempt to show the contracting officer informed Axion, on September 9, 2002, that no more testing was necessary. Pl. Resp. p. 14. However, Axion fails to mention that Mr. Latifi indicated in his deposition that during the September 9, 2002 conversation, the contracting officer said no more testing was required, after Axion informed the contracting officer that Axion had tested 80 units. DA 802, Latifi Depo. 218. Because a written FAT report addressing the testing of 80 units was required that same day, September 9, 2002, it would not have been surprising if the contracting officer had told Axion that testing needed to cease. DA 162; DA 163. Nevertheless, Mr. Korab denies Mr. Latifi's contentions concerning the purported September 9, 2002 phone conversation, and there are no documents in the record that support Mr. Latifi's statement here. DA 798-799, Korab Depo. pp. 141-142.

Because the alleged breach of the duty to cooperate occurred on Friday September 6, 2002, the additional testing Axion believes it was deprived of due to the alleged breach would have had to have taken place during the weekend of September 7-8, 2002, or on or after September 9, 2002. With regard to the weekend of September 7-8, 2002, there is no evidence that Axion requested the Government to provide on-site, overtime QAR coverage. DA 362 (Stickrod Decl. 12). With regard to testing that could have occurred after September 9, 2002, such testing would not have aided Axion, because the FAT report was due by September 9, 2002. DA 163.

Further, the record shows that the QARs provided Axion with full cooperation during the 2nd FAT. Indeed, during the period between July 11, 2002, and September 6, 2002, a Government QAR was present to observe Axion's FAT upon more than a dozen occasions. DA 361 (Stickrod Decl. 8, 10). Further, there is no dispute that Axion's testing problems were not attributable to the QARs. DA 401 (Latifi Depo. 208-209).

In sum, beginning in October 2001, Axion spent nearly a year working with the Government to pass a second FAT, and still only produced a FAT report indicating 25 units failed. DA 159. There is simply no indication that even if Axion had requested Government assistance that final weekend (September 7-8, 2002), that an additional two days of testing would have substantially changed Axion’s September 9, 2002 FAT report.

There is no evidence that the Government breached a duty to cooperate. Count XII should be dismissed. There is no genuine issue of material fact in dispute. The disapproval of Axion's FAT simply is not attributable to a breach of a duty to cooperate.

**CONCLUSION**

For the reasons discussed above, and in our motion for summary judgment, the Government respectfully requests that the Court enter summary judgment in its favor, dismiss the complaint, and deny Axion's motion for summary judgment.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Kathryn A. Bleecker/by Steven Gillingham
KATHRYN A. BLEECKER
Assistant Director

OF COUNSEL:

Richard Martinelli
Office of Counsel
Naval Inventory Control Point
Mechanicsburg, PA 17055-0788

s/Douglas K. Mickle
DOUGLAS K. MICKLE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530
Tele: (202) 307-0383
Fax: (202) 353-7988

November 20, 2006

Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on November 20, 2006, a copy of the foregoing "**DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**" with supplemental appendix was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Douglas K. Mickle
Douglas K. Mickle