AXION CORPORATION

*Innovation is our business.*

September 9, 2002

Mr. John Korab
Naval Inventory Control Point – Mechanicsburg
5450 Carlisle Pike
P.O. Box 2020
Mechanicsburg, PA 17055-2020

RE: Contract N00104-96-C-KA09

Dear John:

In reference to the above contract regarding the first article test performance, please be advised that Axion Corporation has performed tests on 127 units that were submitted to the environmental testing requirements listed below.

1. 7' drop
2. Transportation vibration
3. Minus 40-degree temperature
4. Plus 140-degree temperature

Under the presence of DCMA quality assurance representatives, the units were tested at the above temperature and data collected from 74 units were activated and good data were collected. The copies of the collected data are on floppy disks, which, per your instructions, will be sent overnight to Jerry Hahin for his review.

Please advise.

Thank you for your help and cooperation with this matter. If you should have any questions, please contact the undersigned at 256-851-9770.

Sincerely,

Alex Latifi
President
Axion Corporation

317 Nick Fitcheard Road • Huntsville, Alabama 35806 • Tel: [illegible] • Fax: 256 851 9771 • e-mail: axion@pgtv.net

DEPARTMENT OF THE NAVY
NAVAL INVENTORY CONTROL POINT
700 ROBBINS AVENUE
PHILADELPHIA PA 19111-5098
5450 CARLISLE PIKE - PO BOX 2020
MECHANICSBURG PA 17055-0788

IN REPLY REFER TO:

Ser 0242.6
N00104-96-C-KA09
October 1, 2002

Axion Corporation
Alex Latifi, President
317 Nick Fitcheard Road
Huntsville, AL 35806

Dear Mr. Latifi:

By letter of September 09, 2002, Axion forwarded a First Article Test (FAT) Data Table under contract N00104-96-C-KA09. The FAT consisted of five floppy discs that contained data files from reserve energizer function tests, along with a brief description of the number of reserve energizers tested, number of reserve energizers with good data collected, and a list of environmental tests that the reserve energizers underwent.

Contract modification P00017 required that 120 reserve energizers be function tested. The 120 reserve energizers were to be tested in accordance with Drawing 11744726 for the FAT. The floppy discs contain only 66 separate records, and the five floppy discs contain a total of 84 data files. However, there are 18 duplicitous records. Some of these files have the same name, but are on different discs, while others have different names, but the data in each file are identical. Each of the files with different names are linked to each other in the FAT Data Table.

The contract also required that the reserve energizers be subjected to certain environmental tests before function. Axion's September 09, 2002 letter and the floppy discs data files do not provide any information on which environmental tests each reserve energizer went through.

A FAT report is required by the contract. The format and information required in the FAT report are identified in the Contract Data Requirements List (CDRL) A004 and the Data Item Description (DID) Identification Number DI-NDTI-80809A. Axion's letter of September 09, 2002 does not meet the requirements of CDRL A004. Furthermore, Axion's letter does not contain any information relative to test procedure, test equipment, or data analysis that pertains to the performance requirements.

The FAT Data Table submitted by Axion is disapproved. A total of 25 out of 66 reserve energizers failed to meet the performance requirements per drawing 11744726. Axion failed to comply with contract modification P00017 that required 120 reserve energizers for FAT. Axion's FAT Data Table provides a tabular listing of all the data files that shows three of the four performance requirements for the reserve energizer and identifies the failed performance parameters for each of the 25 defective reserve energizers.

If I can be of further assistance, contact me at 717-605-2027.

Sincerely,
John Korab
John Korab
Contracting Officer

cc: NSWC, Crane Division

For
Jerry Halve

October 11, 2002

Commanding Officer
Naval Inventory Control Point
Code 0242.6
5450 Carlisle Pike
P.O. Box 2020
Mechanicsburg, PA 17055-0788

RE: Contract N00104-96-C-KA09

Dear Mr. Korab:

In reference to the above contract and your letter received October 1, 2002, Axion Corporation stated that 127 units were put through the required environmental testing and they were tested and witnessed by our local DCAS. From the 127 units tested, we collected 74 units with good data. We intended to send you copies of good data collected. While making copies of the disks, my assistant inadvertently put duplicate files on the disks. It remains the same that 74 good data were collected and submitted. Listed below are the data you have received test by test. In the test number, "r" stands for room temperature, "h" stands for plus140-degree temperature, and "c" stands for minus 40-degree temperature. The first column represents the file name, the second column represents the beginning datum, and the third represents the ending datum.

