POWER SUPPLY PART 11744726 (PS115)
FIRST ARTICLE SAMPLE TEST FLOW DIAGRAM




FIGURE 1

*Defective devices shall be replaced. Replacement shall be conditioned in the same sequence.

| SIZE | CODE IDENT NO. | DWG NO. | REV |
|---|---|---|---|
| A | 19202 | 11744726 | – |
| SCALE | | SHEET 15 | |

AXION CORPORATION

*Innovation is our business.*

September 9, 2002

Mr. John Korab
Naval Inventory Control Point – Mechanicsburg
5450 Carlisle Pike
P.O. Box 2020
Mechanicsburg, PA 17055-2020

RE: Contract N00104-96-C-KA09

Dear John:

In reference to the above contract regarding the first article test performance, please be advised that Axion Corporation has performed tests on 127 units that were submitted to the environmental testing requirements listed below.

1. 7' drop
2. Transportation vibration
3. Minus 40-degree temperature
4. Plus 140-degree temperature

Under the presence of DCMA quality assurance representatives, the units were tested at the above temperature and data collected from 74 units were activated and good data were collected. The copies of the collected data are on floppy disks, which, per your instructions, will be sent overnight to Jerry Hahin for his review.

Please advise.

Thank you for your help and cooperation with this matter. If you should have any questions, please contact the undersigned at 256-851-9770.

Sincerely,

Alex Latifi
President
Axion Corporation

317 Nick Fitcheard Road • Huntsville, Alabama 35806 • Tel: 256.851.9770 • Fax: 256.851.9771 • e-mail: axion@pgtv.net

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AXION CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 03-2644C |
| v. | ) | (Judge Firestone) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF JOHN J. KORAB**

1. I, John J. Korab, make the following declaration in accordance with 10 U.S.C. 1746. I am aware that this declaration will be used in the United States Court of Federal Claims, and that this declaration is the legal equivalent to a statement under oath.

2. This declaration is made in supplement of my March 28, 2005, Declaration filed with this Court in respect to the above-captioned litigation.

3. I am employed as a Contract Specialist at the Naval Inventory Control Point - Mechanicsburg, and have been so employed for approximately 22 years. I was the Contract Specialist responsible for administering contact N00104-96-C-KA09 (the "Contract"), and I was responsible for recommending that the contract be terminated for default.

4. I was the contracting officer responsible for executing numerous modifications under the contract. Three of the these modifications, P00017, P00019, and P00020, contained accord and satisfaction, and release language in which the parties agreed to waive "any and all claims, demands, or causes of action" that either the Navy or Axion might "have against the other arising out of or related to the contract to date." Each of these modifications extended the contract's delivery schedule and was executed at a time when Axion was in delinquent status for non-delivery and at risk for a possible termination for default. When signing the modifications, I thought the release language was important from the Navy's perspective in that by receiving a release of claims from Axion the Navy was getting something in return for granting Axion additional time to

perform. Although I did not discuss the release language with Mr. Latifi, I thought he understood the clear meaning of the language when he agreed to the modifications.

5. It is my understanding that Axion now takes the position that Mr. Latifi did not understand the legal significance of the release language. I believe Mr. Latifi did understand the legal significance of the modifications, and I certainly believed such to be the case at the time Mr. Latifi and I signed the modifications. Prior to the signing of these modifications, I had spoken to Mr. Latifi on numerous occasions and read dozens of correspondences from him. I consider Mr. Latifi to have a strong grasp of the English language. This leads me to believe Mr. Latifi must have understood the words "full release… of any and all claims, demands, or causes of action… related to the contract to date." Furthermore, because Mr. Latifi displayed a great attention to detail throughout contract performance and on numerous occasions he brought his questions and concerns to my attention, I think Mr. Latifi would have discussed the release language with me had he not completely understood the significance of the language.

6. I have read several of the arguments Axion has made before the court. One of these arguments implies that I lack honesty because I permitted Axion to agree to the release language while being aware that Axion was unwilling to agree to a no-cost termination for convenience. This argument makes no sense and unfairly attacks my integrity.

7. From my perspective, modifications P00017, P00019 and P00020 each gave Axion additional time to perform and earn the contract's firm fixed price of more than $1.3 million. The fact I knew Axion was unwilling to accept a no cost termination settlement, in which Axion would not receive a single cent, in no way put me on notice that Axion would not be willing to have another chance at earning $1.3 Million in return for a release of claims.

8. Furthermore, as I explained above, Axion was at risk of a termination for default prior to the signing of modifications P00017, P00019 and P00020. Since a termination for default is worse for a contractor than a no-cost termination for convenience, there's nothing inconsistent about a contractor being both unwilling to accept a no-cost termination for convenience and willing to agree to a release of claims in return for additional time

to perform in order to avoid a termination for default. From my perspective, it was entirely reasonable for Mr. Latifi to agree to the release language as the modifications not only gave Axion another chance to earn over $1.3 Million but also removed Axion from delinquent delivery status and the risk of a termination for default.

9. I also think it is important to emphasize that Axion never provided me with specifics on how much it had spent on the contract. Also, Mr. Latifi informed me during the course of the contract that he hoped to use the air gun for future work after performance of the Navy contract was complete.

10. A final point I want to emphasize is that at the time modifications P00017, P00019 and P00020 were executed, I still believed Axion had a reasonable chance to successfully complete the contract. Although Axion experienced many problems, Mr. Latifi never stopped trying and he had experienced some successes. For instance, the Navy had determined Axion's FAT testing successful in 1999, prior to Axion's decision to change material thereby invalidating the successful FAT. Additionally, in the months leading up to the execution of modification P00017 on October 2, 2001 through execution of P00020 on July 11, 2002, Axion sent me several correspondences which confidently described the progress Axion was making. For example, on August 22, 2001, Axion informed me that "everything is in house and Axion is performing the final assembly of the items." I've attached several of these correspondences to this declaration.

