# The United States Court of Federal Claims

**No. 03-2644C & 04-297C**
**CONSOLIDATED**
**(Filed: January 25, 2007)**

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * | * | |
| | * | |
| **AXION CORPORATION,** | * | |
| | * | |
| **Plaintiff,** | * | **Termination for Default; Release;** |
| | * | **Unilateral Mistake; "Excuse" for** |
| **v.** | * | **Default; Duty to Cooperate; First** |
| | * | **Article Test.** |
| **THE UNITED STATES,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * | * | |

*Richard J. R. Raleigh, Jr.,* Huntsville, AL, for plaintiff. *Marcus Huff*, Huntsville, AL, of counsel.

*Douglas K. Mickle,* U.S. Department of Justice, Washington, DC, with whom were *Peter D. Kiesler, Assistant Attorney General* and Director *David M. Cohen* for defendant. *Richard Martinelli*, Naval Inventory Control Point, Mechanicsburg, PA, of counsel.

**OPINION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

**FIRESTONE**, *Judge*.

This matter comes before the court on the parties' cross-motions for summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). In this case, the plaintiff, Axion Corporation ("Axion"), has sued the United States ("government") challenging the termination for default of its $1,313,974.20 contract to provide PS-115 batteries ("batteries" or "units") for use in munitions. The

court denied the parties' earlier cross-motions for partial summary judgment and the government's partial motion to dismiss in its decision dated October 31, 2005. Axion v. United States, 68 Fed. Cl. 468 (2005). The court's prior decision dealt primarily with the government's contention that Axion's claims for compensation were barred by the general release[1] contained in three bilateral modifications.[2] Axion had argued that the releases should be reformed based on principles of "unilateral mistake." In its October 31, 2005 decision, the court held that it could not say, based on the limited record presented, whether the release contained in modifications signed by the parties was unenforceable due to unilateral mistake. 68 Fed. Cl. at 479.

Discovery in the case is now completed. Based on the evidence gathered, Axion moves for summary judgment to convert the termination of the contract for default into a termination for convenience. In addition, Axion claims compensation in the amount of

---

[1] The release contained in bilateral modifications P00017, P00019, and P00020 provided as follows:

> This modification constitutes a full and final disposition of all matters relating to this contract and is a full release and accord and satisfaction of any and all claims, demands, or causes of action that either the contractor or Government may have against the other arising out of or related to the contract to date.

Def.'s App. 159, 162, 163.

[2] The government's prior motion for partial summary judgment did not address Axion's counts X, XI and XII, which dealt with the termination for default. The government's present motion for summary judgment addresses these counts in addition to the remaining counts.

$3,747,298.[3] Axion contends that it is entitled to have the termination converted into one for convenience because the government allegedly breached the contract under various theories and therefore Axion's failure to meet the second First Article Test ("FAT") was "excused." Axion argues that the general releases should be reformed so as not to bar Axion's compensation claims, and that the releases, even if enforced, do not bar Axion's claim that the above-cited breaches "excuse" Axion's failures and require that the termination for default be converted to a termination for convenience.

The government, in response, renews its request for summary judgment. The government contends that the termination for default was justified and that Axion's "excuses" for failing to meet its contract obligations are either barred by the general releases or are unfounded. The government argues, with respect to the releases, that Axion cannot succeed on its theory of unilateral mistake because the uncontested evidence establishes that the contracting officer did not know and had no reason to know of an alleged unilateral mistake by Axion concerning the legal significance of the releases. The government further argues that the termination was justified and asks the court to uphold the government's decision to terminate Axion for default.

For the reasons stated below, the court holds that the release contained in the modifications signed by the parties bars all of Axion's claims for compensation related to

[3] Axion states that this amount is after the liquidation of partial payments that it owes to the government in the amount of $512,365. Thus, including the repayment of the progress payments, Axion is seeking a total of $4,259,663.

the air gun, the plating, and the leaking batteries. The court also holds that Axion's failure to meet the second FAT was not excused by any of the alleged breaches in connection with the air gun, plating, or leaking batteries. However, there are disputed issues of material fact as to whether Axion's failure to meet FAT may have been excused by the government's alleged breach of its duty to cooperate during the second FAT. Therefore, the government's motion for summary judgment is **GRANTED-IN-PART** and **DENIED-IN-PART** and Axion's motion for summary judgment is **DENIED**.

## BACKGROUND

Many of the background facts are included in the court's October 31, 2005 decision. 68 Fed. Cl. at 470-473. The court does not repeat all of these facts here. The following facts are undisputed unless otherwise noted. On December 14, 1995, the Naval Inventory Control Point ("Navy") and Axion entered into a fixed price contract for the delivery of batteries used in Navy munitions. The contract required delivery of 540 first articles within 90 days of contract award and then the delivery of 55,209 batteries (exclusive of first article samples, production lot samples, and option quantities) to be delivered in increments, starting with a first production lot due within in 90 days after approval of first article testing (or by the summer of 1996). The contract established a unit price of $23.80, and the total price, exclusive of option quantities, was $1,313,974.20.

Axion received numerous extensions of the first article delivery schedule. The

first three extensions (modifications P00002, P00004, and P00005) provided Axion with additional time to deliver FAT samples from the initial due date in March 1996 until May 15, 1997. One year after the May 1997 due date, in modification P00007, the government reduced the number of FAT samples from 540 to 360. Almost one year thereafter, on April 12, 1999, Axion delivered its first FAT report. Def.'s App. 187-188. The government approved FAT on May 17, 1999. Def.'s App. 189. As noted, Axion was required to deliver the first production units within 90 days. Axion, however, failed to deliver the production units within 90 days. The government, through numerous extensions, provided Axion with additional time to deliver the first lot of production units. Eventually the delivery date was extended from the initial August 1999 deadline until August 8, 2001 (modifications P00011, P00013, P00014, P00015, and P00016). Axion failed to meet the August 8, 2001 deadline. This led to modification P00017 in October 2001. Modification P00017 required a new first article test because of changes Axion had made after the first FAT had been approved. Modification P00017 required Axion to do testing on 120 samples because Axion had decided to do its own plating and because Axion told the Navy that some of its batteries were leaking. Axion was not able to meet the October 3, 2001 date set in P00017, which led to two additional modifications (P00019 and P00020). Modifications P00019 and P00020 reduced the number of required FAT samples from 120 to 80 and further extended the deadline for the second submission of FAT samples until September 9, 2002.

Axion completed its testing of the FAT samples on September 6, 2002, and submitted a second FAT report on September 9, 2002. In the report Axion submitted data on 74 batteries. The report indicated that 25 of the batteries did not meet FAT requirements. Under the contract, only eight batteries could fail FAT. After giving Axion an opportunity to respond to the Navy's concerns, the government terminated the contract for default on November 12, 2002, on the ground that Axion had failed to satisfy the contract's FAT requirements.

## I. Problem Areas Under the Contract

### A. The Air Gun

It is undisputed that Axion experienced difficulties manufacturing an air gun (which is also referred to as a "spin gun") to test the batteries. The contract required Axion to provide all testing equipment (or "acceptance inspection equipment"), Def.'s App. 109, although the contract did not specify the use of an air gun.

The Navy's contract solicitation referred to two previous contracts for batteries that had been awarded to Accudyne Corporation ("Accudyne").[4] Pl.'s App. 20. Before Axion submitted a proposal, Alex Latifi, the president, chief executive officer, and majority shareholder of Axion, traveled to Wisconsin to meet and discuss potential

---

[4] Before the Navy awarded the contract to Axion, the United States Army ("Army") had acquired batteries for the Navy. The Army acquired batteries from Accudyne. Axion contends that the government had also obtained batteries from Union Carbide; however, the government contends that Union Carbide worked on a battery with a different design than the design called for in Axion's contract.

employment with an individual who had been employed by Accudyne to produce the batteries for the Army. The former Accudyne employee informed Mr. Latifi that under the previous Army contracts the Army had provided Accudyne an air gun to perform the testing of the batteries. It is not disputed that the Army provided an air gun to Accudyne.

In August 1995, Andrew Sabonis and Jeff Swank from the Army Research Laboratory ("ARL") conducted a pre-award survey at Axion's facilities. According to documentation of the survey, "the testing requirements were discussed at length during the preaward survey." Def.'s App. 742. During the survey, Axion did not refer to having the government furnish an air gun. Axion stated that Wildwood Electronics would be used to test the power supply.[5] Based on the pre-award survey (which included discussions with Mr. Latifi, Axion personnel, and the subcontractor selected by Axion to perform the testing) the Navy expressed concern about Axion's ability to fulfill the testing requirements of the contract. Nonetheless, Axion was awarded the contract.[6]

---

[5] Axion contends that the proposed use of Wildwood Electronics to gather data did not preclude its need for the government to provide an air gun. Axion also contends it was clear to the government, as documented in the pre-survey report, that Wildwood Electronics "had no knowledge of the procedure to activate the power supply." Def.'s App. 742.

[6] The Navy initially concluded that Axion was not capable of producing the batteries due to a number of concerns, including concerns about Axion's ability to meet the testing requirements. Def.'s App. 743-747. In a letter to the Small Business Administration, dated October 3, 1995, Mr. A.L. Artz, a Navy contracting officer, stated that he had found Axion to be "non-responsible" and "urges that a Certificate of Competency be denied in this case." Def.'s App. 752. Specific to the testing requirements of the contract, the Navy contracting officer stated:

> The testing requirements were discussed at length during the survey. . . .Axion failed to understand the concept that the power supply had to be activated to be tested. The procedure was not understood or planned by the subcontractor to provide the testing.

