**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **AXION CORPORATION,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 03-2644C & 04-297C** |
| | ) | **(Judge Firestone)** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**AXION CORPORATION'S**
**MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

**COMES NOW** Plaintiff Axion Corporation ("Axion") and submits this Memorandum of Contentions of Fact and Law. While herein Axion provides a concise statement of the facts it expects to establish at trial, Axion is mindful that the Court has already carefully reviewed many previous filings by the parties that provided a more extensive look at the facts giving rise to this action and the applicable law. Thus, in this memorandum, Axion focuses on only the central issues concerning the remaining claims.

## STATEMENT OF FACTS

### I. Axion's Summary of Contentions of Fact.

#### A. Background.

As the Court knows, on December 14, 1995, Axion entered into a fixed price contract with the Naval Inventory Control Point (the "Navy") for the manufacture and delivery of batteries to be used in Navy munitions (the

"Contract"). The Contract called for the delivery of 540 first article units within 90 days of the contract award date, with the delivery of 55,209 batteries (exclusive of first article samples, production lot samples, and option quantities) to be delivered in increments. The first production lot was due within 90 days after the approval of first article testing, which would have been during the summer of 1996.

During the procurement phase of the Contract, Axion learned that the Government had provided an air gun to a previous contractor for use in testing the batteries. However, when Axion requested an air gun, the Government refused to provide the testing equipment. Thus, Axion was forced to develop an air gun in support of the Contract. Axion's air gun consisted of a long tube in which a vacuum is created through the use of an air pump, and a piece of plastic in which a battery is encapsulated for testing. The battery is placed in the open end of the tube, and the tube is then closed and the vacuum turned on. The air gun creates the effect of the battery being in a munition and shot out of a large bore weapon. A computer records the required test data.

As was discussed in greater detail in the parties' briefs on summary judgment, due to delays associated with the air gun and plating used in performing the Contract, Axion received several extensions of the first article delivery schedule from the Navy. On April 12, 1999, Axion delivered its FAT Report to the Navy, and the Navy approved the report on May 17, 1999. During testing in support of the first article test, Axion was allowed to replace batteries for which

insufficient data was collected with new batteries such that Axion tested many more units than its report reflected. The Navy approved of this process during the "first" first article testing.

After approval of the first article, Axion once again experienced delays (due to no fault of Axion) that required extension of the delivery date to August 8, 2001. Due to the inability of Axion to continue its business relationship with a supplier of the plating required to manufacture the batteries, Axion was forced to manufacture the plating itself. As a result of this change, the Government required a new first article test. Pursuant to Modification P00017, Axion was required to submit a second first article sample of 120 batteries. Subsequent modifications reduced the required number of first article units to 80 batteries, and set a delivery date for the second FAT Report of Monday, September 9, 2002.

**B. Second First Article Testing.**

Although Axion had experienced significant problems with its air gun test equipment throughout the contract, by September of 2002 it was able to consistently test batteries and successfully provide test data. During the first and second "first article" testing, a Government Quality Assurance Representative ("QAR") was required to be on-site at Axion while the testing took place. Henry Stickrod ("Stickrod") was the QAR who was present at Axion during most of the testing. During the week leading up to September 9, 2002, the due date for Axion's second FAT Report, Stickrod corresponded with John Korab ("Korab"), the Contracting Officer, verifying that Axion was able to test the batteries with

very few problems, and that a majority of the problems that arose were due to the air gun and other test equipment and not to the functionality of the batteries. In fact, Stickrod notified Korab just 3 days before the second FAT report was due that Axion had successfully tested 90 batteries and that successful tests could be accomplished "at will." Stickrod further indicated to Korab that Axion was able to test three to four batteries per hour. Thus, during the days leading up to the due date for Axion's second FAT report, Axion stood ready to shoot as many batteries as the Navy required for first article approval, and had in fact already successfully tested more than the 80 units required under the Contract modifications.