Disk 1

| | | |
|---|---|---|
| 1 | 13.91 | 21.06 |
| 2rhg | 13.91 | 21.11 |
| 104 | .00 | 27.30 |
| 105 | 4.86 | 28.78 |
| 107c | .12 | 24.85 |
| 108r | .00 | 26.23 |
| 109r | 7.00 | 23.47 |
| 110r | 11.53 | 23.09 |
| 112r | 15.32 | 30.40 |
| 11hg | 16.83 | 24.41 |
| 16rg | 19.21 | 26.87 |

| | | |
|---|---|---|
| 45cg | 20.07 | 28.24 |
| 4hg | 7.21 | 23.14 |
| 52rg | 11.53 | 23.09 |
| 55cg | .44 | 30.72 |
| 5cg | 6.34 | 34.15 |
| 66 | 13.91 | 21.06 |
| 66rg | 30.17 | 28.15 |
| 6cg | 4.40 | 41.36 |
| 7cg | 10.01 | 30.61 |
| 89 | .81 | 30.49 |
| 8cg | 12.80 | 29.28 |
| 9cg | 8.83 | 19.53 |

Disk 5

| | | |
|---|---|---|
| 20h | 7.21 | 23.14 |
| 25rg | 26.94 | 26.93 |
| 30c | 5.00 | 26.02 |
| 32rg | 24.38 | 24.38 |
| 33rg | 2.21 | 14.38 |
| 38cg | 2.62 | 29.02 |
| 3cg | 8.01 | 27.94 |
| 41cg | 7.21 | 23.14 |
| 42cg | 8.01 | 27.94 |
| 44cg | 8.01 | 27.94 |
| 46cg | 0.00 | 20.25 |
| 51cg | 6.55 | .00 |
| 57rg | 8.10 | 28.23 |
| 59cg | 0.00 | 30.28 |
| 61 | 5.60 | 29.79 |
| 61h | 21.27 | 31.21 |
| 62rg | 7.92 | 27.85 |
| 72 | 6.96 | 29.66 |
| 82hg | 19.44 | 22.34 |
| 85c | 12.08 | 17.42 |
| 95 | 6.32 | 26.98 |
| 99 | .51 | 34.10 |
| 9c | .00 | 23.43 |

On Friday, September 6, 2002, while we were performing the testing, DCAS had a question that should we test beyond the 120 units that were previously selected by DCAS. We tried to contact you at that time and the chief of our local DCAS was trying to do the same. Axion could have performed the tests very easily since we are now capable of testing four (4) units per hour, when previously the

| | | |
|---|---|---|
| 16cg | 1.38 | 22.25 |
| 17cg | 2.53 | 30.25 |
| 19cg | 5.87 | 28.61 |

Disk 2

| | | |
|---|---|---|
| 113 | 12.29 | 30.72 |
| 114r | .44 | 30.72 |
| 117h | 15.88 | 29.79 |
| 122c | .95 | 30.12 |
| 123h | 21.68 | 29.89 |
| 125r | 12.80 | 21.22 |
| 126r | 20.37 | 27.26 |
| 15rg | 19.21 | 26.87 |
| 16cg | 1.38 | 22.25 |
| 17cg | 2.53 | 30.25 |
| 19cg | 5.87 | 28.61 |
| 20cg | 10.49 | 29.57 |
| 20h | 7.21 | 23.14 |

Disk 3

| | | |
|---|---|---|
| 129r | 11.41 | 29.87 |
| 137 | 6.65 | 29.70 |
| 139 | 13.31 | 25.80 |
| 13rg | 1.82 | 27.19 |
| 140 | 2.00 | 22.57 |
| 14rg | 32.43 | 31.51 |
| 15rg | 19.21 | 26.87 |
| 16cg | 1.38 | 22.25 |
| 17cg | 2.53 | 30.25 |
| 19cg | 5.87 | 28.61 |
| 20cg | 10.49 | 29.57 |
| 22cg | 2.00 | 22.57 |
| 23cg | 13.31 | 25.80 |
| 24 | .37 | 31.20 |

Disk 4

| | | |
|---|---|---|
| 27rg | 6.65 | 29.70 |
| 28rg | 13.57 | 28.41 |
| 29 | 19.93 | 29.51 |
| 32c | 8.83 | 21.07 |
| 35rg | 29.45 | 24.37 |
| 35rg | 11.41 | 29.89 |
| 37rg | 9.33 | 31.41 |

best we could do was five (5) units per day. The question was not if Axion Corporation was capable of performing the test, but if the government would accept a quantity over 120 units. The local DCAS felt it was not necessary to proceed shooting good units and wasting them when 127 units had been shot and approximately 80 good data were collected. Originally, Jerry Hahin stated that a quantity around 80 units would be sufficient. In my conversation with you on Monday, September 9, 2002, you stated you felt that that quantity was adequate. We should not have had to proceed wasting more units.

We believe we performed as required. Should you want us to shoot more units, we would be glad to shoot with one day's notice.

Mr. Korab, in a telephone conversation almost a year ago between you, a governmental lawyer, and me, the government made an offer to Axion Corporation that it would cancel this contract for convenience with no cost to both parties. Axion Corporation could not accept that offer due to the tremendous amount of money invested in this project. Since then, we have invested more money and time in this project without asking for any progress payments. I am not embarrassed to say I have invested all my retirement funds in this project, plus six years of my life. I really don't know what to do any longer. If the government no longer requires these items, I am willing to sit with you and find a resolution by possibly accepting the cancellation of this contract with Axion Corporation receiving a small amount of funds to compensate for all the investments we have made or the government helping us to proceed and finish the project.