11. When modifications P00017, P00019 and P00020 were executed, I was frustrated with Axion, but I still believed Axion had a reasonable chance at successfully completing the contract and earning more than $1.3 Million. This was not a situation where I accepted Axion's release of claims all the while believing that Axion had no chance to succeed.

12. Axion has also questioned my integrity concerning other aspects of the contract. For instance, Axion views my January 26, 1996 response to Axion's request for an air gun as disingenuous. In that response, I stated the "Navy did not supply any air guns to the previous contractor." Axion believes I used this wording to avoid confronting the fact the Army may have provided an air gun to a prior contractor. Regardless of the words I used in denying the request, the bottom line was that the Navy did not have an air gun to give Axion, and as a Navy contracting officer, I was in no position to acquire an air gun from another agency for Axion to use. I have no idea why Axion waited until after the contract was awarded to determine how it would meet its contractual obligation to provide all test equipment.

13. I have also been accused of lying to Axion in a June 5, 1996 correspondence in which I responded to Axion's request for a 1980 revision to NAVORD OD 18332. In my response to Axion I wrote, "ACCORDING TO THE NAVY'S RECORDS, THE "BASIC" REVISION, DATED 2 FEBRUARY 1967, IS THE LATEST REVISION OF NAVORD OD 18332." I did not lie to Axion. Although I cannot remember every detail of this issue, the records in the contract file show that I referred Axion's request for the 1980 revision to the cognizant engineering activity, Naval Surface Warfare Center (NSWC), Crane Division. My response to Axion was based on information I received from NSWC. The records in the contract file also show that the Naval Ordnance Center, which supported NSWC with Axion's request for the 1980 revision, gave Axion an opportunity to provide additional information concerning the 1980 revision.

14. I have read the foregoing 3-page declaration and I certify under penalty of perjury that the foregoing is true and correct.

John Korab
John Korab

SEPT. 11, 2006
Date

# Condensed Transcript of the Testimony of
# **Henry Kumler Stickrod**

January 27, 2005

Axion Corporation v. The United States

Shoemaker & Associates
Phone: 256-881-8900
Fax: 256-882-2692
Email: i.shoemaker@mindspring.com

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

```
AXION CORPORATION,            )
                              )
              Plaintiff,      )
                              )
      vs.                     )  NO. 63-2644C
                              )
THE UNITED STATES,            )  JUDGE FIRESTONE
                              )
              Defendant.      )
```

* * * * * * * * * * * * * * * * * * * *

DEPOSITION OF HENRY KUMLER STICKROD

January 27, 2005
Huntsville, Alabama
9:15 a.m.

* * * * * * * * * * * * * * * * * * * *

A P P E A R A N C E S

For the Plaintiff: Mr. Richard Raleigh
Wilmer Lee
100 Washington Street
Huntsville, AL 35801
and
Mr. Jerome S. Gabig
Attorney at Law
515 Sparkman Drive
Huntsville, AL 35816

For the Defendant: Mr. Douglas K. Mickle
United States Department of Justice
1100 L Street N.W.
Room 4062
Washington, D.C. 20005
and
Mr. Rick Martinelli
Assistant Counsel for Naval Inventory Control Point
5450 Carlisle Pike, Bldg. 410
Mechanicsburg, PA 17055

Also Present: Mr. Alex Latifi

INDEX

PAGE

Examination by Raleigh .......... .. .... 5

PLAINTIFF'S EXHIBITS

Exhibit No 1 ......... ............ 24
The bird
(Retained by Mr. Raleigh)

Exhibit No 2 ...................... 24
Component of PS-115
(Retained by Mr. Raleigh)

Exhibit No. 3 ...................... 25
PS-115 unit
(Retained by Mr. Raleigh:)

Exhibit No 4 ...................... 25
Component of PS-115 (plating)
(Retained by Mr. Raleigh)

Exhibit No 5 ...................... 27
Component of PS-115 (cutters)
(Retained by Mr. Raleigh)

Exhibit No. 6 ...................... 28
Spent PS-115 (after testing)
(Retained by Mr. Raleigh)

Exhibit No. 7 ... .................. 48
Copy of memorandum to Axion Corporation from Commanding Officer, Naval Inventory Control Point, dated May 11, 1998.

Exhibit No. 8 ...................... 52
Copy of memorandum to Axion Corporation from Commanding Officer, Naval Inventory Control Point, in re Lot Acceptance Testing.



Exhibit No. 9 ...................... 64
Specification control drawing for the PS-115, consisting of 67 pages.

Exhibit No. 10 ...................... 75
Copy of letter over the signature of Alex Latifi, addressed to Mr. John Korab, Naval Inventory Control Point, dated June 13, 2000, in re N00104-96-C-KA09.

Exhibit No. 11 ...................... 77
Copy of a letter from Alex Latifi, addressed to Naval Inventory Control Point, Attention: Mr. John Korab, dated April 12, 1999, in re N00104-96-C-KA09, consisting of 2 pages.

Exhibit No. 12 ...................... 92
Copy of an e-mail from Henry Stickrod to John Korab, dated 09/05/02.

Exhibit No. 13 ...................... 95
Copy of an e-mail from Henry Stickrod to John Korab, dated 09/06/02.

Exhibit No. 14 ......................105
Copy of an e-mail from John Ellis to John Korab, dated 03/23/99.

Exhibits to Other Depositions Referred to in this Deposition:
Exhibit No. 11 (Korab) ................ 49
Exhibit No. 3 (Vartan) ................ 89
Exhibit No. 7 (Korab) ................ 97
Exhibit No. 2 (Vartan) ................110
Exhibit No. 4 (Vartan) ................111
Exhibit No. 5 (Vartan) ................113



Deposition of HENRY KUMLER STICKROD, taken pursuant to the provisions of the Federal Rules of Civil Procedure, before Ileen S. Shoemaker, RPR and Notary Public, State of Alabama at large.