Approximately one month after contract award, on January 17, 1996, Axion requested that the Navy provide it with an air gun, referring in its letter to an air gun having been provided to Accudyne under previous contracts. Def.'s App. 178. On January 26, 1996, the contracting officer denied Axion's request for an air gun. In his letter to Axion, the contracting officer stated, "The Navy did not supply any air guns to the previous contractor, Accudyne Corporation, for test purposes." Def.'s App. 179.

Thereafter, Axion contacted the ARL concerning the contract's testing requirements. ARL provided a cost estimate to test four Axion batteries. Axion did not send the batteries to ARL for testing. Axion contends that it did not send the batteries to ARL for testing because ARL would not have been able to test the batteries at a rate that would have allowed Axion to meet its contractual obligations. Axion and ARL then discussed the possibility of entering into an agreement in which ARL would lend Axion the ARL air gun, or provide a set of mechanical drawings to Axion. The agreement was

---

> Mr. George Norwood, President, Wildwood, was questioned regarding the testing requirements by the preaward survey team. . . . He had no knowledge of the procedure to activate the power supply, he had not included the procedure in his quote to Axion, and felt that the mechanical hardware to accomplish the procedure did not currently exist. . . . Axion has not demonstrated that it can destructively test and/or monitor the voltage produced by the power supply.

Def.'s App. 751.

In a letter dated November 9, 2005, the Small Business Administration stated that the Certificate of Competency Committee had "unanimously voted to recommend issuance of the [Certificate of Competency]." Def.'s App. 754. In terms of the testing requirements, the Small Business Administration stated in its letter: "Wildwood Electronics will perform the destructive testing and monitor the voltage produced by the power supply with Axion's equipment. Axion has the equipment in house to monitor and log data." Def.'s App. 755.

never carried out by the parties and ARL did not provide Axion with any drawings. The government contends that ARL decided not to enter into such an agreement because Axion failed to provide a satisfactory technical proposal.

Axion proceeded to build its own air gun. As Axion's quality assurance manager explained in a letter to the contracting officer, dated April 15, 1997, Axion expected its air gun to allow it to test batteries more quickly and more accurately than ARL's air gun:

> [The spin gun] should be complete within approximately 2 weeks. This will permit Axion to test from 50 to 60 units each day, for a total test time of 7 to 8 days maximum in lieu of the 4 units a day by Harry Diamond Lab.[7] This will enable Axion to produce the required units at least 100 days faster and far more accurately than Harry Diamond Labs. By Axion performing the tests, the data will be clean and accurate. . . . [O]ur method of data collection will be computerized and much more reliable and accurate, in lieu of the method Harry Diamond Lab uses.

Def.'s App. 185 (emphasis in original).

Axion used the air gun that it built to pass the first FAT on May 17, 1999. As discussed above, Axion was subsequently required to conduct a second FAT due to the change in the source of plating material. Axion continued using its air gun through the remainder of the contract, including the second FAT, but experienced some problems with the air gun.

In December 2001 and in 2002 the Navy offered to perform testing for Axion for a cost with testing equipment that it had acquired. Axion declined the Navy's offer to conduct testing. Axion contends that at the time the Navy made this offer, Axion had

---

[7] ARL's predecessor organization was Harry Diamond Laboratories. Def.'s App. 727.

already spent a substantial amount of time and money developing an air gun and it would have incurred additional costs if it had accepted the Navy's offer.

Axion contends that it did not learn until after the contract had been terminated for default that a report issued by the Army's Harry Diamond Laboratories, entitled, "High Speed Tabletop Simulator," dated September 1979, was available for purchase for a nominal fee from the National Technical Information Service ("NTIS"). Axion contends that the report would have assisted it in manufacturing the air gun. The government contends that the report in question did not involve air gun drawings.

Finally, the government asserts and Axion does not dispute that all of the expenses Axion allegedly incurred in designing and manufacturing an air gun were incurred before Axion signed contract modifications P00017, P00019, and P00020 which contained the general release.

**B. The Plating**

It is undisputed that Axion experienced difficulties with manufacturing plating for the batteries. The contract, while specifying the plating required for production of the batteries in Specification Control Drawing 19202-10974349, did not limit Axion's means by which plating could be acquired. One of the issues is the availability of plating at the time Axion entered into the contract. During the pre-award survey of Axion, it was noted that Axion planned to "purchase raw stock and bring in LDC Electroplating to plate the raw stock." Def.'s App. 752. Axion initially obtained plating from a vendor in Germany

and Axion passed the first FAT using this plating. Axion contends that this vendor was unable to provide sufficient quantities of plating to meet the contract requirements, at which point Axion was forced to make its own plating.

In addition, Specification Control Drawing 19202-10974349 listed two suggested sources of plating: Accudyne and Union Carbide. Pl.'s App. 218. The parties dispute whether these suggested sources were suppliers of plating at the time the contract was entered into. Axion argues that the government knew in 1993, three years prior to soliciting the contract, that neither Accudyne or Union Carbide were supplying plating. Axion cites a 1993 trip report by Mr. Sabonis, an ARL employee, who reported that during a pre-award survey of a small business that had been selected for a contract to produce batteries, he had informed the small business that Union Carbide "no longer had an electrode stock plater" and Accudyne was "not a supplier of any power supply components." Pl.'s App. 273-274.[8] The government asserts that Accudyne produced plating during the time of Axion's contract and that it does not know whether Accudyne or Union Carbide could have provided plating when the Axion contract was awarded in 1995.

Also at issue are whether the procedures for manufacturing the plating that were incorporated into the contract were a "specification" and whether the procedures were defective and had been superseded by updated versions. The contract incorporated

---

[8] In 1995, Mr. Sabonis was also a member of the pre-award survey team that examined Axion prior to the award of the contract.

NAVORD OD 18332, entitled: "Procedures for Preparing Lead: Lead Dioxide Reserve Energizer Electrode Stock by Electrodeposition." Axion contends that the contract called NAVORD OD 18332 a "specification." Pl.'s App. 23. The government disputes that NAVORD OD 18332 is a "specification" to the extent that the term means a document that includes mandatory procedures that limit the contractor's discretion. NAVORD OD 18332 describes its purpose as follows:

> 1. The purpose of this document is to describe known satisfactory procedures and equipment for the preparation, manufacture and quality control of reserve energizer lead: lead dioxide electrode stock in a continuous strip and batch sheet plating operation.
>
> 2. The detailed description of the technique and equipment is for the purpose of providing a working guide and is not intended as mandatory inflexible instructions precluding improvements based on sound investigations.

Pl.'s App. 561.

The version of NAVORD OD 18332 that was included in the technical data package accompanying the contract was dated September 1967. There are versions of NAVORD OD 18332 that are dated 1973 and 1980, Pl.'s App. 718 and 904, and these versions were not given to Axion. In letters dated April 22, 1996 and May 22, 1996, Axion requested that the Navy provide a 1980 revised version of NAVORD OD 18332. In a letter dated June 5, 2006, Mr. Korab wrote in response: "According to the Navy's records, the 'basic' revision, dated 2 February 1967, is the latest revision of NAVORD OD 18332. The Navy is not aware of any other revision." Pl.'s App. 224. The government contends that the unsigned 1973 and 1980 versions were internal Army

documents and did not formally revise the Navy's NAVORD OD 18332. In 2000, Axion informed the Navy that Axion was experiencing difficulty with plating and that its problems were caused by inaccurate and incomplete information in the 1967 document. Axion contends that the differences between the 1973 and 1980 versions and the 1967 version demonstrate that the 1967 version was defective. The government contends that the 1967 NAVORD OD 18332 was not defective and that other contractors have used the 1967 document to successfully produce plating.

Finally, at issue is the cost of creating a plating line. Axion contends that it spent $1,416,305 to manufacture a plating line. Axion contends that before it began to manufacture a plating line, the government knew that it would cost $1.5 million or more to do so. The government does not dispute that it knew that a plating line could cost more than $1 million, but contends that this cost would be for a plating line of the magnitude required by companies such as Accudyne and Everready, and that Axion's plating requirements could have been satisfied by a much less costly plating line. The government also asserts and Axion does not dispute that Axion incurred the expenses for its plating line prior to signing the bilateral modifications containing the general release.

**C. Leaking Batteries**

The contract required Axion to provide batteries that did not leak methylene bromide or fluoboric acid prior to use. It is not disputed that the government experienced problems with leaking batteries produced under prior contracts. Pl.'s App. 438-439, 533

(reports concerning leakage dated 1984 and 1985). The government contends, however, that the battery was redesigned in the 1980s to correct the leakage problem and that Axion's contract included the redesigned specifications. The government also contends that the Army has more than 400,000 batteries that were delivered by Accudyne between 1995 and 1998 using the same design as Axion's contract, with no known leakage.

The contract specification required the use of copper-beryllium blades. The contract specification required that the blades touch other copper parts of the batteries, including the copper housing of the methylene ampule. Fluoboric acid, when combined with methylene bromide, has a corrosive effect on copper. Both parties agree that the leakage of fluoboric acid, an electrolyte, can cause the degradation of the performance of the batteries, causing output voltage to decrease, and that decreased voltage could lead to battery test failures.