On Friday, September 6, 2002, Stickrod, the QAR who normally observed Axion's testing of the batteries, was unable to attend testing due to a previously scheduled conflict. However, Charles Vartan ("Vartan"), a government employee who worked with Stickrod, was sent to Axion on September 6 to observe that day's tests. Vartan accompanied Stickrod to Axion's facility the previous day and was aware of Axion's requirements under the Contract.

During his visits on September 5 and 6, Vartan witnessed Axion successfully test 31 batteries. On the afternoon of September 6, Vartan indicated to Alex Latifi ("Latifi"), the Chief Executive Officer of Axion and the engineer who was conducting the battery tests, that a sufficient number of batteries had been tested and that there was no need to continue to destroy the batteries. Vartan then made a phone call to Korab to notify him that Axion had tested enough batteries, but Korab was not available. Vartan then called his supervisor and

asked that he get in touch with Korab. After waiting an hour for Korab to call, and without shooting any more units, Vartan told Latifi that he was leaving, but if the government felt it needed to come back he would return to Axion Monday for further testing. No government representative returned to Axion.

On Monday, September 9, the date that Axion's second FAT report was due, Latifi called Korab to discuss the battery testing, and Korab told Latifi that he had tested a sufficient number of units. Korab also indicated that submission of test data on "around 80 units" was sufficient. After this conversation, believing that Axion had tested a sufficient number of units and that the government was satisfied with the results, Axion tested no more units and submitted the data it had collected.

### C. Communications After Axion Submitted Its Second FAT Report.

Despite the government's representations to Axion regarding the sufficiency of its test results, on October 1, 2002, Korab sent a letter to Axion indicating that Axion's second FAT report did not satisfy the contract in that 25 of the batteries tested failed to meet the performance requirements of the Contract. Korab further indicated that Axion had failed to provide certain required information related to test procedures and equipment. In response, Latifi, on behalf of Axion, sent a letter to Korab indicating that he believed Axion had met the requirements of the contract. Latifi further explained that Axion did not continue testing because it believed that Vartan was satisfied with the testing he

witnessed and that no more testing was required. Axion offered and stood ready to test more batteries, but the Government terminated the contract on November 12, 2002, stating that the termination was based on Axion's second first article units failing to meet the requirements of the Contract and for the lack of information pertaining to test procedures, test equipment, and data analysis in the second FAT report.

By terminating the contract for default after representing to Axion that it has tested a sufficient number of batteries, that no further testing was required, and that the submission of data on "around 80 units" would be acceptable, the Government acted in bad faith. Further, the refusal to allow more testing after Axion explained that it stood ready to test more batteries, coupled with the government's knowledge that a majority of the failed tests were caused by air gun problems, shows the government's unwillingness to cooperate with Axion in its attempts to fully perform the Contract. Accordingly, the government's termination of the contract for default should be converted to a termination for convenience, and Axion should recover the costs it incurred in performing the Contract.

## II. Summary of Axion's Position With Respect To Defendant's Expected Contentions of Fact.

Axion expects the Navy to present testimony in an attempt to show that Vartan and Stickrod never told Latifi and Axion that it had successfully shot a sufficient number of units to comply with the requirements of the Contract.

However, other than this testimony, which varies widely, the Navy has no independent evidence to support these witnesses' assertions. Rather than rely on these statements, the Court should place more credibility in Axion's position. As of Friday, September 6, 2002, Axion unquestionably stood ready to shoot any number of batteries that it would have taken to satisfy the Government's on-site QAR as well as the requirements of the Contract. Further, Axion could have continued testing the batteries on September 9, 2002, before submitting its second FAT Report. Instead, Axion, relying on Vartan's representations, stopped testing batteries, and ultimately the Government terminated the contract for default based on a lack of information and test data that Axion was ready and willing to provide. The Navy has no evidence to dispute Latifi's contention that Axion was ready, willing, and able to do more testing.

The Navy will also likely present testimony that Axion never requested a government representative be present during the weekend for testing. This position is illogical, as Axion had no reason to request the presence of a representative to observe testing where Axion had been told that it had tested enough batteries. When Vartan left on Friday, September 6, he simply stated that if he needed to come back he would. No government representative returned, and on Monday, September 9, Latifi verified in a phone conversation with Korab that Axion had successfully tested a sufficient number of batteries. At that point, Axion obviously had no reason to request further testing.