I appreciate your help and cooperation in this matter. I would be glad to go to your office to discuss this matter with you further and achieve a mutually amicable resolution. I can be in your office with one day's notice.

Please contact the undersigned at 256-851-8770 should you have any questions or need further information.

Sincerely,

Alex Latifi
President
Axion Corporation

Page 110

Q And this is the only notice that you gave the Navy specifically that says, "I am doing the air gun"; is that true?
A Yes.
Q Is there any other documentation regarding the air gun that you know of where the Navy sent something back to you and said, "Build an air gun, submit us the paperwork, the cost --
MR. RALEIGH: Objection to the form of the question.
Q Did the Navy ever come back and say, "We know you are building the air gun now"? Did they ever -- how did the Navy respond to this memo?
A I don't remember, to be honest with you.
Q Did they respond?
A I don't know, sir. You have to look at documents to see. I don't remember.
Q All right. After you told the Navy that you were going to design and build your own spin gun, at any time did you tell the Navy how much it would cost?
A No, because at that time we didn't think it was going to cost that much money. At this time we

Page 111

are going to make a spin gun and go ahead with the hammer -- with thing -- and activate it and use it. That's what we thought we were going to do. And they didn't accept it, so we have to go for the whole thing.
Q And that's why -- the follow-on in the memo -- there is a sentence that says, "We expect to have the manufacturing of the spin gun completed in a few days"?
A Yes, because we thought we are going to get the spin -- the spin machine that we have, put the parts in it and hit it and collect the data.
Q So you couldn't provide an estimate of the cost of the air gun to the Navy?
A It was not -- this way it was not much for us to really -- it was just a simple process. And it would work, too.
Q But at bottom, you never provided an estimate of the cost to the Navy -- how much you thought the air gun would cost to develop?
A No.
Q You just developed it?
A Because we didn't know how much it was going

Page 112

to cost. So there was no way -- it was something we had never done before, so we have no idea what it cost to do -- plus there was no -- Mr. Mickle, there were no drawings, there were no specifications, so you couldn't really tell what it was going to cost. So you really -- you just went --
Q You couldn't even estimate it?
A There is no way. There is no estimation until you start the -- the only way you could make estimation, if you have a drawing, specification, and you say, "Okay, that is how I am going to do it." But the Army never give us that, nor the Navy give us that. So we didn't know what we were against. We just try to -- well, okay, how are we supposed to do this -- now that we are stuck in this middle? If we had a drawing -- some kind of hint of how to do it -- it would have saved us time and money -- a lot.
Q Did you ever talk to the Navy about the cost of the air gun?
A No.
Q You never did?
A I don't believe so. I don't know if I talked on the phone and tell them that this was really too

Page 113

much -- this and that -- but I don't think I went to them demanding money. I did not demand money from them. I might have just told them that it cost a lot of money -- so and so -- but I never put it in words -- that I needed this much money for the air gun. I don't recall doing that.
Q All right. Fair enough.
MR. MICKLE: Off the record, please.
(Discussion off the record.)
(Lunch Recess.)
(Examination Resumed by Mickle:)
Q Mr. Latifi, just to remind you, you are still under oath.
A Yes, sir.
Q And we are going to try to move things along. In April of 1999, it appears that you submitted your First Article Testing, and I would like to show you a letter that was discussed at Mr. Stickrod's deposition -- but we have a new copy of it.
MR. MICKLE: Please mark this.
(Marked Defendant's Exhibit No. 21.)
Q This is Exhibit 21, and this is a letter you wrote on April 12, 1999. Do you recognize this





287A

Q Well, that goes to the numbers, but consistent with the modification -- well, P00020, which was Exhibit 47, and Exhibit 48, in your September 9, 2002 -- when you submitted that data as required by Mod 20, you called that submission "First Article Test Performance"; right?

A Yes.

Q Is that correct?

A Yes, sir.

Q And when you submitted the First Article Test Performance, you submitted the 74 units?

A We tested over 90 units.

Q But how many did you submit?

A In that paper, we -- I think we submitted 74 units.

Q Did you submit other First Articles on September the 9th, on different paper?

A Mr. Hahin took some stuff with him.

Q Mr. Hahin was there on September 9, 2002?

A During the whole test -- the second test we did -- three or four times.

Q Three or four times he was there?

A Yes, sir.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AXION CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 03-2644C |
| v. | ) | (Judge Firestone) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DECLARATION OF JERRY HAHIN

1. I, Jerry Hahin, make the following declaration in accordance with 10 U.S.C. 1746. I am aware that this declaration will be used in the United States Court of Federal Claims, and that this declaration is the legal equivalent to a statement under oath.