By agreement of the parties, all formalities required by the Federal Rules of Civil Procedure pertaining to the taking of depositions are waived, except for the reading and signing of the deposition by the witness.

The parties hereto further respectively reserve all objections as to the admissibility of any question asked of the witness or any answer elicited from the witness until such time as the deposition, or any portion thereof, is offered in evidence on the trial of the above cause, except that objections as to the form of the questions asked of the witness must be made at the time of the taking of the deposition or otherwise such objections are waived.

On January 27, 2005, at 100 Washington Street, Huntsville, Alabama, came before the undersigned authority HENRY KUMLER STICKROD, who, being by me first duly sworn to speak the truth, the whole truth, and nothing but the truth, testified as follows:



EXAMINATION BY MR. RALEIGH:

Q Good morning, Mr. Stickrod. My name is Richard Raleigh, and I represent Axion in this matter that is pending in the Court of Federal Claims. I am going to be asking you some questions on behalf of Axion. Do you understand, Mr. Stickrod, that you are testifying in that matter?

A Yes, sir.

Q Would you please state your full name for the record.

A Including my middle name?

Q Yes, sir, please.

A Henry Kumler -- K-U-M-L-E-R -- Stickrod -- S-T-I-C-K-R-O-D.

Q Mr. Stickrod, because of our process here, you have to provide your answers out loud, and the court reporter has to get them down, so if you don't provide an audible response, I will try to remind you, but please try to remember to say "Yes" or "No," or give the appropriate response, if you would. All right?

A I am just recovering from laryngitis, so at some point my voice will go in and out and in and

Page 66

Q All right. So what does this tell us about the criteria for the testing, in general?
A With a given number being fired, the voltage -- as an example, in, A, Voltage, Accept on 3 and Reject on 4. Out of the amount that were shot, if three of them fluctuated, that was all right; if four of them did, then it was rejected -- the entire thing was rejected.
Q Is that the criteria that you used when doing your testing?
A Well, the difficulty in answering that is because we didn't -- we never got 120, 180, 500 -- whatever -- successively shot to make the determination on whether there were three or four. One would work; one wouldn't; one would work; one wouldn't. Two or three would work; two or three wouldn't. And you never had a complete grouping so that that kind of a definition could really be applied to it. And after the data was acquired by Axion and sent up to -- Jerry Hahin was my understanding -- or John -- I don't know which -- that was where they were attempting to put all of that together to make those kind of determinations.

Page 67

But it was up to them to do that. I didn't make any determination about First Article being, you know, correct or not correct.
Q Why would some of them work and some of them wouldn't work, to use your terminology there?
A There were several different factors. Some of them were human error; some of them were mechanical. There is no way, you know, of saying "This one did that," "That one did this," but sometimes the gun had too much vacuum built up in it, and when it fired, it ruptured everything too much. Other times it didn't have enough vacuum and the PS-115 didn't rupture sufficiently. You didn't get your voltages then, either.
Sometimes when the bird would go down -- the vacuum pulls it down -- and when it hit -- something in excess of 25,000 g's that it stopped -- and the spin would start, and wiring inside would break, or the little computer aboard that was in there to collect data and supply it to the external computer -- sometimes components on that would break.
And on one occasion, we had a couple of failures, and it didn't -- it just didn't make

Page 68

sense -- and we realized then that one of the Axion employees had his hand on the metal part of the bird and grounded himself to a bench and lost all the data that way. But that was corrected quickly when we found out what it was. But those are the kinds of things that were occurring.
Q Did you ever have any information that the failure to collect data on any of the battery systems was because the battery system itself was defective?
A I can't answer that. Because the data wasn't there, I don't know what the failure was when the failure happened. I can't answer that. I don't know. Without having some kind of definitive measure -- way of determining that -- I can't answer that.
Q All right. The definitive things that you did know are -- you knew at one time there was a grounding problem that messed up the data; right?
A Yes.
Q And you know that at one point the bird itself had a wiring problem? -- the bird being Plaintiff's Exhibit 1.
A Several times.

Page 69

Q Several times it had problems?
A Oh, yes. Early on, it was frequent.
Q And you know for certain that at some times the vacuum was too much, and it caused it to fly too fast?
A Yes.
Q Are there any other specific instances of how failures occur that you can think of other than what you have already told us about?
A That was all pretty much in that vein.
Q So if there was a failure to collect data, you can't say definitively if the failure was in the PS-115 unit itself, like Plaintiff's Exhibit 3, or if it was in the air gun or some human error?
A At the time, with each failure we would determine what it was.
Q All right. And you have told us about those?
A Yes. We knew that that was what was happening with them.
Q What does it mean in this exhibit -- I forget the exhibit number -- Plaintiff's Exhibit 9 --what does it mean that "Acceptance/Rejection shall be on a unit basis and not per category"?

Page 70

A That is something that you will have to talk to Jerry Hahin about.
Q All right. A couple of pages -- well, actually, on the next page, in paragraph 4, part 4.4.6.2.2 -- there is a paragraph there called "Field Tests." Do you see that, sir?
A Yes.
Q Can you read that into the record for us.
A "The Government may at its discretion perform the following field tests: One Hundred and Eighty power supplies may be fired from the designated artillery pieces as specified below. Power supply information may be telemetered."
Q All right. And you don't have to go further. But is this the paragraph in the contract that permits the Navy, if it wants to, to actually field test by firing through artillery pieces?
A That's something John Korab would have to tell you. I would assume so, but I can't -- I can't definitively answer that. He made the contract; I didn't.
Q You are aware that the Government had that option, though?