Axion relies on the expert report of Dr. James Baird, Pl.'s App. 338-377, to establish that the copper blades Axion was required to make touched other copper parts of the batteries which led to both corrosion and to the leakage of methylene bromide and fluoboric acid from the batteries. Dr. Baird concluded in his report that the government's specification was not capable of meeting the contract's twenty-year shelf life requirement. "Based upon the corrosion that I saw both in my laboratory and at the Axion plant, most assembled PS-115s would leak within five years of being stored. This loss of electrolyte, plus the build-up of corrosion products that I observed, would likely be sufficient to make

the PS-115 inoperative. Under these conditions the battery would be unlikely to produce the 23.0 V specified by [the contract]." Pl.'s App. 343.

The government disputes this conclusion and provides its own expert, Allan Goldberg, who states that Dr. Baird failed to consider the rate of the corrosion or the effect on corrosion occurring in the oxygen-depleted environment of a battery. Def.'s App. 722-726. The government further suggests that leakage could have been caused by improper welding, which would have allowed oxygen to enter the batteries.

It is not disputed that prior to signing modification P00017 on October 2, 2001, Axion wrote to the contracting officer on August 27, 2001, explaining its concerns with the Navy's battery design. In that letter Axion informed the Navy that some of its batteries were beginning to leak due to the "copper cans." Def.'s App. 194-195. Axion proposed a design change to address the issue of leaking acid. In response, the Navy disputed the need for a design change. Def.'s App. 196-197. The fact that some of Axion's batteries were leaking was one reason that the Navy decided to require a second FAT.

## II. The Modifications to the Contract and the Release Language

As discussed above, Axion and the Navy entered into numerous bilateral modifications to extend the contract's delivery schedule for the first FAT and for the first lot production units. Prior to modification P00017, none of these modifications contained any release language. On August 13, 2001, the contracting officer, Mr. Korab, sent

Axion a letter regarding Axion's failure to make delivery of the first lot production units on August 8, 2001, as required in modification P00016. The letter informed Axion that the government was considering terminating the contract for default. Def.'s App. 364 ("Since you have failed to perform the subject contract within the time required . . . the government is considering terminating said contract pursuant to . . . FAR 52.259-8 entitled "DEFAULT").

In response, Axion provided the government with an explanation for its delay. Letter from Mr. Latifi to Mr. Korab, August 27, 2001, Def.'s App. 194-197. In Axion's letter, Mr. Latifi indicated he believed Axion had improved the product by developing the air gun and changing the plating for the batteries. In this letter, as noted above, Mr. Latifi also revealed that there was a problem with storing the acid in copper cans and that this could lead to the batteries leaking acid. In response to Axion's letter, the government debated whether to terminate the contract for default or to terminate the contract for convenience of both parties. Def.'s App. 198.

Before the execution of modification P00017, the government discussed the possibility of a no-cost termination settlement with Axion. Axion rejected the no-cost settlement because, under such an arrangement, Axion would not have been entitled to collect the $1.3 million available under the contract. In his declaration, Mr. Latifi explained:

> The suggestion of a no-cost termination greatly troubled me. It would mean that Axion would not be recognized as a manufacturer of PS-115s for future

> contracts when other DOD procurement activities would be seeking to replace the defective PS-115s in the existing inventory. Stated differently, I feared that a no-cost termination for convenience would mean that I would lose the millions of dollars that Axion had spent trying to develop (not to be mistaken for "produce") PS-115s. . . . I strongly emphasized how important it was to Axion to continue the contract. Although in other conversations with Mr. Korab I had alluded to Axion spending vastly more to perform the contract than Axion proposed, in this instance I candidly told Mr. Korab that I had spent millions of dollars of my own money from my retirement account. I emphasized that Axion dearly wanted to complete the contract. Knowing that Mr. Korab had broad discretion whether to issue a termination for convenience, I emphasized that "no-cost" was unacceptable in hope of dissuad[ing] him from terminating the contract for convenience.

Latifi Decl., Pl.'s App. 1285-1286.

Following the discussions on the no-cost termination, the government decided to give Axion additional time and to require Axion to submit a second FAT. Hahin Decl., Def.'s App. 350. This decision is reflected in bilateral modification P00017, which was entered into on October 2, 2001. It is not disputed that there were no specific discussions regarding the substance of P00017 between Axion and the government. As noted, modification P00017 provided Axion with relief from the delivery schedule, but required Axion to resubmit FAT samples the following day. Modification P00017 provided as follows:

> The delivery schedule for the re-submission of 120 ea. First Article Samples is established as follows: 01 October 03.[9] Page 2 of this modification incorporates the First Article Testing requirements

Def.'s App. 159. Modification P00017 also contained the following language containing

---

[9] As explained in the court's earlier decision, this modification meant that Axion had until October 3, 2001, to re-submit his first articles for testing. 68 Fed. Cl. at 472, n. 2.

the general release that is at issue here:

> This modification constitutes a full and final disposition of all matters relating to this contract and is a full release and accord and satisfaction of any and all claims, demands, or causes of action that either the contractor or the government may have against the other arising out of or related to the contract to date.

Def.'s App. 159.

Axion did not deliver the FAT samples on October 3, 2001, in accordance with modification P00017. Thereafter, on November 1, 2001, the contracting officer sent a letter to Axion in which he indicated that, because Axion had missed the FAT date, the government was considering terminating the contract for default. Def.'s App. 199. Rather than terminate the contract, the government once again extended the contract. On April 4, 2002, Axion and the Navy entered into bilateral modification P00019 which established a date of April 23, 2002 for FAT. Modification P00019 also included the same release language as in modification P00017.

Axion did not meet the schedule set in modification P00019. On April 30, 2002, the contracting officer sent a letter to Axion stating, "This situation is most serious in that Axion has not been able to test the PS-115 Power Supply successfully due to the malfunctioning test equipment for the past 4-6 months. The Navy does not have confidence in Axion's ability to produce the PS-115 Supply without a First Article Test." Def.'s App. 201.

Once again, however, the government decided to give Axion more time to comply.

On July 11, 2002, Axion and the Navy agreed to bilateral modification P00020. This modification established a final delivery date for the second FAT report. The modification stated, "the delivery date for the First Article Test Report is established as: September 09, 2002." Def.'s App. 163. The modification also provided for the same general release that was included in modifications P00017 and P00019. It is not disputed that Axion did not preserve any claims in any of the releases provided for in modifications P00017, P00019 or P00020.

## III. The Second FAT, "No Tests," and the Termination for Default

Based on the schedule agreed to in modification P00020, Axion was required to submit a second FAT report to the Navy by September 9, 2002. Axion was required to submit 80 FAT samples.[10] Axion submitted the results from the second FAT to the Navy on Monday, September 9, 2002. It is not disputed that the floppy disks submitted by Axion, as its report, addressed FAT testing on fewer than 80 samples. Axion submitted data on 74 units.

Axion contends that the government's quality assurance representative ("QAR"), Charles Vartan, told Mr. Latifi on Friday, September 6, 2002, that Axion had tested

[10] The government contends that 80 FAT samples were required; however, Axion contends that it was not clear how many FAT samples were required. Pl.'s Resp. To Def.'s Proposed Findings of Uncontroverted Fact. ¶ 40. Axion points out that modification P00017 states that 120 samples were to be delivered, while modification P00019 refers to 80 samples. Based on the plain language of the modifications, the court concludes that 80 samples, which is the number called for the in the later modification, is the number of samples required for the second FAT.

enough batteries.[11] Axion contends that Mr. Vartan told Mr. Latifi that he would return that following Monday if more batteries needed to be tested, but that Mr. Vartan did not return. Axion also contends that when Mr. Latifi spoke with Mr. Korab on September 9, 2002, Mr. Korab agreed that submitting a report with data on "around 80 units" was sufficient. The government denies Axion's contention that Mr. Korab told Mr. Latifi that Axion had shot enough batteries. Korab Depo., Def.'s App. 799.

Axion's submission on September 9, 2002 did not include an explanation of its testing procedures as required by the contract's Data Item Description, DI-NDTI-80809A. Axion contends that its first FAT report, likewise did not contain all of the information required under the aforementioned Data Item Description, but was nonetheless approved by the Navy.

The information provided in Axion's September 9, 2002 submission indicated that 25 FAT samples did not satisfy the contract requirements. According to the government, the contract required proof of no more than seven failures and stated that FAT would be rejected with eight or more failures. Def.'s App. 350-351. Axion contends that many of the 25 failures identified in the report were in fact "no tests" due to problems with the air gun. Axion contends that the "no tests" should not be deemed "failures." Axion relies on

---

[11] Henry Stickrod was the government QAR who observed Axion's testing prior to September 6, 2002. According to Mr. Stickrod's declaration, he observed testing at Axion's facilities on August 1, 2, 7, 12, 13, 19, 21, 27, 28, 29, and September 3 and 4, 2002, and that, due to his absence to attend training, Mr. Vartan had been assigned to observe testing after September 4, 2002. Def.'s App. 361.

the testimony of Mr. Stickrod, a government quality assurance representative, who stated that there were "lots" of "no tests" due to a malfunction of the air gun or human error. Pl.'s App. 1206. Axion contends that Accudyne and Everready likewise experienced "no tests" due to problems with test equipment, but that they were able to substitute a new battery for their "no tests." Pl.'s App. 280, 430-433, 434. It is not disputed that Axion did not substitute a new battery for "no tests" during the second FAT. Rather, Axion contends that it stopped testing batteries when the government's quality assurance representative told Mr. Latifi that Axion had tested enough.