Finally, Axion expects the Government to present evidence, in an attempt to justify the termination for default, showing that Axion did not strictly comply with its contractual requirements to provide information related to test procedures, test equipment, or data analysis that pertains to the performance requirements. While Axion does not deny that the contract requires that such information be provided, it did not provide this information in its first FAT report, and then the first article report was accepted without any indication from the government that the report was insufficient. In fact, the first FAT report and the second FAT report contained nearly identical information. Nevertheless, the Government terminated the Contract for default based, in part, on Axion's failure to provide the stated information. The Court should discredit the Government's attempt at justifying its termination of the contract based on these facts due to the procedure the Government established in accepting the first FAT report.

**STATEMENT OF ISSUES OF FACT AND LAW**

1. Did the Government QAR, Vartan, represent to Latifi on Friday, September 6, 2002, that Axion had successfully tested enough batteries to comply with Axion's first article testing requirements under the Contract?

2. Did Vartan call Korab on the afternoon of Friday, September 6, 2002, to verify that Axion had successfully tested a sufficient number of batteries?

3. Did Vartan tell Latifi on Friday, September 6, 2002, that he would return to Axion if further testing was required?

4. Did the contracting officer, Korab, tell Latifi on September 9, 2002, that submission of data on around 80 units was sufficient to meet Axion's requirements under the Contract?

5. Could Axion have continued testing batteries from September 6, 2002, to September 9, 2002, such that it would have been able to provide the government with test data that would have met the requirements of the Contract?

6. Did the Navy breach its duty to cooperate with Axion in the performance of the Contract by notifying Axion that it had tested a sufficient number of batteries and had met the requirements of the contract and then terminating the Contract based on a lack of test data and an insufficient number of test units?

7. Upon termination of the Contract for the government's convenience, what amount of money is owed to Axion by the Navy?

## STATEMENT OF APPLICABLE LEGAL PRINCIPLES

Axion claims that the Navy breached its duty to cooperate by preventing Axion from continuing testing of the batteries that would have allowed Axion to meet its requirements under the Contract. As the Court knows, in every government contract, the Government has a duty to cooperate with the contractor. "The implied duty to cooperate is encompassed within the duty of good faith and fair dealing implied in every government contract." Renda Marine, Inc. v. United States, 71 Fed. Cl. 378, 387 (2006). "Every contract, as an aspect of the duty of good faith and fair dealing, imposes an implied obligation that neither party will

do anything that will hinder or delay the other party in performance of the contract." Essex Electro Engineers, Inc. v. Danzig, 224 F.3d 1283, 1291 (Fed. Cir. 2000). "Not only must the Government refrain from hindering the contractor's performance, it must do whatever is necessary to enable the contractor to perform." Orslosky, Inc. v. United States, 68 Fed. Cl. 296, 311 (2005)(quoting Lewis-Nicholson, Inc. v. United States, 550 F.2d 26, 32 (Ct. Cl. 1977)).

In considering whether the Navy breached its duty to cooperate, the Court must determine whether Axion was reasonable in relying upon Vartan's and Korab's statements that Axion had successfully completed testing a sufficient number of batteries. "Breach of the duty to cooperate is assessed under a reasonableness standard, and depends upon 'the particular contract, its context, and its surrounding circumstances.'" Tecom, 66 Fed. Cl. at 770. "The specifics of the parties' duties under this covenant are dependant on the particular circumstances of the case." Orlosky, 68 Fed. Cl. at 311 (citing Milmark Servs., Inc. v. United States, 731 F.2d 855, 859 (Fed. Cir. 1984).