2. I work for the Naval Surface Warfare Center (NSWC), Crane, located in Crane, Indiana as an Electronics Engineer. I have held this position since December 1985. My duties include technical oversight of production contracts for Naval products. Specifically, my group is assigned as the Acquisition Engineering Agent (AEA) for Naval Gun Ammunition. A few of my duties include preparation of technical documentation packages for Naval production buys, reviewing contractor submitted technical data required by the contract, forwarding quality requirements to be put into solicitations and providing technical oversight once the contract is awarded. For contract N00104-96-C-KA09, I was the AEA for the PS-115 power supply at the time Axion was terminated for default. I began working on this contract on approximately May 5, 1998.

3. Contract N00104-96-C-KA09 contained a First Article Test (FAT) requirement. The purpose of a FAT is to verify the manufacturer's production process and materials for use in full-rate production. FAT is a means of verifying that both the materials and the production process to be used will result in a product that conforms to all the technical requirements required by the Navy.

4. Axion experienced many problems in attempting to perform contract N00104-96-C-KA09. When I first became involved with the contract, I visited Axion to observe First Article tests. This first visit ended up consisting of tests conducted by Axion to validate their test equipment for use in FAT and Lot Acceptance Test (LAT). During this initial visit, Axion had trouble with battery wires breaking inside the package utilized to hold the PS-115 and associated electronics. The electronics were necessary to measure the rise time, voltage under load conditions and life of the power supply. Axion also had problems with components within the package being damaged due to the high acceleration forces experienced during the test. The equipment is meant to simulate a Naval gun-firing environment, which is experienced by the power supply in actual Naval use. Axion built equipment to simulate this environment utilizing a tube in which a vacuum was drawn and then released accelerating the power supply and then suddenly stopping and spinning the power supply similar to set-back force and spin seen in the gun launch environment. Along with this long plastic tube was a motor at the end of the tube connected via pulley to a smaller metal cylinder at the end of the tube. This motor is used to spin the cylinder at up to 300 revolutions per second. Axion experienced difficulties reaching this maximum speed and sustaining it for the required time. This was due to the extreme stress being exerted on the motor to produce the torque necessary to create this spin. Axion experienced problems with the design of the piece containing the power supply and electronics due to the fact that the power supplies needed to be tested within a certain time after temperature conditioning. The power supplies could not be installed in this piece and the piece closed up and fired in the required time. However, despite all these obstacles, Axion was able to conduct FAT and submit an acceptable FAT report in April 1999.

5. Axion then experienced difficulties in producing the first production lot. The most prevalent problem that I was aware of was the difficulty Axion experienced in obtaining electronic components for their test equipment to support LAT. Also, Axion informed the Government that the main computing chip used in the testing equipment was no longer available and the equipment would have to be redesigned. It took quite a while to find a suitable replacement due to the storage capacity needed on-board the chip along with the size constraints inside the electronics

housing. These problems resulted in numerous extensions to the contract's delivery schedule for the production lots.

6. Two events occurred between 2000 and 2001 that invalidated the results of Axion's successful 1999 First Article Testing. The first involved the PS-115 plate stock. Axion passed FAT in 1999 with PS-115 Power Supplies made with plate stock manufactured by another vendor. In 2000, while experiencing other difficulties with contract performance, Axion decided to attempt to produce its own plate stock. The electro deposition of the lead and lead dioxide in the plate stock are critical to acceptable performance of the power supply. The change in production process, therefore, created doubt as to whether the PS-115 used for the 1999 First Article Testing would be comparable to PS-115 using Axion produced plate stock; and a First Article function test, rather than a cell test, was the only way to remove this doubt. A cell test is performed during plate stock manufacturing to provide assurance that the plating process is producing adequate material deposition to produce the required amount of voltage for each cell. However, a cell test does not provide any indication relative to the cell's ability to withstand gun launch or its ability to produce the required voltage under load for the required life of the power supply. A First Article function test is necessary to provide these assurances to both the government and the manufacturer.

7. The second event that invalidated the results of the 1999 First Article Testing is that in 2001 Axion's PS-115 began to leak electrolyte. This raised additional doubt with respect to whether the processes and materials Axion was using in 2001 could yield conforming production deliveries. Both Axion and the Navy agreed additional First Article Testing was appropriate, and on October 2, 2001 the parties executed bilateral modification P00017 establishing a requirement for additional First Article Testing.

8. Modification P00017 required First Article Testing of 120 PS-115, with three types of tests each to be performed on 40 units. The contract specifications allow a maximum of 3 rejects per test group and a maximum number of 7 total rejects as specified on sheet 15 of drawing 11744726 and paragraph 4.4.6.1.2 of the drawing. Two groups of 40 units each were to flow down through the first and last columns

as shown on sheet 15 of drawing 11744726 from the left of the page. As shown on sheet 15, the units are broken down into two groups of 60 and then a group of 40 is taken from each group of 60. The Axion First Article sample required by modification P00017 was to be the 40 units flowing down through the environmental tests specified in each column and then the functional tests. The drawing also shows the accept/reject criteria of accept on three failures but reject on four failures for each environmental group of 20 power supplies. The required parameters for each PS-115 during a First Article test are set forth at paragraphs 3.3.1.1 through 3.3.1.7 of drawing 11744726.