Page 71

A That's what it appears to be here, but I can't answer, because I wasn't in on the contract letting.
Q Who had the authority with this contract to waive the number -- or reduce the number of units that were going to be tested?
A John Korab, Jerry Hahin, Brian Gage, and some -- that group up there.
Q Please walk me through, generally, just a day that testing would occur out at Axion where you would be present. For example, what time would you show up? What would you do? Did you take breaks? -- that type thing. In general terms.
A That's really difficult, because -- you know, if there was some testing that was going to occur, get there and go into the room and -- usually, we were trying to start with room temperature items, so that you would get those done before you do the hot and cold. And initially, you are only getting, you know, three or four -- occasionally five -- a shot, and it would consume the whole day. We are looking probably from -- oh, 8:00, 8:30 in the morning until 3:00 in the afternoon -- just to shoot those

Page 72

four -- or five, if they could get there -- or three -- whatever.
And when a bird broke, well, then, you would have to find out what happened to it and repair it and whatever, and you are looking at two or three or four days of down time there -- or a week, two weeks, even, sometimes -- before you are ready to shoot again. It varied.
Q Was it frustrating to have these problems with the air gun?
A Well, that -- for me, no.
Q Was it frustrating for Mr. Latifi?
A Oh, absolutely. He's the contractor; he's under the gun and he has got to produce, and he has got to meet various criteria. Certainly any time something went wrong with it it was going to be frustrating to him.
Q Could you tell he was frustrated?
A From time to time. He doesn't hide those things very well.
Q Do you have any knowledge of any other air gun used by the Government for testing?
A No. I have heard of it, but I don't know.

Page 73

Q Where have you heard that there was a gun?
A I heard that there was one -- I think it was Aberdeen Proving Ground, or -- yes, Aberdeen, I think. I don't know anything about it.
Q Was the air gun used in this contract special test equipment?
A I would term it that, but -- you know, that is something that if you want a legal determination, somebody else is going to have to do that. But from my experience in the years that I have worked with electronic standards, or whatever, anything that is not general purpose is special purpose.
Q You have never been involved in the design of the PS-115 fuses, have you?
A No, nothing.
Q When you went to do testing at Axion, did you have to sign in?
A No.
Q Who did you deal with when you went out there?
A Generally, it was directly with Mr. Latifi. Occasionally it would be whoever he may have had there that was going to assist him.

but my questions will be fairly general. Is this the type of ramp-up that you are talking about?
A Yes.
Q And does this reflect a voltage of a PS-115?
A I assume that that is what you are representing. It could be anything, but it says, "Power Supply Test Voltage." It doesn't say "115," but yes.
Q All right. How would you determine, when the test was actually being conducted, whether it was a good data collection?
A We could only tell afterwards.
Q All right. And would you see the data collection after it was collected?
A Yes. We had a video representation that this (indicating) is the same thing as.
Q And you are pointing to Vartan Exhibit 3?
A Yes.
Q So there would be a video representation of that graph, essentially?
A That would show that, yes. And then that would be downloaded into a computer.
Q All right. And what would make it a "good



collection" rather than a "bad collection," or --
A The criteria Jerry would have to determine -- whether or not it made its requirements or not.
Q Mr. Latifi believed that he saw some notes you were taking when you were out there. I think you yourself testified that you had taken notes during the thing?
A Yes.
Q Did you take notes during the testing?
A Sometimes, yes.
Q Did you go over those notes on occasion with Mr. Latifi?
A No, not really.
Q Did you mark in your notes whether there was a good collection or a bad collection?
A I would have indicated in there that we had one or two that were successful and others that were not.
Q Would you have any indication in your notes of whether they were tests or no-tests?
A We are getting back to that test or no-test business. I do not know anything about a no-test. That was not in the criteria that I ever had at any



point.
Q I am going to show you some documents and ask you some questions about them. These, I believe, are documents that either you authored or you received. I am handing you what has been marked as Plaintiff's Exhibit 12 to this deposition. Is this an e-mail message that you sent to John Korab?
A It sure looks like it, yes.
Q And cc'ed Mr. Jerry Hahin?
A Yes.
Q And David King?
A Yes.
Q Looking here, it says -- and I believe you are referring to testing that was done at Axion -- "We had a total of approximately 14 good shots during the past three working days." Do you see that?
A Yes.
Q That would be consistent with the numbers that you indicated that you were able to shoot per day, wouldn't it?
A At the end, yes; not in the beginning.
Q All right. Look further down to -- it's hard to determine where the paragraphs begin and end, but



there is a paragraph that begins "AXION," and the next paragraph starts: "The majority of the failed items (failed to capture acceptable data) provide sufficient voltage after data collection failure to seem to indicate that the cell functioned correctly to requirements despite the inability to collect the data"?
A Yes.
Q And was that true at the time you sent this message?
A Absolutely.
Q All right. So even where there seemed to be a failure to collect the data, for example, the problem with the bird where a wire would become unattached or something, you found that the majority of those provided sufficient voltage to indicate the cell functioned correctly?
A The majority of the failed items that were up in here (indicating), yes.
Q All right.
A We hooked a meter external and measured voltage and found the voltage to be sufficient.
Q How did you do the -- rather, how did you

determine whether sufficient voltage was there?
A Measured it with a Fluke volt meter, external to the --
Q External to the bird?
A Yes. External to everything. It was just the cell sitting there and these two wires coming out -- put meter leads on either wire and read the voltage off the meter.
Q All right. So using Plaintiff's Exhibit 3 as an example, the two wires that are on the side of it --
A Yes.
Q -- you would put a voltage meter on that?
A Yes. One lead on one wire and the other lead on the other wire and then read the voltage off the meter.
Q So for the tests that are described in your e-mail message you did find that the majority of the ones where there was a failure to capture acceptable data did still have sufficient voltage to indicate the cell functioned correctly?
A Yes.
Q All right. Let me show you now what has been