The contract's FAT clause provided that disapproval of FAT shall be deemed a failure to make delivery within the meaning of the contract's default clause. The contract's default clause provided that the government could terminate a contract for default for failure to deliver in accordance with the contract. The contract's FAT clause provided that the contracting officer was the official responsible for approving or disapproving FAT. The contract's FAT clause provided that the contracting officer's approval or disapproval of FAT would be in writing.

> FIRST ARTICLE APPROVAL-CONTRACTOR TESTING (SEP 1989)
>
> ***
>
> (b) The Contractor shall submit the first article test report . . . . Within 30 days after the Government receives the test report, the Contracting Officer shall notify the Contractor in writing, of the conditional approval, approval, or disapproval of the first article.
>
> ***
>
> (d) If the Contractor fails to deliver any first article report on time, or the Contracting Officer disapproves any first article, the Contractor shall be

> deemed to have failed to make delivery within the meaning of the Default clause of the contract.

Def.'s App. 62.

The contract included the following clause regarding authorized changes to the contract:

> 5252.9400 AUTHORIZED CHANGES ONLY BY THE CONTRACTING OFFICER (JAN 1992)
>
> (a) Except as specified in paragraph (b) below, no order, statement, or conduct of Government personnel who visit the Contractor's facilities or in any other manner communicates with Contractor personnel during the performance of this contract shall constitute a change under the "Changes" clause of this contract.
>
> (b) The Contractor shall not comply with any order, direction or request of Government personnel unless it is issued in writing and signed by the Contracting Officer, or is pursuant to specific authority otherwise included as part of this contract.
>
> (c) The Contracting Officer is the only person authorized to approve changes in any of the requirements of this contract and notwithstanding provisions contained elsewhere in this contract, the said authority remains solely with the Contracting Officer. In the event the Contractor effects any changes at the direction of any person other than the Contracting Officer, the change will be considered to have been made without authority and no adjustments will be made in contract price to cover any increase in charges incurred as a result thereof.

Def.'s App. 11.

The contract also included the following clause regarding inspection and acceptance:

> INSPECTION AND ACCEPTANCE

> Production Quality Assurance of all items to be furnished hereunder shall be made by the cognizant Government Inspector at the contractor's or subcontractor's plant.
>
> NOTE:
>
> Acceptance or rejection shall be accomplished by the cognizant GQAR based upon his own inspection(s) and the results of the First Articles . . . from the testing activity to the GQAR via Procurement Contracting Officer (PCO).

Def.'s App. 43.

On October 1, 2002, the contracting officer sent a letter to Axion indicating that Axion's September 9, 2002 FAT submission did not satisfy the contract in that 25 of the batteries tested failed to meet the performance requirements of the contract. Def.'s App. 203. The letter also stated that Axion had failed to provide required information about test procedure, test equipment, or data analysis that pertains to the performance requirements. Def.'s App. 203. On the same date, the contracting officer sent a second letter to Axion disapproving Axion's second FAT. The letter indicated that the government was considering terminating the contract for default. Def.'s App. 204.

Axion sent a letter in response, on October 11, 2002, in which it stated that it believed it had met the requirements of the contract. Def.'s App. 205-207. Axion explained that there was an error in the data it had submitted to the government and that it had, in fact, collected good data on 74 batteries of the 127 batteries it had tested. Axion explained that it did not perform more tests because it believed that the government representative who was present at the testing was satisfied with Axion's results. Axion

offered to test more batteries. "We believe we performed as required. Should you want us to shoot more units, we would be glad to shoot with one day's notice." Def.'s App. 207A. Axion also stated that Mr. Latifi had "invested all of my retirement funds in this project" and offered to accept a termination of the contract in return for some compensation. Def.'s App. 207A. "If the government no longer requires these items, I am willing to sit with you and find a resolution by possibly accepting the cancellation of this contract with Axion Corporation receiving a small amount of funds to compensate for all the investments we have made or the government helping us to proceed and finish the project." Def.'s App. 207A.

The government terminated the contract for default on November 12, 2002, in modification P00021. In its decision, the government stated:

> The Navy examined Axion's FATR [FAT Report] and disapproved the First Article for failure to meet the requirements of Contract Data Requirements list A004 and the lack of information that would pertain to test procedures, test equipment, or data analysis that is relevant to the performance requirements. Furthermore, a total of 25 out of 66 First Article Power Supplies failed to meet the performance requirements of drawing 11744726. The Navy's letter of October 1, 2002 advised Axion of its First Article disapproval. A Show Cause letter of October 1, 2002 was sent to inform Axion that the Navy was considering terminating the contract for default for failure to make delivery unless facts were presented, in writing, indicating that failure to perform was due to causes beyond Axion's control and without fault or negligence on Axion's part. Axion's letter of October 11, 2002 does not provide an adequate excuse for Axion's failure of the First Article thereby failing to meet the September 09, 2002 delivery schedule.

Def.'s App. 165.

## DISCUSSION

### I. Standard of Review

The parties have filed cross-motions for summary judgment on the complaint under RCFC 56. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). A fact is material if it would affect the outcome of the suit. Id. at 248. Doubts as to factual issues must be resolved in favor of the non-moving party. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Liberty Lobby, 477 U.S. at 248. In order to defeat summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." RCFC 56(e); Celotex, 477 U.S. at 324.

Cross-motions for summary judgment are not an admission that no material facts remain at issue. See Massey v. Del Labs., Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997) (citations omitted). "Each party carries the burden on its own motion to show entitlement to judgment as a matter of law after demonstrating the absence of any genuine disputes

over material facts." Id.

## II. The Government's Motion For Summary Judgment

### A. Axion's Compensation Claims Associated With the Air Gun, Plating, and Leaking in Counts I - IX and XIII - XXIX Are Barred by the Release Contained in the Modifications Signed by the Parties.

In its current motion, the government contends that all of Axion's claims related to the air gun, the plating, and the leaking batteries (counts I-IX and XIII-XXIX) are barred by the following release contained in the modifications signed by the parties on October 2, 2001, April 4, 2002, and July 11, 2002:

> This modification constitutes a full and final disposition of all matters relating to this contract and is a full release and accord and satisfaction of any and all claims, demands, or causes of action that either the contractor or the government may have against the other arising out of or related to the contract to date.

Axion contends that Mr. Latifi did not understand the scope of the release and did not intend to relinquish Axion's claims in connection with the work identified in counts I through IX, and XIII through XXIX. Axion argues that the releases should be reformed to reflect Mr. Latifi's understanding. Axion argues that this result is compelled by Mr. Latifi's "unilateral mistake." Axion argues that the government should have known that Mr. Latifi did not intend to relinquish the subject claims, based on (1) Mr. Latifi's limited knowledge of the English language; (2) Mr. Latifi's statements regarding the money he had spent to comply with the contract; and (3) Mr. Latifi's earlier rejection of a no-cost termination.

The court held in its previous decision that the record was not sufficient to grant or deny summary judgment to the government regarding the scope of the subject releases because of Axion's alleged unilateral mistake. 68 Fed. Cl. at 479. Additional discovery was conducted and in its renewed motion for summary judgment, the government has submitted the supplemental declaration of the contracting officer, John Korab. Def.'s App. 732-735.

Mr. Korab states in his supplemental declaration that he (1) did not know that Mr. Latifi did not intend to release the government for all of Axion's claims when Mr. Latifi entered into the subject modifications; and (2) had no reason to know that Mr. Latifi did not understand the scope of the releases when he signed the modifications. To the contrary, Mr. Korab states that he believed that Mr. Latifi understood that without the modifications, which included the releases, Axion would not be allowed to complete the contract and would lose the opportunity to obtain the full $1.3 million available under the contract. According to Mr. Korab, Mr. Latifi had a "strong grasp of the English language" and must have understood the words of the release because in the past, "Mr. Latifi displayed a great attention to detail . . . and on numerous occasions he brought his questions and concerns to my attention." Def.'s App. 733. It is not disputed that Mr. Latifi did not ask any questions about the nature or scope of the releases. Mr. Korab also states that he did not consider Mr. Latifi's refusal to accept a no-cost termination of the contract as an indication of Mr. Latifi's unwillingness to accept the terms of the

modifications and the releases. Rather, Mr. Korab states that he believed that Axion wanted the chance to finish the contract and collect the amount remaining on the contract. "From my perspective, it was entirely reasonable for Mr. Latifi to agree to the release language as the modifications not only gave Axion another chance to earn over $1.3 Million but also removed Axion from delinquent delivery status and the risk of a termination for default." Def.'s App. 734. Mr. Korab explains that he did not have any idea how much money had been spent by Axion. "Axion never provided me with specifics on how much it had spent on the contract." Def.'s App. 734. Finally, Mr. Korab states that he believed, when each of the modifications were executed, that "Axion had a reasonable chance at successfully completing the contract and earning more than $1.3 million. This was not a situation where I accepted Axion's release of claims all the while believing that Axion had no chance to succeed." Id.

Axion has not submitted any evidence to rebut Mr. Korab's declaration. Rather, Axion stands on the initial declaration submitted by Mr. Latifi in the first phase of this litigation.[12] Axion has not identified any objective evidence that would place Mr. Korab's statements in doubt.