The Federal Circuit's decision in Malone v. United States, 849 F.2d 1441 (Fed. Cir. 1988) provides a look at a situation similar to that experienced by Axion. In Malone, the government's termination of default was converted to a termination for convenience where "[t]he [Contracting Officer] was evasive when he did not clearly state on inspecting the exemplar in December 1983, whether or not he accepted it. He further misled Malone to rely on the exemplar as a workmanship standard by failing to object to Malone's continued performance, by

continuing to make progress payments to Malone, and by refusing until June, 1984, to answer Malone's explicit question concerning whether the standard of workmanship had changed." Malone, 849 F.2d at 1445. Similarly, Axion relied on the government QAR, Vartan, when he stated that Axion had successfully completed a sufficient number of tests to comply with the requirements of the Contract. Vartan also indicated that if further testing were required, he would return. Finally, the contracting officer, Korab, told Latifi on September 9, 2002, that he could submit data on "around 80 units." Much like the contractor in Malone, Axion reasonably relied on the statements of the government representatives, and because of the Navy's breach of its implied duty to cooperate, Axion is entitled to a conversion of the termination of its contract for default to a termination for the Government's convenience.

Upon conversion of the termination for default to a termination for the government's convenience, Axion is entitled to be reimbursed for the costs it incurred in performance of the Contract, along with the costs associated with preparing its termination settlement proposal. Astro Dynamics, Inc., ASBCA No. 41825, 91-2 BCA par. 23807 (stating that "upon conversion of a termination for default to a termination for convenience of the Government, the fixed price contract is essentially converted in to a cost reimbursement contract and appellant becomes entitled to recover its allowable costs in performance of the terminated contract."); See also FAR 52.249-2(g). However, Axion's recovery cannot exceed the total contract price of $1,313,974.20. FAR 52.249-2(f). Thus, Axion is

entitled to recover $1,313,974,20, less progress payments of $512,365.00, plus $60,999.00 in settlement expenses, for a total of $862,608.20.

Axion expects the Navy to argue that Axion was in a loss situation under this Contract and accordingly cannot recover a profit, and that its recovery for costs must be reduced. "The fact that a contract appears to be in a loss position at the time of termination does not necessarily mean that a loss adjustment applies." McDonnell Douglas Corp. v. United States, 37 Fed. Cl. 270, 273 (1996). "It is [the Government's] burden to prove that plaintiffs would have sustained a loss on the entire contract." McDonnell Douglas, 37 Fed. Cl. at 274; see also Specon, Inc., ASBCA 29137, 86-3 BCA ¶ 19,163 at 96,855, 1986 WL 221146; Wolfe Constr. Co., ENGBCA 5309, 88-3 BCA ¶ 21,122 at 106,655, 1988 WL 100976; John Cibinic, Jr. & Ralph C. Nash, Jr., Administration of Government Contracts 1129 (3d ed. 1994). Furthermore, "when a contract is terminated for convenience, th[e] requirement to disallow profit in a case of loss is not applicable to situations in which the Government substantially contributed to the increased costs and it is not possible to separate that portion of the loss from possible losses caused by the contractor." Astro Dynamics, Inc., ASBCA No. 41825, 91-2 BCA par. 23807. Accordingly, due to the Government's failure to share its superior knowledge that Axion would be required to build an air gun and a plating line to perform the contract, and its refusal to provide accurate specifications to assist Axion in building the air gun and plating line, the Government substantially contributed to

the increased costs of performing the Contract, and the "loss rule" that would reduce Axion's recovery is inapplicable in this action.

**ATTORNEYS OF RECORD:**

/s/ Richard J.R. Raleigh, Jr.
**RICHARD J.R. RALEIGH JR.**
**MARCUS A. HUFF**
**WILMER & LEE, P.A.**
100 Washington Street, Suite 200
Huntsville, Alabama 35801
(256) 533-0202 Telephone
(256) 533-0302 Facsimile
E-mail: rraleigh@wilmerlee.com
mhuff@wilmerlee.com

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been furnished this 26th day of March, 2007, by U.S. Mail, postage prepaid and properly addressed to:

Douglas K. Mickle
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530

Richard Martinelli
Office of Counsel
Naval Inventory Control Point
Mechanicsburg, PA 17055-0788

/s/ Richard J.R. Raleigh, Jr.
**COUNSEL FOR PLAINTIFF**