9. From October 2001 Axion experienced further difficulties that prevented the company from successfully completing FAT. Axion discovered that producing plate stock was not a simple task and encountered delays due to process modifications necessary to produce the plate stock. This resulted in two additional bilateral modifications, P00019 and P00020, both extending the date for completion of First Article Testing. Modification P00019 also reduced the First Article quantity from 120 to 80. Modification P00020, which was signed on July 11, 2002, required submission of First Article Test report by September 9, 2002.

10. According to discussions I had with the Quality Assurance Representative, I understood that testing in 2002 was progressing, albeit slowly. I was unable to visit the contractor's facility during this time frame due to other assigned duties. Again, my understanding of the problems encountered during this time period were similar to those experienced in the past due to test equipment failures. Axion continued testing throughout July and August, and into early September 2002.

11. On September 9, 2002, Axion submitted a FAT report. I reviewed this report and determined the report should be rejected for failure to meet the technical data requirements. The primary basis for rejecting the FAT report was due to the fact that twenty-five of the samples failed to meet the requirements of drawing 11744726. The two major requirements the power supplies failed to meet were activation time and discharge life. A few batteries also failed peak voltage requirements. In addition to the fact Axion's FAT report indicated 25 of the tested PS-115 failed, Axion's test equipment did not collect data on two

of the tested PS-115. Also, two units were not counted in my analysis and were considered to be "no tests" because no electrical load was applied during the test as required by the technical data package. This failure rate falls below the standards set forth in the contract's specification that I have explained above in paragraph 8. I, therefore, drafted NSWC's letter of September 26, 2002 concluding that Axion's FAT report should be rejected. The contracting officer adopted my recommendation and disapproved Axion's FAT report on October 1, 2002.

12. On October 1, 2002, the contracting officer also informed Axion that the Government was considering a termination for default due to Axion's disapproved FAT report and afforded Axion the opportunity to show why the contract should not be terminated for default. In response to this "show cause" notice, Axion submitted an October 11, 2002 letter summarizing the testing data. This letter provided no information explaining the test failures noted by the government in their analysis. All that was provided was a description of the data files on the disc and whether the power supply was conditioned to hot, cold or ambient temperature. Axion's October 1, 2002 letter also states that 74 units produced good data. The government does not consider data not meeting the requirements of the technical data package to be good data. The government also did not find 74 files with data, only 68. Axion's October 11, 2002 letter provided no assurances that Axion could produce power supplies that would meet the specified performance requirements of the technical data package.

13. Although Axion experienced difficulties with its testing equipment, the information submitted in Axion's September 9, 2002 FAT report indicate that on 25 occasions a PS-115 was properly tested but failed to achieve the contract requirements for a successful test. The test data indicates a number of probable reasons for these failures. In some cases, the power supplies appeared to lose voltage rapidly, indicating leakage of the electrolyte due to poorly produced housing or damage from improper test procedures. Two units exceed the maximum allowable voltage output, indicating too many cells. Finally, a few indicated inadequate activation time due to either leaking electrolyte before the test was performed or during the test due to improper test procedures. I also note that despite Axion's air gun difficulties, the Navy had previously acquired approximately 135,000 PS-115 in

seventeen lots from another manufacturer, and in all instances, an air gun was successfully used to perform acceptance testing.

14. In 2000, the NSWC test group obtained a spin tester and in late 2001 the spin tester became available for possible use under Axion's contract. In December 2001, the Navy offered to perform functional testing for Axion using the government spin tester and this offer was repeated in April or May of 2002. The offers included both cost and time to complete estimates. Axion declined to accept these offers both times.

15. I have read the foregoing 6-page declaration and I certify under penalty of perjury that the foregoing is true and correct.

Jerry Hahin

Jerry Hahin

3/28/05

Date

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AXION CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 03-2644C |
| v. | ) | (Judge Firestone) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF HENRY STICKROD**

1. I, Henry Stickrod, make the following declaration in accordance with 10 U.S.C. 1746. I am aware that this declaration will be used in the United States Court of Federal Claims, and that this declaration is the legal equivalent to a statement under oath.

2. I work for the Defense Contact Management Agency (DCMA), Redstone Arsenal, Alabama as a Quality Assurance Specialist. I have held this position since January 5, 1998. My duties include the review of Government contracts awarded to contractors assigned to me for Quality Assurance oversight, observing manufacturing and testing processes, workmanship, submission of completed forms, investigation of Quality Deficiency Reports, and helping to assure the Government receives a quality product in accordance with the Technical Data Package for which it has contracted. I was the Quality Assurance Representative (QAR) for the contract N00104-96-C-KA09 at the time Axion was terminated for default.