marked as Plaintiff's Exhibit 13 to your deposition and ask you if you recognize this?
A Yes.
Q This is an e-mail that you sent one day after the last e-mail we looked at to Mr. Korab and Mr. Hahin and Mr. King; is that correct?
A Yes.
Q And that was September 6, 2002?
A Yes.
Q This would be toward the end of the testing that was done at Axion, would it not?
A As I understand it, the T for D was on the 9th of September, so yes, it would be.
Q Do you see in -- I guess perhaps it is the second full paragraph, that begins with "AXION" there, the second or third sentence, that begins "He has successfully completed testing --" do you see that sentence, sir?
A Yes.
Q It says, "He has successfully completed testing (recorded successful data) on at least 90 items --" Was that correct at the time that you e-mailed this to Mr. Korab and Mr. Hahin?



A As far as I was concerned, yes. That was what I had indicated.
Q All right. What do you mean by "90 items"? Do you mean 90 units of the PS-115?
A Yes.
Q And had you observed those 90 items being tested?
A Yes.
Q There is a "bottom line" statement down toward the conclusion of this message: "Bottom line is: I think the PS-115 and the testing apparatus have matured to the point that any number of shots can be made and the successful collection of reliable data can be accomplished at will." What did you mean by that, sir?
A Just what it says: Can shoot them and record the data.
Q And toward the end of that testing, you were getting -- the majority of the tests you were getting good data from?
A Yes.
Q Based on that statement, had you come to the conclusion that where a destructive test didn't



produce the 23 volts over 150 seconds, the most probable reason for the failure was that the air gun hadn't operated properly or there was some human error in the test?
A I didn't make any conclusion about it.
Q I am going to hand you another exhibit that is part of this huge deposition. I don't have another copy, so, again, I am going to have to look over your shoulder.
MR. RALEIGH: And, Doug, you can look on here. I'm sorry for that.
Q This is Exhibit No. 7 to Mr. Korab's deposition, and it appears to be -- it appears that you are the initiator, or originator, of this document; is that right?
A Yes.
Q All right. Would you read into the record the remarks that you have in this document.
A "Recommend approval. After having observed the procedures and testing over a period of months, contractor has achieved valid consistency in testing and successful test results. Further destructive testing is unlikely to produce any additional valid

Page 98

data. Contractor will be destructively testing a portion of every lot submitted which should fulfill any desired additional data testing requirements."
Q So isn't it true that with regard to this fact you had become convinced that enough PS-115s had been destructively tested to convince you that there was no further reason to continue this destructive testing?
A It was not my call.
Q That's your remarks there, though?
A No, I think those were Steve Thomas's remarks.
Q Do you know who prepared this document?
A I don't remember it at all.
Q What does it mean when it says that you were the initiator? I think I am reading that correctly.
A I am not real sure, but this has got a "Steve Thomas" that has signed this thing.
Q Do you know who that is?
A No. I never heard of him. I very well could have done that.
Q All right.
A But I don't recall it.

Page 99

Q Well, regardless of if you recall whether or not you typed that statement, wouldn't it be true that at the time you sent that e-mail message -- around September of 2002 -- that we looked at, toward the end of that testing that you participated in, that you had become convinced that enough PS-115s had been destructively tested to convince you that there was no further reason to continue the destructive testing?
A That wasn't my call. That was Jerry Halin's call.
Q Whether or not it was your call, was that your opinion and recommendation?
A It is my opinion that he could have met requirements, but it's not -- not a recommendation.
Q Were you surprised that the T for D occurred?
A It was there, and I -- I wasn't surprised or not surprised. It had been a long, drawn-out contract and had exceeded the normal Federal requirement of five years -- or whatever -- so it -- however they wanted to deal with it -- it was up to them. I wasn't surprised or not surprised. It was just a -- that's what they decided they had to do.

Page 100

Q You just testified that you believed they could have met the testing had it continued?
A Yes.
Q Given that, wasn't it in fact surprising to you that there was a Termination for Default?
A No. That is the contracting officer's call, not mine. What I did was supply him with whatever information I knew. And it's up to them -- they went around -- they had a whole lot of communication going between Axion and NAV Weapons Center in Indiana and NAV ICP that I was not privy to. There may have been other things there. That was not my call.
Q Do you know why the contract was terminated for default?
A No.
Q If you were told it was terminated for default because of failure to have the testing completed, would that surprise you?
A No.
Q It wouldn't surprise you given the fact that you believed that toward the end of that testing period they could have completed the tests?
A That was somebody else's determination, not mine. I gave them the best information I could.

Page 101

Q What was the last time that you remember observing the PS-115s produced by Axion?
A Before I went to school. It must have been the -- the week just before. Probably Wednesday, Thursday, or Friday of the week before.
Q I think you told us that you had observed some corrosion on some of the PS-115s?
A Yes.
Q Approximately how many units appeared to be corroded?
A There were a bundle of them. I couldn't tell you how many. I looked over the top of them -- they are -- what? -- several thousand in a gray tub. And I looked, and you could see on the tops of several of them where they were --
Q And there were a number of gray tubs, were there not?
A Oh, yes. There was a whole rack full of them. There must have been -- it seems to me like there were about a thousand in each, but -- and it would make about 10 tubs, 12 tubs that he had there, something like that.