It is well-settled that "the execution by a contractor of a release which is complete on its face reflects the contractor's unqualified acceptance and agreement with its terms

[12] Had Mr. Latifi disagreed with anything Mr. Korab said, Mr. Latifi was free to challenge Mr. Korab's statements in a supplemental declaration prior to filing Axion's response to the government's renewed motion for summary judgment. Under RCFC 56(e), if a party does not challenge statements with evidence of its own, summary judgment is appropriate.

and is binding on both parties." C & H Commercial Contractors, Inc. v. United States, 35 Fed. Cl. 246, 252 (1996) (quoting Clark Mech. Contractors, Inc. v. United States, 5 Cl. Ct. 84, 86 (1984)). The court may only void or reform a release for a unilateral mistake if the government knew or should have known of the mistake. Burnett Elecs. Lab., Inc. v. United States, 479 F.2d 1329, 1333 (Ct. Cl. 1973) ("The remedy [of reformation] has been extended from its traditional area of application – mutual mistake by the parties – to include cases where the Government knew or should have known of a mistake in a bid costly to the bidder."). Where there is a mistake as to the legal significance of a release, such as here, "the parties to a contract generally are charged with knowledge of the law affecting their business dealings . . . Consequently, courts have expressed reluctance to reform a contract on the basis of mistake . . . involving issues of law unless unusual circumstances are present." T.L. Roof & Associates Constr. Co. v. United States, 28 Fed. Cl. 572, 577 (1993) (citations omitted).

Mr. Korab's supplemental declaration establishes that Mr. Korab did not know that Mr. Latifi had not agreed to the terms of the releases. In addition, Mr. Korab's declaration establishes that the government had no reason to know of Mr. Latifi's understanding regarding the releases. In his supplemental declaration, Mr. Korab has provided an undisputed and cogent explanation for each of Mr. Latifi's claims. Mr. Korab states that Mr. Latifi had a "strong grasp of English" and attached correspondence which demonstrated that Mr. Latifi was able to easily conduct government business. In this

connection, it is undisputed that Mr. Latifi would ask questions if he did not understand issues and that Mr. Latifi did not ask any questions regarding the release provisions. Mr. Korab also states that Mr. Latifi's decision to reject the government's offer of a no-cost termination for convenience did not put the government on notice of Mr. Latifi's understanding of the scope of the release. It is not disputed that a no-cost termination would have deprived Axion of any payment, whereas the subject modifications provided Axion with the opportunity to finish the contract and collect $1.3 million. Indeed, Mr. Latifi stated that when the possibility of a no-cost termination was discussed he had told Mr. Korab that "Axion dearly wanted to complete the contract." Pl.'s App. 1286. Moreover, it is not disputed that the government did not know with any specificity how much Mr. Latifi had spent on the contract. Axion never submitted any claim to the government. For example, although Axion stated that it had spent an "outrageous amount of money and manpower" on the plating line, Axion indicated that it had done so at least in part because Axion wanted to obtain contracts with the government in the future. Def.'s App. 757 ( "Axion has invested a great deal of time and money, way beyond the contract to be able to manufacture the item, in hope to provide this item in the future for the US government.").

Given the uncontested statements of Mr. Korab in his supplemental declaration, the court agrees with the government that it is now entitled to summary judgment on the release issue. By failing to refute Mr. Korab's contentions that the government did not

know or had no reason to know of Axion's understanding of the release, Axion failed to meet its burden of creating a genuine issue of material fact that would preclude summary judgment on the issue. It is not enough for Axion to rely on Mr. Latifi's beliefs, as set forth in his earlier affidavit, to defeat summary judgment. In order to obtain reformation of a release based on "unilateral mistake" the party seeking reformation must show that the other party either knew or objectively should have known based on the facts and circumstances surrounding the transaction that there had not been a meeting of the minds. Burnett Elecs. Lab, 479 F.2d at 1333; Conner Bros. Constr. Co. v. United States, 65 Fed. Cl. 657, 691 (2005). Here, Mr. Latifi has not identified any objective evidence which would put Mr. Korab's understanding of the modifications, including the releases, into doubt. Indeed, in cases where courts have held that a contractor's claims were not barred by a release, there was objective evidence that the government continued to negotiate the claims after the release was signed, see, e.g., Community Heating & Plumbing Co., Inc. v. Kelso, II, 987 F.2d 1575 (Fed. Cir. 1993), or that the government misrepresented to the contractor the scope of the release in order to induce the contractor to sign it, see, e.g., C & H Commercial Contractors, Inc. v. United States, 35 Fed. Cl. 246 (1996). There is no evidence of such actions on the part of the government here.

Based on the uncontested facts, the government is entitled to enforcement of the general releases contained within bilateral modifications P00017, P00019, and P00020. Absent any evidence of a discussion between Axion and the contracting officer regarding

preservation of its then existing claims associated with the air gun, plating, and batteries leaking, the contracting officer could not have known of Axion's intent to exclude those claims from the scope of the releases that were signed as part of modifications P00017, P00019, and P00020.[13]

Therefore, the government is entitled to summary judgment for Axion's claims for compensation related to the air gun, the plating, and the leaking (counts I through IX, and XIII through XXIX).[14] Axion's claims for compensation under these counts are barred.

### B. The Termination For Default Was Justified.

#### 1. Axion Failed to Pass the Second FAT (Count X).

Axion alleges in count X that it substantially complied with the contract's FAT requirements and that the government's termination of the contract for default was therefore unjustified. Specifically, Axion contends that its failure to provide information about the testing procedures were "information defects" that were not a valid basis to reject FAT. Axion also contends that the 25 failures of batteries tested were due to problems with its air gun and that the next 31 successful tests of the batteries demonstrated that the batteries met the contract specifications.

---

[13] Indeed, Axion's request for "a small amount of funds," in its October 11, 2002 letter to Mr. Korab, Def.'s App. 207A, indicates that Axion did not believe that it was entitled to recover millions of dollars.

[14] To the extent that Axion alleges in count XVI that the contracting officer's termination of the contract for default was an abuse of discretion (apart from the claims waived by the release), as discussed under count X, the court holds that the termination for default was not an abuse of discretion.

The government contends that it is entitled to summary judgment on count X on the ground that the Navy's rejection of the FAT report and subsequent termination for default were warranted. The government argues that Axion was required to deliver a FAT report by September 9, 2002 that complied with specific contract requirements regarding the number of FAT samples tested, a description of testing procedures, and the test results. The government contends that the FAT report Axion submitted on September 9, 2002 did not comply with these contract requirements. Specifically, the government contends that the FAT report submitted by Axion on September 9, 2002 (1) did not address the testing of 80 units (data on the testing of only 74 or fewer units was included); and (2) did not include a complete description of the procedures used in conducting the FAT, including a description of the sequence of testing steps and any conditions imposed, as required by the contract.[15] In addition, the government contends that an unacceptable number of the batteries tested failed. The government argues that, according to the contract requirements, a maximum of seven units could fail among the 80 samples required for FAT, whereas Axion's FAT report included 25 failures.

Because Axion's FAT report did not comply with these contract requirements, the government contends that the contracting officer was justified in disapproving the second

[15] The government contends that Axion's October 11, 2002 response to the Navy's show cause letter also did not meet the contract requirements. Specifically, the government contends that Axion's response, while identifying units that were exposed to hot, cold or ambient temperatures, did not address whether the units underwent Extreme Temperature Storage or 7-Foot Drop.

FAT. The government contends that, because the contract provided that disapproval of FAT by the contracting officer shall constitute a failure to deliver within the meaning of the termination for default clause, the termination for default of Axion's contract was also justified.

In response, Axion does not dispute that its second FAT report did not contain all the information purportedly required under the contract. However, Axion argues that the parties established different standards and procedures during the first FAT that are binding on the government. Specifically, Axion contends that, on April 12, 1999, Axion sent Mr. Korab a letter submitting the data collected pursuant to the FAT ("first letter"). Axion contends that the first letter did not contain the detailed description of testing procedures and testing steps that the government now argues were necessary. Axion contends that its first FAT was approved based on information provided by Axion that was nearly identical to that provided for the second FAT.[16]

With regard to the number of batteries tested, Axion concedes that it submitted data on 74 batteries in the September 9, 2002 letter. But Axion argues this number was adequate because the contracting officer told Axion it had done enough testing after Axion represented that it had tested around 80 batteries.

As for the number of failures, Axion contends that, for the first FAT, only 221

[16] The government argues that Axion's waiver argument based on the course of dealing between Axion and the Navy for the first FAT fails because (1) a party does not have the ability to enforce an express contract requirement through its conduct on a single occasion under a single contract; and (2) the circumstances surrounding the first and second FATs were different.

successful test results were observed out of a total of 581 tests, yet the government approved Axion's first FAT based on the recommendations of the QAR, Mr. Stickrod. Similarly for the second FAT, Axion argues that it tested 127 units, but only successfully collected data from 74 of the tests. Axion also argues that, an email dated September 6, 2002 from Mr. Stickrod, who had observed the testing, to Mr. Korab, indicates that the problems were due to human error rather than because the units were defective:

> Axion has successfully completed testing (recorded successful data) on at least 90 items . . . At this point the testing system functions very well – Axion can shoot and record, optimally, 4 per hour; human error has caused every non-acceptable data collection problem that has been encountered over the past couple of weeks . . . Bottom line is: I think that the PS115 and the testing apparatus have matured to the point that any number of shots can be made and the successful collection of reliable data can be accomplished at will.