3. My involvement with contract N00104-96-C-KA09 began in the middle of 1998 when I assumed the duty of contract QAR from Ms. Brenda Middleton. The contract required Axion to produce PS-115 batteries for use in Navy munitions. The contract included a First Article Test requirement during which Axion had to test PS-115 under various environmental conditions. As QAR, my role was to observe and verify the units were tested under the correct environmental conditions and that the test data was downloaded and recorded for submission for First Article determination. Axion created a First Article Test report by downloading test results from each item tested into a permanent data

file. It was then Axion's responsibility to submit a First Article Test report to the Government for evaluation (see Contract, page 50).

4. My role did not include approving or disapproving the First Article Tests, and it was not the responsibility of my activity, DCMA, to be involved in the decision to approve or disapprove First Article Testing. Under the terms of the contract, the Naval Inventory Control Point contracting officer was responsible for approving or disapproving the First Article testing (see Contract, page 50). In addition, the Naval Surface Warfare Center (NSWC), Crane (located in Crane, Indiana) provided technical expertise with regard to whether the First Article Testing should be approved. Also, the negotiation of contract modifications was not my responsibility nor did I have any involvement with the negotiation of any contract modifications. In many instances, I did not learn of a contract modification until some time after the modification was executed.

5. In May 1999, the contracting officer notified Axion that First Article Testing was approved, although I did not become aware of this until some time later. Axion was then required to conduct production lot testing and deliver the contract's production quantities. Between May 1999 and October 2001, I spent approximately 92 hours at Axion. During this time, Axion experienced problems associated with both the testing equipment and PS-115 production. A significant issue during this time was Axion's decision to produce its own plating for the PS-115 rather than acquire plating from an outside vendor as was accomplished when Axion's First Article Testing was approved in May 1999. The problems Axion encountered with testing equipment and PS-115 production resulted in numerous contract modifications extending the contract's delivery schedule for production quantities. The last of these modifications was P00016, which was signed by both Axion and the Navy on June 4, 2001. Modification P00016 required Axion to make the first production delivery by August 8, 2001.

6. After Axion failed to comply with the delivery schedule of modification P00016, Axion and the Navy agreed that Axion's change in production process to produce its own plate stock was such that the prior First Article Test results were invalidated and that additional First Article Testing was necessary. On October 1, 2001, Axion and the

Navy signed modification P00017. This modification established a requirement for additional First Article Testing. After Axion failed to accomplish First Article Testing by the date required in modification P00017, the Navy and Axion bilaterally extended the date for completion of First Article Testing through modification P00019. And Axion again failed to complete First Article Testing by the date set forth in P00019. The reasons for Axion's failure to satisfy the requirements of P00017 and P00019 included difficulties with Axion's testing equipment providing verifiable test data, Axion's attempt to develop a plating line, Axion's interest in changing material to provide a superior product to that required by the contract, and that some of the PS-115 Axion had produced were leaking electrolyte.

7. In July 2002, the Navy and Axion agreed to their final modification setting forth a new date for completion of First Article Testing. This modification (P00020) required Axion to deliver a First Article Test report by September 9, 2002.

8. I visited Axion on 8/1/02, 8/2/02, 8/7/02, 8/12/02, 8/13/02, 8/19/02, 8/21/02, 8/27/02, 8/28/02, 8/29/02, 9/3/02 and 9/4/02, for a total of approximately 39 hours, to observe First Article Testing. While it appeared that many of the problems encountered during the testing had been eliminated by Axion, there were some remaining difficulties in downloading data from the modules to the permanent data file on an ancillary computer.

9. My visits to Axion to observe testing were prompted when Axion notified me that the company was prepared to perform testing. In those situations when a QAR assigned to a contract is not able to satisfy a contractor's request for a visit within a 7-day timeframe, DCMA will send another employee to the contractor. Under the Axion contract, there were no instances that DCMA was unable to immediately send a representative to Axion upon a request from the company for a site visit.

10. Mr. Charles Vartan was assigned by my supervision to observe the testing and downloading of data in my absence after September 4, 2002 since I was required to attend training at a distant location. I informed both Mr. Latifi of Axion and Mr. Vartan that Mr. Vartan would be present at Axion for the sole purpose of observing Axion's testing.

In addition, I told Mr. Latifi and Mr. Vartan that, like myself, Mr. Vartan would not have authority to change the contract or to make any determinations with respect to First Article approval or disapproval. Mr. Latifi and Mr. Vartan acknowledged that they understood that the role of Mr. Vartan and myself was solely to observe testing.

11. Axion completed testing in September 2002 and submitted a First Article Test Report. I later learned that upon the recommendation of NSWC, the contracting officer disapproved the report, and the contracting officer then terminated the contract for default. It was not my responsibility to determine or to know whether the problems evidenced in Axion's report were due to defective PS-115 or problems with the testing equipment, or a combination of the two.