Page 102

Q So there could have been 10,000 or more of these PS-115s --
A Oh, there were. He had over 10,000 of them made.
Q Is it your duty to do in-process inspection of production quantity?
A Yes.
Q And you did that here, in this contract?
A No. We never got to lot production.
Q You did not inspect production quantity?
A I inspected and -- the process that he utilized to make all of the 10,000-plus that he made, but there was no official lot production ever really done, because he never -- as far as I know, never completed the First Article.
Q Well, we have seen a document that seemed to indicate the First Article was approved --
A Well, I -- one of the things it said in here -- in this one particularly -- is that Axion said they were required to shoot 80 for First Article Testing, 20 hot, 20 cold, 20 room, 20 from drop testing. I told Alex that I have to stick to what the contract has in writing, and the last I knew 120

Page 103

was needed for First Article Testing. And that was -- again, there was communication going on around me that I wasn't privy to.
Q The exhibit that you just referred to, sir, what number is it?
A Exhibit 13.
Q All right. You saw 10,000 or more of these PS-115s?
A No doubt, yes.
Q Wasn't it obvious to you, based on that, that they were not just producing these for First Article testing?
A Well, obviously.
Q I mean, they only needed a few hundred for First Article Testing?
A That's right.
Q So they were into production of the actual PS-115s?
A He produced them.
Q Are you aware of any instance where Axion had not complied with the drawing requirements in producing the PS-115s?
A Only with the nickel plating aspect thing,

Page 104

but that was, again, Jerry Hahin and those folks up there that had to make those determinations.
Q And you didn't play any part in that?
A No.
Q And you don't know whether they approved the new nickel plating or not?
A I have no idea.
Q So you are not aware of any instance where Axion didn't comply with the drawing in producing the PS-115s; is that right?
A Yes.
Q That is correct, that you don't --
A That is correct.
Q Did you have the opportunity to do any inspection that would indicate one way or the other what the cause of the leaking acid was?
A No.
Q So you wouldn't have any information from your inspections that would suggest the leaking acid was caused by poor workmanship?
A No.
Q Have you ever spoken to anyone at the Army Research Laboratory about air guns?

Page 105

A No.
Q Was there ever any time that you felt the Navy was not cooperating with Axion and Mr. Latifi with regard to the air gun?
A No.
Q Did you ever feel there was a time that the Navy was not cooperating with Axion with regard to anything on this contract?
A No.
Q Do you know what shelf life the PS-115 was supposed to have?
A No.
Q Who is John Ellis?
A I have no idea.
Q Let me show you a document -- I don't, either, and I was trying to figure out who that might be. This will be Plaintiff's Exhibit 14.
(Marked Plaintiff's Exhibit No. 14.
Q This appears to be a message from Jerry Hahin to John Korab. And I say it appears to be, because it has "V/R" -- Very Respectfully -- Jerry Hahin," and his information at the bottom of the message, but up at the top of it, though, it says "From:

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AXION CORPORATION,
Plaintiff . NO. 03-2644C
vs. .
. JUDGE FIRESTONE
THE UNITED STATES, .
Defendants .

Deposition of: JOHN KORAB
Taken by: Plaintiff
Date: July 27, 2004, 10:00 a.m.
Before: Vicki L. Fox, RMR, Reporter-Notary
Place: Naval Inspection Depot
Mechanicsburg, Pennsylvania

APPEARANCES:
WILMER & LEE
BY: RICHARD J. R. RALEIGH, JR., ESQUIRE
JEROME S. GABIG, ESQUIRE
For - Plaintiff
UNITED STATES DEPARTMENT OF JUSTICE
BY: DOUGLAS K. MICKLE, ESQUIRE
RICHARD A. MARTINELLI, ESQUIRE
For - Defendant



INDEX

WITNESS

JOHN KORAB Examination
By Mr. Gabig 4

EXHIBITS

Korab Deposition Exhibit Numbers Introduced
1. Complaint in Axion Corporation v. The United States. 13
2. Contract No. N00104-96-C-KA09 Requests for Equitable Adjustments, 1-13. 14
3. Memo stamped 9/28/02, From Crane Division to Commanding Officer, Naval Ammunition Logistics Center. 82
4. 6/13/2000 letter, Latifi to Korab. —
5. Same as Exhibit 3. 96
6. 4/12/99 letter, Latifi to Korab. 104
7. DD Form 1998, dated 5/6/99 signed by Steve Thomas. 104
8. E-mail of 3/23/99, John Ellis to John Korab. 107
9. Ee-mail of 1/25/02, King to Stickrod. 116
10. Letter stamped 9/26/02, Crane Division to Commanding Officer, with attachments. 116
11. 9/5/02 e-mail, Henry Stickrod to John Korab. 121
12. 9/6/02 e-mail, Henry Stickrod to John Korab. 130
13. Handwritten notes of John Korab. 135



EXHIBITS

Korab Deposition Exhibits Introduced
14. 1/26/96 letter, John Korab to Alex Latifi. 20
15. Information and/or Action Form, 5/11/98 To Axion Corp. 64
16. 8/16/2000 letter, John Korab to Axion Corp. 65
17. 8/25/2000 letter, Alex Latifi to Mr. Korab. 66
18. 6/13/2000 letter, Alex Latifi to John Korab. 70
19. 8/27/01 letter, Alex Latifi to John Korab. 71
20. Information and/or Action Form, 6/14/00, to Axion Corporation. 71
21. Complaint in Axion Corporation v. The United States, No. 04-297C. 75
22. Defendant's Amended Answer to Consolidated Complaint. 75
23. Letter to Officer in Charge from Commander, Crane Division, Ref: Axion Corporation letter Dated 22 August, 2001. 85



STIPULATION

It is hereby stipulated by and between the respective parties that sealing, certification and filing are waived; and that all objections except as to the form of the question are reserved until the time of trial.