Def.'s App. 329. Axion contends that, based on Mr. Stickrod's representations to Mr. Korab, all instances of non-successful data found in Axion's report should have been counted as "no tests" just as they allegedly were for the first FAT, rather than as "failures."

Axion's efforts to defeat the government's motion for summary judgment on count X must be rejected. Regardless of whether Axion had a legitimate excuse for failing FAT (see discussion that follows related to count XII), the government was justified in concluding that Axion had not met the requirements for FAT set forth in the contract. First, Axion did not submit the requisite information. It is not disputed that Axion did not submit a complete report with information about testing procedures as required by the contract. Second, Axion did not submit data on an adequate number of batteries. Axion

was required to submit results on 80 tests and submitted results on 74. Pl.'s Reply 10. While Axion claims that this number was approved by the contracting officer, it is not disputed that Axion did not submit data on 80 batteries. Finally, Axion's failure rate was too high to pass FAT. The undisputed evidence established that 25 of the 74 batteries failed to meet the test criteria.[17]

Moreover, Axion's arguments as to why the government should have accepted the second FAT are not supported. Axion's reliance on the government's acceptance of the submissions Axion provided in connection with the first FAT to argue that it should have passed the second FAT is misplaced. There is no question but that the second FAT was conducted under different circumstances from the first FAT. The second FAT was required because of specific concerns raised by Axion's failure to produce the batteries approved in the first FAT. Axion had passed FAT in May 1999 and did not submit the second FAT report until September 2002, more than six years after the batteries were to have been delivered under the original contract. The government correctly states that Axion cannot reasonably rely on a course of conduct based on one prior acceptance under circumstances that were different. See L.P. Consulting Group, Inc. v. United States, 66 Fed. Cl. 238, 241 (2005) ("Such waivers have been found where, over the course of a

[17] With regard to the high failure rate, Axion contends that the government should not have considered "no tests" to be "failures," because in other cases the government allowed contractors to substitute batteries, when there was a "no test" result. While this may be true, Axion has failed to establish that Axion offered to substitute batteries when there was a "no test" result prior to September 9, 2002. Instead, the evidence shows that Axion decided to submit a report without a sufficient number of successful tests to pass FAT.

great number of prior similar contracts, the government failed to enforce a particular requirement or set thereof."). Therefore, the government was entitled to insist on all of the information identified in the contract.

Axion's contention that the contracting officer agreed to accept testing on fewer than 80 batteries is not supported. Axion's claims regarding the role of the QAR in the FAT process are dealt with later, however there is no evidence that the contracting officer expressly waived Axion's obligation to submit test data on 80 batteries. As discussed above, only the contracting officer could make changes to the contract and the contracting officer never authorized a reduction in the number of batteries to be tested. It is well-settled that in dealing with the government, a contractor may rely only on those authorized to bind the government. See Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947). The evidence does not show that the contracting officer stated that he would approve a report with results on fewer than 80 batteries. Rather, the record shows that when Mr. Latifi called Mr. Korab on September 9, 2002 and represented that Axion had tested around 80 batteries, Mr. Korab stated that no more testing was necessary. Axion's October 11, 2002 letter to Mr. Korab, Def.'s App. 207A.

> I talked to [Mr. Korab], and I said, "Mr. Korab, we have done this here, and they are all happy, and everything is okay. Do you want me to shoot some more?" "Mr. Hahin[18] said, '80 is good enough.'" "Do you want me to shoot some more?" And he said, "That's adequate."

---

[18] Although Mr. Latifi refers to a Mr. Hahin, Mr. Vartan was in fact the last QAR on site and the QAR who allegedly said that Mr. Latifi had done enough testing.

Latifi Depo., Pl.'s App. 1291.[19] Therefore, even accepting Axion's account of this conversation as true, it does not provide evidence that the contracting officer expressly authorized Axion to submit data on fewer than the 80 batteries required by the contract. In addition, there is absolutely no evidence in the record to suggest that the contracting officer agreed that Axion could pass FAT with 25 "failures."

In sum, because Axion failed to comply with FAT as set forth in the contract, the government was justified in finding that Axion had failed FAT and is entitled to summary judgment on count X of Axion's complaint.

**2. The Navy Never Approved the Second FAT (Count XI).**

In count XI, Axion alleges, in the alternative, that the Navy actually approved the second FAT when the QAR told Axion that it had completed enough tests. Axion claims that the Navy should be bound by the QAR's representation that Axion had successfully completed enough tests to pass FAT.

The government argues that it is entitled to summary judgment on count XI because, contrary to Axion's contentions, the Navy did not approve the second FAT when the QAR stated that Axion had done enough testing. The government argues that the contract neither provides for verbal approval of FAT nor authorizes the QAR to approve FAT. Specifically, the government argues that the contract's FAT clause establishes that the contracting officer is the official who approves or disapproves the FAT. Def.'s App.

[19] The government contends that Mr. Korab did not tell Mr. Latifi that he had shot enough batteries. Korab Depo., Def.'s App. 799.

62 ("[T]he Contracting Officer shall notify the Contractor, in writing, of the conditional approval, approval, or disapproval of the first article."). The government argues that, as provided by the following contract clause, the QAR does not have any authority to change the FAT process set forth in the contract:

> 5252.9400 AUTHORIZED CHANGES ONLY BY THE CONTRACTING OFFICER (JAN 1992)
>
> (a) Except as specified in paragraph (b) below, no order, statement, or conduct of Government personnel who visit the Contractor's facilities or in any other manner communicates with Contractor personnel during the performance of this contract shall constitute a change under the "Changes" clause of this contract.
>
> (b) The Contractor shall not comply with any order, direction or request of Government personnel unless it is issued in writing and signed by the Contracting Officer, or is pursuant to specific authority otherwise included as part of this contract.
>
> (c) The Contracting Officer is the only person authorized to approve changes in any of the requirements of this contract and notwithstanding provisions contained elsewhere in this contract, the said authority remains solely with the Contracting Officer. In the event the Contractor effects any changes at the direction of any person other than the Contracting Officer, the change will be considered to have been made without authority and no adjustments will be made in contract price to cover any increase in charges incurred as a result thereof.

Def.'s App. 11. The government argues that this clause is consistent with the long standing principle that the government may only be bound by those possessing actual authority. See Federal Crop Ins., 332 U.S. at 384. Therefore, the government argues, Axion's allegations that verbal communications between Axion and a government QAR on September 6, 2002 resulted in FAT approval are without legal merit.

In response, Axion contends that for the second FAT, as with the first FAT, Axion relied on the QAR's representations that a successful test had occurred to satisfy the contractual requirements.[20] Latifi Depo., Pl.'s App. 1293. With regard to the clause in the contract titled "Authorized Changes Only by the Contracting Officer," Axion relies on subsection (b), which states: "The Contractor shall not comply with any order, direction or request of Government personnel unless it is issued in writing and signed by the Contracting Officer, <u>or is pursuant to specific authority otherwise included as part of this Contract</u>." Def.'s App. 11 (emphasis added). Axion contends that the contract provides that "[a]cceptance or rejection shall be accomplished by the cognizant GQAR based upon his own inspection(s) and the results of the First Articles . . . from the testing activity . . . ." Def.'s App. 43.[21] Axion contends that, because the contract gave the government's QAR

---

[20] The government contends that the first FAT was approved through written communications between Axion and the contracting officer. Def.'s App. 187-189.

[21] The subject contract clause provides as follows:

> INSPECTION AND ACCEPTANCE
>
> Production Quality Assurance of all items to be furnished hereunder shall be made by the cognizant Government Inspector at the contractor's or subcontractor's plant.
>
> NOTE:
>
> Acceptance or rejection shall be accomplished by the cognizant GQAR based upon his own inspection(s) and the results of the First Articles . . . from the testing activity to the GQAR via Procurement Contracting Officer (PCO).

Def.'s App. 43.

the authority to accept or reject the production of units following first article testing, Mr. Vartan had the authority to accept Axion's second FAT. The government argues that this clause addresses "Production Quality Assurance" rather than the FAT approval process. As evidence that the FAT approval process is distinct from "Production Quality Assurance," the government argues that the contract designates First Article samples as "Preproduction Samples," Def.'s App. 2, which are separate from production quantities.

The court agrees with the government. Axion was bound by the contract to obtain the contracting officer's written approval of FAT. The contract did not allow Axion to rely upon the QAR. Therefore, even if the QAR told Axion that it had tested enough batteries to pass FAT, these statements did not amount to the Navy's approval of FAT. The QAR simply lacked authority under the contract to approve the second FAT. See Federal Crop Ins., 332 U.S. at 384. As such, the contracting officer was able to reject Axion's second FAT. The government is therefore entitled to summary judgment on count XI of Axion's complaint.

## III. Whether Axion's Termination for Default Was Excused

Axion asserts that even if the government's termination for default were supported, as the court has found, Axion's termination for default should be "excused" because of various government breaches. It is well-settled that once the court finds that a contractor has defaulted, it must next determine whether that default is "excusable." See Abcon v. United States, 49 Fed. Cl. 678, 687 (2001). If a contractor can show that the government's

improper actions were the controlling cause of the default, then the default will be excused and converted from a termination for default to a determination for convenience. Id. (citing TGC Contracting Corp. v. United States, 736 F.2d 1512 (Fed. Cir. 1984)). It is the contractor's burden to demonstrate that its failure was excusable. See Becho, Inc. v. United States, 47 Fed. Cl. 595, 600 (2000).