12. Axion has alleged in Count XII of their complaint that the company was ready, willing, and able to continue testing beyond the afternoon of Friday, September 6, 2002, which was the last workday before the First Article Test report was due on Monday, September 9, 2002. Additional testing would have been contingent upon having sufficient PS-115s that had been prepared for First Article Testing. A DCMA QAR would then have been required to select additional First Article samples from that batch. Since I was in training at an out-of-state facility until September 20, 2002, I have no first hand knowledge of what transpired after Mr. Vartan began observing the testing. However, in so far as I know, Axion did not request DCMA provide overtime coverage during the weekend between September 6, 2002 and September 9, 2002 to observe First Article Testing.

13. I have read the foregoing 4-page declaration and I certify under penalty of perjury that the foregoing is true and correct.

Henry K Stickrod

Henry Stickrod

28 March 2005

Date

question -- there is no question pending. Ask me the question.

(Discussion off the record.)

Q Regardless if it was a First Article Test or a Lot Test --

A Yes.

Q -- on April 23, 2002, 80 units weren't successfully tested, were they?

A No, sir.

Q And as a result of that, on May 10, 2002 --

MR. MICKLE: Let's go off the record for a second.

(Recess.)

(Marked Defendant's Exhibit Nos. 45 through 52, inclusive.)

(Examination Resumed by Mr. Mickle:)

Q I guess we are done with Exhibit 44, which is P00019. Let's go to the next document. And I just need some explanation. And that's Exhibit 45. That is a May 10, 2002, letter you sent. And it looks like up until this point you are still having difficulty with your measuring apparatus -- with the air gun and the computer on board?



A Yes.

Q And am I correct in saying that as of May 10th you thought you would be ready to do testing once again on May 13, 2002?

A Yes.

Q And then, once again, you followed up with that and made good on your word with Exhibit -- 46, is it? Is that what that is, Exhibit 46?

A Yes.

Q Where you sent an e-mail to Mr. Korab -- I think it was May 14th -- that you performed the tests and the rings held and now you are -- it looks like you are ready to start testing again.

A Yes.

Q And every time that you shot -- or performed a test -- somebody from DCMA was there?

A Always.

Q Always. And was that usually Mr. Stickrod?

A Yes.

Q And Mr. Stickrod, how many times was he in your building?

A Numerous times.

Q Numerous times. In fact, my impression was



even though you had a professional relationship, you respected each other and got along fairly well?

A Yes.

Q Has that been your relationship with DCMA throughout?

A Always, always.

Q So they were very cooperative?

A I was very cooperative.

Q You were very cooperative? Were they cooperative?

A I was very cooperative, so I didn't give them any reason not to be cooperative.

Q But I mean, I gather when -- if you needed them, you could call them up, and they would respond?

A If they were available, yes.

Q If they were available. Did they ever say they weren't available?

A There is a limit when you call DCAS. They have a limit time to do it. I think three or four days they have to get back to you. But we always had a good relationship with them.

Q All right. So any of the problems that you had in doing your testing, was DCMA at fault at all?



A No.

Q Now, let me show you Exhibit 47. And this is Modification 20. And the way I read this modification -- and tell me if you disagree -- but first, is that your signature down there? I see it is a printed name of "Alex Latifi."

A Yes, sir.

Q And, Mr. Latifi, through P00020, on July 11, 2002, a new delivery date, once again for First Article Tests, was established -- and this time as of September 9, 2002?

A Yes.

Q All right. And what did you have to do on September 9, 2002, pursuant to this modification?

A Nothing. Just delivery time went to September 9, 2002.

Q And what were you delivering?

A The test -- the results -- so I could ship the stuff.

Q All right. And, of course -- is this again -- even though it says "First Article Test," you always thought this meant Lot Test?

A Well, the Mod before, that was 80 pieces, so

Page 210

I assumed the 80 pieces.
Q But now you are sure that -- now, after you have read this modification, I am assuming that you now agree that this was First Article Test?
A They meshed them together. I didn't -- it really didn't make any difference which one they wanted me to do. I just wanted to test so I can ship. It didn't make any difference which one it is -- or what they call it. Sometimes they call "Lot Test"; sometimes they call "80 pieces"; sometimes they call "120 pieces." It really wasn't clear -- but what it was, I have to test quantities, 80 to 120 -- somewhere -- to ship my product --
Q All right.
A -- because they change it -- 80 -- 120 -- you couldn't tell exactly what.
Q You couldn't tell --
A No. But I agree to test the quantity to satisfy so I could ship.
Q But I note that on September 9th, on that delivery date -- and this is Exhibit 48 -- in your note that forwarded the test results, you also referred to the testing as "First Article Testing"?