JOHN KORAB, called as a witness, being duly sworn, was examined and testified, as follows:

BY MR. GABIG:

Q: Mr. Korab, my name is Jerry Gabig. I have been retained by Mr. Latifi to represent him on the dispute he has with you on the termination of the contract for PS-115.
And as you know, I am going to be asking you a series of questions today. Before I start, I just have some preliminary matters to make sure we have an understanding here.
The first one is that you have just received an oath from the court reporter. You realize you are testifying today under the penalty of perjury?
A: Yes.
Q: Do you understand that your testimony is the same importance as if you were testifying in a court?
A: I do.
Q: And you will do your best to tell the truth; is that

DA 797

Q: The math on that would make it a 55 percent, the ratio of those at which data was successful and those that were unsuccessful?
A: Yes.
Q: The reason I asked you that is that our first FATs succeeds at a 38 percent ratio of those that were shot to those that had successful data. This time we have a better airgun. It is much faster, improved, and we get a ratio of 55 percent, and it fails.
Do you see my logic? The first time it succeeds, and the number that is shot, the ratio of success to failure is only 38 percent, but the failures are off, and it is a no test?
A: The first FAT was approved.
Q: Correct. The second FAT was not?
A: That's correct.
Q: It is not that they approved or not approved. It is what happened during the FAT. And in the first FAT, only 38 percent of those that were shot was the data any good. In the second FAT, 55 percent of the data is good, the airgun is getting better, but you fail us.
A: But the first FAT was approved.
Q: Correct. That established what should be the benchmark for what is approved and what is disapproved; correct?
A: Right. If that process that he followed for the first



FAT was followed, and he passed.
Q: If they followed the process that they did on the first FATs, and you had the same success ratio, would it be logical that the second FATs should also pass?
A: Failure was based on one unit failing.
Q: Is it your testimony that there wasn't one unit that failed in the first FATs?
A: Not to my recollection because we approved the first article.
Q: If I can prove to you this hypothetical that more than one unit failed in the first FATs, would you then say that you held Axion to an unreasonable standard in the second FATs?
A: As I said earlier, the engineering activity is the support unit for me to make my decision. If they said — in any case, whether it is this contract or any contract, if that lot where the first article or production is approved, I send out a letter saying the lot is approved.
Q: Let's go back to your statement. Every single one has to work; correct?
A: As far as I know.
Q: What work means is that what you really want is you want to take that PS-115 and put it into a real projectile the Navy is going to use and fire it, and it better



work; that is what you mean by it has to work, correct?
A: Yes.
Q: All right. Now if we take a unit and we put it in an airgun and because the airgun doesn't work properly, you get what in first FATs was called a no test, but in the second FATs is called a failure, but that unit in fact could have gone into a real Navy projectile and shot and worked, in that instance, is it a failure because the airgun failed versus what that unit can really perform?
A: If it could be proven that the airgun was malfunctioning or not operating properly, it is possible that the device that was to be tested could be good, could be approved.
Q: Okay. Just a few more questions. I am going to get you out on time. I promise.
A: Thank you. I appreciate it. Not me, but the rider.
Q: I want to go back to very early September, 2001 when the second FATs was happening. Do you recall this is happening there at the Axion facility?
Do you recall that on that day Mr. Stickrod couldn't available so his assistant was actually stepping in representing him?
A: I was not aware that that would occur.
Q: But you realize this is Mr. Chuck Vartan who is going to be deposed tomorrow; is that correct?



A: Yes, yes.
Q: Did you receive a voice mail from Mr. Chuck Vartan on that Friday, the 6th of September late in the afternoon?
A: I do not remember. I would have to say no, but I don't recall.
Q: But is it possible you received a voice mail?
A: Anything is possible.
Q: If he testifies he placed a voice mail to you and he said that they had fired a significant number of successful tests and he didn't see any need to go forward with it, he may have said that, and you just didn't hear it?
A: No. There was nothing on my voice mail.
Q: Could it have been from someone else, Mr. Latifi?
A: No, no.
Q: Nothing like that came to your attention?
A: No.
Q: That same afternoon later on in the afternoon — it was Friday so you might have left.
A: Excuse me. That is my day off.
Q: Friday is your day off?
A: Right.
Q: So you would know if you got back in on Monday whether there was a voice mail?
A: Well, I should know if there is a voice mail on it.

Page 141

Q: The following Monday. You don't get it on Friday?
A: No.
Q: Could there have been a voice mail from Mr. Stickrod's supervisor also relaying the same message?
A: What is his name?
Q: Steve. I don't recall the rest of it. We will find out tomorrow.
A: It is very highly unlikely.
Q: All right. The following Monday, did you get a phone call from anybody from Huntsville from Defense Contract Management and Command?
A: I can't remember.
Q: So it is a possibility that either Mr. Vartan or his supervisor called you on Monday to discuss what happened on Friday?
A: Well, it should have been on my voice mail. I don't recall. I would say no.
Q: Do you have any notes to this effect one way or another on a phone call?
A: No, because I wasn't aware of it.
Q: What about on September 9th, did you have a phone conversation with Mr. Latifi?
A: That is possible.
Q: And did Mr. Latifi explain to you what actually occurred on Friday?

Page 142

A: I can't recall the conversation.
Q: So Mr. Latifi, could it have been that he told you that they fired units to the point that Mr. Vartan decided that it was foolish to shoot any more or wasteful to shoot any more? Mr. Latifi could have told you that, and you don't remember?
A: No, I would remember something like that. He never told me that.
Q: Was there any discussion of the fact that enough was shot, and there wasn't any need to shoot any more?
A: No.
MR. GABIG: Can we take a moment to caucus among our people here?
A: Not too long. Go ahead. I still got twenty minutes or so.
(A five minute recess was taken.)

AFTER RECESS

MR. GABIG: That is all the questions.
MR. RALEIGH: We have a couple of agreements. We are going to substitute for Exhibit 21 and 22 another copy of the Complaint and the Defendants Amended Answer to the Consolidated Complaint.
And also, we have limited ourselves to discussions of accord and satisfaction and the issues that surround that today. We have some time left for a deposition.