In this section the court addresses Axion's claims that its termination for default is excused because of the government's alleged breaches in connection with: (1) the plating, (2) the air gun, (3) the design of the batteries, and (4) the government's duty to cooperate during the second FAT. Accordingly, the court will determine whether the claims are barred by the releases and, if not, whether any of the claims would provide an "excuse" for Axion's failure to meet FAT.

### A. The Plating Claims

Axion claims that the government's breaches with regard to the plating caused the termination for default because Axion would not have had to conduct a second FAT if the government had met its contractual obligations regarding the plating specifications and the availability of plating for the batteries. Axion's claims with regard to the plating include: defective specifications, violations of the Spearin[22] and superior knowledge doctrines, and a breach of the duty to cooperate.

[22] Under the Spearin doctrine, "where the government authors the specifications, it warrants that, if they are complied with, satisfactory performance will result." See Natus Corp. v. United States, 371 F.2d 450, 455 (Ct. Cl. 1967) (citing United States v. Spearin, 248 U.S. 132 (1918) and R.M. Hollingshead Corp. v. United States, 124 Ct. Cl. 681 (1953)).

More specifically, Axion alleges that the Navy erroneously provided Axion with the 1967 version of NAVORD OD 18332, the plating specification, when the 1967 version was defective and had been replaced by later versions. Axion contends that the Navy's failure to provide the proper version of NAVORD OD 18332 amounted to a breach of contract for defective specifications, the duty to cooperate, and violated the Spearin doctrine.

The government argues that all of the claims associated with the plating specifications were known and identified before Axion signed the first of the releases in modification P00017 and therefore the claims are barred. The record shows that Axion requested the "1980" version of NAVORD OD 18332 on May 22, 1996, Def.'s App. 766, more than five years before Axion signed the first release. The record further shows that Axion told the Navy that it believed that NAVORD OD 18332 was defective in November 2000, Def.'s App. 190, nearly a year before it signed the first release. Similarly, Axion's Spearin claim predates the release. Contrary to Axion's contentions, Mr. Korab wrote to Axion in November 2000 stating that NAVORD OD 18332 was a "guideline" and that Axion was not precluded from "altering the process." Def.'s App. 192.

Based on the foregoing undisputed evidence, the court agrees with the government that the above-noted plating claims are barred by the releases signed by Axion in modifications P00017, P00019 and P00020. Axion was aware of these claims and could have preserved them before signing the modifications that contained the releases in which

Axion agreed to a contract completion date and to perform a second FAT. These claims cannot therefore serve as an "excuse" for Axion's failure to meet FAT.

Axion's additional claim regarding "superior knowledge" is similarly flawed. Axion claims that the government knew but did not reveal to Axion the fact that Axion would not be able secure plating from domestic sources in the United States and that Axion would therefore have to incur the expense of creating a plating line. Axion notified the government that it had built a plating line on August 22, 2001, prior to signing the first modification. Indeed, Axion informed the government that building a plating line had cost an "outrageous" amount of money. Def.'s App. 756-758. Nonetheless, Axion did not preserve the claim when it signed the first modification with a release in October 2001. As such, the claim is barred.

In view of the foregoing, Axion's breach claims associated with the plating and the need to perform a second FAT predate the first release and therefore cannot serve as an "excuse" for Axion's failure to meet FAT. These claims do not provide a basis for converting the termination for default to a termination for the convenience.

**B. The Air Gun Claims**

Axion contends that the termination for default is "excused" by the government's breaches in connection with the air gun. Axion charges that (1) the government had superior knowledge regarding the air gun which it intentionally failed to share with Axion; and (2) the government failed to cooperate with Axion in Axion's efforts to produce or

obtain an air gun.

The government argues that the claims related to the air gun are covered by the releases Axion signed in modifications P00017, P00019, and P00020 because these claims both predate the modifications. It is not disputed that Axion asked the Navy for an air gun in January 1996 and was told that one would not be provided. Eventually, Axion produced the air gun it used to pass the first FAT in 1999. Axion did not preserve any claims regarding the air gun in the releases it signed in modifications P00017, P00019 and P00020. Accordingly, the government argues that these claims may not serve as an "excuse" for Axion's termination for default.

The court agrees with the government. The air gun claims predate the releases and the claims were not preserved. Therefore, the above-cited air gun claims cannot serve as an excuse for Axion's termination for default.[23]

[23] Furthermore, even if Axion's claims that problems with the air gun kept Axion from meeting the second FAT were not barred, this "excuse" would not be valid. Axion was responsible for testing under the contract. Def.'s App. 109. Axion passed the first FAT using its air gun. Prior to the second FAT, the government had offered to test Axion's batteries at a cost, but Axion chose to use its own air gun to test the batteries. Indeed, in letters to the contracting officer, Axion expressed confidence in its air gun. Letter dated April 15, 1997, Def.'s App. 185; Letter dated August 27, 2001, Def.'s App. 194 ("Axion has improved the product by developing the complete Air Gun and complete automated wireless data collection by developing a 1-inch by 2-inch computer placed on board of "flying Bird" to collect the data."). Therefore, if Axion failed to meet the second FAT because its air gun was not working properly, Axion bears responsibility for that failure. To the extent Axion failed the second FAT because of problems with the air gun, the government's actions in connection with Axion's efforts to procure or manufacture the air gun were not the cause of Axion's problem. Because the Navy made the test equipment a contractor responsibility under this contract (in contrast to the Army providing an air gun to its contractors), the fact that the Navy counted "no tests" as failures was not unreasonable, especially where there is no evidence that Axion substituted a new battery for a "no test."

### C. The Effect of the Leakage in the Batteries

Axion contends based on Dr. Baird's expert report that the government's specification for manufacturing the batteries was defective.[24] Specifically, Axion contends

---

Therefore, the government's actions, even if established, go to Axion's damages in securing an air gun. The government is in no way responsible for the quality of Axion's air gun. If Axion's air gun did not work properly, the fault lies with Axion, not the government. Therefore, Axion's air gun claims would not provide an "excuse" for Axion's failure to meet FAT.

[24] Dr. Baird provides the following opinions in his expert report:

> Opinion #1: It was impossible for Axion to comply with the non-operational requirement of Subsection 3.3.2.3 of drawing 11744726 that there be no leaking of methylene bromide. Leaking was inevitable because the specification requires copper-beryllium cutter blades to come into contact with the copper housing of the methylene ampule. Over time, the contact results in galvanic corrosion that facilitates leakage of the methylene bromide.

Pl.'s App. 339.

> Opinion #2: Inasmuch as the specification required no leakage of methylene bromide, the specifications for the PS-115 were defective. Leakage was inevitable, because the specification requires copper-beryllium cutter blades to come into contact with the copper housing of the methylene bromide ampule. Over time, the contact results in galvanic corrosion thus facilitating leakage of the methylene bromide.

Pl.'s App. 340.

> Opinion #3: It was impossible for Axion to comply with the non-operational requirement of Subsection 3.3.2.2 of drawing 11744726 that there be no leakage of fluoboric acid. Over time, the corrosion resulting from the fluoboric acid coming in contact with the copper diaphragm would facilitate leakage of fluoboric acid.

Pl.'s App. 341.

> Opinion #4: Inasmuch as the specification prohibited leakage of fluoboric acid, the specification was defective. Over time, the corrosion resulting from the fluoboric acid coming in contact with the copper diaphragm would facilitate leakage of fluoboric acid.

that the specification caused the leakage of fluboric acid, an electrolyte, which can cause the output voltage of the batteries to decrease below the desired levels. Axion relies on Dr. Baird's findings, which he stated in his deposition, "[F]luoboric acid is an electrolyte . . . . [I]f you drain out the electrolyte, the circuit is broken, because the ionic conducting part of the closed circuit is removed." Pl.'s App. 1221. Axion contends that because of this design flaw Axion could not meet the second FAT. Axion argues that even though the leakage was one of the reasons that the government required a second FAT, the government's FAT process looked solely at voltage and activation time and did not consider whether corrosion or leakage contributed in any way to low voltage results and therefore Axion's high failure rate.

In response, the government argues that Axion's allegation that defective specifications caused the batteries to leak is covered by the release. The government relies on the fact that Axion told the Navy that the batteries were corroding in a letter dated August 27, 2001, prior to Axion signing the first modification containing a release. Def.'s App. 194-195. Accordingly, the government states that the claim cannot serve as an "excuse" for Axion's failure to meet FAT.

The court agrees with the government that Axion's claim regarding the allegedly defective specification causing leaking of the batteries, which in turn may have affected the voltage of the batteries, is barred by the release as a potential "excuse" for its failure to

---

Pl.'s App. 342.

meet FAT. Axion alleged that the government's specification was defective and caused the leakage prior to signing the modifications containing the release. In its August 27, 2001 letter to Mr. Korab, Axion stated:

> The design requires Axion to put Acid in copper cans, which is a chemical fact, the acid will eventually dislove [sic] the copper. We are experiencing this phenomenon at this time. We have over thousands of copper cans that have been filled with acid and welded and started leaking on the surface of the diaphragms.