Page 211

A Yes. But that time, they said "First Article," so we are taking the same --
Q So at least on September 9, 2002, you and the Government were in agreement that this was a First Article Test you were submitting on September 9th?
A We used the same word they used.
Q So did you agree on September 9th that you were submitting First Article Test Performance Results?
A We have shot --
Q Would you answer that question for us, please, sir.
A At this time?
Q Yes.
A We used the same word they use.
Q And by using the same verbiage, did that mean that you agreed, then, that you were submitting First Article Test Results on September 9th?
A The last time it was 80, and then they said 120, and now 127 pieces. So we -- we do what they tell us. It seem like the Government has pushed the Lot Test and First Article together as a -- one case. So we are proceeding with it as they want us to.

Page 212

Q Well, that goes to the numbers, but consistent with the modification -- well, P00020, which was Exhibit 47, and Exhibit 48, in your September 9, 2002 -- when you submitted that data as required by Mod 20, you called that submission "First Article Test Performance"; right?
A Yes.
Q Is that correct?
A Yes, sir.
Q And when you submitted the First Article Test Performance, you submitted the 74 units?
A We tested over 90 units.
Q But how many did you submit?
A In that paper, we -- I think we submitted 74 units.
Q Did you submit other First Articles on September the 9th, on different paper?
A Mr. Hahin took some stuff with him.
Q Mr. Hahin was there on September 9, 2002?
A During the whole test -- the second test we did -- three or four times.
Q Three or four times he was there?
A Yes, sir.

Page 213

Q But on September the 9th --
A These tests --
Q Let me go back.
A Yes, sir.
Q On Modification 20, the delivery date for First Article Test Report is established as September 9, 2002. Do you agree with that statement?
A Yes.
Q On September 9, 2002, you submitted First Article Test Performance Data Report. Is that true?
A Yes, but it took us a long time to bring the data.
Q I understand, but you only submitted one report; right?
A In this instance, we tested over a hundred and some units.
Q Okay.
A Mr. Hahin was there. He collected some data and took with him. Mr. Henry Stickrod was there, and he counted 90 units he took with him -- he counted 90 good units that we tested. Mr. -- the last gentleman --
Q Vartan?

tested, and we only got two hundred and some pieces -- good units -- and they passed the First Article. The percentage of this P000 compared to the first one -- it was much higher here than then.

Q Were there any modifications that you signed with the Government that said First Article Testing was based not on numbers but actually percentages?

A They were --

Q "Yes" or "No"? Was it percentages or was it numbers?

A Numbers or what?

Q I mean, were you required to produce a percentage of PS-115s that tested with good data or a certain number of PS-115s that tested with good data?

A The contract provided me the ability to shoot one unit and if there is no test, replace it. So you put as much as you can -- but in true fact, I shot as long as required -- until the Government was satisfied.

Q All right. But, once again, did the contract require you to submit a percentage of good data or a number of PS-115s with good data?

MR. RALEIGH: I object to the form.



Q Did the Government require you to submit PS-115s -- how many PS-115s did the Government require you to submit?

A First Article?

Q Right.

A 540.

Q At the end -- in 2002?

A They asked 80 one time; they asked 120 next time.

Q So you had to submit 80 with good data? At least 80?

A 80 units to be tested.

Q 80 units to be tested?

A Yes, sir.

Q And none of them had good data on there --

A You replace them until you get good data.

Q You replace them until you get good data. So you are telling me the Government contracted to buy PS-115s that theoretically none worked?

A The test that we perform -- the way it was set by contract to perform, you really couldn't tell.

Q Did you ever ask?

A They were all aware of it.



Q All aware of what?

A That the test the Government used to perform -- that Axion produce a quality unit or not is not verifiable -- would not provide the result to show that Axion made or not --

Q Did you ever send a letter to the Government stating that?

A The Government stated that.

Q Who?

A Mr. Henry Stickrod.

Q Stated that in writing?

A Stated that in e-mail.

Q He did?

A Yes, sir.

Q All right. Did you ever state that to Mr. Korab?

A Mr. Korab was aware of it -- that we replace them one by one.

Q Did you ever state to Mr. Korab that the evaluation criteria was invalid?

A Mr. Hahin talked to it. He was there. And when we had one fail, we looked at it and -- and we replaced with new one.



Q But, again, did you ever ask Mr. Korab -- tell him that you thought --

A I understood that Mr. Korab wasn't an engineer, so I had to talk to Mr. Hahin. He is an engineer. Mr. Stickrod --

MR. RALEIGH: Try to speak clearly for her. I think he said that he understood that Mr. Korab was not an engineer. I think that's what he said.

THE WITNESS: Yes.

(Discussion off the record.)

(Recess.)

(Examination Resumed by Mr. Mickle:)

Q Let's quickly look at Exhibit 50. And that is a 1 October 2002 letter that also was sent to you, basically telling you that they are considering terminating you for default?

A Yes, sir.

Q Did you receive that letter?

A Yes.

Q And in response to that letter --

MR. RALEIGH: Is this 51?

MR. MICKLE: 52. It is out of place, but 51 will come in soon.