Page 143

So if the Court ever broadens our ability to conduct discovery, then we may pick up with Mr. Korab on those issues.
Other than that, that is all we have today.
MR. MICKLE: We don't have any questions at this time.
(The deposition was concluded at 4:05 p.m.)

Page 144

COMMONWEALTH OF PENNSYLVANIA :
COUNTY OF CUMBERLAND :

I, Vicki L. Fox, Reporter and Notary Public in and for the Commonwealth of Pennsylvania and County of Cumberland, do hereby certify that the foregoing testimony was taken before me at the time and place hereinbefore set forth, and that it is the testimony of:

JOHN KORAB

I further certify that said witness was by me duly sworn to testify the whole and complete truth in said cause; that the testimony then given was reported by me stenographically, and subsequently transcribed under my direction and supervision; and that the foregoing is a full, true and correct transcript of my original shorthand notes.

I further certify that I am not counsel for nor related to any of the parties to the foregoing cause, nor employed by them or their attorneys, and am not interested in the subject matter or outcome thereof.

Dated at Camp Hill, Pennsylvania, this 6th day of August, 2004.

Vicki L. Fox
Reporter - Notary Public

(The foregoing certification does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)

DA 799

# Condensed Transcript of the Testimony of
# **Alex Latifi**

January 28, 2005

Axion Corporation v. The United States

Shoemaker & Associates
Phone: 256-881-8900
Fax: 256-882-2692
Email: i.shoemaker@mindspring.com

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AXION CORPORATION, )
)
Plaintiff, )
)
vs. ) NO. 63-2644C
)
THE UNITED STATES, ) Judge Firestone
)
Defendant. )

* * * * * * * * * *

DEPOSITION OF ALEX LATIFI

January 28, 2005
Huntsville, Alabama
9:15 a.m.

* * * * * * * * * *

A P P E A R A N C E S

For the Plaintiff: Mr. Richard Raleigh
Wilmer Lee
100 Washington Street
Huntsville, Alabama 35801
and
Mr. Jerome S. Gabig
Attorney at Law
515 Sparkman Drive
Huntsville, Alabama 35816

For the Defendant: Mr. Douglas K. Mickle
United States Department of Justice
1100 L Street N.W.
Room 4062
Washington, D.C. 20005
and
Mr. Rick Martinelli
Assistant Counsel for Naval Inventory Control Point
5450 Carlisle Pike, Bldg. 410
Mechanicsburg, PA 17055

start shipping the part.
Q Now, you said you had 90 good ones. Well, why in your September 9, 2002, letter did you say data was only collected from 74 units?
A Because some went with Mr. Hahin.
Q Well, why didn't you say in your letter, then, "74 good units are included in this report, and the other 16 units went with Mr. Hahin"?
A I thought he knows. But I talked to Mr. Korab Monday myself --
Q September the 9th?
A The date before -- after the Friday, whatever the date was. I talked to him, and I said, "Mr. Korab, we have done this here, and they are all happy, and everything is okay. Do you want me to shoot some more?" "Mr. Hahin said, '80 is good enough.'" "Do you want to shoot some more?" And he said, "That's adequate."
Q 80 was good enough?
A Yes.
Q But even by your September 9th report, you only submitted 74.
A We shoot 80.



Q Well, why did you only submit 74 good ones, then?
A You shoot 80, and you collect a percentage of the good -- if you want, you replace them as you need -- they didn't let -- they didn't let me proceed. They stopped Friday. Nobody came Monday for me to shoot some more -- if they want me to.
Q All right. Did you ask anybody to come?
A No. The Monday they said it was adequate, that it was good, they were happy.
Q Who said that?
A Mr. -- the Friday guy. He said --
Q Mr. Vartan?
A Vartan.
Q The Friday guy?
A Yes. That's why he called Mr. Korab.
Q Okay.
A And told him -- that's what stopped us. We could have proceeded. At that time we were doing pretty good. We have units over there -- we have around 25,000, 30,000 units sitting over there ready to be shipped. We don't care if we shoot 20 more, 30 more, 100 more. It doesn't make any difference



any more. All we want -- this is adequate, it is good -- perfect -- "Don't worry about it. Everything is okay." And we start packaging.
Q Why did you send the information in to Jerry Hahin for his review if you thought that everything was good to go and you had already been approved?
A These are the ones he didn't see -- oh, I have to submit a report no matter what. If they tell me, "Perfect," I am supposed to send the report.
Q All right.
A No matter -- you know, even though -- that report has to go. They ask me to send the papers -- plus he didn't take all of them with him -- that was left over.
Q What was your understanding regarding the authority that Mr. Stickrod and Mr. Vartan had in this contract?
A Mr. Stickrod is representative of the Government to my office. Whatever he tells me I do. When I want to sell something to the Government, I provide to him, and he looks at it, and he signs off, and I send it. He is the buyer.



Q Well, then, who is -- what authority does Mr. Korab have?
A Mr. Korab is the contract officer. He manages the contract. Henry manages the quality and procedures and tasks, and everything else.
Q You testified earlier that as president of Axion, you have been involved with between 100 and 200 Government contracts?
A Yes.
Q And in your involvement, have you ever known someone besides the contracting officer to have final authority on important decisions in the contract?
A The authority of accepting the product in the field is left to DCAS.
Q To DCAS. And that was in the contract?
A Yes.
Q Well, then, why did you submit them to Mr. Hahin all the time?
A They asked us to -- the contract officer asked us to submit it to Mr. Hahin.
Q Did you ever ask them, "Well, why do we have to submit it to Mr. Hahin when I have got Henry Stickrod and Charles Vartan right here?"