Def.'s App. 194. Because Axion did not reserve its claims regarding the specifications causing leakage prior to signing the modifications containing the releases, Axion cannot rely on these claims as an "excuse."[25]

### D. Duty To Cooperate During the Second FAT (Count XII)

Finally, in count XII, Axion alleges that its failure to meet FAT is excused by the government's breach of its duty to cooperate during the second FAT. In particular, Axion

[25] Furthermore, even if Axion's claims related to the allegedly defective specifications having caused leakage were not barred by the release, the claim does not provide Axion with an "excuse" for failing FAT. In support of this alleged "excuse," Axion relies on the report and deposition of Dr. Baird. Dr. Baird's expert report and deposition are not sufficient to establish an "excuse" for Axion failing to meet FAT. Dr. Baird states that because of the battery design the batteries "would leak within five years," and that the loss of electrolyte from this leaking would "make the PS-115 inoperative" and that "the battery would be unlikely to produce the 23.0 V specified by [the contract]." Pl.'s App. 343. Likewise, in his deposition, Dr. Baird stated, "So if you drain out the electrolyte, the circuit is broken, because the ionic conducting part of the closed circuit is removed." Pl.'s App. 1221. All of Dr. Baird's statements go to future events. Nowhere does Dr. Baird state that the reason Axion failed to meet FAT was because the subject batteries were leaking and thus the voltage was not adequate. At best, Dr. Baird raises issues regarding whether Axion would have been able to produce batteries that would meet the contract requirements in the long term. Pl's App. 343 ("The specification used in [the contract] is not capable of a shelf life of 20 years."). In such circumstances, Axion has failed to demonstrate that problems with battery design "excused" Axion from failing FAT.

claims that it had been misled by the on-site QAR, Mr. Vartan, to believe that it had tested enough batteries, and that it had understood that if more tests were needed, the QAR would return before the FAT report was due on Monday, September 9, 2002.[26] Mr. Latifi stated in his deposition:

> Mr. Vartan came two days, Thursday and Friday. And the Friday – which we proceeded [] to test – and he decided that we shot enough, that there was no reason to continue. We had 31 continuous good test results, and he saw there was no reason to proceed anymore.
>
> So he went and called Mr. Korab and asked him should – that he don't see any reason to proceed anymore, destroying good units. And he didn't get Mr. Korab, and he called his boss – his name is Steve somebody – and asked him to get ahold of Mr. Korab and tell us what to do – that there was no reason for shooting those things – we already shot 90, and now we shoot 30 pieces over that – so what they want us to do?
>
> So he waited for at least an hour or so, and nobody answered, so he is going to go, and if they want to come back, he will come back Monday. We still had a lot to shoot if they want us to shoot. But he did not come back Monday.

Latifi Depo., Pl.'s App. 1293. Axion further alleges that it confirmed with the contracting officer on Monday, September 9, 2002, that it had tested enough batteries.

Axion contends that, because the QAR did not return, Axion was unable to do any additional testing to meet the contract requirements nor could it substitute new batteries for the "no tests." Axion argues that the government's refusal to allow Axion to continue

---

[26] Axion also contends that the government breached its duty to cooperate by providing defective specifications for the plating and by failing to provide drawings for Axion to use in manufacturing the air gun. As discussed above, the court holds that Axion released its claims regarding the plating and air gun; therefore, the court does not consider these claims here.

testing the units, and its misrepresentation that an adequate number of units had been tested, constitutes a breach of its duty to cooperate. Axion relies on Renda Machine, Inc. v. United States, 71 Fed. Cl. 378, 387 (2006), for the proposition that the duty to cooperate is encompassed within the duty of good faith and fair dealing implied in every government contract. Axion also relies on Orlosky, Inc. v. United States, 68 Fed. Cl. 296, 311 (2005) for the proposition that the duty to cooperate is an affirmative duty. "Not only must the Government refrain from hindering the contractor's performance, it must do whatever is necessary to enable to contractor to perform." Id. (quoting Lewis-Nicolson, Inc. v. United States, 550 F.2d 26, 32 (Ct. Cl. 1977)). Axion relies on the reasoning of the Federal Circuit in Malone v. United States, 849 F.2d 1441, 1445 (Fed. Cir. 1988), which held that the government breached its duty to cooperate where the contracting officer misled the contractor into believing that an exemplar was acceptable when the contracting officer did not clearly inform the contractor of the exemplar's failings.

While the government does not contend that this claim is barred by the general release, the government argues that it is nonetheless entitled to summary judgment on the ground that the government did not breach its duty to cooperate during the testing for FAT. The government relies on TECOM, Inc. v. United States, 66 Fed. Cl. 736, 770 (2005), for the proposition that the implied duty to cooperate prohibits the government from substantially impeding contractor performance by acting in an evasive or untimely

manner.[27] The government argues that Mr. Korab did not agree to having Axion submit data on fewer than 80 batteries. The government also contends that the government QAR's departure from Axion on the afternoon of Friday, September 6, 2002 did not constitute a breach of any government obligation. The government argues that between the time that the parties agreed to modification P00020, on July 11, 2002, and the September 9, 2002 deadline for the FAT report, a government QAR was present at Axion to observe FAT on more than a dozen occasions, including the afternoon of Friday, September 6, 2002, the last working day prior to the September 9, 2002 deadline. The government contends that the Navy had no duty to make a QAR available over the weekend, nor did Axion request that a QAR be present over the weekend. Nonetheless, the government does not submit any evidence to dispute Mr. Latifi's recollection of Mr. Vartan's actions or statements. In his declaration, Mr. Stickrod, the QAR who had observed FAT testing at Axion's facility through September 4, 2002, states that he had no "first hand knowledge of what transpired after Mr. Vartan began observing the testing." Def.'s App. 363.

---

[27] While the TECOM court cited a case in which the court held that the government had "substantially impeded [the contractor's] ability to perform," 66 Fed. Cl. 770 (quoting Abcon Assocs., 49 Fed. Cl. at 689), and another case regarding a contracting officer's responses to a contracting officer's requests "in an evasive or untimely manner," id. (citing Malone, 849 F.2d at 1445-46), the standard the government attributes to TECOM is not the standard set forth by the TECOM court for a breach of the duty to cooperate. Rather, TECOM provides that the duty of good faith and fair dealing requires "that neither party will do anything that will hinder or delay the other party in performance of the contracts," id. (quoting Essex Electro Engineers, Inc. v. Danzig, 224 F.3d 1283, 1291 (Fed. Cir. 2000)), and that such a breach is to be "assessed under a reasonableness standard." Id.

Whether the government breached its duty to cooperate is to be judged by a reasonableness standard, which is a factual inquiry. "Breach of the duty to cooperate is assessed under a reasonableness standard, and depends upon 'the particular contract, its context, and its surrounding circumstances.'" Tecom, 66 Fed. Cl. at 770. "The specifics of the parties' duties under this covenant are dependant on the particular circumstances of the case." Orlosky, 68 Fed. Cl. at 311 (citing Milmark Servs., Inc. v. United States, 731 F.2d 855, 859 (Fed. Cir. 1984). See also John Cibinic, Jr., Ralph C. Nash, Jr., and James F. Nagle, Administration of Government Contracts, 305 (4th ed. 2006).

To the extent that the government QAR's actions may have been unreasonable, the Federal Circuit's decision in Malone, 849 F.2d at 1445, provides an analogous situation. In Malone, the court held that the government had breached its duty to cooperate when the contracting officer did not clearly state on inspecting an exemplar whether he accepted it, which led the contractor to rely on a workmanship standard that the contracting officer eventually found unacceptable. Id. Similarly, here, Axion alleges that it relied on the statement of the QAR and the contracting officer that it had tested enough batteries, and that the departure of the QAR did not permit Axion to test a sufficient number of batteries to satisfy FAT. Whether Axion's reliance on the QAR and the conversations thereafter with the contracting officer was reasonable and prevented it from passing the second FAT depends on what Mr. Vartan and Mr. Korab said, which is in dispute.

Axion's claim that the government breached its duty to cooperate raises a material

issue of fact which precludes summary judgment on count XII.[28]

## CONCLUSION

For the foregoing reasons, the government's motion for summary judgment is **GRANTED-IN-PART** and **DENIED-IN-PART** and Axion's motion for summary judgment is **DENIED**. The court holds that Axion's counts I-IX and XIII-XXIX are barred by the release contained in modifications signed by the parties, and that the government is also entitled to summary judgment on counts X-XI. However, the court holds that summary judgment is precluded on count XII and on the issue of whether Axion's failure to meet FAT was excused based on the government's alleged breach of its duty to cooperate during the second FAT. The court will contact the parties to resolve this remaining issue in the litigation.

**IT IS SO ORDERED.**

**s/Nancy B. Firestone**
NANCY B. FIRESTONE
Judge

[28] The government argues the termination for default would nonetheless be justified because the government rejected Axion's second FAT report for reasons that had nothing to do with the QAR – specifically, that Axion's FAT report did not provide the testing procedures required under the contract. However, the court finds that this deficiency alone would not necessarily have been a valid basis to terminate the contract for default if such defects were "minor in nature and capable of correction within a reasonable period of time." See Appeal of Hurt's Printing Co., 1994 WL 275098 (G.P.O.B.C.A. Jan. 21, 1994) (citing Radiation Tech., Inc. v. United States, 366 F.2d, 1003, 1006 (Ct. Cl. 1966)).